UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

United States of America and States of the United States,
ex rel. Patrick Donohue,

                                Plaintiffs,

                -against-

[UNDER SEAL],

                                Defendants.

-----------------------------------------------------------------------x

**1:20–CV–5396 (GHW)**

**<u>SECOND AMENDED
COMPLAINT</u>**

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x
United States of America and States of the United States,
ex rel. Patrick Donohue,

                                        Plaintiffs,                          **1:20–CV–5396 (GHW)**

                                                                             <u>**SECOND AMENDED**</u>
                                                                             <u>**COMPLAINT**</u>

                        -against-

**RICHARD CARRANZA**, in his official capacity as                            **FILED UNDER SEAL**
the former Chancellor of New York City Department of                        **PURSUANT TO**
Education,

**MEISHA PORTER,** in her official capacity as the current                  **31 U.S.C. § 3730(b)(2)**
Chancellor of the New York City Department of Education,

**NEW YORK CITY DEPARTMENT OF EDUCATION,**

**NIAGARA FALLS PUBLIC SCHOOL DISTRICT,**

**MARK LAURRIE,** in his official capacity as Superintendent,

**BUFFALO PUBLIC SCHOOL DISTRICT,**

**KRINER CASH,** in his official capacity as Superintendent,

**MASSACHUSETTS DEPARTMENT OF EDUCATION,**

**SOMERVILLE PUBLIC SCHOOL DISTRICT,**

**MARY SKIPPER,** in her official capacity as Superintendent,

**JEFFREY C. RILEY**, in his official capacity
as Superintendent,

**STAMFORD PUBLIC SCHOOL DISTRICT,**

**DR. TAMU LUCERO,** in her official capacity
as Superintendent,

**CHICAGO PUBLIC SCHOOL DISTRICT,**

**JOSE M. TORRES, PhD,** in his official capacity
as Superintendent,

**LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT,**

**SCOTT A. ZIEGLER,** in his official capacity as
Superintendent,

**CAMDEN CITY PUBLIC SCHOOL DISTRICT,**

**KATRINA McCOMBS,** in her official capacity as
Superintendent,

2

**LOS ANGELES UNIFIED SCHOOL DISTRICT,**

**AUSTIN BEUTNER,** in his official capacity as
Superintendent,

**SAN DIEGO UNIFIED SCHOOL DISTRICT,**

**DR. LAMONT A. JACKSON,** in his official capacity
as Superintendent, and

**CINDY MARTEN**, in her official capacity as former
Superintendent,

**WAKE COUNTY PUBLIC SCHOOL DISTRICT,**

**CATHY QUIROZ MOORE**, in her official capacity as
Superintendent,

**AUSTIN INDEPENDENT PUBLIC SCHOOL DISTRICT,**

**STEPHANIE S. ELIZADE,** in her official capacity as
Superintendent,

Defendants.

-----------------------------------------------------------------------------x

## PRELIMINARY STATEMENT AND NATURE OF THIS ACTION

**COMES NOW**, Patrick Donohue ("Relator Donohue"), files this second amended

complaint and brings this *qui tam* action on behalf of the United States of America ("United

States") and the States of the United States along with the District of Columbia, (collectively, the

"Government"), against RICHARD CARRANZA, in his official capacity as the former

Chancellor of New York City Department of Education ("Defendant CARRANZA"), MEISHA

PORTER, in her official capacity as current Chancellor of the New York City Department of

Education ("Defendant PORTER"), the New York City Department of Education ("NYC DOE"),

the City of New York ("NYC"), and other above-named Defendants under the federal False

Claims Act, 31 U.S.C. § 3729-3733, ("FCA") as well as the corresponding state false claim

statutes, including but not limited to: the New York False Claims Act; the New York City False

Claims Act (Local Law 53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145

et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud); Mass. General Laws Ch. 12, §5(B) et seq.; CT GEN. STAT. §4-275; 740 ILCS §175, et seq.; VA. CODE ANN. §8.01-216.3, et seq.; N.J. STAT. ANN. §§ 2A:32C-1—32C-18; CAL. GOV. CODE § 12650 et seq., N.C.G.S. §§1-605 through 617, et seq.; TEX. HUM. RES. CODE § 32.039(b); TEX. HUM. RES. CODE § 36.002 (13); and alleges upon his first-hand knowledge as follows:

## <u>INTRODUCTION</u>

1.   This is an action brought to recover taxpayer dollars spent as a result of Defendants' fraudulent conduct. Specifically, above-named Defendants conducted related services for students with disabilities via telehealth and/or via phone, contrary to the Medicaid and IDEA/Title I billing requirements, and submitted for reimbursement of same by misrepresenting that such services were in compliance with the relevant State and federal laws.

2.   Due to the profound nature of their disabilities, known to both the Defendants and related providers, these students were unable to meaningfully participate in these remote "sessions," yet Defendants fraudulently billed for these "sessions" through Medicaid at their regular, full rates. Defendants herein also utilized IDEA funding for non-related services, despite failing to offer a free appropriate public education in accordance with the law.

3.   As a result, Defendants obtained the benefit of virtually unfettered Medicaid reimbursements for these related service sessions, and as a result, Defendants have violated the federal False Claims Act, 31 U.S.C. § 3729-3733, ("FCA") as well as the corresponding state false claim statutes.

4.      In addition to violating the federal FCA, NEW YORK DEFENDANTS (collectively) herein have also violated the New York False Claims Act; the New York City False Claims Act (Local Law 53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); §176 (Insurance Fraud); and §177 Health Care Fraud.

5.      In addition to violating the federal FCA, MASSACHUSETTS DEFENDANTS (collectively) herein have also violated MASS. GENERAL LAWS CH. 12, §5(B) et seq. and related state law.

6.      In addition to violating the federal FCA, CONNECTICUT DEFENDANTS (collectively) herein have also violated CT GEN. STAT. §4-275, et seq. and relevant state law.

7.      In addition to violating the federal FCA, ILLINOIS DEFENDANTS (collectively) herein have also violated 740 ILCS §175, et seq. and related state law.

8.      In addition to violating the federal FCA, VIRGINIA DEFENDANTS (collectively) herein have also violated VA. CODE ANN. §8.01-216.3, et seq. and relevant state law.

9.      In addition to violating the federal FCA, NEW JERSEY DEFENDANTS (collectively) herein have also violated N.J. STAT. ANN. §§ 2A:32C-1—32C-18 and related state law.

10.      In addition to violating the federal FCA, CALIFORNIA DEFENDANTS (collectively) herein have also violated CAL. GOV. CODE § 12650-12656, et seq. and relevant state law.

11.      In addition to violating the federal FCA, NORTH CAROLINA DEFENDANTS (collectively) herein have also violated N.C.G.S. §§1-605 through 617, et seq. and relevant state law.

12. In addition to violating the federal FCA, TEXAS DEFENDANTS (collectively) herein have also violated TEX. HUM. RES. CODE § 32.039(b), TEX. HUM. RES. CODE § 36.002 (13), and relevant state law.

## THE PARTIES

### PLAINTIFF RELATOR

13. Relator Patrick Donohue, JD/MBA, is a civil rights attorney with a focus on special education law and Founder and former Chairman of The International Academy of HOPE ("iHOPE") (2013-2018), and the Founder and current Chairman of the International Institute for the Brain ("iBRAIN") (2018-Present). iBRAIN is a not-for-profit educational organization that provides students with brain injuries and brain-based disorders highly specialized educational opportunities based on the individual needs of each student.

14. As Founder and Chairman of these schools, the Relator has extensive knowledge of the rules governing the provision of special education services to profoundly disabled children.

15. Prior to establishing iHOPE and iBRAIN, Donohue founded the Sarah Jane Brain Foundation ("SJBF"), an international non-profit named for his daughter who was shaken as a baby by a nurse, causing broken ribs, broken collarbones, and a severe brain injury. Launched in October 2007, the SJBF quickly became one of the largest organizations in the world for youth brain injury.

16. The SJBF International Advisory Board includes over 200 experts from major medical institutions and research universities around the world.

17. In June 2009, SJBF announced the largest healthcare collaboration in U.S. history dealing with Pediatric Acquired Brain Injuries ("PABI")—one institution from each state (including D.C. and Puerto Rico), were selected as a SJBF State Lead Center of Excellence. Thereafter,

6

Congress introduced bi-partisan legislation to fund a $2.9 billion, seven-year national initiative to implement SJBF's PABI plan.

18.  Thus, the Relator has significant knowledge and expertise in the field of Special Education law.

19.  The Relator has learned that profoundly disabled children in NYC and other named School Districts received Medicaid reimbursements, payments, and otherwise for related service sessions that were not provided in a manner and environment that is consistent with the students' physical and medical needs and did not adhere to the relevant Medicaid and IDEA billing requirements.

20.  As required by the Act, Relator is "an individual who has direct and independent knowledge of the information on which the allegations are based." USC 3730(e)(4)(B)(2006) (amended 2010).

<u>DEFENDANTS</u>

21.  As set forth by 31 USCS §3730 and relevant case law, though States and local governments are not "persons" for the purposes of the Act, a State employee may be sued in an individual capacity under the False Claims Act for actions takes in the course of their official duties. *See* Cook County v. United States ex rel. Chandler, 538 U.S. 119 (2003).

22.  However, it is incredibly important to note that each named Defendant municipality has waived their 11th Amendment sovereign immunity by receiving funds under the Individual with Disabilities Education Act (IDEA) Part B 20. USCS § 1415. Defendant sovereigns are made aware of this waiver upon the processing of their respective IDEA applications each year. **Exhibit 1,** IDEA Part B letters to respective Defendants.

23. Although Defendants may attempt to argue that they maintain sovereign immunity with regard to Medicaid reimbursement claims, the Relator alleges that this argument fails, not only because it is contrary to the relevant case law, but the Medicaid claims made as alleged herein are underlined directly related to Defendants' responsibilities under the IDEA, and as a recipient of IDEA funding, Defendants have expressly waived their sovereign immunity under the 11th Amendment. *See* **Exhibit 1.**

24. Additionally, Defendants cannot seek refuge in the comforts of sovereign immunity while simultaneously engaging in abuse of authority and/or power of their respective official positions.[1]

*New York Defendants*

25. Defendant RICHARD CARRANZA, is the former New York City Schools Chancellor, employed by the NEW YORK CITY DEPARTMENT OF EDUCATION during the 2019-2020, and part of the 2020-2021 school year until Defendant PORTER's appointment on February 26, 2021.

26. Defendant MEISHA PORTER, is the current New York City Schools Chancellor, and is responsible for the oversight and management of the NEW YORK CITY DEPARTMENT OF EDUCATION, was appointed this position on or about February 26, 2021 and continues to hold this position.

27. Pursuant to N.Y. EDUC. LAW §2590-H, the Chancellor is responsible for the integrity of audits, and has the authority to intervene when a School District is persistently failing to achieve educational results. *See,* §2590-H(31), (35).

---

[1] The Supreme Court has noted that such immunity extends only to a very limited class of officials, including the U.S. President, legislators carrying out their legislative functions, and judges carrying out their judicial functions. *See Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824).

28. Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("NYC DOE") is a municipal agency of the City of New York, State of New York.

29. Defendant NIAGARA FALLS PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Niagara Falls, New York.

30. Defendant MARK LAURRIE is the current Superintendent of NIAGARA FALLS PUBLIC SCHOOL DISTRICT in Niagara Falls, New York and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

31. Pursuant to NY Article 51, §2508 the Superintendent of a School District is responsible for the enforcement of all provisions of law, rules, and regulations relating to the management of schools and other educational, social, and recreational activities. The Superintendent is responsible for the supervision and direction of associate, assistant, and other superintendent, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, claim auditors, deputy claim auditors, attendance officers, janitors, and other persons employed in the management of schools. *See,* Article 51, §2508 (3) and (5)(emphasis added).

32. Defendant BUFFALO PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Buffalo, New York.

33. Defendant KRINER CASH is the current Superintendent of BUFFALO PUBLIC SCHOOL DISTRICT in Buffalo, New York and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

34. Pursuant to NY Article 51, §2508 the Superintendent is responsible for the enforcement of all provisions of law, rules, and regulations relating to the management of schools and other educational, social, and recreational activities. The Superintendent is responsible for the

supervision and direction of associate, assistant, and other superintendent, directors, supervisors, principals, teachers, lecturers, <u>medical inspectors</u>, <u>nurses</u>, <u>claim auditors</u>, <u>deputy claim auditors</u>, <u>attendance officers</u>, janitors, <u>and other persons employed in the management of schools</u>. *See,* Article 51, §2508 (3) and (5)(emphasis added).

<u>*Massachusetts Defendants*</u>

35.   Defendant SOMERVILLE PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Somerville, Massachusetts.

36.   Defendant MARY SKIPPER is the Superintendent of Schools, employed by the SOMERVILLE PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

37.   Pursuant to MASS. GEN. LAWS C. 71 §52, the Superintendent is responsible for managing the [educational] system in a fashion consistent with state law and policy determinations.

38.   Defendant JEFFREY C. RILEY, in his official capacity as Superintendent of the Massachusetts Department of Education, is responsible for the oversight and management of the schools within its State.

<u>*Connecticut Defendants*</u>

39.   Defendant STAMFORD PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Stamford, Connecticut.

40.   Defendant DR. TAMU LUCERO is the Superintendent of Schools, employed by the STAMFORD PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

41.     Pursuant to CGS §10-157, the Superintendent has the authority and responsibility for the management of the school system within its respective jurisdiction.

*Illinois Defendants*

42.     Defendant CHICAGO PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Chicago, Illinois.

43.     Defendant JOSE M. TORRES, PhD is the Superintendent of Schools, employed by the CHICAGO PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

44.     Pursuant to 105 ILCS 5 §10-21.4, the Superintendent is responsible for the management of their respective School Districts.

*Virginia Defendants*

45.     Defendant LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Loudoun County, Virginia.

46.     Defendant SCOTT A. ZIEGLER is the current Superintendent of LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT in Loudoun County, Virginia and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

47.     As set forth in VA CODE ANN. §66-13.1, the Superintendent is responsible for the oversight and management of the administration of the designated School District.

*New Jersey Defendants*

*48.*   Defendant CAMDEN CITY PUBLIC SCHOOL DISTRICT operated within the jurisdiction of Camden City, New Jersey.

49.   Defendant KATRINA McCOMBS is the current Superintendent of CAMDEN CITY PUBLIC SCHOOL DISTRICT in Camden City, New Jersey and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

50.   Pursuant to NJ REV. STAT. §18A:17-20, the Superintendent is responsible for the management and supervision of its School District.

*California Defendants*

51.   Defendant LOS ANGELES UNIFIED SCHOOL DISTRICT operates within the jurisdiction of Los Angeles County, California.

52.   Defendant AUSTIN BEUTNER is the current Superintendent of LOS ANGELES UNIFIED SCHOOL DISTRICT in Los Angeles, California and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

53.   Defendant SAN DIEGO UNIFIED SCHOOL DISTRICT operates within the jurisdiction of San Diego, California.

54.   Defendant DR. LAMONT A. JACKSON is the current interim Superintendent of SAN DIEGO UNIFIED SCHOOL DISTRICT in San Diego, California and is responsible for the oversight and management of the schools within its District beginning on or about January 2021, and continuing.

55.  Defendant CINDY MARTEN is the former Superintendent of SAN DIEGO UNIFIED SCHOOL DISTRICT, in San Diego, California and was responsible for the oversight and management of the schools within its District during the 2019-2020, 2020-2021, and part of the 2021-2022 school year until her appointment as the United States Deputy Secretary of Education on May 11, 2021.

56.  In accordance with CA EDUC. CODE §35035, the Superintendent has the authority and responsibility of managing its School District in accordance with the relevant laws.

*North Carolina Defendants*

57.  Defendant WAKE COUNTY PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Wake County, North Carolina.

58.  Defendant CATHY QUIROZ MOORE is the current Superintendent of WAKE COUNTY PUBLIC SCHOOL DISTRICT in Wake County, North Carolina.

59.  Pursuant to NGCL §115C-276, the Superintendent of each School District is responsible for the oversight and management of its respective District in accordance with the relevant state and federal laws.

*Texas Defendants*

60.  Defendant AUSTIN INDEPENDENT SCHOOL DISTRICT operates within the jurisdiction of Austin, Texas.

61.  Defendant STEPHANIE S. ELIZADE is the current Superintendent of AUSTIN INDEPENDENT SCHOOL DISTRICT in Austin, Texas, and is responsible for the management and oversight of all schools within its jurisdiction.

62. Pursuant to TEXAS EDUC. CODE §11.201, the Superintendent of each School District is responsible for the planning, organization, supervision, and evaluation of the educational programs, services, and facilities of the District.

63. Above-named Texas Defendants knowingly made or caused to be made false statements or misrepresentations of material facts to the Texas Medicaid School and Health Related Services ("SHARs") program by submitting claims for reimbursement for services that were substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry.  Specifically, Texas Defendants submitted claims to the Texas Medicaid SHARS program with supporting treatment notes that were false (i.e. that telehealth therapy was an appropriate treatment option for profoundly disabled children, etc.).

64. Defendants knowingly or intentionally made, or caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material facts concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of the TMFPA.  TEX. HUM. RES. CODE § 36.002 (4) (B).

65. Under the TMFPA, each Texas Defendant is liable to the State for the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of its unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or the value of the benefit; and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the State of Texas and the Relators in investigating and

14

obtaining civil remedies in this matter.  TEX. HUM. RES. CODE §§ 36.052, 36.007, 36.110 (c).

66.    Relator reserves the right to amend and add Defendants upon the conclusion of discovery.

## JURISDICTION AND VENUE

67.    Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

68.    This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. § 1331 (Federal question), 28 U.S.C. § 1367 (Supplemental jurisdiction), 31 U.S.C. § 3732 (False claims jurisdiction), and 28 U.S.C. § 1345 (United States as plaintiff).

69.    To the extent, if any, that this case involves questions relating to special education rights, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

70.    Pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b), venue is properly placed within the Southern District of New York because at least one of the Defendants resides or transacts business in the Southern District, specifically, Defendant RICHARD CARRANZA ("Chancellor Carranza"), in his official capacity as former Chancellor of the New York City Department of Education; Defendant MEISHA PORTER, in her official capacity as current Chancellor of the New York City Department of Education; and Defendant New York City Department of Education ("NYC DOE"), maintain business offices in New York County.  In addition, Realtor Donohue is a resident of New York County.

71.    As set forth in 31 USCS §3732 of the Act, "any action under [21 USCS §3730] may be brought in *any* judicial district in which the defendant, <u>or in the case of multiple defendants,</u>

any *one* defendant can be found, resides, transacts business, or in which any act proscribed in §3729 occurred." (emphasis added).

72. Thus, this Court appropriately has jurisdiction over all Defendants, as the named New York Defendants (collectively) operate and conduct business within this Court's jurisdiction.

73. Plaintiffs are entitled to costs and attorneys' fees under 31 U.S.C. §3730(d), if determined to be a prevailing party.

## **BACKGROUND**

### IDEA Part B Funding

74. The purpose of IDEA Part B (20 USCS § 1415) grants is to assist States, outlying areas, freely associated States, and the Secretary of the Interior to provide special education and related services to children with disabilities, including ensuring that children with disabilities have access to a Free Appropriate Public Education (FAPE[2]). In general, IDEA Part B funds *must be used only to pay the excess costs of providing FAPE to children with disabilities,* such as costs for special education teachers and administrators; related services providers (speech therapists, psychologists, etc.); materials and supplies for use with children with disabilities; professional development for special education personnel; professional development for regular education teachers who teach children with disabilities; and specialized equipment or devices to assist children with disabilities.

75. Generally, IDEA funds cannot be used for core instruction in the general education classroom, instructional materials for use with non-disabled children, or for professional

---

[2] IDEA Section 602 (9) The term 'free appropriate public education' means special education and related services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 614(d).

development of general education teachers not related to meeting the needs of students with disabilities. Two exceptions to these guidelines are when IDEA Part B funds are used for coordinated early intervening services[3] (CEIS) or are consolidated in a Title I schoolwide school (under ESEA).

76.     LEAs may use up to fifteen percent of their IDEA Part B funds for CEIS to assist students enrolled in grades K through 12 (with an emphasis on K through 3) who are not currently identified as needing special education and related services but who need additional academic and behavioral support to succeed in a general education environment.[4] CEIS funds can be used to provide professional development[5] to educators who are responsible for helping children who need additional academic and behavioral support succeed in a general education environment or to provide direct interventions to children who need academic and behavioral support. CEIS funds may be used in coordination with ESEA funds but _**must supplement, and not supplant,**_ ESEA funds for those activities.[6]

77.     A Title I schoolwide school may use, to carry out the schoolwide project, an amount of IDEA funds that is the same proportion of the total cost of the project as the number of children with disabilities benefiting from the program is to the total school population participating in the program. In a Title I schoolwide school that consolidates Federal funds (e.g., ESEA, IDEA, etc.), a school may use those funds for any activity in its schoolwide plan without accounting separately for the funds. [7]  The schoolwide school _**needs to ensure that children**_

---

[3] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 618(d)(2)(B); Note: The calculation for the maximum CEIS funds is based on the total of the regular IDEA, Part B allocations
[4] IDEA Section 613(f).
[5] IDEA Section 613(f)(2)(A).
[6] IDEA Section 613(f)(5).
[7] ESEA Section 1114.

17

*with disabilities continue to receive FAPE,* but would not need to show that IDEA funds were spent only on allowable special education and related services expenditures.[8]

<u>MEDICAID Funding</u>

78.   As provided in the IDEA, a public school must offer all children a FAPE regardless whether or not it receives federal funds under IDEA.  Many IDEA-eligible children are covered by the Medicaid program, a federal program managed through the Centers for Medicare & Medicaid Services ("CMS"), whose Early and Periodic Screening, Diagnosis and Treatment mandate requires Medicaid agencies to provide eligible children under 21 years old with the services necessary to meet their medical needs. In many cases, a Medicaid-eligible child's IEP under IDEA includes health-related services such as audiology, nursing and therapies that are medical in nature and covered by Medicaid.

79.   In 1988, the federal law was amended, through the passage of the Medicare Catastrophic Coverage Act of 1988, to allow Medicaid payment for services provided to children under IDEA.  Recognizing that schools provide medically necessary services and IDEA funding typically covers less than 20 percent of the average per student costs for special education, the US Congress amended federal law in 1988 expressly to forbid Medicaid from restricting or prohibiting payment for covered services authorized in a child's IEP. [9]

---

[8] IDEA Section 613(a)(2)(D)
[9] Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 - P.L. 100-360.

80.     This amendment was enacted to require Medicaid to be primary payor to the Department of Education for payment of the health-related services provided under IDEA and the school districts must follow strict reporting requirements to secure this federal funding.[10]

81.     There are six conditions that must be met for Medicaid to reimburse for IDEA-related services:[11]

>   1)      The child receiving the service must be enrolled in Medicaid;
>
>   2)      The services are medically necessary;
>
>   3)      The services must be covered in the state Medicaid plan or authorized by the federal Medicaid statute;
>
>   4)      The services *must* be listed in the child's individualized education program (IEP);
>
>   5)      The school district or local educational agency (LEA) must be authorized by the state as a qualified Medicaid provider; and
>
>   6)      The LEA or school district must follow state guidance as to how claims are to be submitted for reimbursement.  School districts and providers are instructed to maintain proper documentation and follow the reporting requirements to avoid fraud.

SECTION 411(K)(13) OF THE MEDICARE CATASTROPHIC COVERAGE ACT OF 1988 (emphasis added).

49.     Various improper billing by states and school districts have occurred by and through Medicaid throughout the decades since the law was changed in 1988; CMS has increased its oversight and regulations for school districts to continue to receive these federal dollars.[12]

---

[10] CMS Medicaid School-based Administrative Claiming Guide (May 2003): https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/MedicaidBudgetExpendSystem/Downloads/Schoolhealthsvcs.pdf

[11] How to Obtain Medicaid Funding for School-Based Services: A Guide for Schools in System of Care Communities: http://www.rippleeffects.com/pdfs/MedicaidFunding.pdf

[12] https://www.cms.gov/newsroom/fact-sheets/hhs-issues-final-rules-protect-medicaid-improper-payments-school-based-claiming

As an example, New York State has a history of noncompliance.[13]  In a federal lawsuit filed in 1998, the federal audit found the program to be out of compliance with federal guidelines and that New York State school districts did not maintain adequate documentation to support Medicaid billing.  Upon settlement, the State instituted a new claim methodology. Perhaps the biggest difference between the old and new methodology is the old methodology was based on a minimum number of services per month *while the new methodology requires the school districts to PROVE a session occurred in order to bill.* [14]

50.   Thereafter, the School Supportive Health Services Program (SSHSP) and the Preschool Supportive Health Services Program (PSHSP) were developed jointly by the New York State Education Department (NYS SED) and the New York State Department of Health (NYS DOH). SSHSP applies to the 5 to 21-year-old student population and PSHSP applies to the preschool 3 to 4-year-old student population pursuant to §4410 of the Education Law. The SSHSP and PSHSP were established to assist school districts and counties in obtaining Medicaid Reimbursement for certain diagnostic and health support services provided to students with disabilities.[15]

51.   In a handbook created in 2014, the SSHSP and PSHSP provided specific guidelines for LEAs to follow in order to receive Medicaid funding.[16]  Local Education Agencies (LEAs) have an entire department dedicated Medicaid reimbursements, funding, and otherwise.

52.   More recently, New York City was cited again for Medicaid noncompliance and mismanagement for the 2018-2019 year. *See* **Exhibit 2**.

---

[13] https://oig.hhs.gov/oas/reports/region2/20301008.pdf
[14] https://www.uft.org/files/attachments/medicaid-speech.pdf
[15] http://www.oms.nysed.gov/medicaid/
[16] http://www.oms.nysed.gov/medicaid/handbook/sshsp_handbook_8_nov_25_14.pdf

53.   Amidst the COVID-19 pandemic on June 5, 2020, the SSHSP released a memorandum with

specific guidance to all service providers about proper and improper Medicaid billing. In

this memorandum, SSHSP specifically stated:

> "There must be *live interaction* between the therapist and the student or Medicaid
> cannot be billed. There is no Medicaid reimbursement for videos, material packets,
> activities that are not completed during a live interaction between the therapist and
> the student."; "No, text messaging and email contact with students or parents will
> not be reimbursable by SSHSP Medicaid."; "No, sending activities for a student to
> complete will not be reimbursable by SSHSP Medicaid."; "No, providing
> consultation to parents is not a reimbursable SSHSP service."; and "No,
> asynchronous "store and forward" services are not reimbursable by Medicaid under
> the SSHSP."[17]

54.   Additionally, in New York, the United Federation of Teachers ("UFT") is the sole bargaining

agent for most of the non-supervisory educators who work in the New York City public

schools.   UFT   represents   approximately   75,000   teachers,   19,000   classroom

paraprofessionals, along with related service providers, such as occupational therapists,

physical therapists and speech therapists.[18]   Despite the clear guidance from the New York

State Education Department and the New York State Health Department about providing

live, synchronous instruction, UFT advised its members, "...synchronous instruction *is not*

*required* at this time."[19] (emphasis added). This improper and inappropriate guidance further

substantiates Relator's claims of fraudulent billing for educational, medical, related services

and otherwise processed through Medicare/Medicaid on behalf of students with disabilities.

55.   CMS tracks state expenditures through the automated Medicaid Budget and Expenditure

System/State Children's Health Insurance Budget and Expenditure System (MBES/CBES).

The amounts reported and the related attachments must be actual expenditures for which all

---

[17] http://www.oms.nysed.gov/medicaid/medicaid_alerts/alerts_2020/20_02_Addendum.html
[18] https://www.uft.org/your-union/about-uft
[19] https://www.uft.org/your-rights/safety-health/coronavirus/guidance-on-remote-learning

supporting documentation, in readily reviewable form, has been compiled and is available immediately at the time the claim is filed. Consequently, the amount claimed on the Form CMS-64[20] is a summary of expenditures derived from source documents such as invoices, cost reports and eligibility records. All summary statements or descriptions of each claim must identify the claim and source documentation.

56. Medicaid spending on school-based health accounts for about $4.5 billion[21] of the entire Medicaid budget, which currently consists of approximately $400 billion.[22]  The 2019 IDEA funding was approximately $13.5 billion.[23]

57. The Relator has direct first-hand knowledge that NYC School Districts were and continue to be reimbursed in accordance with the principle of Reasonable Cost Reimbursement, as described in 42 C.F.R. §413, subpts. A-G for related services offered to Special Education students throughout the school years 2019-2020 and 2020-2021 while school campuses were physically closed.

58. As a Parent of a teenage Special Education student diagnosed with a Traumatic Brain Injury (TBI) and Chairman of iBRAIN, Relator is aware that: "[t]he term 'related services' means transportation, and such developmental, corrective, and other support services . . . as may be required to assist a child with a disability *to benefit from special education*, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C.S. §1402(a)(17) (emphasis added).

---

[20] https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-medicaid-chip/index.html
[21] https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbes/index.html
[22] Congress of the United States Congressional Budget Office. (2019.) The Budget and Economic Outlook 2019 – 2029. Retrieved from: https://www.cbo.gov/system/files?file=2019-01/54918-Outlook.pdf
[23] United State Department of Education. (2018.) Department of Education Fiscal Year 2019 Congressional Action. Retrieved from: https://www2.ed.gov/about/overview/budget/budget19/19action.pdf

59.  Moreover, the text of the "related services" definition "broadly encompasses those supportive services that "may be required to assist a child with a disability to benefit from special education. As a general matter, services that enable a disabled child _to remain in school during the day_ provide the student with the _meaningful access_ to education that Congress envisioned." _See,_ U.S.C.S. 1401(a)(17) (emphasis added); _see also_ Cedar Rapids Cmty. Sch. Dist. v. Garret F. by Charlene F., 526 U.S. 66 (1999).

60.  The Relator has first-hand knowledge that the named District(s) and entities received interim payments based on fixed estimates of their actual costs in accordance with 42 C.F.R. §413.60(a), (c); §413.64(a), (f).

61.  At the end of each fiscal year, Relator knows that providers submitted cost reports of their actual expenditures in accordance with C.F.R. §413.60(b), §413.64(f) and that a final adjustment is made to settle the difference between the interim payments and a provider's actual purported costs. C.F.R. §413.64(f)(2).

62.  Further described herein, Relator has first-hand knowledge that claims were submitted on behalf of Special Education students by the Defendants for related services that were not offered in-person as defined by relevant case law, including related service sessions that were not offered to at all to students with disabilities, as described in their respective IEPs.

63.  In accordance with 42 C.F.R. §413.24(a), the named Defendants(s) must be able to provide adequate cost data supported by financial and statistical records, which must be capable of verification by independent and qualified auditors, and must provide the cost information in accurate and sufficient detail to support the payments made for services furnished to the purported students. _See_ 42 C.F.R. §413.24(c), §413.20(d).

64. Further, Defendants are to maintain adequate documentation for auditing purposes. In order to perform a comprehensive audit, the Relator alleges that the claim details must be obtained from the provider's records. 42 C.F.R. §413.24(c).

65. The Relator has knowledge that the above-named Defendants do not possess adequate or detailed records to substantiate the Medicaid claims made on behalf of students with disabilities for the 2019-2020 and 2020-2021 school years.

66. The Relator also has first-hand knowledge that Defendants herein knowingly submitted false claims for related services purportedly offered to Special Education students via telehealth, phone, and otherwise, when Defendants were acutely aware that such services were contrary to those set forth in each Student's last-agreed-upon IEP, which required in-person services. Relator also has knowledge that some of these sessions were not offered to students with disabilities, despite Defendants' assertions that students within their jurisdictions were being educated in accordance with the law. *See,* M.H. v. New York City Dep't of Educ., 685 F.3d 217, 224 (2nd Cir., 2012) ("The IEP, the results of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and *describes the specially designed instruction and services that will enable the child to meet those objectives*.") (emphasis added).

67. Upon information and belief, Defendants obtained a consent from some parents on behalf of students with disabilities in order to obtain reimbursement for said services or alternatively, submitted said claims without consent.

68. Further, Relator alleges that Defendants did not change the rate at which related services were billed when offered by alternative means (i.e. telehealth, phone, etc.), and were billed

at the same rate as in-person services at the full rate, while conferring no meaningful benefit to students with disabilities, as required by law.

69. As set forth above, Defendants must produce provider detailed statements in accordance with 42 C.F.R. §413.24(c).

70. Each of the named Defendants is eligible to receive reimbursement by the federal government for a portion of the cost of providing health-related and related services to Medicaid eligible children pursuant to the IDEA, 20 U.S.C. §1400 et seq., 42 U.S.C. §1396b(c).

71. The IDEA (20 U.S.C. §1400) sets forth the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), guarantees students with disabilities a free and appropriate public education ("FAPE"). The term FAPE refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living.

72. Defendants fraudulently created Individualized Education Plans (IEPs) for special education students, knowing they could not implement these IEPs as written, thus knowingly denying students a FAPE.

73. Defendants then fraudulently claimed they were providing special education and related services as outlined and described in the students' IEPs and billed and/or were reimbursed or otherwise by the federal government and the States, including the District of Columbia, for services that were not performed, and for services performed at an over-billed rate or for services (medical, educational, related, and otherwise) that were established fraudulently.

74. As a result of Defendants' multi-faceted campaign of fraud against the government, Defendants have collected hundreds of millions of dollars, if not billions of dollars, to which they were never entitled, causing direct injury to students with disabilities that had an IEP in place for the 2019-2020 and 2020-2021 school years, in addition to the general taxpayers funding such grants and reimbursements.

75. Additionally, while simultaneously depriving students with disabilities of a free appropriate public education ("FAPE"), Defendants herein submitted additional applications for IDEA funding to the federal government with false assurances that Defendants were offering FAPE to students with disabilities for school years 2019-2020, 2020-2021, and 2021-2022. **Exhibit 1.**

## FACTUAL ALLEGATIONS

76. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

77. As the parent of a special education student, the Relator has first-hand knowledge that the NYC DOE Committee on Special Education ("CSE") fraudulently created an IEP for his daughter (S.J.D.) that Defendants knew could not be implemented during the COVID-19 situation. Said IEP included in-person services, including 1:1 nursing and a 1:1 paraprofessional, which were not offered by the NYC DOE as a result of the COVID-19 closures. There was no subsequent IEP meeting to amend his daughter's IEP to include remote services.

78. During the recorded IEP meeting, Relator questioned the NYC District Representative why in-person services were being recommended when the doors to the schools themselves remained closed. The District Representative informed Relator that the District was

instructed to proceed as if schools were not closed and to continue recommending in-person services. Defendants proceeded to finalize said IEP and fraudulently present it as a FAPE. Although this meeting was not transcribed, the Relator is willing and able to produce an audio recording substantiating same upon request.

79.    There are dozens of other parents and students that Relator has first-hand knowledge of involving the Defendants named herein, as further described below.

## NEW YORK CITY

80.    There are over 100 students Relator has first-hand knowledge of to whom NYC DOE failed to provide the services outlined in their IEP since March 2020 (including live synchronous services), yet, Defendants herein fraudulently projected that these students were continuing to be properly serviced in accordance with each respective Students' IEP.  Adding insult to injury, the NYC DOE and CSE fraudulently created IEPs including in-person services, for the 2019-2020 and 2020-2021 school years for these students they knew they could not implement during the COVID-19 situation.

81.    For illustration, Relator presents the IEP of J.R., with an implementation date of February 26, 2020 (pre-COVID). J.R. is a 15-year-old young man diagnosed with Autism. It is important to note that J.R. is also non-verbal. A copy of J.R.'s IEP implemented before the COVID-19 closures is annexed hereto as **Exhibit 3.**

82.    However, in a letter dated April 22, 2020, the NYC DOE informed J.R.'s parents that "[n]ow that your child's school has moved towards a new Remote Learning Model, this Special Education Remote Learning Plan sets out the special education supports that are being

provided during the COVID-19 school closure." *See,* **Exhibit 4**, *Special Education Remote Learning Plan for J.R.* (April 22, 2020).

83.   Perhaps even more surprising, in a hearing on J.R.'s case before the Impartial Hearing Officer, NYC DOE took the position that they offered J.R. a FAPE, and that "[w]hether or not the student and their family *chose* to participate in remote services . . . what program was available for the student to access the curriculum, and what, if anything, did the family do with that" would be the grounds to make a determination of whether a FAPE was denied. **Exhibit 5**, p. 20, lines 4-12.

84.   This position is contradictory at best—in light of the Executive Orders set forth by the local and state authorities, J.R.'s parents did not "choose" remote services, nor did the parents "choose" for the NYC DOE schools to remain closed following the expiry of said Executive Orders. As J.R.'s 2020 and 2021 IEP highlights, "Home instruction would be too restrictive for [J.R.]'s social and academic progress at this time." **Exhibit 3**, p. 28 ("*Other Options Considered*"). Additionally, it would seem that NYC DOE takes the position that any regression in skills and learning is a fault and burden shouldered by parents, which is not only inaccurate, but such a contention undermines the entire spirit of the IDEA.

85.   The letter dated April 22, 2020 (**Exhibit 4**) not only serves as evidence of the District's unilateral transfer of the Student's educational placement to remote learning, but also indicates that an IEP meeting should have been reconvened to appropriately determine J.R.'s remote services.

86.   Instead, taking into consideration J.R.'s specific conditions and management needs, NYC DOE recommended J.R. for individual remote Speech Services for twenty minutes, once a week, *by telephone. See,* **Exhibit 4.**

87. It is incredibly important to note that J.R.'s other related services, Occupational Therapy and Physical Therapy, were recommended to be performed via tele-therapy.

88. Relator alleges that not only is the NYC DOE's recommendation wholly inappropriate for J.R.—a non-verbal, Autistic young man— but that NYC DOE subsequently *billed* Medicaid for J.R.'s speech services, despite rendering a service that does not meet the requirements for Medicaid and/or IDEA reimbursement, and a service that was of no benefit whatsoever to J.R.

89. Similarly, Relator presents redacted hearing transcripts from closed administrative hearings he served as a witness for his daughter, S.J.D., which further substantiates inconsistent Medicaid billing practices on behalf of the NYC DOE for billing Medicaid at full rates, as if IEPs were being fully implemented, despite a lack of resources and reduced services, as testified by an assistant principal from S.J.D.'s recommended D75 school. A copy of the redacted hearing transcripts from S.J.D.'s administrative hearings regarding the 2019-2020 and 2020-2021 school years are annexed hereto as **Exhibits 6** and **7**.

90. In the hearing held for S.J.D. on October 1, 2020 as referenced above, the NYC DOE's witness, an assistant principal at the P79M Horan School in New York City testified about the school's operation and services during the 2019-2020 school year. In this hearing, the vice principal concedes that Horan School had fallen short of fulfilling the Student's IEP mandates.

91. For instance, the assistant principal admitted that though a special education classroom recommendation in their school is for a 12:1:(3+1) classroom ratio, requiring 4 paraprofessionals in the classroom, the school was understaffed during the year and had only one paraprofessional available. *See* **Exhibit 6**, p. 30, 132.

92.    More astonishingly, this assistant principal admitted that though S.J.D.'s IEP mandates physical therapy in 60-minute sessions, the physical therapist at the school would only provide 40 minutes of therapy and <u>leaves the student for 20 minutes</u>, without the physical therapist. **Exhibit 6**, p. 44-45, 47 (emphasis added).

93.    In another closed administrative hearing for S.J.D. on July 14, 2021 with regard to the 2020-2021 school year (IHO Case: 196228), Relator witnessed the Horan School's assistant principal testify that during the 2020-2021 extended school year, students who have mandated nursing services on their IEPs could not receive those services because the school's nurse "[d]uring remote learning, our school nurse would not have been able provide services to the student." *See* **Exhibit 7,** p. 64.

94.    Without offering the nursing services within the IEP that Defendant drafted, S.J.D. was, by definition, denied a FAPE. Thus, any Medicaid billing for other related services in the IEP is unlawful, as a FAPE must be provided in order to submit claims for Medicaid reimbursement for related services.

95.    Moreover, though S.J.D. has mandated therapy and related service sessions of 60-minutes, and although the NYC DOE claimed that S.J.D.'s IEP mandates could be implemented at their proposed school(s), the assistant principal's testimony revealed that the NYC schools could not, in fact, implement the IEP because the school mandates 8 periods for 45 minutes per day, and does not offer an extended school day, indicating that all of S.J.D.'s related service mandates from her IEP could not realistically be implemented in a NYC DOE school, as NYC DOE schools do not offer extended school days. **Exhibit 7**, p. 66 - 70, generally.

96.    The above only serve as some of the many examples of NYC DOE's fraudulent behavior regarding Medicaid and IDEA billing. Without offering the Student a FAPE, by definition,

the LEA cannot bill Medicaid for services or receive IDEA/Title I funds that would not offer the Student a meaningful education under the IDEA.

97. Relator alleges that NYC DOE billed Medicaid for the full amount of services as listed on Students' IEPs, without actually delivering those services as mandated, as evidenced by the testimony of the assistant principal of the Horan School, a NYC DOE school.

98. In addition to these claims and alleged misconduct, the Relator also alleges that Defendants CARRANZA, Defendant PORTER, and the NYC DOE further misappropriated these unlawfully obtained federal funds through Medicaid and/or the IDEA and transferred $43,967,285 into a high-interest yield savings CD Rollover account, approved on September 24, 2020, in the midst of the pandemic. A copy of the NYC DOE 2020 December Financial Status Report substantiating same is annexed hereto as **Exhibit 8,** p. 5.

99. In said report, the DOE reported that it "rolled over" approximately $43,967,285 to a CD Rollover account and has earned, or continues to earn, interest on said federal funds. **Exhibit 8**, p. 5.

100. This not only evidences Defendants' gross misconduct, but also serves to show that Defendants deliberately withheld these federal funds (in the midst of a worldwide pandemic) intended for students with disabilities, or alternatively, the public at large and taxpayers, and further intended to benefit from their malfeasance in the form of accruing interest on said federal funds.

101. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor and Defendant PORTER, in official capacity as the current Chancellor, have the responsibility of overseeing the LEAs and providers that are mandated to offer the related services tailored to the needs of students with disabilities.

102.   Based on his observations and interactions, Relator has direct first-hand knowledge that not only have numerous students been recommended to receive their related services remotely this year, despite the drafting and implementation of an IEP that requires "push in/pull out" services in "classrooms" or "separate provider locations", but that these students will continue to receive their services remotely, despite the tremendous reopening efforts, due to insufficient staffing. *See* **Exhibit 6, 7,** *see also* **Exhibit 9**, *infra*.

103.   Relator alleges that by and through the efforts of Defendants CARRANZA and PORTER, and NYC DOE extracted from the State and Federal Governments hundreds of millions of dollars in payments when they:

   a.   knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b.   knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c.   knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d.   conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

104.   Moreover, in addition to violation(s) under the federal FCA, New York City Defendants also violated the New York False Claims Act; the New York City False Claims Act (Local Law

53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); and Penal Law §177 (Health Care Fraud) as described herein.

105. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Students' parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (NYC DOE) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures, which constitutes a procedural violation of the IDEA.

106. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her official capacity as current Chancellor, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing and IDEA restrictions and is unlawful.

107. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

108. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, have failed to provide the students with disabilities within its jurisdiction a FAPE by directly or indirectly assisting in formulating IEPs with recommended related services to be offered to

students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

109. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, benefitted from these unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEPs as written, and IDEA funds when a FAPE has been denied to numerous New York City students with disabilities.

110. Alternatively, Defendants CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor remained complicit in the scheme to defraud.

## BUFFALO PUBLIC SCHOOL DISTRICT

111. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

112. Defendants KRINER CASH, in his official capacity as Superintendent of BUFFALO PUBLIC SCHOOL DISTRICT ("BPSD"), and the BUFFALO PUBLIC SCHOOL DISTRICT (collectively, "Buffalo Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

113.   Moreover, in addition to violation(s) under the federal FCA, Buffalo Defendants have also violated the New York False Claims Act; N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud) as described herein.

114.   To substantiate these claims, Relator presents a redacted IEP from G.M., a 17-year-old student in Buffalo diagnosed Autism, as well as a speech and language impairment. A redacted copy of G.M.'s 2020 IEP is annexed hereto as **Exhibit 9.**

115.   In addition to Special Education classes, G.M. is recommended for Adaptive Physical Education, Speech Language Therapy, Occupational Therapy, Behavioral Intervention Therapy, Augmentative Technology Services, and Adaptive Seating. *See*, **Exhibit 9**, p. 15.

116.   Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, employed Autism Services, Inc., to offer G.M. the related services tailored to her needs. *See* **Exhibit 9.**

117.   Relator's initial interactions with G.M.'s Parent were with regard to the insufficiency and defects of the IEP in place. In the course of G.M.'s case, Relator has first-hand knowledge that not only has G.M. received all of her services remotely, but that she will continue to

<u>receive her services remotely</u>, despite reopening efforts due to insufficient staffing. Annexed hereto is a letter acknowledging the insufficient staffing. **Exhibit 10.**

118. Albeit G.M.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

119. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (BPSD) did <u>*not*</u> reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

120. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, billing for any "remote sessions" is not only inappropriate, but runs afoul of the Medicaid and IDEA billing restrictions and is unlawful.

121. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

122. Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus (i.e. push-in/pull out, in

"classroom" or at "separate provider location", etc.) and subsequently failing to provide the recommended related services as written.

123. Thereafter, Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments and IDEA funds for services that were not offered in accordance with the IEPs as written.

124. Alternatively, Defendants BPSD and Defendant KRINER CASH, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

### NIAGARA FALLS PUBLIC SCHOOL DISTRICT

125. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

126. Defendants MARK LAURRIE, in his official capacity as Superintendent, and the NIAGARA FALLS PUBLIC SCHOOL DISTRICT ("NFPSD") (collectively, "Niagara Falls Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.  conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

127.  Moreover, in addition to violation(s) under the federal FCA, Niagara Falls Defendants have also violated the New York False Claims Act; N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud) as described herein.

128.  To substantiate these claims, Relator presents a redacted 2020 IEP from T.S., a 17-year-old student in Niagara Falls, New York classified with an "Other Health Impairment" (i.e. Attention Deficit/Hyperactivity Disorder (ADHD), and Oppositional Defiant Disorder (ODD)) assigned to attend a BOCES class at N. Tonawanda Learning Center, located in Niagara Falls, New York. A redacted copy of T.S.'s 2020 IEP is annexed hereto as **Exhibit 11.**

129.  In addition to Special Education, T.S. is recommended for Speech/Language Therapy, Occupational Therapy, and Behavioral Intervention Plan/Therapy. *See*, **Exhibit 11**, p. 1.

130.  As reflected on his IEP, T.S. requires "tactile (touch) sensory input in order to promote increase sensory regulation." *See*, **Exhibit 11**, p. 8.

131.  T.S. also requires substantial adult intervention to address behavioral issues, and sometimes requires two or more adults to calm him when dysregulated. He also requires constant prompting and adult directives. **Exhibit 11,** p. 2.

132. When T.S. was unilaterally placed in a remote learning environment, Defendants NIAGARA FALLS SCHOOL DISTRICT and MARK LAURRIE, in his official capacity as Superintendent, failed to reconvene an IEP meeting to amend the 2020 IEP to include remote services.

133. Although T.S.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

134. The Relator alleges that not only was the method of delivery for T.S.'s services inappropriate and rendered useless services to the student, but alleges that Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the Student as designed and described in her IEP.

135. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (NFPSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

136. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

137. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

138. Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

139. Thereafter, Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEPs as written and designed for students with disabilities.

140. Alternatively, Defendants NFPSD and Defendant MARK LAURRIE, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## OTHER EDUCATIONAL AGENCIES ENGAGED IN FRAUD

141. There are more than one hundred additional students the Relator has first-hand knowledge, of whom their Local Educational Agencies (LEAs) throughout the United States failed to provide services outlined in their IEP since March 2020 (including live synchronous services), however, fraudulently projected these students were continuing to be properly serviced remotely. The Relator has presented various illustrations of the ongoing fraud in anticipation of Defendant's claims that Relator's first-hand knowledge is without merit. In addition, these LEAs fraudulently created IEPs for the 2020-2021 school year for these students that they knew they could not implement during the COVID-19 situation.

## SOMERVILLE, MASSACHUSETTS

142. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

143. Defendants MARY SKIPPER, in her official capacity as Superintendent, the SOMERVILLE PUBLIC SCHOOL DISTRICT ("SPSD") and JEFFREY C. RILEY, in his official capacity as Superintendent of the Massachusetts Department of Education ("MDOE"), (collectively, "Somerville Defendants" or "Massachusetts Defendants"), engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d. conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

144. Moreover, in addition to violation(s) under the federal FCA, Somerville Defendants have also violated Mass. General Laws Ch. 12, §5(B) et seq. as described herein.

145. In yet another example of the expansive breadth of this scheme, Relator presents the redacted 2020 IEP of student P.M., a student in the Somerville Public School District with a diagnosis of Autism Spectrum Disorder (ASD).

146. In P.M.'s IEP, Somerville School District acknowledged that the evaluations performed "indicate[d] that [P.M.] requires very substantial support." (*See,* **Exhibit 12**, p. 7).

147. Accordingly, P.M. was recommended for Speech/Language Therapy, which is listed as a "pull-out" service, for 30 minutes each week. (*See,* **Exhibit 12**, p. 12).

148. However, in further investigating the Parent's alarming allegation that P.M. had not received his related services since his birthday in October of 2020, the Relator became aware that Massachusetts Department of Education ("MDOE") was not reporting anything at all in their 2020 Year-End Financial Report(s). A copy of the published 2020 Year-End Financial Report is annexed hereto as **Exhibit 13.**

149. Each line item contains a "$0" for 112 pages, which makes abundantly clear that MDOE intends to conceal their fraudulent acts. *See,* **Exhibit 13.**

150. Upon information and belief, Defendant JEFFREY C. RILEY, in his official capacity as Superintendent, is responsible for the management and oversight of the reporting within the State.

151. By reporting nothing at all for the 2020 Year-End Report, Defendant JEFFREY C. RILEY, in his official capacity as Superintendent, aided and abetted the Massachusetts Defendants herein, or alternatively, remained complicit in Defendants' scheme to defraud.

152. P.M.'s Parent is not privy to the billing practices and requirements for Medicaid billing, however, the Relator's expertise and experience lead to the allegations herein.

153. The Relator alleges that not only was the method of delivery for P.M.'s services inappropriate and rendered useless services to the student, but alleges that Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

154. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

155. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, have billed for services that were recommended to be _in person_ as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

156. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

157. Defendant SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with

disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

158. Thereafter, Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

159. Alternatively, Defendants SPSD and Defendant MARY SKIPPER, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

**STAMFORD, CONNECTICUT**

160. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

161. Defendants DR. TAMU LUCERO, in her official capacity as Superintendent, and the STAMFORD PUBLIC SCHOOL DISTRICT (collectively, "Stamford Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.   conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

162.   Moreover, in addition to violation(s) under the federal FCA, Stamford Defendants have also violated CT GEN. STAT. §4-275, et seq. as described herein.

163.   In anticipation of Defendant's allegations that Relator's claims are without merit, Relator presents a redacted 2020 IEP for H.P., a student assigned to attend the Stamford Public School District diagnosed with multiple disabilities, and is wheelchair-bound. Accordingly, she cannot ambulate without assistance. A redacted copy of H.P.'s IEP is annexed hereto as **Exhibit 14.**

164.   As reflected on H.P.'s IEP, she requires Physical Therapy, Occupational Therapy, and Speech/Language therapy. As highlighted on page 2 of her IEP, H.P.'s IEP was formulated "during the time of school closure due to the COVID-19 pandemic. The IEP has been developed for implementation within a regular school building and is based on the currently available information." *See,* **Exhibit 14**, page 2.

165.   Clearly, Defendants drafted and "implemented" a hypothetical IEP with unrealistic terms. Relator alleges that in drafting the IEP this way (as if the Student were on school campus), Defendants submitted for Medicaid reimbursement and/or IDEA funding using the terms of this hypothetical IEP.

166.   Although H.P.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

167. As set forth herein, a school district may only bill Medicaid for services outlined on the Student's IEP. *Supra,* ¶76(4).

168. The Relator alleges that not only was the method of delivery for H.P.'s services inappropriate and rendered useless services to the student, but alleges that Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

169. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

170. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, have billed for services that were recommended and drafted to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

171. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

172. Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written, yet billed Medicaid and/or utilized IDEA funding to "provide" the services as written.

173. Thereafter, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

174. Alternatively, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, and Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, remained complicit in the scheme to defraud.

### CHICAGO, ILLINOIS

175. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

176. Defendants JOSE M. TORRES, PhD, in his official capacity as Superintendent, and CHICAGO PUBLIC SCHOOL DISTRICT ("CPSD") (collectively, "Chicago Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a.   knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b.     knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.     knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.     conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

177.  Moreover, in addition to violation(s) under the federal FCA, Chicago Defendants have also violated 740 ILCS §175 et seq. as described herein.

178.  In anticipation of Defendants' allegations that the Relator's allegations are without merit, Relator presents a redacted 2020 IEP from B.W., a student assigned to attend CPSD diagnosed with mild to moderate visual impairment, as well as a speech and language impairment. A redacted copy of B.W.'s 2020 IEP is annexed hereto as **Exhibit 15.**

179.  As evidenced on B.W.'s IEP, he requires Occupational Therapy, Vision Therapy, Speech/Language Therapy, and a 1:1 paraprofessional. As highlighted on page 2 of his IEP, B.W. was educated via remote sessions, despite being recommended for in person services. *See* **Exhibit 15.**

180.  However, on the last two pages of B.W.'s IEP, the delivery of related services, specifically the 1:1 paraprofessional, during "remote learning" are outlined. In the delivery descriptions, the:

"Paraprofessional will support the classroom, students, teacher and families in the following: live-stream lessons, read-alouds, recorded lessons, small-group discussions, individual breakout sessions, check-ins via approved platforms, online learning software, practice sheets, or self-paced with teacher check-ins. As well as parent reports, pictures, and video recordings of progress updates."

(**Exhibit 15**, p.32-33).

181. Clearly, Defendants blatantly disregarded B.W.'s need for 1:1 assistance via a paraprofessional, and used (and billed for) said paraprofessional to offer assistance and services to the classroom, teachers, other students, and families instead of offering assistance to B.W. as described in his IEP.

182. Despite being acutely aware of B.W.'s visual impairments which makes his vision "blurry at all distances" (**Exhibit 15**, page 3), B.W.'s 1:1 paraprofessional was assigned to "support the classroom, students, teachers and families." (**Exhibit 15**, page 32-33).

183. The Relator alleges that not only was the method of delivery for B.W.'s services inappropriate and rendered essentially useless services to the student, but alleges that Defendant CPSD billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

184. B.W.'s Parent is not privy to the billing practices and requirements for Medicaid billing, however, the Relator's expertise and experience lead to the allegations herein.

185. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (CPSD) did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

186. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each

student's IEP. However, Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

187. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

188. Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

189. Thereafter, Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

190. Alternatively, Defendants CHICAGO PUBLIC SCHOOL DISTRICT, and Defendant JOSE M. TORRES, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## LOUDOUN COUNTY, VIRGINIA

191. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

192. Defendants SCOTT A. ZIEGLER, in his official capacity as Superintendent, and LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT ("LCPSD") (collectively, "Loudoun County Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

193. Moreover, in addition to violation(s) under the federal FCA, Loudoun County Defendants have also violated VA. CODE ANN. §8.01-216.3, et seq. as described herein.

194. Relator has first-hand knowledge of LCPSD's failure to provide services as mandated, and thus its false submission of reimbursement claims to Medicaid and fraudulent projection of students being services properly remotely.

195. As an example of Defendants' fraud, Relator presents the redacted IEP of T.A. dated November 4, 2020, with an IEP review date of November 3, 2021. *See*, **Exhibit 16**. T.A.,

was a high schooler at John Champe High School and classified with Multiple Disabilities during the 2020-2021 school year. *See* **Exhibit 16.**

196. Shockingly, the IEP originally contained a Prior Notice and Parent Consent section indicating that the services could be designated for in person or a remote location, based on the school division's ability, and <u>stating that the school division does not have an obligation to make up missed services on days that the school division does not offer instruction due to pandemics, health emergencies, inclement weather, and other such reasons</u>. **Exhibit 16**. (emphasis added).

197. On the next page, the IEP elicited parental consent to release the student's information and bill Medicaid for services. **Exhibit 16,** p.20.

198. Although T.A.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

199. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (LCPSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

200. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

201.  Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

202.  Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

203.  Thereafter, Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

204.  Alternatively, Defendants LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT, and Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## CAMDEN CITY, NEW JERSEY

205.  Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

206.  Defendants KATRINA T. MCCOMBS, in her official capacity as Superintendent, and CAMDEN CITY PUBLIC SCHOOL DISTRICT ("CCPS") (collectively, "Camden City Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.      knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.      knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.      knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.      conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

207.  Moreover, in addition to violation(s) under the federal FCA, Camden City Defendants have also violated N.J. STAT. ANN. §§ 2A:32C-1—32C-18, et seq. as described herein.

208.  Relator presents a redacted IEP from A.K., a student currently enrolled in a charter school called Leap Academy, which is a financial subsidiary of CCPS. **Exhibit 17**.

209.  Upon information and belief, Defendant CCPS applies for federal funding and reimbursement through the IDEA, Medicaid, and otherwise, on behalf of the Leap Academy.

210.  A.K. is 8-years-old and classified with a Specific Learning Disability on her IEP. During the 2020-2021 school year, A.K. was recommended to receive Speech therapy in a speech room for 30 minutes, 30 times per year. Additionally, she was recommended to receive a one-to-one aide in the classroom, and supplementary education once a day for 45 minutes. **Exhibit 17**, p. 3.

211. In fact, A.K.'s IEP explicitly states that <u>the school may not be required to make up related service sessions</u>, but would be provided "to the extent possible." **Exhibit 17**, p.8-9 (emphasis added).

212. Although A.K.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

213. The Relator alleges that not only was the method of delivery for A.K.'s services inappropriate and rendered essentially useless services to the student, but alleges that Defendants CCPS, by and through Defendant McCOMBS in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

214. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (CCPS) did <u>*not*</u> reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

215. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent have billed for services that were recommended to be <u>*in person*</u> as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

216. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

217. Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

218. Thereafter, Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

219. Alternatively, Defendants CAMDEN CITY PUBLIC SCHOOL DISTRICT, and Defendant KATRINA McCOMBS, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

## CALIFORNIA

220. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

221. Defendants AUSTIN BEAUTNER, in his official capacity as Superintendent of Los Angeles Unified School District, LOS ANGELES UNIFIED SCHOOL DISTRICT ("LAUSD"), DR. LAMONT A. JACKSON, in his official capacity as Interim Superintendent of San Diego Unified School District; CINDY MARTEN, in her official capacity as former Superintendent of San Diego Unified School District for the 2019-2020 and 2020-2021

school years; and SAN DIEGO UNIFIED SCHOOL DISTRICT ("SDUSD") (collectively, "California Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

202.   Moreover, in addition to violation(s) under the federal FCA, California Defendants (collectively) have also violated Ch. 6, Article 9, §12650-12656, et seq. as described herein.

### Los Angeles, California

203.   In yet another example of the expansive breadth of this nationwide Medicaid scheme, Relator presents the redacted school year 2019-2020 IEP of student C.A., a 10-year-old student with autism who attends Pomelo Community Charter School, a financial subsidiary of LAUSD. **Exhibit 18.**

204.   Due to his autism, C.A. requires redirection to focus on tasks and struggles in various skill sets and academics. **Exhibit 18**. He was recommended for an extended school year with

services of OT, Speech and Language Therapy, Adapted Physical Education, to be delivered by direct service and in school-based areas. **Exhibit 18.**

205.  In C.A.'s IEP, it specifically states: "[C.A.]'s speech and language impairment, secondary to his eligibility of autism, impacts his ability to progress and participate in the classroom curriculum." **Exhibit 18,** p. 6.

206.  Relator also presents the 2019-2020 school year IEP of M.R., an 8-year-old student who also attended Pomelo Community Charter School. **Exhibit 19**. She is classified with a specific learning disability and was recommended for an extended school year with instructional accommodations. *Id*. These accommodations were not prescribed to be delivered remotely, yet after the COVID closures, M.R. was subsequently left no choice but to receive her education and related services through remote learning.

207.  In M.R.'s IEP, formulated in September 2020, it states: "[M.R.] <u>has not</u> met her reading goals from the last IEP. She is not able to identify all upper and lowercase letters or corresponding sounds. [M.R.] continues to exhibit difficulty in recognizing and identifying high frequency words. <u>[M.R.] is very dependent [on] parental support during distance learning</u>." **Exhibit 19**, p.3 (emphasis added).

208.  More importantly, even though M.R.'s IEP was formulated in the midst of the COVID-19 pandemic (September 2020), the District noted that:

> "LAUSD schools are closed at this time due to COVID-19 national pandemic. <u>[M.R.] will receive educational services as described in the Distance learning Plan (DLP) recommended by the IEP team</u>. Parent is requesting an OT screening and possible assessment. Parent is requesting tutoring and part of our recoupment conversation is to utilize in house pool teachers to support tutoring at this time."
> **Exhibit 19,** p. 21 (emphasis added).

209.  This not only denotes the unilateral transfer of the Student from the "brick and mortar" placement to remote learning, but also clearly evidences that Defendants drafted an IEP that

they <u>had no intention of implementing following the meeting</u> in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf for the services (as written) in the IEP.

210. Indeed, it is abundantly clear that LAUSD drafted M.R.'s IEP <u>with no intention to actually implement the IEP as written.</u> Further, despite being informed of M.R.'s educational, management needs, *<u>and noted regression in learning</u>*, LAUSD failed to offer M.R. a FAPE in accordance with the IDEA.

211. Although C.A.'s and M.R.'s Parents are not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

212. The Relator alleges that not only was the method of delivery for C.A.'s and M.R.'s services inappropriate and rendered essentially useless services to the students, but alleges that Defendant LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

213. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Students' parents to recommend remote related services. Relator has first-hand knowledge that the LEA did *<u>not</u>* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

214. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent of Schools, have billed for services

that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

215. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

216. Defendant LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, have failed to provide the students within their jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

217. Thereafter, Defendant LAUSD, by and through Defendant AUSTUN BEUTNER, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

218. Alternatively, Defendants LOS ANGELES UNIFIED PUBLIC SCHOOL DISTRICT, and Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, remained complicit in the scheme to defraud the state and federal governments.

### SAN DIEGO, CALIFORNIA

219. Also complicit in these fraudulent billing practices were DR. LAMONT A. JACKSON, in his official capacity as current Interim Superintendent; CINDY MARTEN, in her official capacity as former Superintendent (in the 2019-2020 and 2020-2021 school years); and SAN DIEGO UNIFIED SCHOOL DISTRICT ("SDUSD").

220. Relator presents the IEP of J.M., a 17-year-old student who is autistic, has ADHD, and is classified with an Other Health Impairment. **Exhibit 20**. He attended Morse High School, a school in the SDUSD, during the 2020-2021 school year. *Id*. His IEP indicated he was to receive special instruction, nursing services, psychological services, and transitional training as part of his related services. *Id*. These services were to be provided at the public school campus, either in the regular classroom or in a separate classroom, depending on the service. *Id*. However, he was not given any of his special accommodations as outlined in his IEP during the COVID-19 school closures.

221. J.M.'s Parents met with Defendants via Zoom on November 3, 2020. However, despite voicing concerns about the services that J.M. was receiving, Defendants drafted another IEP and noted that: "Service hours are written for return to brick and mortar sites. The case manager explains the difference in services via distance learning and directs parent to PWN previously sent home by the district re Distance Learning due to Covid-19 school closure." **Exhibit 20,** p. 26.

222. Again, this not only establishes the unilateral transfer of the Student's educational placement from the "brick and mortar" placement to remote learning, but also clearly evidences that Defendants drafted an IEP that they had no intention of implementing following the meeting in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf for the services (as written) in the IEP.

223. Although J.M.'s parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

224. The Relator alleges that not only was the method of delivery for J.M's services inappropriate and rendered useless services to the student, but alleges that Defendants SDUSD, by and

through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Interim Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent for school years 2019-2020 and 2020-2021, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

225.  Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (SDUSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

226.  As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

227.  Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

228.  Defendant SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with

disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written, from March 2020 and continuing.

229. Thereafter, Defendants SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, benefitted from their malfeasance by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

230. Alternatively, SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, remained complicit in the scheme to defraud the state and federal governments.

## WAKE COUNTY, NORTH CAROLINA

231. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

232. Defendants CATHY QUIROZ MOORE, in her official capacity as Superintendent, and WAKE COUNTY PUBLIC SCHOOL DISTRICT ("WCPSD") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.   knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.   conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

233.   Moreover, in addition to violation(s) under the federal FCA, Wake County Defendants (collectively) have also violated N.C.G.S. §§1-605 through 617, et seq. as described herein.

234.   To substantiate these claims, Relator presents a redacted IEP from A.C., a 14-year-old student in Wake County with Autism. A redacted copy of A.C.'s 2020 IEP is annexed hereto as **Exhibit 21.**

235.   A.C. is recommended for special education instruction including Social/Emotion Skills, Adapted Physical Education, Writing, Reading, and Math. *See*, **Exhibit 21**, p. 26. He is recommended for related services of Occupational Therapy, as well as Speech and Language Therapy. *See Id.*

236.   A.C.'s IEP, drafted in the midst of the pandemic on October 5, 2020, does not denote the setting in which A.C. is to receive his services (i.e. "remote", "push-in", "pull out", etc.), and only notes that he shall receive his services "within the school environment." A.C.'s IEP also notes that a Special Assistant is to accompany him to class to help him meet classroom expectations and prevent maladaptive behaviors. **Exhibit 21.**

237.   However, this serves as yet another example of Defendants' attempts to conceal their fraudulent conduct; in a remote setting, there was no Special Assistant to "accompany him"

to class, as classes were remote. This is further substantiated by the Parents' concerned noted on page 1 of the IEP, that notes A.C. was indeed not given the face-to-face instruction as written in the IEP and required under the Medicaid billing requirements. *See*, **Exhibit 21.**

238.   Additionally, Defendants noted the following in A.C.'s IEP:

> "In Remote Learning, [A.C.] is relying heavily on his parent for support. In the classroom, he sat up and worked daily. In remote learning, he has a sensory need to sit in a more relaxed seat and work like he is in a classroom. He has been unresponsive to any discussion of his behavior and such discussions have been counterproductive. Nevertheless, [A.C.] has continued to improve his understanding of the material although does not show improvement in his independence building behaviors." (**Exhibit 21**, p. 6).

239.   This evidences both the unilateral transfer of the Student's educational placement from the "brick and mortar" placement to remote learning and that Defendants drafted an IEP that they had no intention of implementing following the meeting in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf for the services (as written) in the IEP.

240.   Although his IEP thoroughly describes A.C.'s needs and for instance, need for "support from the SLP [Speech Language Pathologist] to monitor social skills interactions with peers and adults in the in-person and virtual school environments", Defendants changed A.C.'s service recommendations to "00" minutes of Speech Language Therapy, Occupational Therapy, and Adaptive Physical Education. **Exhibit 21,** p. 12-13.

241.   However, A.C.'s IEP specifically notes his need for assistance in speech; for instance, on page 15 of A.C.'s IEP, it notes:

> "[A.C.] has struggled since transitioning to remote/virtual learning in March 2020. [A.C.] continues to require support from the SLP to monitor social skills interactions with peers and adults in the in-person and virtual school environments, especially when he is overwhelmed, anxious, or confused." **Exhibit 21.**

242.   Moreover, the IEP highlights that: "Parents are concerned that due to pandemic, [A.C.] is not receiving face-to-face, in-person help from his Instructional Assistant. Working with his

father is causing [A.C.] to over-rely on his father. Parents are concerned about seizures, regression, and that he has needed more one-to-one support than before the pandemic." **Exhibit 21,** p. 1.

243. Despite being made aware of A.C.'s educational and management needs, the District met in October 2020 and drafted an IEP that simply could not be implemented. For instance, one of A.C.'s social-emotional goals moving forward was "[A.C.] will strike up a quick conversation with at least 3 others each school day in at least 4/5 trials." **Exhibit 21**, p. 11.

244. In remote learning from his home, this goal is unattainable. This serves as yet another example of Defendants recommending and implementing an IEP that is a per se denial of FAPE, yet utilizing the same IEP to bill Medicaid and implement the utilize IDEA funds.

245. Although A.C.'s Parents are not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

246. The Relator alleges that not only was the method of delivery for A.C.'s services inappropriate and rendered useless services to the students, but alleges that Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the students with disabilities as described in their IEPs.

247. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Students' parents to recommend remote related services. Relator has first-hand knowledge that the LEA did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

248. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE in her official capacity as Superintendent of Schools, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

249. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

250. Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, have failed to provide the students within their jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

251. Thereafter, Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

252. Alternatively, Defendants WCPS and Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

**AUSTIN, TEXAS**

253.  Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

254.  Defendants STEPHANIE S. ELIZADE, in her official capacity as Superintendent, and AUSTIN INDEPENDENT SCHOOL DISTRICT ("AISD") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a.  knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b.  knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c.  knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d.  conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

255.  Moreover, in addition to violation(s) under the federal FCA, Austin Defendants (collectively) have also violated TEX. HUM. RES. CODE § 32.039(b).  TEX. HUM. RES. CODE § 36.002 (13) as described herein.

256.  Relator presents a redacted IEP from A.N., a student currently enrolled in Austin Achieve Elementary School, in Austin, Texas. **Exhibit 22**.

257.  A.N. is 4-years-old and classified with a Speech Impairment on her IEP. During the 2020-2021 school year, A.N. was recommended to receive Speech Therapy in a small group setting (3:1 model) with a speech pathologist. It is not noted whether this was offered as a "push-in" or "pull-out" service, however, it was noted that "[t]he committee recommends that this student receive part or all instruction in a special education setting." **Exhibit 22**, p. 9 (emphasis added).

258.  A.N.'s IEP also states that she will "receive paraprofessional support during academic instruction times." **Exhibit 22**, p.15.

259.  Although A.N.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

260.  The Relator alleges that not only was the method of delivery for A.N.'s services inappropriate and rendered useless services to the student, but alleges that Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the Student as designed and described in her IEP.

261.  Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (AISD) did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

262.  As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants AISD, by and through Defendant ELIZADE, in her

official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

263. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

264. Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

265. Thereafter, Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

266. Alternatively, Defendant AISD and Defendant ELIZADE, in her official capacity as Superintendent, remained complicit in the scheme to defraud the state and federal governments.

## DEFENDANTS' FRAUDULENT CONDUCT

267. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

268. The FCA subjects those who receive federal funds fraudulently to civil liability.  The United States Justice Department relies on this provision to curb the abuse of federal funds in programs ranging from Medicaid to disaster assistance.

FALSE CERTIFICATION FRAUD

269. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

270. The Defendants submitted "false claims" when its representatives submitted fraudulent representations that:

    A)    the IEPs they created were knowingly not in compliance with IDEA and they could not implement these IEPs, thereby denying the students a FAPE; and

    B)    when their service providers knowingly misrepresented that they were providing related services in accordance with IDEA and Medicaid regulations.

271. These claims were legally false, since the provider knew it was in violation of federal regulations at the time of submission. Upon information and belief, the federal and state government disbursed the money for said fraudulent claims because the Defendants certified that they had complied with the relevant federal regulations.

IMPLIED CERTIFICATION FRAUD

272. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

273. In some instances, the Defendants' representative may not have actually signed a form certifying compliance. However, this would still violate the FCA. By the very act of the provider submitting the claim, it is implied the provider affirmed that it was in compliance

with the regulations, as violating those regulations would have made the claimant ineligible to receive the funding.

274. In this context, the relevant regulations require keeping accurate attendance and providing special education services to all students. Thus, the Defendants who did not keep close track of log-ins and attendance data would be liable since school officials implicitly certified that they would keep their data current when they made the claim for public funds.

## WORTHLESS SERVICES FRAUD

275. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

276. Under the Worthless Services Fraud, the Defendants are liable since the limited services they may have provided was so subpar as to be completely worthless.

277. By claiming reimbursement for providing valueless care, the provider effectively has forced the government to pay for nothing—making it so the provider submits a legally false claim when it asks the government to reimburse it for services that have no value.

278. These deceptive practices are a prima facie case of fraudulent behavior. The Defendants knew the services they were claiming to provide were sub-par, if not worthless.

## **FIRST CLAIM**
Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(A))
Presenting False Claims for Payment

279. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

280. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

281. As set forth above, Defendants herein (collectively) knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval in connect with the submission of claim for school-based services for students with disabilities.

282. Medicaid and the respective Department of Education(s) reimbursed school districts, counties, and/or intermediate school districts using state and Federal funds as a result of Defendants' fraudulent conduct.

283. By reason of Defendants' false claims, the States of the United States along with the District of Columbia and the United States have been damaged in a substantial amount to be determined at trial, upon the conclusion of discovery.

## **SECOND CLAIM**
Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(B))
Use of False Statements

284. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

285. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

286. As set forth above, all Defendants herein (collectively) knowingly made, used, or caused to be made and used, false records and statements material to a false or fraudulent claim paid or approved in connect with the submission of claim for school-based services for students with disabilities.

287. Medicaid and the respective Department of Education(s) reimbursed school districts, counties and/or intermediate school districts using state and Federal funds because of Defendants' fraudulent conduct.

288. By reason of Defendants' false claims, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

### THIRD CLAIM
Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(G))
Use of False Statements

289. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

290. The United States seeks relief against all Defendants herein (collectively) under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

291. As set forth above, all Defendants herein knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

292. Medicaid and the respective Department of Education paid school districts, counties and/or intermediary state and Federal funds as a result of Defendants' fraudulent conduct.

293. By reason of Defendants' false claims, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

### FOURTH CLAIM
Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(C))
Conspiracy to Commit a Violation of the False Claims Act

294. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

295. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

296. As set forth above, Defendants individually conspired to commit a violation of subparagraph (A), (B) and (G) of the False Claims Act.

297. Defendants have each committed at least one overt act in furtherance of their conspiracy.

298. By reason of Defendants' conspiracy within their respective school districts, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

Violation of The New York False Claims Act

NYS ARTICLE 13 §187-194 (AMENDED 2018)

299. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

300. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §187-194 of Article 13 of the New York State Finance Law, under the New York False Claims Act.

301. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

302. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## SIXTH CLAIM

Violation of The New York City False Claims Act

(Administrative Code §§7-801 through 7-810)

303. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

304. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, and NYC DOE (herein "New York City Defendants") under Sections §7-801 through 7-810 of Administrative Code of New York City, known as the New York City False Claims Act.

305. As set forth above, New York City Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

306. New York City Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York City students with disabilities.

## SEVENTH CLAIM

Violation of New York Social Services Law

(NY Soc. Services Law §366 et seq.)

307. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

308. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH,

and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §366 et seq. of the New York State Social Services Law, for violations under §366-B.

309. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

310. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## EIGHTH CLAIM

Violation of New York Penal Law

NY Penal Code §175.05 (False Written Statements)

311. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

312. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §366 et seq. of the New York State Social Services Law, for violations under §366-B.

313. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

314. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## NINETH CLAIM

Violation of New York Penal Law

NY Penal Code §176 et seq. (Insurance Fraud)

315.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

316. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §176 et seq. of the New York State Penal Law.

317. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

318. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## TENTH CLAIM

Violation of New York Penal Law

NY Penal Code §177 (Health Care Fraud)

194.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §177 et seq. of the New York State Penal Law.

196. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## ELEVENTH CLAIM
### Violation of Massachusetts General Laws
#### MASS. GENERAL LAWS CH. 12, §5(B) et seq.

194.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Massachusetts Defendants (Defendant SKIPPER, and SOMERVILLE PUBLIC SCHOOL DISTRICT, collectively) under MASS. GENERAL LAWS CH. 12, §5(B) et seq.

196. As set forth above, Massachusetts Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Massachusetts Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Somerville students with disabilities.

## TWELVETH CLAIM

Violation of Connecticut General Laws

CT GEN. STAT. §4-275, et seq.

194.   The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Connecticut Defendants (Defendant LUCERO, and STAMFORD PUBLIC SCHOOL DISTRICT, collectively) under CT GEN. STAT. §4-275, et seq.

196. As set forth above, Connecticut Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Stamford students with disabilities.

## THIRTEENTH CLAIM

Violation of Illinois State Law(s)

740 ILCS §175 et seq.

194.   The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Illinois Defendants (Defendant TORRES, and CHICAGO PUBLIC SCHOOL DISTRICT, collectively) under 740 ILCS §175 et seq.

196. As set forth above, Illinois Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Illinois Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Chicago students with disabilities.

**FOURTEENTH CLAIM**

Violation of Virginia State Law(s)

VA. CODE ANN. §8.01-216.3, et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Virginia Defendants (Defendant ZIEGLER, and LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT, collectively) under VA. CODE ANN. §8.01-216.3, et seq.

196. As set forth above, Virginia Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Virginia Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Loudoun County students with disabilities.

## FIFTEENTH CLAIM

Violation of New Jersey State Law(s)

N.J. STAT. ANN. §§ 2A:32C-1—32C-18

194.   The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195.   The United States seeks relief against New Jersey Defendants (Defendant McCOMBS, and CAMDEN CITY PUBLIC SCHOOL DISTRICT, collectively) under N.J. STAT. ANN. §§ 2A:32C-1—32C-18.

196.   As set forth above, New Jersey Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197.   New Jersey Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Camden City students with disabilities.

## SIXTEENTH CLAIM

Violation of Texas State Law(s)

TEX. HUM. RES. CODE § 36.002, et seq.

194.   The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195.   The United States seeks relief against Texas Defendants (Defendant ELIZADE, AUSTIN INDEPENDENT SCHOOL DISTRICT, collectively) under TEX. HUM. RES. CODE § 36.002, et seq.

196.   A person commits an unlawful act as defined under the Texas Medicaid Fraud Prevention Act by, among other things:

A.   Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.  TEX. HUM. RES. CODE §36.002 (1).

B.   Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE § 36.002 (2).

C.   Knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.  TEX. HUM. RES. CODE § 36.002 (4) (B).

D.   Knowingly making or causing to be made a claim under the Medicaid program for a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry. HUM. RES. CODE § 36.002 (7) (B).

E.   Knowingly engaging in conduct that constitutes a violation under TEX. HUM. RES. CODE § 32.039(b).  TEX. HUM. RES. CODE § 36.002 (13).

197.  As set forth above, Texas Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal

funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

198. Texas Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Austin students with disabilities.

### SEVENTEENTH CLAIM

Violation of California State Law(s)

CAL. GOV. CODE § 12650-12656, et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against California Defendants (Defendant BEUTNER, LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant JACKSON, Defendant MARTEN, and SAN DIEGO UNIFIED SCHOOL DISTRICT, collectively) under CAL. GOV. CODE § 12650-12656, et seq.

196. As set forth above, California Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. California Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Los Angeles and San Diego students with disabilities.

**WHEREFORE**, Plaintiff the United States ex rel. Patrick Donohue respectfully requests that judgment be entered in their favor and against Defendants herein as follows:

a.  On the First, Second, Third and Fourth Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G)), for treble the United States' damages, in an amount to be determined at trial, and a statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants;

b.  Awarding Patrick Donohue his relator's share pursuant to 31 U.S.C. § 3730(d)(1) or (2);

c.  On the First, Second, Third and Fourth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d); and

d.  Awarding such other and further relief as this Court deems just and proper.

Dated: September ___, 2021

Respectfully submitted,

_____

**PATRICK B. DONOHUE, ESQ.**
55 W 116th Street – Suite 159
New York, NY 10026
(917) 359-4556

## TO:

**UNITED STATES ATTORNEY**
*Southern District of New York*
86 Chambers Street – 3rd Floor
New York, N.Y. 10007

**ATTORNEY GENERAL: CIVIL DIVISION**
*US Department of Justice*
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

**SOMERVILLE PUBLIC SCHOOL DISTRICT**
*Attn: Mary Skipper,*
*Superintendent*
8 Bonair Street
Somerville, MA 02145

**MARY SKIPPER, SUPERINTENDENT**
*Somerville Public School District*
8 Bonair Street
Somerville, MA 02145

**STAMFORD PUBLIC SCHOOL DISTRICT**
*Attn: Dr. Tamu Lucero*
888 Washington Boulevard
Stamford, CT 06901

**DR. TAMU LUCERO, SUPERINTENDENT**
*Stamford Public School District*
888 Washington Boulevard
Stamford, CT 06901

**CHICAGO PUBLIC SCHOOL DISTRICT**
*Attn: Jose M. Torres, PhD,*
*Superintendent*
42 W. Madison Street
Chicago, IL 60602

**JOSE M. TORRES, PHD, SUPERINTENDENT**
*Chicago Public School District*
42 W. Madison Street
Chicago, IL 60602

**LOUDOUN COUNTY PUBLIC SCHOOLS**
*Attn: Scott A. Ziegler,*
*Superintendent*
21000 Education Court
Ashburn, VA 21048

**SCOTT A. ZIEGLER, ED.D.,**
**SUPERINTENDENT**
*Loudoun County Public Schools*
21000 Education Court
Ashburn, VA 21048

**CAMDEN CITY PUBLIC SCHOOL DISTRICT**
*Attn: Katrina McCombs,*
*Superintendent*
1033 Cambridge Street
Camden, NJ 08105

**KATRINA T. MCCOMBS, SUPERINTENDENT**
*Camden City Public School*
*District*
1033 Cambridge Street
Camden, NJ 08105

**LOS ANGELES UNIFIED SCHOOL DISTRICT**
*Attn: Austin Beutner,*
*Superintendent*
333 South Beaudry Avenue
Los Angeles, CA 90017

**AUSTIN BEUTNER, SUPERINTENDENT**
*Los Angeles Unified School*
*District*
333 South Beaudry Avenue
Los Angeles, CA 90017

**SAN DIEGO UNIFIED SCHOOL DISTRICT**
*Attn: Dr. Lamont A. Jackson*
4100 Normal Street, Room 2231
San Diego, CA 92103

**DR. LAMONT A. JACKSON, SUPERINTENDENT**
*San Diego Unified School District*
4100 Normal Street, Room 2231
San Diego, CA 92103

**CINDY MARTEN, FORMER SUPERINTENDENT**
*San Diego Unified School District*
4100 Normal Street, Room 2231
San Diego, CA 92103

**WAKE COUNTY PUBLIC SCHOOL DISTRICT**
*Attn: Cathy Quiroz Moore*
5625 Dillard Drive
Cary, NC 27518

**CATHY QUIROZ MOORE, SUPERINTENDENT**
*Wake County Public School District*
5625 Dillard Drive
Cary, NC 27518

**AUSTIN INDEPENDENT SCHOOL DISTRICT**
*Attn: Stephanie S. Elizade*
4000 S. I-H 35 Frontage Road
Austin, TX 78704

**STEPHANIE S. ELIZADE, SUPERINTENDENT**
*Austin Independent School District*
4000 S. I-H 35 Frontage Road
Austin, TX 78704

# EXHIBIT LIST

| Ex. | *Description* | # Pgs. |
|---|---|---|
| 1 | IDEA Part B Letters for respective Defendants from United States Department of Education (alphabetical order by State) | 271 |
| 2 | Press Release from NYC Comptroller Scott M. Stringer: "*Comptroller Stringer Audit Finds the City Lost $179 Million Due to Mismanagement of DOE Medicaid Reimbursement Claims for Special Education Services*", (July 19, 2021) | 6 |
| 3 | J.R. 2020 IEP (NYC) | 29 |
| 4 | J.R. Remote IEP Plan (NYC) | 1 |
| 5 | J.R. Transcript (IHO Case No. 197017)(July 14, 2021)(NYC) | 52 |
| 6 | S.J.D. Transcript (IHO Case No: 185111) (Oct. 1, 2020) (NYC) | 159 |
| 7 | S.J.D. Transcript (IHO Case No: 196228) (Jul. 14, 2021) (NYC) | 182 |
| 8 | New York City December 2020 Financial Status Report | 17 |
| 9 | G.M. 2020 IEP (Buffalo, NY) | 18 |
| 10 | G.M. Letter from Autism Services, Inc. (dated: Aug. 6, 2021) | 1 |
| 11 | T.S. 2020 IEP (Niagara Falls, NY) | 14 |
| 12 | P.M. 2020 IEP (Somerville, MA) | 18 |
| 13 | Massachusetts DOE 2020 Year End Financial Report | 112 |
| 14 | H.P. 2020 IEP (Stamford, CT) | 28 |
| 15 | B.W. 2020 IEP (Chicago, IL) | 33 |

| 16 | T.A. 2020 IEP (Loudoun County, VA) | 23 |
| 17 | A.K. 2020 IEP (Camden City, NJ) | 30 |
| 18 | C.A. 2020 IEP (Los Angeles, CA) | 31 |
| 19 | M.R. 2020 IEP (Los Angeles, CA) | 23 |
| 20 | J.M. 2020 IEP (San Diego, CA) | 27 |
| 21 | A.C. 2020 IEP (Wake County, NC) | 19 |
| 22 | A.N. 2020 IEP (Austin, TX) | 17 |

## DEFENDANT SCHOOL DISTRICTS

|     | DISTRICT | STATE |
|-----|----------|-------|
| 1   | New York City | NY |
| 2   | Niagara Public School District | NY |
| 3   | Buffalo Public School District | NY |
| 4   | Somerville Public School District | MA |
| 5   | Stamford Public School District | CT |
| 6   | Chicago Public School District | IL |
| 7   | Loudoun County Public School District | VA |
| 8   | Camden City Public School District | NJ |
| 9   | Los Angeles Public School District | CA |
| 10  | San Diego Public School District | CA |
| 11  | Wake County Public School District | NC |
| 12  | Austin Independent School District | TX |