UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

United States of America and States of the United States,
ex rel. Patrick Donohue,

                                 Plaintiffs,

               -against-

[UNDER SEAL],

                          Defendants.

---------------------------------------------------------------------------x

**ORIGINAL**

**1:20–CV–5396 (GHW)**

**SECOND AMENDED
COMPLAINT**

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**



RECEIVED
SEP 29 2021
KH
PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

United States of America and States of the United States,
ex rel. Patrick Donohue,

Plaintiffs,

**1:20–CV–5396 (GHW)**

**SECOND AMENDED**
**COMPLAINT**

-against-

**RICHARD CARRANZA,** in his official capacity as
the former Chancellor of New York City Department of
Education,

**MEISHA PORTER,** in her official capacity as the current
Chancellor of the New York City Department of Education,

**NEW YORK CITY DEPARTMENT OF EDUCATION,**

**NIAGARA FALLS PUBLIC SCHOOL DISTRICT,**

**MARK LAURRIE,** in his official capacity as Superintendent,

**BUFFALO PUBLIC SCHOOL DISTRICT,**

**KRINER CASH,** in his official capacity as Superintendent,

**MASSACHUSETTS DEPARTMENT OF EDUCATION,**

**SOMERVILLE PUBLIC SCHOOL DISTRICT,**

**MARY SKIPPER,** in her official capacity as Superintendent,

**JEFFREY C. RILEY,** in his official capacity
as Superintendent,

**STAMFORD PUBLIC SCHOOL DISTRICT,**

**DR. TAMU LUCERO,** in her official capacity
as Superintendent,

**CHICAGO PUBLIC SCHOOL DISTRICT,**

**JOSE M. TORRES, PhD,** in his official capacity
as Superintendent,

**LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT,**

**SCOTT A. ZIEGLER,** in his official capacity as
Superintendent,

**CAMDEN CITY PUBLIC SCHOOL DISTRICT,**

**KATRINA McCOMBS,** in her official capacity as
Superintendent,

**FILED UNDER SEAL**
**PURSUANT TO**

**31 U.S.C. § 3730(b)(2)**

2

**LOS ANGELES UNIFIED SCHOOL DISTRICT,**

**AUSTIN BEUTNER,** in his official capacity as
Superintendent,

**SAN DIEGO UNIFIED SCHOOL DISTRICT,**

**DR. LAMONT A. JACKSON,** in his official capacity
as Superintendent, and

**CINDY MARTEN,** in her official capacity as former
Superintendent,

**WAKE COUNTY PUBLIC SCHOOL DISTRICT,**

**CATHY QUIROZ MOORE,** in her official capacity as
Superintendent,

**AUSTIN INDEPENDENT PUBLIC SCHOOL DISTRICT,**

**STEPHANIE S. ELIZADE,** in her official capacity as
Superintendent,

Defendants.

----------------------------------------------------------------------------x


## PRELIMINARY STATEMENT AND NATURE OF THIS ACTION

**COMES NOW**, Patrick Donohue ("Relator Donohue"), files this second amended
complaint and brings this *qui tam* action on behalf of the United States of America ("United
States") and the States of the United States along with the District of Columbia, (collectively, the
"Government"), against RICHARD CARRANZA, in his official capacity as the former
Chancellor of New York City Department of Education ("Defendant CARRANZA"), MEISHA
PORTER, in her official capacity as current Chancellor of the New York City Department of
Education ("Defendant PORTER"), the New York City Department of Education ("NYC DOE"),
the City of New York ("NYC"), and other above-named Defendants under the federal False
Claims Act, 31 U.S.C. § 3729-3733, ("FCA") as well as the corresponding state false claim
statutes, including but not limited to: the New York False Claims Act; the New York City False
Claims Act (Local Law 53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145

3

et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud); Mass. General Laws Ch. 12, §5(B) et seq.; CT GEN. STAT. §4-275; 740 ILCS §175, et seq.; VA. CODE ANN. §8.01-216.3, et seq.; N.J. STAT. ANN. §§ 2A:32C-1—32C-18; CAL. GOV. CODE § 12650 et seq., N.C.G.S. §§1-605 through 617, et seq.; TEX. HUM. RES. CODE § 32.039(b); TEX. HUM. RES. CODE § 36.002 (13); and alleges upon his first-hand knowledge as follows:

## INTRODUCTION

1.    This is an action brought to recover taxpayer dollars spent as a result of Defendants' fraudulent conduct. Specifically, above-named Defendants conducted related services for students with disabilities via telehealth and/or via phone, contrary to the Medicaid and IDEA/Title I billing requirements, and submitted for reimbursement of same by misrepresenting that such services were in compliance with the relevant State and federal laws.

2.    Due to the profound nature of their disabilities, known to both the Defendants and related providers, these students were unable to meaningfully participate in these remote "sessions," yet Defendants fraudulently billed for these "sessions" through Medicaid at their regular, full rates. Defendants herein also utilized IDEA funding for non-related services, despite failing to offer a free appropriate public education in accordance with the law.

3.    As a result, Defendants obtained the benefit of virtually unfettered Medicaid reimbursements for these related service sessions, and as a result, Defendants have violated the federal False Claims Act, 31 U.S.C. § 3729-3733, ("FCA") as well as the corresponding state false claim statutes.

4

4.     In addition to violating the federal FCA, NEW YORK DEFENDANTS (collectively) herein have also violated the New York False Claims Act; the New York City False Claims Act (Local Law 53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); §176 (Insurance Fraud); and §177 Health Care Fraud.

5.     In addition to violating the federal FCA, MASSACHUSETTS DEFENDANTS (collectively) herein have also violated MASS. GENERAL LAWS CH. 12, §5(B) et seq. and related state law.

6.     In addition to violating the federal FCA, CONNECTICUT DEFENDANTS (collectively) herein have also violated CT GEN. STAT. §4-275, et seq. and relevant state law.

7.     In addition to violating the federal FCA, ILLINOIS DEFENDANTS (collectively) herein have also violated 740 ILCS §175, et seq. and related state law.

8.     In addition to violating the federal FCA, VIRGINIA DEFENDANTS (collectively) herein have also violated VA. CODE ANN. §8.01-216.3, et seq. and relevant state law.

9.     In addition to violating the federal FCA, NEW JERSEY DEFENDANTS (collectively) herein have also violated N.J. STAT. ANN. §§ 2A:32C-1—32C-18 and related state law.

10.     In addition to violating the federal FCA, CALIFORNIA DEFENDANTS (collectively) herein have also violated CAL. GOV. CODE § 12650-12656, et seq. and relevant state law.

11.     In addition to violating the federal FCA, NORTH CAROLINA DEFENDANTS (collectively) herein have also violated N.C.G.S. §§1-605 through 617, et seq. and relevant state law.

12. In addition to violating the federal FCA, TEXAS DEFENDANTS (collectively) herein have also violated TEX. HUM. RES. CODE § 32.039(b), TEX. HUM. RES. CODE § 36.002 (13), and relevant state law.

## THE PARTIES

### PLAINTIFF RELATOR

13. Relator Patrick Donohue, JD/MBA, is a civil rights attorney with a focus on special education law and Founder and former Chairman of The International Academy of HOPE ("iHOPE") (2013-2018), and the Founder and current Chairman of the International Institute for the Brain ("iBRAIN") (2018-Present). iBRAIN is a not-for-profit educational organization that provides students with brain injuries and brain-based disorders highly specialized educational opportunities based on the individual needs of each student.

14. As Founder and Chairman of these schools, the Relator has extensive knowledge of the rules governing the provision of special education services to profoundly disabled children.

15. Prior to establishing iHOPE and iBRAIN, Donohue founded the Sarah Jane Brain Foundation ("SJBF"), an international non-profit named for his daughter who was shaken as a baby by a nurse, causing broken ribs, broken collarbones, and a severe brain injury. Launched in October 2007, the SJBF quickly became one of the largest organizations in the world for youth brain injury.

16. The SJBF International Advisory Board includes over 200 experts from major medical institutions and research universities around the world.

17. In June 2009, SJBF announced the largest healthcare collaboration in U.S. history dealing with Pediatric Acquired Brain Injuries ("PABI")—one institution from each state (including D.C. and Puerto Rico), were selected as a SJBF State Lead Center of Excellence. Thereafter,

6

Case 1:20-cv-05396-GHW-SDA   Document 19   Filed 09/29/21   Page 7 of 783

Congress introduced bi-partisan legislation to fund a \$2.9 billion, seven-year national initiative to implement SJBF's PABI plan.

18. Thus, the Relator has significant knowledge and expertise in the field of Special Education law.

19. The Relator has learned that profoundly disabled children in NYC and other named School Districts received Medicaid reimbursements, payments, and otherwise for related service sessions that were not provided in a manner and environment that is consistent with the students' physical and medical needs and did not adhere to the relevant Medicaid and IDEA billing requirements.

20. As required by the Act, Relator is "an individual who has direct and independent knowledge of the information on which the allegations are based." USC 3730(e)(4)(B)(2006) (amended 2010).

## DEFENDANTS

21. As set forth by 31 USCS §3730 and relevant case law, though States and local governments are not "persons" for the purposes of the Act, a State employee may be sued in an individual capacity under the False Claims Act for actions takes in the course of their official duties. *See* Cook County v. United States ex rel. Chandler, 538 U.S. 119 (2003).

22. However, it is incredibly important to note that each named Defendant municipality has waived their 11th Amendment sovereign immunity by receiving funds under the Individual with Disabilities Education Act (IDEA) Part B 20. USCS § 1415. Defendant sovereigns are made aware of this waiver upon the processing of their respective IDEA applications each year. **Exhibit 1,** IDEA Part B letters to respective Defendants.

7

23. Although Defendants may attempt to argue that they maintain sovereign immunity with regard to Medicaid reimbursement claims, the Relator alleges that this argument fails, not only because it is contrary to the relevant case law, but the Medicaid claims made as alleged herein are <u>directly related</u> to Defendants' responsibilities under the IDEA, and as a recipient of IDEA funding, Defendants have expressly waived their sovereign immunity under the 11th Amendment. *See* **Exhibit 1.**

24. Additionally, Defendants cannot seek refuge in the comforts of sovereign immunity while simultaneously engaging in abuse of authority and/or power of their respective official positions.[1]

## *New York Defendants*

25. Defendant RICHARD CARRANZA, is the former New York City Schools Chancellor, employed by the NEW YORK CITY DEPARTMENT OF EDUCATION during the 2019-2020, and part of the 2020-2021 school year until Defendant PORTER's appointment on February 26, 2021.

26. Defendant MEISHA PORTER, is the current New York City Schools Chancellor, and is responsible for the oversight and management of the NEW YORK CITY DEPARTMENT OF EDUCATION, was appointed this position on or about February 26, 2021 and continues to hold this position.

27. Pursuant to N.Y. EDUC. LAW §2590-H, the Chancellor is responsible for the integrity of audits, and has the authority to intervene when a School District is persistently failing to achieve educational results. *See,* §2590-H(31), (35).

---

[1] The Supreme Court has noted that such immunity extends only to a very limited class of officials, including the U.S. President, legislators carrying out their legislative functions, and judges carrying out their judicial functions. *See Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824).

28. Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("NYC DOE") is a municipal agency of the City of New York, State of New York.

29. Defendant NIAGARA FALLS PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Niagara Falls, New York.

30. Defendant MARK LAURRIE is the current Superintendent of NIAGARA FALLS PUBLIC SCHOOL DISTRICT in Niagara Falls, New York and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

31. Pursuant to NY Article 51, §2508 the Superintendent of a School District is responsible for the enforcement of all provisions of law, rules, and regulations relating to the management of schools and other educational, social, and recreational activities. The Superintendent is responsible for the supervision and direction of associate, assistant, and other superintendent, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, claim auditors, deputy claim auditors, attendance officers, janitors, and other persons employed in the management of schools. *See,* Article 51, §2508 (3) and (5)(emphasis added).

32. Defendant BUFFALO PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Buffalo, New York.

33. Defendant KRINER CASH is the current Superintendent of BUFFALO PUBLIC SCHOOL DISTRICT in Buffalo, New York and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

34. Pursuant to NY Article 51, §2508 the Superintendent is responsible for the enforcement of all provisions of law, rules, and regulations relating to the management of schools and other educational, social, and recreational activities. The Superintendent is responsible for the

9

supervision and direction of associate, assistant, and other superintendent, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, claim auditors, deputy claim auditors, attendance officers, janitors, and other persons employed in the management of schools. *See,* Article 51, §2508 (3) and (5)(emphasis added).

*Massachusetts Defendants*

35. Defendant SOMERVILLE PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Somerville, Massachusetts.

36. Defendant MARY SKIPPER is the Superintendent of Schools, employed by the SOMERVILLE PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

37. Pursuant to MASS. GEN. LAWS C. 71 §52, the Superintendent is responsible for managing the [educational] system in a fashion consistent with state law and policy determinations.

38. Defendant JEFFREY C. RILEY, in his official capacity as Superintendent of the Massachusetts Department of Education, is responsible for the oversight and management of the schools within its State.

*Connecticut Defendants*

39. Defendant STAMFORD PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Stamford, Connecticut.

40. Defendant DR. TAMU LUCERO is the Superintendent of Schools, employed by the STAMFORD PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

41.   Pursuant to CGS §10-157, the Superintendent has the authority and responsibility for the management of the school system within its respective jurisdiction.

*Illinois Defendants*

42.   Defendant CHICAGO PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Chicago, Illinois.

43.   Defendant JOSE M. TORRES, PhD is the Superintendent of Schools, employed by the CHICAGO PUBLIC SCHOOL DISTRICT and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

44.   Pursuant to 105 ILCS 5 §10-21.4, the Superintendent is responsible for the management of their respective School Districts.

*Virginia Defendants*

45.   Defendant LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT operates within the jurisdiction of Loudoun County, Virginia.

46.   Defendant SCOTT A. ZIEGLER is the current Superintendent of LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT in Loudoun County, Virginia and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

47.   As set forth in VA CODE ANN. §66-13.1, the Superintendent is responsible for the oversight and management of the administration of the designated School District.

*New Jersey Defendants*

48. Defendant CAMDEN CITY PUBLIC SCHOOL DISTRICT operated within the jurisdiction of Camden City, New Jersey.

49. Defendant KATRINA McCOMBS is the current Superintendent of CAMDEN CITY PUBLIC SCHOOL DISTRICT in Camden City, New Jersey and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

50. Pursuant to NJ REV. STAT. §18A:17-20, the Superintendent is responsible for the management and supervision of its School District.

*California Defendants*

51. Defendant LOS ANGELES UNIFIED SCHOOL DISTRICT operates within the jurisdiction of Los Angeles County, California.

52. Defendant AUSTIN BEUTNER is the current Superintendent of LOS ANGELES UNIFIED SCHOOL DISTRICT in Los Angeles, California and was responsible for the oversight and management of the schools within its District during the 2019-2020 school year and continuing.

53. Defendant SAN DIEGO UNIFIED SCHOOL DISTRICT operates within the jurisdiction of San Diego, California.

54. Defendant DR. LAMONT A. JACKSON is the current interim Superintendent of SAN DIEGO UNIFIED SCHOOL DISTRICT in San Diego, California and is responsible for the oversight and management of the schools within its District beginning on or about January 2021, and continuing.

55.    Defendant CINDY MARTEN is the former Superintendent of SAN DIEGO UNIFIED
       SCHOOL DISTRICT, in San Diego, California and was responsible for the oversight and
       management of the schools within its District during the 2019-2020, 2020-2021, and part of
       the 2021-2022 school year until her appointment as the United States Deputy Secretary of
       Education on May 11, 2021.

56.    In accordance with CA EDUC. CODE §35035, the Superintendent has the authority and
       responsibility of managing its School District in accordance with the relevant laws.

*North Carolina Defendants*

57.    Defendant WAKE COUNTY PUBLIC SCHOOL DISTRICT operates within the
       jurisdiction of Wake County, North Carolina.

58.    Defendant CATHY QUIROZ MOORE is the current Superintendent of WAKE COUNTY
       PUBLIC SCHOOL DISTRICT in Wake County, North Carolina.

59.    Pursuant to NGCL §115C-276, the Superintendent of each School District is responsible for
       the oversight and management of its respective District in accordance with the relevant state
       and federal laws.

*Texas Defendants*

60.    Defendant AUSTIN INDEPENDENT SCHOOL DISTRICT operates within the jurisdiction
       of Austin, Texas.

61.    Defendant STEPHANIE S. ELIZADE is the current Superintendent of AUSTIN
       INDEPENDENT SCHOOL DISTRICT in Austin, Texas, and is responsible for the
       management and oversight of all schools within its jurisdiction.

62. Pursuant to TEXAS EDUC. CODE §11.201, the Superintendent of each School District is responsible for the planning, organization, supervision, and evaluation of the educational programs, services, and facilities of the District.

63. Above-named Texas Defendants knowingly made or caused to be made false statements or misrepresentations of material facts to the Texas Medicaid School and Health Related Services ("SHARs") program by submitting claims for reimbursement for services that were substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry.  Specifically, Texas Defendants submitted claims to the Texas Medicaid SHARS program with supporting treatment notes that were false (i.e. that telehealth therapy was an appropriate treatment option for profoundly disabled children, etc.).

64. Defendants knowingly or intentionally made, or caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material facts concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of the TMFPA.  TEX. HUM. RES. CODE § 36.002 (4) (B).

65. Under the TMFPA, each Texas Defendant is liable to the State for the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of its unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or the value of the benefit; and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the State of Texas and the Relators in investigating and

14

obtaining civil remedies in this matter. TEX. HUM. RES. CODE §§ 36.052, 36.007, 36.110 (c).

66. Relator reserves the right to amend and add Defendants upon the conclusion of discovery.

## JURISDICTION AND VENUE

67. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

68. This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. § 1331 (Federal question), 28 U.S.C. § 1367 (Supplemental jurisdiction), 31 U.S.C. § 3732 (False claims jurisdiction), and 28 U.S.C. § 1345 (United States as plaintiff).

69. To the extent, if any, that this case involves questions relating to special education rights, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

70. Pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b), venue is properly placed within the Southern District of New York because at least one of the Defendants resides or transacts business in the Southern District, specifically, Defendant RICHARD CARRANZA ("Chancellor Carranza"), in his official capacity as former Chancellor of the New York City Department of Education; Defendant MEISHA PORTER, in her official capacity as current Chancellor of the New York City Department of Education; and Defendant New York City Department of Education ("NYC DOE"), maintain business offices in New York County. In addition, Realtor Donohue is a resident of New York County.

71. As set forth in 31 USCS §3732 of the Act, "any action under [21 USCS §3730] may be brought in *any* judicial district in which the defendant, or in the case of multiple defendants,

any *one* defendant can be found, resides, transacts business, or in which any act proscribed

in §3729 occurred." (emphasis added).

72.    Thus, this Court appropriately has jurisdiction over all Defendants, as the named New York

Defendants (collectively) operate and conduct business within this Court's jurisdiction.

73.    Plaintiffs are entitled to costs and attorneys' fees under 31 U.S.C. §3730(d), if determined

to be a prevailing party.

## BACKGROUND

### IDEA Part B Funding

74.    The purpose of IDEA Part B (20 USCS § 1415) grants is to assist States, outlying areas,

freely associated States, and the Secretary of the Interior to provide special education and

related services to children with disabilities, including ensuring that children with disabilities

have access to a Free Appropriate Public Education (FAPE[2]). In general, IDEA Part B funds

*must be used only to pay the excess costs of providing FAPE to children with disabilities,*

such as costs for special education teachers and administrators; related services providers

(speech therapists, psychologists, etc.); materials and supplies for use with children with

disabilities; professional development for special education personnel; professional

development for regular education teachers who teach children with disabilities; and

specialized equipment or devices to assist children with disabilities.

75.    Generally, IDEA funds cannot be used for core instruction in the general education

classroom, instructional materials for use with non-disabled children, or for professional

---

[2] IDEA Section 602 (9) The term 'free appropriate public education' means special education and related services
that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B)
meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or
secondary school education in the State involved; and (D) are provided in conformity with the individualized
education program required under section 614(d).

development of general education teachers not related to meeting the needs of students with disabilities. Two exceptions to these guidelines are when IDEA Part B funds are used for coordinated early intervening services[3] (CEIS) or are consolidated in a Title I schoolwide school (under ESEA).

76.   LEAs may use up to fifteen percent of their IDEA Part B funds for CEIS to assist students enrolled in grades K through 12 (with an emphasis on K through 3) who are not currently identified as needing special education and related services but who need additional academic and behavioral support to succeed in a general education environment.[4]  CEIS funds can be used to provide professional development[5] to educators who are responsible for helping children who need additional academic and behavioral support succeed in a general education environment or to provide direct interventions to children who need academic and behavioral support. CEIS funds may be used in coordination with ESEA funds but *must supplement, and not supplant,* ESEA funds for those activities.[6]

77.   A Title I schoolwide school may use, to carry out the schoolwide project, an amount of IDEA funds that is the same proportion of the total cost of the project as the number of children with disabilities benefiting from the program is to the total school population participating in the program. In a Title I schoolwide school that consolidates Federal funds (e.g., ESEA, IDEA, etc.), a school may use those funds for any activity in its schoolwide plan without accounting separately for the funds. [7]  The schoolwide school *needs to ensure that children*

---

[3] Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 618(d)(2)(B); Note: The calculation for the maximum CEIS funds is based on the total of the regular IDEA, Part B allocations
[4] IDEA Section 613(f).
[5] IDEA Section 613(f)(2)(A).
[6] IDEA Section 613(f)(5).
[7] ESEA Section 1114.

17

*with disabilities continue to receive FAPE,* but would not need to show that IDEA funds were spent only on allowable special education and related services expenditures.[8]

MEDICAID Funding

78.   As provided in the IDEA, a public school must offer all children a FAPE regardless whether or not it receives federal funds under IDEA.   Many IDEA-eligible children are covered by the Medicaid program, a federal program managed through the Centers for Medicare & Medicaid Services ("CMS"), whose Early and Periodic Screening, Diagnosis and Treatment mandate requires Medicaid agencies to provide eligible children under 21 years old with the services necessary to meet their medical needs. In many cases, a Medicaid-eligible child's IEP under IDEA includes health-related services such as audiology, nursing and therapies that are medical in nature and covered by Medicaid.

79.   In 1988, the federal law was amended, through the passage of the Medicare Catastrophic Coverage Act of 1988, to allow Medicaid payment for services provided to children under IDEA.   Recognizing that schools provide medically necessary services and IDEA funding typically covers less than 20 percent of the average per student costs for special education, the US Congress amended federal law in 1988 expressly to forbid Medicaid from restricting or prohibiting payment for covered services authorized in a child's IEP. [9]

---

[8] IDEA Section 613(a)(2)(D)
[9] Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 - P.L. 100-360.

80. This amendment was enacted to require Medicaid to be primary payor to the Department of Education for payment of the health-related services provided under IDEA and the school districts must follow strict reporting requirements to secure this federal funding.[10]

81. There are six conditions that must be met for Medicaid to reimburse for IDEA-related services:[11]

    1) The child receiving the service must be enrolled in Medicaid;

    2) The services are medically necessary;

    3) The services must be covered in the state Medicaid plan or authorized by the federal Medicaid statute;

    4) The services *must* be listed in the child's individualized education program (IEP);

    5) The school district or local educational agency (LEA) must be authorized by the state as a qualified Medicaid provider; and

    6) The LEA or school district must follow state guidance as to how claims are to be submitted for reimbursement. School districts and providers are instructed to maintain proper documentation and follow the reporting requirements to avoid fraud.

SECTION 411(K)(13) OF THE MEDICARE CATASTROPHIC COVERAGE ACT OF 1988 (emphasis added).

49. Various improper billing by states and school districts have occurred by and through Medicaid throughout the decades since the law was changed in 1988; CMS has increased its oversight and regulations for school districts to continue to receive these federal dollars.[12]

---

[10] CMS Medicaid School-based Administrative Claiming Guide (May 2003): https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/MedicaidBudgetExpendSystem/Downloads/Schoolhealthsvcs.pdf

[11] How to Obtain Medicaid Funding for School-Based Services: A Guide for Schools in System of Care Communities: http://www.rippleeffects.com/pdfs/MedicaidFunding.pdf

[12] https://www.cms.gov/newsroom/fact-sheets/hhs-issues-final-rules-protect-medicaid-improper-payments-school-based-claiming

19

As an example, New York State has a history of noncompliance.[13] In a federal lawsuit filed in 1998, the federal audit found the program to be out of compliance with federal guidelines and that New York State school districts did not maintain adequate documentation to support Medicaid billing. Upon settlement, the State instituted a new claim methodology. Perhaps the biggest difference between the old and new methodology is the old methodology was based on a minimum number of services per month *while the new methodology requires the school districts to PROVE a session occurred in order to bill.* [14]

50.   Thereafter, the School Supportive Health Services Program (SSHSP) and the Preschool Supportive Health Services Program (PSHSP) were developed jointly by the New York State Education Department (NYS SED) and the New York State Department of Health (NYS DOH). SSHSP applies to the 5 to 21-year-old student population and PSHSP applies to the preschool 3 to 4-year-old student population pursuant to §4410 of the Education Law. The SSHSP and PSHSP were established to assist school districts and counties in obtaining Medicaid Reimbursement for certain diagnostic and health support services provided to students with disabilities.[15]

51.   In a handbook created in 2014, the SSHSP and PSHSP provided specific guidelines for LEAs to follow in order to receive Medicaid funding.[16] Local Education Agencies (LEAs) have an entire department dedicated Medicaid reimbursements, funding, and otherwise.

52.   More recently, New York City was cited again for Medicaid noncompliance and mismanagement for the 2018-2019 year. *See* **Exhibit 2**.

---

[13] https://oig.hhs.gov/oas/reports/region2/20301008.pdf
[14] https://www.ufl.org/files/attachments/medicaid-speech.pdf
[15] http://www.oms.nysed.gov/medicaid/
[16] http://www.oms.nysed.gov/medicaid/handbook/sshsp_handbook_8_nov_25_14.pdf

20

53.    Amidst the COVID-19 pandemic on June 5, 2020, the SSHSP released a memorandum with

specific guidance to all service providers about proper and improper Medicaid billing. In

this memorandum, SSHSP specifically stated:

"There must be *live interaction* between the therapist and the student or Medicaid
cannot be billed. There is no Medicaid reimbursement for videos, material packets,
activities that are not completed during a live interaction between the therapist and
the student."; "No, text messaging and email contact with students or parents will
not be reimbursable by SSHSP Medicaid."; "No, sending activities for a student to
complete will not be reimbursable by SSHSP Medicaid."; "No, providing
consultation to parents is not a reimbursable SSHSP service."; and "No,
asynchronous "store and forward" services are not reimbursable by Medicaid under
the SSHSP."[17]

54.    Additionally, in New York, the United Federation of Teachers ("UFT") is the sole bargaining

agent for most of the non-supervisory educators who work in the New York City public

schools.      UFT      represents      approximately      75,000      teachers,      19,000      classroom

paraprofessionals, along with related service providers, such as occupational therapists,

physical therapists and speech therapists.[18]  Despite the clear guidance from the New York

State Education Department and the New York State Health Department about providing

live, synchronous instruction, UFT advised its members, "...synchronous instruction *is not*

*required* at this time."[19] (emphasis added). This improper and inappropriate guidance further

substantiates Relator's claims of fraudulent billing for educational, medical, related services

and otherwise processed through Medicare/Medicaid on behalf of students with disabilities.

55.    CMS tracks state expenditures through the automated Medicaid Budget and Expenditure

System/State Children's Health Insurance Budget and Expenditure System (MBES/CBES).

The amounts reported and the related attachments must be actual expenditures for which all

---

[17] http://www.oms.nysed.gov/medicaid/medicaid_alerts/alerts_2020/20_02_Addendum.html

[18] https://www.uft.org/your-union/about-uft

[19] https://www.uft.org/your-rights/safety-health/coronavirus/guidance-on-remote-learning

supporting documentation, in readily reviewable form, has been compiled and is available immediately at the time the claim is filed. Consequently, the amount claimed on the Form CMS-64[20] is a summary of expenditures derived from source documents such as invoices, cost reports and eligibility records. All summary statements or descriptions of each claim must identify the claim and source documentation.

56. Medicaid spending on school-based health accounts for about \$4.5 billion[21] of the entire Medicaid budget, which currently consists of approximately \$400 billion.[22] The 2019 IDEA funding was approximately \$13.5 billion.[23]

57. The Relator has direct first-hand knowledge that NYC School Districts were and continue to be reimbursed in accordance with the principle of Reasonable Cost Reimbursement, as described in 42 C.F.R. §413, subpts. A-G for related services offered to Special Education students throughout the school years 2019-2020 and 2020-2021 while school campuses were physically closed.

58. As a Parent of a teenage Special Education student diagnosed with a Traumatic Brain Injury (TBI) and Chairman of iBRAIN, Relator is aware that: "[t]he term 'related services' means transportation, and such developmental, corrective, and other support services . . . as may be required to assist a child with a disability *to benefit from special education*, and includes the early identification and assessment of disabling conditions in children." 20 U.S.C.S. §1402(a)(17) (emphasis added).

[20] https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-medicaid-chip/index.html
[21] https://www.medicaid.gov/medicaid/financial-management/state-expenditure-reporting-for-medicaid-chip/expenditure-reports-mbescbcs/index.html
[22] Congress of the United States Congressional Budget Office. (2019.) The Budget and Economic Outlook 2019 – 2029. Retrieved from: https://www.cbo.gov/system/files?file=2019-01/54918-Outlook.pdf
[23] United State Department of Education. (2018.) Department of Education Fiscal Year 2019 Congressional Action. Retrieved from: https://www2.ed.gov/about/overview/budget/budget19/19action.pdf

59. Moreover, the text of the "related services" definition "broadly encompasses those supportive services that "may be required to assist a child with a disability to benefit from special education. As a general matter, services that enable a disabled child *to remain in school during the day* provide the student with the *meaningful access* to education that Congress envisioned." *See,* U.S.C.S. 1401(a)(17) (emphasis added); *see also* Cedar Rapids Cmty. Sch. Dist. v. Garret F. by Charlene F., 526 U.S. 66 (1999).

60. The Relator has first-hand knowledge that the named District(s) and entities received interim payments based on fixed estimates of their actual costs in accordance with 42 C.F.R. §413.60(a), (c); §413.64(a), (f).

61. At the end of each fiscal year, Relator knows that providers submitted cost reports of their actual expenditures in accordance with C.F.R. §413.60(b), §413.64(f) and that a final adjustment is made to settle the difference between the interim payments and a provider's actual purported costs. C.F.R. §413.64(f)(2).

62. Further described herein, Relator has first-hand knowledge that claims were submitted on behalf of Special Education students by the Defendants for related services that were not offered in-person as defined by relevant case law, including related service sessions that were not offered to at all to students with disabilities, as described in their respective IEPs.

63. In accordance with 42 C.F.R. §413.24(a), the named Defendants(s) must be able to provide adequate cost data supported by financial and statistical records, which must be capable of verification by independent and qualified auditors, and must provide the cost information in accurate and sufficient detail to support the payments made for services furnished to the purported students. *See* 42 C.F.R. §413.24(c), §413.20(d).

64.   Further, Defendants are to maintain adequate documentation for auditing purposes. In order to perform a comprehensive audit, the Relator alleges that the claim details must be obtained from the provider's records. 42 C.F.R. §413.24(c).

65.   The Relator has knowledge that the above-named Defendants do not possess adequate or detailed records to substantiate the Medicaid claims made on behalf of students with disabilities for the 2019-2020 and 2020-2021 school years.

66.   The Relator also has first-hand knowledge that Defendants herein knowingly submitted false claims for related services purportedly offered to Special Education students via telehealth, phone, and otherwise, when Defendants were acutely aware that such services were contrary to those set forth in each Student's last-agreed-upon IEP, which required in-person services. Relator also has knowledge that some of these sessions were not offered to students with disabilities, despite Defendants' assertions that students within their jurisdictions were being educated in accordance with the law. *See,* M.H. v. New York City Dep't of Educ., 685 F.3d 217, 224 (2nd Cir., 2012) ("The IEP, the results of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and *describes the specially designed instruction and services that will enable the child to meet those objectives.*") (emphasis added).

67.   Upon information and belief, Defendants obtained a consent from some parents on behalf of students with disabilities in order to obtain reimbursement for said services or alternatively, submitted said claims without consent.

68.   Further, Relator alleges that Defendants did not change the rate at which related services were billed when offered by alternative means (i.e. telehealth, phone, etc.), and were billed

24

at the same rate as in-person services at the full rate, while conferring no meaningful benefit to students with disabilities, as required by law.

69. As set forth above, Defendants must produce provider detailed statements in accordance with 42 C.F.R. §413.24(c).

70. Each of the named Defendants is eligible to receive reimbursement by the federal government for a portion of the cost of providing health-related and related services to Medicaid eligible children pursuant to the IDEA, 20 U.S.C. §1400 et seq., 42 U.S.C. §1396b(c).

71. The IDEA (20 U.S.C. §1400) sets forth the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), guarantees students with disabilities a free and appropriate public education ("FAPE"). The term FAPE refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living.

72. Defendants fraudulently created Individualized Education Plans (IEPs) for special education students, knowing they could not implement these IEPs as written, thus knowingly denying students a FAPE.

73. Defendants then fraudulently claimed they were providing special education and related services as outlined and described in the students' IEPs and billed and/or were reimbursed or otherwise by the federal government and the States, including the District of Columbia, for services that were not performed, and for services performed at an over-billed rate or for services (medical, educational, related, and otherwise) that were established fraudulently.

74.  As a result of Defendants' multi-faceted campaign of fraud against the government, Defendants have collected hundreds of millions of dollars, if not billions of dollars, to which they were never entitled, causing direct injury to students with disabilities that had an IEP in place for the 2019-2020 and 2020-2021 school years, in addition to the general taxpayers funding such grants and reimbursements.

75.  Additionally, while simultaneously depriving students with disabilities of a free appropriate public education ("FAPE"), Defendants herein submitted additional applications for IDEA funding to the federal government with false assurances that Defendants were offering FAPE to students with disabilities for school years 2019-2020, 2020-2021, and 2021-2022. **Exhibit 1.**

## FACTUAL ALLEGATIONS

76.  Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

77.  As the parent of a special education student, the Relator has first-hand knowledge that the NYC DOE Committee on Special Education ("CSE") fraudulently created an IEP for his daughter (S.J.D.) that Defendants knew could not be implemented during the COVID-19 situation. Said IEP included in-person services, including 1:1 nursing and a 1:1 paraprofessional, which were not offered by the NYC DOE as a result of the COVID-19 closures. There was no subsequent IEP meeting to amend his daughter's IEP to include remote services.

78.  During the recorded IEP meeting, Relator questioned the NYC District Representative why in-person services were being recommended when the doors to the schools themselves remained closed. The District Representative informed Relator that the District was

26

instructed to proceed as if schools were not closed and to continue recommending in-person services. Defendants proceeded to finalize said IEP and fraudulently present it as a FAPE. Although this meeting was not transcribed, the Relator is willing and able to produce an audio recording substantiating same upon request.

79.    There are dozens of other parents and students that Relator has first-hand knowledge of involving the Defendants named herein, as further described below.

## NEW YORK CITY

80.    There are over 100 students Relator has first-hand knowledge of to whom NYC DOE failed to provide the services outlined in their IEP since March 2020 (including live synchronous services), yet, Defendants herein fraudulently projected that these students were continuing to be properly serviced in accordance with each respective Students' IEP. Adding insult to injury, the NYC DOE and CSE fraudulently created IEPs including in-person services, for the 2019-2020 and 2020-2021 school years for these students they knew they could not implement during the COVID-19 situation.

81.    For illustration, Relator presents the IEP of J.R., with an implementation date of February 26, 2020 (pre-COVID). J.R. is a 15-year-old young man diagnosed with Autism. It is important to note that J.R. is also non-verbal. A copy of J.R.'s IEP implemented before the COVID-19 closures is annexed hereto as **Exhibit 3.**

82.    However, in a letter dated April 22, 2020, the NYC DOE informed J.R.'s parents that "[n]ow that your child's school has moved towards a new Remote Learning Model, this Special Education Remote Learning Plan sets out the special education supports that are being

27

provided during the COVID-19 school closure." *See,* **Exhibit 4**, *Special Education Remote Learning Plan for J.R.* (April 22, 2020).

83. Perhaps even more surprising, in a hearing on J.R.'s case before the Impartial Hearing Officer, NYC DOE took the position that they offered J.R. a FAPE, and that "[w]hether or not the student and their family *chose* to participate in remote services . . . what program was available for the student to access the curriculum, and what, if anything, did the family do with that" would be the grounds to make a determination of whether a FAPE was denied. **Exhibit 5**, p. 20, lines 4-12.

84. This position is contradictory at best—in light of the Executive Orders set forth by the local and state authorities, J.R.'s parents did not "choose" remote services, nor did the parents "choose" for the NYC DOE schools to remain closed following the expiry of said Executive Orders. As J.R.'s 2020 and 2021 IEP highlights, "Home instruction would be too restrictive for [J.R.]'s social and academic progress at this time." **Exhibit 3**, p. 28 ("*Other Options Considered*"). Additionally, it would seem that NYC DOE takes the position that any regression in skills and learning is a fault and burden shouldered by parents, which is not only inaccurate, but such a contention undermines the entire spirit of the IDEA.

85. The letter dated April 22, 2020 (**Exhibit 4**) not only serves as evidence of the District's unilateral transfer of the Student's educational placement to remote learning, but also indicates that an IEP meeting should have been reconvened to appropriately determine J.R.'s remote services.

86. Instead, taking into consideration J.R.'s specific conditions and management needs, NYC DOE recommended J.R. for individual remote Speech Services for twenty minutes, once a week, *by telephone. See,* **Exhibit 4.**

87.   It is incredibly important to note that J.R.'s other related services, Occupational Therapy and Physical Therapy, were recommended to be performed via tele-therapy.

88.   Relator alleges that not only is the NYC DOE's recommendation wholly inappropriate for J.R.—a non-verbal, Autistic young man— but that NYC DOE subsequently *billed* Medicaid for J.R.'s speech services, despite rendering a service that does not meet the requirements for Medicaid and/or IDEA reimbursement, and a service that was of no benefit whatsoever to J.R.

89.   Similarly, Relator presents redacted hearing transcripts from closed administrative hearings he served as a witness for his daughter, S.J.D., which further substantiates inconsistent Medicaid billing practices on behalf of the NYC DOE for billing Medicaid at full rates, as if IEPs were being fully implemented, despite a lack of resources and reduced services, as testified by an assistant principal from S.J.D.'s recommended D75 school. A copy of the redacted hearing transcripts from S.J.D.'s administrative hearings regarding the 2019-2020 and 2020-2021 school years are annexed hereto as **Exhibits 6** and **7**.

90.   In the hearing held for S.J.D. on October 1, 2020 as referenced above, the NYC DOE's witness, an assistant principal at the P79M Horan School in New York City testified about the school's operation and services during the 2019-2020 school year. In this hearing, the vice principal concedes that Horan School had fallen short of fulfilling the Student's IEP mandates.

91.   For instance, the assistant principal admitted that though a special education classroom recommendation in their school is for a 12:1:(3+1) classroom ratio, requiring 4 paraprofessionals in the classroom, the school was understaffed during the year and had only one paraprofessional available. *See* **Exhibit 6**, p. 30, 132.

92. More astonishingly, this assistant principal admitted that though S.J.D.'s IEP mandates physical therapy in 60-minute sessions, the physical therapist at the school would only provide 40 minutes of therapy and <u>leaves the student for 20 minutes</u>, without the physical therapist. **Exhibit 6,** p. 44-45, 47 (emphasis added).

93. In another closed administrative hearing for S.J.D. on July 14, 2021 with regard to the 2020-2021 school year (IHO Case: 196228), Relator witnessed the Horan School's assistant principal testify that during the 2020-2021 extended school year, students who have mandated nursing services on their IEPs could not receive those services because the school's nurse "[d]uring remote learning, our school nurse would not have been able provide services to the student." *See* **Exhibit 7,** p. 64.

94. Without offering the nursing services within the IEP that Defendant drafted, S.J.D. was, by definition, denied a FAPE. Thus, any Medicaid billing for other related services in the IEP is unlawful, as a FAPE must be provided in order to submit claims for Medicaid reimbursement for related services.

95. Moreover, though S.J.D. has mandated therapy and related service sessions of 60-minutes, and although the NYC DOE claimed that S.J.D.'s IEP mandates could be implemented at their proposed school(s), the assistant principal's testimony revealed that the NYC schools could not, in fact, implement the IEP because the school mandates 8 periods for 45 minutes per day, and does not offer an extended school day, indicating that all of S.J.D.'s related service mandates from her IEP could not realistically be implemented in a NYC DOE school, as NYC DOE schools do not offer extended school days. **Exhibit 7,** p. 66 - 70, generally.

96. The above only serve as some of the many examples of NYC DOE's fraudulent behavior regarding Medicaid and IDEA billing. Without offering the Student a FAPE, by definition,

the LEA cannot bill Medicaid for services or receive IDEA/Title I funds that would not offer the Student a meaningful education under the IDEA.

97. Relator alleges that NYC DOE billed Medicaid for the full amount of services as listed on Students' IEPs, without actually delivering those services as mandated, as evidenced by the testimony of the assistant principal of the Horan School, a NYC DOE school.

98. In addition to these claims and alleged misconduct, the Relator also alleges that Defendants CARRANZA, Defendant PORTER, and the NYC DOE further misappropriated these unlawfully obtained federal funds through Medicaid and/or the IDEA and transferred $43,967,285 into a high-interest yield savings CD Rollover account, approved on September 24, 2020, in the midst of the pandemic. A copy of the NYC DOE 2020 December Financial Status Report substantiating same is annexed hereto as **Exhibit 8**, p. 5.

99. In said report, the DOE reported that it "rolled over" approximately $43,967,285 to a CD Rollover account and has earned, or continues to earn, interest on said federal funds. **Exhibit 8**, p. 5.

100. This not only evidences Defendants' gross misconduct, but also serves to show that Defendants deliberately withheld these federal funds (in the midst of a worldwide pandemic) intended for students with disabilities, or alternatively, the public at large and taxpayers, and further intended to benefit from their malfeasance in the form of accruing interest on said federal funds.

101. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor and Defendant PORTER, in official capacity as the current Chancellor, have the responsibility of overseeing the LEAs and providers that are mandated to offer the related services tailored to the needs of students with disabilities.

31

102. Based on his observations and interactions, Relator has direct first-hand knowledge that not only have numerous students been recommended to receive their related services remotely this year, despite the drafting and implementation of an IEP that requires "push in/pull out" services in "classrooms" or "separate provider locations", but that these students will continue to receive their services remotely, despite the tremendous reopening efforts, due to insufficient staffing. *See* **Exhibit 6, 7,** *see also* **Exhibit 9**, *infra*.

103. Relator alleges that by and through the efforts of Defendants CARRANZA and PORTER, and NYC DOE extracted from the State and Federal Governments hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d. conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

104. Moreover, in addition to violation(s) under the federal FCA, New York City Defendants also violated the New York False Claims Act; the New York City False Claims Act (Local Law

53); N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); and Penal Law §177 (Health Care Fraud) as described herein.

105. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Students' parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (NYC DOE) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures, which constitutes a procedural violation of the IDEA.

106. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her official capacity as current Chancellor, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing and IDEA restrictions and is unlawful.

107. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

108. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, have failed to provide the students with disabilities within its jurisdiction a FAPE by directly or indirectly assisting in formulating IEPs with recommended related services to be offered to

33

students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

109. Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, benefitted from these unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEPs as written, and IDEA funds when a FAPE has been denied to numerous New York City students with disabilities.

110. Alternatively, Defendants CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor remained complicit in the scheme to defraud.

## BUFFALO PUBLIC SCHOOL DISTRICT

111. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

112. Defendants KRINER CASH, in his official capacity as Superintendent of BUFFALO PUBLIC SCHOOL DISTRICT ("BPSD"), and the BUFFALO PUBLIC SCHOOL DISTRICT (collectively, "Buffalo Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

113.   Moreover, in addition to violation(s) under the federal FCA, Buffalo Defendants have also violated the New York False Claims Act; N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud) as described herein.

114.   To substantiate these claims, Relator presents a redacted IEP from G.M., a 17-year-old student in Buffalo diagnosed Autism, as well as a speech and language impairment. A redacted copy of G.M.'s 2020 IEP is annexed hereto as **Exhibit 9.**

115.   In addition to Special Education classes, G.M. is recommended for Adaptive Physical Education, Speech Language Therapy, Occupational Therapy, Behavioral Intervention Therapy, Augmentative Technology Services, and Adaptive Seating. *See*, **Exhibit 9**, p. 15.

116.   Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, employed Autism Services, Inc., to offer G.M. the related services tailored to her needs. *See* **Exhibit 9.**

117.   Relator's initial interactions with G.M.'s Parent were with regard to the insufficiency and defects of the IEP in place. In the course of G.M.'s case, Relator has first-hand knowledge that not only has G.M. received all of her services remotely, but that she will continue to

receive her services remotely, despite reopening efforts due to insufficient staffing. Annexed hereto is a letter acknowledging the insufficient staffing. **Exhibit 10.**

118. Albeit G.M.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

119. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (BPSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

120. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, billing for any "remote sessions" is not only inappropriate, but runs afoul of the Medicaid and IDEA billing restrictions and is unlawful.

121. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

122. Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus (i.e. push-in/pull out, in

"classroom" or at "separate provider location", etc.) and subsequently failing to provide the recommended related services as written.

123. Thereafter, Defendants BPSD, by and through Defendant KRINER CASH, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments and IDEA funds for services that were not offered in accordance with the IEPs as written.

124. Alternatively, Defendants BPSD and Defendant KRINER CASH, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## NIAGARA FALLS PUBLIC SCHOOL DISTRICT

125. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

126. Defendants MARK LAURRIE, in his official capacity as Superintendent, and the NIAGARA FALLS PUBLIC SCHOOL DISTRICT ("NFPSD") (collectively, "Niagara Falls Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.     conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

127. Moreover, in addition to violation(s) under the federal FCA, Niagara Falls Defendants have also violated the New York False Claims Act; N.Y. State Fin. Law §§188-194 et seq.; Social Services Law §145 et seq.; Social Services Law §366 et seq.; Penal Law §175 (False Written Statements); Penal Law §176 (Insurance Fraud); Penal Law §177 (Health Care Fraud) as described herein.

128. To substantiate these claims, Relator presents a redacted 2020 IEP from T.S., a 17-year-old student in Niagara Falls, New York classified with an "Other Health Impairment" (i.e. Attention Deficit/Hyperactivity Disorder (ADHD), and Oppositional Defiant Disorder (ODD)) assigned to attend a BOCES class at N. Tonawanda Learning Center, located in Niagara Falls, New York. A redacted copy of T.S.'s 2020 IEP is annexed hereto as **Exhibit 11.**

129. In addition to Special Education, T.S. is recommended for Speech/Language Therapy, Occupational Therapy, and Behavioral Intervention Plan/Therapy. *See*, **Exhibit 11**, p. 1.

130. As reflected on his IEP, T.S. requires "tactile (touch) sensory input in order to promote increase sensory regulation." *See*, **Exhibit 11**, p. 8.

131. T.S. also requires substantial adult intervention to address behavioral issues, and sometimes requires two or more adults to calm him when dysregulated. He also requires constant prompting and adult directives. **Exhibit 11**, p. 2.

132. When T.S. was unilaterally placed in a remote learning environment, Defendants NIAGARA FALLS SCHOOL DISTRICT and MARK LAURRIE, in his official capacity as Superintendent, failed to reconvene an IEP meeting to amend the 2020 IEP to include remote services.

133. Although T.S.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

134. The Relator alleges that not only was the method of delivery for T.S.'s services inappropriate and rendered useless services to the student, but alleges that Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the Student as designed and described in her IEP.

135. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (NFPSD) did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

136. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent have billed for services that were recommended to be _in person_ as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

39

137. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

138. Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

139. Thereafter, Defendants NFPSD, by and through Defendant MARK LAURRIE, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEPs as written and designed for students with disabilities.

140. Alternatively, Defendants NFPSD and Defendant MARK LAURRIE, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## OTHER EDUCATIONAL AGENCIES ENGAGED IN FRAUD

141. There are more than one hundred additional students the Relator has first-hand knowledge, of whom their Local Educational Agencies (LEAs) throughout the United States failed to provide services outlined in their IEP since March 2020 (including live synchronous services), however, fraudulently projected these students were continuing to be properly serviced remotely. The Relator has presented various illustrations of the ongoing fraud in anticipation of Defendant's claims that Relator's first-hand knowledge is without merit. In addition, these LEAs fraudulently created IEPs for the 2020-2021 school year for these students that they knew they could not implement during the COVID-19 situation.

**SOMERVILLE, MASSACHUSETTS**

142. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

143. Defendants MARY SKIPPER, in her official capacity as Superintendent, the SOMERVILLE PUBLIC SCHOOL DISTRICT ("SPSD") and JEFFREY C. RILEY, in his official capacity as Superintendent of the Massachusetts Department of Education ("MDOE"), (collectively, "Somerville Defendants" or "Massachusetts Defendants"), engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

144. Moreover, in addition to violation(s) under the federal FCA, Somerville Defendants have also violated Mass. General Laws Ch. 12, §5(B) et seq. as described herein.

145. In yet another example of the expansive breadth of this scheme, Relator presents the redacted 2020 IEP of student P.M., a student in the Somerville Public School District with a diagnosis of Autism Spectrum Disorder (ASD).

146. In P.M.'s IEP, Somerville School District acknowledged that the evaluations performed "indicate[d] that [P.M.] requires very substantial support." (*See,* **Exhibit 12**, p. 7).

147. Accordingly, P.M. was recommended for Speech/Language Therapy, which is listed as a "pull-out" service, for 30 minutes each week. (*See,* **Exhibit 12**, p. 12).

148. However, in further investigating the Parent's alarming allegation that P.M. had not received his related services since his birthday in October of 2020, the Relator became aware that Massachusetts Department of Education ("MDOE") was not reporting anything at all in their 2020 Year-End Financial Report(s). A copy of the published 2020 Year-End Financial Report is annexed hereto as **Exhibit 13.**

149. Each line item contains a "$0" for 112 pages, which makes abundantly clear that MDOE intends to conceal their fraudulent acts. *See,* **Exhibit 13.**

150. Upon information and belief, Defendant JEFFREY C. RILEY, in his official capacity as Superintendent, is responsible for the management and oversight of the reporting within the State.

151. By reporting nothing at all for the 2020 Year-End Report, Defendant JEFFREY C. RILEY, in his official capacity as Superintendent, aided and abetted the Massachusetts Defendants herein, or alternatively, remained complicit in Defendants' scheme to defraud.

152. P.M.'s Parent is not privy to the billing practices and requirements for Medicaid billing, however, the Relator's expertise and experience lead to the allegations herein.

153. The Relator alleges that not only was the method of delivery for P.M.'s services inappropriate and rendered useless services to the student, but alleges that Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

154. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

155. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

156. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

157. Defendant SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with

disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

158. Thereafter, Defendants SPSD, by and through Defendant MARY SKIPPER, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

159. Alternatively, Defendants SPSD and Defendant MARY SKIPPER, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

## STAMFORD, CONNECTICUT

160. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

161. Defendants DR. TAMU LUCERO, in her official capacity as Superintendent, and the STAMFORD PUBLIC SCHOOL DISTRICT (collectively, "Stamford Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c. knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly

44

avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

162.   Moreover, in addition to violation(s) under the federal FCA, Stamford Defendants have also violated CT GEN. STAT. §4-275, et seq. as described herein.

163.   In anticipation of Defendant's allegations that Relator's claims are without merit, Relator presents a redacted 2020 IEP for H.P., a student assigned to attend the Stamford Public School District diagnosed with multiple disabilities, and is wheelchair-bound. Accordingly, she cannot ambulate without assistance. A redacted copy of H.P.'s IEP is annexed hereto as **Exhibit 14.**

164.   As reflected on H.P.'s IEP, she requires Physical Therapy, Occupational Therapy, and Speech/Language therapy. As highlighted on page 2 of her IEP, H.P.'s IEP was formulated "during the time of school closure due to the COVID-19 pandemic. The IEP has been developed for implementation within a regular school building and is based on the currently available information." *See,* **Exhibit 14,** page 2.

165.   Clearly, Defendants drafted and "implemented" a hypothetical IEP with unrealistic terms. Relator alleges that in drafting the IEP this way (as if the Student were on school campus), Defendants submitted for Medicaid reimbursement and/or IDEA funding using the terms of this hypothetical IEP.

166.   Although H.P.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

167. As set forth herein, a school district may only bill Medicaid for services outlined on the Student's IEP. *Supra,* ¶76(4).

168. The Relator alleges that not only was the method of delivery for H.P.'s services inappropriate and rendered useless services to the student, but alleges that Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

169. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

170. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, have billed for services that were recommended and drafted to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

171. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

46

172. Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written, yet billed Medicaid and/or utilized IDEA funding to "provide" the services as written.

173. Thereafter, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, by and through Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

174. Alternatively, Defendants STAMFORD PUBLIC SCHOOL DISTRICT, and Defendant DR. TAMU LUCERO, in her official capacity as Superintendent of Schools, remained complicit in the scheme to defraud.

## CHICAGO, ILLINOIS

175. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

176. Defendants JOSE M. TORRES, PhD, in his official capacity as Superintendent, and CHICAGO PUBLIC SCHOOL DISTRICT ("CPSD") (collectively, "Chicago Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b.  knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.  knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.  conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

177. Moreover, in addition to violation(s) under the federal FCA, Chicago Defendants have also violated 740 ILCS §175 et seq. as described herein.

178. In anticipation of Defendants' allegations that the Relator's allegations are without merit, Relator presents a redacted 2020 IEP from B.W., a student assigned to attend CPSD diagnosed with mild to moderate visual impairment, as well as a speech and language impairment. A redacted copy of B.W.'s 2020 IEP is annexed hereto as **Exhibit 15.**

179. As evidenced on B.W.'s IEP, he requires Occupational Therapy, Vision Therapy, Speech/Language Therapy, and a 1:1 paraprofessional. As highlighted on page 2 of his IEP, B.W. was educated via remote sessions, despite being recommended for in person services. *See* **Exhibit 15.**

180. However, on the last two pages of B.W.'s IEP, the delivery of related services, specifically the 1:1 paraprofessional, during "remote learning" are outlined. In the delivery descriptions, the:

"Paraprofessional will support the classroom, students, teacher and families in the following: live-stream lessons, read-alouds, recorded lessons, small-group discussions, individual breakout sessions, check-ins via approved platforms, online learning software, practice sheets, or self-paced with teacher check-ins. As well as parent reports, pictures, and video recordings of progress updates."

(**Exhibit 15**, p.32-33).

181. Clearly, Defendants blatantly disregarded B.W.'s need for 1:1 assistance via a paraprofessional, and used (and billed for) said paraprofessional to offer assistance and services to the classroom, teachers, other students, and families instead of offering assistance to B.W. as described in his IEP.

182. Despite being acutely aware of B.W.'s visual impairments which makes his vision "blurry at all distances" (**Exhibit 15**, page 3), B.W.'s 1:1 paraprofessional was assigned to "support the classroom, students, teachers and families." (**Exhibit 15**, page 32-33).

183. The Relator alleges that not only was the method of delivery for B.W.'s services inappropriate and rendered essentially useless services to the student, but alleges that Defendant CPSD billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

184. B.W.'s Parent is not privy to the billing practices and requirements for Medicaid billing, however, the Relator's expertise and experience lead to the allegations herein.

185. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (CPSD) did _not_ reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

186. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each

student's IEP. However, Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

187. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

188. Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

189. Thereafter, Defendants CPSD, by and through Defendant JOSE M. TORRES, PhD, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

190. Alternatively, Defendants CHICAGO PUBLIC SCHOOL DISTRICT, and Defendant JOSE M. TORRES, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## LOUDOUN COUNTY, VIRGINIA

191. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

192. Defendants SCOTT A. ZIEGLER, in his official capacity as Superintendent, and LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT ("LCPSD") (collectively, "Loudoun County Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.     knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.     knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.     knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.     conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

193. Moreover, in addition to violation(s) under the federal FCA, Loudoun County Defendants have also violated VA. CODE ANN. §8.01-216.3, et seq. as described herein.

194. Relator has first-hand knowledge of LCPSD's failure to provide services as mandated, and thus its false submission of reimbursement claims to Medicaid and fraudulent projection of students being services properly remotely.

195. As an example of Defendants' fraud, Relator presents the redacted IEP of T.A. dated November 4, 2020, with an IEP review date of November 3, 2021. *See*, **Exhibit 16**. T.A.,

was a high schooler at John Champe High School and classified with Multiple Disabilities during the 2020-2021 school year. *See* **Exhibit 16.**

196. Shockingly, the IEP originally contained a Prior Notice and Parent Consent section indicating that the services could be designated for in person or a remote location, based on the school division's ability, and stating that the school division does not have an obligation to make up missed services on days that the school division does not offer instruction due to pandemics, health emergencies, inclement weather, and other such reasons. **Exhibit 16.** (emphasis added).

197. On the next page, the IEP elicited parental consent to release the student's information and bill Medicaid for services. **Exhibit 16,** p.20.

198. Although T.A.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

199. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (LCPSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

200. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

201. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

202. Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

203. Thereafter, Defendants LCPSD, by and through Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

204. Alternatively, Defendants LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT, and Defendant SCOTT A. ZIEGLER, in his official capacity as Superintendent, remained complicit in the scheme to defraud.

## CAMDEN CITY, NEW JERSEY

205. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

206. Defendants KATRINA T. MCCOMBS, in her official capacity as Superintendent, and CAMDEN CITY PUBLIC SCHOOL DISTRICT ("CCPS") (collectively, "Camden City Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

a.   knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b.   knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.   knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.   conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

207. Moreover, in addition to violation(s) under the federal FCA, Camden City Defendants have also violated N.J. STAT. ANN. §§ 2A:32C-1—32C-18, et seq. as described herein.

208. Relator presents a redacted IEP from A.K., a student currently enrolled in a charter school called Leap Academy, which is a financial subsidiary of CCPS. **Exhibit 17**.

209. Upon information and belief, Defendant CCPS applies for federal funding and reimbursement through the IDEA, Medicaid, and otherwise, on behalf of the Leap Academy.

210. A.K. is 8-years-old and classified with a Specific Learning Disability on her IEP. During the 2020-2021 school year, A.K. was recommended to receive Speech therapy in a speech room for 30 minutes, 30 times per year. Additionally, she was recommended to receive a one-to-one aide in the classroom, and supplementary education once a day for 45 minutes. **Exhibit 17**, p. 3.

211. In fact, A.K.'s IEP explicitly states that the school may not be required to make up related service sessions, but would be provided "to the extent possible." **Exhibit 17**, p.8-9 (emphasis added).

212. Although A.K.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

213. The Relator alleges that not only was the method of delivery for A.K.'s services inappropriate and rendered essentially useless services to the student, but alleges that Defendants CCPS, by and through Defendant McCOMBS in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

214. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (CCPS) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

215. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

216. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

217. Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

218. Thereafter, Defendants CCPS, by and through Defendant McCOMBS, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

219. Alternatively, Defendants CAMDEN CITY PUBLIC SCHOOL DISTRICT, and Defendant KATRINA McCOMBS, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

## **CALIFORNIA**

220. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

221. Defendants AUSTIN BEAUTNER, in his official capacity as Superintendent of Los Angeles Unified School District, LOS ANGELES UNIFIED SCHOOL DISTRICT ("LAUSD"), DR. LAMONT A. JACKSON, in his official capacity as Interim Superintendent of San Diego Unified School District; CINDY MARTEN, in her official capacity as former Superintendent of San Diego Unified School District for the 2019-2020 and 2020-2021

school years; and SAN DIEGO UNIFIED SCHOOL DISTRICT ("SDUSD") (collectively, "California Defendants") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

    a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

    b.    knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

    c.    knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

    d.    conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

202. Moreover, in addition to violation(s) under the federal FCA, California Defendants (collectively) have also violated Ch. 6, Article 9, §12650-12656, et seq. as described herein.

## LOS ANGELES, CALIFORNIA

203. In yet another example of the expansive breadth of this nationwide Medicaid scheme, Relator presents the redacted school year 2019-2020 IEP of student C.A., a 10-year-old student with autism who attends Pomelo Community Charter School, a financial subsidiary of LAUSD. **Exhibit 18.**

204. Due to his autism, C.A. requires redirection to focus on tasks and struggles in various skill sets and academics. **Exhibit 18**. He was recommended for an extended school year with

services of OT, Speech and Language Therapy, Adapted Physical Education, to be delivered by direct service and in school-based areas. **Exhibit 18.**

205. In C.A.'s IEP, it specifically states: "[C.A.]'s speech and language impairment, secondary to his eligibility of autism, impacts his ability to progress and participate in the classroom curriculum." **Exhibit 18,** p. 6.

206. Relator also presents the 2019-2020 school year IEP of M.R., an 8-year-old student who also attended Pomelo Community Charter School. **Exhibit 19**. She is classified with a specific learning disability and was recommended for an extended school year with instructional accommodations. *Id.* These accommodations were not prescribed to be delivered remotely, yet after the COVID closures, M.R. was subsequently left no choice but to receive her education and related services through remote learning.

207. In M.R.'s IEP, formulated in September 2020, it states: "[M.R.] has not met her reading goals from the last IEP. She is not able to identify all upper and lowercase letters or corresponding sounds. [M.R.] continues to exhibit difficulty in recognizing and identifying high frequency words. [M.R.] is very dependent [on] parental support during distance learning." **Exhibit 19**, p.3 (emphasis added).

208. More importantly, even though M.R.'s IEP was formulated in the midst of the COVID-19 pandemic (September 2020), the District noted that:

> "LAUSD schools are closed at this time due to COVID-19 national pandemic. [M.R.] will receive educational services as described in the Distance learning Plan (DLP) recommended by the IEP team. Parent is requesting an OT screening and possible assessment. Parent is requesting tutoring and part of our recoupment conversation is to utilize in house pool teachers to support tutoring at this time." **Exhibit 19,** p. 21 (emphasis added).

209. This not only denotes the unilateral transfer of the Student from the "brick and mortar" placement to remote learning, but also clearly evidences that Defendants drafted an IEP that

they had no intention of implementing following the meeting in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf for the services (as written) in the IEP.

210. Indeed, it is abundantly clear that LAUSD drafted M.R.'s IEP with no intention to actually implement the IEP as written. Further, despite being informed of M.R.'s educational, management needs, *and noted regression in learning*, LAUSD failed to offer M.R. a FAPE in accordance with the IDEA.

211. Although C.A.'s and M.R.'s Parents are not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

212. The Relator alleges that not only was the method of delivery for C.A.'s and M.R.'s services inappropriate and rendered essentially useless services to the students, but alleges that Defendant LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

213. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Students' parents to recommend remote related services. Relator has first-hand knowledge that the LEA did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

214. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent of Schools, have billed for services

59

that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

215. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

216. Defendant LAUSD, by and through Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, have failed to provide the students within their jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

217. Thereafter, Defendant LAUSD, by and through Defendant AUSTUN BEUTNER, in his official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

218. Alternatively, Defendants LOS ANGELES UNIFIED PUBLIC SCHOOL DISTRICT, and Defendant AUSTIN BEUTNER, in his official capacity as Superintendent, remained complicit in the scheme to defraud the state and federal governments.

### SAN DIEGO, CALIFORNIA

219. Also complicit in these fraudulent billing practices were DR. LAMONT A. JACKSON, in his official capacity as current Interim Superintendent; CINDY MARTEN, in her official capacity as former Superintendent (in the 2019-2020 and 2020-2021 school years); and SAN DIEGO UNIFIED SCHOOL DISTRICT ("SDUSD").

220. Relator presents the IEP of J.M., a 17-year-old student who is autistic, has ADHD, and is classified with an Other Health Impairment. **Exhibit 20**. He attended Morse High School, a school in the SDUSD, during the 2020-2021 school year. *Id.* His IEP indicated he was to receive special instruction, nursing services, psychological services, and transitional training as part of his related services. *Id.* These services were to be provided at the public school campus, either in the regular classroom or in a separate classroom, depending on the service. *Id.* However, he was not given any of his special accommodations as outlined in his IEP during the COVID-19 school closures.

221. J.M.'s Parents met with Defendants via Zoom on November 3, 2020. However, despite voicing concerns about the services that J.M. was receiving, Defendants drafted another IEP and noted that: "Service hours are written for return to brick and mortar sites. The case manager explains the difference in services via distance learning and directs parent to PWN previously sent home by the district re Distance Learning due to Covid-19 school closure." **Exhibit 20,** p. 26.

222. Again, this not only establishes the unilateral transfer of the Student's educational placement from the "brick and mortar" placement to remote learning, but also clearly evidences that Defendants drafted an IEP that they had no intention of implementing following the meeting in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf for the services (as written) in the IEP.

223. Although J.M.'s parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

224. The Relator alleges that not only was the method of delivery for J.M's services inappropriate and rendered useless services to the student, but alleges that Defendants SDUSD, by and

through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Interim Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent for school years 2019-2020 and 2020-2021, billed Medicaid for said services, even though they were not offered to students with disabilities as designed and described in their IEPs.

225. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (SDUSD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

226. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

227. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

228. Defendant SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with

62

disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written, from March 2020 and continuing.

229. Thereafter, Defendants SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, benefitted from their malfeasance by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

230. Alternatively, SDUSD, by and through Defendant Dr. LAMONT A. JACKSON, in his official capacity as Superintendent, and CINDY MARTEN, in her official capacity as former Superintendent, remained complicit in the scheme to defraud the state and federal governments.

### WAKE COUNTY, NORTH CAROLINA

231. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

232. Defendants CATHY QUIROZ MOORE, in her official capacity as Superintendent, and WAKE COUNTY PUBLIC SCHOOL DISTRICT ("WCPSD") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b. knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

63

      c.     knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

      d.     conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

233. Moreover, in addition to violation(s) under the federal FCA, Wake County Defendants (collectively) have also violated N.C.G.S. §§1-605 through 617, et seq. as described herein.

234. To substantiate these claims, Relator presents a redacted IEP from A.C., a 14-year-old student in Wake County with Autism. A redacted copy of A.C.'s 2020 IEP is annexed hereto as **Exhibit 21.**

235. A.C. is recommended for special education instruction including Social/Emotion Skills, Adapted Physical Education, Writing, Reading, and Math. *See*, **Exhibit 21**, p. 26. He is recommended for related services of Occupational Therapy, as well as Speech and Language Therapy. *See Id.*

236. A.C.'s IEP, drafted in the midst of the pandemic on October 5, 2020, does not denote the setting in which A.C. is to receive his services (i.e. "remote", "push-in", "pull out", etc.), and only notes that he shall receive his services "within the school environment." A.C.'s IEP also notes that a Special Assistant is to accompany him to class to help him meet classroom expectations and prevent maladaptive behaviors. **Exhibit 21.**

237. However, this serves as yet another example of Defendants' attempts to conceal their fraudulent conduct; in a remote setting, there was no Special Assistant to "accompany him"

64

to class, as classes were remote. This is further substantiated by the Parents' concerned noted

on page 1 of the IEP, that notes A.C. was indeed not given the face-to-face instruction as

written in the IEP and required under the Medicaid billing requirements. *See*, **Exhibit 21.**

238.  Additionally, Defendants noted the following in A.C.'s IEP:

> "In Remote Learning, [A.C.] is relying heavily on his parent for support. In the
> classroom, he sat up and worked daily. In remote learning, he has a sensory need
> to sit in a more relaxed seat and work like he is in a classroom. He has been
> unresponsive to any discussion of his behavior and such discussions have been
> counterproductive. Nevertheless, [A.C.] has continued to improve his
> understanding of the material although does not show improvement in his
> independence building behaviors." **(Exhibit 21,** p. 6).

239.  This evidences both the unilateral transfer of the Student's educational placement from the

"brick and mortar" placement to remote learning and that Defendants drafted an IEP that

they had no intention of implementing following the meeting in order to continue utilizing

IDEA funds and making submissions for reimbursement to Medicaid on the Student's behalf

for the services (as written) in the IEP.

240.  Although his IEP thoroughly describes A.C.'s needs and for instance, need for "support from

the SLP [Speech Language Pathologist] to monitor social skills interactions with peers and

adults in the in-person and virtual school environments", Defendants changed A.C.'s service

recommendations to "00" minutes of Speech Language Therapy, Occupational Therapy, and

Adaptive Physical Education. **Exhibit 21,** p. 12-13.

241.  However, A.C.'s IEP specifically notes his need for assistance in speech; for instance, on

page 15 of A.C.'s IEP, it notes:

> "[A.C.] has struggled since transitioning to remote/virtual learning in March 2020.
> [A.C.] continues to require support from the SLP to monitor social skills
> interactions with peers and adults in the in-person and virtual school environments,
> especially when he is overwhelmed, anxious, or confused." **Exhibit 21.**

242.  Moreover, the IEP highlights that: "Parents are concerned that due to pandemic, [A.C.] is

not receiving face-to-face, in-person help from his Instructional Assistant. Working with his

65

father is causing [A.C.] to over-rely on his father. Parents are concerned about seizures, regression, and that he has needed more one-to-one support than before the pandemic." **Exhibit 21,** p. 1.

243. Despite being made aware of A.C.'s educational and management needs, the District met in October 2020 and drafted an IEP that simply could not be implemented. For instance, one of A.C.'s social-emotional goals moving forward was "[A.C.] will strike up a quick conversation with at least 3 others each school day in at least 4/5 trials." **Exhibit 21,** p. 11.

244. In remote learning from his home, this goal is unattainable. This serves as yet another example of Defendants recommending and implementing an IEP that is a per se denial of FAPE, yet utilizing the same IEP to bill Medicaid and implement the utilize IDEA funds.

245. Although A.C.'s Parents are not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

246. The Relator alleges that not only was the method of delivery for A.C.'s services inappropriate and rendered useless services to the students, but alleges that Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the students with disabilities as described in their IEPs.

247. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Students' parents to recommend remote related services. Relator has first-hand knowledge that the LEA did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

248. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE in her official capacity as Superintendent of Schools, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

249. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

250. Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, have failed to provide the students within their jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campuses and subsequently failing to provide the recommended related services as written.

251. Thereafter, Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

252. Alternatively, Defendants WCPS and Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

## AUSTIN, TEXAS

253. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

254. Defendants STEPHANIE S. ELIZADE, in her official capacity as Superintendent, and AUSTIN INDEPENDENT SCHOOL DISTRICT ("AISD") engaged in fraudulent conduct by extracting from the State and Federal Governments, hundreds of millions of dollars in payments when they:

   a.  knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b.  knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c.  knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d.  conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

255. Moreover, in addition to violation(s) under the federal FCA, Austin Defendants (collectively) have also violated TEX. HUM. RES. CODE § 32.039(b). TEX. HUM. RES. CODE § 36.002 (13) as described herein.

256. Relator presents a redacted IEP from A.N., a student currently enrolled in Austin Achieve Elementary School, in Austin, Texas. **Exhibit 22**.

257. A.N. is 4-years-old and classified with a Speech Impairment on her IEP. During the 2020-2021 school year, A.N. was recommended to receive Speech Therapy in a small group setting (3:1 model) with a speech pathologist. It is not noted whether this was offered as a "push-in" or "pull-out" service, however, it was noted that "[t]he committee recommends that this student receive part or all instruction in a special education setting." **Exhibit 22**, p. 9 (emphasis added).

258. A.N.'s IEP also states that she will "receive paraprofessional support during academic instruction times." **Exhibit 22**, p.15.

259. Although A.N.'s Parent is not privy to the billing practices and requirements for Medicaid billing, the Relator's expertise and experience lead to the allegations herein.

260. The Relator alleges that not only was the method of delivery for A.N.'s services inappropriate and rendered useless services to the student, but alleges that Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, billed Medicaid for said services, even though they were not offered to the Student as designed and described in her IEP.

261. Relator alleges that in order to properly bill Medicaid for related services offered remotely, the LEA should have reconvened an IEP meeting with the Student's parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (AISD) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures.

262. As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants AISD, by and through Defendant ELIZADE, in her

69

official capacity as Superintendent have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing restrictions and is unlawful.

263. Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a FAPE for the Student.

264. Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, have failed to provide the students within its jurisdiction a FAPE by formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

265. Thereafter, Defendants AISD, by and through Defendant ELIZADE, in her official capacity as Superintendent, benefitted from their unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

266. Alternatively, Defendant AISD and Defendant ELIZADE, in her official capacity as Superintendent, remained complicit in the scheme to defraud the state and federal governments.

## DEFENDANTS' FRAUDULENT CONDUCT

267. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

268. The FCA subjects those who receive federal funds fraudulently to civil liability. The United States Justice Department relies on this provision to curb the abuse of federal funds in programs ranging from Medicaid to disaster assistance.

## FALSE CERTIFICATION FRAUD

269. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

270. The Defendants submitted "false claims" when its representatives submitted fraudulent representations that:

    A)    the IEPs they created were knowingly not in compliance with IDEA and they could not implement these IEPs, thereby denying the students a FAPE; and

    B)    when their service providers knowingly misrepresented that they were providing related services in accordance with IDEA and Medicaid regulations.

271. These claims were legally false, since the provider knew it was in violation of federal regulations at the time of submission. Upon information and belief, the federal and state government disbursed the money for said fraudulent claims because the Defendants certified that they had complied with the relevant federal regulations.

## IMPLIED CERTIFICATION FRAUD

272. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

273. In some instances, the Defendants' representative may not have actually signed a form certifying compliance. However, this would still violate the FCA. By the very act of the provider submitting the claim, it is implied the provider affirmed that it was in compliance

with the regulations, as violating those regulations would have made the claimant ineligible to receive the funding.

274. In this context, the relevant regulations require keeping accurate attendance and providing special education services to all students. Thus, the Defendants who did not keep close track of log-ins and attendance data would be liable since school officials implicitly certified that they would keep their data current when they made the claim for public funds.

## WORTHLESS SERVICES FRAUD

275. Plaintiff Relator reiterates, repeats, and reaffirms each allegation set forth as if fully set forth herein.

276. Under the Worthless Services Fraud, the Defendants are liable since the limited services they may have provided was so subpar as to be completely worthless.

277. By claiming reimbursement for providing valueless care, the provider effectively has forced the government to pay for nothing—making it so the provider submits a legally false claim when it asks the government to reimburse it for services that have no value.

278. These deceptive practices are a prima facie case of fraudulent behavior. The Defendants knew the services they were claiming to provide were sub-par, if not worthless.

## **FIRST CLAIM**

Violations of the False Claims Act
(31 U.S.C. § 3729(a)(1)(A))
Presenting False Claims for Payment

279. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

280. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

281. As set forth above, Defendants herein (collectively) knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval in connect with the submission of claim for school-based services for students with disabilities.

282. Medicaid and the respective Department of Education(s) reimbursed school districts, counties, and/or intermediate school districts using state and Federal funds as a result of Defendants' fraudulent conduct.

283. By reason of Defendants' false claims, the States of the United States along with the District of Columbia and the United States have been damaged in a substantial amount to be determined at trial, upon the conclusion of discovery.

### SECOND CLAIM

Violations of the False Claims Act

(31 U.S.C. § 3729(a)(1)(B))

Use of False Statements

284. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

285. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

286. As set forth above, all Defendants herein (collectively) knowingly made, used, or caused to be made and used, false records and statements material to a false or fraudulent claim paid or approved in connect with the submission of claim for school-based services for students with disabilities.

287. Medicaid and the respective Department of Education(s) reimbursed school districts, counties and/or intermediate school districts using state and Federal funds because of Defendants' fraudulent conduct.

73

288. By reason of Defendants' false claims, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

Violations of the False Claims Act

(31 U.S.C. § 3729(a)(1)(G))

Use of False Statements

289. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

290. The United States seeks relief against all Defendants herein (collectively) under Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

291. As set forth above, all Defendants herein knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

292. Medicaid and the respective Department of Education paid school districts, counties and/or intermediary state and Federal funds as a result of Defendants' fraudulent conduct.

293. By reason of Defendants' false claims, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

## FOURTH CLAIM

Violations of the False Claims Act

(31 U.S.C. § 3729(a)(1)(C))

Conspiracy to Commit a Violation of the False Claims Act

294. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

295. The United States seeks relief against all Defendants herein under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

296. As set forth above, Defendants individually conspired to commit a violation of subparagraph (A), (B) and (G) of the False Claims Act.

297. Defendants have each committed at least one overt act in furtherance of their conspiracy.

298. By reason of Defendants' conspiracy within their respective school districts, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial.

## FIFTH CLAIM

Violation of The New York False Claims Act

NYS ARTICLE 13 §187-194 (AMENDED 2018)

299. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

300. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §187-194 of Article 13 of the New York State Finance Law, under the New York False Claims Act.

301. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material to an obligation to pay or transmit money or property to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

75

302. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## SIXTH CLAIM

Violation of The New York City False Claims Act

(Administrative Code §§7-801 through 7-810)

303. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

304. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, and NYC DOE (herein "New York City Defendants") under Sections §7-801 through 7-810 of Administrative Code of New York City, known as the New York City False Claims Act.

305. As set forth above, New York City Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

306. New York City Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York City students with disabilities.

## SEVENTH CLAIM

Violation of New York Social Services Law

(NY Soc. Services Law §366 et seq.)

307. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

308. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH,

and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §366 et seq. of the New York State Social Services Law, for violations under §366-B.

309. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

310. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## EIGHTH CLAIM

Violation of New York Penal Law
NY Penal Code §175.05 (False Written Statements)

311. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

312. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §366 et seq. of the New York State Social Services Law, for violations under §366-B.

313. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

314. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## NINETH CLAIM

Violation of New York Penal Law

NY Penal Code §176 et seq. (Insurance Fraud)

315. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

316. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH, and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants", collectively) under Sections §176 et seq. of the New York State Penal Law.

317. As set forth above, New York Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

318. New York Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to New York students with disabilities.

## TENTH CLAIM

Violation of New York Penal Law

NY Penal Code §177 (Health Care Fraud)

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

78

195. The United States seeks relief against Defendant CARRANZA, Defendant PORTER, NYC
DOE, Defendant LAURRIE, NIAGARA PUBLIC SCHOOL DISTRICT, Defendant CASH,
and BUFFALO PUBLIC SCHOOL DISTRICT (herein, "New York Defendants",
collectively) under Sections §177 et seq. of the New York State Penal Law.

196. As set forth above, New York Defendants knowingly made, used, or caused to be made and
used, false records and statements material in order to receive reimbursement in the form of
federal funds for related services that were not offered, or alternatively, were offered
contrary to the requirements set forth by Medicaid and the IDEA.

197. New York Defendants fraudulently obtained federal funds by and through both the IDEA
and Medicaid for unlawful related services purportedly "rendered" to New York students
with disabilities.

## ELEVENTH CLAIM

Violation of Massachusetts General Laws

MASS. GENERAL LAWS CH. 12, §5(B) et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as
if fully set forth herein.

195. The United States seeks relief against Massachusetts Defendants (Defendant SKIPPER, and
SOMERVILLE PUBLIC SCHOOL DISTRICT, collectively) under MASS. GENERAL LAWS
CH. 12, §5(B) et seq.

196. As set forth above, Massachusetts Defendants knowingly made, used, or caused to be made
and used, false records and statements material in order to receive reimbursement in the form
of federal funds for related services that were not offered, or alternatively, were offered
contrary to the requirements set forth by Medicaid and the IDEA.

197. Massachusetts Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Somerville students with disabilities.

## TWELVETH CLAIM

Violation of Connecticut General Laws

CT GEN. STAT. §4-275, et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Connecticut Defendants (Defendant LUCERO, and STAMFORD PUBLIC SCHOOL DISTRICT, collectively) under CT GEN. STAT. §4-275, et seq.

196. As set forth above, Connecticut Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Stamford students with disabilities.

## THIRTEENTH CLAIM

Violation of Illinois State Law(s)

740 ILCS §175 et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Illinois Defendants (Defendant TORRES, and CHICAGO PUBLIC SCHOOL DISTRICT, collectively) under 740 ILCS §175 et seq.

196. As set forth above, Illinois Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Illinois Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Chicago students with disabilities.

## FOURTEENTH CLAIM

Violation of Virginia State Law(s)

VA. CODE ANN. §8.01-216.3, et seq.

194. The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195. The United States seeks relief against Virginia Defendants (Defendant ZIEGLER, and LOUDOUN COUNTY PUBLIC SCHOOL DISTRICT, collectively) under VA. CODE ANN. §8.01-216.3, et seq.

196. As set forth above, Virginia Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197. Virginia Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Loudoun County students with disabilities.

## FIFTEENTH CLAIM

Violation of New Jersey State Law(s)

N.J. STAT. ANN. §§ 2A:32C-1—32C-18

194.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195.  The United States seeks relief against New Jersey Defendants (Defendant McCOMBS, and CAMDEN CITY PUBLIC SCHOOL DISTRICT, collectively) under N.J. STAT. ANN. §§ 2A:32C-1—32C-18.

196.  As set forth above, New Jersey Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197.  New Jersey Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Camden City students with disabilities.

## SIXTEENTH CLAIM

Violation of Texas State Law(s)

TEX. HUM. RES. CODE § 36.002, et seq.

194.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195.  The United States seeks relief against Texas Defendants (Defendant ELIZADE, AUSTIN INDEPENDENT SCHOOL DISTRICT, collectively) under TEX. HUM. RES. CODE § 36.002, et seq.

196.  A person commits an unlawful act as defined under the Texas Medicaid Fraud Prevention Act by, among other things:

A.   Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE §36.002 (1).

B.   Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE § 36.002 (2).

C.   Knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program. TEX. HUM. RES. CODE § 36.002 (4) (B).

D.   Knowingly making or causing to be made a claim under the Medicaid program for a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry. HUM. RES. CODE § 36.002 (7) (B).

E.   Knowingly engaging in conduct that constitutes a violation under TEX. HUM. RES. CODE § 32.039(b). TEX. HUM. RES. CODE § 36.002 (13).

197. As set forth above, Texas Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal

funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

198.  Texas Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Austin students with disabilities.

### SEVENTEENTH CLAIM

Violation of California State Law(s)

CAL. GOV. CODE § 12650-12656, et seq.

194.  The United States and Relator Donohue incorporate by reference the above paragraphs as if fully set forth herein.

195.  The United States seeks relief against California Defendants (Defendant BEUTNER, LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant JACKSON, Defendant MARTEN, and SAN DIEGO UNIFIED SCHOOL DISTRICT, collectively) under CAL. GOV. CODE § 12650-12656, et seq.

196.  As set forth above, California Defendants knowingly made, used, or caused to be made and used, false records and statements material in order to receive reimbursement in the form of federal funds for related services that were not offered, or alternatively, were offered contrary to the requirements set forth by Medicaid and the IDEA.

197.  California Defendants fraudulently obtained federal funds by and through both the IDEA and Medicaid for unlawful related services purportedly "rendered" to Los Angeles and San Diego students with disabilities.

**WHEREFORE**, Plaintiff the United States ex rel. Patrick Donohue respectfully requests that judgment be entered in their favor and against Defendants herein as follows:

84

a.  On the First, Second, Third and Fourth Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G)), for treble the United States' damages, in an amount to be determined at trial, and a statutory penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants;

b.  Awarding Patrick Donohue his relator's share pursuant to 31 U.S.C. § 3730(d)(1) or (2);

c.  On the First, Second, Third and Fourth Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d); and

d.  Awarding such other and further relief as this Court deems just and proper.

Dated: September ___, 2021

Respectfully submitted,

**PATRICK B. DONOHUE**
55 W 116ᵗʰ Street – Suite 159
New York, NY 10026
(917) 359-4556

85

## TO:

**UNITED STATES ATTORNEY**
*Southern District of New York*
86 Chambers Street – 3rd Floor
New York, N.Y. 10007

**ATTORNEY GENERAL: CIVIL DIVISION**
*US Department of Justice*
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

**SOMERVILLE PUBLIC SCHOOL DISTRICT**
*Attn: Mary Skipper,*
*Superintendent*
8 Bonair Street
Somerville, MA 02145

**MARY SKIPPER, SUPERINTENDENT**
*Somerville Public School District*
8 Bonair Street
Somerville, MA 02145

**STAMFORD PUBLIC SCHOOL DISTRICT**
*Attn: Dr. Tamu Lucero*
888 Washington Boulevard
Stamford, CT 06901

**DR. TAMU LUCERO, SUPERINTENDENT**
*Stamford Public School District*
888 Washington Boulevard
Stamford, CT 06901

**CHICAGO PUBLIC SCHOOL DISTRICT**
*Attn: Jose M. Torres, PhD,*
*Superintendent*
42 W. Madison Street
Chicago, IL 60602

**JOSE M. TORRES, PHD, SUPERINTENDENT**
*Chicago Public School District*
42 W. Madison Street
Chicago, IL 60602

**LOUDOUN COUNTY PUBLIC SCHOOLS**
*Attn: Scott A. Ziegler,*
*Superintendent*
21000 Education Court
Ashburn, VA 21048

**SCOTT A. ZIEGLER, ED.D.,**
**SUPERINTENDENT**
*Loudoun County Public Schools*
21000 Education Court
Ashburn, VA 21048

**CAMDEN CITY PUBLIC SCHOOL DISTRICT**
*Attn: Katrina McCombs,*
*Superintendent*
1033 Cambridge Street
Camden, NJ 08105

**KATRINA T. MCCOMBS, SUPERINTENDENT**
*Camden City Public School*
*District*
1033 Cambridge Street
Camden, NJ 08105

**LOS ANGELES UNIFIED SCHOOL DISTRICT**
*Attn: Austin Beutner,*
*Superintendent*
333 South Beaudry Avenue
Los Angeles, CA 90017

**AUSTIN BEUTNER, SUPERINTENDENT**
*Los Angeles Unified School*
*District*
333 South Beaudry Avenue
Los Angeles, CA 90017

**SAN DIEGO UNIFIED SCHOOL DISTRICT**
*Attn: Dr. Lamont A. Jackson*
4100 Normal Street, Room 2231
San Diego, CA 92103

**DR. LAMONT A. JACKSON, SUPERINTENDENT**
*San Diego Unified School District*
4100 Normal Street, Room 2231
San Diego, CA 92103

**CINDY MARTEN, FORMER SUPERINTENDENT**
*San Diego Unified School District*
4100 Normal Street, Room 2231
San Diego, CA 92103

**WAKE COUNTY PUBLIC SCHOOL DISTRICT**
*Attn: Cathy Quiroz Moore*
5625 Dillard Drive
Cary, NC 27518

**CATHY QUIROZ MOORE, SUPERINTENDENT**
*Wake County Public School District*
5625 Dillard Drive
Cary, NC 27518

**AUSTIN INDEPENDENT SCHOOL DISTRICT**
*Attn: Stephanie S. Elizade*
4000 S. I-H 35 Frontage Road
Austin, TX 78704

**STEPHANIE S. ELIZADE, SUPERINTENDENT**
*Austin Independent School District*
4000 S. I-H 35 Frontage Road
Austin, TX 78704

# EXHIBIT LIST

| Ex. | *Description* | # Pgs. |
|---|---|---|
| 1 | IDEA Part B Letters for respective Defendants from United States Department of Education (alphabetical order by State) | 271 |
| 2 | Press Release from NYC Comptroller Scott M. Stringer: *"Comptroller Stringer Audit Finds the City Lost $179 Million Due to Mismanagement of DOE Medicaid Reimbursement Claims for Special Education Services"*, (July 19, 2021) | 6 |
| 3 | J.R. 2020 IEP (NYC) | 29 |
| 4 | J.R. Remote IEP Plan (NYC) | 1 |
| 5 | J.R. Transcript (IHO Case No. 197017)(July 14, 2021)(NYC) | 52 |
| 6 | S.J.D. Transcript (IHO Case No: 185111) (Oct. 1, 2020) (NYC) | 159 |
| 7 | S.J.D. Transcript (IHO Case No: 196228) (Jul. 14, 2021) (NYC) | 182 |
| 8 | New York City December 2020 Financial Status Report | 17 |
| 9 | G.M. 2020 IEP (Buffalo, NY) | 18 |
| 10 | G.M. Letter from Autism Services, Inc. (dated: Aug. 6, 2021) | 1 |
| 11 | T.S. 2020 IEP (Niagara Falls, NY) | 14 |
| 12 | P.M. 2020 IEP (Somerville, MA) | 18 |
| 13 | Massachusetts DOE 2020 Year End Financial Report | 112 |
| 14 | H.P. 2020 IEP (Stamford, CT) | 28 |
| 15 | B.W. 2020 IEP (Chicago, IL) | 33 |

| 16 | T.A. 2020 IEP (Loudoun County, VA) | 23 |
|----|------------------------------------|----|
| 17 | A.K. 2020 IEP (Camden City, NJ) | 30 |
| 18 | C.A. 2020 IEP (Los Angeles, CA) | 31 |
| 19 | M.R. 2020 IEP (Los Angeles, CA) | 23 |
| 20 | J.M. 2020 IEP (San Diego, CA) | 27 |
| 21 | A.C. 2020 IEP (Wake County, NC) | 19 |
| 22 | A.N. 2020 IEP (Austin, TX) | 17 |

## DEFENDANT SCHOOL DISTRICTS

|  | DISTRICT | STATE |
|---|---|---|
| 1 | New York City | NY |
| 2 | Niagara Public School District | NY |
| 3 | Buffalo Public School District | NY |
| 4 | Somerville Public School District | MA |
| 5 | Stamford Public School District | CT |
| 6 | Chicago Public School District | IL |
| 7 | Loudoun County Public School District | VA |
| 8 | Camden City Public School District | NJ |
| 9 | Los Angeles Public School District | CA |
| 10 | San Diego Public School District | CA |
| 11 | Wake County Public School District | NC |
| 12 | Austin Independent School District | TX |

# EXHIBIT 1

CALIFORNIA



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Tony Thurmond
State Superintendent of Public Instruction
California Department of Education
1430 N Street, Suite 5602
Sacramento, California 95814

Honorable Ralph Diaz
Secretary
California Department of Corrections and Rehabilitation
Post Office Box 942883
Sacramento, California 94283

Dear Superintendent Thurmond and Secretary Diaz:

We have conditionally approved California's application for Federal Fiscal Year (FFY) 2020
funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our
conditional approval is based on our review of the IDEA Part B application submitted by the
California Department of Education to the U.S. Department of Education (Department), Office
of Special Education Programs (OSEP), on May 14, 2020, including the assurances provided in
Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is
also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B),
signed by Deputy Superintendent Sarah Neville-Morgan on May 7, 2020, that the State's
provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the
State will operate its Part B program in accordance with all of the required assurances and
certifications, consistent with 34 CFR §76.104.

In addition, the State provided specific assurances that it will:

1. Operate throughout the period of the FFY 2020 grant award consistently with IDEA Part
   B and applicable regulations; and

2. Make such changes to existing policies and procedures as are necessary to bring those
   policies and procedures into compliance with the requirements of IDEA Part B as soon as
   possible, and not later than June 30, 2021. Within Section II of its application, the State
   has included, for each assurance it cannot meet at this time, the date by which it expects
   to complete necessary changes to any policies and procedures that are not yet in
   compliance with the requirements of IDEA Part B.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of
recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to
Assurance 23a or 23b related to accessible instructional materials as reflected in your State's
FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other
persons with print disabilities" has been removed from the Copyright Act and replaced with

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

"eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

The California FFY 2020 IDEA Part B grant awards are being released subject to Specific Conditions, as set forth in Enclosure E, pursuant to the Department's authority in IDEA Section 616(g) and 2 CFR §§200.207 and 3474.10. Specifically, OSEP has designated California as a high-risk grantee with regard to the provision of special education and related services to eligible individuals with disabilities who are convicted as adults and incarcerated in adult prisons. The reasons for the Specific Conditions and California's high-risk designation are detailed in Enclosure E.

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of the State's Part B application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94), for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020 through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula, in a year in which the amount available for allocation to States remains the

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform in writing local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as

Page 4 – Chief State School Officer

amended in 2008. First-tier subaward information must be reported by the end of the following
month from when the award was made or obligated. FFATA guidance is found at
https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have
further questions.

We appreciate your ongoing commitment to the provision of quality educational services to
children with disabilities.

Sincerely,

*Laurie VanderPloeg*

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D
Enclosure E (Programmatic Specific Conditions)

cc: State Director of Special Education

**State Name:  California**

**Enclosure A**

**Section II**

**A.  Assurances Related to Policies and Procedures**

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|:---:|:---:|---|
| x | | 1.   A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| x | | 2.   The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| x | | 3.   All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| x | | 4.   An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| | | 5.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, |

| | | | |
|---|---|---|---|
| x | | | separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| x | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| x | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| x | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| x | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| x | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| x | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency |

| | | | |
|---|---|---|---|
| x | | | described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| x | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| x<br>6/30/2021 | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| x | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| x | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| x | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| x | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| x | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| x | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |

| x | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
|---|---|---|---|
| x | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| x | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| x | | | 23b.1 The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | | 23b.2 The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| x | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| x | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under |

|  |  | 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |
| --- | --- | --- |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| x | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| x | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| x | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| x | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| x | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.

With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| x | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| x | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C
IDEA Grants to States Program
(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Section 611 Base Allocation to LEAs (Column C)**

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

**Maximum Set-Aside for Administration (Column D)**

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E – H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column C)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

**Enclosure E**

**California Specific Conditions**

1. **Basis for Requiring Specific Conditions**

   Due to the State's long-standing failure to comply with the requirements of Part B of the Individuals with Disabilities Education Act (IDEA), the Office of Special Education Programs (OSEP) designated California as a high-risk grantee, and imposed Specific Conditions on California's Federal Fiscal Year (FFY) 2019 IDEA Part B grant award pursuant to section 616(g) of IDEA and 2 CFR §§200.207 and 3474.10. OSEP's prior actions were based, in part, upon the failure of the California Department of Corrections and Rehabilitation (CDCR- formerly, the California Department of Corrections (CDC)[1]) to ensure that a free appropriate public education (FAPE) is available to eligible inmates with disabilities in adult correctional facilities consistent with the requirements of Part B of the IDEA. 34 CFR §§300.101-300.102. Because this noncompliance has not been corrected, OSEP is imposing Specific Conditions on California's FFY 2020 Part B grant award. These Specific Conditions are a continuation of the prior Conditions that applied to CDCR and are imposed pursuant to section 616(g) of IDEA and 2 CFR §§200.207 and 3474.10. In its 1996 Monitoring Report, OSEP found that California was not making special education and related services available to eligible youth with disabilities in any of California's adult correctional facilities. The 1996 Monitoring Report required that the State take corrective action. Last year's Specific Conditions contained a provision regarding this requirement. To date, OSEP does not have any data indicating that CDCR has ensured that FAPE is made available to all eligible youth with disabilities in adult correctional facilities. Therefore, these Specific Conditions remain appropriate under 20 U.S.C. §1412(a)(11) and 34 CFR §§300.149 and 300.600.

2. **Nature of the Specific Conditions**

   At the request of the Department, the State will provide one or more reports detailing the steps the State has taken to comply with the requirements of Part B of the IDEA, including steps taken by CDCR, the CDE, or both, as appropriate, to locate, identify, evaluate, and provide special education and related services to eligible youth with disabilities in adult correctional facilities, consistent with the requirements of Part B of the IDEA. Full compliance with a request for a report under these Specific Conditions must be achieved within thirty days of any such request.

   Any report submitted under these Specific Conditions shall, at a minimum, include the following documentation and information:

   a. CDCR's written policies and procedures for identifying individuals with disabilities incarcerated in adult correctional facilities who are eligible to receive special education and related services, consistent with 34 CFR §§300.102 and 300.111;

---

[1] On June 5, 1997, in his Executive Order W-155-97, former Governor Wilson transferred from the California Department of Education (CDE) to CDCR the responsibility for ensuring that the requirements of the IDEA are met with respect to eligible youth who are convicted as adults under State law and are incarcerated in adult prisons.

b.  A chronological list of any actions that CDCR has taken to identify individuals with disabilities who are incarcerated in adult correctional facilities and eligible to receive special education and related services, consistent with 34 CFR §§300.102 and 300.111;

c.  The number of individuals with disabilities in adult correctional facilities that CDCR has identified as eligible to receive special education and related services, consistent with 34 CFR §§300.102 and 300.111;

d.  CDCR's written policies and procedures to make FAPE available to eligible individuals with disabilities in adult correctional facilities, consistent with 34 CFR §300.101;

e.  A chronological list of any actions that CDCR has taken to make FAPE available to eligible individuals with disabilities in adult correctional facilities, consistent with 34 CFR §300.101; and

f.  Data on the number of eligible individuals with disabilities in adult correctional facilities to whom CDCR has made FAPE available, consistent with 34 CFR §300.101.

3.  **Evidence Necessary for Conditions to Be Removed**

The Department will remove these Specific Conditions if, at any time prior to the expiration of the grant year, California provides documentation, satisfactory to the Department, that it has fully met the requirement to make FAPE available to eligible individuals with disabilities in adult correctional facilities.

4.  **Method of Requesting Reconsideration**

The State may write to Laurie VanderPloeg, Director of OSEP, at the address below, if it wishes the Department to reconsider any aspect of these Specific Conditions. The request must describe in detail the changes to the Specific Conditions sought by the State and the reasons for those requested changes.

5.  **Submission of Reports and Documentation**

All reports and documentation that are required to be submitted by California to the Department under the Specific Conditions should be submitted to:

U.S. Department of Education
Office of Special Education and Rehabilitative Services
Attn:  Susan Murray
400 Maryland Ave, SW
Washington, DC  20202-2550



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Tony Thurmond
State Superintendent of Public Instruction
California Department of Education
1430 N Street
Sacramento, California 95814

Honorable Kathleen Allison
Secretary
California Department of Corrections and Rehabilitation
1515 S Street, Room 502
South Sacramento, California 95811

Dear State Superintendent Thurmond and Secretary Allison:

We have conditionally approved California's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our conditional approval is based on our review of the IDEA Part B grant application submitted by the California Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 13, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our conditional approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by Deputy Superintendent, Sarah Neville-Morgan on May 7, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

In addition, the State provided specific assurances that it will:

1. Operate throughout the period of the FFY 2021 grant award consistently with IDEA Part B and applicable regulations; and

2. Make such changes to existing policies and procedures as are necessary to bring those policies and procedures into compliance with the requirements of IDEA Part B as soon as possible, and not later than June 30, 2022. Within Section II of its grant application, the State has included, for each assurance it cannot meet at this time, the date by which it expects to complete necessary changes to any policies and procedures that are not yet in compliance with the requirements of IDEA Part B.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

California's enclosed IDEA Part B grant awards are also being released subject to Specific Conditions (which are represented in Enclosure E to this letter and incorporated in this grant letter by this reference). OSEP is also designating California as a high-risk grantee with regard to the provision of special education and related services to eligible individuals with disabilities who are convicted as adults and incarcerated in adult prisons. The Specific Conditions, along with the high-risk designation, are being imposed by OSEP pursuant to the Department's authority in IDEA Section 616(g) and 2 C.F.R. §§ 200.208 and 3474.10. Enclosure E identifies the Specific Conditions imposed on the enclosed grant awards to ensure that a free appropriate public education (FAPE) is available to eligible inmates with disabilities in adult correctional facilities consistent with the requirements of Part B of the IDEA. By accepting these grant awards, California expressly agrees to comply with the Specific Conditions identified in Enclosure E throughout the period California uses its IDEA Part B funds under the enclosed grant awards.

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of the State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act of 2021 (Public Law 116-94) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and

Page 3 – Chief State School Officer

minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula, in a year in which the amount available for allocation to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

[2] Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718).Under the 2019 FAQs, OSERS granted prior approval for participant support costs under

Page 4 – Chief State School Officer

application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform in writing local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

---

IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 5 – Chief State School Officer

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D
Enclosure E – Specific Conditions

cc:  State Director of Special Education

**State Name: California**

## Enclosure A

**Section II**

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes *(Assurance is given.)* | No *(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)* *Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | . | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| | X 6/30/2022 | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: <br><br> • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or <br><br> • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

#### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE)), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over \$850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over \$850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is \$850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is \$850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

### Enclosure D
### IDEA Preschool Grants Program
### (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

Page 1

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column I)

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

**Enclosure E**

**California Specific Conditions**

1. **Basis for Requiring Specific Conditions**

   Due to the State's long-standing failure to comply with the requirements of Part B of the Individuals with Disabilities Education Act (IDEA), the Office of Special Education Programs (OSEP) designated California as a high-risk grantee, and imposed Specific Conditions on California's Federal Fiscal Year (FFY) 2020 IDEA Part B grant award pursuant to section 616(g) of IDEA and 2 C.F.R. §§ 200.207 and 3474.10. OSEP's prior actions were based, in part, upon the failure of the California Department of Corrections and Rehabilitation (CDCR – formerly, the California Department of Corrections (CDC)[1]) to ensure that a free appropriate public education (FAPE) is available to eligible inmates with disabilities in adult correctional facilities consistent with the requirements of Part B of the IDEA. 34 C.F.R. §§ 300.101-300.102. Because this noncompliance has not been corrected, OSEP is imposing Specific Conditions on California's FFY 2021 Part B grant award and designating California as a high-risk grantee with regard to the provision of FAPE to eligible individuals with disabilities in adult correctional facilities. These Specific Conditions are a continuation of the prior Conditions that applied to CDCR and are imposed pursuant to section 616(g) of IDEA and 2 C.F.R. §§ 200.208[2] and 3474.10. In its 1996 Monitoring Report, OSEP found that California was not making special education and related services available to eligible youth with disabilities in any of California's adult correctional facilities. The 1996 Monitoring Report required that the State take corrective action. Last year's Specific Conditions contained a provision regarding this requirement. To date, OSEP does not have any data indicating that CDCR has ensured that FAPE is made available to all eligible youth with disabilities in adult correctional facilities. Therefore, these Specific Conditions remain appropriate under 20 U.S.C. §1412(a)(11) and 34 C.F.R. §§ 300.149 and 300.600.

2. **Nature of the Specific Conditions**

   At the request of the Department, the State will provide one or more reports detailing the steps the State has taken to comply with the requirements of Part B of the IDEA, including steps taken by CDCR, the CDE, or both, as appropriate, to locate, identify, evaluate, and provide special education and related services to eligible youth with disabilities in adult correctional facilities, consistent with the requirements of Part B of the IDEA. Full compliance with a request for a report under these Specific Conditions must be achieved within thirty days of any such request.

---

[1] On June 5, 1997, in his Executive Order W-155-97, then-Governor Wilson transferred from the California Department of Education (CDE) to CDCR the responsibility for ensuring that the requirements of the IDEA are met with respect to eligible youth who are convicted as adults under State law and are incarcerated in adult prisons.
[2] The Office of Management and Budget recently revised certain provisions in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards at 2 C.F.R. part 200, including moving the provision regarding specific conditions from section 200.207 to section 200.208.  See 85 Fed. Reg. 49506, 49541 (Aug. 13, 2020).

Any report submitted under these <u>Specific Conditions</u> shall, at a minimum, include the following documentation and information:

    a.   CDCR's written policies and procedures for identifying individuals with disabilities incarcerated in adult correctional facilities who are eligible to receive special education and related services, consistent with 34 C.F.R. §§ 300.102 and 300.111;

    b.   A chronological list of any actions that CDCR has taken to identify individuals with disabilities who are incarcerated in adult correctional facilities and eligible to receive special education and related services, consistent with 34 C.F.R. §§ 300.102 and 300.111;

    c.   The number of individuals with disabilities in adult correctional facilities that CDCR has identified as eligible to receive special education and related services, consistent with 34 C.F.R. §§ 300.102 and 300.111;

    d.   CDCR's written policies and procedures to make FAPE available to eligible individuals with disabilities in adult correctional facilities, consistent with 34 C.F.R. § 300.101;

    e.   A chronological list of any actions that CDCR has taken to make FAPE available to eligible individuals with disabilities in adult correctional facilities, consistent with 34 C.F.R. § 300.101; and

    f.   Data on the number of eligible individuals with disabilities in adult correctional facilities to whom CDCR has made FAPE available, consistent with 34 C.F.R. § 300.101.

3. **Evidence Necessary for Conditions to Be Removed**

The Department will remove these <u>Specific Conditions</u> if, at any time prior to the expiration of the grant year, California provides documentation, satisfactory to the Department, that it has fully met the requirement to make FAPE available to eligible individuals with disabilities in adult correctional facilities.

4. **Method of Requesting Reconsideration**

The State may write to David Cantrell, Ph.D., Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services, at the address below, if it wishes the Department to reconsider any aspect of these <u>Specific Conditions</u>. The request must describe in detail the changes to the <u>Specific Conditions</u> sought by the State and the reasons for those requested changes.

5. **Submission of Reports and Documentation**

All reports and documentation that are required to be submitted by California to the Department under the <u>Specific Conditions</u> should be submitted to:

U.S. Department of Education
Office of Special Education and Rehabilitative Services
Attn: Kathryn Sabrina Austin
400 Maryland Ave, SW
Washington, DC 20202-2550

# CONNECTICUT



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Miguel Cardona
Commissioner of Education
Connecticut State Department of Education
450 Columbus Boulevard
Hartford, Connecticut 06103

Dear Commissioner Cardona:

We have approved Connecticut's application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B application submitted by the Connecticut State Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 14, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed by you on May 12, 2020, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020, through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

    Enclosure A (Sections II.A-C. of the State's application)
    Enclosure B (Section II.D. of the State's application)
    Enclosure C
    Enclosure D

cc: State Director of Special Education

**State Name:  Connecticut**

## Enclosure A

**Section II**

### A.  Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|:---:|:---:|---|
| X | | 1.  A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.  The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.  All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.  An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.  To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, |

| | | | |
|---|---|---|---|
| | | | separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency |

| | | | |
|---|---|---|---|
| | | | described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |

| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
|---|---|---|---|
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: <br><br> • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or <br><br> • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under |

| | | 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |
|---|---|---|

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education. |
|   | With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2020 under
Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-
94).

State total grants are calculated in accordance with several factors. First, each State is allocated
an amount equal to the amount that it received for fiscal year 1999. If the total program
appropriation increases over the prior year, 85 percent of the remaining funds are allocated based
on the relative population of children aged 3 through 21 who are in the age range for which the
State ensures the availability of a free appropriate public education (FAPE) to children with
disabilities. Fifteen percent of the remaining funds are allocated based on the relative population
of children aged 3 through 21 living in poverty who are in the age range for which the State
ensures the availability of FAPE to children with disabilities. The statute also includes several
maximum and minimum allocation requirements when the amount available for distribution to
States increases.

If the amount available for allocation to States remains the same from one year to the next, States
receive the same level of funding as in the prior year. If the amount available for allocation to
States decreases from the prior year, any amount available for allocation to States above the
fiscal year 1999 level is allocated based on the relative increases in funding that the States
received between fiscal year 1999 and the prior year. If there is a decrease below the amount
allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

#### Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must
be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999
funds had the State educational agency (SEA) flowed through 75 percent of the State award to
LEAs. Note that this amount is less than the minimum amount that States were required to
provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify
how adjustments to the base payment amounts for LEAs are made.

#### Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve
for State administration up to the greater of the maximum amount the State could reserve for
State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected
by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside
amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum
amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not
more than 5 percent of the amount the outlying area receives under this program or $35,000,
whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

**Maximum State Set-Aside (Column C)**

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

Page 1

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Charlene Russell-Tucker
Acting Commissioner of Education
Connecticut State Department of Education
450 Columbus Boulevard
Hartford, Connecticut 06103

Dear Acting Commissioner Russell-Tucker:

We have approved Connecticut's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the Connecticut State Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 19, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by you on May 7, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc:  State Director of Special Education

**State Name: Connecticut**

**Enclosure A**

## Section II

### A.  Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)*<br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1.  A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.  The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.  All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.  An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.  To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

|  |  | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
|---|---|---|
|  |  | 23a. The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| X |  | 23b. *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X |  | 23b.1 The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
|  |  | 23b.2 The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X |  | 24. The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X |  | 25. The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education. <br><br> With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Outlying Areas, Freely Associated States, and the U.S. Department of the Interior**

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(c) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

# ILLINOIS



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Carmen Ayala, Ph.D.
State Superintendent of Education
Illinois State Board of Education
100 North 1st Street
Springfield, Illinois  62777

Dear State Superintendent Ayala:

We have approved Illinois's grant application for Federal fiscal year (FFY) 2021 funds under
Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based
on our review of the IDEA Part B grant application submitted by the Illinois State Board of
Education to the U.S. Department of Education (Department), Office of Special Education
Programs (OSEP), on May 17, 2021, May 21, 2021, and May 26, 2021, including the assurances
provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our
approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B
grant application (Enclosure B), signed by you on May 17, 2021, that the State's provisions meet
the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate
its Part B program in accordance with all of the required assurances and certifications, consistent
with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of
recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to
Assurance 23a or 23b related to accessible instructional materials as reflected in your State's
FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other
persons with print disabilities" has been removed from the Copyright Act and replaced with
"eligible person," and the term "specialized format" has been removed and replaced with the
term "accessible format." Although at this time Congress has not made conforming amendments
to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as
incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your
State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the
requirements of IDEA Part B and that the State will operate its Part B program in accordance
with all of the required assurances and certifications. Any changes made by the State, after OSEP
approval, to information that is a part of a State's IDEA Part B grant application, must meet the
public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents
the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool
Grants) grant award for funds currently available under the Consolidated Appropriations Act,
2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by
fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: Illinois**

## Enclosure A

### Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | |
|---|---|---|
| | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a.   The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b.   *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1  The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: |
| | | • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or |
| | | • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2  The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24.    The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25.    The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Outlying Areas, Freely Associated States, and the U.S. Department of the Interior**

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE)), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

# MASSSACHUSETTS



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Jeffrey C. Riley
Commissioner of Elementary and Secondary Education
Massachusetts Department of Elementary and Secondary Education
75 Pleasant Street
Malden, Massachusetts 02148

Dear Commissioner Riley:

We have approved Massachusetts's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the Massachusetts Department of Elementary and Secondary Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 6, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by Senior Associate Commissioner, Russell Johnston on May 5, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act,

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: Massachusetts**

**Enclosure A**

**Section II**

### A.  Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>(Assurance is given.) | No<br>(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)<br><br>Check and enter date(s) as applicable | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing. (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities. (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation. (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: |
| | | | • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or |
| | | | • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

## Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(c) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

Page 1

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column I)

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs -- both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds -- meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Jeffrey C. Riley
Commissioner of Elementary and Secondary Education
Massachusetts Department of Elementary and Secondary Education
75 Pleasant Street
Malden, Massachussetts 02148

Dear Commissioner Riley:

We have approved Massachusetts' application for Federal Fiscal Year (FFY) 2020 funds under
Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based
on our review of the IDEA Part B application submitted by the Massachusetts Department of
Elementary and Secondary Education to the U.S. Department of Education (Department), Office
of Special Education Programs (OSEP), on May 1, 2020 and May 30, 2020, including the
assurances provided in Section II and incorporated by reference to this letter as noted in
Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY
2020 application (Enclosure B), signed by Senior Associate Commissioner, Russell Johnston on
April 28, 2020, that the State's provisions meet the requirements of IDEA Part B as found in
Public Law 108-446, and that the State will operate its Part B program in accordance with all of
the required assurances and certifications, consistent with 34 CFR §76.104.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of
recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to
Assurance 23a or 23b related to accessible instructional materials as reflected in your State's
FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other
persons with print disabilities" has been removed from the Copyright Act and replaced with
"eligible person," and the term "specialized format" has been removed and replaced with the
term "accessible format." Although at this time Congress has not made conforming amendments
to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as
incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification,
pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that
the State will operate its Part B program in accordance with all of the required assurances and
certifications. Any changes made by the State, after OSEP approval, to information that is a part
of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of
Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the
IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These
funds are available for obligation by States from July 1, 2020 through September 30, 2022, in
accordance with 34 CFR §76.709.

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg

Director
Office of Special Education Programs

Enclosures

    Enclosure A (Sections II.A-C. of the State's application)
    Enclosure B (Section II.D. of the State's application)
    Enclosure C
    Enclosure D

cc: State Director of Special Education

**State Name: Massachusetts**

## Enclosure A

**Section II**

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

|   |   |     | |
|---|---|---|---|
|   |   |     | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X |   | 6.  | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X |   | 7.  | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X |   | 8.  | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X |   | 9.  | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X |   | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X |   | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X |   | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note:  Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

### Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

### Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

   (1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

   (2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

   (3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

   (4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column C)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

Page 1

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

# NEW JERSEY



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Angelica Allen-McMillan
Acting Commissioner
New Jersey Department of Education
100 River View Plaza
P.O. Box 500
Trenton, New Jersey 08625

Dear Acting Commissioner Allen-McMillan:

We have approved New Jersey's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the New Jersey Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 13, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by you on May 13, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc:  State Director of Special Education

**State Name: New Jersey**

## Enclosure A

### Section II

#### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | |
|---|---|---|
| | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Outlying Areas, Freely Associated States, and the U.S. Department of the Interior**

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over \$850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over \$850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is \$850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is \$850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

Page 1

for direct services for children with disabilities who are eligible for services under section 619;
(4) for activities at the State and local levels to meet the performance goals established by the
State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and
implement a statewide coordinated services system designed to improve results for children and
families, including children with disabilities and their families (but not more than up to 1 percent
of the amount received under this program); (6) to provide early intervention services (which
shall include an educational component that promotes school readiness and incorporates
preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities
who are eligible for services under section 619 and who previously received services under Part
C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the
State's discretion, to continue service coordination or case management for families who receive
services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that
may be used to administer this program. The amount that may be used for administration is
limited to 20 percent of the maximum amount available to a State for State-level activities. These
funds may also be used, at the State's discretion, for the administration of the Grants for Infants
and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs
based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA
flowed through 75 percent of the State award to LEAs. Note that this amount is less than the
minimum amount that States were required to provide LEAs from the FFY 1997 funds. The
IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment
amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the
State determines that the amount available for base payments is less than 75 percent of the
State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by
the percentage of the reduction in the total amount actually available for making base payments
in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100
and the total amount available for making base payments in FFY 2021 is $90, the reduction in
the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must
be reduced by 10 percent. The State, if necessary, must make base payment adjustments in
accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a
supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not
affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. §
300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would
have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its
grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter
making these base payments, States must allocate the remaining IDEA section 619 funds based
on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R.
§ 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and
poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619
funds for State-level activities. After a State sets aside funds for State-level activities and makes

Page 2

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Lamont Repollet
Commissioner of Education
New Jersey Department of Education
100 River View Plaza, P.O. Box 500
Trenton, New Jersey 08625

Dear Commissioner Repollet:

We have approved New Jersey's application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B application submitted by the New Jersey Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 11, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed by you on March 17, 2020, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020, through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

    Enclosure A (Sections II.A-C. of the State's application)
    Enclosure B (Section II.D. of the State's application)
    Enclosure C
    Enclosure D

cc: State Director of Special Education

**State Name: New Jersey**

## Enclosure A

## Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1.   A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.   The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.   All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.   An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing. (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities. (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation. (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:  • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or  • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Section 611 Base Allocation to LEAs (Column C)**

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

**Maximum Set-Aside for Administration (Column D)**

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

**Maximum State Set-Aside (Column C)**

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

# NEW YORK



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Betty A. Rosa
Commissioner
New York State Education Department
89 Washington Avenue
Albany, New York  12234

Dear Commissioner Rosa:

We have approved New York's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the New York State Education Department to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 18, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by you on May 18, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA and Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: New York**

**Enclosure A**

**Section II**

**A. Assurances Related to Policies and Procedures**

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given.  Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1.   A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.   The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.   All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.   An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | |
|---|---|---|
| | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a.  The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b.  *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1  The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: |
| | | • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or |
| | | • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2  The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24.  The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25.  The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|---------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

### Enclosure C
### IDEA Grants to States Program
### (Part B, Section 611)

## Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

### Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

### Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or \$800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or \$35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or \$35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

### Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

#### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

**Maximum Set-Aside Available for Administration (Column F)**

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

**Section 619 Base Payment for LEAs (Column G)**

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

**Section 619 Population/Poverty Factors (Column H)**

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Shannon Tahoe
Interim Commissioner
New York State Education Department
89 Washington Avenue
Albany, New York 12234

Dear Interim Commissioner Tahoe:

We have approved New York's application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B application submitted by the New York State Education Department to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 14, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed by you on May 13, 2020, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020 through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B. As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

    Enclosure A (Sections II.A-C. of the State's application)
    Enclosure B (Section II.D. of the State's application)
    Enclosure C
    Enclosure D

cc:  State Director of Special Education

**State Name: New York**

## Enclosure A

## Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Section 611 Base Allocation to LEAs (Column C)**

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

**Maximum Set-Aside for Administration (Column D)**

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column C)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

Page 1

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

Page 2

# NORTH CAROLINA



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Catherine Truitt
State Superintendent
North Carolina Department of Public Instruction
6301 Mail Service Center
Raleigh, North Carolina  27699

Dear Superintendent Truitt:

We have approved North Carolina's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the North Carolina Department of Public Instruction to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 20, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by you on May 20, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(c)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(c)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: North Carolina**

## Enclosure A

## Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act.  (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1.    A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.    The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.    All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.    An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.    To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | | |
|---|---|---|---|---|
| | | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing. (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities. (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation. (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: |
| | | | • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or |
| | | | • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying,* the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the
Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the
American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated
an amount equal to the amount that it received for fiscal year 1999. If the total program
appropriation increases over the prior year, 85 percent of the remaining funds are allocated based
on the relative population of children aged 3 through 21 who are in the age range for which the
State ensures the availability of a free appropriate public education (FAPE) to children with
disabilities. Fifteen percent of the remaining funds are allocated based on the relative population
of children aged 3 through 21 living in poverty who are in the age range for which the State
ensures the availability of FAPE to children with disabilities. The statute also includes several
maximum and minimum allocation requirements when the amount available for distribution to
States increases.

If the amount available for allocation to States remains the same from one year to the next, States
receive the same level of funding as in the prior year. If the amount available for allocation to
States decreases from the prior year, any amount available for allocation to States above the
fiscal year 1999 level is allocated based on the relative increases in funding that the States
received between fiscal year 1999 and the prior year. If there is a decrease below the amount
allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the
amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with
the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas
will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were
not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA,
funds were allocated to those entities on the basis of their relative populations of individuals
aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section
611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each
freely associated State receives level funding until reauthorization. As such, the freely associated
States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the
IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for
2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the
lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no
case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result
of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column I)

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Mark Johnson
Superintendent
North Carolina Department of Public Instruction
6301 Mail Service Center
Raleigh, North Carolina 27699

Dear Superintendent Johnson:

We have approved North Carolina's application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B application submitted by the North Carolina Department of Public Instruction to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 14, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed you on April 15, 2020, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020 through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg
Director
Office of Special Education Programs


Enclosures

    Enclosure A (Sections II.A-C. of the State's application)
    Enclosure B (Section II.D. of the State's application)
    Enclosure C
    Enclosure D

cc: State Director of Special Education

**State Name: North Carolina**

## Enclosure A

## Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1.   A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.   The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3.   All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.   An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | |
|---|---|---|
| | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6.    Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7.    Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8.    Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9.    Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10.   Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11.   The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12.   The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note:  Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|---|---|
| | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|---|---|
| | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

## Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

### Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column C)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

# TEXAS



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable Mike Morath
Commissioner
Texas Education Agency
1701 North Congress Avenue
Austin, Texas  78701

Dear Commissioner Morath:

We have conditionally approved Texas' grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our conditional approval is based on our review of the IDEA Part B grant application submitted by the Texas Education Agency to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 17, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our conditional approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by Mike Meyer, Deputy Commissioner of Finance on May 13, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

TEA submitted numerous documents to demonstrate correction of the findings of noncompliance in response to OSEP's October 19, 2020, monitoring report that was based on OSEP's May, 2019 on-site monitoring visit to TEA. The Department is reviewing the submitted information to determine TEA's progress toward implementing the State's CAR and will respond under separate cover regarding the State's progress toward the correction of noncompliance.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

approval, to information that is a part of the State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act of 2021 (Public Law 116-94) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula, in a year in which the amount available for allocation to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] [Choose one of the following:  The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform in writing local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718).Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the
functions and duties of the Assistant
Secretary for the Office of Special
Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: Texas**

## Enclosure A

**Section II**

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes *(Assurance is given.)* | No *(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)* <br><br> *Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| | X<br>June 30,2022 | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| | X<br>June 30,2022 | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| | X<br>June 30,2022 | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the state recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

#### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column E)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable Mike Morath
Commissioner
Texas Education Agency
1701 N. Congress Avenue
Austin, Texas 78701

Dear Commissioner Morath:

We have conditionally approved Texas's application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our conditional approval is based on our review of the IDEA Part B application submitted by the Texas Education Agency (TEA) to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 14, 2020 and May 21, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed by Deputy Commissioner Mike Meyer on May 6, 2020 that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104.

In addition, the State provided specific assurances that it will:

1. Operate throughout the period of the FFY 2020 grant award consistently with IDEA Part B and applicable regulations; and

2. Make such changes to existing policies and procedures as are necessary to bring those policies and procedures into compliance with the requirements of IDEA Part B as soon as possible, and not later than June 30, 2021. Within Section II of its application, the State has included, for each assurance it cannot meet at this time, the date by which it expects to complete necessary changes to any policies and procedures that are not yet in compliance with the requirements of IDEA Part B.

As part of its Part B application for its FFY 2020 IDEA Part B grant awards, TEA submitted the State's Dyslexia Handbook as part of its documentation to demonstrate the State is taking steps to ensure the State and its local educational agencies carry out their child find responsibilities under the Individuals with Disabilities Education Act. The Department is reviewing the Handbook, as well as information gathered during OSEP's on-site monitoring visit conducted the week of May 6, 2019, to determine TEA's progress toward implementing the State's CAR. OSEP will respond under separate cover concerning OSEP's May 2019 monitoring visit, the Dyslexia Handbook, and the State's progress in completing the CAR.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of the State's Part B application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94), for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020 to September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula, in a year in which the amount available for allocation to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform in writing local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

Page 4 – Chief State School Officer

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

*Laurie VanderPloeg*

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

State Name: Texas

## Enclosure A

## Section II

### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes *(Assurance is given.)* | No *(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)* *Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| | X<br>June 30, 2021 | 1.   A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2.   The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| | X<br>June 30, 2021 | 3.   All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4.   An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4).  (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5.   To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| | X June 30, 2021 | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | |
|---|---|---|
| | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B.  Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|---|---|
| X | 1.  The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2.  The State shall provide data to the Secretary on any information that may be required by the Secretary.  (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3.  The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4.  As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C.  Certifications

The State is providing the following certifications:

| Yes | Certifications |
|---|---|
| X | 1.  The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the state recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2.  The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3.  The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current.  This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

## Enclosure C
## IDEA Grants to States Program
## (Part B, Section 611)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

#### Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

#### Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

Page 2

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

**Maximum State Set-Aside (Column C)**

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

# VIRGINIA



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

July 1, 2021

Honorable James Lane, Ph.D.
Superintendent of Public Instruction
Virginia Department of Education
P.O. Box 2120
Richmond, Virginia 23218

Dear Superintendent Lane:

We have approved Virginia's grant application for Federal fiscal year (FFY) 2021 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B grant application submitted by the Virginia Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on June 2, 2021 and June 10, 2021, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2021 IDEA Part B grant application (Enclosure B), signed by you on May 26, 2021, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 C.F.R. § 76.104.

Please note that OSEP Memorandum 21-01, dated January 21, 2021, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2021 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to Section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your State's grant application for FFY 2021 IDEA Part B funds, your State has provided a certification, pursuant to 34 C.F.R. § 76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's IDEA Part B grant application, must meet the public participation requirements in 34 C.F.R. § 300.165.

Enclosed are two separate grant award notification (GAN) documents. The first GAN represents the State's FFY 2021 IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) grant award for funds currently available under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA). The second GAN represents the State's grant award for IDEA Part B (Section 611 and Section 619) funds under Section 2014 of the American Rescue

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202-2600
www.ed.gov
*The Department of Education's mission is to promote student achievement and preparedness for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

Plan Act of 2021 (Public Law 117-02) (ARP). Both grant awards are subject to all the terms and conditions of the State's FFY 2021 IDEA Part B grant application. The funds under both of these grant awards are available for obligation by States from July 1, 2021 through September 30, 2023, in accordance with 34 C.F.R. § 76.709.

The amounts of Section 619 funds shown in both grant awards represent the full amount of Section 619 funds to which your State is entitled under the CAA and the ARP. In addition, the amount of Section 611 funds shown in your State's ARP IDEA Part B grant award represents the full amount of Section 611 funds to which your State is entitled under the ARP. However, the amount of Section 611 funds shown in your State's CAA FFY 2021 IDEA Part B grant award is only part of the total Section 611 funds that will be awarded to your State under the CAA for FFY 2021. Of the $12,937,457,000 appropriated for Section 611 in FFY 2021 under the CAA, $3,654,074,000 is available for awards on July 1, 2021, and $9,283,383,000 will be available for awards on October 1, 2021. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2021, the appropriation for the Preschool Grants program is $597,620,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under IDEA Section 605, the Office of Management and Budget Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (OMB Uniform Guidance) in 2 C.F.R. Part 200, and 34 C.F.R. § 300.718, States must request prior approval from OSEP for certain State-level activities or expenses. On October 29, 2019, the Office of Special Education and Rehabilitative Services released a Frequently Asked Questions document (2019 FAQs) on prior approval.[2] The State did not submit a prior approval request with its grant application. If the State plans to use its FFY 2021 IDEA Part B grant funds for such costs, and those costs fall outside of the scope of the 2019 FAQs, it must submit a request for prior approval to which OSEP will respond separate from the grant letter.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

In Section V.A of its IDEA Part B grant application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2019 and SFY 2020. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V.A, OSEP will follow up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as

---

[2]Prior approval must be obtained under IDEA for the following direct costs: (1) equipment (defined generally as $5,000 or more per item of equipment) (2 C.F.R. § 200.1 and 34 C.F.R. § 300.718); (2) participant support costs (such as training or travel costs for non-employees) (2 C.F.R. § 200.1); and (3) construction or alteration of facilities (34 C.F.R. § 300.718). Under the 2019 FAQs, OSERS granted prior approval for participant support costs under IDEA that: are associated with State Advisory Panels; are incurred during the provision of services under IDEA; do not exceed $5000 per individual participant per training/conference; and are incurred by local educational agencies under IDEA Part B. In addition, the 2019 FAQs provide prior approval for equipment that is identified on or directly related to the implementation of an individualized education program for youth and children with disabilities.

Page 4 – Chief State School Officer

amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

David Cantrell

David Cantrell, Ph.D.
Delegated the authority to perform the functions and duties of the Assistant Secretary for the Office of Special Education and Rehabilitative Services

Enclosures

Enclosure A (Sections II.A-C. of the State's application)
Enclosure B (Section II.D. of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: Virginia**

## Enclosure A

**Section II**

**A. Assurances Related to Policies and Procedures**

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311. (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10). (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148 unless the Secretary has arranged for services to those children under subsection (f) [By pass]. (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608. (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | |
|---|---|---|---|
| | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | | |
|---|---|---|---|
| | | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. | The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. | *(Note: Check either "23b.1" or "23b.2" whichever applies.* |
| X | | 23b.1 | The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to: |
| | | | • require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or |
| | | | • purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 | The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.  (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. | The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8.  (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. | The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|-----|------------------|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|-----|----------------|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

### Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table

#### Total Grant Award (Column B)

Column B shows your total grant award for the Grants to States program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

#### Outlying Areas, Freely Associated States, and the U.S. Department of the Interior

The Department used its discretion under section 611(b)(1)(A) of the IDEA to increase the amount of funding reserved for Part B programs in the outlying areas for 2021, consistent with the increased IDEA section 611 funding provided by the ARP Act. As a result, the outlying areas will receive a separate allocation of ARP Act IDEA section 611 funds. Funding increases were not consistent across the outlying areas because, pursuant to section 611(b)(1)(A) of the IDEA, funds were allocated to those entities on the basis of their relative populations of individuals aged 3 through 21.

The IDEA Part B funding level for the freely associated States is defined in section 611(b)(1)(A)(ii) of the IDEA. The Department has no discretion over this funding level, and each freely associated State receives level funding until reauthorization. As such, the freely associated States were not eligible for IDEA ARP Act funds.

For the Department of the Interior (the Bureau of Indian Education (BIE)), the amount of the IDEA Part B grant is determined under the terms of the relevant appropriations act, which, for 2021, establishes the BIE's funding level as what the BIE received in FFY 2020 increased by the lesser of the increase in the appropriation under section 611(i) of the IDEA or inflation, but in no case less than the what the BIE received in FFY 2020. CAA, 134 Stat. 1182, at 1601. As a result of the regularly appropriated IDEA Part B funds for FFY 2021, the BIE received the maximum

amount of IDEA Part B funds that it could receive under the terms of the appropriations act (that is, its allocation was determined by inflation), and additional increases in FFY 2021 funding would have no effect on the BIE's IDEA Part B allocation. As such, the BIE was not eligible for additional IDEA Part B funding through the ARP Act.

## Section 611 Base Allocation to LEAs (Column C)

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 C.F.R. §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 611 of the IDEA. Under 34 CFR. § 300.705(b)(1), the amount of an LEA's section 611 base payment is the amount the LEA would have received under section 611 for fiscal year 1999 if the State had distributed 75 percent of its grant for that year under section 611(d) of the IDEA as that section was then in effect. After making these base payments, States must allocate the remaining IDEA section 611 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.705(b)(3).

## Maximum Set-Aside for Administration (Column D)

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

Under 34 C.F.R. § 300.704(a) and (b), the amounts that States may reserve for State administration and other State-level activities are set in accordance with section 611(e) of the IDEA and therefore impacted by inflation and not increases in grant award amounts. As a result, the additional IDEA section 611 funds made available through the ARP Act do not increase the amount of IDEA section 611 funds that can be reserved for State administration and other State-level activities.

Part B programs in the outlying areas have been provided an increase in the maximum amount available for State administration as a result of the ARP Act IDEA section 611 funds. This is because, under 34 C.F.R. § 300.704(a)(1)(ii), the maximum amount that each outlying area may reserve for State administration is 5% of the amount the outlying area receives under 34 C.F.R. § 300.701(a) for the fiscal year or $35,000, whichever is greater. Because the ARP Act appropriated additional funds for grants to States under IDEA section 611, the amount that each outlying area receives under 34 C.F.R. § 300.701(a) for FFY 2021 includes both the regular IDEA section 611 funds and the ARP Act IDEA section 611 funds, and 5% of that aggregate amount represents the maximum amount that each outlying area may reserve for State administration.

## Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2021:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act

of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

**Section 611 Population/Poverty**

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).

**Enclosure D**
**IDEA Preschool Grants Program**
**(Part B, Section 619)**

**Explanation of the Federal Fiscal Year (FFY) 2021 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Preschool Grants program for FFY 2021 under the Consolidated Appropriations Act, 2021 (Public Law 116-260) (CAA) and section 2014 of the American Rescue Plan Act of 2021 (Public Law 117-02) (ARP Act).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

**Maximum State Set-Aside (Column E)**

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU).

There were slight increases in the maximum amounts States may reserve for State-level activities under the Federal fiscal year (FFY) 2021 IDEA (regular under CAA plus additional under ARP Act) section 619 grants. Specifically, under 34 C.F.R. §§ 300.812(b) and 300.813, the maximum amount of FFY 2021 section 619 funds a State may set aside for State administration and other State-level activities is based on what the State could reserve in FFY 2020 adjusted by the lesser of: (1) the percentage increase from the preceding year in the State's section 619 allocation or (2) the rate of inflation (i.e., 0.99%). Based on the regular IDEA section 619 funds made available under the CAA and the additional IDEA section 619 funds made available under the ARP Act, States had a total section 619 allocation increase in excess of 0.99% and, as a result, every State's maximum State reservation under section 619 was 0.99% more than the amount each was allowed to reserve under the FFY 2020 IDEA section 619 grants.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3)

for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column F)

Column F indicates the maximum portion of the total State set-aside amount (Column E) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (IDEA Part C).

## Section 619 Base Payment for LEAs (Column G)

Column G is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The IDEA Part B regulations at 34 C.F.R. § 300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If, after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2021. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2021 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2021 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 C.F.R. § 300.816(b) based on the ratably reduced base payments.

IDEA funds awarded under the ARP Act are not a separate grant program but serve as a supplement to the FFY 2021 IDEA funds. As a result, the ARP Act IDEA Part B funds do not affect LEAs' base payment amounts under section 619 of the IDEA. Under 34 C.F.R. § 300.816(a), the amount of an LEA's section 619 base payment is the amount the LEA would have received under section 619 for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3) of the IDEA as that section was then in effect. fter making these base payments, States must allocate the remaining IDEA section 619 funds based on population and poverty (i.e., 85% population and 15% poverty), in accordance with 34 C.F.R. § 300.816(c).

## Section 619 Population/Poverty Factors (Column H)

Column H shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2021 section 619 funds for State-level activities. After a State sets aside funds for State-level activities and makes

the required base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

**Total State Minimum Flow-Through to LEAs (Column I)**

The minimum flow-through to LEAs (Column I) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column E). If States do not choose to retain the maximum amount available under the State set-aside (Column E), the remaining funds flow through to LEAs in addition to the funds in Column I.

Separate Grant Award Notices (GANs) and identifiers have been issued to States for the regular IDEA Part B funds made available under the CAA and the additional IDEA Part B funds made available under the ARP Act. Therefore, States must ensure that allocations to LEAs – both the regular IDEA Part B funds under the CAA and the additional ARP Act IDEA Part B funds – meet the Federal award identification requirements in 2 C.F.R. § 200.332(a)(1).



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES
OFFICE OF SPECIAL EDUCATION PROGRAMS

July 1, 2020

Honorable James Lane, Ph.D.
Superintendent of Public Instruction
Virginia Department of Education
P.O. Box 2120
Richmond, Virgina 23218

Dear Superintendent Lane:

We have approved Virginia application for Federal Fiscal Year (FFY) 2020 funds under Part B of the Individuals with Disabilities Education Act (IDEA Part B). Our approval is based on our review of the IDEA Part B application submitted by the Virginia Department of Education to the U.S. Department of Education (Department), Office of Special Education Programs (OSEP), on May 7, 2020, including the assurances provided in Section II and incorporated by reference to this letter as noted in Enclosure A. Our approval is also based on the State's certification in Section II.D of its FFY 2020 application (Enclosure B), signed by you on May 6, 2020, that the State's provisions meet the requirements of IDEA Part B as found in Public Law 108-446, and that the State will operate its Part B program in accordance with all of the required assurances and certifications, consistent with 34 CFR §76.104.

Please note that OSEP Memorandum 20-01, dated January 23, 2020, explained the impact of recent amendments to the Copyright Act, 17 U.S.C. § 121, on certain terms relevant to Assurance 23a or 23b related to accessible instructional materials as reflected in your State's FFY 2020 application for funds under IDEA Part B. As a result, the term "blind and other persons with print disabilities" has been removed from the Copyright Act and replaced with "eligible person," and the term "specialized format" has been removed and replaced with the term "accessible format." Although at this time Congress has not made conforming amendments to section 612(a)(23) of IDEA, the Department construes Assurances 23a and 23b as incorporating the terms "eligible person" and "accessible format."

Please note that as part of your application for FFY 2020, your State has provided a certification, pursuant to 34 CFR §76.104, that its application meets the requirements of IDEA Part B and that the State will operate its Part B program in accordance with all of the required assurances and certifications. Any changes made by the State, after OSEP approval, to information that is a part of a State's application, must meet the public participation requirements in 34 CFR §300.165.

Enclosed are the State's FFY 2020 grant awards for funds currently available under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94) for the IDEA Part B Section 611 (Grants to States) and Section 619 (Preschool Grants) programs. These funds are available for obligation by States from July 1, 2020 through September 30, 2022, in accordance with 34 CFR §76.709.

The amount in your award for Section 619 represents the full amount of funds to which you are entitled. However, the amount shown in your award for the Section 611 program is only part of

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-2800

www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – Chief State School Officer

the total funds that will be awarded to you for FFY 2020. Of the $12,764,392,000 appropriated for Section 611 in FFY 2020, $3,481,009,000 is available for awards on July 1, 2020, and $9,283,383,000 will be available for awards on October 1, 2020. Under the Section 611 formula, in a year in which the amount available for allocations to States increases from the prior year, subject to certain maximum and minimum funding requirements, State allocations are based on the amount that each State received under Section 611 for FFY 1999, the relative population of children in the age range for which each State ensures the availability of a free appropriate public education (FAPE) to children with disabilities, and the relative population of children living in poverty in the age range for which each State ensures the availability of FAPE to children with disabilities.[1]

For FFY 2020, the appropriation for the Preschool Grants program is $394,120,000. Under the Section 619 formula in a year in which the amount available for allocations to States remains the same or increases from the prior year, State allocations, subject to certain maximum and minimum funding requirements, are based on the amount that each State received under Section 619 for FFY 1997, the relative population of children aged three through five, and the relative population of all children aged three through five living in poverty.

Enclosure C provides a short description of how Section 611 funds were allocated and how those funds can be used. In addition, Table I in Enclosure C shows funding levels for distribution of Section 611 funds and the parameters for within-State allocations.

Enclosure D provides a short description of how Section 619 funds were allocated and how those funds can be used. In addition, Table II in Enclosure D shows State-by-State funding levels for distribution of Section 619 funds.

Section 611(e)(1)(C) of the IDEA provides that "[p]rior to expenditure of funds under this paragraph [Section 611(e)(1) concerning funds for State administration], the State shall certify to the Secretary that the arrangements to establish responsibility for services pursuant to [S]ection 612(a)(12)(A) are current." We read this provision to mean that if a State does not have interagency agreements or other arrangements in place to establish responsibility for the provision of services, the State may not expend funds available to the State under Section 611(e)(1) [State administration funds] until the State has these agreements or arrangements in place.

Under Section 608(a)(2) of the IDEA, each State that receives funds under IDEA Part B is required to inform, in writing, local educational agencies located in the State of any State-imposed rule, regulation, or policy that is not required by IDEA or Federal regulations. A State may use the same list of State-imposed rules, regulations, and policies that it was required to submit to the Department in Section IV of its IDEA Part B application for this purpose.

---

[1] The amount that a State's allocation may increase from one year to the next is capped at the amount the State received in the prior year multiplied by the sum of 1.5 percent and the percentage increase in the total amount appropriated for Part B of IDEA from the prior year. Additionally, the maximum amount that a State may receive in any fiscal year is calculated by multiplying the number of children with disabilities ages 3 through 21 served during the 2004-2005 academic year in that State by 40 percent of the annual per pupil expenditure (APPE), adjusted by the rate of annual change in the sum of 85 percent of the children aged 3 through 21 for whom that State ensures the availability of FAPE and 15 percent of the children living in poverty. Because there are multiple caps, in any year the "effective cap" on a State's allocation is the lowest cap for that State.

Page 3 – Chief State School Officer

In Section V of its IDEA Part B application, pursuant to the authority in IDEA Section 618(a)(3), the State was required to submit data on the total amount of State financial support made available for special education and related services for children with disabilities in State fiscal year (SFY) 2018 and SFY 2019. If OSEP receives information through audits, fiscal monitoring or other means that raises questions about the data your State has provided in Section V, OSEP will follow-up with your State.

Section 604 of the IDEA provides that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this [Act]." Section 606 provides that each recipient of assistance under the IDEA make positive efforts to employ and advance in employment qualified individuals with disabilities in programs assisted under the IDEA. Therefore, by accepting this grant, your State is expressly agreeing as a condition of IDEA funding to a waiver of Eleventh Amendment immunity and to ensuring that positive efforts are made to employ and advance employment of qualified individuals with disabilities in programs assisted under the IDEA.

The enclosed grant awards of FFY 2020 funds are made with the continued understanding that this Office may, from time to time, require clarification of information within your application, if necessary. These inquiries may be necessary to allow us to appropriately carry out our administrative responsibilities related to IDEA Part B.

As a reminder, all prime recipients of IDEA Part B funds must report subaward information as required by the Federal Funding Accountability and Transparency Act of 2006 (FFATA), as amended in 2008. First-tier subaward information must be reported by the end of the following month from when the award was made or obligated. FFATA guidance is found at https://www.fsrs.gov/. Please contact your State's Fiscal Accountability Facilitator if you have further questions.

We appreciate your ongoing commitment to the provision of quality educational services to children with disabilities.

Sincerely,

Laurie VanderPloeg

Laurie VanderPloeg
Director
Office of Special Education Programs

Enclosures

Enclosure A (Sections II.A-C of the State's application)
Enclosure B (Section II.D of the State's application)
Enclosure C
Enclosure D

cc: State Director of Special Education

**State Name: Virginia**

## Enclosure A

### Section II

#### A. Assurances Related to Policies and Procedures

The State makes the following assurances that it has policies and procedures in place as required by Part B of the Individuals with Disabilities Education Act. (20 U.S.C. 1411-1419; 34 CFR §§300.100-300.174)

| Yes<br>*(Assurance is given.)* | No<br>*(Assurance cannot be given. Provide date on which State will complete changes in order to provide assurance.)*<br><br>*Check and enter date(s) as applicable* | Assurances Related to Policies and Procedures |
|---|---|---|
| X | | 1. A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 U.S.C. 1412(a)(1); 34 CFR §§300.101-300.108. |
| X | | 2. The State has established a goal of providing a full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal. (20 U.S.C. 1412(a)(2); 34 CFR §§300.109-300.110) |
| X | | 3. All children with disabilities residing in the State, including children with disabilities who are homeless or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services in accordance with 20 U.S.C. 1412(a)(3); 34 CFR §300.111. |
| X | | 4. An individualized education program, or an individualized family service plan that meets the requirements of section 636(d), is developed, reviewed, and revised for each child with a disability in accordance with 34 CFR §§300.320 through 300.324, except as provided in §§300.300(b)(3) and 300.300(b)(4). (20 U.S.C. 1412(a)(4); 34 CFR §300.112) |
| X | | 5. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular |

| | | | |
|---|---|---|---|
| | | | classes with the use of supplementary aids and services cannot be achieved satisfactorily in accordance with 20 U.S.C. 1412(a)(5)(A)-(B); 34 CFR §§300.114-300.120. |
| X | | 6. | Children with disabilities and their parents are afforded the procedural safeguards required by 34 CFR §§300.500 through 300.536 and in accordance with 20 U.S.C. 1412(a)(6); 34 CFR §300.121. |
| X | | 7. | Children with disabilities are evaluated in accordance with 34 CFR §§300.300 through 300.311.  (20 U.S.C. 1412(a)(7); 34 CFR §300.122) |
| X | | 8. | Agencies in the State comply with 34 CFR §§300.610 through 300.626 (relating to the confidentiality of records and information). (20 U.S.C. 1412(a)(8); 34 CFR §300.123) |
| X | | 9. | Children participating in early intervention programs assisted under Part C, and who will participate in preschool programs assisted under this part, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9). By the third birthday of such a child, an individualized education program or, if consistent with 34 CFR §300.323(b) and section 636(d), an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10).  (20 U.S.C. 1412(a)(9); 34 CFR §300.124) |
| X | | 10. | Agencies in the State, and the SEA if applicable, comply with the requirements of 34 CFR §§300.130 through 300.148 (relating to responsibilities for children in private schools), including that to the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this part by providing for such children special education and related services in accordance with the requirements found in 34 CFR §§300.130 through 300.148  unless the Secretary has arranged for services to those children under subsection (f) [By pass].  (20 U.S.C. 1412(a)(10); 34 CFR §§300.129-300.148) |
| X | | 11. | The State educational agency is responsible for ensuring that the requirements of Part B are met including the requirements of 34 CFR §§300.113, 300.149, 300.150 through 300.153, and 300.175 and 300.176 and that the State monitors and enforces the requirements of Part B in accordance with 34 CFR §§300.600-300.602 and 300.606-300.608.  (20 U.S.C. 1412(a)(11); 34 CFR §300.149) |
| X | | 12. | The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (b) of 34 CFR §300.154 and the State educational agency, in order to ensure that all services described in paragraph (b)(1)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under §300.154(a)(3). Such agreement or |

| | | | | |
|---|---|---|---|---|
| | | | | mechanism shall meet the requirements found in 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154. |
| X | | | 13. | The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this part without first affording that agency reasonable notice and an opportunity for a hearing.  (20 U.S.C. 1412(a)(13); 34 CFR §300.155) |
| X | | | 14. | The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities as noted in 20 U.S.C. 1412(a)(14)(A)-(E); 34 CFR §300.156. |
| X | | | 15. | The State has established goals for the performance of children with disabilities in the State that meet the requirements found in 20 U.S.C. 1412(a)(15)(A)-(C); 34 CFR §300.157. |
| X | | | 16. | All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 1111 of the Elementary and Secondary Education Act of 1965, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs as noted in 20 U.S.C. 1412(a)(16)(A)-(E); 34 CFR §300.160. |
| X | | | 17. | Funds paid to a State under this part will be expended in accordance with all the provisions of Part B including 20 U.S.C. 1412(a)(17)(A)-(C); 34 CFR §300.162. |
| X | | | 18. | The State will not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year, unless a waiver is granted, in accordance with 20 U.S.C. 1412(a)(18)(A)-(D); 34 CFR §§300.163 through 300.164. |
| X | | | 19. | Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.  (20 U.S.C. 1412(a)(19); 34 CFR §300.165) |
| X | | | 20. | In complying with 34 CFR §§300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.  (20 U.S.C. 1412(a)(20); 34 CFR §300.166) |
| X | | | 21. | The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State as found in 20 U.S.C. 1412(a)(21)(A)-(D); 34 CFR §§300.167-300.169. |
| X | | | 22. | The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant |

| | | |
|---|---|---|
| | | discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities in accordance with 20 U.S.C. 1412(a)(22)(A)-(B); 34 CFR §300.170. |
| X | | 23a. The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register in accordance with 20 U.S.C. 1412(a)(23)(A) and (D); 34 CFR §300.172. |
| | | 23b. *(Note: Check either "23b.1" or "23b.2" whichever applies.)* |
| X | | 23b.1 The State educational agency coordinates with the National Instructional Materials Access Center and not later than 12/03/06 the SEA as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials enters into a written contract with the publisher of the print instructional materials to:<br><br>• require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center, electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or<br><br>• purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. (20 U.S.C. 1412(a)(23)(C); 34 CFR §300.172) |
| | | 23b.2 The State educational agency has chosen not to coordinate with the National Instructional Materials Access Center but assures that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. (20 U.S.C. 1412(a)(23)(B); 34 CFR §300.172) |
| X | | 24. The State has in effect, consistent with the purposes of the IDEA and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in 34 CFR §300.8. (20 U.S.C 1412(a)(24); 34 CFR §300.173) |
| X | | 25. The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 812(c)) as a condition of attending school, receiving an evaluation under 34 CFR §§300.300 through 300.311, or receiving services under the IDEA as described in 20 U.S.C. 1412(a)(25)(A)-(B); 34 CFR §300.174. |

## B. Other Assurances

The State also makes the following assurances:

| Yes | Other Assurances |
|---|---|
| X | 1. The State shall distribute any funds the State does not reserve under 20 U.S.C. 1411(e) to local educational agencies (including public charter schools that operate as local educational agencies) in the State that have established their eligibility under section 613 for use in accordance with this part as provided for in 20 U.S.C. 1411(f)(1)-(3); 34 CFR §300.705. |
| X | 2. The State shall provide data to the Secretary on any information that may be required by the Secretary. (20 U.S.C. 1418(a)(3); 34 CFR §§300.640-300.645.) |
| X | 3. The State, local educational agencies, and educational service agencies shall use fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds. (34 CFR §76.702) |
| X | 4. As applicable, the assurance in OMB Standard Form 424B (Assurances for Non-Construction Programs), relating to legal authority to apply for assistance; access to records; conflict of interest; merit systems; nondiscrimination; Hatch Act provisions; labor standards; flood insurance; environmental standards; wild and scenic river systems; historic preservation; protection of human subjects; animal welfare; lead-based paint; Single Audit Act; and general agreement to comply with all Federal laws, executive orders and regulations. |

## C. Certifications

The State is providing the following certifications:

| Yes | Certifications |
|---|---|
| X | 1. The State certifies that ED Form 80-0013, *Certification Regarding Lobbying*, is on file with the Secretary of Education.<br><br>With respect to the *Certification Regarding Lobbying*, the State recertifies that no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; that the State shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR Part 82, Appendix B); and that the State Agency shall require the full certification, as set forth in 34 CFR Part 82, Appendix A, in the award documents for all sub awards at all tiers. |
| X | 2. The State certifies that certification in the Education Department General Administrative Regulations (EDGAR) at 34 CFR §76.104 relating to State eligibility, authority and approval to submit and carry out the provisions of its State application, and consistency of that application with State law are in place within the State. |
| X | 3. The State certifies that the arrangements to establish responsibility for services pursuant to 20 U.S.C. 1412(a)(12)(A)-(C); 34 CFR §300.154 (or 20 U.S.C. 1412(a)(12)(A); 34 CFR §300.154(a) are current. This certification must be received prior to the expenditure of any funds reserved by the State under 20 U.S.C. 1411(e)(1); 34 CFR §300.171. |

**Enclosure C**
**IDEA Grants to States Program**
**(Part B, Section 611)**

**Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table**

**Total Grant Award (Column B)**

Column B shows your total grant award for the Grants to States program for FFY 2020 under Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to the amount that it received for fiscal year 1999. If the total program appropriation increases over the prior year, 85 percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 who are in the age range for which the State ensures the availability of a free appropriate public education (FAPE) to children with disabilities. Fifteen percent of the remaining funds are allocated based on the relative population of children aged 3 through 21 living in poverty who are in the age range for which the State ensures the availability of FAPE to children with disabilities. The statute also includes several maximum and minimum allocation requirements when the amount available for distribution to States increases.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1999 level is allocated based on the relative increases in funding that the States received between fiscal year 1999 and the prior year. If there is a decrease below the amount allocated for 1999, each State's allocation is ratably reduced from the fiscal year 1999 level.

**Section 611 Base Allocation to LEAs (Column C)**

Column C is the portion of the local educational agency (LEA) flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from FFY 1999 funds had the State educational agency (SEA) flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide to LEAs from FFY 1999 funds. The Part B regulations at 34 CFR §300.705(b)(2) clarify how adjustments to the base payment amounts for LEAs are made.

**Maximum Set-Aside for Administration (Column D)**

Column D includes the maximum State set-aside amount for administration. A State may reserve for State administration up to the greater of the maximum amount the State could reserve for State administration from fiscal year 2004 funds, or $800,000, increased by inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). The maximum State set-aside amount available for administration for FFY 2020 is a 2.0 percent increase over the maximum amount that was available for FFY 2019. Each outlying area may reserve for each fiscal year not more than 5 percent of the amount the outlying area receives under this program or $35,000, whichever is greater.

**Maximum Set-Aside Available for Other State-Level Activities (Columns E - H)**

The maximum level of funding that may be set aside from a State's total allocation for State-level activities, other than administration, is contingent upon the amount that the State actually sets aside for administration and whether the State opts to establish a LEA high-risk pool under IDEA, section 611(e)(3). For FFY 2020:

(1) If the actual amount a State will set aside for State administration is over $850,000 and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(2) If the actual amount a State will set aside for State administration is over $850,000 and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.0 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(3) If the actual amount a State will set aside for State administration is $850,000 or less and the State will use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 10.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

(4) If the actual amount a State will set aside for State administration is $850,000 or less and the State will not use funds from its award to support a high-risk pool, the maximum amount the State may set aside of its total award for State-level activities (other than administration) is 9.5 percent of its FFY 2006 award as adjusted for inflation based on the CPIU.

SEAs are required to use some portion of these State set-aside funds on monitoring, enforcement, and complaint investigation and to establish and implement the mediation process required by section 615(e), including providing for the costs of mediators and support personnel. In addition, States setting aside funds for a high-risk pool, as provided for under section 611(e)(3), must reserve at least 10 percent of the amount the State reserved for State-level activities for the high-risk pool.

SEAs also may use State set-aside funds: (1) for support and direct services, including technical assistance, personnel preparation, and professional development and training; (2) to support paperwork reduction activities, including expanding the use of technology in the individualized education program process; (3) to assist LEAs in providing positive behavioral interventions and supports and mental health services to children with disabilities; (4) to improve the use of technology in the classroom by children with disabilities to enhance learning; (5) to support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities; (6) for development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities; (7) to assist LEAs in meeting personnel shortages; (8) to support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities; (9) for alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools; (10) to support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities,

in accordance with sections 1111(b) and 1201 of the Elementary and Secondary Education Act of 1965 (ESEA); and (11) to provide technical assistance to schools and LEAs, and direct services, including direct student services described in section 1003A(c)(3) of the ESEA to children with disabilities, in schools or LEAs implementing comprehensive support and improvement activities or targeted support and improvement activities under section 1111(d) of the ESEA on the basis of consistent underperformance of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement based on the challenging academic standards described in section 1111(b)(1) of the ESEA.

## Section 611 Population/Poverty

The minimum amount that a State must flow through to LEAs based on population/poverty equals the total award (Column B) minus the LEA base allocation (Column C), the maximum amount available for administration (Column D), and the maximum amount available for other State-level activities (Column E, F, G, or H). Of this amount, 85 percent must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Enclosure D
## IDEA Preschool Grants Program
## (Part B, Section 619)

### Explanation of the Federal Fiscal Year (FFY) 2020 Allocation Table

### Total Grant Award (Column B)

Column B shows your total grant award for the Preschool Grants program for FFY 2020 under the Title III of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94).

State total grants are calculated in accordance with several factors. First, each State is allocated an amount equal to its fiscal year 1997 allocation. For any year in which the appropriation is greater than the prior year level, 85 percent of the funds above the fiscal year 1997 level are distributed based on each State's relative population of children aged 3 through 5. The other 15 percent is distributed based on each State's relative population of children aged 3 through 5 who are living in poverty. The formula provides several minimums and maximums regarding the amount a State can receive in any year.

If the amount available for allocation to States remains the same from one year to the next, States receive the same level of funding as in the prior year. If the amount available for allocation to States decreases from the prior year, any amount available for allocation to States above the fiscal year 1997 level is allocated based on the relative increases in funding that the States received between fiscal year 1997 and the prior year. If there is a decrease below the amount allocated for fiscal year 1997, each State's allocation is ratably reduced from the fiscal year 1997 level.

### Maximum State Set-Aside (Column C)

States may reserve funds for State-level activities up to an amount equal to 25 percent of the amount they received for fiscal year 1997 under the Preschool Grants program, adjusted upward each year by the lesser of either the rate of increase in the State's allocation or the rate of inflation as reflected by the Consumer Price Index for All Urban Consumers (CPIU). If a State chooses to set-aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for making local educational agency (LEA) base payments in Column E may be below 75 percent of the State's FFY 1997 section 619 grant.

State educational agencies (SEAs) may use State set-aside funds: (1) for administration (limited to no more than 20 percent of the maximum State set-aside – Column C); (2) for support services (including establishing and implementing the mediation process required under section 615(e) of the IDEA and 34 CFR §300.506), which may benefit children with disabilities younger than 3 or older than 5, as long as those services also benefit children with disabilities aged 3 through 5; (3) for direct services for children with disabilities who are eligible for services under section 619; (4) for activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the IDEA; (5) to supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families (but not more than up to 1 percent of the amount received under this program); (6) to provide early intervention services (which shall include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C to children with disabilities who are eligible for services under section 619 and who previously received services under Part

Page 1

369 of 783

C until such children enter, or are eligible under State law to enter, kindergarten; or (7) at the State's discretion, to continue service coordination or case management for families who receive services under Part C, consistent with number 6.

## Maximum Set-Aside Available for Administration (Column D)

Column D indicates the maximum portion of the total State set-aside amount (Column C) that may be used to administer this program. The amount that may be used for administration is limited to 20 percent of the maximum amount available to a State for State-level activities. These funds may also be used, at the State's discretion, for the administration of the Grants for Infants and Families program (Part C).

## Section 619 Base Payment for LEAs (Column E)

Column E is the portion of the LEA flow-through amount that must be distributed to LEAs based on the amounts that the LEAs would have received from the FFY 1997 funds had the SEA flowed through 75 percent of the State award to LEAs. Note that this amount is less than the minimum amount that States were required to provide LEAs from the FFY 1997 funds. The Part B regulations at 34 CFR §300.816(b) clarify how adjustments to the base payment amounts for LEAs are made. If after the State set-aside is subtracted from the total award, the State determines that the amount available for base payments is less than 75 percent of the State's FFY 1997 section 619 grant, the State must ratably reduce each LEA's base payment by the percentage of the reduction in the total amount actually available for making base payments in FFY 2017. For example, if the total amount in the "Base Payment for LEAs" column is $100 and the total amount available for making base payments in FFY 2019 is $90, the reduction in the total base payment amount is 10 percent, and each LEA's base payment for FFY 2020 must be reduced by 10 percent. The State, if necessary, must make base payment adjustments in accordance with 34 CFR §300.816(b) based on the ratably reduced base payments.

## Section 619 Population/Poverty Factors (Column F)

Column F shows the minimum amount a State must allocate to LEAs based on population and poverty factors if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities. As noted above, if a State chooses to set aside the maximum amount of FFY 2020 section 619 funds for State-level activities, the amount available for LEA subgrants could be below the base payment amount in Column E, and the State will not have any remaining section 619 funds available after making base payments. Therefore, the State would be unable to make a population or poverty payment. If States with no funds in Column F reserve the maximum amount of FFY 2020 section 619 funds for State-level activities, they would be unable to make a population or poverty payment.

However, if a State does not set aside the maximum amount for State-level activities and additional funds are available after making base payments, 85 percent of the remaining amount must be distributed on a pro-rata basis to LEAs according to public and private elementary and secondary school enrollment, and 15 percent on a pro-rata basis to LEAs according to the number of children in LEAs living in poverty, as determined by the State.

## Total State Minimum Flow-Through to LEAs (Column G)

The minimum flow-through to LEAs (Column G) is the difference between the Total Grant Award (Column B) and the Maximum State Set-Aside (Column C). If States do not choose to retain the maximum amount available under the State set-aside (Column C), the remaining funds flow through to LEAs in addition to the funds in Column G.

# EXHIBIT 2

Newsroom (https://comptroller.nyc.gov/newsroom/) / Press Releases & Statements (https://comptroller.nyc.gov/newsroom/press-releases/) / Comptroller Stringer Audit Finds the City Lost $179 Million Due to Mis...

# Comptroller Stringer Audit Finds the City Lost $179 Million Due to Mismanagement of DOE Medicaid Reimbursement Claims for Special Education Services

**JULY 19, 2021**

An audit of the New York City Department of Education found the agency did not adequately collect documentation to verify special education services claims for Medicaid reimbursement and does not perform routine collection for a variety of reimbursable services

DOE did not submit the necessary documentation for Medicaid reimbursement claims for the 2018-2019 School Year that totaled as much as $179,688,706 in costs for services for occupational, physical, and speech therapy

Comptroller Stringer recommended improvements to the DOE's handling of claims including meeting all State and federal requirements and ensuring all documentation is collected appropriately for every eligible service



vitec/Shutterstock

**(New York, NY)** – Today, New York City Comptroller Scott M. Stringer released an audit (https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fnyc.us13.list-manage.com%2Ftrack%2Fclick%3Fu%3Dbf606302e0aec6b092c87b850%26id%3D763d8efbcc%26e%3D59df8c1601&data=04%7C01%7Cabrumli%40comptroller.nyc.gov%7C00f6e03848ed47520b2a08d94aacd1bf%7C5dab1e21cf464df29dc0f1510adf88d9%7C0%7C0%7C637622928432154267%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&sdata=NQBwrYy%2Fg2ZyEhGZ%2BW3ooMTURtXGkljhUMgpJqFXIt8%3D&reserved=0) of the New York City Department of Education's (DOE) management of Medicaid reimbursement claims for special education services that provide students with special needs with occupational, physical, and speech therapy services. The audit found that the DOE's failure to perform the due diligence necessary to meet State and federal requirements to receive Medicaid reimbursement for claims on services performed resulted in the agency losing an estimated $179 million in the 2018-2019 school year alone. The findings concluded that the DOE did not perform the necessary steps to receive reimbursement from the federal government for claims submitted to the DOE including obtaining written orders or referrals for services, verifying provider credentials, recording session notes, and obtaining parental consent to bill Medicaid. In response to this mismanagement, Comptroller Stringer recommended steps the DOE should undertake to ensure the agency receives all the federal Medicaid reimbursement funding that it is entitled to enshrined in the Individuals with Disabilities Act (IDEA).

"New York City's students with disabilities deserve the best quality education and every opportunity to succeed. Our audit found the DOE's mismanagement of Medicaid claims for special education services resulted in the City losing out on hundreds of millions of dollars. Exhibit 21 Page 2 of 6

accountability. This is money that could be in our classrooms supporting our children when they need it most," said **New York City Comptroller Scott M. Stringer.** "This mismanagement is unacceptable, and the DOE must improve its process to capture every last dollar eligible for reimbursement. The stakes couldn't be higher and our children deserve nothing less."

The DOE is entitled to submit Medicaid reimbursement claims for covered services provided to Medicaid eligible students with disabilities who are between the ages of 3 and 21. The New York State Department of Health (NYSDOH) and the New York State Department of Education (NYSED) jointly developed the Preschool/School Supportive Health Services Program (SSHSP) to help school districts obtain Medicaid reimbursement. The DOE Office of Medicaid Operations (OMO) is responsible for the coordination of programmatic and administrative efforts to maximize Medicaid reimbursement claims for related services including Physical Therapy (PT), Occupational Therapy (OT), and Speech Therapy. OMO is charged with ensuring that Medicaid reimbursement claims submitted by DOE meet federal and State requirements, and with finding efficiencies to increase claims.

Comptroller Stringer's audit found the following lack of controls with regard to the DOE's management of maximizing Medicaid reimbursement claims for special education services:

- DOE did not have adequate controls in place to ensure that student occupational therapy (OT), physical therapy (PT), and Speech Therapy service encounters met all of the federal and State Medicaid reimbursement documentation requirements including obtaining written orders or referrals for services, verifying provider credentials, recording session notes to document that diagnostic and/or treatment services were provided to students, and obtaining parental consent to bill Medicaid. As a result, DOE could not submit Medicaid reimbursement claims for those services.

- For the 2018-2019 School Year, DOE did not realize gross Medicaid reimbursements totaling as much as $179,688,706, for OT, PT, and speech therapy services.

- DOE does not submit any Medicaid reimbursement claims for the following covered services including valuations and reevaluations, Psychological Counseling, certain speech services, Special Transportation, and Skilled Nursing provided to public and non-public school students; and covered services provided to pre-school students who attend public schools and private schools other than NYSED-approved pre-school special education programs, and pre-school students who receive instruction at home.

- For the 2018-2019 School Year, DOE did not realize gross Medicaid reimbursements totaling as much as $9,966,540 for Psychological Counseling, certain Speech Therapy services, and covered services provided to pre-school public and non-public school students.

- DOE did not maintain evaluation and re-evaluation data, and did not provide the Comptroller's audit team with students' Individualized Education Program (IEP) data including service start and

end dates, frequency, or duration of recommended services for Special Transportation and Skilled Nursing.

In response to these findings, Comptroller Stringer recommended the following:

- Perform a systematic analysis of those OT, PT, and Speech Therapy service encounters that do not pass the claim validation process to determine why those encounters did not meet Medicaid claiming requirements and to identify and prioritize corrective actions to maximize future Medicaid reimbursement revenues;

- Submit Medicaid reimbursement claims for Psychological Counseling service encounters which meet State and federal requirements;

- Ensure that evaluations are conducted and documented in a way that allows DOE to claim for covered services and submit Medicaid reimbursement claims for those services where appropriate;

- Reconsider the feasibility of submitting Medicaid reimbursement claims for Speech Therapy services provided under the supervision of a licensed provider and provided to students in all public and non-public schools, including but not limited to, running a pilot with adequate staffing levels and compliance with timely and complete session note;

- Ensure that contracted providers maintain electronic transportation logs which include Medicaid required elements for each trip and submit Medicaid reimbursement claims for Special Transportation services where appropriate;

- Immediately start claiming for Skilled Nursing services which meet federal and State requirements; and

- Take all necessary steps to ensure that Medicaid documentation claiming requirements are met for covered services provided to preschool-age students and submit Medicaid reimbursement claims for those services where appropriate.

To read Comptroller Stringer's audit of the DOE's Medicaid reimbursement program for special education services, click here (/reports/audit-report-on-the-department-of-educations-efforts-to-maximize-medicaid-reimbursement-claims-for-special-education-services/).

###

**PRESS CONTACT**
**Amy Varghese**
(646) 745-0802 avarghe@comptroller.nyc.gov,

Exhibit 2: Page 4 of 6

**Skye Ernst**
(646) 689-7147 sernst@comptroller.nyc.gov


**SHARE THIS**


**READ THE REPORT**



**City of New York**

OFFICE OF THE COMPTROLLER

**Scott M. Stringer**
**COMPTROLLER**



**FINANCIAL AUDIT**

Marjorie Landa
Deputy Comptroller for Audit

Audit Report on the Department of
Education's Efforts to Maximize
Medicaid Reimbursement Claims for
Special Education Services

FK18-111A
July 14, 2021
http://comptroller.nyc.gov

(https://comptroller.nyc.gov/reports/audit-report-on-the-department-of-educations-efforts-to-maximize-medicaid-reimbursement-claims-for-special-education-services/)

Audit Report on the Department of Education's Efforts to Maximize Medicaid Reimbursement Claims for Special Education Services (https://comptroller.nyc.gov/reports/audit-report-on-the-department-of-educations-efforts-to-maximize-medicaid-reimbursement-claims-for-special-education-services/)


## The Office

One Centre Street
New York, NY 10007
(212) 669-3916

## Navigate

About (/about/)
Services (/services/)
Reports (/reports/)   Exhibit 2: Page 5 of 6

**Suspect Wasteful Spending?**

Call (212) NO-WASTE

Newsroom (/newsroom/)

Employment (/jobs/)

Contact Us (/about/contact-our-office/)

## Follow Us

🐦 @NYCComptroller
(https://twitter.com/NYCComptroller)

**f** @scottstringernyc
(https://www.facebook.com/scottstringernyc/)

📷 NYCComptroller
(https://www.instagram.com/NYCComptroller/)

▶ ComptrollersOffice
(https://www.youtube.com/user/ComptrollersOffice)

## Join Mailing List

Get the latest news in your inbox.

Sign Up

© 2021 Copyright, Office of the New York City Comptroller • Sitemap (/sitemap/) • Disclaimer (/disclaimer/) • Privacy Policy (/privacy-policy/) • Language Disclaimer (/language-disclaimer/) • Text Size • Supported Browsers

Exhibit 2: Page 6 of 6

# EXHIBIT 3

## INDIVIDUALIZED EDUCATION PROGRAM (IEP)

| STUDENT NAME: ███ ███ 2005 | DISABILITY CLASSIFICATION: Autism |
|---|---|
| DATE OF BIRTH: 2005 | |
| PROJECTED DATE IEP IS TO BE IMPLEMENTED: 02/26/2020 | PROJECTED DATE OF ANNUAL REVIEW: 02/26/2021 |
| LOCAL ID #: ███ | |
| STUDENT NAME: J███ | NYC ID: ███ |

### PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

**EVALUATION RESULTS (INCLUDING FOR SCHOOL-AGE STUDENTS, PERFORMANCE ON STATE AND DISTRICT-WIDE ASSESSMENTS)**

J███ is a 14 year-old boy with a classification of autism. J███ participates in an Alternate Assessment program and is exempt from all state and local standardized exams.

███ was assessed using the Student Annual Needs Determination Inventory (SANDI) checklist and the Formative Assessment of Standards Task (FAST). The SANDI assessments capture student progress across time and support Educational Benefit in order to determine entry points and linkages accessing grade level standards and the general education curriculum. The FAST assessment is a short-cycle assessment that informs instruction by giving immediate feedback on student performance in specific standards and skill areas.

According to the SANDI assessment, ███'s scores were:
Reading: June 2019 - 94/436; October 2019 - 87/436
Writing: June 2019– 52/276; October 2019 - 48/276
Math: June 2019 - 45/396; October 2019 – 41/396
Communication Development: June 2019 - 96/324; October 2019 - 95/324
Social Emotional/Behavior: October 2019 - 64/352

With these scores in reading, he has demonstrated the ability to connect spoken word by performing an action (e.g., lines up at the door, go to the bathroom, wash your hands and walks up to the smart board when called upon. ███ is also able to identify age appropriate objects (e.g., book, pencil, juice box, preferred snacks) yet is not able to identify by touching from a field of 4, 4 community and school based symbols (e.g: STOP, EXIT, CAUTION, DANGER).

With these scores in writing, he has demonstrated the ability to pick up 5 small objects using pincer grasp and demonstrates eye hand coordination by placing 5 items in a container, yet is not able to draw 3 horizontal and 2 vertical lines on a horizontal surface.

With these scores in math, he has demonstrated the ability to reach for a math manipulative and understands the concept of "more" by taking one more from a group, yet is not able to manipulatives.

With these scores in communication, he has demonstrated the ability to turn look and listen when his name is being called. ███ is also able to responded to 5 simple request , yet is not able to maintain eye contact or show attention for 5 minutes in a interactive activity.

With these scores in social emotional, he has demonstrated the ability to respond to a greeting by turning his head and or body in 5 interaction and shows enjoyment of self initiated activities by smiling and gesturing, yet does not show interest in interacting with his peers during class or small group activities.

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

FAST Level 1 Results:
Reading for Information 1: March 2019 – 63%; October 2019 – 19%
Reading for Information 10: March 2019 – 63%; October 2019 – 0%
Operations and Algebraic Thinking: March 2019 – 56%; October 2019 – 19%
Measurement and Data: March 2019 – 75%; October 2019 – 0%

Previous Individualized Education Program (IEP) completed (March 6, 2019): Provided information about ▮'s Activities of Daily Living (ADL), Intellectual Functioning and Social Development previously reported and progress over the past year.

Speech and Language assessments used:
CSS Communication Profile
Classroom Observations
Record Review
▮ is non-verbal male who communicates by using gestures, pointing to items, and activating 1-2 icons on his IEP driven dynamic display device given visual and tactile cues as necessary. He follows one- and two-step directions independently and given verbal cues. ▮ has difficulties interacting with peers and requires assistance during classroom and worksites activities. He has limited attention span and displays difficulties attending and focusing on task.

New York State Alternate Assessment (NYSAA): Spring 2019: English Language Arts (ELA)- 3, Math- 2
According to NYSAA, ▮ was able to identify familiar people and understand the functions of objects but was not yet able to match a picture representation with a real object and identify descriptive features and words based on the student's learning profile.

Based on recent assessments, ▮'s intellectual and academic skills are significantly below his peers his age in community schools. This precludes his participation in the general education curriculum without modifications and accommodations. ▮ will receive Specially Designed Instruction in all academic and vocational areas as needed.

As a result of ▮'s performance in the SANDI assessment, annual goals have been developed to address his needs. His student work portfolio will also be used to assess his progress throughout the year.

▮ was also assessed through teacher observations, data folios, and a Level 1 Vocational Assessment.
Based on teacher observations and performance on alternate assessments, ▮ is currently performing on a kindergarten grade level for reading and a kindergarten grade level for math.

According to ▮'s (Parent/Student/Teacher) Level 1 Vocational Assessment (October 2019), he can empty out the dishwasher, help put clothing in the dryer as well as take them out and with parent assistance he can put his clothes away.
**ACADEMIC ACHIEVEMENT, FUNCTIONAL PERFORMANCE AND LEARNING CHARACTERISTICS**
LEVELS OF KNOWLEDGE AND DEVELOPMENT IN SUBJECT AND SKILL AREAS INCLUDING ACTIVITIES OF DAILY LIVING, LEVEL OF INTELLECTUAL FUNCTIONING, ADAPTIVE BEHAVIOR, EXPECTED RATE OF PROGRESS IN ACQUIRING SKILLS AND INFORMATION, AND LEARNING STYLE:
STUDENT PARTICIPATION IN THE IEP

Exhibit 3: Page 2 of 29

**PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS**

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

J█ was invited to attend and participate in his annual review. He did not attend his annual review.
J█'s needs and wants were expressed throughout the meeting with help from his parents and school team.

PARENT PARTICIPATION IN IEP
J█'s parent was invited, attended and participated in the conference and transition planning.

AGENCY PARTICIPATION IN IEP
J█'s parent was sent permission to invite an agency but did not choose to include an agency at this time. J█'s parent stated they are working with Advance Care Alliance agency. Information regarding Transition and related issues were presented to parent. The Transition Linkage Coordinator's (TLC) contact information was given to parent at meeting.

ACTIVITIES OF DAILY LIVING
J█ is a 14 year old student classified with autism. He is currently placed in a (6:1:1) class in a specialized school (D75).

According to the Level One Teacher Vocational Assessment (2019), J█ is able to perform the following activities of daily living (ADL) in school, feed himself use the restroom wash and wash his hands. He just needs to be reminded to use the restroom as he will not request it.
According to the Level One Parent Vocational Assessment (2019), parent stated J█ performs the following daily living (ADL) tasks at home J█ is able to empty out the dishwasher, help put clothing in the dryer as well as take them out and with parent assistance he can put his clothes away.

J█ is a non-verbal student using a dynamic display, speech generating device. J█ is able to follow multi step directions. J█ is able to match picture to picture symbols but needs multiple verbal and gestural prompts to remain on task as he is easily distracted looking for his preferred item(String or anything that may look like string). J█ is able to identify numbers 1- 10 by pointing to them, when asked "Point to the number ___." J█ is also able to identify the alphabet but does not recognize the difference between capital and lower-case letters. J█ is also able to identify colors when asked "touch the ___ color" but is unable to sort colors into their corresponding bins. J█ learns best when a reward system is set into place as he is easily distracted.

Speech and Language:
J█ is a non-verbal communicator. He communicates using spontaneous gestures and his IEP driven dynamic display Alternative Augmentative Communication (AAC) device given visual and tactile cues. J█ leads an adult to a desired item and/or activates one icon (want) on his AAC device in order to meet his needs. He also uses gestures, body language, and establishes eye contact in order to meet his needs when highly motivated. J█ follows one and two steps related directives and at times can sustain joint attention during a session. He has difficulties focusing and requires redirection throughout the activities. J█ requires visuals supports, hand-over-hand assistance, and verbal cues to participate in activity. He inconsistently answers simple WH questions related to vocational activities by pointing to visual representation when provided with a choice of 2-3 visuals. J█ engages in self- stimulatory behaviors by vocalizing, tapping on objects, and flapping the string or wire.
J█ receives speech and language therapy three (3) times a week for 30 minutes individually, and one (1) time a week for 30 minutes in a group with 1 other student. The speech and language therapy can take place across all school environments including classroom, therapy area, and worksites.

LEVEL OF INTELLECTUAL FUNCTIONING

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

▉ participates in a curriculum based on alternate grade level indicators, New York State Standards and Career Development and Occupational Studies (CDOS) learning standards.

According to ▉'s SANDI reading results he can connect spoken word by performing an action (e.g., lines up at the door, go to the bathroom, wash your hands and walks up to the smart board when called upon.
In class in reading, ▉ is able to connect spoke words together. When given a verbal directive to line up and get your coat Joseph will do so.
There are times when he may be distracted because he is busy looking for his preferred item, but with a verbal reminder he will continue to follow the direction that was requested.

According to ▉'s SANDI writing results the can to pick up 5 small objects using pincer grasp and demonstrates eye hand coordination by placing 5 items in a container
In class in writing, ▉ is able to manipulate small objects. ▉ has also displayed hand eye coordination, when given the task to string some beads he his able to complete the task with very minimal verbal prompts to remain on task.

According to ▉'s SANDI math results he can reach for a math manipulative and understands the concept of "more" by taking one more from a group
In class in math, he is asked to reach for math manipulatives like numbers, colors, counters and is able to complete the task. ▉ also understands the concept of more, staff member will verbally request ▉ to add more math counters when engaging a math lesson and ▉ is able to complete the task.

Based on the previous year's IEP, ▉ has mastered the goal of matching 5 symbols/pictures (books/pencils/eating utensils/soap/clothes) to their corresponding activities (reading/writing/eating/bathroom/dressing) and retelling the sequence of events in a story using 5 pictures with 2 verbal and 1 gestural prompts.

Based on the previous year's IEP, ▉ has made progress by using gestures to express his wants and needs. ▉ has a difficult time navigating his communication device but will tap his figures together to sign for "more,"when he wants more food or more water. ▉ will also raise his hand to sign to an adult the needs help. whether it's to open and item or to let someone know he needs to use the restroom.

### ADAPTIVE BEHAVIOR
▉ is assisted throughout the day by a Special Education Teacher as well as a classroom Paraprofessional.
▉ uses a communication device to request his wants and needs. ▉ requires redirection to maintain focus for extended periods of time as he is easily distracted. When over stimulated. ▉ will engage in negative behavior when he is not allowed to use his preferred item, he will usually start yelling and crying and will throw the object he is holding on the floor. He will also get up out of his chair or stop what he is doing to run to the teachers desk or try to open the cabinet to find a piece of string. Although this behavior does not happen frequently staff will usually ask him to get up and use the restroom to take a small body break. Once he has calmed down staff will reassure him that once he has completed his task he will earn the string as a reward.

### EXPECTED RATE OF PROGRESS IN ACQUIRING SKILLS AND INFORMATION
Based on ▉'s level of cognitive ability, he will need consistent repetition and multiple opportunities to demonstrate acquired skills. It is projected that ▉ will meet his goals. Progress towards these goals will be measured weekly, and progress reports will be sent home coinciding with report

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

card distribution throughout the year.

LEARNING STYLE
█ learns best when given hands on manipulative's, visual aids, extended time and one to one support. He is also assisted using a static display communication device

According to the Level 1 Vocational Assessment █ learns best when hands on materials are presented to him. In September, █ had a difficult time following class routine. █ would periodically get up out of his chair to look for his preferred item (String or anything that resembles a string); this behavior has since increased and we are working on decreasing this behavior by teaching him; first work then you get your preferred item. A typical day would be. █ is given a task; once that task is completed he is allowed a break were he gets to use his preferred item for two to three minutes. This can occur a few times during the instructional period. String or string like objects must be kept away and only used as a reward for short periods of time as this may over stimulate. █ will chew on his shirt, jacket, zipper or sleeve multiple times during the school day. He needs multiple verbal prompts to stop. █ will also remove his sneakers when he is over stimulated. █ needs multiple prompts to remain on task as he is easily distracted. █ will occasionally push his chair back, cry, scream and jump out of his chair when he is upset because his preferred item was not given to him.

Transition: According to the Level One Vocational Assessment, █ has indicated he is interested in working as a stock boy when he completes D75 Program. Currently he is participating in a program that allows him to be a personal shopper, making purchases at our local Shop Rite.
During his Level One Student Assessment █ indicated he likes listening to music and watching television. █ indicated he would like to work as a delivery man he also indicated that he is interested in dance classes and going to the store to shop.

STUDENT STRENGTHS, PREFERENCES, INTERESTS:

█ is able to stringing beads, play with silly string and shred paper using a paper shredder. █ is currently working in Adaptive Design, some of the tasks that he is able to complete with some verbal and gestural prompts are sanding, painting and tearing paper.
ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS OF THE STUDENT, INCLUDING CONSIDERATION OF STUDENT NEEDS THAT ARE OF CONCERN TO THE PARENT:

The Student Annual Needs Determination Inventory (SANDI) shows that. █ should continue to work on the following skills: Identify community and school based symbols (e.g., EXIT, RESTROOM, DANGER, STOP and CAUTION) this goals will help him better understand what there significance means and what to do when faced with them. █ should also work on matching items from a template and package the items. █ is currently working at Adaptive Design and one of his jobs is to tear strips of paper stack them and roll them up. █ 's math goal will be reinforced throughout the course of this program as well as in class using math manipulatives. In social emotional: █ should also continue to work on peer interaction, █ has demonstrated peer awareness but shows no interest in interacting with his peers during class or small group activities.

At the IEP meeting, parent expressed a concern regarding. █ learning more daily living skills, becoming more independent. Mrs. █ also expressed she would like █ to focus more when completing a task as he is easily distracted.
According to the Level One Vocational Assessments, parent indicated █ needs further instruction with clothing care, household management, health/ first aid, safety and hygiene/grooming.

█ 's parents were offered workshops and resources throughout the school year to support and expand on the skills █ is learning in school.

According to the Measurable Post-Secondary Goals

Exhibit 3: Page 5 of 29

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

-Education/Training parent expressed ▮ will attend a full time adult program where he will continue to work on job skills.
-Employment parent expressed ▮ will volunteer in the community with the assistance of an adult program.
-Independent Living parent expressed ▮ will live at home with his family while exploring supported living options.

**SOCIAL DEVELOPMENT**
THE DEGREE (EXTENT) AND QUALITY OF THE STUDENT'S RELATIONSHIPS WITH PEERS AND ADULTS; FEELINGS ABOUT SELF; AND SOCIAL ADJUSTMENT TO SCHOOL AND COMMUNITY ENVIRONMENTS:
According to classroom observation, J▮ does not interact with his peers, he prefers working independently. Teacher provides multiple opportunities for ▮ to interact with his peers e.g., ▮ hand out the pencils to your friends, or at work site ▮ will get partnered up with another student to search for and purchase a few items off of our shopping list. J▮ will interact with the cashier at ShopRite when it is time to pay his preferred snacks. ▮ will also let a staff member know he needs help by raising his hand.
STUDENT STRENGTHS:
▮ gets along with all of his peers when asked to share an item. ▮ will hand it to his peers voluntarily. J▮ shows awareness that is time to pay the cashier because he takes his money and reaches over to hand it to her. ▮ is also working on bagging his own items.
SOCIAL DEVELOPMENT NEEDS OF THE STUDENT, INCLUDING CONSIDERATION OF STUDENT NEEDS THAT ARE OF CONCERN TO THE PARENT.
At the IEP meeting, parent expressed a concern regarding J▮ walking off with strangers because he gets along with most people.

**PHYSICAL DEVELOPMENT**
THE DEGREE (EXTENT) AND QUALITY OF THE STUDENT'S MOTOR DEVELOPMENT, HEALTH, VITALITY AND PHYSICAL SKILLS OR LIMITATIONS WHICH PERTAIN TO THE LEARNING PROCESS:
Joesph has a peanut and penicillin allergies and has an EpiPen with him at all times. J▮ receives medication from the nurse everyday at 2pm.

Physical Therapy: J▮ is a 14 year old boy with known allergy to peanut and penicillin and a Diagnosis of Autism, mandated for Physical therapy 2 x 30 minutes per week individually in the school. He is non- verbal and presents with severe expressive and receptive language delays. He is currently enrolled in a 6:1:1 classroom in specialized district 75 school. He is currently receiving Physical therapy as mandated, to address issues with motor planning, coordination , balance, strength/endurance problems as well as safety awareness. He is an independent ambulator on level surfaces and can transition from the classroom to anywhere in the school environment without difficulty but with adult supervision for safety reasons. He is also able to go up and down the stairs using reciprocal gait pattern and one hand rail. He has difficulty finding important locations within the school/community environment independently due to lack of focus and frequent distractions. He needs frequent verbal cues with verbal prompts and constant redirection to perform gross motor activities accurately, either alone or in a group, as a result of his balance, coordination and motor planning problems compounded by decreased safety awareness and self stimulatory behaviors. He also exhibits tantrum and avoidance behaviors sometimes when engaged in a prolonged activity. J▮ is able to rise from sit to stand, pick up objects off the floor and place them in their right location with supervision. He can catch a medium sized ball thrown to him from about 5 to 10 feet but has difficulty releasing the ball. He continues to play with the ball in his hands instead of throwing it back to his therapist. He can hardly kick a ball with his feet and when he does, the kicks are immature and non-directional. J▮ is able to walk over 3 - 4 one foot high hurdle (obstacle) in his path without knocking them over but has difficulty running/jumping over them. J▮ is unable to exhibit the multi step motor movement involved in jumping and can hardly lift himself an inch from the floor with both feet together. He can jump on the trampoline with assistance. When asked to jump up/down from a 6 inch high platform he would simply step up/down instead of jumping. He enjoys walking on the tread mill for few minutes but would want to come down soon after either due to decreased endurance or avoidance behaviors. J▮ gets along well with the therapist and with peers and loved by many adults in the school who often adore him with a kiss as he smiles to see them. He listens to directions from teacher/therapist but has difficulty executing them and therefore continues to have redirections sometimes with verbal cues/prompts and /or physical assistance.

Exhibit 3: Page 6 of 29

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

OT: ██ receives Occupational Therapy 2x a week for 30 minutes on a group and 2x a week for 30 minutes as an individual session. ██ was observed on February 12, 2020, performing several tasks. ██ demonstrates the ability to follow a simple 1 step commands with minimal cues as needed. He engaged in a cutting activity to assess his cutting skills. He required verbal cues, visual modeling and tactile cues to correctly hold the scissors. While cutting a straight line, he deviated from the highlighted lines. He also required tactile cues to hold the paper and stabilize it to increase scissor safety. While sitting by the computer, he was unable to match the 3 letters from the keyboard word document with verbal cues and visual cues. He lightly pressed random buttons on the keyboard. He also engaged in an ADL board. He is able to button and unbutton medium size buttons. He also zipped a zipper with tactile cues. He is able to completely slide zipper up successfully on a dressing board after the zipper ends are engaged together. Following, ██ was able to use the bathroom with supervision however he required 1 verbal prompt to pull up his pants and fasten it post toileting. He was able to follow all the steps of washing his hands using the visual step by step pictures. ██ presents with fair proximal stability and control to prop himself up in sitting position. He also appears to have decreased endurance to initiate a task. ██ continues to brush his teeth with a very light pressure and doesn't rinse well enough. He requires assistance to open the toothpaste lids with tip of his thumb and index finger.

STUDENT STRENGTHS:
With verbal and minimal physical prompts Joesph is able to wipe down table and chairs, restock napkin, straws, sporks and sweep during our cafeteria duties; which are part of our in house work site program. ██ is also able to walk with his class when we are walking down the aisles of the supermarket looking for his preferred snacks. ██ is also able to paint, sand and tear paper at Adaptive Design with verbal and physical prompts.

PT: He walks independently but needs supervision for safety reasons. He is cooperative and participates regularly in therapy to the best of his ability. ██ loves using the tread mill for short periods and gets along well with peers and adults in the school.

OT: ██ is able to engage in pre-vocational tasks such as sorting utensils and categorizing with visual prompts. ██ demonstrates the ability to scribble on paper while holding a pencil in an extended palmer grasp. ██ presents with decrease fine motor strength and core strength as evidence by difficulty in the above activities.

PHYSICAL DEVELOPMENTAL NEEDS OF THE STUDENT, INCLUDING CONSIDERATION OF STUDENT NEEDS THAT ARE OF CONCERN TO THE PARENT:

██ requires non 1:1 school nurse services. ██ has a peanut and penicillin allergy. An epi-pen is required for the peanut allergy during trips and during the school year if needed. ██ is given medication during school.

At the IEP meeting, parent expressed a concern regarding J██ always looking for a string or string like object to stem on. Mrs. F██ has mentioned that at home ██ has obsessive compulsive disorder he will move her mail from where she last left it he will move things around and then she can't find it, he has also taken her hallway rugs and pulled each string of causing her to remove all rugs from her hallway. ██ will remove all strings from jackets, hoodies and sneakers so therefore she must keep all rooms locked.

PT: J██ will continue with Physical therapy in the school for 2 x 30 minutes per week individually in the school. He will continue to require adult supervision for safety.

OT: J██ demonstrated an inability to complete hygiene tasks independently. He also demonstrated an inability to zip a zipper on an ADL board independently. He will continue to require visual and verbal cues to type on the keyboard 3 letter words.

Exhibit 3: Page 7 of 29

## PRESENT LEVELS OF PERFORMANCE AND INDIVIDUAL NEEDS

DOCUMENTATION OF STUDENT'S CURRENT PERFORMANCE AND ACADEMIC, DEVELOPMENTAL AND FUNCTIONAL NEEDS

**MANAGEMENT NEEDS**

J█████ requires a highly-structured program with added adult supervision and a low student ratio (6:1:1) with emphasis on functional academics, occupational/vocational training, ADL skills, and related services provided by a District 75 school/program.

At this time J█████ requires:
12 month program
adapted physical education (APE)
assistive technology to support his communication needs
non 1:1 Nurse services for Epi-Pen as needed during school and trips and Medication is taken during school hours
*****Peanut and penicillin allergies

Speech outside school 2x60 1:1
speech and language 3x30, 1:1, 1x30, 2:1
occupational therapy 2x30 1:1
occupational therapy 2x30 2:1
Physical therapy 2x30 1:1

SCHOOL FOOD MENU
J█████ is able to adhere to the School Food Menu provided to District 75 students, but is lactose and tolerant and has a peanut allergy.

**EFFECT OF STUDENT NEEDS ON INVOLVEMENT AND PROGRESS IN THE GENERAL EDUCATION CURRICULUM OR, FOR A PRESCHOOL STUDENT, EFFECT OF STUDENT NEEDS ON PARTICIPATION IN APPROPRIATE ACTIVITIES**

The IEP Team is individualizing J█████'s educational program in the areas of cognitive, communicative, physical and social needs which effects his ability to process and retain information in the general education curriculum without supports. J█████ requires a more structured learning environment with an emphasis on functional academics and vocational training to support him due to his evidenced deficits in English Language Arts (ELA), Math, communication skills, fine motor skills, gross motor skills, daily living skills and vocational skills which precludes his participation in general education at this time. He requires a highly specialized educational program that facilitates the acquisition, application and transfer of skills across natural environments. In addition to J█████'s academic needs, he requires direct instruction in such areas as vocational training, community safety and life skills planning

**STUDENT NAME:** J█████ R█                                         **NYC ID:** █████

**STUDENT NEEDS RELATING TO SPECIAL FACTORS**

BASED ON THE IDENTIFICATION OF THE STUDENT'S NEEDS, THE COMMITTEE MUST CONSIDER WHETHER THE STUDENT NEEDS A PARTICULAR DEVICE OR SERVICE TO ADDRESS THE SPECIAL FACTORS AS INDICATED BELOW, AND IF SO, THE APPROPRIATE SECTION OF THE IEP MUST IDENTIFY THE PARTICULAR DEVICE OR SERVICE(S) NEEDED:

Exhibit 3: Page 8 of 29

## STUDENT NEEDS RELATING TO SPECIAL FACTORS

BASED ON THE IDENTIFICATION OF THE STUDENT'S NEEDS, THE COMMITTEE MUST CONSIDER WHETHER THE STUDENT NEEDS A PARTICULAR DEVICE OR SERVICE TO ADDRESS THE SPECIAL FACTORS AS INDICATED BELOW, AND IF SO, THE APPROPRIATE SECTION OF THE IEP MUST IDENTIFY THE PARTICULAR DEVICE OR SERVICE(S) NEEDED:

Does the student need strategies, including positive behavioral interventions, supports and other strategies to address behaviors that impede the student's learning or that of others? ☐Yes ☒No

Does the student need a behavioral intervention plan? ☒No ☐Yes

For a student with limited English proficiency, does he need a special education service to address his language needs as they relate to the IEP? ☐ Yes ☐No ☒ Not Applicable

For a student who is blind or visually impaired, does he need instruction in Braille and the use of Braille? ☐Yes ☐No ☒ Not Applicable

Does the student need a particular device or service to address his communication needs? ☒Yes ☐No

In the case of a student who is deaf or hard of hearing, does the student need a particular device or service in consideration of the student's language and communication needs, opportunities for direct communications with peers and professional personnel in the student's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the student's language and communication mode?
☐Yes ☐No ☒ Not Applicable

Does the student need an assistive technology device and/or service? ☒Yes ☐No

If yes, does the Committee recommend that the device(s) be used in the student's home? ☒Yes ☐No

**STUDENT NAME:** J███████ R███████    NYC ID: ████████

BEGINNING NOT LATER THAN THE FIRST IEP TO BE IN EFFECT WHEN THE STUDENT IS AGE 15 (AND AT A YOUNGER AGE IF DETERMINED APPROPRIATE)

## MEASURABLE POSTSECONDARY GOALS

LONG-TERM GOALS FOR LIVING, WORKING AND LEARNING AS AN ADULT

**EDUCATION/TRAINING:** J██████ will attend a full time adult program where he will continue to work on job skills.
**EMPLOYMENT:** J██████ will volunteer in the community with the assistance of an adult program in the area of stock boy.
**INDEPENDENT LIVING SKILLS (WHEN APPROPRIATE):** J██████ will live at home with his family while exploring supported living options.

BEGINNING NOT LATER THAN THE FIRST IEP TO BE IN EFFECT WHEN THE STUDENT IS AGE 15 (AND AT A YOUNGER AGE IF DETERMINED APPROPRIATE)

## MEASURABLE POSTSECONDARY GOALS

LONG-TERM GOALS FOR LIVING, WORKING AND LEARNING AS AN ADULT

**TRANSITION NEEDS**

In consideration of present levels of performance, transition service needs of the student that focus on the student's courses of study, taking into account the student's strengths, preferences and interests as they relate to transition from school to post-school activities:

J █ will receive a Skills and Achievement Commencement Credential.

Needs for a Successful Transition

J █ needs to work for longer periods of time.
J █ needs to work more independently with less prompts.
J █ needs to decrease his impulses to search for string when asked to do a task that is not preferred.

Course of Study:

Beyond the requirements for the Skills and Achievement Commencement Credential (SACC), J █ needs to receive specific instruction related to his post school vocational interests. To provide job exploration and skills development, his course of study should include a school/community based vocational training opportunity in the area of shopper and stock boy so that he can identify the jobs within that field that match his interest and ability levels. J █'s course of study is to continue participating in a District 75 special class with emphasis on functional academics, activities for daily living, and occupational/vocational training.

J █ is presently enrolled in an alternate assessment curriculum in a (6:1:1) special class in a specialized school (D75 Program).

STUDENT NAME: J █                          R █                                                NYC ID: █████

**ALTERNATE SECTION FOR STUDENTS WHOSE IEPs WILL INCLUDE SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS**
**(REQUIRED FOR PRESCHOOL STUDENTS AND/OR SCHOOL-AGE STUDENTS WHO MEET ELIGIBILITY CRITERIA TO TAKE THE NEW YORK STATE ALTERNATE ASSESSMENT)**

## MEASURABLE ANNUAL GOALS

THE FOLLOWING GOALS ARE RECOMMENDED TO ENABLE THE STUDENT TO BE INVOLVED IN AND PROGRESS IN THE GENERAL EDUCATION CURRICULUM OR, FOR A PRESCHOOL CHILD, IN APPROPRIATE ACTIVITIES, ADDRESS OTHER EDUCATIONAL NEEDS THAT RESULT FROM THE STUDENT DISABILITY, AND, FOR A SCHOOL-AGE STUDENT, PREPARE THE STUDENT TO MEET HIS/HER POSTSECONDARY GOALS.

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| classroom: J █ will identify by touching from a field of 4, 4 community and school based symbols (e.g., Stop, Exit, | 4 out of 5 trials over 2 consecutive weeks | data collection sheets | 1 time per week |

Restroom and Caution)" when requested to do so. Ex: "
Touch the _____ symbol", with no more than 1 verbal and 1
gestural prompt.

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL): | | | |
| when shown a community and school based symbol ▮ will match the correct symbol from a field of 2 with no more than 3 verbal and 3 gestural prompt. | | | |
| when shown a community and school based symbol ▮ will match the correct symbol from a field of 2 with no more than 3 verbal and 2 gestural prompt. | | | |
| when shown a community and school based symbol ▮ will touch the correct symbol from a field of 3 with no more than 2 verbal and 1 gestural prompt. | | | |

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| classroom:Using 5 math manipulatives ▮ will create 8 packages using a template. Once completed ▮ will place the items in a completed bin with no more than 4 verbal prompts and 1 gestural. | 4 out of 5 trials over 2 consecutive weeks | data collection sheets | 1 time per week |
| SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL): | | | |
| Using 2 math manipulatives ▮ will create 2 packages using a template with no more than 5 verbal prompts and 3 gestural. | | | |
| Using 3 math manipulatives ▮ will create 4 packages using a template. Once completed ▮ will place the items in a completed bin with no more than 5 verbal prompts and 2 gestural. | | | |
| Using 4 math manipulatives ▮ will create 6 packages using a template. Once completed ▮ will place the items in a completed bin with no more than 4 verbal prompts and 2 gestural. | | | |

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| classroom: ▮ will ask 3 simple questions from a script, wait for answer during peer interaction activities using preferred mode of communication with no more than 3 gestural. 3 times a week. | 4 out of 5 trials over 2 consecutive weeks | data collection | 1 time per week |
| SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL): | | | |
| ▮ will ask 1 simple question from a script, wait for answer during peer interaction activities using preferred mode of communication with 5 gestural prompts. 1 times a week | | | |

J▬ will ask 2 simple questions from a script, wait for answer during peer interaction activities using preferred mode of communication with no more than 5 gestural prompts, 2 times a week.

J▬ will ask 3 simple question from a script, wait for answer during peer interaction activities using preferred mode of communication with no more than 4 gestural prompts, 2 times a week.

| ANNUAL GOALS WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| Physical Therapy: J▬ will be able to walk up to 50 feet and back to his starting point with his back pack and a 5 lb. kettle or sand bell weight in one hand with distant supervision and not more than 2 verbal prompts in 4/5 trials. | 4 out of 5 trials during 2 consecutive weeks | Provider recorded session notes | 1 time per month |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

1: ▬ will be able to walk up to 15 feet and back to his starting point with his back pack and a 5 lb. kettle or sand bell weight in one hand with distant supervision and not more than 2 verbal prompts in 4/5 trials.

2: ▬ will be able to walk up to 25 feet and back to his starting point with his back pack and a 5 lb. kettle or sand bell weight in one hand with distant supervision and not more than 2 verbal prompts in 4/5 trials

3: ▬ will be able to walk up to 35 feet and back to his starting point with his back pack and a 5 lb. kettle or sand bell weight in one hand with distant supervision and not more than 2 verbal prompts in 4/5 trials.

4: ▬ will be able to walk up to 50 feet and back to his starting point with his back pack and a 5 lb. kettle or sand bell weight in one hand with distant supervision and not more than 2 verbal prompts in 4/5 trials.

**IEP PROGRESS REPORT**

1st Progress report for this IEP ☑    Little progress made
Report of Progress
Progress Towards Annual Goals    Anticipate meeting goal

2nd Progress report for this IEP ☐

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|

| WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| Physical Therapy: ▉ will be able to demonstrate improvement in his endurance, motor planning, balance and coordination necessary to safely participate with peers in a planned Classroom/Gym. gross motor activity for 20 minutes with verbal prompts and no more than 5 tactile cues. | 4 out of 5 trials over 2 consecutive weeks | Provider recorded session notes | 1 time per month |

**ANNUAL GOALS**

1st Progress report for this IEP ☑    Little progress made

Report of Progress

Progress Towards Annual Goals      Anticipate meeting goal

2nd Progress report for this IEP ☐

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

**IEP PROGRESS REPORT**

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

1. ▉ will be able to throw and catch a medium sized ball from 5 feet with same speed and accuracy as his peers without physical assist. and not more than 2 verbal prompts. in 4/5 trials.
2. ▉ will be able to throw and catch a medium sized ball from 8 feet with same speed and accuracy as his peers without physical assist. and not more than 2 verbal prompts. in 4/5 trials.
3. ▉ will be able to throw and catch a medium sized ball from 10 feet with same speed and accuracy as his peers without physical assist. and not more than 2 verbal prompts. in 4/5 trials.
4. ▉ will be able to throw and catch a medium sized ball from 12 feet with same speed and accuracy as his peers without physical assist. and not more than 2 verbal prompts. in 4/5 trials.

| | | | |
|---|---|---|---|
| Physical therapy: ▉ will be able to throw and catch a medium sized ball from 12 feet with same speed and accuracy as his peers without physical assistance and not more than 2 verbal prompts. in 4/5 trials. | throw/catch a ball from 12 feet with same speed and accuracy as his peers without physical assist. and not more than 2 verbal prompts in 4/5 trials over 2 consecutive weeks. | Provider recorded session notes | 1 time per month |

Exhibit 3: Page 13 of 29

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

1: ▮ will be able to demonstrate improvement in his endurance, motor planning, balance and coordination necessary to safely participate with peers in a planned Classroom/Gym., gross motor activity for 5 minutes with verbal prompts and no more than 5 tactile cues

2: ▮ will be able to demonstrate improvement in his endurance, motor planning, balance and coordination necessary to safely participate with peers in a planned Classroom/Gym. gross motor activity for 10 minutes with verbal prompts and no more than 5 tactile cues.

3: ▮ will be able to demonstrate improvement in his endurance, motor planning, balance and coordination necessary to safely participate with peers in a planned Classroom/Gym gross motor activity for 15 minutes with verbal prompts and no more than 5 tactile cues.

4. ▮ will be able to demonstrate improvement in his endurance, motor planning, balance and coordination necessary to safely participate with peers in a planned Classroom/Gym gross motor activity for 20 minutes with verbal prompts and no more than 5 tactile cues.

## IEP PROGRESS REPORT

1st Progress report for this IEP ☑

Report of Progress   Little progress made

Progress Towards Annual Goals   Anticipate meeting goal

2nd Progress report for this IEP ☐

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| A.P.E.: When given a medicine ball, ▮ will demonstrate arm strength by throwing a 4 pound medicine ball towards a specified target, from 12-15 feet, and having the strength to hit the target, 4/5 trials, with 100% accuracy, with limited prompting to remain on task. | 4 out of 5 trials over 2 consecutive weeks | data collection sheets | 1 time per week |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

When given a medicine ball, ▮ will demonstrate arm strength by throwing a 4 pound medicine ball towards a specified target, from 5 feet, and having the strength to hit the target, 4/5 trials, with 100% accuracy, with limited prompting to remain on task.

When given a medicine ball, ▮ will demonstrate arm strength by throwing a 4 pound medicine ball towards a specified target, from 7 feet, and having the strength to hit the target, 4/5 trials, with 100% accuracy, with limited prompting to remain on task.

When given a medicine ball, ▮ will demonstrate arm strength by throwing a 4 pound medicine ball towards a specified target, from 10 feet, and having the strength to hit the target, 4/5 trials, with 100% accuracy, with limited prompting to remain on task.

**IEP PROGRESS REPORT**

1st Progress report for this IEP ☒
Report of Progress        Little progress made
Progress Towards Annual Goals    Anticipate meeting goal

2nd Progress report for this IEP ☒
Report of Progress        Little progress made
Progress Towards Annual Goals    Anticipate meeting goal

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| OT: ▮ will type 3 simple 3 letter words on the computer with 1 verbal or visual cue. | 3 out of 4 trials over a two week period. | Session notes or Teacher/Provider recorded Observations | 2 times per month |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):
▮ will match 2 letters from the keyboard with 2 verbal or visual cue.
▮ will type one 2 letter word on the keyboard with 1 verbal or visual cue.
▮ will type one three letter word on the keyboard with 1 verbal or visual cue.

**IEP PROGRESS REPORT**

1st Progress report for this IEP ☒
Report of Progress        Little progress made
Progress Towards Annual Goals    Anticipate meeting goal

2nd Progress report for this IEP ☐

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| OT (2/3): ▮ will complete self care task (washing, rinsing and oral hygiene) independently. | 3/4 trials over 2 consecutive weeks | providers recorded observation, Session notes | 1 time per month |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

☐ will turn the faucet, apply soap, rub hands and rinse at least 2 verbal cues.
☐ will turn the faucet, apply soap, rub hands and rinse at least 1 verbal cues.
☐ will turn the faucet, apply soap, rub hands and rinse without verbal cues.

IEP PROGRESS REPORT

1st Progress report for this IEP ☒        Little progress made

Report of Progress

Progress Towards Annual Goals        Anticipate meeting goal

2nd Progress report for this IEP ☐

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| OT (3/3): ▮ will manipulate zippers on practice board with physical prompts. | 10 consecutive trials for 2 weeks | provider recorded observation; Session notes | 1 time per week |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

☐ will hold both sides of the zipper with thumb facing up and bring 2 side together 5/10 trials
☐ will catch both sides of the zipper by inserting one into the other 5/10 trials
☐ will completely slide zipper up on dressing board 5/10 trials.

IEP PROGRESS REPORT

**1st Progress report for this IEP** ☒   Little progress made

Report of Progress

Progress Towards Annual Goals   Anticipate meeting goal

**2nd Progress report for this IEP** ☐

**3rd Progress report for this IEP** ☐

**4th Progress report for this IEP** ☐

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| speech:<br>1. ▮▮ will request items during academic and/or vocational task using his preferred mode of communication and/or by activating up to three icons on his AAC device | in 4 out of 5 times over 3 consecutive sessions | Provider recorded observations | 1 time per week |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):
1.1 ▮▮ will request items by activating one icon (want) on his AAC device and/or pointing to the desired item given no more than one visual and one verbal cue.
1.2 ▮▮ will request items by activating up to two icons (I+want) on his AAC device and by pointing to the desired item given no more than one visual and one verbal cue.
1.3 ▮▮ will request items by activating up to three icons (I+want+more) on his AAC device and by pointing to the desired item given no more than one visual and one verbal cue.

**IEP PROGRESS REPORT**

**1st Progress report for this IEP** ☒   Little progress made

Report of Progress

Progress Towards Annual Goals   Anticipate meeting goal

**2nd Progress report for this IEP** ☒   Progress made; goal not yet met

Report of Progress

Progress Towards Annual Goals   Anticipate meeting goal

**3rd Progress report for this IEP** ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA<br>MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| speech:<br>2. ▮ will participate in communicative interactions by responding to yes/no questions during academic and vocational activities using preferred method of communication (PMC) and/or activating single icon on his AAC device with no more than one visual cue. | in 4 out of 5 times over 3 consecutive sessions | Provider recorded observations | 1 time per day |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

2.1 ▮ will respond to yes/no questions during academic and vocational activities using preferred method of communication (PMC) and/or activating single icon on his AAC device given no more than two visual and one verbal cue.

2.2 ▮ will respond to yes/no questions during academic and vocational activities using preferred method of communication (PMC) and/or activating single icon on his AAC device given no more than two visual cues.

## IEP PROGRESS REPORT

1st Progress report for this IEP ☒

Report of Progress ............ Little progress made

Progress Towards Annual Goals ............ Anticipate meeting goal

2nd Progress report for this IEP ☒

Report of Progress ............ Progress made; goal not yet met

Progress Towards Annual Goals ............ Anticipate meeting goal

3rd Progress report for this IEP ☐

4th Progress report for this IEP ☐

| ANNUAL GOALS<br>WHAT THE STUDENT WILL BE EXPECTED TO | CRITERIA<br>MEASURE TO | METHOD<br>HOW PROGRESS WILL BE MEASURED | SCHEDULE<br>WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|

| ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | DETERMINE IF GOAL HAS BEEN ACHIEVED | | |
|---|---|---|---|
| Outside Speech 1/2: Within one year, J___ will correctly identify vocabulary with minimal prompting | 80% Accuracy | Teacher/Provider Observations | 1 time per quarter |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

- will correctly point to a picture on his SGD when given a choice of 2 pictures after labeled by the therapist with 80% accuracy
- will correctly identify between two objects when given a choice of two after verbally labeled by the therapist with 80% accuracy
- will correctly point to a picture card when given a choice of two after verbally labeled by the therapist with 80% accuracy
- will correctly point to an item in a book after the therapist labels two items with 80% accuracy

**IEP PROGRESS REPORT**

**1st Progress report for this IEP** ☑
Report of Progress
Progress Towards Annual Goals

Progress made; goal not yet met

Anticipate meeting goal

**2nd Progress report for this IEP** ☑
Report of Progress
Progress Towards Annual Goals

Progress made; goal not yet met

Anticipate meeting goal

**3rd Progress report for this IEP** ☐

**4th Progress report for this IEP** ☐

| ANNUAL GOALS WHAT THE STUDENT WILL BE EXPECTED TO ACHIEVE BY THE END OF THE YEAR IN WHICH THE IEP IS IN EFFECT | CRITERIA MEASURE TO DETERMINE IF GOAL HAS BEEN ACHIEVED | METHOD HOW PROGRESS WILL BE MEASURED | SCHEDULE WHEN PROGRESS WILL BE MEASURED |
|---|---|---|---|
| Outside Speech 2/2: Within one year, J___ will follow 1 step directions involving prepositions verbally presented without a model or visual cue | 80% Accuracy | Teacher/Provider Observations | 1 time per quarter |

SHORT-TERM INSTRUCTIONAL OBJECTIVES AND/OR BENCHMARKS (INTERMEDIATE STEPS BETWEEN THE STUDENT'S PRESENT LEVEL OF PERFORMANCE AND THE MEASURABLE ANNUAL GOAL):

- will follow 1 step direction with prepositions after model with 80% accuracy
- will follow 1 step direction with prepositions with a gestural cue with 80% accuracy
- will follow 1 step directions with a gestural cue with 80% accuracy

**IEP PROGRESS REPORT**

Exhibit 3: Page 19 of 29

**1st Progress report for this IEP** ☑
Report of Progress

Progress made; goal not yet met

Progress Towards Annual Goals

Anticipate meeting goal

**2nd Progress report for this IEP** ☑
Report of Progress

Progress made; goal not yet met

Progress Towards Annual Goals

Anticipate meeting goal

**3rd Progress report for this IEP** ☐

**4th Progress report for this IEP** ☐

STUDENT NAME: ▮                                    NYC ID: ▮

## REPORTING PROGRESS TO PARENTS

Identify when periodic reports on the student's progress toward meeting the annual goals will be provided to the student's parents:
4 times per year: at the same time report cards are issued

STUDENT NAME: ▮                                    NYC ID: ▮

## RECOMMENDED SPECIAL EDUCATION PROGRAMS AND SERVICES

| SPECIAL EDUCATION PROGRAM/SERVICES | SERVICE DELIVERY RECOMMENDATIONS* | FREQUENCY HOW OFTEN PROVIDED | DURATION LENGTH OF SESSION | LOCATION WHERE SERVICE WILL BE PROVIDED | PROJECTED BEGINNING / SERVICE DATE(S) |
|---|---|---|---|---|---|
| **SPECIAL EDUCATION PROGRAM:** | | | | | |
| Adapted Physical Education | | 3 time(s) per week | Period | Other Facility gymnasium | 02/26/2020 |
| Special Class ELA | 6:1+1 Language of Service: English | 8 time(s) per week | Period | Special Education Classroom | 02/26/2020 |
| Special Class Math | 6:1+1 Language of Service: English | 5 time(s) per week | Period | Special Education Classroom | 02/26/2020 |

Exhibit 3: Page 20 of 29

| RECOMMENDED SPECIAL EDUCATION PROGRAMS AND SERVICES | | | | |
|---|---|---|---|---|
| Special Class Sciences | 6:1+1<br>Language of Service: English | 3 time(s) per week | Period | Special Education Classroom | 02/26/2020 |
| Special Class Social Studies | 6:1+1<br>Language of Service: English | 3 time(s) per week | Period | Special Education Classroom | 02/26/2020 |
| Special Class Career Development | 6:1+1<br>Language of Service: English | 6 time(s) per week | Period | Special Education Classroom | 02/26/2020 |
| **RELATED SERVICES:** | | | | | |
| Occupational Therapy | Group of 2<br>Language of Service: English | 2 time(s) per week | 30 minutes | Special Education Classroom | 02/26/2020 |
| Occupational Therapy | Individual service<br>Language of Service: English | 2 time(s) per week | 30 minutes | Separate Location Other | 02/26/2020 |
| Parent Counseling and Training | group | 3 times per year | 50 minutes | school building | 02/26/2020 |
| Physical Therapy | Individual service<br>Language of Service: English | 2 time(s) per week | 30 minutes | Separate Location Therapy Gym | 02/26/2020 |
| School Nurse Services | Other service non 1:1 service<br>Language of Service: English | Daily time(s) per week | Daily | nurse's office | 02/26/2020 |
| School Nurse Services | Other service non 1:1 service<br>Language of Service: English | As Needed time(s) per week | As Needed | class trips | 02/26/2020 |
| Speech-Language Therapy | Individual service<br>Language of Service: English | 3 time(s) per week | 30 minutes | Special Education Classroom | 02/26/2020 |
| Speech-Language Therapy | Group of 2<br>Language of Service: English | 1 time(s) per week | 30 minutes | Special Education Classroom | 02/26/2020 |
| Speech-Language Therapy | Individual service<br>Language of Service: English | 2 time(s) per week | 60 minutes | Separate Location outside school/after school hours | 02/26/2020 |
| **SUPPLEMENTARY AIDS AND SERVICES/PROGRAM MODIFICATIONS/ACCOMMODATIONS:** | | | | | |
| **ASSISTIVE TECHNOLOGY DEVICES** | | | | | |

## RECOMMENDED SPECIAL EDUCATION PROGRAMS AND SERVICES

**AND/OR SERVICES:**

| | | | | | |
|---|---|---|---|---|---|
| Dynamic display speech generating device (SGD) | Individual service | Daily | not applicable | school and home | 02/26/2020 |
| **SUPPORTS FOR SCHOOL PERSONNEL ON BEHALF OF THE STUDENT:** | | | | | |
| Staff training for use of Epi-Pen | group | 1x per year | 30 minutes | school | 02/26/2020 |

* Identify, if applicable, class size (maximum student-to-staff ratio), language if other than English, group or individual services, direct and/or indirect consultant teacher services or other service delivery recommendations.

**STUDENT NAME:** ▮R▮                                                                      **NYC ID:** ▮▮▮

**12-MONTH SERVICE AND/OR PROGRAM** - Student is eligible to receive special education services and/or program during July/August: ☐ No ☒ Yes

If yes:

☒ Student will receive the same special education program/services as recommended above.

OR

☐ Student will receive the following special education program/services:

| SPECIAL EDUCATION PROGRAM/SERVICES | SERVICE DELIVERY RECOMMENDATIONS | FREQUENCY | DURATION | LOCATION | PROJECTED BEGINNING / SERVICE DATE(S) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

For a preschool student, reason(s) the child requires services during July and August:
high school. In order to maintain academic and social skills, ▮▮ requires continuous programming over 12 months. Data indicates ▮▮ will regress if he does not continue academic, social, and communication skills, with related services.

**STUDENT NAME:** ▮R▮                                                                      NYC ID:218602647

**TESTING ACCOMMODATIONS (TO BE COMPLETED FOR PRESCHOOL CHILDREN ONLY IF THERE IS AN ASSESSMENT PROGRAM FOR NONDISABLED PRESCHOOL CHILDREN): INDIVIDUAL TESTING ACCOMMODATIONS, SPECIFIC TO THE STUDENT'S DISABILITY AND NEEDS, TO BE USED CONSISTENTLY BY THE STUDENT IN THE RECOMMENDED EDUCATIONAL PROGRAM AND IN THE ADMINISTRATION OF DISTRICT-WIDE ASSESSMENTS OF STUDENT ACHIEVEMENT AND, IN ACCORDANCE WITH DEPARTMENT POLICY, STATE ASSESSMENTS OF STUDENT ACHIEVEMENT.**

| TESTING ACCOMMODATIONS | CONDITIONS* | IMPLEMENTATION RECOMMENDATIONS** |
|---|---|---|
| ☑ NONE | | |

*Conditions — Test Characteristics: Describe the type, length, purpose of the test upon which the use of testing accommodations is conditioned, if applicable.
**Implementation Recommendations: Identify the amount of extended time, type of setting, etc., specific to the testing accommodations, if applicable.

STUDENT NAME: ▉ ▉     NYC ID: ▉

BEGINNING NOT LATER THAN THE FIRST IEP TO BE IN EFFECT WHEN THE STUDENT IS AGE 15 (AND AT A YOUNGER AGE, IF DETERMINED APPROPRIATE).

**COORDINATED SET OF TRANSITION ACTIVITIES**

| NEEDED ACTIVITIES TO FACILITATE THE STUDENT'S MOVEMENT FROM SCHOOL TO POST-SCHOOL ACTIVITIES | SERVICE/ACTIVITY | SCHOOL DISTRICT/AGENCY RESPONSIBLE |
|---|---|---|
| Instruction | ▉ will receive ongoing instruction in focusing on increasing his independence when given a task. | (D75) Special Education Teacher |
| Related Services | ▉ will receive, Speech and Language Therapy to help improve his communication skills. ▉ will receive Occupational Therapy and Physical Therapy to improve his safety and participation in physical activities. | (D75) Related Service Providers: speech therapist, occupational therapist, physical therapist |
| Community Experiences | ▉ will participate in the community based job sites where he will learn skills required to work appropriately in the community. | (D75) Special Education Teacher |
| Development of Employment and Other Post-school Adult Living Objectives | ▉ will participate in work training within and outside of the school building in the area of personal shopper and . | (D75) Special Education Teacher |
| Acquisition of Daily Living Skills (if applicable) | ▉ will develop self care skills to help both in school and at the work sites. | (D75) Special Education Teacher |

Exhibit 3: Page 23 of 29

BEGINNING NOT LATER THAN THE FIRST IEP TO BE IN EFFECT WHEN THE STUDENT IS AGE 15 (AND AT A YOUNGER AGE, IF DETERMINED APPROPRIATE).

**COORDINATED SET OF TRANSITION ACTIVITIES**

| NEEDED ACTIVITIES TO FACILITATE THE STUDENT'S MOVEMENT FROM SCHOOL TO POST-SCHOOL ACTIVITIES | SERVICE/ACTIVITY | SCHOOL DISTRICT/AGENCY RESPONSIBLE |
|---|---|---|
| Functional Vocational Assessment (if applicable) | will be assessed monthly at his work based learning site. In addition he will complete a monthly self- assessment | (D75) Special Education Teacher |

**STUDENT NAME:** R█████  **NYC ID:** ██████

**PARTICIPATE IN STATE AND DISTRICT-WIDE ASSESSMENTS**
(TO BE COMPLETED FOR PRESCHOOL STUDENTS ONLY IF THERE IS AN ASSESSMENT PROGRAM FOR NONDISABLED PRESCHOOL STUDENTS)

☐ The student will participate in the same State and district-wide assessments of student achievement that are administered to general education students.

☑ The student will participate in an alternate assessment on a particular State or district-wide assessment of student achievement.

Identify the alternate assessment:
New York State Alternate Assessment (NYSAA)
Student Annual Needs Determination Inventory (SANDI)
Student work portfolio

Statement of why the student cannot participate in the regular assessment and why the particular alternate assessment selected is appropriate for the student:
Due to Jospeh's severe cognitive delays and disability, he is presently following an instructional program based on the New York State Learning Standards with accommodations and modifications. This precludes his participation in state and local assessments.

**STUDENT NAME:** R█████  **NYC ID:** ██████

**PARTICIPATION WITH STUDENTS WITHOUT DISABILITIES**

Exhibit 3: Page 24 of 29

## PARTICIPATION WITH STUDENTS WITHOUT DISABILITIES

REMOVAL FROM THE GENERAL EDUCATION ENVIRONMENT OCCURS ONLY WHEN THE NATURE OR SEVERITY OF THE DISABILITY IS SUCH THAT, EVEN WITH THE USE OF SUPPLEMENTARY AIDS AND SERVICES, EDUCATION CANNOT BE SATISFACTORILY ACHIEVED.

### FOR THE PRESCHOOL STUDENT:

Explain the extent, if any, to which the student will not participate in appropriate activities with age-appropriate nondisabled peers (e.g., percent of the school day and/or specify particular activities):
not applicable as the student is not in preschool.

### FOR THE SCHOOL-AGE STUDENT:

Explain the extent, if any, to which the student will not participate in regular class, extracurricular and other nonacademic activities (e.g., percent of the school day and/or specify particular activities):
Due to ███'s cognitive, language and academic delays, he is unable to participate in a regular class at this time. ███ requires a special class in a specialized school with the support of related services.

If the student is not participating in a regular physical education program, identify the extent to which the student will participate in specially-designed instruction in physical education, including adapted physical education:
███'s cognitive, developmental, and social needs preclude his participation in a regular physical education program at this time. He requires adapted physical education.

EXEMPTION FROM LANGUAGE OTHER THAN ENGLISH DIPLOMA REQUIREMENT:
☐ No ☒ Yes - The Committee has determined that the student's disability adversely affects his/her ability to learn a language and recommends the student be exempt from the language other than English requirement.

STUDENT NAME: ███ F███                                    NYC ID: ███

## SPECIAL TRANSPORTATION

TRANSPORTATION RECOMMENDATION TO ADDRESS NEEDS OF THE STUDENT RELATING TO HIS/HER DISABILITY

☐ None.
☒ Student needs special transportation accommodations/services as follows:
    Transportation from the closest safe curb location to school.
    Adult Supervision – 1:1 Nursing Services
    Vehicle and/or Equipment Needs – Air Conditioning
    Other Accommodations – Limited Travel Time
    Other Accommodations: Mini-wagon

Exhibit 3: Page 25 of 29

**SPECIAL TRANSPORTATION**

TRANSPORTATION RECOMMENDATION TO ADDRESS NEEDS OF THE STUDENT RELATING TO HIS/HER DISABILITY

Reason(s) why the student needs special transportation service and/or accommodations:
_____'s cognitive, developmental and language delays require him to have transportation from the closest safe curb location to school and home.
Due to ____'s delays, ____ requires the above transportation accommodation at this time.

☐ Student needs transportation to and from special classes or programs at another site:

**PLACEMENT RECOMMENDATION**

NYC DOE Specialized School

---

**SUMMARY**

**STUDENT INFORMATION**

Student Name: ___ F

NYC ID:

DOB: ___2005

Gender: Male

Parents Language(s) Spoken/Mode Communication: English

**IEP INFORMATION**

Date of IEP Meeting: 02/26/2020

IEP Amendment: ☐ Yes ☑ No

Reconvene of IEP Meeting: ☐ Yes ☑ No

**INSTRUCTIONAL/FUNCTIONAL LEVELS**

| Reading: | Kindergarten |
| Math: | Kindergarten |

**SUMMARY OF RECOMMENDATIONS**

Classification of Disability: Autism

Recommended Services:

| Special Education Programs | |
|---|---|
| Adapted Physical Education | |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Related Services | |
| Occupational Therapy | English |
| Occupational Therapy | English |
| Parent Counseling and Training | |
| Physical Therapy | English |
| School Nurse Services | English |
| School Nurse Services | English |
| Speech-Language Therapy | English |
| Speech-Language Therapy | English |
| Speech-Language Therapy | English |
| **12-Month Services:** | |
| Adapted Physical Education | |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Special Class | English |
| Occupational Therapy | English |
| Occupational Therapy | English |
| Parent Counseling and Training | |
| Physical Therapy | English |
| School Nurse Services | English |
| School Nurse Services | English |
| Speech-Language Therapy | English |
| Speech-Language Therapy | English |
| Speech-Language Therapy | English |

The student will participate in an alternate assessment on a particular State or district-wide assessment of student achievement
Alternate assessment:
New York State Alternate Assessment (NYSAA)
Student Annual Needs Determination Inventory (SANDI)
Student work portfolio

Due to J███'s severe cognitive delays and disability, he is presently following an instructional program based on the New York State Learning Standards with accommodations and modifications. This precludes his participation in state and local assessments.

Does J███ have a **Behavioral Intervention Plan?** No

Recommended for **Specialized Transportation:** ☐None ☑ Student needs specialized transportation
School Type: NYC DOE Specialized School

**Medical Alert:** The student has ☑ medical conditions and/or ☐ physical limitations which affect his ☐ learning, ☐ behavior and/or ☐ participation in school activities.
The student requires ☐ medical and/or ☐ health care treatment(s) or procedure(s) during the school day.
**Accessibility:**
Does the student need an accessible school building? No
Does the student have limited mobility? No

## PROMOTION CRITERIA

**CURRENT YEAR**

☐ Standard  ☐Modified

**NEXT YEAR**

☐ Standard  ☐Modified

**Parent Concerns:**

## OTHER OPTIONS CONSIDERED

General Education
Special Class in a specialized school 8:1+1
Home/Hospital Instruction

**Reason(s) for Rejection:** J███ requires a highly structured setting that is adapted to his specific needs. He needs a program that will address his cognitive, communication and social needs. Academic and communication needs require significant modifications to the general education curriculum A Special Class in a specialized school (8:1:1) would not be appropriate at this time as J███'s significant academic and language communication needs require the additional supports of personnel in a smaller class setting, where the ratio of student to teacher is (6:1:1). Home instruction would be too restrictive for J███'s social and academic progress at this time.

**STUDENT NAME:** J██████ F█
**DATE OF IEP MEETING:** 02/26/2020

**NYC ID:** ████

**ATTENDANCE PAGE**

PLEASE NOTE THAT YOUR SIGNATURE REFLECTS YOUR PARTICIPATION AT THE CONFERENCE AND DOES NOT NECESSARILY INDICATE AGREEMENT WITH THE INDIVIDUALIZED EDUCATION PROGRAM.

| ROLE (INDICATE IF BILINGUAL) | NAME | SIGNATURE |
|---|---|---|
| Related Service Provider/Special Education Teacher | Marilyn Tendler | |
| Parent/Legal Guardian | A█ R█ | |
| District Representative | Marilyn Tendler | |
| Speech | Marina Volpe | |

Exhibit 3: Page 29 of 29

# EXHIBIT 4



**Department of
Education**

Special Education Remote Learning Plan

**Date:** 04/22/2020

Dear Parent or Guardian of J███ R██

Now that your child's school has moved towards a new Remote Learning Model, this Special Education Remote Learning Plan sets out the special education supports that are being provided during the COVID-19 school closure. If you have any questions regarding this plan, you can contact your child's school administration.

---

### STUDENT INFORMATION

**Student Name:** J███ R██          **NYC Student ID#:** ███████          **Student's DOB:** ███2005

**English Language Learner Status:** No

**Disability Classification:** Autism

---

### STUDENT NEEDS

**Does this student use Assistive Technology?:** Yes
   **Please specify:** Proloquo2Go app on a tablet
   **Does the student require this technology at home?** Yes
   **Does the student have the technology at home now?** Yes

**Does the student require additional classroom tools to supplement learning at home (e.g., enlarged text, rules pages, graphic organizers)?** Yes
   **Please specify:** Graphic Organizer, sentence stripes, visual support, extended time
   **Does the student have these tools at home now?** NA

---

### REMOTE SPECIAL EDUCATION AND RELATED SERVICES

| PROGRAM / SERVICE | LANGUAGE | MINUTES PER SESSION | SESSIONS PER WEEK |
|---|---|---|---|
| Speech Individual Service | English | 20 | 1 phone consultation |
| OT Individual Service | English | 30 | 1 tele therapy |
| PT Individual service | English | 30 | 1 tele therapy |

# EXHIBIT 5

```
1                       DEPARTMENT OF EDUCATION
                               of the
2                          CITY OF NEW YORK

3
        ------------------------------X
4
        In the Matter of:
5
              J█████ R█████              Case No. 197017
6
        ------------------------------X
7                                        EXPEDITED
                                         District # 31
8                                        131 Livingston Street
                                         Brooklyn, NY 11201
9
                                         Monday
10                                       August 16, 2021

11              The above-entitled matter came on for hearing at
        2:01 p.m.
12

13      BEFORE:            VANDANA CHAK,
                           Impartial Hearing Officer
14

15      A P P E A R A N C E S:

16      (All present by video or telephone)

17      For the Student:
          SARAH KHAN, ESQ., Attorney
18        ASHLEIGH ROUSSEAU, ESQ., Attorney
          LINDSAY PLUNKETT, PH.D., Neuropsychologist
19

20      For the Department of Education:
          GERALDINE DORSAINT, District Representative
21

22

23

24

25
```

Exhibit 5: Page 1 of 52

```
 1                        I N D E X
                          ---------
 2
                                               VOIR
 3   WITNESSES:        DIRECT  CROSS REDIRECT  RECROSS DIRE

 4   Lindsay Plunkett    102    107    113

 5

 6                      E X H I B I T S

 7   STUDENT          DESCRIPTION              I.D.  IN EV.

 8   A                Dr. Plunkett resume,     111   113
                      unidentified date, four
 9                    pages

10   B                Dr. Plunkett NYS         112   113
                      license, unidentified
11                    date, unspecified
                      number of pages
12
     C                Dr. Plunkett affidavit,  112   113
13                    8/9/21, unspecified
                      number of pages
14

15   DEPARTMENT OF
     EDUCATION        DESCRIPTION              I.D.  IN EV.
16
     None
17

18   IMPARTIAL
     HEARING OFFICER  DESCRIPTION              I.D.  IN EV.
19
     None
20

21

22

23

24

25
```

Exhibit 5: Page 2 of 52

1              P R O C E E D I N G S

2                     HEARING OFFICER VANDANA CHAK:  This is

3       the case of student J█████ R███, case number

4       197017.  The student has a disability

5       classification of autism.  He is 15 years of age.

6       And his date of birth is ████████ 2005.

7                     At the hearing present for the District

8       is, please mark your appearance.

9                     MS. GERALDINE DORSAINT:  Good afternoon,

10      everyone.  Geraldine Dorsaint, District 75,

11      impartial hearing representative, appearing for the

12      District.  Thank you.

13                    HEARING OFFICER CHAK:  And appearing for

14      the Parent are two attorneys.  Could you mark your

15      appearance for the record?

16                    MS. SARAH KHAN:  Good afternoon.  This is

17      Sarah Khan, K-H-A-N, attorney for the Parents, from

18      Brain Injury Rights Group.

19                    MS. ASHLEIGH ROUSSEAU:  And Ashleigh

20      Rousseau, last name spelled R-O-U-S-S-E-A-U, also

21      from the Brain Injury Rights Group, for the

22      Parents.

23                    HEARING OFFICER CHAK:  Thank you.  We are

24      at the hearing in this case as discussed earlier.

25      The parents have claimed a denial of FAPE to the

1        student since mid-March of 2020 until the end of

2        the school year 2020/2021.  The parents claim that

3        due to the pandemic closures in March 2020 the

4        services to the student were materially altered

5        which resulted in the denial of FAPE to the

6        student.  The parent also claims that since the

7        reopening of the schools in 2021 the services

8        delivered to the student through an alternative

9        method over the phone is also a denial of FAPE to

10       the student.

11              The onus of proof rests on the District

12       to show what services were provided to the student

13       from March 2020 until the end of the school year

14       2020/2021.  The Parent is seeking evaluations to

15       assess the weight of the deprivation it believes

16       may have occurred because of the denial of FAPE to

17       the student for this period that is March 2020 to

18       the end of the school year 2020/2021, which would

19       be June 30th, 2021.

20              The Parent today has witnesses with

21       respect to establish their claim where they are

22       seeking evaluations of the student to assess the

23       weight or to assess the extent of deprivation or

24       regression that may have occurred in the student.

25       So I will request the Parent's attorneys to bring

1    their first witness to the stand -- I take that

2    back.

3              I'm asking Ms. Dorsaint who has appeared

4    for the District what the District's position is

5    with the respect to the first claim of denial of

6    FAPE during that period of March 2020 until June

7    30th, 2021, to the student.

8              MS. DORSAINT:   I'm making a record.

9    Please note that the District representative

10   assigned to this case, Ms. Chanie Graus, had

11   requested an adjournment.  And it's my

12   understanding that adjournment has been denied

13   adjournment.

14             HEARING OFFICER CHAK:   Adjournment, when

15   was that?  I'm sorry to interrupt.  I did not know

16   of the adjournment.

17             MS. DORSAINT:   The request for the

18   adjournment was made as the school is now closed as

19   of August 13th.  However --

20             HEARING OFFICER CHAK:   August 13th?  I

21   must have missed that email.  Of Ms. Graus?

22             MS. DORSAINT:   However, I have no other

23   choice but to move forward on this matter.

24             In terms of the denial of FAPE, the

25   District would be making an oral motion at this

1      time to have this entire matter dismissed as there

2      had been a number of cases.  Specifically, this

3      matter has gone before other legal authorities

4      which have found it to have -- they found that the

5      parent's request to when they reopened the schools

6      closed by COVID-19 -- it says that the hearing

7      officer lacks jurisdiction to adjudicate the

8      parent's request for that requested relief.  In

9      addition, the parent's requested relief to reopen

10     school is moot because schools have since reopened.

11          The parent in its due process complaint

12     fails to say the claim upon which relief can be

13     granted, one of which is the independent

14     educational evaluations as it is a matter of

15     process or regulations that the school be notified

16     and not through a due process complaint but the

17     request be made directly to the school.  It is not

18     the intent of the IDEA to seek independent

19     educational evaluations through a due process but

20     to seek that directly through the schools upon

21     which the schools can then make a determination as

22     to whether or not it's appropriate and then

23     respond.  And as the matter had been stalled for a

24     number of months as there was no hearing officer

25     assigned and we could not have responded other than

1        the time in which the due process complaint has

2        been put before a hearing officer which is not

3        occurring when school is out.

4               Hold on, I just made a couple of notes.

5               Although the hearing officer is granted

6        the authority to order an interim IEE pursuant to

7        State Regulations, the purposes should not be to

8        give the parent leeway to go on a fishing

9        expedition as what it appears they are seeking now.

10       My understanding is if the parent is seeking this

11       independent educational evaluation as final relief,

12       obviously due to the stalled due process in its

13       entirety, that's a different matter.  But it's my

14       understanding if it's interim relief that they're

15       seeking, in order to bring forth a claim, then

16       clearly they don't have enough information to seek

17       compensatory.  And it sounds as though that's what

18       this is due process complaint is seeking.

19               In terms of indicating that the District

20       failed to offer a free and appropriate public

21       education due to school closures, there's been a

22       number of -- there's been a number of decisions

23       before other courts that specifically speak to that

24       indicating that the closures that happened

25       worldwide not even just statewide but everywhere

1    was not a unilateral change of placement.  And

2    hence, the District is not conceding FAPE in those

3    areas.

4              However, I'm unable at this time to bring

5    forth the case as all the schools are closed as of

6    August 13th and would be reopened again my

7    understanding September 13th after Labor Day.

8    Thank you.

9              HEARING OFFICER CHAK:  Thank you, Ms.

10   Dorsaint.  I will on the record state that I have

11   not -- I know there was in another case -- that's

12   what I have thought, a similar adjournment because

13   of lack of witnesses because of the school closures

14   until September 13th.  They had the school

15   (indiscernible).  Those teachers and other

16   administrators are not available.

17             I will go back.  Otherwise, I would have

18   contacted the attorneys for the Parent to look into

19   this request for an adjournment.  I know there is

20   in another case that I am handling, there has been

21   such a request.  And it may be that I have mixed

22   the emails not realizing that --

23             Anyway, the bottom line is that attorneys

24   for the Parents, it has been brought to my notice

25   that on August 13th -- and I will go back and

1    look -- but in any event, at this moment, there is

2    a request for an adjournment due to the fact that

3    witnesses are not available for a certain period of

4    time until September 13th and that the School

5    District is not conceding FAPE in this matter. So

6    it only would be appropriate that they be allowed

7    to present their witnesses.

8              So my second observation is that this

9    hearing today is not for -- or any hearing --

10   today's hearing -- and I'm inclined to adjourn to

11   another hearing after September 13th. It's either

12   of the hearings today or the next is not one for

13   interim relief. And that was my clear indication

14   at the very beginning that the entire case would be

15   heard. And the seeking of evaluations was a

16   integral part of the due process complaint that was

17   filed by the parent. And therefore the hearing

18   would be a final hearing and it would not be part

19   of any form of an interim relief, which is not an

20   interim really. So that is where we were.

21             Parent's attorneys, I have to apologize

22   because you have brought your witnesses, you put

23   them together for this particular day. And --

24             MS. KHAN: (Interposing) I'm sorry, IHO

25   Chak, if I may?

84

1    HEARING OFFICER CHAK:  Yes.

2    MS. KHAN:  I want to for the record just

3    so that --

4    HEARING OFFICER CHAK:  (Interposing) Yes.

5    MS. KHAN:  -- we're all clear here, this

6    DPC was filed August 19th of 2020.  So in three

7    days we're coming up on a year.  And we haven't

8    even begun to address any kind of merits of this

9    case because we're being stonewalled by no fault of

10   the DOE or anyone here.  There was a delay of ten

11   months.  And then Ms. Graus at our last conference

12   was agreeable to the fact that we would have IEEs.

13   I understand now today Ms. Dorsaint is articulating

14   a different position.

15   But respectfully, to ask for an

16   adjournment because there are no witnesses

17   available is inappropriate at this point.  Even if

18   schools aren't in session, the DOE should have

19   their witnesses.  And I would like it to be known,

20   at least, for the record, that the Parents brought

21   both witnesses, have both witnesses ready and

22   available to be crossed.  I mean, we submitted

23   disclosures in advance.  We didn't get a notice

24   from Ms. Graus about any kind of adjournment.  But

25   again, just as long as our objection is noted for

1    the record, I mean I guess that's all I can ask

2    for.

3       HEARING OFFICER CHAK:   Sure.   Sure.   It

4    is on the record.

5       And I would request Ms. Dorsaint for the

6    efficiency of the next hearing that the District

7    file a short memorandum explaining exactly what you

8    have just put on the record.

9       My observation also is that one of the

10   arguments of your case was insufficiency of the

11   complaint.   But that the District I believe has not

12   made a motion to dismiss the complaint on the basis

13   of it being insufficient.   So the due process

14   complaint will continue to be heard.

15      But the District has made an argument

16   that there is precedent decisions with respect to

17   why the District will not be held to the argument

18   that it has denied FAPE to the student due to

19   pandemic disclosures that started in March of 2020.

20      So I would like the District to place on

21   the record a short memorandum of law of authority

22   on that issue.

23      And I can only apologize to the Parent's

24   witnesses at this time.   I know that the DPC was

25   filed in August of 2020 and several of its requests

1       are moot.  And as the District says, there are some

2       requests in the DPC which the IHO, in fact, does

3       not have the authority to order relief upon.  But

4       nevertheless, the issues that remain -- issues that

5       remain are that of seeking evaluations.

6               The Parent's attorneys, I just want you

7       to focus on an argument that has been made by the

8       District that the process by which evaluations are

9       sought are not through the due process complaint

10      process but that the Parent should make an

11      independent request to the District.  And it might

12      be that between now and the next date of hearing,

13      you could initiate that process.  And I would know

14      where that process is in during this period.  I

15      would know in the next hearing where it was at.

16              MS. KHAN:   IHO CHAK?

17              HEARING OFFICER CHAK:  Yes, please.

18      Please.

19              MS. KHAN:  Are we backtracking on these

20      IEEs now that Ms. Graus agreed to?  It seems like

21      now we're going to litigate whether or not IEEs are

22      available for this child who was unilaterally

23      placed in a remote learning plan.

24              HEARING OFFICER CHAK:  No.  I know --

25              MS. KHAN:  (Interposing) I mean --

1                      HEARING OFFICER CHAK:  -- there's no

2            issue about that.

3                      Ms. Dorsaint, is that what the District

4            is claiming?

5                      MS. DORSAINT:  No.  However, I am

6            asserting that there has been no unilateral

7            placement as it's alleged in the due process

8            complaint, as it's alleged just now by Parent's

9            counsel.  There's not been any unilateral change in

10           placement.  And there's obviously some decisions.

11                     I don't know if the hearing officer is

12           familiar with any of these decisions.  But there

13           has been some decisions that has been handed down

14           that has certainly supported the position that

15           there has not been any unilateral placements.  And

16           I'll be more than happy to prepare that legal

17           memorandum as requested or have my colleague,

18           Chanie Graus, prepare that and forward that to your

19           attention.

20                     HEARING OFFICER CHAK:  Sure.  What do you

21           say to that?

22                     Yes, please do that.  Because even if we

23           know it in one case, each case is different.  So we

24           need to know it in every case.

25                     MS. DORSAINT:  Sure.

1          MS. KHAN:  So --

2          HEARING OFFICER CHAK:  (Interposing) Yes.

3   The Parent's attorney, please --

4          MS. KHAN:  For the next appearance,

5   should I have my independent evaluators ready?  I'm

6   trying to think ahead for the next --

7          HEARING OFFICER CHAK:  (Interposing) Yes.

8          MS. KHAN:  -- appearance here.  And it

9   seemed like really was challenging these IEEs.  And

10  if they are, I don't want to tell my witness to be

11  ready again to have another conversation about

12  whether IEEs appropriate when we agreed that they

13  were.  But I understand now that that's changed.

14         But just for future and for the next

15  date, should I have my two evaluators ready is my

16  question.

17         HEARING OFFICER CHAK:  You have made a

18  request in your due process complaint.  So the

19  first position is that the Parents should be

20  prepared.  But the second position is that between

21  now and the second hearing, you might want to

22  request the same evaluation directly and as soon as

23  possible, maybe in the next two days.

24         MS. KHAN:  Didn't we just hear Ms.

25  Dorsaint say that school is not going to start for

1    another month?  So --

2                    HEARING OFFICER CHAK:  (Interposing) Ms.

3    Dorsaint, could you explain what the Parents would

4    need to do?

5                    MS. DORSAINT:  Sure.  I did indicate that

6    school would not be reopened until September 13th.

7    What I did indicate is that I guess the intent of

8    the IDEA would have been that the parent reach out

9    to the District and indicate which evaluations, if

10   any, that they are not in agreement with.  And at

11   which point if there is some sort of disagreement,

12   it would then be at that juncture that a due

13   process complaint would be filed upon which there

14   is not agreement between the parties.

15                    I think that my understanding is that the

16   parent has --

17                    MS. KHAN:  (Interposing) I think

18   (indiscernible) --

19                    MS. DORSAINT:  I'm sorry, IHO Chak, are

20   you saying something?  I can't hear you.

21                    HEARING OFFICER CHAK:  No, I did not

22   speak.  I think it was the Parent attorney.

23                    MS. DORSAINT:  Oh, okay.

24                    HEARING OFFICER CHAK:  Yes.

25                    MS. DORSAINT:  So --

1                    MS. KHAN:   (Interposing) (Audio
2          interference) --
3                    MS. DORSAINT:  -- what has happened
4          here --  I need to finish my point though.  If you
5          would just allow me to finish my point, please?
6                    What would need to happen here I believe
7          is that the Parent would then have to seek that
8          independent evaluation, then the District would
9          then respond to it.  And if that does not occur, at
10         that point they would seek a due process complaint.
11         But to circumvent the entire system and seek a due
12         process complaint and have a hearing officer decide
13         without I guess having gone through the appropriate
14         process, I don't necessarily believe that that was
15         the intent of the IDEA.  I do know that there's
16         been some case law to support that.
17                   Again, I have to also indicate I don't
18         know what the previous District representative,
19         Chanie, agreed to.  I wasn't privy to that.  I did
20         review the records and I do see what the due
21         process complaint is requesting.  And I did have an
22         opportunity to speak to the team and learn that we
23         were not in agreement with any independent
24         educational evaluations in terms of any interim
25         relief.

1          However, as final relief, if that's the

2     only thing being sought, of course I can absolutely

3     agree to that because of the longstanding time upon

4     which the matter had been heard.  Then it would be

5     the matter of the weight.

6          HEARING OFFICER CHAK:  Yes.  Ms.

7     Dorsaint, just for you to know that that is exactly

8     what it is.  It is not an interim relief.  We have

9     been through this.  This is a hearing on the full

10    merits of the case.  And in the merits of the case

11    it was discussed in the pre-hearing conference that

12    if the District wishes to defend, then it has the

13    time period of March 2020 until June 30th to

14    defend.  There was an issue that was.  But when the

15    schools reopened in January of this year, whether

16    the student was being provided via telephone,

17    option of learning via the telephone method

18    actually did occur or was -- did the District have

19    a better option.  All this was discussed.

20         And so the issues as described earlier

21    right now and in the earlier hearing was really

22    limited to March 2020 until June 30th, 2021.  And

23    within this period it was before schools reopened

24    whether there was a denial of FAPE.  And

25    thereafter, once the schools were open, what

1    services were being provided and if they met the

2    needs of the student.

3    And second, the evaluations that the

4    parent is seeking is not in this hearing at all.

5    This is not a hearing (indiscernible).  You are

6    here, Ms. Dorsaint, on a hearing of the case.

7    So the only issue then is -- other than

8    the onus of proof -- and I am sorry, I did not

9    notice your email of August 13th or I may have

10   opened it.  And there was another request from the

11   District maybe on a case, so I may have confused

12   that with the two adjournments.  Because this

13   reason for adjournments has been taken before.  But

14   in several cases witnesses are appearing and IHOs

15   are hearing cases.  So it's not as though the

16   schools are closed and the Districts cannot bring

17   witnesses to the hearing.

18   But nevertheless, I just want you to be

19   clear that this is a final hearing.  Whether it's

20   this hearing or the next hearing, it's not for

21   interim relief.  And it is on the IHOs who

22   determine what evaluations, if any, need to be

23   ordered in this case.

24   And so there are two things I could

25   suggest to the District.  The argument on

1        insufficiency of the complaint is being brought too

2        late.  It should have been brought much earlier

3        when the complaint was filed so that an order could

4        be made on that aspect.  Two, these hearings are

5        not for interim relief and the interim evaluations

6        IEE.  It's a final hearing.  And in the previous

7        discussions, it was an expectation by the Parent

8        that once the evaluations are done, that they be

9        considered by the CSE.

10        And those are the three steps as far as

11        this particular DPC is concerned.  So I would like

12        to know that even if I do adjourn this matter,

13        would District be bringing witnesses on the next

14        date of hearing to factually prove the Parent's

15        claim to factually disprove?  The onus of proof is

16        on the District to show that services were

17        provided.  So will be the District be providing

18        documentary evidence and witnesses?  Because

19        there's no --

20        MS. DORSAINT:  (Interposing) Yes.

21        HEARING OFFICER CHAK:  -- exhibit yet.

22        Yes?  Yes?  Ms. Dorsaint, did you say yes?

23        MS. DORSAINT:  Yes.  I'd like to respond

24        to that.

25        HEARING OFFICER CHAK:  Thank you.

1    MS. DORSAINT:  So in terms of the

2    allegations of a FAPE denial, obviously the

3    District would be putting on a case and indicating

4    that we did offer the student a FAPE.  Whether or

5    not the student and their family chose to

6    participate in the remote services is a different

7    matter which I'm not getting to.  But we would be

8    prepared to put forth what program was offered,

9    what was available for the student to access the

10   curriculum, and what, if anything, did the family

11   do with that?  That is the case that we would be

12   putting forth.

13   So that would be the case that we would

14   be putting on to defend that we did provide a FAPE.

15   That is a different matter altogether once we began

16   talking about compensatory and if the student is

17   entitled to that.  But if the District --

18   MS. KHAN:  (Interposing)

19   (Indiscernible) --

20   HEARING OFFICER CHAK:  (Interposing) Ms.

21   Dorsaint, just one second.  I'm going to interrupt

22   you.  Please don't go into areas which have already

23   been discussed and they are not here for this

24   (indiscernible).  Compensatory right now is not

25   part of the hearing because evaluations have not

1           taken place.  So nobody can understand what

2           compensatory should be.  So you are going into

3           issues that have already been decided and you are

4           not clear on them.

5                 And I think Ms. Graus maybe she had

6           mentioned once that she was going to be out on a

7           vacation for a certain number of days.

8                 MS. DORSAINT:  And she returns in

9           September when school reopens.  This matter was

10          originally assigned to Ms. Graus.  And she returns

11          in September as --

12               HEARING OFFICER CHAK:  (Interposing) Yes.

13               MS. DORSAINT:  -- the entire --

14               HEARING OFFICER CHAK:  (Interposing) So

15          Ms. Dorsaint --

16               MS. DORSAINT:  You indicated on the

17          record that the schools are open.  It is not.  If

18          you look -- and I could actually send that

19          information to both you and Parent's counsel

20          school -- the extended school year ended August

21          13th.

22               HEARING OFFICER CHAK:  Ms. Dorsaint, you

23          know very well that IHOs are being assigned new

24          cases.  Hearings are going on.  The fact that

25          somebody is off on vacation or the schools are

1            closed is not relevant to the production of

2            witnesses of which has been discussed ahead of

3            time, ahead of time.  So --

4                      MS. DORSAINT:  (Interposing)

5            (Indiscernible).  I'm making a record whether or

6            not you're in agreement with that.  My job is

7            simply to make a record.  That's all.

8                      I'm making a record and I'm representing

9            schools are closed.  There is no witness available

10           after August 13.  They will become available

11           September 13 when school reopens.  I'm indicating

12           on the record the extended school year ends August

13           13.  That was on Friday.  This matter is being

14           heard after that date and before the September 13th

15           reopening of schools.

16                      HEARING OFFICER CHAK:  Ms. Dorsaint, when

17           was the previous hearing in this matter?

18                      MS. DORSAINT:  I was not the District

19           representative at the --

20                      HEARING OFFICER CHAK:  (Interposing) It

21           doesn't matter.  It doesn't matter.

22           (Indiscernible) --

23                      MS. DORSAINT:  I'm indicating it was

24           Chanie Graus.  I did not appear at the last

25           hearing.  I was assigned to this matter on Friday,

1        August 13.  I did not appear at the last hearing.

2        I am making representation that the schools closed

3        August 13 and will reopen September 13.

4        HEARING OFFICER CHAK:  Ms. Dorsaint, it

5        doesn't matter who appears for the District for us

6        or for me.  For me it does not.  Whoever appears is

7        equally supposed to know what happened in the

8        previous hearing.

9        In the previous hearing, it was not a

10       week back.  This date was mutually accepted and

11       assigned as a hearing date for the entire case.

12       The issues were limited to --

13       MS. DORSAINT:  (Interposing) With all due

14       respect, there was an adjournment request made by

15       Chanie Graus indicating that she would not be

16       available and hence the reason why --

17       HEARING OFFICER CHAK:  Are you saying --

18       MS. DORSAINT:  -- I (indiscernible) at a

19       hearing that I didn't appear at the last time.  And

20       I don't know what issues were.  Obviously, it

21       sounds like you guys have sorted out some issue.  I

22       now had an opportunity to read through the

23       transcript.  I've read through the due process

24       complaint.  And I moving forward as if this matter

25       was assigned to me.

1              HEARING OFFICER CHAK:  Ms. Dorsaint, if

2      on August 13th Ms. Graus has sent a request for

3      adjournment, which I am missed looking at, which I

4      am admitting I have missed because I would have

5      already addressed the issue.  And August 13, this

6      is only three days ago just on Friday.  Right?  And

7      we've had the hearing scheduled much before than in

8      the last three days.

9              Today is the 16th.  If you say a request

10     was sent on the 13th, then it was just on Friday

11     that you sent it, which is late for the Parents,

12     which is late for even for the IHO to then be --

13     I'm looking at this because you could have put

14     something on the record with respect to

15     nonavailability to your witnesses.

16             I want to put on the record that the

17     District had enough time to, in fact -- we could

18     have (indiscernible).  We maybe would not have kept

19     the 16th.  We would have kept a date prior to the

20     13th, August 13th.  We would have changed it much

21     before.  And this case would have been complied

22     with close enough to the 45-day deadline that the

23     IDEA statute says cases must be decided in.  And

24     the issues have been limited.

25             So the issue is very clearly just on the

1          period of March 2020 to the end of the school year,

2          2020/2021.  And two, it has to do with evaluations.

3          And it's a final hearing, it's not an interim

4          hearing.

5                    And at this point, since the parent is

6          seeking evaluations, they are not sure what

7          compensatory remedies they want.  So when they

8          filed their due process complaint, they were

9          seeking several remedies which are now moot.  But

10         the remedy that remains that they are seeking is of

11         evaluations and that is it.

12                   Because as of the date of filing of this

13         due process complaint, the parent did not know what

14         compensatory remedies.  It wants to know if there

15         has been a regression in the student.  So there is

16         no further issue, simple issue, and they have come

17         today with their witnesses.

18                   And of course, the onus of proof is on

19         you with respect to denial of FAPE.

20                   MS. DORSAINT:  Hello?  Did the line cut?

21                   HEARING OFFICER CHAK:  Yes.  No, the line

22         is not cut.  I am just thinking.

23                   Let me just go off the record at this

24         time, please.

25                   (OFF THE RECORD)

1    (ON THE RECORD)

2            HEARING OFFICER CHAK:  We are back on the

3    record in the case of J█████ R██, 197017.  We are

4    looking to have Parent's witnesses testify.  We

5    have present at the hearing Dr. Lindsay Plunkett.

6    Her testimony will be in the context of final

7    relief for educational evaluations that the parent

8    is seeking.

9            And I want to thank Dr. Plunkett for

10   joining us even though we've been a little late in

11   our hearing.

12           For the record, Ms. Khan, please

13   introduce your witness.

14           MS. KHAN:  Yes.  Good afternoon.  Would

15   you please state your name for the record?

16           DR. LINDSAY PLUNKETT:  Dr. Lindsay

17   Plunkett.

18           MS. KHAN:  Okay.  Thank you, Ms.

19   Plunkett.  So as per the IHO's directions, I'll

20   skip over the biographic information for you which

21   was included in your affidavit.

22           Could you please --

23           HEARING OFFICER CHAK:  (Interposing) Ms.

24   Khan just a minute.

25           MS. KHAN:  Yes.

1              HEARING OFFICER CHAK:  I want to swear

2      Dr. Plunkett in.

3              MS. KHAN:  Oh, yes.  Yes, of course.

4              HEARING OFFICER CHAK:  Thank you.  Dr.

5      Plunkett, I have two directions.  One is I hope you

6      are alone in the room while you're testifying.

7              DR. PLUNKETT:  Yes, I am.

8              HEARING OFFICER CHAK:  Thank you.  And

9      you are testifying for the student J███ R██.  Do

10     you know that?

11             DR. PLUNKETT:  Yes, I do.

12             HEARING OFFICER CHAK:  Thank you.  And

13     has the Parent's attorney provided you with the

14     exhibits that they filed prior to the hearing?

15             DR. PLUNKETT:  Yes, I have received that.

16             HEARING OFFICER CHAK:  Thank you.  And if

17     you refer to any of those exhibits while you're

18     testifying, do let me know.

19             DR. PLUNKETT:  Okay.  I will.

20             HEARING OFFICER CHAK:  Thank you.  Now,

21     I'd like to swear you in.

22             Do you swear to speak the truth and

23     nothing but the truth?

24             DR. PLUNKETT:  Yes, I do.

25             HEARING OFFICER CHAK:  Thank you.  Ms.

1          Khan, Ms. Rousseau, your witness to direct.

2                    MS. KHAN:   Thank you, IHO.   Dr. Plunkett,

3          may I ask are you currently employed?

4                    DR. PLUNKETT:   Yes.   I am currently

5          employed as a clinical neuropsychologist within my

6          private practice.

7                    MS. KHAN:   And where is your private

8          practice located?

9                    DR. PLUNKETT:   In Glen Head, New York.

10                   MS. KHAN:   How long have you been

11         employed in your private practice?

12                   DR. PLUNKETT:   Since April 2020.

13                   MS. KHAN:   And what is your official

14         position at your practice?

15                   DR. PLUNKETT:   I am the owner and sole

16         practitioner.   I'm a clinical neuropsychologist.

17                   MS. KHAN:   As a clinical

18         neuropsychologist, do you conduct evaluations?

19                   DR. PLUNKETT:   Yes.   That is my

20         primary -- primary job, conducting

21         psychoeducational evaluations and comprehensive

22         neuropsychological evaluations.

23                   MS. KHAN:   And can you please explain

24         what encompasses the psychoeducational evaluation?

25                   DR. PLUNKETT:   The psychoeducational

1    evaluation includes IQ testing which includes

2    cognitive testing typically done by a -- a measure

3    that includes an assessment of verbal abilities,

4    visual spatial ability, working memory abilities,

5    and processing speed.  Additionally, the

6    psychoeducational evaluation includes assessment of

7    the student's academic abilities, so that's within

8    the domains of reading, writing, and mathematics.

9    Given the student's diagnosis, the evaluation would

10   also include a measure of adaptive abilities which

11   is the most often used measure is the Vineland

12   Adaptive Behavior Scale.

13            MS. KHAN:  Thank you.  And how many

14   psychoeducational evaluations would you estimate

15   that you conducted in total --

16            DR. PLUNKETT:  (Interposing) So I

17   conducted approximately 30 psychoeducational

18   evaluations.  But if I may be clear, I've conducted

19   over 500 neuropsychological evaluations.  And

20   neuropsychological evaluations includes all

21   components of a psychoeducational evaluation.

22            MS. KHAN:  Thank you.  And specifically

23   for the student here, J███  R███, what evaluations

24   will you be conducting for him?

25            DR. PLUNKETT:  I will use -- just to

1            clarify, is J▮▮▮ -- J▮▮▮ is now 16 years old;

2            is that correct?

3                      MS. KHAN:  He's 15 years old.

4                      DR. PLUNKETT:  He is 15 still.  My

5            apologies.  So as a 15-year-old, he will be

6            administered by the -- the WISC-V , which is the

7            Wechsler Individual Scale of Intellectual -- excuse

8            me -- he -- he will get the WISC-V, which is the

9            Wechsler Individual -- Individual Scale of

10           Intelligence for Children, the 5th edition.  He

11           will also receive the WIAT-IV, the Wechsler

12           Individual Achievement Test, 4th Edition.  And then

13           additionally as I said, given the student's

14           disability, I'm also proposing to administer the

15           Vineland Adaptive Behavior Scale.

16                      MS. KHAN:  Okay.  And have you reviewed

17           all of the student's documents that were sent to

18           you?

19                      DR. PLUNKETT:  I received those shortly

20           before the hearing and I have been quickly reading

21           through.  I received a 77-page document.  I've been

22           quickly reading through that document, yes.

23                      MS. KHAN:  Okay.  And just from what

24           you've seen so far, could you explain what

25           documents you do have in your possession regarding

1          the student?

2                    DR. PLUNKETT:  Yes.  Yes.  So I have the

3          student's -- I have the due process complaint, I

4          have the student's IEP for the 2020/2021 school

5          year, as well -- as well as the IEP for the

6          2021/2022 school year.  Additional documents, the

7          ten-day notice.  My information is all included as

8          is the other evaluator's information.

9                    MS. KHAN:  And based on the tests you

10         were saying you would administer for the student,

11         can you say how many hours or how many days

12         approximately you would need in order to conduct

13         those evaluations of him?

14                   DR. PLUNKETT:  I believe because the

15         student is very impaired, I am -- I am expecting

16         approximately four hours of evaluation time.

17         Additionally, included within a psychoeducational

18         evaluation, there is also a clinical interview with

19         the family to understand the student's background.

20         That's not a -- that's not an objective measure,

21         that's just a clinical interview.  So that would be

22         approximately an hour.  So total time, I am

23         anticipating five hours.

24                   MS. KHAN:  Okay.  And how soon could you

25         potentially schedule the student for an evaluation?

1    DR. PLUNKETT:  I told the Parent's

2    attorney that I do have a cancellation this coming

3    week, the week of the 23rd.  So I would be

4    available to accommodate the family that week.  If

5    not, I have informed everyone that I will do my

6    best to accommodate within the following two weeks.

7    MS. KHAN:  And when you start conducting

8    these evaluations, how soon could you present the

9    results?

10   DR. PLUNKETT:  It takes me approximately

11   two weeks after the conclusion of the evaluation to

12   provide a comprehensive report.

13   MS. KHAN:  And finally -- actually not

14   finally, what is your rate for an independent

15   psychoeducational evaluation?

16   DR. PLUNKETT:  $2,000.

17   MS. KHAN:  And has the New York City DOE

18   ever paid this rate in the past for you?

19   DR. PLUNKETT:  I have not been paid by

20   the Department of Education but this is my standard

21   fee.  And it is my understanding that the

22   Department of Education has paid this fee in the

23   past.

24   MS. KHAN:  Okay.  And if I can just have

25   one moment.

Exhibit 5: Page 32 of 52

1              Okay.  That concludes our direct
2        testimony.
3              HEARING OFFICER CHAK:  Ms. Dorsaint, any
4        questions (audio interference) --
5              MS. DORSAINT:  (Interposing) I do have a
6        couple of questions.
7              HEARING OFFICER CHAK:  Okay.
8              MS. DORSAINT:  I do have a couple of
9        questions.
10             Hi, Dr. Plunkett.  How are you today?
11             DR. PLUNKETT:  Hi.  Good.  Thank you so
12        much.
13             MS. DORSAINT:  I guess we'll work
14        backwards.  You indicated that you know the
15        Department of Education has paid this fee but not
16        to you directly.  Who do you know that the
17        Department of Education has paid this fee to?
18             DR. PLUNKETT:  I -- I was informed by the
19        Parent's attorney that this has been a fee that has
20        been paid.  But this is my standard --
21             MS. DORSAINT:  (Interposing) Oh.  But you
22        don't firsthand --
23             DR. PLUNKETT:  Correct.
24             MS. DORSAINT:  You don't have any
25        firsthand knowledge of that?

1           DR. PLUNKETT:  Correct.

2           MS. DORSAINT:  Okay.  And you also

3    indicated that you were provided with a packet of

4    information that you're reading through.  Have you

5    completed your review of those documents?

6           DR. PLUNKETT:  I have -- I have quickly

7    scanned through all of the documents.  It was

8    provided just before this hearing so I have not

9    had --

10          MS. DORSAINT:  (Interposing) Oh.

11          DR. PLUNKETT:  -- an opportunity to read

12   in detail and take notes, annotate all of the

13   pages.  But I have been able to quickly read

14   through every page.

15          MS. DORSAINT:  Oh.  Would you say in your

16   brief scan of this document that you're familiar

17   with this student?

18          DR. PLUNKETT:  I would say I'm familiar

19   with the student.  I do not have all the

20   information, correct.

21          MS. DORSAINT:  Oh, okay.  Did you have an

22   opportunity to review any prior evaluations that

23   may have been conducted for this student?

24          DR. PLUNKETT:  So the only evaluations

25   that I have in front of me are listed on the

1           student's IEP.  So the Student Annual Needs
2           Determination Inventory, the formative assessment
3           of standard tasks.  Those are the assessments that
4           are provided in the IEP.  I don't have any other
5           outside evaluation.
6                       MS. DORSAINT:  Oh, okay.  Okay.  So just
7           so that I'm clear, the only document that you have
8           before you regarding any evaluation is just an IEP?
9                       DR. PLUNKETT:  Correct.
10                      MS. DORSAINT:  Okay.  Do you think it
11          would have been helpful for you to have the actual
12          evaluations in order to form an opinion about this
13          student?
14                      DR. PLUNKETT:  Yes.  The -- yes.
15                      MS. DORSAINT:  Okay.  It's a yes or no
16          question and that was -- and did you have an
17          opportunity to perhaps speak to the parent of the
18          student?
19                      DR. PLUNKETT:  No, I have not spoken to
20          the parent.
21                      MS. DORSAINT:  Oh, okay.  You were asked
22          to perform a psycho-ed -- or you're being
23          considered to perform a psycho-ed evaluation.  Do
24          you know if there are any other evaluations that
25          are being performed for this student?

1           DR. PLUNKETT:  It is my understanding the
2      student is also being requested for speech, OT, and
3      PT updated evaluations.
4           MS. DORSAINT:  Okay.
5           DR. PLUNKETT:  Based on the (audio
6      interference).
7           MS. DORSAINT:  Based on?
8           DR. PLUNKETT:  The -- the -- the Parent
9      disclosure that was provided.
10           MS. DORSAINT:  Okay.  And by chance in
11      that disclosure did you see any other evaluations
12      other than the IEP in that disclosure?
13           DR. PLUNKETT:  I do not -- no, no.
14      There --- it's just those two evaluations listed on
15      the IEP.
16           MS. DORSAINT:  Oh, okay.  Okay.  So if
17      you did not see any prior evaluations for this
18      student and you only have the due process complaint
19      requesting the evaluations, how do you know that
20      the student requires this evaluation?
21           DR. PLUNKETT:  I -- I -- I was simply
22      asked to provide testimony on what a
23      psychoeducational evaluation is.  I -- I believe
24      that is up to you all to determine if he needs an
25      evaluation.  I -- I don't have that information.

1          MS. DORSAINT:  Okay.  So you're not

2     making representation that the student requires an

3     evaluation in your testimony?

4          DR. PLUNKETT:  Correct.  I -- I don't

5     think I can make that -- yeah, correct.

6          MS. DORSAINT:  I have no further

7     questions for this witness.  Thank you.

8          HEARING OFFICER CHAK:  Thank you.

9     Meanwhile, I would like to -- Dr. Plunkett, could

10     you take a look at Exhibit A, B and C?

11          DR. PLUNKETT:  Yes.  A, B, and C, yes.

12          HEARING OFFICER CHAK:  So what is Exhibit

13     A?

14          DR. PLUNKETT:  Dr. Plunkett -- is my

15     resume.

16          HEARING OFFICER CHAK:  Is that your

17     resume?

18          DR. PLUNKETT:  Yes.

19          HEARING OFFICER CHAK:  And how many pages

20     is that?

21          DR. PLUNKETT:  I believe it's four pages.

22          (Whereupon Student's Exhibit A was marked

23     for identification.)

24          HEARING OFFICER CHAK:  And what is

25     Exhibit B?

112

1               DR. PLUNKETT:  Exhibit B is my
2          certificate, my license.
3               HEARING OFFICER CHAK:  And what is the
4          certificate for?  So to --
5               DR. PLUNKETT:  (Interposing) It's my --
6               HEARING OFFICER CHAK:  What is that?
7               DR. PLUNKETT:  It's my -- my license.
8          Um-hum.
9               HEARING OFFICER CHAK:  To practice as?
10               DR. PLUNKETT:  A psychologist in New York
11          State.
12               (Whereupon Student's Exhibit B was marked
13          for identification.)
14               HEARING OFFICER CHAK:  And Exhibit C?
15               DR. PLUNKETT:  Is my affidavit.
16               HEARING OFFICER CHAK:  And is that your
17          signature on the affidavit?
18               DR. PLUNKETT:  That is correct.
19               HEARING OFFICER CHAK:  And what is the
20          date of this affidavit?
21               DR. PLUNKETT:  The date is August 9th,
22          2021.
23               (Whereupon Student's Exhibit C was marked
24          for identification.)
25               HEARING OFFICER CHAK:  Okay.  So for the

1           attorneys for the Parent, do you wish to introduce

2           these three documents as evidence as exhibits in

3           this hearing?

4                       MS. KHAN:  Yes, IHO, we do.

5                       HEARING OFFICER CHAK:  So Parent Exhibit

6           A, B, and C is admitted into evidence.

7                       (Whereupon Student's Exhibits A through C

8           were admitted into evidence.)

9                       HEARING OFFICER CHAK:  Dr. Plunkett --

10                      DR. PLUNKETT:  Yes.

11                      HEARING OFFICER CHAK:  -- I don't have

12          any other questions for you.  So this --

13                      MS. KHAN:  (Interposing) IHO, can we very

14          briefly redirect just two questions?

15                      HEARING OFFICER CHAK:  Sure.  Sure.  You

16          may do redirect, yes.

17                      MS. KHAN:  Thank you.  Dr. Plunkett, were

18          you called here to testify about your

19          qualifications for a potential evaluation?

20                      DR. PLUNKETT:  Yes.

21                      MS. KHAN:  And have you yet been retained

22          to actually conduct these evaluations yet?

23                      DR. PLUNKETT:  No.

24                      MS. KHAN:  Okay.  That's all.

25                      HEARING OFFICER CHAK:  Actually, I have

1              just a question.  If, Dr. Plunkett, an evaluation
2         is ordered, would it be possible for you to be able
3         to do this in the month of February rather than in
4         the next two weeks -- no, not February, the month
5         of September rather than in the next two weeks?
6                   DR. PLUNKETT:  Yes.  Yes, yes.  I -- I
7         will accommodate in September, yes.
8                   HEARING OFFICER CHAK:  And the timeline
9         to provide a report and to do the test would be the
10        same?
11                  DR. PLUNKETT:  It will be the same, yes.
12        Two weeks after the conclusion of the evaluation I
13        will have the report ready for the family.  Only
14        note is I will be out of the office the week of the
15        12th so that is one restriction I do have in
16        September.
17                  HEARING OFFICER CHAK:  Thank you.  I have
18        no further questions.
19                  Dr. Plunkett, thank you for coming to the
20        hearing today.  And you could actually go off the
21        hearing and disengage.
22                  DR. PLUNKETT:  Okay.  Thank you so much.
23        Thank you all.  Take care.
24                  MS. DORSAINT:  Thank you.
25                  HEARING OFFICER CHAK:  For the Parent,

1          your next witness.

2                     MS. KHAN:  Yes, IHO.  We're just getting

3          in touch with her right now just to be sure she can

4          still dial in.  If you can just give us a few

5          minutes, please?

6                     HEARING OFFICER CHAK:  Sure.

7                     (Pause)

8                     MS. KHAN:  Hello.  IHO?

9                     HEARING OFFICER CHAK:  Yes.

10                    MS. KHAN:  So unfortunately, it seems our

11         other witness is unavailable now.  We went beyond

12         the time that she was able to dial in.  So she has

13         appointments right now that she has to attend to.

14         So I don't know if we want to save her testimony

15         for another day.  I do know we had some

16         (indiscernible).  I'd have to check in with her to

17         see if she can testify tomorrow because all we had

18         information for was that she was available today.

19                    HEARING OFFICER CHAK:  Yes.  Yes.  So

20         what I remember is in the previous hearing we had

21         scheduled today and tomorrow for your witnesses.

22                    MS. KHAN:  Right.

23                    HEARING OFFICER CHAK:  But since in the

24         interim Ms. Dorsaint has mentioned that I have

25         missed looking at August 13th request to adjourn, I

1           think it would be best to find a neutral date to

2           adjourn this matter to.  And we could choose two

3           dates mutually so that you could have your

4           witnesses together on that date and the District

5           would also have their witnesses on that date.

6                          MS. KHAN:  Okay.

7                          HEARING OFFICER CHAK:  So let's look at

8           our calendars.  Let's go off the record and look at

9           our calendars in September.

10                         (OFF THE RECORD)

11                         (ON THE RECORD)

12                         HEARING OFFICER CHAK:  We are back on the

13          record.  And both sides have mutually agreed to two

14          hearing dates in September.  September 17th is the

15          first and September 23rd is the second hearing

16          date.

17                         On September 17th, the District will

18          present its case.

19                         And on the 23rd the Parents will present

20          its case and its witnesses.

21                         Of course, both parties must adhere to

22          the rule of providing exhibits and list of

23          witnesses five business days prior to the hearing.

24                         So I'm also requesting that the District

25          provide any pre-hearing memorandum of law or fact

1      that it wishes to present in this case prior to

2      September 17th.

3              I would like to ask attorneys, on the

4      17th is there a time that you prefer to begin the

5      hearing at?

6              The District, on the 17th what time do

7      you wish to schedule the hearing?

8              MS. DORSAINT:  10 o'clock is fine.  9

9      o'clock is fine.

10             HEARING OFFICER CHAK:  So we will keep it

11     at 10 a.m. on the 17th.

12             And the Parents, for the 23rd is there a

13     time that you prefer?

14             MS. KHAN:  I'm looking at my calendar

15     right now, IHO.  23rd looks pretty open, so any

16     time that you deem appropriate.

17             HEARING OFFICER CHAK:  So let's do it at

18     10 o'clock as well.

19             MS. KHAN:  Sounds good.

20             HEARING OFFICER CHAK:  So thank you both

21     for coming to the hearing today.

22             And I will see you both on the 17th.

23             (Whereupon, at 3:22 p.m. the proceeding

24     was adjourned.)

25

C E R T I F I C A T I O N

I, Rochelle Eichen, do hereby certify
that I typed the transcript in the Matter of ▮
▮ taken on August 16, 2021 by Sierra Self at the
offices of the Department of Education, 131
Livingston Street, Brooklyn, NY 11201, and that to
the best of my ability, this is an accurate
transcription of what was recorded at that time and
place. I further certify that I am not connected
by blood, marriage, or employment with any of the
parties herein nor interested directly or
indirectly in the matter transcribed.

_____

ROCHELLE EICHEN

August 17, 2021

118

**$**

**$2000 (1)**
106:16

**1**

**12th (1)**
114:15
**13th (17)**
79:19; 79:20; 82:6;
82:7; 82:14; 82:25;
83:4; 83:11; 89:6;
92:9; 95:21; 96:14;
98:2; 98:10; 98:20;
98:20; 115:25
**15-year-old (1)**
104:5
**16th (2)**
98:9; 98:19
**17th (7)**
116:14; 116:17;
117:2; 117:4; 117:6;
117:11; 117:22
**19th (1)**
84:6

**2**

**2020/2021 (5)**
78:2; 78:14; 78:18;
99:2; 105:4
**2021/2022 (1)**
105:6
**23rd (5)**
106:3; 116:15;
116:19; 117:12;
117:15

**3**

**30th (4)**
78:19; 79:7; 91:13;
91:22

**4**

**45-day (1)**
98:22
**4th (1)**
104:12

**5**

**5th (1)**
104:10

**7**

**77-page (1)**
104:21

**9**

**9th (1)**

112:21

**A**

**abilities (4)**
103:3; 103:4; 103:7;
103:10
**ability (1)**
103:4
**able (3)**
108:13; 114:2; 115:12
**absolutely (1)**
91:2
**academic (1)**
103:7
**accepted (1)**
97:10
**access (1)**
94:9
**accommodate (3)**
106:4; 106:6; 114:7
**Achievement (1)**
104:12
**actual (1)**
109:11
**Actually (1)**
113:25
**actually (5)**
91:18; 95:18; 106:13;
113:22; 114:20
**Adaptive (2)**
103:12; 104:15
**adaptive (1)**
103:10
**addition (1)**
80:9
**Additional (1)**
105:6
**Additionally (2)**
103:5; 105:17
**additionally (1)**
104:13
**address (1)**
84:8
**addressed (1)**
98:5
**adhere (1)**
116:21
**adjourn (4)**
83:10; 93:12; 115:25;
116:2
**adjourned (1)**
117:24
**Adjournment (1)**
79:14
**adjournment (12)**
79:11; 79:12; 79:13;
79:16; 79:18; 82:12;
82:19; 83:2; 84:16;
84:24; 97:14; 98:3
**adjournments (2)**
92:12; 92:13
**adjudicate (1)**
80:7

**administer (2)**
104:14; 105:10
**administered (1)**
104:6
**administrators (1)**
82:16
**admitted (2)**
113:6; 113:8
**admitting (1)**
98:4
**advance (1)**
84:23
**affidavit (4)**
100:21; 112:15;
112:17; 112:20
**afternoon (3)**
77:9; 77:16; 100:14
**Again (1)**
90:17
**again (3)**
82:6; 84:25; 88:11
**age (1)**
77:5
**ago (1)**
98:6
**agree (1)**
91:3
**agreeable (1)**
84:12
**agreed (4)**
86:20; 88:12; 90:19;
116:13
**agreement (4)**
89:10; 89:14; 90:23;
96:6
**ahead (3)**
88:6; 96:2; 96:3
**allegations (1)**
94:2
**alleged (2)**
87:7; 87:8
**allow (1)**
90:5
**allowed (1)**
83:6
**alone (1)**
101:6
**altered (1)**
78:4
**alternative (1)**
78:8
**Although (1)**
81:5
**altogether (1)**
94:15
**annotate (1)**
108:12
**Annual (1)**
109:1
**anticipating (1)**
105:23
**apologies (1)**
104:5
**apologize (2)**

83:21; 85:23
**appear (3)**
96:24; 97:1; 97:19
**appearance (4)**
77:8; 77:15; 88:4;
88:8
**appeared (1)**
79:3
**appearing (3)**
77:11; 77:13; 92:14
**appears (3)**
81:9; 97:5; 97:6
**appointments (1)**
115:13
**appropriate (6)**
80:22; 81:20; 83:6;
88:12; 90:13; 117:16
**approximately (5)**
103:17; 105:12;
105:16; 105:22;
106:10
**April (1)**
102:12
**areas (2)**
82:3; 94:22
**argument (4)**
85:15; 85:17; 86:7;
92:25
**arguments (1)**
85:10
**articulating (1)**
84:13
**Ashleigh (1)**
77:19
**ASHLEIGH (1)**
77:19
**aspect (1)**
93:4
**asserting (1)**
87:6
**assess (3)**
78:15; 78:22; 78:23
**assessment (3)**
103:3; 103:6; 109:2
**assessments (1)**
109:3
**assigned (7)**
79:10; 80:25; 95:10;
95:23; 96:25; 97:11;
97:25
**attend (1)**
115:13
**attention (1)**
87:19
**attorney (6)**
77:17; 88:3; 89:22;
101:13; 106:2; 107:19
**attorneys (8)**
77:14; 78:25; 82:18;
82:23; 83:21; 86:6;
113:1; 117:3
**audio (2)**
107:4; 110:5
**Audio (1)**

90:1
**August (17)**
79:19; 79:20; 82:6;
82:25; 84:6; 85:25;
92:9; 95:20; 96:10;
96:12; 97:1; 97:3;
98:2; 98:5; 98:20;
112:21; 115:25
**authorities (1)**
80:3
**authority (3)**
81:6; 85:21; 86:3
**autism (1)**
77:5
**available (11)**
82:16; 83:3; 84:17;
84:22; 86:22; 94:9;
96:9; 96:10; 97:16;
106:4; 115:18

**B**

**back (6)**
79:2; 82:17; 82:25;
97:10; 100:2; 116:12
**background (1)**
105:19
**backtracking (1)**
86:19
**backwards (1)**
107:14
**based (1)**
105:9
**Based (2)**
110:5; 110:7
**basis (1)**
85:12
**become (1)**
96:10
**began (1)**
94:15
**begin (1)**
117:4
**beginning (1)**
83:14
**begun (1)**
84:8
**Behavior (2)**
103:12; 104:15
**believes (1)**
78:15
**best (2)**
106:6; 116:1
**better (1)**
91:19
**beyond (1)**
115:11
**biographic (1)**
100:20
**birth (1)**
77:6
**both (7)**
84:21; 84:21; 95:19;
116:13; 116:21;

117:20; 117:22
**bottom (1)**
82:23
**Brain (2)**
77:18; 77:21
**brief (1)**
108:16
**briefly (1)**
113:14
**bring (4)**
78:25; 81:15; 82:4;
92:16
**bringing (1)**
93:13
**brought (5)**
82:24; 83:22; 84:20;
93:1; 93:2
**business (1)**
116:23

## C

**calendar (1)**
117:14
**calendars (2)**
116:8; 116:9
**called (1)**
113:18
**can (14)**
80:12; 80:21; 85:1;
85:23; 91:2; 95:1;
102:23; 105:11;
106:24; 111:5;
113:13; 115:3; 115:4;
115:17
**cancellation (1)**
106:2
**care (1)**
114:23
**case (28)**
77:3; 77:3; 77:24;
79:10; 82:5; 82:11;
82:20; 83:14; 84:9;
85:10; 87:23; 87:23;
87:24; 90:16; 91:10;
91:10; 92:6; 92:11;
92:23; 94:3; 94:11;
94:13; 97:11; 98:21;
100:3; 116:18;
116:20; 117:1
**cases (5)**
80:2; 92:14; 92:15;
95:24; 98:23
**certain (2)**
83:3; 95:7
**certainly (1)**
87:14
**certificate (2)**
112:2; 112:4
**CHAK (73)**
77:2; 77:13; 77:23;
79:14; 79:20; 82:9;
84:1; 84:4; 85:3;
86:16; 86:17; 86:24;
87:1; 87:20; 88:2;

88:7; 88:17; 89:2;
89:21; 89:24; 91:6;
93:21; 93:25; 94:20;
95:12; 95:14;
95:22; 96:16; 96:20;
97:4; 97:17; 98:1;
99:21; 100:2;
100:23; 101:1;
101:4; 101:8;
101:12; 101:16;
101:20; 101:25;
107:3; 107:7; 111:8;
111:12; 111:16;
111:19; 111:24;
112:3; 112:6; 112:9;
112:14; 112:16;
112:19; 112:25;
113:5; 113:9;
113:11; 113:15;
113:25; 114:8;
114:17; 114:25;
115:6; 115:19;
115:19; 115:23;
116:7; 116:12;
117:10; 117:17;
117:20
**Chak (2)**
83:25; 89:19
**challenging (1)**
88:9
**chance (1)**
110:10
**change (2)**
82:1; 87:9
**changed (2)**
88:13; 98:20
**Chanie (5)**
79:10; 87:18; 90:19;
96:24; 97:15
**check (1)**
115:16
**child (1)**
86:22
**Children (1)**
104:10
**choice (1)**
79:23
**choose (1)**
116:2
**chose (1)**
94:5
**circumvent (1)**
90:11
**City (1)**
106:17
**claim (6)**
78:2; 78:21; 79:5;
80:12; 81:15; 93:15
**claimed (1)**
77:25
**claiming (1)**
87:4
**claims (1)**
78:6

**clarify (1)**
104:1
**classification (1)**
77:5
**clear (6)**
83:13; 84:5; 92:19;
95:4; 103:18; 109:7
**clearly (2)**
81:16; 98:25
**clinical (5)**
102:5; 102:16;
102:17; 105:18;
105:21
**close (1)**
98:22
**closed (7)**
79:18; 80:6; 82:5;
92:16; 96:1; 96:9;
97:2
**closures (4)**
78:3; 81:21; 81:24;
82:13
**cognitive (1)**
103:2
**colleague (1)**
87:17
**coming (4)**
84:7; 106:2; 114:19;
117:21
**Compensatory (1)**
94:24
**compensatory (5)**
81:17; 94:16; 95:2;
99:7; 99:14
**complaint (22)**
80:11; 80:16; 81:1;
81:18; 83:16; 85:11;
85:12; 85:14; 86:9;
87:8; 88:18; 89:13;
90:10; 90:12; 90:21;
93:1; 93:3; 97:24;
99:8; 99:13; 105:3;
110:18
**completed (1)**
108:5
**complied (1)**
98:21
**components (1)**
103:21
**comprehensive (2)**
102:21; 106:12
**conceding (2)**
82:2; 83:5
**concerned (1)**
93:11
**concludes (1)**
107:1
**conclusion (2)**
106:11; 114:12
**conduct (3)**
102:18; 105:12;
113:22
**conducted (4)**
103:15; 103:17;

103:18; 108:23
**conducting (3)**
102:20; 103:24; 106:7
**conference (2)**
84:11; 91:11
**confused (1)**
92:11
**considered (2)**
93:9; 109:23
**contacted (1)**
82:18
**context (1)**
100:6
**continue (1)**
85:14
**conversation (1)**
88:11
**counsel (2)**
87:9; 95:19
**couple (3)**
81:4; 107:6; 107:8
**course (4)**
91:2; 99:18; 101:3;
116:21
**courts (1)**
81:23
**COVID-19 (1)**
80:6
**crossed (1)**
84:22
**CSE (1)**
93:9
**currently (2)**
102:3; 102:4
**curriculum (1)**
94:10
**cut (2)**
99:20; 99:22

## D

**date (15)**
77:6; 86:12; 88:15;
93:14; 96:14; 97:10;
97:11; 98:19; 99:12;
112:20; 112:21;
116:1; 116:4; 116:5;
116:16
**dates (2)**
116:3; 116:14
**day (2)**
83:23; 115:15
**Day (1)**
82:7
**days (7)**
84:7; 88:23; 95:7;
98:6; 98:8; 105:11;
116:23
**deadline (1)**
98:22
**decide (1)**
90:12
**decided (2)**
95:3; 98:23

**decisions (5)**
81:22; 85:16; 87:10;
87:12; 87:13
**deem (1)**
117:16
**defend (3)**
91:12; 91:14; 94:14
**delay (1)**
84:10
**delivered (1)**
78:8
**denial (9)**
77:25; 78:5; 78:9;
78:16; 79:5; 79:24;
91:24; 94:2; 99:19
**denied (2)**
79:12; 85:18
**Department (4)**
106:20; 106:22;
107:15; 107:17
**deprivation (2)**
78:15; 78:23
**described (1)**
91:20
**detail (1)**
108:12
**Determination (1)**
109:2
**determination (1)**
80:21
**determine (2)**
92:22; 110:24
**diagnosis (1)**
103:9
**dial (2)**
115:4; 115:12
**different (5)**
81:13; 84:14; 87:23;
94:6; 94:15
**direct (2)**
102:1; 107:1
**directions (2)**
100:19; 101:5
**directly (4)**
80:17; 80:20; 88:22;
107:16
**disability (2)**
77:4; 104:14
**disagreement (1)**
89:11
**disclosure (3)**
110:9; 110:11; 110:12
**disclosures (2)**
84:23; 85:19
**discussed (5)**
77:24; 91:11; 91:19;
94:23; 96:2
**discussions (1)**
93:7
**disengage (1)**
114:21
**dismiss (1)**
85:12
**dismissed (1)**

80:1
**disprove (1)**
 93:15
**District (38)**
 77:7; 77:10; 77:12;
 78:11; 79:4; 79:9;
 79:25; 81:19; 82:2;
 83:5; 85:6; 85:11;
 85:15; 85:17; 85:20;
 86:1; 86:8; 86:11;
 87:3; 89:9; 90:8;
 90:18; 91:12; 91:18;
 92:11; 92:25; 93:13;
 93:16; 93:17; 94:3;
 94:17; 96:18; 97:5;
 98:17; 116:4; 116:17;
 116:24; 117:6
**District's (1)**
 79:4
**Districts (1)**
 92:16
**document (4)**
 104:21; 104:22;
 108:16; 109:7
**documentary (1)**
 93:18
**documents (6)**
 104:17; 104:25;
 105:6; 108:5; 108:7;
 113:2
**DOE (3)**
 84:10; 84:18; 106:17
**domains (1)**
 103:8
**done (2)**
 93:8; 103:2
**DORSAINT (44)**
 77:9; 79:8; 79:17;
 79:22; 87:5; 87:25;
 89:5; 89:19; 89:23;
 89:25; 90:3; 93:20;
 93:23; 94:1; 95:8;
 95:13; 95:16; 96:4;
 96:18; 96:23; 97:13;
 97:18; 99:20; 107:5;
 107:8; 107:13;
 107:21; 107:24;
 108:2; 108:10;
 108:15; 108:21;
 109:6; 109:10;
 109:15; 109:21;
 110:4; 110:7; 110:10;
 110:16; 111:1; 111:6;
 114:24; 117:8
**Dorsaint (19)**
 77:10; 79:3; 82:10;
 84:13; 85:5; 87:3;
 88:25; 89:3; 91:7;
 92:6; 93:22; 94:21;
 95:15; 95:22; 96:16;
 97:4; 98:1; 107:3;
 115:24
**down (1)**
 87:13
**DPC (4)**

84:6; 85:24; 86:2;
 93:11
**Dr (13)**
 100:5; 100:9; 100:16;
 101:2; 101:4; 102:2;
 107:10; 111:9;
 111:14; 113:9;
 113:17; 114:1; 114:19
**DR (56)**
 100:16; 101:7;
 101:11; 101:15;
 101:19; 101:24;
 102:4; 102:9; 102:12;
 102:15; 102:19;
 102:25; 103:16;
 103:25; 104:4;
 104:19; 105:2;
 105:14; 106:1;
 106:10; 106:16;
 106:19; 107:11;
 107:18; 107:23;
 108:1; 108:6; 108:11;
 108:18; 108:24;
 109:9; 109:14;
 109:19; 110:1; 110:5;
 110:8; 110:13;
 110:21; 111:4;
 111:11; 111:14;
 111:18; 111:21;
 112:1; 112:5; 112:7;
 112:10; 112:15;
 112:18; 112:21;
 113:10; 113:20;
 113:23; 114:6;
 114:11; 114:22
**due (26)**
 78:3; 80:11; 80:16;
 80:19; 81:1; 81:12;
 81:12; 81:18; 81:21;
 83:2; 83:16; 85:13;
 85:18; 86:9; 87:7;
 88:18; 89:12; 90:10;
 90:11; 90:20; 97:13;
 97:23; 99:8; 99:13;
 105:3; 110:18
**during (2)**
 79:6; 86:14

**E**

**earlier (4)**
 77:24; 91:20; 91:21;
 93:2
**Edition (1)**
 104:12
**edition (1)**
 104:10
**education (1)**
 81:21
**Education (4)**
 106:20; 106:22;
 107:15; 107:17
**educational (5)**
 80:14; 80:19; 81:11;
 90:24; 100:7

**efficiency (1)**
 85:6
**either (1)**
 83:11
**email (2)**
 79:21; 92:9
**emails (1)**
 82:22
**employed (3)**
 102:3; 102:5; 102:11
**encompasses (1)**
 102:24
**end (4)**
 78:1; 78:13; 78:18;
 99:1
**ended (1)**
 95:20
**ends (1)**
 96:12
**enough (3)**
 81:16; 98:17; 98:22
**entire (5)**
 80:1; 83:14; 90:11;
 95:13; 97:11
**entirety (1)**
 81:13
**entitled (1)**
 94:17
**equally (1)**
 97:7
**establish (1)**
 78:21
**estimate (1)**
 103:14
**evaluation (23)**
 81:11; 88:22; 90:8;
 102:24; 103:1; 103:6;
 103:9; 103:21;
 105:16; 105:18;
 105:25; 106:11;
 106:15; 109:5; 109:8;
 109:23; 110:20;
 110:23; 110:25;
 111:3; 113:19; 114:1;
 114:12
**evaluations (38)**
 78:14; 78:22; 80:14;
 80:19; 83:15; 86:5;
 86:8; 89:9; 90:24;
 92:3; 92:22; 93:5;
 93:8; 94:25; 99:2;
 99:6; 99:11; 100:7;
 102:18; 102:21;
 102:22; 103:14;
 103:18; 103:19;
 103:20; 103:23;
 105:13; 106:8;
 108:22; 108:24;
 109:12; 109:24;
 110:3; 110:11;
 110:14; 110:17;
 110:19; 113:22
**evaluator's (1)**
 105:8

**evaluators (2)**
 88:5; 88:15
**even (6)**
 81:25; 84:8; 87:22;
 93:12; 98:12; 100:10
**Even (1)**
 84:17
**event (1)**
 83:1
**everyone (2)**
 77:10; 106:5
**everywhere (1)**
 81:25
**evidence (4)**
 93:18; 113:2; 113:6;
 113:8
**exactly (2)**
 85:7; 91:7
**excuse (1)**
 104:7
**exhibit (1)**
 93:21
**Exhibit (9)**
 111:10; 111:12;
 111:22; 111:25;
 112:1; 112:12;
 112:14; 112:23; 113:5
**exhibits (4)**
 101:14; 101:17;
 113:2; 116:22
**Exhibits (1)**
 113:7
**expectation (1)**
 93:7
**expecting (1)**
 105:15
**expedition (1)**
 81:9
**explain (2)**
 89:3; 102:23; 104:24
**explaining (1)**
 85:7
**extended (2)**
 95:20; 96:12
**extent (1)**
 78:23

**F**

**fact (6)**
 83:2; 84:12; 86:2;
 95:24; 98:17; 116:25
**factually (2)**
 93:14; 93:15
**failed (1)**
 81:20
**fails (1)**
 80:12
**familiar (3)**
 87:12; 108:16; 108:18
**family (5)**
 94:5; 94:10; 105:19;
 106:4; 114:13
**FAPE (14)**

77:25; 78:5; 78:9;
 78:16; 79:6; 79:24;
 82:2; 83:5; 85:18;
 91:24; 94:2; 94:4;
 94:14; 99:19
**far (2)**
 93:10; 104:24
**fault (1)**
 84:9
**February (2)**
 114:3; 114:4
**fee (5)**
 106:21; 106:22;
 107:15; 107:17;
 107:19
**few (1)**
 115:4
**file (1)**
 85:7
**filed (7)**
 83:17; 84:6; 85:25;
 89:13; 93:3; 99:8;
 101:14
**filing (1)**
 99:12
**final (7)**
 81:11; 83:18; 91:1;
 92:19; 93:6; 99:3;
 100:6
**finally (2)**
 106:13; 106:14
**find (1)**
 116:1
**fine (2)**
 117:8; 117:9
**finish (2)**
 90:4; 90:5
**first (4)**
 79:1; 79:5; 88:19;
 116:15
**firsthand (2)**
 107:22; 107:25
**fishing (1)**
 81:8
**five (2)**
 105:23; 116:23
**focus (1)**
 86:7
**following (1)**
 106:6
**form (2)**
 83:19; 109:12
**formative (1)**
 109:2
**forth (4)**
 81:15; 82:5; 94:8;
 94:12
**forward (3)**
 79:23; 87:18; 97:24
**found (2)**
 80:4; 80:4
**four (2)**
 105:16; 111:21
**free (1)**

81:20
**Friday (4)**
96:13; 96:25; 98:6;
98:10
**front (1)**
108:25
**full (1)**
91:9
**further (3)**
99:16; 111:6; 114:18
**future (1)**
88:14

### G

**Geraldine (1)**
77:10
**GERALDINE (1)**
77:9
**Given (1)**
103:9
**given (1)**
104:13
**Glen (1)**
102:9
**Good (4)**
77:9; 77:16; 100:14;
107:11
**good (1)**
117:19
**granted (2)**
80:13; 81:5
**Graus (11)**
79:10; 79:21; 84:11;
84:24; 86:20; 87:18;
95:5; 95:10; 96:24;
97:15; 98:2
**Group (2)**
77:18; 77:21
**guess (4)**
85:1; 89:7; 90:13;
107:13
**guys (1)**
97:21

### H

**handed (1)**
87:13
**handling (1)**
82:20
**happen (1)**
90:6
**happened (3)**
81:24; 90:3; 97:7
**happy (1)**
87:16
**Head (1)**
102:9
**hear (2)**
88:24; 89:20
**heard (4)**
83:15; 85:14; 91:4;
96:14
**HEARING (72)**

77:2; 77:13; 77:23;
79:14; 79:20; 82:9;
84:1; 84:4; 85:3;
86:17; 86:24; 87:1;
87:20; 88:2; 88:7;
88:17; 89:2; 89:21;
89:24; 91:6; 93:21;
93:25; 94:20; 95:12;
95:14; 95:22;
96:16; 96:20; 97:4;
97:17; 98:1; 99:21;
100:2; 100:23;
101:1; 101:4; 101:8;
101:12; 101:16;
101:20; 101:25;
107:3; 107:7; 111:8;
111:12; 111:16;
111:19; 111:24;
112:3; 112:6; 112:9;
112:14; 112:16;
112:19; 112:25;
113:5; 113:9;
113:11; 113:15;
113:25; 114:8;
114:17; 114:25;
115:6; 115:9;
115:19; 115:23;
116:7; 116:12;
117:10; 117:17;
117:20
**hearing (57)**
77:7; 77:11; 77:24;
80:6; 80:24; 81:2;
81:5; 83:9; 83:9;
83:10; 83:11; 83:17;
83:18; 85:6; 86:12;
86:15; 87:11; 88:21;
90:12; 91:9; 91:21;
92:4; 92:5; 92:6;
92:15; 92:17; 92:19;
92:20; 92:20; 93:6;
93:14; 94:25; 96:17;
96:25; 97:1; 97:8;
97:9; 99:3; 99:4;
100:5; 100:11;
108:8; 113:3; 114:20;
114:21; 115:20;
116:14; 116:15;
116:23; 117:5; 117:7;
117:21
**hearings (2)**
83:12; 93:4
**Hearings (1)**
95:24
**held (1)**
85:17
**Hello (2)**
99:20; 115:8
**helpful (1)**
109:11
**hence (2)**
82:2; 97:16
**Hi (2)**

107:10; 107:11
**Hold (1)**
81:4
**hope (1)**
101:5
**hour (1)**
105:22
**hours (3)**
105:11; 105:16;
105:23

### I

**IDEA (4)**
80:18; 89:8; 90:15;
98:23
**identification (3)**
111:23; 112:13;
112:24
**IEE (2)**
81:6; 93:6
**IEEs (5)**
84:12; 86:20; 86:21;
88:9; 88:12
**IEP (7)**
105:4; 105:5; 109:1;
109:4; 109:8; 110:12;
110:15
**IHO (11)**
83:24; 86:2; 86:16;
89:19; 98:12; 102:2;
113:4; 113:13; 115:2;
115:8; 117:15
**IHO's (1)**
100:19
**IHOs (3)**
92:14; 92:21; 95:23
**impaired (1)**
105:15
**impartial (1)**
77:11
**inappropriate (1)**
84:17
**inclined (1)**
83:10
**include (1)**
103:10
**included (3)**
100:21; 105:7; 105:17
**includes (5)**
103:1; 103:1; 103:3;
103:6; 103:20
**independent (8)**
80:13; 80:18; 81:11;
86:11; 88:5; 90:8;
90:23; 106:14
**indicate (4)**
89:5; 89:7; 89:9;
90:17
**indicated (3)**
95:16; 107:14; 108:3
**indicating (6)**
81:19; 81:24; 94:3;
96:11; 96:23; 97:15
**indication (1)**

83:13
**Indiscernible (3)**
94:19; 96:5; 96:22
**indiscernible (7)**
82:15; 89:18; 92:5;
94:24; 97:18; 98:18;
115:16
**Individual (4)**
104:7; 104:9; 104:9;
104:12
**information (9)**
81:16; 95:19; 100:20;
105:7; 105:8; 108:4;
108:20; 110:25;
115:18
**informed (2)**
106:5; 107:18
**initiate (1)**
86:13
**Injury (2)**
77:18; 77:21
**insufficiency (2)**
85:10; 93:1
**insufficient (1)**
85:13
**integral (1)**
83:16
**Intellectual (1)**
104:7
**Intelligence (1)**
104:10
**intent (3)**
80:18; 89:7; 90:15
**interference (3)**
90:2; 107:4; 110:6
**interim (12)**
81:6; 81:14; 83:13;
83:19; 83:20; 90:24;
91:8; 92:21; 93:5;
93:5; 99:3; 115:24
**Interposing (23)**
83:24; 84:4; 86:25;
88:2; 88:7; 89:2;
89:17; 90:1; 93:20;
94:18; 94:20; 95:12;
95:14; 96:4; 96:20;
97:13; 100:23;
103:16; 107:5;
107:21; 108:10;
112:5; 113:13
**interrupt (2)**
79:15; 94:21
**interview (1)**
105:18; 105:21
**into (5)**
82:18; 94:22; 95:2;
113:6; 113:8
**introduce (2)**
100:13; 113:1
**Inventory (1)**
109:2
**IQ (1)**
103:1
**issue (9)**

85:22; 87:2; 91:14;
92:7; 97:21; 98:5;
98:25; 99:16; 99:16
**issues (7)**
86:4; 86:4; 91:20;
95:3; 97:12; 97:20;
98:24

### J

**January (1)**
91:15
**job (2)**
96:6; 102:20
**joining (1)**
100:10
**J⬛⬛⬛ (6)**
77:3; 100:3; 101:9;
103:23; 104:1; 104:1
**juncture (1)**
89:12
**June (4)**
78:19; 79:6; 91:13;
91:22
**jurisdiction (1)**
80:7

### K

**K-H-A-N (1)**
77:17
**keep (1)**
117:10
**kept (2)**
98:18; 98:19
**Khan (4)**
77:17; 100:12;
100:24; 102:1
**KHAN (47)**
77:16; 83:24; 84:2;
84:5; 86:16; 86:19;
86:25; 88:1; 88:4;
88:8; 88:24; 89:17;
90:1; 94:18; 100:14;
100:18; 100:25;
101:3; 102:2; 102:7;
102:10; 102:13;
102:17; 102:23;
103:13; 103:22;
104:3; 104:16;
104:23; 105:9;
105:24; 106:7;
106:13; 106:17;
106:24; 113:4;
113:13; 113:17;
113:21; 113:24;
115:2; 115:8; 115:10;
115:22; 116:6;
117:14; 117:19
**kind (2)**
84:8; 84:24
**knowledge (1)**
107:25
**known (1)**
84:19

## L

**Labor (1)**
82:7
**lack (1)**
82:13
**lacks (1)**
80:7
**last (6)**
77:20; 84:11; 96:24;
97:1; 97:19; 98:8
**late (4)**
93:2; 98:11; 98:12;
100:10
**law (3)**
85:21; 90:16; 116:25
**learn (1)**
90:22
**learning (2)**
86:23; 91:17
**least (1)**
84:20
**leeway (1)**
81:8
**legal (2)**
80:3; 87:16
**license (2)**
112:2; 112:7
**limited (3)**
91:22; 97:12; 98:24
**LINDSAY (1)**
100:16
**Lindsay (2)**
100:5; 100:16
**line (3)**
82:23; 99:20; 99:21
**list (1)**
116:22
**listed (2)**
108:25; 110:14
**litigate (1)**
86:21
**little (1)**
100:10
**located (1)**
102:8
**long (2)**
84:25; 102:10
**longstanding (1)**
91:3
**look (6)**
82:18; 83:1; 95:18;
111:10; 116:7; 116:8
**looking (5)**
98:3; 98:13; 100:4;
115:25; 117:14
**looks (1)**
117:15

## M

**making (6)**
79:8; 79:25; 96:5;
96:8; 97:2; 111:2

**many (4)**
103:13; 105:11;
105:11; 111:19
**March (8)**
78:3; 78:13; 78:17;
79:6; 85:19; 91:13;
91:22; 99:1
**mark (2)**
77:8; 77:14
**marked (3)**
111:22; 112:12;
112:23
**materially (1)**
78:4
**mathematics (1)**
103:8
**matter (21)**
79:23; 80:1; 80:3;
80:14; 80:23; 81:13;
83:5; 91:4; 91:5;
93:12; 94:7; 94:15;
95:9; 96:13; 96:17;
96:21; 96:21; 96:25;
97:5; 97:24; 116:2
**may (10)**
78:16; 78:24; 82:21;
83:25; 92:9; 92:11;
102:3; 103:18;
108:23; 113:16
**maybe (4)**
88:23; 92:11; 95:5;
98:18
**mean (3)**
84:22; 85:1; 86:25
**Meanwhile (1)**
111:9
**measure (4)**
103:2; 103:10;
103:11; 105:20
**memorandum (4)**
85:7; 85:21; 87:17;
116:25
**memory (1)**
103:4
**mentioned (2)**
95:6; 115:24
**merits (3)**
84:8; 91:10; 91:10
**met (1)**
92:1
**method (2)**
78:9; 91:17
**mid-March (1)**
78:1
**might (2)**
86:11; 88:21
**minute (1)**
100:24
**minutes (1)**
115:5
**missed (2)**
79:21; 98:3; 98:4;
115:25
**mixed (1)**

82:21
**moment (2)**
83:1; 106:25
**month (3)**
89:1; 114:3; 114:4
**months (2)**
80:24; 84:11
**moot (3)**
80:10; 86:1; 99:9
**more (1)**
87:16
**most (1)**
103:11
**motion (2)**
79:25; 85:12
**move (1)**
79:23
**moving (1)**
97:24
**much (5)**
93:2; 98:7; 98:20;
107:12; 114:22
**must (3)**
79:21; 98:23; 116:21
**mutually (3)**
97:10; 116:3; 116:13

## N

**name (2)**
77:20; 100:15
**necessarily (1)**
90:14
**need (6)**
87:24; 89:4; 90:4;
90:6; 92:22; 105:12
**Needs (1)**
109:1
**needs (2)**
92:2; 110:24
**neuropsychological (3)**
102:22; 103:19;
103:20
**neuropsychologist (3)**
102:5; 102:16; 102:18
**neutral (1)**
116:1
**nevertheless (2)**
86:4; 92:18
**New (3)**
102:9; 106:17; 112:10
**new (1)**
95:23
**next (13)**
83:12; 85:6; 86:12;
86:15; 88:4; 88:6;
88:14; 88:23; 92:20;
93:13; 114:4; 114:5;
115:1
**nobody (1)**
95:1
**nonavailability (1)**
98:15
**note (2)**

79:9; 114:14
**noted (1)**
84:25
**notes (2)**
81:4; 108:12
**notice (4)**
82:24; 84:23; 92:9;
105:7
**notified (1)**
80:15
**November (1)**
77:6
**number (6)**
77:3; 80:2; 80:24;
81:22; 81:22; 95:7

## O

**o'clock (3)**
117:8; 117:9; 117:18
**objection (1)**
84:25
**objective (1)**
105:20
**observation (2)**
83:8; 85:9
**Obviously (1)**
97:20
**obviously (3)**
81:12; 87:10; 94:2
**occur (2)**
90:9; 91:18
**occurred (2)**
78:16; 78:24
**occurring (1)**
81:3
**off (4)**
95:25; 99:23; 114:20;
116:8
**OFF (2)**
99:25; 116:10
**offer (2)**
81:20; 94:4
**offered (1)**
94:8
**office (1)**
114:14
**OFFICER (72)**
77:2; 77:13; 77:23;
79:14; 79:20; 82:9;
84:1; 84:4; 85:3;
86:17; 86:24; 87:1;
87:20; 88:2; 88:7;
88:17; 89:2; 89:21;
89:24; 91:6; 93:21;
93:25; 94:20; 95:12;
95:14; 95:22; 96:16;
96:20; 97:4; 97:17;
98:1; 99:21; 100:2;
100:23; 101:1; 101:4;
101:8; 101:12;
101:16; 101:20;
101:25; 107:3; 107:7;
111:8; 111:12;
111:16; 111:19;

111:24; 112:3;
112:6; 112:9;
112:14; 112:16;
112:19; 112:25;
113:5; 113:9;
113:11; 113:15;
113:25; 114:8;
114:17; 114:25;
115:6; 115:9;
115:19; 115:23;
116:7; 116:12;
117:10; 117:17;
117:20
**officer (6)**
80:7; 80:24; 81:2;
81:5; 87:11; 90:12
**official (1)**
102:13
**often (1)**
103:11
**old (2)**
104:1; 104:3
**once (4)**
91:25; 93:8; 94:15;
95:6
**One (1)**
101:5
**one (7)**
80:13; 83:12; 85:9;
87:23; 94:21; 106:25;
114:15
**only (8)**
83:6; 85:23; 91:2;
92:7; 98:6; 108:24;
109:7; 110:18
**Only (1)**
114:13
**onus (2)**
78:11; 92:8; 93:15;
99:18
**open (3)**
91:25; 95:17; 117:15
**opened (1)**
92:10
**opinion (1)**
109:12
**opportunity (5)**
90:22; 97:22; 108:11;
108:22; 109:17
**option (2)**
91:17; 91:19
**oral (1)**
79:25
**order (6)**
81:6; 81:15; 86:3;
93:3; 105:12; 109:12
**ordered (2)**
92:23; 114:2
**originally (1)**
95:10
**OT (1)**
110:2
**Otherwise (1)**
82:17

**out (5)**
81:3; 89:8; 95:6;
97:21; 114:14
**outside (1)**
109:5
**over (3)**
78:9; 100:20; 103:19
**owner (1)**
102:15

**P**

**packet (1)**
108:3
**page (1)**
108:14
**pages (3)**
108:13; 111:19;
111:21
**paid (6)**
106:18; 106:19;
106:22; 107:15;
107:17; 107:20
**pandemic (2)**
78:3; 85:19
**parent (13)**
78:6; 80:11; 81:8;
81:10; 83:17; 89:8;
89:16; 92:4; 99:5;
99:13; 100:7; 109:17;
109:20
**Parent (12)**
77:14; 78:14; 78:20;
82:18; 86:10; 89:22;
90:7; 93:7; 110:8;
113:1; 113:5; 114:25
**parent's (3)**
80:5; 80:8; 80:9
**Parent's (12)**
78:25; 83:21; 85:23;
86:6; 87:8; 88:3;
93:14; 95:19; 100:4;
101:13; 106:1; 107:19
**parents (2)**
77:25; 78:2
**Parents (9)**
77:17; 77:22; 82:24;
84:20; 88:19; 89:3;
98:11; 116:19; 117:12
**part (5)**
83:16; 83:18; 94:25
**participate (1)**
94:6
**particular (2)**
83:23; 93:11
**parties (2)**
89:14; 116:21
**past (2)**
106:18; 106:23
**Pause (1)**
115:7
**per (1)**
100:19
**perform (2)**
109:22; 109:23

**performed (1)**
109:25
**perhaps (1)**
109:17
**period (7)**
78:17; 79:6; 83:3;
86:14; 91:13; 91:23;
99:1
**phone (1)**
78:9
**place (2)**
85:20; 95:1
**placed (1)**
86:23
**placement (3)**
82:1; 87:7; 87:10
**placements (1)**
87:15
**plan (1)**
86:23
**Please (3)**
79:9; 86:18; 94:22
**please (11)**
77:8; 86:17; 87:22;
88:3; 90:5; 99:24;
100:12; 100:15;
100:22; 102:23; 115:5
**PLUNKETT (56)**
100:16; 101:7;
101:11; 101:15;
101:19; 101:24;
102:4; 102:9; 102:12;
102:15; 102:19;
102:25; 103:16;
103:25; 104:4;
104:19; 105:2;
105:14; 106:1;
106:10; 106:16;
106:19; 107:11;
107:18; 107:23;
108:1; 108:6; 108:11;
108:18; 108:24;
109:9; 109:14;
109:19; 110:1; 110:5;
110:8; 110:13;
110:21; 111:4;
111:11; 111:14;
111:18; 111:21;
112:1; 112:5; 112:7;
112:10; 112:15;
112:18; 112:21;
113:10; 113:20;
113:23; 114:6;
114:11; 114:22
**Plunkett (14)**
100:5; 100:9; 100:17;
100:19; 101:2; 101:5;
102:2; 107:10; 111:9;
111:14; 113:9;
113:17; 114:1; 114:19
**pm (1)**
117:23
**point (6)**
84:17; 89:11; 90:4;
90:5; 90:10; 99:5

**position (6)**
79:4; 84:14; 87:14;
88:19; 88:20; 102:14
**possession (1)**
104:25
**possible (2)**
88:23; 114:2
**potential (1)**
113:19
**potentially (1)**
105:25
**practice (5)**
102:6; 102:8; 102:11;
102:14; 112:9
**practitioner (1)**
102:16
**pre-hearing (1)**
91:11; 116:25
**precedent (1)**
85:16
**prefer (2)**
117:4; 117:13
**prepare (2)**
87:16; 87:18
**prepared (2)**
88:20; 94:8
**present (7)**
77:7; 83:7; 100:5;
106:8; 116:18;
116:19; 117:1
**pretty (1)**
117:15
**previous (6)**
90:18; 93:6; 96:17;
97:8; 97:9; 115:20
**primary (2)**
102:20; 102:20
**prior (6)**
98:19; 101:14;
108:22; 110:17;
116:23; 117:1
**private (3)**
102:6; 102:7; 102:11
**privy (1)**
90:19
**proceeding (1)**
117:23
**process (26)**
80:11; 80:15; 80:16;
80:19; 81:1; 81:12;
81:18; 83:16; 85:13;
86:8; 86:9; 86:10;
86:13; 86:14; 87:7;
88:18; 89:13; 90:10;
90:12; 90:14; 90:21;
97:23; 99:8; 99:13;
105:3; 110:18
**processing (1)**
103:5
**production (1)**
96:1
**program (1)**
94:8
**proof (4)**

**78:11; 92:8; 93:15;**
99:18
**proposing (1)**
104:14
**prove (1)**
93:14
**provide (9)**
94:14; 106:12;
110:22; 114:9; 116:25
**provided (9)**
78:12; 91:16; 92:1;
93:17; 101:13; 108:3;
108:8; 109:4; 110:9
**providing (2)**
93:17; 116:22
**psycho-ed (2)**
109:22; 109:23
**psychoeducational (10)**
102:21; 102:24;
102:25; 103:6;
103:14; 103:17;
103:21; 105:17;
106:15; 110:23
**psychologist (1)**
112:10
**PT (1)**
110:3
**public (1)**
81:20
**purposes (1)**
81:7
**pursuant (1)**
81:6
**put (3)**
81:2; 83:22; 85:8;
94:8; 98:13; 98:16
**putting (3)**
94:3; 94:12; 94:14

**Q**

**qualifications (1)**
113:19
**quickly (4)**
104:20; 104:22;
108:6; 108:13

**R**

**R-O-U-S-S-E-A-U (1)**
77:20
**R███ (4)**
77:3; 100:3; 101:9;
103:23
**rate (2)**
106:14; 106:18
**rather (2)**
114:3; 114:5
**reach (1)**
89:8
**read (4)**
97:22; 97:23; 108:11;
108:13
**reading (2)**
103:8; 104:20;

**104:22; 108:4**
**ready (5)**
84:21; 88:5; 88:11;
88:15; 114:13
**realizing (1)**
82:22
**really (3)**
83:20; 88:9; 91:21
**reason (2)**
92:13; 97:16
**receive (1)**
104:11
**received (3)**
101:15; 104:19;
104:21
**record (22)**
77:15; 79:8; 82:10;
84:2; 84:20; 85:1;
85:4; 85:8; 85:21;
95:17; 96:5; 96:7;
96:8; 96:12; 98:14;
98:16; 99:23; 100:3;
100:12; 100:15;
116:8; 116:13
**RECORD (4)**
99:25; 100:1; 116:10;
116:11
**records (1)**
90:20
**redirect (2)**
113:14; 113:16
**refer (1)**
101:17
**regarding (2)**
104:25; 109:8
**regression (2)**
78:24; 99:15
**regulations (1)**
80:15
**Regulations (1)**
81:7
**relevant (1)**
96:1
**relief (14)**
80:8; 80:9; 80:12;
81:11; 81:14; 83:13;
83:19; 86:3; 90:25;
91:1; 91:8; 92:21;
93:5; 100:7
**remain (2)**
86:4; 86:5
**remains (1)**
99:10
**remedies (3)**
99:7; 99:9; 99:14
**remedy (1)**
99:10
**remember (1)**
115:20
**remote (2)**
86:23; 94:6
**reopen (2)**
80:9; 97:3
**reopened (6)**

80:5; 80:10; 82:6;
89:6; 91:15; 91:23
reopening (2)
78:7; 96:15
reopens (2)
95:9; 96:11
report (3)
106:12; 114:9; 114:13
representation (2)
97:2; 111:2
representative (4)
77:11; 79:9; 90:18;
96:19
representing (1)
96:8
request (17)
78:25; 79:17; 80:5;
80:8; 80:17; 82:19;
82:21; 83:2; 85:5;
86:11; 88:18; 88:22;
92:10; 97:14; 98:2;
98:9; 115:25
requested (5)
79:11; 80:8; 80:9;
87:17; 110:2
requesting (3)
90:21; 110:19; 116:24
requests (2)
85:25; 86:2
requires (2)
110:20; 111:2
respect (6)
78:21; 79:5; 85:16;
97:14; 98:14; 99:19
respectfully (1)
84:15
respond (3)
80:23; 90:9; 93:23
responded (1)
80:25
restriction (1)
114:15
rests (1)
78:11
resulted (1)
78:5
results (1)
106:9
resume (2)
111:15; 111:17
retained (1)
113:21
returns (2)
95:8; 95:10
review (3)
90:20; 108:5; 108:22
reviewed (1)
104:16
right (5)
91:21; 94:24; 115:3;
115:13; 117:15
Right (2)
98:6; 115:22
Rights (2)

77:18; 77:21
room (1)
101:6
ROUSSEAU (1)
77:19
Rousseau (2)
77:20; 102:1
rule (1)
116:22

S

same (3)
88:22; 114:10; 114:11
Sarah (1)
77:17
SARAH (1)
77:16
save (1)
115:14
saying (3)
89:20; 97:17; 105:10
Scale (4)
103:12; 104:7; 104:9;
104:15
scan (1)
108:16
scanned (1)
108:7
schedule (2)
105:25; 117:7
scheduled (2)
98:7; 115:21
school (21)
78:2; 78:13; 78:18;
79:18; 80:10; 80:15;
80:17; 81:3; 81:21;
82:13; 82:14; 88:25;
89:6; 95:9; 95:20;
95:20; 96:11; 96:12;
99:1; 105:4; 105:6
School (1)
83:4
schools (16)
78:7; 80:5; 80:10;
80:20; 80:21; 82:5;
84:18; 91:15; 91:23;
91:25; 92:16; 95:17;
95:25; 96:9; 96:15;
97:2
second (6)
83:8; 88:20; 88:21;
92:3; 94:21; 116:15
seek (6)
80:18; 80:20; 81:16;
90:7; 90:10; 90:11
seeking (13)
78:14; 78:22; 81:9;
81:10; 81:15; 81:18;
83:15; 86:5; 92:4;
99:6; 99:9; 99:10;
100:8
seemed (1)
88:9
seems (2)

86:20; 115:10
send (1)
95:18
sent (4)
98:2; 98:10; 98:11;
104:17
September (19)
82:7; 82:14; 83:4;
83:11; 89:6; 95:9;
95:11; 96:11; 96:14;
97:3; 114:5; 114:7;
114:16; 116:9;
116:14; 116:14;
116:15; 116:17; 117:2
services (6)
78:4; 78:7; 78:12;
92:1; 93:16; 94:6
session (1)
84:18
several (3)
85:25; 92:14; 99:9
short (2)
85:7; 85:21
shortly (1)
104:19
show (2)
78:12; 93:16
sides (1)
116:13
signature (1)
112:17
similar (1)
82:12
simple (1)
99:16
simply (2)
96:7; 110:21
skip (1)
100:20
sole (1)
102:15
somebody (1)
95:25
soon (3)
88:22; 105:24; 106:8
sorry (4)
79:15; 83:24; 89:19;
92:8
sort (1)
89:11
sorted (1)
97:21
sought (2)
86:9; 91:2
Sounds (1)
117:19
sounds (2)
81:17; 97:21
spatial (1)
103:4
speak (5)
81:23; 89:22; 90:22;
101:22; 109:17
Specifically (1)

80:2
specifically (2)
81:23; 103:22
speech (1)
110:2
speed (1)
103:5
spelled (1)
77:20
spoken (1)
109:19
stalled (1)
80:23; 81:12
stand (1)
79:1
standard (3)
106:20; 107:20; 109:3
start (2)
88:25; 106:7
started (1)
85:19
state (2)
82:10; 100:15
State (2)
81:7; 112:11
statewide (1)
81:25
statute (1)
98:23
steps (1)
93:10
still (2)
104:4; 115:4
stonewalled (1)
84:9
Student (1)
109:1
student (36)
77:3; 77:4; 78:1;
78:4; 78:6; 78:8;
78:10; 78:12; 78:17;
78:22; 78:24; 79:7;
85:18; 91:16; 92:2;
94:4; 94:5; 94:9;
94:16; 99:15; 101:9;
103:23; 105:1;
105:10; 105:15;
105:25; 108:17;
108:19; 108:23;
109:13; 109:18;
109:25; 110:2;
110:18; 110:20; 111:2
student's (8)
103:7; 103:9; 104:13;
104:17; 105:3; 105:4;
105:19; 109:1
Student's (4)
111:22; 112:12;
112:23; 113:7
submitted (1)
84:22
suggest (1)
92:25
support (1)

90:16
supported (1)
87:14
supposed (1)
97:7
sure (2)
99:6; 115:3
Sure (8)
85:3; 85:3; 87:20;
87:25; 89:5; 113:15;
113:15; 115:6
swear (1)
101:1; 101:21; 101:22
system (1)
90:11

T

talking (1)
94:16
tasks (1)
109:3
teachers (1)
82:15
team (1)
90:22
telephone (2)
91:16; 91:17
ten (1)
84:10
ten-day (1)
105:7
terms (4)
79:24; 81:19; 90:24;
94:1
Test (1)
104:12
test (1)
114:9
testify (3)
100:4; 113:18; 115:17
testifying (3)
101:6; 101:9; 101:18
testimony (5)
100:6; 107:2; 110:22;
111:3; 115:14
testing (2)
103:1; 103:2
tests (1)
105:9
thereafter (1)
91:25
therefore (1)
83:17
thinking (1)
99:22
though (4)
81:17; 90:4; 92:15;
100:10
thought (1)
82:12
three (5)
84:6; 93:10; 98:6;
98:8; 113:2

**timeline (1)**
114:8
**today (10)**
78:20; 83:9; 83:12;
84:13; 99:17; 107:10;
114:20; 115:18;
115:21; 117:21
**Today (1)**
98:9
**today's (1)**
83:10
**together (2)**
83:23; 116:4
**told (1)**
106:1
**tomorrow (2)**
115:17; 115:21
**total (2)**
103:15; 105:22
**touch (1)**
115:3
**transcript (1)**
97:23
**truth (2)**
101:22; 101:23
**trying (1)**
88:6
**two (15)**
77:14; 88:15; 88:23;
92:12; 92:24; 99:2;
101:5; 106:6; 106:11;
110:14; 113:14;
114:4; 114:5; 116:2;
116:13
**Two (2)**
93:4; 114:12
**typically (1)**
103:2

## U

**Um-hum (1)**
112:8
**unable (1)**
82:4
**unavailable (1)**
115:11
**unfortunately (1)**
115:10
**unilateral (4)**
82:1; 87:6; 87:9;
87:15
**unilaterally (1)**
86:22
**up (2)**
84:7; 110:24
**updated (1)**
110:3
**upon (5)**
80:12; 80:20; 86:3;
89:13; 91:3
**use (1)**
103:25
**used (1)**

103:11

## V

**vacation (2)**
95:7; 95:25
**VANDANA (1)**
77:2
**verbal (1)**
103:3
**via (2)**
91:16; 91:17
**Vineland (2)**
103:11; 104:15
**visual (1)**
103:4

## W

**wants (1)**
99:14
**Wechsler (3)**
104:7; 104:9; 104:11
**week (5)**
97:10; 106:3; 106:3;
106:4; 114:14
**weeks (5)**
106:6; 106:11; 114:4;
114:5; 114:12
**weight (3)**
78:15; 78:23; 91:5
**Whereupon (5)**
111:22; 112:12;
112:23; 113:7; 117:23
**WIAT-IV (1)**
104:11
**WISC-V (2)**
104:6; 104:8
**wish (2)**
113:1; 117:7
**wishes (2)**
91:12; 117:1
**within (5)**
91:23; 102:5; 103:7;
105:17; 106:6
**without (1)**
90:13
**witness (8)**
79:1; 88:10; 96:9;
100:13; 102:1; 111:7;
115:1; 115:11
**witnesses (23)**
78:20; 82:13; 83:3;
83:7; 83:22; 84:16;
84:19; 84:21; 84:21;
85:24; 92:14; 92:17;
93:13; 93:18; 96:2;
98:15; 99:17; 100:4;
115:21; 116:4; 116:5;
116:20; 116:23
**work (1)**
107:13
**working (1)**
103:4
**worldwide (1)**

81:25
**writing (1)**
103:8

## Y

**year (10)**
78:2; 78:13; 78:18;
84:7; 91:15; 95:20;
96:12; 99:1; 105:5;
105:6
**years (3)**
77:5; 104:1; 104:3
**York (3)**
102:9; 106:17; 112:10

# EXHIBIT 6

573

1                    DEPARTMENT OF EDUCATION
                              of the
2                         CITY OF NEW YORK

3
     ------------------------------X
4
     In the Matter of:
5
          S      J    DONOHUE              Case No.  185111
6
     ------------------------------X
7                                        EXPEDITED
                                         District # 2
8                                        131 Livingston Street
                                         Brooklyn, NY 11201
9
                                         Thursday
10                                       October 1, 2020

11          The above-entitled matter came on for hearing at
     9:10 a.m.
12

13   BEFORE:              JOHN FARAGO,
                          Impartial Hearing Officer
14

15   A P P E A R A N C E S:

16   For the Student:
       JOHN HENRY OLTHOFF, ESQ., Attorney (Via Telephone)
17     PATRICK DONOHUE, Parent (Via Telephone)

18
     For the Department of Education:
19     JAMES COUGHLIN, ESQ., Attorney (Via Telephone)
       MICHELLE LEFAIVRE, Assistant Principal (Via Telephone)
20

21

22

23

24

25

Exhibit 6: Page 1 of 159

574

1                               I N D E X
                                ---------
2
                                                            VOIR
3      WITNESSES:        DIRECT   CROSS REDIRECT   RECROSS DIRE

4      Michelle LeFaivre          589     628

5      Patrick Donohue            648     694,699   698

6

7                             E X H I B I T S

8      STUDENT           DESCRIPTION                I.D.   IN EV.

9      Q                 Affidavit of P.            582    582
                         Donohue, Undated, three
10                       pages

11
       DEPARTMENT OF
12     EDUCATION         DESCRIPTION                I.D.   IN EV.

13     30                Affidavit of M.            578    578
                         LeFaivre, 10/1/20, four
14                       pages

15
       IMPARTIAL
16     HEARING OFFICER   DESCRIPTION                I.D.   IN EV.

17     V                 Record review, 8/25/20,    581    581
                         15 pages
18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2               HEARING OFFICER JOHN FARAGO:   Good

3      morning.   My name's John Farago.   I'm impartial

4      hearing officer assigned to hear the matter of the

5      placement of S█████ J███ Donohue.   This is case

6      number 185111.   It's a continuation.   Today is

7      Thursday, October 1st, 2020.   It's now

8      approximately 9:10 a.m.

9               This hearing is being continued

10     telephonically by reason of the COVID-19 lockdown,

11     and so everybody's participating by telephone.   I'd

12     ask those who are the line presently to introduce

13     themselves, beginning with the District's

14     representative.

15               MR. JAMES COUGHLIN:   For the Department

16     of Education, Agency attorney, James Coughlin.

17     Good morning.

18               HEARING OFFICER FARAGO:   And the Family's

19     representative, lawyer?

20               MR. JOHN HENRY OLTHOFF:   Yes, good

21     morning.   John Henry Olthoff, Brain Injury Rights

22     Group, attorneys for the parent.

23               HEARING OFFICER FARAGO:   And the parent's

24     participating, as well.

25               MR. PATRICK DONOHUE:   Patrick --

1                    HEARING OFFICER FARAGO:  (Interposing) Go

2          ahead.

3                    MR. DONOHUE:  -- Donohue, S▆▆▆ J▆▆ 's

4          father.

5                    THE COURT REPORTER:  Excuse me, who was

6          John Henry, what is his last name.  I didn't get

7          his --

8                    HEARING OFFICER FARAGO:  (Interposing)

9          Olthoff.

10                   THE COURT REPORTER:  Spell your last

11         name, please.

12                   MR. OLTHOFF:  Yes, O as in Oscar, L as in

13         Lima, T as in tango, H as in hotel, O as in Oscar,

14         F as in foxtrot, F as in foxtrot.

15                   HEARING OFFICER FARAGO:  Thank you.

16                   MR. OLTHOFF:  Always happy to do the NATO

17         alphabet.

18                   HEARING OFFICER FARAGO:  Yeah, okay.

19         Interesting.  Does the NATO alphabet include

20         letters with accents and things like that that NATO

21         countries have?

22                   MR. OLTHOFF:  Not that I'm seeing, but

23         there is a separate international phonetic

24         alphabet, which I --

25                   HEARING OFFICER FARAGO:  (Interposing)

1    But you would think -- you could imagine people

2    spending weeks around a committee table trying to

3    deal with the facts with whether --

4              MR. OLTHOFF:  With M, Matilda or --

5              HEARING OFFICER FARAGO:  (Interposing)

6    Yeah, yeah, (indiscernible) over an E or a

7    different letter from an E without one.  Or whether

8    that's simply needs to be put as a dialectic mark.

9    Certainly, in Hungarian, they're treated as totally

10   separate letters, but anyway.

11             So here we are all back at the table.  It

12   is time for the District to call its final witness.

13   They have provided an affidavit to effectuate that.

14             MR. COUGHLIN: It wasn't signed, so we'll

15   have to swear the witness.

16             HEARING OFFICER FARAGO:  It's okay, no,

17   that's fine.  For these purposes, because we have

18   the witness available, they will, in fact, have the

19   opportunity to review it and attest to it.  At the

20   present moment, I'm going to admit it.

21             It is now Exhibit 30 that you've proposed

22   to put in.  It's four pages long.  It's dated

23   October 1st, 2020.  And it's the affidavit of

24   Assistant Principal Michelle Lefaivre, which I am

25   now going to admit, subject to subsequent

1       affirmation.

2                       (Whereupon Department of Education's

3       Exhibit 30 was marked and admitted into evidence.)

4                       HEARING OFFICER FARAGO:  Exhibit 29, did

5       we admit that on the previous day?

6                       MR. COUGHLIN: Yeah, so that was admitted,

7       I think, back in November, so --

8                       HEARING OFFICER FARAGO:  (Interposing)

9       Um-hum.

10                      MR. COUGHLIN: -- and then, there's

11      Exhibit 28 --

12                      HEARING OFFICER FARAGO:  (Interposing)

13      Okay.

14                      MR. COUGHLIN: -- which you entered into

15      evidence as one of your exhibits.

16                      HEARING OFFICER FARAGO:  Exhibit 28, yes,

17      right.  Well, no, what is that?

18                      MR. COUGHLIN: It's a two-page email --

19                      HEARING OFFICER FARAGO:  (Interposing)

20      Oh, the email, yes, right.  Got you, okay.  So let

21      me go here and -- so my Exhibit I was the recusal

22      motion, was that correct or?

23                      MR. COUGHLIN: I don't think there -- let

24      me bring -- I think I have the transcripts, let's

25      see.  Yours is a decision.  I is a decision in case

1    number 171539, which was 15 pages.
2                HEARING OFFICER FARAGO:  171539, yep.
3                MR. COUGHLIN: Yep, the second one was the
4    email dated June 18th, 2019, which was two pages.
5                HEARING OFFICER FARAGO:  June 18, 2019,
6    how many pages, three?
7                MR. COUGHLIN: It was two pages.
8                HEARING OFFICER FARAGO:  Two pages and --
9                MR. COUGHLIN:  (Interposing) There may
10   have been some other IHO exhibits that were
11   entered.  I just don't have all the transcripts up
12   right now.
13               HEARING OFFICER FARAGO:  Okay.  No
14   problem.  And at the end of that, of course,
15   there's the record review --
16               MR. COUGHLIN:  (Interposing) Yeah.
17               HEARING OFFICER FARAGO:  -- which is the
18   reason I was trying to figure out what the most --
19   what the final IHO exhibit was.
20               But after that, let's make sure that we
21   add -- let's see -- we might as well do this right
22   if we're going to do it.  Okay.  I and II are the
23   ones you just described.
24               That's on November 6 -- no, that's on
25   November 5th.  Then, on November 6th, we added

1           Family Exhibit P as in Peter.  Right, on November

2           4th, we admitted Exhibits A through O, and the

3           District's Exhibits 1 through 27.  And then --

4                       MR. COUGHLIN:  (Interposing) I have the

5           November 8th open now.

6                       HEARING OFFICER FARAGO:  All right, hang

7           on.

8                       MR. COUGHLIN: And that's when the

9           Department's 19 was admitted into evidence -- I

10          mean, 29, I'm sorry.  And then Hearing Officer's

11          Exhibit III, which is the transcript --

12                      HEARING OFFICER FARAGO:  (Interposing) So

13          first we're doing -- we've got P in on November 6,

14          and now we go to November 8.  As you say -- at

15          which point we admitted District 29 and Hearing

16          Officer's III and IV, right

17                      MR. COUGHLIN: Yes, yes.

18                      HEARING OFFICER FARAGO:  And then, on

19          February 10th, we convened and no exhibits, and

20          September 11th, we convened and no exhibits.  So I

21          believe that there -- I don't know, no, I think

22          that's it.  So we were up to IV, and the record

23          review needs to be admitted as V.  Okay.  And that

24          is dated -- let's find it --

25                      So that is a 15-page document dated

```
 1            August 25th, and that's now admitted as V.
 2                     (Whereupon Impartial Hearing Officer's
 3            Exhibit V was marked and admitted into evidence.)
 4                     HEARING OFFICER FARAGO:   Okay.  I think I
 5            should be able to resurrect my notes in a way that
 6            the hearing office can upload everything properly
 7            for the record.
 8                     So we are now adding, as I say, we have
 9            Exhibit 29 in the record already.  We're now adding
10            the four-page affidavit, Exhibit 30, that was just
11            described.
12                     The Family, in addition, has submitted a
13            three-page affidavit which it wishes to denominate
14            as Exhibit --
15                     Mr. Olthoff?
16                     MR. OLTHOFF:   The -- Your Honor just said
17            that up to P was admitted for the Parent because I
18            don't have the transcripts open.  I can --
19                     HEARING OFFICER FARAGO:   (Interposing)
20            Yes.
21                     MR. OLTHOFF:   -- open them and double
22            check.  So this would be --
23                     HEARING OFFICER FARAGO:   (Interposing)
24            (Indiscernible) what I have.
25                     MR. OLTHOFF:   Then, this would be Q.
```

1               HEARING OFFICER FARAGO:  Okay.  So you're

2       going to provide for me an updated cover sheet in

3       Microsoft Word and as a PDF, including everything A

4       through Q --

5               MR. OLTHOFF:  (Interposing) Yes.

6               HEARING OFFICER FARAGO:  -- and an

7       updated copy of this affidavit denominated Exhibit

8       Q and numbered accordingly, all right?

9               MR. OLTHOFF:  Yes.

10              HEARING OFFICER FARAGO:  Paginated and

11      numbered, so then, I'm going to admit Exhibit Q, an

12      affidavit of Patrick Donohue, three pages long,

13      undated as of its submission.

14              (Whereupon Student's Exhibit Q was marked

15      and admitted into evidence.)

16              HEARING OFFICER FARAGO:  Mr. Coughlin,

17      you had an objection to the substance of paragraph

18      12, as I understand it.

19              MR. COUGHLIN:  Yes, sir.  According to

20      F.O. versus New York City Department of Education,

21      976F sup 2D 499, a subsequent year's IEP cannot be

22      submitted into evidence or considered because it

23      was not in existence at the time of the IEP in

24      question was developed.

25              Paragraph 12 indicates what the CSE

1          recommended for the 2020/2021 school year, and

2          because that document or IEP was not developed to

3          the IEP at issue in this case, that IEP should not

4          be considered with respect to determine whether or

5          not the recommendations in the IEP for the

6          2019/2020 school year were appropriate.

7                    HEARING OFFICER FARAGO:  I -- if we want

8          to step back from that just one step, my -- I'm

9          going to construe that, correct me if I'm wrong, an

10         argument to the effect that -- I guess the first

11         question I have is if I look at this affidavit,

12         the -- and if I look at paragraph 12, it states

13         that that IEP was developed on April 22nd, 2020,

14         and has an implementation date of May 7th, 2020.

15                    So the first question I have is are you

16         disputing the accuracy of that description?

17                    MR. COUGHLIN:  I'm not disputing the

18         accuracy of that description.  I am just --

19                    HEARING OFFICER FARAGO:  (Interposing)

20         Okay.  Okay.  One step at a time, one step at a

21         time, I'm just teasing it apart so that we have

22         precision.

23                    So if it's factually accurate, then, it

24         seems to me that that assertion raises a matter of

25         controversy, legitimate controversy with the

1    District's point of view being that that is -- that

2    can be characterized for the legal purposes you

3    just described as an IEP developed in a subsequent

4    year, which may not -- which in your view, legally,

5    may not be admitted, and which the family, I

6    gather, believes was developed within the year in

7    question and to be implemented within the year in

8    question.

9              Is that correct, Mr. Olthoff?

10             MR. OLTHOFF:  Yes, Your Honor.  When

11    parent saw the implementation date, and of course,

12    parent had requested a reconvene in his ten-day

13    notice, so then, the CSE did reconvene during the

14    school year and created this IEP with an

15    implementation date during the '19/'20 school year.

16             HEARING OFFICER FARAGO:  Okay.  Well, I

17    don't want to litigate that particular question

18    right this second, but in order to litigate it, we

19    do need paragraph 12 in the document.

20             So I'm going to admit the document as is,

21    including paragraph  12, reserving judgement on the

22    substantive as to whether or not the content of

23    that paragraph is germane.

24             I note that on its face, of course, it

25    is.  It takes -- it's a report of a CSE review

Exhibit 6: Page 12 of 159

1          within the year over which I have jurisdiction in

2          this case, and the implementation date, as

3          allegedly agreed, was well within the period of

4          time under review in this case and constitutes a

5          CSE action, a proposed action, within the timeframe

6          I'm reviewing.

7                    And as such, would seem to me to be

8          totally admissible, but I'm certainly willing to

9          hear more argument about that from both sides later

10          this morning or subsequently in the hearing.  So

11          this document is now admitted.  It's a three-page

12          affidavit of Patrick Donohue, undated, and admitted

13          as Exhibit Q.

14                    Okay.  I think I have physically the

15          documents I need from the District and will get

16          them from the Family.  We have a second Family

17          witness who's not available until after 3:30 p.m.

18          Is she available today?

19                    MR. OLTHOFF:  Your Honor, the Parent

20          would be able to have Mr. Donohue, S    J    's

21          dad, about the iBrain program, so we believe that

22          Ms. Semm's testimony will not be necessary.  So we

23          would be able to close out this hearing this

24          morning.

25                    HEARING OFFICER FARAGO:  Let's hope so,

1              okay.  Certainly, Mr. Donohue stands in a distinct

2              relation to the nexus of the program and the child

3              as he is, in effect, the parent of each.

4                        And so perhaps, that'll work -- if the

5              District has no questions that it feels have gone

6              unanswered that could only be answered by somebody

7              else, and even then, this somebody else is probably

8              not Ms. Semm, maybe not Ms. Semm, since I gather

9              she's not working in the program any longer.

10                       Is that correct? Mr. Olthoff?

11                       MR. OLTHOFF:  She is available to

12             testify, but I think she's --

13                       HEARING OFFICER FARAGO:  (Interposing)

14             Right.

15                       MR. OLTHOFF:  -- not on site.

16                       HEARING OFFICER FARAGO:  But depending on

17             what the District's questions might be, they might

18             want to be asking them of somebody who's currently

19             there.  But who knows? Let's see what they are,

20             and it'll unfold as it unfolds.

21                       Shall we get Ms. Lefaivre available, Mr.

22             Coughlin?

23                       MR. COUGHLIN:  Yes, I'm sending the email

24             now.

25                       HEARING OFFICER FARAGO:  Thank you.

Exhibit 6: Page 14 of 159

1                    Is Ms. Semm these days in the City?  Is
2            she in our time zone?
3                    MR. OLTHOFF:  I believe so.
4                    HEARING OFFICER FARAGO:  Yeah?
5                    MR. OLTHOFF:  Yeah.
6                    HEARING OFFICER FARAGO:  Okay.  Okay.
7            Let's go off the record for a second.  I have a
8            question to ask of --
9                    THE COURT REPORTER:  Off the record.
10                   (OFF THE RECORD)
11                   (ON THE RECORD)
12                   THE COURT REPORTER:  Back on the record.
13                   HEARING OFFICER FARAGO:  Thank you.  So
14           we have been joined by our witness.
15                   If you can introduce yourself for the
16           record, please?
17                   MS. MICHELLE LEFAIVRE:  Hi, Michelle
18           LeFaivre, assistant principal at P79M.
19                   HEARING OFFICER FARAGO:  Great, thank
20           you.  And the spelling that I have has two L's in
21           your first name.
22                   MS. LEFAIVRE:  Correct.
23                   HEARING OFFICER FARAGO:  Okay.  And your
24           last name is L-E-F-A-I-V-R-E, right?
25                   MS. LEFAIVRE:  Correct.

1            HEARING OFFICER FARAGO:  Good, I have it
2       all.  So in addition to that, I have -- well, first
3       of all, let me swear you in.  If you would raise
4       your hand, do you swear or affirm that the
5       testimony you will give is the truth, the whole
6       truth, and nothing but the truth?
7            MS. LEFAIVRE:  I do.
8            HEARING OFFICER FARAGO:  Thank you.  I
9       have a document that we've labeled, or Mr. Coughlin
10      has labeled Exhibit 30.  It's a four-page-long
11      document.  It's not signed or dated, but it has a
12      signature line with your name at the end of it, and
13      it has 19 numbered paragraphs.
14            Do you have a copy of a document that
15      looks like that?
16            MS. LEFAIVRE:  I do, yes.
17            HEARING OFFICER FARAGO:  Great.  Could
18      you scan the 19 paragraphs and just see if there's
19      anything you want to change or correct or fix typos
20      or modify in any way?  Or if you've done --
21            MS. LEFAIVRE:  (Interposing) It is -- it
22      is correct, yes.
23            HEARING OFFICER FARAGO:  Okay.  Thank
24      you.  Then, on that basis, to the best of your
25      knowledge or recollection, is everything in this

1        document accurate?

2                  MS. LEFAIVRE:  It is.

3                  HEARING OFFICER FARAGO:  That being said,

4        does it constitute your direct testimony on behalf

5        or in this case about S    J     Donohue?

6                  MS. LEFAIVRE:  Yes, it does.

7                  HEARING OFFICER FARAGO:  Okay.  Then,

8        that, we have admitted into evidence as your direct

9        testimony.  What's left is simply cross-examination

10       by Mr. Olthoff.

11                 And Mr. Olthoff, she's your witness.

12                 MR. OLTHOFF:  Thank you, Your Honor.

13                 And good morning, Ms. Lefaivre.  This --

14       I'm the attorney for the Parent and I'm going to

15       ask you some questions about your affidavit.

16                 MS. LEFAIVRE:  Okay.

17                 MR. OLTHOFF:  If there any objections,

18       just please hold and wait until they're resolved

19       before you answer.

20                 MS. LEFAIVRE:  Understood.

21                 MR. OLTHOFF:  Okay.  So I'm looking at

22       your affidavit.  You're the AP at the Horan School,

23       correct?

24                 MS. LEFAIVRE:  Correct.

25                 MR. OLTHOFF:  And is this building -- is

```
 1                your school kind of standalone or is it part of
 2                another school or is there another school sharing
 3                the building?
 4                          MS. LEFAIVRE:  We -- no, we are a self-
 5                contained building, so we're the only school in
 6                this building.
 7                          MR. OLTHOFF:  Okay.  And does the
 8                building have central air-conditioning?
 9                          MS. LEFAIVRE:  No, we do not have central
10                air-conditioning.  We have window units in all of
11                the classrooms.
12                          MR. OLTHOFF:  Okay.  And how many
13                students are there total at Horan School?
14                          MS. LEFAIVRE:  Approximately 280.
15                          MR. OLTHOFF:  Okay.  And in the third
16                paragraph of your affidavit, you note that you have
17                taught students with similar learning profiles as
18                S█████ J█████ --
19                          MS. LEFAIVRE:  (Interposing) Correct.
20                          MR. OLTHOFF:  -- can you give me, like,
21                an approximation -- approximately how many students
22                you've taught that you believe have similar
23                learning profiles?
24                          MS. LEFAIVRE:  I taught a 12:1:4 or
25                12:1:3-plus 1 class for about -- for six years.  So
```

1       over the course of those six years had six

2       different classes.  I can't give an exact number of

3       students.  Some students I had for multiple years,

4       but it was a total of six years that I taught that

5       class.

6                   MR. OLTHOFF:  And so how would you

7       describe from your review of the record, how would

8       you describe S███  Jane's learning profile?

9                   MS. LEFAIVRE:  So based on what I've --

10      I've looked at in the IEP, seems that S███  J███ ,

11      like many of the students that -- that I taught,

12      are -- she's -- she's nonverbal, so requiring

13      communication supports, nonambulatory, so requiring

14      physical assistance in the classroom, as well,

15      using, you know, with -- in terms of fine -- fine

16      and fine motor skills.

17                  So in terms of the students that -- that

18      I've taught and was familiar with, you know, using

19      communication supports including, like, adaptive

20      communication devices, visual aids, other physical

21      supports, wheelchairs, and other equipment such as

22      that.

23                  MR. OLTHOFF:  Have you taught or are you

24      familiar with the students who are classified with

25      traumatic brain injury?

1              MS. LEFAIVRE:  Yes.

2              MR. OLTHOFF:  Okay.  And are you -- how

3    many students -- during the '19/'20 school year,

4    which is the year we're talking about, how many

5    students at your school would have been classified

6    with traumatic brain injury?

7              MS. LEFAIVRE:  That, I don't have an

8    exact answer to.

9              MR. OLTHOFF:  Okay.  Can you say if there

10   were any?

11             MS. LEFAIVRE:  I cannot say for sure if

12   there were any with that primary classification.  I

13   don't have those IEPs in front of me.

14             MR. OLTHOFF:  Okay.  And I'm looking at

15   paragraph 6 of your affidavit, there's the --

16             MS. LEFAIVRE:  (Interposing) Um-hum.

17             MR. OLTHOFF:  -- types of special ed

18   classes --

19             MS. LEFAIVRE:  (Interposing) Um-hum.

20             MR. OLTHOFF:  -- at your school.  What --

21   how many students attended the 6:1:1 class?

22             MS. LEFAIVRE:  I don't know the exact

23   number of students that attended the 6:1:1 class

24   last year.  I can --

25             MR. OLTHOFF:  (Interposing) Well, how

1    many 6:1:1 classes are there?

2                    MS. LEFAIVRE:  I was going to say I can

3        tell you -- I can tell you that.

4                    MR. OLTHOFF:  Okay.

5                    MS. LEFAIVRE:  So for the -- the '19/'20

6        school year, there were 14 6:1:1 classes.

7                    MR. OLTHOFF:  Okay.  And what -- is there

8        a general profile of students who attend a 6:1:1

9        class?

10                   MS. LEFAIVRE:  Typically, students in the

11       6:1:1 classes are students with autism spectrum

12       disorders.  It does -- it does vary, but that's --

13       that's the most prominent disability classification

14       for 6:1:1.

15                   MR. OLTHOFF:  Okay.  And how many 8:1:1

16       classes were there?

17                   MS. LEFAIVRE:  There were five.

18                   MR. OLTHOFF:  And what would be a general

19       profile for students in the 8:1:1?

20                   MS. LEFAIVRE:  8:1:1 is typically also

21       some students with autism spectrum disorder, some

22       students, as well, with intellectual disability or

23       emotional disturbance.

24                   MR. OLTHOFF:  Okay.  And the 6:1:1 class

25       and the 8:1:1 class, where are they located in your

1           building?

2                           MS. LEFAIVRE:  They're -- we're -- we're

3           located on three floors, so they're varied

4           throughout the -- the floors.

5                           MR. OLTHOFF:  Okay.

6                           MS. LEFAIVRE:  There -- there were 6:1:1

7           and 8:1:1 classes on -- on every floor.

8                           MR. OLTHOFF:  Okay.  So were there 6:1:1

9           and 8:1:1 classes on the same floor as the 12:1:4

10          classes?

11                          MS. LEFAIVRE:  There was a 6:1:1 class on

12          the same floor as the 12:1:4 class last year.

13                          MR. OLTHOFF:  Okay.  And how many 12:1:1

14          classes were there?

15                          MS. LEFAIVRE:  There were 12.

16                          MR. OLTHOFF:  And what general --

17                          HEARING OFFICER FARAGO:  (Interposing)

18          Which classes are we -- what was that?  12 -- was

19          that the 12:1:4 you were asking --

20                          MR. OLTHOFF:  (Interposing) I was asking

21          about the 12:1, first, Your Honor.

22                          HEARING OFFICER FARAGO:  12:1:1?  Got

23          you.

24                          MR. OLTHOFF:  Yes.

25                          HEARING OFFICER FARAGO:  Okay.  Okay.

1              MS. LEFAIVRE:   The 12:1:1, primary

2         students with intellectual disabilities and

3         learning disabilities.

4              MR. OLTHOFF:   Okay.  And how many -- you

5         said -- did you say how many there were?

6              MS. LEFAIVRE:   There were 12 classes, I'm

7         sorry.

8              MR. OLTHOFF:   12, okay, intellectual

9         disabilities classes and learning disabilities.

10        And so how many 12:1:4 classes were there?

11             MS. LEFAIVRE:   There were two.

12             MR. OLTHOFF:   Two, and where are they

13        located?

14             MS. LEFAIVRE:   They were -- in terms of

15        floors, first floor.

16             MR. OLTHOFF:   First floor.  Okay.  And --

17        okay, one second, I'm just looking at something.

18        What --

19             HEARING OFFICER FARAGO:   (Interposing)

20        How were students in the 12:1:1 characterized?

21             MS. LEFAIVRE:   I'm sorry?

22             HEARING OFFICER FARAGO:   How were the

23        students in the 12:1:1 class characterized?

24             MS. LEFAIVRE:   Oh, primarily,

25        intellectual disability or learning disability.

1                    MR. OLTHOFF:  And in the 12:1:4 classes,

2            how were the students separated between one class

3            or the other?

4                    MS. LEFAIVRE:  All of our classes are

5            grouped, first, by age, so we -- students are

6            grouped within an age range of three years.  And

7            then, beyond that, if it's relevant, by ELL,

8            English language learner status, so if they're

9            bilingual students or ENL, English as new language,

10           that would be a -- a grouping, as well.  But

11           primarily, by age.

12                   MR. OLTHOFF:  So what are the age groups,

13           then?

14                   MS. LEFAIVRE:  So the classes last year,

15           we had students in the 12:1:4 program that were --

16           the birthdates were ranging from '99 through '05.

17           So one -- one group was '99, 2000, 2001, and then,

18           another group, 2002, 2003, 2005, so one -- one

19           older class and one younger class.

20                   MR. OLTHOFF:  Okay.  One second.  I'm

21           scrolling.  I'm sorry, it takes a second.

22                   MS. LEFAIVRE:  That's okay.

23                   MR. OLTHOFF:  Okay.  And --

24                   HEARING OFFICER FARAGO:  (Interposing)

25           How were those students characterized or what kinds

1    of disabilities?

2               MS. LEFAIVRE:  Typically, the -- the

3    primary classification is multiple disabilities, as

4    it's written on the IEP.

5               HEARING OFFICER FARAGO:  Um-hum.

6               MR. OLTHOFF:  Are you -- okay.  So if

7    students in those classes are typically classified

8    as multiple disabilities --

9               MS. LEFAIVRE:  (Interposing) Um-hum.

10              MR. OLTHOFF:  -- are you aware having

11   been a teacher, are you aware of any -- in your

12   experience, is there any difference in teaching if

13   a student was classified as multiple disabilities

14   versus a student who was classified as TBI?

15              MS. LEFAIVRE:  I mean, it would -- it

16   would completely depend on that student's

17   particular, like, individual needs.

18              So you know, in terms of communication

19   style, in terms of the physical support that was

20   needed, whether they're ambulatory, nonambulatory,

21   what their level of -- of gross and fine motor

22   functioning is.

23              So it could -- it could be similar.

24   Some, you know, it could be that a student with

25   multiple disabilities, one of those disabilities is

1    TBI.  So it really does just depend, you know,
2    multiple -- we've had -- I've had students that
3    their multiple disabilities are, you know, vision
4    impairment and you know, Down syndrome, for
5    instance, or something like that.
6              So it would -- it would really depend on
7    the -- the nature of the disabilities, but it's
8    possible that it would --
9              MR. OLTHOFF:  (Interposing) Okay.
10             MS. LEFAIVRE:  -- be quite similar.
11             MR. OLTHOFF:  And so in the 12:1:4 class
12   that S███ J███ would have been assigned to --
13             MS. LEFAIVRE:  (Interposing) Um-hum.
14             MR. OLTHOFF:  -- was there a range of
15   academic or educational needs that the students had
16   who were in that class?
17             MS. LEFAIVRE:  Yes, typically, there --
18   there would be a range of academic or cognitive
19   functioning and needs that the teacher would
20   address in terms of how they differentiate their
21   instruction and how students are -- are grouped for
22   instruction and things of that nature.
23             MR. OLTHOFF:  So would you say that
24   there -- there was a -- that there would have been
25   potentially a wide range of educational needs in

1    that class?

2              MS. LEFAIVRE:  I mean, I suppose it -- it

3    depends on what you would consider wide, wide

4    range.  But there -- there would be a range.  I

5    don't know since I didn't teach that class last

6    year, I don't know their specific academic

7    functioning levels.

8              MR. OLTHOFF:  Okay.  And so in the 12:1:4

9    class that S███ J███ would have been assigned

10   to  --

11             MS. LEFAIVRE:  (Interposing) Um-hum.

12             MR. OLTHOFF:  -- how many students were

13   ambulatory?

14             MS. LEFAIVRE:  There were two

15   ambulatory -- no, I'm sorry -- three, three

16   ambulatory students.

17             MR. OLTHOFF:  So three out of how many?

18             MS. LEFAIVRE:  Out of 12.

19             MR. OLTHOFF:  Okay.  And --

20             MS. LEFAIVRE:  (Interposing) The other --

21             MR. OLTHOFF:  -- others -- yeah.

22             MS. LEFAIVRE:  I'm sorry.

23             MR. OLTHOFF:  No, go ahead.

24             MS. LEFAIVRE:  To answer, the other nine

25   were wheelchair users.

600

1              MR. OLTHOFF:  Okay.  And of the students
2       in -- who would have been in S███ Jane's class,
3       how many were nonverbal?
4              MS. LEFAIVRE:  Well, I'm going to say
5       all -- well, two -- two of the students have very
6       limited verbal functioning in that they are able to
7       communicate through sort of like sound and gestures
8       and not necessarily, like, typical developmental
9       speech, but -- so I --
10              You -- you could say that 12 are
11       nonverbal, but 2 have limited verbal ability.
12              HEARING OFFICER FARAGO:  And how many
13       are -- would you say are verbal?
14              MS. LEFAIVRE:  I wouldn't say any were
15       fully verbal.  2 -- 2 of the 12 students are able
16       to communicate with some sound.
17              HEARING OFFICER FARAGO:  Okay.  And ten
18       cannot?
19              MS. LEFAIVRE:  And ten, yeah, ten were
20       nonverbal.
21              MR. OLTHOFF:  Um-hum.  So if the students
22       who you're classifying as having some verbal
23       functioning were able to communicate with sounds,
24       then, what do you mean -- how would you describe
25       the students who are completely nonverbal?

1              MS. LEFAIVRE:   Those students would

2         communicate either using communication devices,

3         using, like, eye-gaze boards or visuals or -- or

4         something of that nature.

5              MR. OLTHOFF:   Okay.   And in that

6         classroom, how many students had a one-to-one

7         health paraprofessional?

8              MS. LEFAIVRE:   A one-to-one health

9         paraprofessional, there were 3 of the 12.

10             MR. OLTHOFF:   Okay.   So there would have

11        been four -- am I correct that there were would

12        have been three or four classroom

13        paraprofessionals, how many were there?

14             MS. LEFAIVRE:   In that class, there

15        were -- there was one classroom para assigned to

16        that class, and there were four additional

17        paraprofessionals that were one-to-ones.

18             MR. OLTHOFF:   Okay.   So can you explain,

19        then, what does the designation 12:1:3-plus 1 mean?

20             MS. LEFAIVRE:   Right, so it's 12

21        students, 1 teacher, and three paraprofessionals

22        for every -- or yeah, three paraprofessionals --

23        no --

24             HEARING OFFICER FARAGO:   (Interposing)

25        One paraprofessional.

602

1              MS. LEFAIVRE:  -- three -- one para for

2         every three students.

3              HEARING OFFICER FARAGO:  Right.

4              MS. LEFAIVRE:  Thank you.  One para for

5         every three students.  So we did not have -- we had

6         one classroom paraprofessional assigned to that

7         class last year based on our staffing availability,

8         and there were four additional paras there as one-

9         on-ones, so in total, there were five

10        paraprofessionals in the room and one teacher.

11             HEARING OFFICER FARAGO:  So let me just

12        do the math on this, and I appreciate the precision

13        and delicacy with which you worded the response.

14        But it sounds to me as though that class was

15        staffed under mandate; is that correct?

16             MS. LEFAIVRE:  That is correct, I

17        suppose, based on that 12:1:3-plus 1.

18             HEARING OFFICER FARAGO:  Right, because

19        if you take the 4 out of the 12, you're left with

20        8, which means you should have had 3 para,

21        classroom paras --

22             MS. LEFAIVRE:  (Interposing) Yes.

23             HEARING OFFICER FARAGO:  -- right?

24             MS. LEFAIVRE:  Yes.

25             HEARING OFFICER FARAGO:  And you only had

1       one, okay.
2                   MS. LEFAIVRE:   That is accurate.
3                   HEARING OFFICER FARAGO:   Just so I
4       understand.
5                   MS. LEFAIVRE:   Yes.
6                   HEARING OFFICER FARAGO:   Okay.
7                   MR. OLTHOFF:   Okay.  And did any students
8       in that class have a one-to-one nurse?
9                   MS. LEFAIVRE:   There was -- yes, one
10      student that had a -- actually, no, you know what?
11      I'm sorry.  There was not.  No, no students had a
12      one-to-one nurse.  There were three students with a
13      one-to-one health para and one student with a one-
14      to-one crisis paraprofessional.
15                  MR. OLTHOFF:   Can you describe the role
16      of a crisis paraprofessional?
17                  MS. LEFAIVRE:   Yeah, the crisis
18      paraprofessional supports with any behavioral
19      management needs for a student.  So --
20                  MR. OLTHOFF:   (Interposing) And -- yes.
21      And the crisis para -- was the crisis para assigned
22      to one of the students who were ambulatory in that
23      class?
24                  MS. LEFAIVRE:   No, she's nonambulatory, a
25      wheelchair user.

1          MR. OLTHOFF:  Okay.  And what would have

2     been the types of -- without being too specific,

3     what would have been the types of crises that the

4     para would have had to address?

5          MS. LEFAIVRE:  Um-hum, for that --

6          MR. COUGHLIN:  (Interposing) Objection.

7          HEARING OFFICER FARAGO:  Nature?

8          MR. COUGHLIN:  We're discussing other

9     students' needs in order to determine whether or

10    not the IEP and the placement was appropriate for

11    S       J    , and not for this student.

12         HEARING OFFICER FARAGO:  Can you repeat

13    question?

14         MR. OLTHOFF:  I said what would have been

15    the type of crises that the crisis para would have

16    addressed in the classroom?

17         HEARING OFFICER FARAGO:  Okay.  I'll let

18    it in.  That tells us something about what kinds of

19    things go on in the classroom.

20         MS. LEFAIVRE:  Okay.  So I should answer?

21         HEARING OFFICER FARAGO:  Yes.

22         MR. OLTHOFF:  Yes, please.

23         MS. LEFAIVRE:  So that -- that particular

24    student when she got frustrated would sort of,

25    like, forcefully rock in her chair and needed

1        someone to -- to monitor, just to -- to support her

2        with her safety.

3                    She was a wheelchair user, but she was

4        able to walk short distances, so the crisis

5        paraprofessional would also support, you know, with

6        related services staff to take her out of the chair

7        and take her on walks when she got frustrated.

8                    So sort of, like, a self-injurious

9        behavior thing, she would kind of, like, bang her

10       head back on her chair.

11                   MR. OLTHOFF:  Okay.  So is it fair to say

12       you're describing a wide range of behavioral needs

13       in that 12:1:4 class?

14                   MR. COUGHLIN:  Objection, the question

15       was asked and answered earlier.

16                   HEARING OFFICER FARAGO:  I think, too,

17       about a different group, to some extent, well, I

18       don't know if that's exactly what I mean.  It

19       seemed to me to be slightly different now because

20       it's been contextualized.  I'm letting it in.

21                   MR. COUGHLIN:  Okay.

22                   MR. OLTHOFF:  You can answer, Ms.

23       Lefaivre.

24                   MS. LEFAIVRE:  So in terms of a wide

25       range, so I mean, that --

1              MR. OLTHOFF:  (Interposing) Yeah.

2              MS. LEFAIVRE:  -- really, it -- it was

3    just that one student that exhibited behavioral

4    challenges, so it was -- it was fairly specific to

5    that student.

6              HEARING OFFICER FARAGO:  And that student

7    had a para?

8              MS. LEFAIVRE:  Yes.

9              HEARING OFFICER FARAGO:  For these

10   purposes.

11             MS. LEFAIVRE:  Okay.

12             HEARING OFFICER FARAGO:  Okay.

13             MR. OLTHOFF:  All right.  Thank you.  Is

14   there an elevator in your building?

15             MS. LEFAIVRE:  There is, yes.

16             MR. OLTHOFF:  And so looking at paragraph

17   12 of your affidavit, regarding occupational

18   therapy sessions --

19             MS. LEFAIVRE:  (Interposing) Um-hum.

20             MR. OLTHOFF:  -- are -- so in the DOE IEP

21   that you have reviewed, it's in evidence as Exhibit

22   1 --

23             MS. LEFAIVRE:  (Interposing) Um-hum.

24             MR. OLTHOFF:  -- S    J    would have

25   received therapy outside, a separate location, so

1    she would have been -- just please confirm, she

2    would have been receiving OT in room 324?

3                MS. LEFAIVRE:  Correct.  That's the OT

4    room.

5                MR. OLTHOFF:  Okay.  Can you describe the

6    OT room?

7                MS. LEFAIVRE:  Sure.  It's a -- it's one

8    of our larger classrooms, and it's split by a

9    divider, a -- a wall divider, so it's two sections

10   in the room.  There's one section where they have

11   their equipment, so a large mat, you know, a --

12   a  -- a small trampoline, exercise balls, those

13   types of things.

14               And then, the other side of the room,

15   they have tables where they would do, like, table-

16   top exercises.  It just depends on what the

17   student's goal is and what they were working on in

18   terms of where they would serve them.

19               MR. OLTHOFF:  Okay.  And how many OTs are

20   there at your school?

21               MS. LEFAIVRE:  Four.

22               MR. OLTHOFF:  And how many students would

23   be using the room 324 at the same time?

24               MS. LEFAIVRE:  I don't -- I don't know

25   that answer.  I don't know how many students they

1          would have at a time.

2                    MR. OLTHOFF:  Would it --

3                    MS. LEFAIVRE:  (Interposing) I guess

4          it  -- it depends on, you know, some -- some

5          providers see students in groups.  It would depend

6          on their schedule and when they're seeing students.

7                    They -- they may not always -- it depends

8          on what the student is -- is working on as far as

9          their goal is concerned.

10                    Primarily, pullout services are done in

11         324.  They may also, if you're using some other

12         types of equipment, take the student -- either they

13         may be on the stairs or if they're -- if they're

14         working on navigating stairs or sometimes, in the

15         hallway if they're doing, like, catch-and-throw

16         exercises or using the -- the modified bicycle, as

17         well.

18                    So they do also sometimes use other

19         locations.  So I can't say for sure how many

20         students would be in there at a time.

21                    MR. OLTHOFF:  Okay.  But is it safe to

22         say that the room has been used by more than one

23         student per period?

24                    MS. LEFAIVRE:  Yes.

25                    MR. OLTHOFF:  Okay.  And from the

1    classroom where S███ J███ would be assigned to the

2    therapy room, approximately, how long would it take

3    to get there?

4              MS. LEFAIVRE:  No more than two to three

5    minutes, probably, it's just down the hall to the

6    elevator and then up to the third floor and just

7    down the hall from the elevator.  So I would say

8    two to three minutes.

9              MR. OLTHOFF:  Okay.  And just one second.

10              MS. LEFAIVRE:  Um-hum.

11              MR. OLTHOFF:  I'm looking at the IEP that

12    was developed by the DOE, on page 6 of that IEP,

13    there's a management needs section --

14              MS. LEFAIVRE:  (Interposing) Um-hum.

15              MR. OLTHOFF:  -- so if S███ J███ is

16    being -- going up to room 324, would she be able to

17    have her therapy in a quiet, nondistracting

18    environment with limited visual and auditory

19    stimuli, according to the management needs?

20              MS. LEFAIVRE:  Yes, if that's -- if

21    that's what her IEP states her management needs

22    are, then, yes, the therapist would accommodate

23    that.

24              MR. OLTHOFF:  Okay.  But would this

25    therapist be able to accommodate that if there were

1              other students in the same therapy room at the same

2              time?

3                        MR. COUGHLIN:  Objection, calls for

4              speculation.  It's also been asked and answered.

5                        MR. OLTHOFF:  How has it been asked and

6              answered?  I haven't even gotten to this yet.

7                        HEARING OFFICER FARAGO:  Why don't you

8              repeat the question then?

9                        MR. OLTHOFF:  So would -- how would this

10             management need be addressed if there were multiple

11             students using the therapy room at the same time?

12                       MR. COUGHLIN:  Objection again.  We're

13             talking about speculation here.  If many students

14             are in there, then, you know, it all calls for

15             speculation.

16                       She's indicated that the occupational

17             therapist will address the management needs in the

18             previous question, so it should be sustained

19             because it's also asked and answered.

20                       HEARING OFFICER FARAGO:  I gather that's

21             what's being asked is simply examples of how it

22             is -- how that room is described when there are, in

23             fact, more than one student in it, and I believe

24             the question that had been asked and answered was

25             whether there was one -- more than one student in

1       it regularly, you know, with some regularly, and

2       the answer was yes.

3                   But I don't recall there being an answer

4       to that gave me a sense of it having been described

5       what it's like.

6                   Am I hearing your question properly, Mr.

7       Olthoff?

8                   MR. OLTHOFF:  Yeah, yes, Your Honor, I

9       think it's a -- just it's a question of math.

10      There are -- how many students receive OT, how many

11      OTs are there, and if there's one therapy room, how

12      is it possible to accommodate Miss Donohue's needs?

13                  HEARING OFFICER FARAGO:  Well, that's a

14      whole different question, I think, from the one you

15      just asked.

16                  MR. OLTHOFF:  Okay.

17                  HEARING OFFICER FARAGO:  Well, it may be

18      what you were building a foundation for or trying

19      to.

20                  MR. OLTHOFF:  Yes.

21                  HEARING OFFICER FARAGO:  I wouldn't mind

22      having just a description of how big that room is

23      and how many kids in wheelchairs can receive

24      therapy in it at once without conflicting with one

25      another and what it kind of looks like when more

1          than one student is there.

2                    So if you want to do something kind of

3          open-endedly descriptive like that, I'd be

4          appreciative.

5                    MR. OLTHOFF:  If Your Honor would be kind

6          enough as to repeat your question for the witness,

7          then, we will get her answer, and I'll move onto

8          the next, if that's possible.

9                    HEARING OFFICER FARAGO:  Okay.  Sure.  I

10         would appreciate -- yeah.  What I want to know --

11                   Did you understand, Ms. Lefaivre,

12         that's --

13                   MS. LEFAIVRE:  (Interposing) Yeah, I -- I

14         understand your question.

15                   HEARING OFFICER FARAGO:  -- a description

16         of the room when multiple --

17                   MS. LEFAIVRE:  (Interposing) Sure.

18                   HEARING OFFICER FARAGO:  -- people are

19         using it?  Yeah, great.

20                   MS. LEFAIVRE:  Sure.  So I -- I don't

21         have the dimensions of the room.  It is one of our

22         larger rooms.  Like I said, it's split into second

23         sections.  There is a -- a wall with a door between

24         the two sections, and that door can be closed.

25                   So students could be working in one --

1       one in each side of the room.

2                   In the -- the side of the room where they

3       have the -- the desks and tables, there are

4       multiple tables, there are multiple tables, one

5       sort of facing the back wall and one facing the

6       other way, so you could have two students there,

7       working separately where they wouldn't have each

8       other in their line of vision.

9                   The therapists, also, the occupational

10      therapists work together when they're creating

11      their schedules, so I would suppose that they, you

12      know, they would be able to have a conversation

13      about when they were seeing different students,

14      when they had groups, or when they had individual

15      mandates for students and -- and arrange their

16      schedule in a way that would, you know, allow them

17      to serve the students that they were serving and

18      meet their management needs at any given time to

19      ensure that there weren't too many students

20      present.

21                  MR. OLTHOFF:   Okay.   Thank you.

22                  HEARING OFFICER FARAGO:   About how big is

23      the room?

24                  MR. OLTHOFF:   Oh, yes.

25                  MS. LEFAIVRE:   Huh?

1            HEARING OFFICER FARAGO:  About how big is

2       the room?  It is a standard New York City

3       classroom, like 28 by 28 or is it something bigger

4       or smaller?

5            MS. LEFAIVRE:  It's -- yeah, it would be

6       about -- it's a standard classroom size but divided

7       in half.

8            HEARING OFFICER FARAGO:  Right, right.

9            MS. LEFAIVRE:  Right.

10           MR. OLTHOFF:  Thank you.

11           MS. LEFAIVRE:  Um-hum.

12           MR. OLTHOFF:  So I'm also looking at the

13      next paragraph about the physical therapy services

14      in your --

15           MS. LEFAIVRE:  (Interposing) Sure.

16           MR. OLTHOFF:  -- affidavit.

17           MS. LEFAIVRE:  Um-hum.

18           MR. OLTHOFF:  So are you familiar with a

19      gait trainer?

20           MS. LEFAIVRE:  Yes.

21           MR. OLTHOFF:  Can you describe what a

22      gait trainer is?

23           MS. LEFAIVRE:  It's used to support

24      ambulation for -- for students.

25           MR. OLTHOFF:  Have you ever -- so how

1       does the student get in and out of a gait trainer?

2                  MS. LEFAIVRE:  Typically, the physical

3           therapist supports with that process, with

4           supporting them out of the wheelchair into the gait

5           trainer and then back.  I have not personally done

6           that.

7                  MR. OLTHOFF:  Okay.  And so this -- did

8           when you -- did you consult with any -- how many

9           physical therapists are in the school, first of

10          all, let's start there.

11                 MS. LEFAIVRE:  Two.

12                 MR. OLTHOFF:  Two, and did you consult

13          with any of the physical therapists before you

14          drafted this part of your affidavit?

15                 MS. LEFAIVRE:  I did, yes.  I spoke with

16          one of our physical therapists.

17                 MR. OLTHOFF:  Okay.  And so -- and then,

18          did they review what you wrote here?

19                 MS. LEFAIVRE:  They didn't review what I

20          wrote, but they -- but I spoke with them and -- and

21          what I wrote is based on the conversation that we

22          had.

23                 MR. OLTHOFF:  Okay.  So in this

24          affidavit, you note that if a student has an IEP

25          goal to be in a Rifton gait trainer for 60 minutes,

1          the therapist would either stay with them for the
2          first 40 and leave or --
3                    MS. LEFAIVRE:  (Interposing) Um-hum.
4                    MR. OLTHOFF:  -- (indiscernible) and
5          leave and come back.
6                    MS. LEFAIVRE:  Um-hum.
7                    MR. OLTHOFF:  Have you ever seen this
8          happen?  Have you ever done this?
9                    MS. LEFAIVRE:  Me, personally?  No, I
10         have not.
11                   MR. OLTHOFF:  But the physical therapist
12         in your school said that this was something that
13         they could do?
14                   MS. LEFAIVRE:  Yes, they -- they said
15         that if the -- for instance, if the student had a
16         goal to be in the gait trainer for 60 minutes, but
17         the session time was only 40 minutes, that they
18         would see them for 40 minutes, either at the
19         beginning or end of that -- that time, that they
20         would be there to support the -- the transfer in
21         and out.
22                   But that would only -- so they would
23         either put them in, stay for the 40 minutes, leave
24         and come back then after 20 to assist with the
25         transfer back into the chair, or then, the opposite

1    of that.

2                    They would -- they would put the

3    student -- transfer the student into the gait

4    trainer, and then, leave and come back after 20

5    minutes, then, complete their 40-minute session,

6    and then, help with the transfer out.

7                    MR. OLTHOFF:  So for 20 minutes, the

8    student would be in the gait trainer without the

9    physical therapist, is that what you're saying?

10                   MS. LEFAIVRE:  Yes.

11                   MR. OLTHOFF:  And approximately, how --

12   do you understand about how much training it would

13   involve to have the person who's not a qualified

14   physical therapist attend the student in a gait

15   trainer?

16                   MS. LEFAIVRE:  Yeah, the physical

17   therapist, I'm -- I'm not sure exactly how much

18   training it would require, but they -- they did

19   state that they would work with the -- work with

20   the -- the staff in the classroom, whether it's the

21   one-to-one para, classroom para, whoever is going

22   to be with the student at the time, the teacher, to

23   train them on, you know, what the student is using

24   the trainer for, how they need to navigate when

25   they're in it, and then, if any data needs to be

1          collected while they're not in the room.

2                    So that was just based on the -- the --

3          the hypothetical I was given of if there's a goal

4          for 60 minutes and a session for 40.

5                    MR. OLTHOFF:  All right.  So could you

6          give me the name, please, of the physical therapist

7          you discussed this with?

8                    MS. LEFAIVRE:  Sure.  His name is Andrew,

9          first name, Andrew, last name, Mariott.

10                    MR. OLTHOFF:  Like the hotel?

11                    MS. LEFAIVRE:  Say it again?

12                    MR. OLTHOFF:  Like the hotel?  Mariott?

13                    MS. LEFAIVRE:  Yeah, like -- yes,

14          correct, M-A-R-I-O-T-T.

15                    MR. OLTHOFF:  Okay.  But you're aware

16          that this -- you noted that this was -- in this

17          hypothetical situation, but this is actually in

18          S███   Jane's IEP that she would be in a --

19                    MS. LEFAIVRE:  (Interposing) Yes.

20                    MR. OLTHOFF:  -- Rifton chair for 60

21          minutes.

22                    MS. LEFAIVRE:  Correct.  And her session

23          time is -- is 3x40.

24                    MR. OLTHOFF:  Okay.  So do you -- okay,

25          I'm sorry.  But did you -- so after you spoke with

619

1   Mr. Mariott, did you -- you drafted this portion of

2   the affidavit yourself?

3              MS. LEFAIVRE:  Yes.

4              MR. OLTHOFF:  Okay.  Did you have any

5   help with drafting this?

6              MS. LEFAIVRE:  No.

7              MR. OLTHOFF:  Okay.  And so I guess my

8   question is because in S▇▇▇ Jane's IEP, she is to

9   receive physical therapy in a separate location, so

10  are you saying that the therapist would help her

11  into the gait trainer in the therapy room, and

12  then, leave?

13             MS. LEFAIVRE:  No, at no time would a

14  student be unsupervised.  I guess it depends on

15  whether they were seeing the student for the first

16  40 or second 40 or the last 40 of that session, but

17  the time that they were not in session, those 20

18  minutes, they would -- the student would be in the

19  classroom with the staff.

20             The separate location would just be for

21  the 40 minutes of the physical therapy session.

22             MR. OLTHOFF:  Okay.  I'm just --

23             HEARING OFFICER FARAGO:  (Interposing)

24  I'm sorry, you kind of dropped out on my phone.

25  Can you just repeat that last sentence or so?

1          MS. LEFAIVRE:  Oh, sure.

2          HEARING OFFICER FARAGO:  You said at no

3     time, yeah.

4          MS. LEFAIVRE:  Yeah, I just said the

5     students wouldn't be unsupervised, that they would

6     remain in the classroom.  The separate location

7     would just be for the 40 minutes of the physical

8     therapy session.

9          MR. OLTHOFF:  Okay.

10          HEARING OFFICER FARAGO:  Right, so when

11     you say unsupervised, who would be supervising

12     them?

13          MS. LEFAIVRE:  The classroom teacher and

14     paraprofessionals, when they're not --

15          HEARING OFFICER FARAGO:  (Interposing)

16     Okay.

17          MS. LEFAIVRE:  -- in session with the

18     physical therapist.

19          MR. OLTHOFF:  So if she is placed in the

20     gait trainer in her classroom, how would she get to

21     the therapy room?

22          MS. LEFAIVRE:  The therapist would then

23     come in and pick her up and take her to the -- to

24     the therapy room, using the elevator.

25          MR. OLTHOFF:  In the gait trainer?

1          MS. LEFAIVRE:  That would -- that's --
2     that would be up to the physical therapist.  I
3     don't know enough about the student or the -- how
4     that would work.
5          MR. OLTHOFF:  Okay.  But so it would be
6     up to the physical therapist, so is it possible
7     that she would be placed in the gai trainer in the
8     classroom, removed from the gait trainer to be
9     transferred to the therapy room, and then placed
10    back in the gait trainer?
11         MR. COUGHLIN:  Objection.  Is it
12    possible?  Anything is possible.  This witness has
13    answered that she's not the physical therapist and
14    that would be the physical therapist's job to
15    determine the appropriate course of action.
16         MR. OLTHOFF:  I'm just trying to figure
17    out the mechanics of this --
18         HEARING OFFICER FARAGO:  (Interposing)
19    (indiscernible) I think he's just trying to
20    clarify, yeah.  I think he's trying to get clarity,
21    and I don't have it either, so I'm letting that in.
22         MS. LEFAIVRE:  So am I -- should I
23    answer?
24         HEARING OFFICER FARAGO:  Yes, please do,
25    yes.

1           MS. LEFAIVRE:  Okay.  Yeah, I -- I

2      honestly -- I -- I can't say that I have an answer

3      to that because I don't -- I -- I'm not a physical

4      therapist, so I don't know enough about the use of

5      gait trainers or -- or how that would work.  I

6      can't answer that.

7           MR. OLTHOFF:  Okay.  Just one quick

8      second, Your Honor.  I'm looking at just one other

9      thing.

10          So I'm going to move to the -- okay, so

11     just the question here is if -- Ms. Lefaivre, if

12     you're --

13          MS. LEFAIVRE:  (Interposing) Um-hum.

14          MR. OLTHOFF:  -- saying you don't know

15     this student or you're not the physical therapist

16     and aren't familiar enough with the gait trainer,

17     so how can you say that this would work or would

18     not work?

19          MS. LEFAIVRE:  I personally can't.  All

20     I -- that's what I have written in the affidavit is

21     based on the conversation that I had with the

22     physical therapist.

23          I didn't have a conversation about how

24     the student would transfer to the -- the -- to room

25     324 once they were in the trainer, so I can't

1　　　answer that question.

2　　　　　　　　MR. OLTHOFF:  Okay.  So did Mr. Mariott

3　　　review S███ Jane's IEP?

4　　　　　　　　MS. LEFAIVRE:  No.

5　　　　　　　　MR. OLTHOFF:  So okay.  I would like

6　　　to  -- I'll go on.  I'm going to leave that aside

7　　　for a second.  I'm going to go onto your next

8　　　paragraph.

9　　　　　　　　MS. LEFAIVRE:  Okay.

10　　　　　　　　MR. OLTHOFF:  Does the school have a

11　　　separate room for the speech therapy sessions?

12　　　　　　　　MS. LEFAIVRE:  Yes, the -- the speech

13　　　room is room 210.

14　　　　　　　　MR. OLTHOFF:  Speech room is room 210.

15　　　　　　　　MS. LEFAIVRE:  Um-hum.

16　　　　　　　　MR. OLTHOFF:  Okay.  And so the student

17　　　would also need to take the elevator to that room,

18　　　as well?

19　　　　　　　　MS. LEFAIVRE:  That is correct.  It's on

20　　　the second floor.

21　　　　　　　　MR. OLTHOFF:  Okay.  How many speech

22　　　therapists are there?

23　　　　　　　　MS. LEFAIVRE:  We have six.

24　　　　　　　　MR. OLTHOFF:  And how many therapists use

25　　　that room?

1    MS. LEFAIVRE:  All six use that room.

2    MR. OLTHOFF:  Okay.  And do they use that

3    room for students in the 12:1:4 class?

4    MS. LEFAIVRE:  It depends on the -- the

5    mandate.  If the student has a mandate for a

6    separate location in an office, then, they would,

7    yes.

8    MR. OLTHOFF:  Okay.  So is that room an

9    office?

10   MS. LEFAIVRE:  It's both their -- they

11   have desks in there.  It's their office when

12   they're doing their clerical work.  It's also used

13   for pullout services if that's what the IEP states.

14   MR. OLTHOFF:  Okay.  And one second, I'm

15   moving on.  With regard to the 16th -- okay, I'm

16   sorry, the vision, also, how many vision providers

17   are there at your school?

18   MS. LEFAIVRE:  One.

19   MR. OLTHOFF:  And is that vision provider

20   only for your school or does the vision provider

21   travel?

22   MS. LEFAIVRE:  No, that -- that provider

23   is not permanent here.  She's -- we -- I don't know

24   the exact number, but we don't have enough students

25   with vision services on their IEPs for her to be

1          fulltime here.  So she typically is only here just
2          to see her students, so not fulltime.
3                    MR. OLTHOFF:  Okay.  And where would the
4          vision therapy sessions take place?
5                    MS. LEFAIVRE:  The -- that office is room
6          2 -- 219.
7                    MR. OLTHOFF:  And --
8                    MS. LEFAIVRE:  (Interposing) Also second
9          floor.
10                   MR. OLTHOFF:  Does that room -- is that
11         room used for any other (indiscernible)?
12                   MS. LEFAIVRE:  Is it used for any other
13         purpose?
14                   MR. OLTHOFF:  Yes.
15                   MS. LEFAIVRE:  Yes, there was another
16         staff member assigned to that room, our programmer,
17         who does not see students, was also using that
18         space.
19                   MR. OLTHOFF:  Okay.  And I just want
20         to --
21                   MS. LEFAIVRE:  (Interposing) So it's also
22         a staff office, but for no other students.
23                   MR. OLTHOFF:  Okay.  And I just want to
24         ask you just to go back quickly about the speech-
25         language therapy.  Have you ever seen a speech

1       session conducted in room 210?

2                   MS. LEFAIVRE:  Like, I have observed a

3       session there?

4                   MR. OLTHOFF:  Yes.

5                   MS. LEFAIVRE:  No.

6                   MR. OLTHOFF:  Okay.  And I'm looking at

7       paragraph 16 of your affidavit.

8                   MS. LEFAIVRE:  Um-hum.

9                   MR. OLTHOFF:  And did you consult with

10      the school nurse before you drafted this portion?

11                  MS. LEFAIVRE:  I did, yes.

12                  MR. OLTHOFF:  And did the school nurse

13      review this before you finalized the affidavit?

14                  MS. LEFAIVRE:  No.

15                  MR. OLTHOFF:  Okay.  And when you say

16      according to the doctor's orders, which doctor?

17                  MS. LEFAIVRE:  The -- the child's doctor,

18      the student's doctor.

19                  MR. OLTHOFF:  Okay.  So If the student

20      was going to receive a G-tube feeding, does that

21      have to be done in the nurse's office?

22                  MS. LEFAIVRE:  So the nurse -- the nurse

23      said to me that the -- they don't -- they don't

24      administer any kind of treatment or medical care

25      without the written doctor's orders for that

1    student.

2              So the nurse stated that it would be

3    indicated on the doctor's orders where that student

4    should be receive that treatment or that -- the G-

5    tube feeding.

6              So if the doctor stated the student had

7    to be in the nurse's office, under the nursing

8    supervision, that's where the student would be.  If

9    the -- the order that the student could be G-tube

10   fed  while in class, then that would happen.

11             MR. OLTHOFF:  And are you aware that

12   S      J    has been known to vomit after spoon or

13   G-tube feedings?

14             MS. LEFAIVRE:  I was not aware of that.

15             MR. OLTHOFF:  And if S      J    were to

16   receive feedings with the nurse attending at all

17   times, would she have to stay in the nurse's

18   office?

19             MS. LEFAIVRE:  If it was the -- the

20   school nurse attending, yes, because the school

21   nurse would have to stay in -- in their office.

22             MR. OLTHOFF:  Okay.  So she would be in

23   the nurse's office the whole time she's receiving

24   the feeding?

25             MS. LEFAIVRE:  Yes.

1           MR. OLTHOFF:  Okay.  And okay, just let's
2      see -- now in March, your school closed, is that
3      correct?
4           MS. LEFAIVRE:  Well, yeah, we
5      transitioned to remote learning.  That's correct.
6      The building physically closed.
7           MR. OLTHOFF:  Okay.  And so all of the
8      students received virtual or remote learning?
9           MS. LEFAIVRE:  Yes.
10          MR. OLTHOFF:  Okay.  Thank you.
11          Your Honor, I don't have anything more
12     for Ms. Lefaivre.
13          Thank you very much.
14          HEARING OFFICER FARAGO:  Thank you.  I
15     had a couple questions, but first, redirect.
16          Mr. Coughlin?
17          MR. COUGHLIN:  Good morning.
18          MS. LEFAIVRE:  Good morning.
19          MR. COUGHLIN:  When you first discussed
20     the different class sizes, you indicated there was
21     typical students for each of the class -- typical
22     (indiscernible) for each of the classrooms, but you
23     said it can vary.  How can classes vary?
24          MS. LEFAIVRE:  In terms of the disability
25     classification?

1              MR. COUGHLIN:  Yes.

2              MS. LEFAIVRE:  Or -- so I -- when I

3         mentioned those -- those classifications before,

4         that's the primary classification.

5              We have had students who -- so for

6         instance, like, the 6 -- 6:1:1 class, we have had

7         students in our 12:1:4 program with multiple

8         disabilities who, you know, have shown progress and

9         at their IEP meeting, based on a review of all of

10        the data, determine that they could move to a -- a

11        less restrictive environment and they might then

12        move to a 6:1:1 class.

13             So we have had students with other

14        disabilities in -- in those classes.  It just

15        depends on their, you know, their progress and --

16        and their management needs in terms of class size.

17             MR. COUGHLIN:  Thank you.  You also --

18             MS. LEFAIVRE:  (Interposing) Um-hum.

19             MR. COUGHLIN:  -- discussed an eye-gaze

20        board.

21             MS. LEFAIVRE:  Um-hum.

22             MR. COUGHLIN:  What is an eye-gaze board?

23             MS. LEFAIVRE:  So I don't know if that's,

24        like, an official term, but it -- I mean, we have

25        students who are -- have, you know, I've worked

1           with students with gross motor impairments who may

2           not be able to point to a visual to indicate a

3           choice.

4                       So it would look something, just like

5           a -- a black, usually, it's -- it's high contrast,

6           so a black, sort of poster-board background with

7           bright visuals, maybe two or three pictures on it,

8           but the student would be able to eye gaze to a

9           visual to make a choice if they're not able to --

10          to point or to select a picture, you know,

11          manually.

12                      MR. COUGHLIN:   When you discussed the

13          occupational therapy and the separate --

14                      MS. LEFAIVRE:   (Interposing) Um-hum.

15                      MR. COUGHLIN:   -- location in the

16          occupational office, do all students at your school

17          receive occupational therapy in a separate

18          location?

19                      MS. LEFAIVRE:   No.

20                      MR. COUGHLIN:   And so where do some

21          students -- where do the students --

22                      MS. LEFAIVRE:   (Interposing) Well,

23          some  -- some students may have mandates for

24          occupational therapy to be a push-in service, so

25          the occupational therapist would push into their

1        classroom and see them in class.

2                    That's a determination that the

3        occupational therapist and the IEP team would make

4        when they're, you know, making their

5        recommendations.

6                    It depends on what the goal so, you know,

7        if -- if an occupational therapist is working on a

8        fine motor goal for a student, if they're working

9        on handwriting, that might be something that they

10       would -- that would be a -- they would push in into

11       the classroom and work with that student in class

12       on that goal.  It would just depend on -- on that

13       student and what their goal is.

14                   MR. COUGHLIN:  And can physical therapy

15       be done in the classroom, as well?

16                   MS. LEFAIVRE:  Yes.

17                   MR. COUGHLIN:  So what about the speech

18       therapy, can that be done during class?

19                   MS. LEFAIVRE:  Yes.

20                   MR. COUGHLIN:  Okay.  Now, you all

21       discussed the feeding.

22                   MS. LEFAIVRE:  Um-hum.

23                   MR. COUGHLIN:  And typically, in your

24       school, when is feeding done in the nurse's office?

25                   MS. LEFAIVRE:  Typically -- what'd you

1      say?  I'm sorry.
2                      MR. COUGHLIN:  When the feeding is being
3      administered, when --
4                      MS. LEFAIVRE:  (Interposing) Um-hum.
5                      MR. COUGHLIN:  -- is that done?
6                      MS. LEFAIVRE:  It's typically done during
7      the student's lunch time, so whenever that class
8      has lunch, it's a -- lunch -- our student lunch
9      periods are 45 minutes, so usually during that --
10     that period of time.
11                     MR. COUGHLIN:  And would that --
12                     MS. LEFAIVRE:  (Interposing) Obviously --
13                     MR. COUGHLIN:  Oh, sorry.
14                     MS. LEFAIVRE:  Yeah.  No, I was just
15     going to say I know some -- some students may --
16     the -- the feeding time maybe longer or a little
17     shorter, so they would accommodate that, obviously,
18     but it typically coincides with the student's lunch
19     period.
20                     MR. COUGHLIN:  And if it coincides with
21     lunch, would there be other students in the nurse's
22     office receiving feeding, as well?
23                     MS. LEFAIVRE:  Yes, yeah, if there are
24     other students in the nurse's office, they would
25     also be, yeah, there for feeding.

1          MR. COUGHLIN: All right. Thank you. I
2     have no further questions.
3          HEARING OFFICER FARAGO: Okay. Thank
4     you. The questions I have really come down to
5     trying to get a sense of what the different -- what
6     goes on differently in the classrooms of different
7     staffing ratios.
8          MS. LEFAIVRE: Um-hum.
9          HEARING OFFICER FARAGO: If you can give
10    me a -- sort of again, a kind of open-ended feel
11    for the curriculum --
12         MS. LEFAIVRE: (Interposing) Um-hum.
13         HEARING OFFICER FARAGO: -- differences
14    among those classrooms?
15         MS. LEFAIVRE: Sure. So I mean, in terms
16    of -- of curriculum, in terms of the content being
17    presented to students --
18         HEARING OFFICER FARAGO: (Interposing)
19    Right.
20         MS. LEFAIVRE: -- all of our students are
21    sort of -- the -- the curriculum is -- is -- does
22    not differ all that much, the way that it's
23    presented, and you know, some of the content may be
24    adapted for some of our younger learners or
25    cognitively younger learners.

1      But the curriculum is pretty much

2  consistent across the board.  What -- what looks

3  different is the way that the materials are

4  presented, the way that the information is

5  differentiated.

6      So you know, in a -- in a classroom,

7  like, a 12:1:4 classroom or some of 6:1:1

8  classrooms, our students have may more challenges

9  with communication or comprehension, there would be

10  a lot more visual and hands-on learning.  The

11  material may be presented, you know, visually or

12  with more, like, auditory supports, videos, things

13  like that.

14      Where in one of our 12:1:1 classes, the

15  students have higher comprehension levels or higher

16  reading levels.  There may be more text-based

17  learning, and then, obviously, the learning tasks

18  are going to look different for those students, as

19  well.

20      So it's more about how the material is

21  differentiated and how it's presented to students.

22      HEARING OFFICER FARAGO:  So what kinds of

23  things would the material be?

24      MS. LEFAIVRE:  So I mean, our -- we have

25  a -- a scope and sequence that -- that follows the

1          New York State alternate assessment, that -- that

2          the -- the State tests that our students are --

3                    HEARING OFFICER FARAGO:  (Interposing)

4          Right.

5                    MS. LEFAIVRE:  -- taking here, so we look

6          at those, the essential elements from that test,

7          and our scope and sequence is designed to support

8          students in their learning and understanding for --

9          for that.

10                   And in -- in addition -- in addition to

11         that, just aligning with the New York State Next

12         Generation standards, which were the Common Core,

13         and just everything is -- everything is standards

14         aligned --

15                   HEARING OFFICER FARAGO:  (Interposing)

16         Um-hum.

17                   MS. LEFAIVRE:  -- and is supporting --

18                   HEARING OFFICER FARAGO:  (Interposing)

19         Right.

20                   MS. LEFAIVRE:  -- that measure.

21                   HEARING OFFICER FARAGO:  Can you give me

22         just a concrete example of one or two things that

23         can --

24                   MS. LEFAIVRE:  (Interposing) In terms of,

25         like, curriculum material?

1        HEARING OFFICER FARAGO:  Yeah, well, I'm

2    just trying, again, build a sort of visual sense of

3    what goes on in a classroom and starting from the

4    content.  So --

5        MS. LEFAIVRE:  (Interposing) Um-hum.

6        HEARING OFFICER FARAGO:  -- of anything,

7    randomly.

8        MS. LEFAIVRE:  So -- so I guess, just,

9    like, in terms of thinking about last year for

10   our -- our ELA classes, you know, one of the -- one

11   of the standards that we were focusing on was

12   studying literary texts, so answering recall

13   comprehension questions about literary texts,

14   comparing and contrasting.

15       So we had different classes.  One of the

16   books that they read last year was Romeo and

17   Juliet, so they -- different classes approached

18   that text in different ways --

19       HEARING OFFICER FARAGO:  (Interposing)

20   Um-hum.

21       MS. LEFAIVRE:  -- you know, so that --

22   that was one example.  So some of our students --

23       HEARING OFFICER FARAGO:  (Interposing) So

24   how might, say, the 12:1:3:1 --

25       MS. LEFAIVRE:  (Interposing) Um-hum.

1          HEARING OFFICER FARAGO:   -- do that?

2          MS. LEFAIVRE:   So --

3          HEARING OFFICER FARAGO:   (Interposing)

4    What kind of thing would you do in that class?

5          MS. LEFAIVRE:   Right, I mean, it -- it

6    depends on what the -- the student's IEP goals are

7    in terms of how -- what --

8          HEARING OFFICER FARAGO:   (Interposing)

9    Right.

10          MS. LEFAIVRE:   -- their -- their learning

11    tasks would be.  But they would probably be

12    focusing more just on basic recall, like, "wh"

13    style questions, identifying characters --

14          HEARING OFFICER FARAGO:   (Interposing)

15    Okay.

16          MS. LEFAIVRE:   -- that sort of thing.

17    The text is -- is adapted, probably presented with

18    visuals, and I know that some of the classes

19    watched clips of movies, as well, to --

20          HEARING OFFICER FARAGO:   (Interposing)

21    Um-hum.

22          MS. LEFAIVRE:   -- support what their

23    understanding of that.

24          HEARING OFFICER FARAGO:   And they'd be

25    engaging through the AT devices and --

1              MS. LEFAIVRE:  (Interposing) Um-hum, yes.

2              HEARING OFFICER FARAGO:  Would the

3       teacher or a para --

4              MS. LEFAIVRE:  (Interposing) Correct,

5       yes.

6              HEARING OFFICER FARAGO:  -- things like

7       that.  And then, say, in one of the other class

8       ratios?

9              MS. LEFAIVRE:  Sure, so like, in a 12:1:1

10      class, those students may have been reading an

11      adapted version of that text, but it would be more

12      texted-based where they may be --

13             HEARING OFFICER FARAGO:  (Interposing)

14      Uh-huh.

15             MS. LEFAIVRE:  -- I know some students,

16      like, acted out scenes from the play, wrote --

17      maybe have -- had, like, writing tasks, where they

18      were comparing and contrasting --

19             HEARING OFFICER FARAGO:  (Interposing)

20      Right.

21             MS. LEFAIVRE:  -- characters or you know,

22      writing opinions on things, things like that.

23             HEARING OFFICER FARAGO:  And say, a

24      6:1:1?

25             MS. LEFAIVRE:  6:1:1's sort of in the

| | |
|---|---|
| 1 | middle.  There again, just depending on the |
| 2 | students, whether they're readers or -- or |
| 3 | prereaders, if they would be working with adapted |
| 4 | text or more visual based or -- or -- or videos |
| 5 | to -- to support their understanding of that. |
| 6 | HEARING OFFICER FARAGO:  So the -- and |
| 7 | how would the 6:1:1 differ, say, from the 8:1:1? |
| 8 | MS. LEFAIVRE:  Typically, not -- not in |
| 9 | every case, but typically, the students in the |
| 10 | 8:1:1 classes are cognitively more advanced, so |
| 11 | they may have higher reading levels and |
| 12 | comprehension, so they may be, you know, reading |
| 13 | higher level -- |
| 14 | HEARING OFFICER FARAGO:  (Interposing) |
| 15 | Um-hum. |
| 16 | MS. LEFAIVRE:  -- texts or engaging in |
| 17 | higher level writing tasks, typically. |
| 18 | HEARING OFFICER FARAGO:  Okay.  Well, if |
| 19 | you were sitting at a CSE review -- |
| 20 | MS. LEFAIVRE:  (Interposing) Um-hum. |
| 21 | HEARING OFFICER FARAGO:  -- how would |
| 22 | you, you know, what criteria would you use for |
| 23 | yourself, not speaking for the whole CSE, |
| 24 | obviously, but just as you, as a participant, what |
| 25 | criteria would you use to distinguish between |

1       recommending a 6:1:1 and an 8:1:1?

2                   MS. LEFAIVRE:  There's a few things I

3       would consider, like, so the -- we use -- we have

4       an assessment that we do in-house, SANDI, which is

5       the Student Annual Needs --

6                   HEARING OFFICER FARAGO:  (Interposing)

7       Right.

8                   MS. LEFAIVRE:  -- Determination

9       Inventory, so we do that as a -- a formative and a

10      summative assessment every year.

11                  So at the beginning of every year,

12      students are assessed in  -- with the SANDI, which

13      is essentially a -- a skills checklist, and they

14      have -- it's available in all of the different --

15                  HEARING OFFICER FARAGO:  (Interposing)

16      Right.  I'm familiar with it.

17                  MS. LEFAIVRE:  Okay.  So we look at SANDI

18      scores to see what students' levels are in each of

19      those and then also look at, you know, management

20      needs and any behavioral data or, you know, what

21      the student in terms of --

22                  HEARING OFFICER FARAGO:  (Interposing)

23      Okay.

24                  MS. LEFAIVRE:  -- support in the

25      classroom.  Obviously, like, the students in an

1           8:1:1, it's a less restrictive environment, so they

2           may not need as much individual support in the

3           classroom as a 6:1:1 student might.

4                       So yeah, I would -- I would look at this

5           two things, primarily.

6                       HEARING OFFICER FARAGO:  What kinds of

7           things would be (indiscernible) of, oh, this kid

8           should go into an 8:1:1 and this kid should go to a

9           6:1:1?

10                      MS. LEFAIVRE:  I mean, it's very student

11          specific, but you know, if a student has

12          significant, like, sensory challenges or -- or

13          needs where that student can't tolerate a lot of

14          noise or -- or light or, you know, things like

15          that, then, I would, you know, recommend that they

16          not be in a larger class size, so that, you know,

17          that might be a --

18                      HEARING OFFICER FARAGO:  (Interposing)

19          Okay.

20                      MS. LEFAIVRE:  -- student that would be

21          better suited in a 6:1:1 class.

22                      So, like, management needs in terms of

23          that, or if a student needs, you know, if they

24          don't have a one-to-one para, but they do need a

25          lot of one-to-one support to complete assignments,

1    they would probably be better served in a smaller

2    class where they would have more individual

3    attention from staff.  So things like that.

4              HEARING OFFICER FARAGO:  Do you ever find

5    yourselves going back to the CSE and suggest to

6    them that they revise the IEP so that the student

7    who had one staffing ratio maybe should have a

8    different one and be placed in a different class?

9              MS. LEFAIVRE:  We wouldn't do that

10   until -- no, not on -- not on enrollment.  I mean,

11   we would have --

12             HEARING OFFICER FARAGO:  (Interposing)

13   No, not on enrollment.  I mean in the course of a

14   year.

15             MS. LEFAIVRE:  In the course of a year,

16   yes, we -- we -- we have, you know, once data is

17   collected, and we have information --

18             HEARING OFFICER FARAGO:  (Interposing)

19   Right.

20             MS. LEFAIVRE:  -- to go on, then, at the

21   annual review, the -- the IEP team may recommend a

22   change in placement.  That does happen.

23             HEARING OFFICER FARAGO:  I was actually

24   thinking in between the two, that before the annual

25   review, but after --

1          MS. LEFAIVRE:  (Interposing) Oh.

2          HEARING OFFICER FARAGO:  -- initial

3     enrollment -- during the year, your work with the

4     student leads you to believe in the data you've

5     collected and things -- leads you to believe that

6     the student would be better served in a different

7     one of your classes.

8          MS. LEFAIVRE:  Sure, it -- it could

9     happen.  I can't say that it happens often, but

10    it -- it could happen --

11         HEARING OFFICER FARAGO:  (Interposing)

12    Okay.

13         MS. LEFAIVRE:  -- and if -- if the IEP

14    team felt that it was, you know, in the best

15    interest of the student and everyone was in

16    agreement, then, we could reconvene the IEP early

17    to make that recommendation.

18         HEARING OFFICER FARAGO:  Okay.  Thanks.

19    That's kind of what I wanted to know.

20         Did that raise any other questions either

21    you, Mr. Olthoff or you, Mr. Coughlin, want to ask?

22         MR. COUGHLIN:  No, thank you.

23         HEARING OFFICER FARAGO:  Okay.

24         Thank you, Ms. Lefaivre, you've been --

25         MS. LEFAIVRE:  (Interposing) Yes.

1              HEARING OFFICER FARAGO:   -- extremely
2        helpful and clear and engaged.  Usually, getting
3        any one of those is something to be grateful for,
4        getting all three is really quite special, so thank
5        you.
6              MS. LEFAIVRE:  Oh, well, I'm glad -- I'm
7        glad to hear that.
8              HEARING OFFICER FARAGO:  Have a good day.
9        You can hang up now.
10             MS. LEFAIVRE:  Thank you so much.  Have a
11       great --
12             HEARING OFFICER FARAGO:  (Interposing)
13       Yeah.
14             MS. LEFAIVRE:  -- day, everyone.
15             HEARING OFFICER FARAGO:  Good.  Bye-bye.
16             MS. LEFAIVRE:  All right, bye.
17             HEARING OFFICER FARAGO:  Okay, so we turn
18       to Mr. Donohue.
19             Mr. Donohue?
20             MR. DONOHUE:  Yes.
21             HEARING OFFICER FARAGO:  Let's first of
22       all swear you in.  And would you raise your right
23       hand?  And do you swear or affirm that the
24       testimony you will give is the truth, the whole
25       truth, and nothing but the truth?

1                    MR. DONOHUE:  I do.

2                    HEARING OFFICER FARAGO:  Thank you.  We

3          have a three-page document, unsigned, that has a

4          total of 12 numbered paragraphs in the document.  I

5          gather we're going to call this Exhibit Q.

6                    Is that right, Mr. Olthoff?

7                    MR. OLTHOFF:  Yes, Your Honor.

8                    HEARING OFFICER FARAGO:  Okay.  So --

9                    MR. DONOHIUE:  (Interposing) And Your

10         Honor, I did make one modification do the document,

11         if that's okay?

12                   HEARING OFFICER FARAGO:  Yeah.  That's

13         what I was just going to ask.

14                   MR. DONOHUE:  Well, two things, there's

15         two paragraph 9s.

16                   HEARING OFFICER FARAGO:  Ah --

17                   MR. DONOHUE:  So that was just a typo on

18         my end.  I apologize.

19                   HEARING OFFICER FARAGO:  Yeah, okay.

20                   MR. DONOHUE:  And --

21                   HEARING OFFICER FARAGO:  (Interposing)

22         Maybe --

23                   MALE VOICE:  (Interposing) So I will --

24                   HEARING OFFICER FARAGO:  (Interposing) So

25         I now have 13, and when you give me your paginated

1        version, you'll correct the paragraph numbering?
2                    MR. OLTHOFF:  Yes, I will do that, Your
3        Honor.
4                    HEARING OFFICER FARAGO:  Thanks, and we
5        will --
6                    MR. DONOHIUE:  (Interposing) So -- so --
7                    HEARING OFFICER FARAGO:  -- visualize it.
8                    MR. DONOHUE:  So the new paragraph 10,
9        which was the old paragraph 9, I -- I had
10       inadvertently put the wrong IEP meeting date
11       because I took it off of the DOE's IEP that they
12       had put into evidence.  They had it listed as May
13       20th.
14                   But the actual date of the IEP meeting
15       was June 19th.  I, you know, I looked back after I
16       had already created this, so I apologize for that.
17                   So the IEP meeting that was conducted was
18       actually June 19th, even though the DOE document
19       says May 20th.
20                   HEARING OFFICER FARAGO:  Okay.  And Mr.
21       Coughlin, with you permission, I'll ask Mr. Olthoff
22       also to make that correction before he submits
23       this.
24                   MR. COUGHLIN:  Yes, that's fine.  I
25       believe the May 20th meeting was postponed to

1    accommodate Mr. Donohue's --

2              HEARING OFFICER FARAGO:  (Interposing)

3    Right.

4              MR. COUGHLIN:  -- request.

5              MR. DONOHUE:  Right, but the document,

6    the IEP document itself, says the IEP was conducted

7    on May 20th, so --

8              HEARING OFFICER FARAGO:  (Interposing)

9    Right.  Right.  Okay.

10             So you'll fix that error, Mr. Olthoff,

11   when we get the final version.

12             MR. OLTHOFF:  Yes.

13             HEARING OFFICER FARAGO:  And other than

14   those two things, anything else to change --

15             MR. DONOHUE:  (Interposing) No, Your

16   Honor.

17             HEARING OFFICER FARAGO:  -- in this?

18   Okay.  Then, taking a look at that and to the best

19   of your knowledge and recollection, is everything

20   in this document other than two items correct?

21             MR. DONOHUE:  Yes, Your Honor.

22             HEARING OFFICER FARAGO:  And does it

23   constitute your direct testimony in this case?

24             MR. DONOHUE:  Yes, Your Honor.

25             HEARING OFFICER FARAGO:  Then, he's your

1                witness, Mr. Coughlin.

2                          MR. COUGHLIN:  Good morning, sir, how are

3                you today?

4                          MR. DONOHUE:  Good morning.

5                          MR. COUGHLIN:  So what is your position

6                with iBrain?

7                          MR. DONOHUE:  I'm not sure how that's

8                relevant.

9                          HEARING OFFICER FARAGO:  Well,

10               (indiscernible).

11                         MR. DONOHUE:  (Indiscernible).

12                         HEARING OFFICER FARAGO:  Right, but

13               you're also --

14                         MR. DONOHIUE:  (Interposing) I'm

15               testifying --

16                         HEARING OFFICER FARAGO:  -- going to be

17               testifying (indiscernible) witness, right?

18                         MR. DONOHUE:  So I'm testifying --

19                         HEARING OFFICER FARAGO:  (Interposing)

20               (Indiscernible) program.

21                         MR. DONOHUE:  Okay.  So I'm -- I'm -- I'm

22               the founder and chairman of the board.

23                         MR. COUGHLIN:  And last year's

24               transcripts were entered into evidence for this

25               matter.  Has your role changed since last year with

1            respect to the everyday operations, the educational

2            aspects of the iBrain program?

3                      MR. DONOHUE:  No.

4                      MR. COUGHLIN:  And for the start of the

5            2019/2020 school year, how many students were

6            attending the iBrain program?

7                      MR. DONOHUE:  I believe about 35,

8            somewhere in that range.

9                      MR. COUGHLIN:  And there five 6:1:1

10           classes; is that right?

11                     MR. DONOHUE:  And one 8:1:1.

12                     MR. COUGHLIN:  Okay.  Were all those

13           classes full?

14                     MR. DONOHUE:  No.

15                     MR. COUGHLIN:  Okay.  And how many

16           teachers were employed by iBrain to start the

17           2019/2020 school year?

18                     MR. DONOHUE:  Well, each -- each

19           classroom had a special education teacher, and

20           there were also additional special education

21           teachers that had other roles, so there were vision

22           education teachers who were also special education

23           teachers.

24                     Our director of special education was

25           also a special education teacher, so the -- the --

| | |
|---|---|
| 1 | each class definitely had its own special education |
| 2 | teacher and there were more special education |
| 3 | teachers employed throughout the program. |
| 4 | MR. COUGHLIN:  So at least six? |
| 5 | MR. DONOHUE:  Yes. |
| 6 | MR. COUGHLIN:  And they were all |
| 7 | certified by the State of New York? |
| 8 | MR. DONOHUE:  I believe one was pending a |
| 9 | certification.  They were certified by another |
| 10 | state, but specifically for S███ J██ 's classroom, |
| 11 | which I think is most relevant, her teacher was |
| 12 | a -- a state-certified special education teacher. |
| 13 | MR. COUGHLIN:  How many paraprofessionals |
| 14 | are employed by iBrain for the start of the |
| 15 | 2019/2020 school year? |
| 16 | MR. DONOHUE:  Well, there was at least |
| 17 | one per student, and there was an overflow of that, |
| 18 | so if we had -- if there were about 35 students, |
| 19 | there would have been at least 40 |
| 20 | paraprofessionals. |
| 21 | MR. COUGHLIN:  And what are the |
| 22 | qualifications needed to be a paraprofessional in |
| 23 | iBrain? |
| 24 | MR. DONOHUE:  Well, the general |
| 25 | identification is either a bachelor's degree or a |

1      high school degree with additional training and --

2      and support.

3                    MR. COUGHLIN:   How many occupational

4      therapists were employed by iBrain to start the

5      2019/2020 school year?

6                    MR. DONOHUE:   I'm going to -- I think

7      five or six.

8                    MR. COUGHLIN:   And what qualifications do

9      you need to be an occupational therapist at iBrain?

10                   MR. DONOHUE:   To be a licensed

11     occupational therapist and all -- all the

12     therapists across the board are licensed in New

13     York State.

14                   MR. COUGHLIN:   All right.  And how many

15     students at iBrain were recommended to receive

16     occupational therapy for the 2019/2020 school year?

17                   MR. DONOHUE:   All the students.

18                   MR. COUGHLIN:   At least 35?

19                   MR. DONOHUE:   Yeah.

20                   MR. COUGHLIN:   And did all the students

21     have the same recommendation as S    J   , which

22     was 4 sessions per week for 60 minutes per session?

23                   MR. DONOHUE:   No.  It ranged from, I

24     believe, on the low side of two to the high side of

25     five.

1              MR. COUGHLIN:  Were all the sessions for

2        60 minutes?

3              MR. DONOHUE:  I believe so.

4              MR. COUGHLIN:  And how many physical

5        therapists were employed by iBrain to start the

6        2019/2020 school year?

7              MR. DONOHUE:  I believe it was eight.

8              MR. COUGHLIN:  Were all the students --

9              MR. DONOHIUE:  (Interposing) Maybe nine,

10       but I think it was eight.

11             MR. COUGHLIN:  Okay.  How many students

12       are recommended to receive physical therapy for the

13       2019/2020 school year?

14             MR. DONOHUE:  All the students receive

15       physical therapy.

16             MR. COUGHLIN:  And were all physical

17       therapy sessions also done in 60-minute sessions?

18             MR. DONOHUE:  No, there -- I believe that

19       there were some students because they were more

20       ambulatory, their recommendations were, I believe,

21       45 minutes.

22             MR. COUGHLIN:  And what is your belief

23       based on?

24             MR. DONOHUE:  My knowledge of some of the

25       students, which I -- I don't necessarily know those

1           students are relevant to S█████ J███.

2                        MR. COUGHLIN:  And how many visual

3           therapists are there employed by  to start the

4           2019/2020 school year?

5                        MR. DONOHUE:  I believe it was three.

6                        MR. COUGHLIN:  Okay.  And how many

7           students were recommended to receive vision therapy

8           for the 2019/2020 school year?

9                        MR. DONOHUE:  I'd say probably about

10          half.

11                       MR. COUGHLIN:  Around 15 to 18?

12                       MR. DONOHUE:  Somewhere in that range.

13                       MR. COUGHLIN:  Okay.  And are all vision

14          therapy sessions done in 60-minute increments?

15                       MR. DONOHUE:  I believe so.

16                       MR. COUGHLIN:  And how many speech

17          therapists are employed by iBrain for the 2019/2020

18          school year?

19                       MR. DONOHUE:  Eight or nine.

20                       MR. COUGHLIN:  And were all students also

21          recommended to receive speech and language therapy?

22                       MR. DONOHUE:  Yes, all the students

23          receive speech-language therapy.

24                       MR. COUGHLIN:  And again, the

25          recommendations, is that the same for all students

1          with 60 minutes in duration?

2                    MR. DONOHUE:  I believe all the students

3          that receive speech therapy mandates for 60

4          minutes.

5                    MR. COUGHLIN:  So what --

6                    HEARING OFFICER FARAGO:  (Interposing)

7          Can I interrupt for one second just to ask to go

8          back and say how many physical therapists there

9          are, roughly, in the program?

10                   MR. DONOHUE:  Eight to nine, Your Honor.

11                   HEARING OFFICER FARAGO:  And the same

12         number of speech therapists?

13                   MR. DONOHUE:  Yes.

14                   HEARING OFFICER FARAGO:  Okay.  Thanks.

15                   MR. COUGHLIN:  So what are your duties as

16         chairman of the board and founder of iBrain?

17                   MR. DONOHUE:  To have the vision of the

18         program and to help to make sure that the program

19         satisfies what it's -- what it's supposed to be

20         doing and -- and also assist with the growth of

21         the -- of the program.

22                   MR. COUGHLIN:  How often are you in

23         classrooms?

24                   MR. DONOHUE:  How often am I in

25         classrooms?  I periodically walk through the -- the

1          building, you know, on a regular basis, so I may

2          stop in in a classroom here and there, not with any

3          set specific time.

4                    MR. COUGHLIN:  Do you participate -- so

5          iBrain creates what's they -- what's called an

6          IEPs, the iBrain IEPs, I believe is in evidence as

7          Exhibit D, Parent's Exhibit D.  Do you participate

8          in all IEP meetings, all IEPs for all students at

9          iBrain or just --

10                   MR. DONOHIUE:  (Interposing) No.

11                   MR. COUGHLIN:   -- your daughter?

12                   MR. DONOHUE:  Just my daughter's.

13                   MR. COUGHLIN:  Okay.  I'm just scrolling

14         down my notes, just give me one moment.  Did you

15         participate in any CSE IEP meetings for any of the

16         students at iBrain during the course of the

17         2019/2020 school year?

18                   MR. OLTHOFF:  Objection.

19                   MR. DONOHUE:  Yeah, I'm -- I'm -- I'm --

20                   MR. COUGHLIN:  (Interposing) Objection --

21                   MR. DONOHUE:  -- it -- it -- it certainly

22         would have been in the capacity of iBrain, so I

23         think it's irrelevant.

24                   MR. OLTHOFF:  Oh, sorry, am I muted?  No.

25         Okay.  Your Honor, I think I objected.  I think I'm

1       on --
2                   HEARING OFFICER FARAGO:  (Interposing) I
3       didn't hear you.  Nope, I did not hear you.  So now
4       I can hear you.
5                   MR. OLTHOFF:  Oh, okay.
6                   HEARING OFFICER FARAGO:  What's the
7       nature of your objection?
8                   MR. OLTHOFF:  That is not relevant to the
9       student.
10                  HEARING OFFICER FARAGO:  Can you repeat
11      the question for me, please?
12                  MR. COUGHLIN:  I asked as chairman of the
13      board and founder of iBrain, if Mr. Donohue
14      participated in any CSE meetings for other students
15      at iBrain.
16                  MR. DONOHUE:  Well, I -- I -- I can
17      answer that in the context (indiscernible)
18      question, Your Honor, that I've never participated
19      in an IEP meeting in my role with iBrain.
20                  HEARING OFFICER FARAGO:  Okay.
21                  MR. COUGHLIN:  So Parent's Exhibit D is
22      the iBrain IEP.  What was your role in this meeting
23      or this IEP?
24                  MR. DONOHUE:  Well, the -- the -- the --
25      you talking about S     J    's IEP?

657

1               MR. COUGHLIN:  Yes.

2               MR. DONOHUE:  So the staff creates a

3          draft IEP, and they make recommendations on goals

4          and objectives and -- and the progress that S█

5          J█  has made.  And once they have a draft, they,

6          then, sent it to me, I reviewed it, made comments

7          back or clarifications, and -- and then, a final

8          version was completed.

9               MR. COUGHLIN:  Do you remember what

10         comments you wrote back, if any?

11              MR. DONOHUE:  No.

12              MR. COUGHLIN:  Do you remember if you

13         asked for any clarifications?

14              MR. DONOHUE:  I mean, I -- I know I made

15         comments, and I had discussions, which I readily do

16         with her teacher, her -- and her therapists and her

17         para, so part of that is in the -- I also get

18         weekly updates and so it's -- it's kind of an

19         ongoing communication, but I don't remember

20         anything specific that I asked about the proposed

21         IEP.

22              MR. COUGHLIN:  Can you tell me when you

23         received this IEP from iBrain?

24              MR. DONOHUE:  No, I don't know when I

25         received it.

1          MR. COUGHLIN:  There's a date on Exhibit

2     D.  If you could refer to that, is that the date

3     you would have -- around when you would have

4     received the IEP?

5          MR. DONOHUE:  Yeah, I -- I just don't

6     remember the exact date or the approximate date.

7          MR. COUGHLIN:  Well, do you know as your

8     role with iBrain, do you know when these iBrain

9     IEPs are provided to parents after they're --

10          MR. DONOHIUE:  (Interposing) Whatever --

11          MR. COUGHLIN:  -- completed?

12          MR. DONOHUE:  Well, they're provided

13     once -- I mean, there's -- there's different

14     iterations, so I could have been provided -- this

15     date here on D-1 says May 16th, so I could have

16     been provided a draft prior to that.

17          It may have gone through one or two

18     drafts.  I don't remember exactly, but typically,

19     the -- the IEPs are going -- have gone back and

20     forth either sometimes with minor modifications,

21     sometimes with additional, depending upon the

22     student.

23          But S█████ J██, I believe there was just

24     one -- one previous draft.

25          MR. COUGHLIN:  Do you remember when that

1       draft was created?

2                   MR. DONOHUE:  I don't.  I know that they

3       start doing reviews starting in January, February,

4       March, and April.  They start looking at their

5       planning meetings, the staff does, in anticipation

6       of both progress and looking forward into the next

7       school year.

8                   MR. COUGHLIN:  But this iBrain IEP that's

9       in evidence as Parent's Exhibit D, this is the

10      final draft of the iBrain IEP for that school year?

11                  MR. DONOHUE:  Yes.

12                  MR. COUGHLIN:  And did you agree with all

13      the recommendations found in that iBrain IEP, sir?

14                  MR. DONOHUE:  Yes.

15                  MR. COUGHLIN:  Did you agree with all the

16      goals?

17                  MR. DONOHUE:  I believe so.

18                  MR. COUGHLIN:  Do you have any -- as

19      chairman and founder of iBrain, do you participate

20      in the admission process for iBrain?

21                  MR. DONOHUE:  I may meet parents that

22      come in, but I don't make any -- any determinations

23      on which students are accepted or not.

24                  MR. COUGHLIN:  Do you discuss the program

25      with parents when they come in?

1           MR. DONOHUE:  Yeah, I -- I -- when -- if

2      a parent comes in and there's a likelihood after

3      they do assessments of the student, frequently,

4      I'll met the parents and tell them about the vision

5      of the program and what -- why we're doing what

6      we're doing.

7           MR. COUGHLIN:  Do you discuss the

8      enrollment contract with the parents?

9           MR. DONOHUE:  No.

10          MR. COUGHLIN:  Do you discuss what the

11     parents would have to provide and pay for?

12          MR. DONOHUE:  No, I just -- no, I just

13     discuss the -- the -- the program and the vision of

14     the overall mission of the program.

15          MR. COUGHLIN:  Who speaks to --

16          MR. DONOHUE:  But certainly, as S▬▬

17     Jane's dad, I was aware of the enrollment

18     agreement, so I didn't have to discuss it with

19     myself.

20          MR. COUGHLIN:  Who discusses the --

21          MR. DONOHIUE:  (Interposing)

22     (Indiscernible), right?

23          MR. COUGHLIN:  Who discusses with the

24     parents the enrollment contracts?

25          MR. DONOHUE:  Well, I'm not sure how

1     that's relevant to S███ J██. I didn't need to
2     discuss it for S███ Jane's.
3                    MR. COUGHLIN:  Sir, you are the chairman
4     and the founder of the iBrain --
5                    MR. DONOHIUE:  (Interposing)  Right, but
6     what does that have to do -- where is the relevance
7     to S███ Jane's case of --
8                    HEARING OFFICER FARAGO:  (Interposing)
9     Mr. Donohue, you have to --
10                    MR. DONOHUE:  -- (indiscernible)
11     students' enrollment agreement.
12                    HEARING OFFICER FARAGO:  I understand the
13     (indiscernible) of the question, and I share it,
14     but you are represented in terms of the order of
15     these things.  Mr. Olthoff should --
16                    MR. DONOHIUE:  (Interposing) So I --
17                    MR. OLTHOFF:  (Interposing) Okay, Your
18     Honor, I'm going to object these questions about
19     enrollment or contracts as they do not relate to
20     S███ J██ specifically.
21                    HEARING OFFICER FARAGO:  Okay.  Mr.
22     Coughlin, where are we headed in this and why is
23     this relevant?
24                    MR. COUGHLIN:  Well, the Parents have
25     admitted into evidence the contracts, the

1           enrollment contracts for iBrain.  And also --
2                     MR. DONOHIUE:  (Interposing) No, the
3           enrollment contract for S███ J██ .
4                     MR. OLTHOFF:  For S███ J██ .
5                     MR. COUGHLIN:  For -- and please let me
6           finish.  So --
7                     HEARING OFFICER FARAGO:  (Interposing)
8           Yeah, go ahead.
9                     MR. COUGHLIN:  -- the contracts are
10          admitted into evidence.  The program description's
11          admitted  into evidence.
12                    However, it is my understanding that
13          the -- Mr. Donohue sends mass-market emails out to
14          a lot of individuals discussing the actual payment
15          obligations of parents and the fact that parents
16          are only obligated to pay $100 deposit that is
17          refunded based on Mr. Donohue's representations --
18                    HEARING OFFICER FARAGO:  (Interposing)
19          Don't you --
20                    MR. OLTHOFF:  (Interposing) Are any of
21          these in evidence?
22                    HEARING OFFICER FARAGO:  Mr. Olthoff,
23          wait a second.
24                    Mr. Coughlin, do you think that if you
25          wish to raise that inquiry, you would better served

1    doing so by subpoenaing Mr. Donohue to appear in a
2    case other than his own daughter's?
3                    MR. COUGHLIN:  Well, I just wanted to ask
4    some -- I'm just trying to ask some questions to --
5                    MR. DONOHIUE:  (Interposing)
6    (indiscernible).
7                    HEARING OFFICER FARAGO:  Wait,
8    (indiscernible), Mr. Coughlin.  Wait --
9                    MR. DONOHIUE:  (Interposing) I'm sorry,
10   Your Honor.
11                   HEARING OFFICER FARAGO:  -- a second.
12                   Mr. Coughlin?
13                   MR. COUGHLIN:  I would just like to ask
14   him about statements that he had made with other --
15   in other matters and outside of this --
16                   HEARING OFFICER FARAGO:  (Interposing) I
17   understand that.  Now, link that up to this case.
18                   MR. COUGHLIN:  Well, if -- if, again --
19                   HEARING OFFICER FARAGO:  (Interposing)
20   (Indiscernible) exactly how I would characterize
21   what you were doing.  I don't get it.
22                   MR. COUGHLIN:  Okay.  But he is, you
23   know, his obligation, so he has a dual role, so he
24   has two obligations, so technically --
25                   HEARING OFFICER FARAGO:  (Interposing)

664

1       That's true.

2                    MR. COUGHLIN:   -- his only obligation is

3       to also only to pay $100, as well.

4                    HEARING OFFICER FARAGO:  Yes, so?

5                    MR. COUGHLIN:   I'm just curious if he had

6       made these statements --

7                    HEARING OFFICER FARAGO:  (Interposing)

8       Did you ask about that?

9                    MR. COUGHLIN:   That's what I was getting

10      to, sir?

11                   HEARING OFFICER FARAGO:  What?

12                   MR. COUGHLIN:   That's what I was getting

13      to.

14                   HEARING OFFICER FARAGO:  I know, but the

15      other part of it isn't in this case.  I do lots of

16      things other than hear impartial hearings.  I'm a

17      law professor, as well.  But I don't spend my time

18      here lecturing about the constitution.  The case is

19      the case.

20                   What brings that -- what could bring what

21      Mr. Donohue says to other families about other

22      children into this case?

23                   MR. COUGHLIN:  Goes to his cooperation

24      and his -- why he has thwarted the CSE's efforts to

25      develop an IEP for this student.

1           HEARING OFFICER FARAGO:  I don't see the
2      connection.  I don't see the connection.  I'm not
3      letting it in.  I do encourage you to, however, in
4      other children's cases, to subpoena Mr. Donohue and
5      ask him these questions that you've got about other
6      children.
7           I don't think they're bad questions.  I
8      just think it's the wrong case.  So let's move on.
9           MR. COUGHLIN:  I'll move on.
10          Sir, what is Conductive Education?
11          MR. DONOHUE:  Conductive Education is
12     a  -- a multidisciplinary program that was
13     developed in Hungry, post-World War 2, by a
14     pediatric neurologist named Dr. Peto.
15          And what he did is after World War 2
16     there were a lot of young children who had
17     neurological impairments, but they had very little
18     resources.  So he developed an entire
19     multidisciplinary program that used very low tech
20     mechanisms in order to help and -- with the
21     developmental and growth of those students.
22          And it's widely used throughout Europe,
23     and -- and it's sporadically -- it's growing in use
24     here in the United States.  They have a Conductive
25     Education Center in Florida.

1          There's -- it's taught -- I forget which

2     university, Michigan.  It's now being taught, so

3     it's -- it's a developing therapeutic intervention

4     developing here in the United States but widely

5     used throughout Europe.

6               MR. COUGHLIN:  How long -- how often does

7     S███ J███ receive Conductive Education sessions

8     during the 2019/2020 school year?

9               MR. DONOHUE:  I believe it's twice a

10    week.

11              MR. COUGHLIN:  And how long are those

12    sessions?

13              MR. DONOHUE:  Typically, an hour.

14              MR. COUGHLIN:  Can you tell me what the

15    age-appropriate test is for S███ J███?

16              MR. DONOHUE:  I don't think there is age-

17    appropriate tests.  I believe that she is outside

18    of standardized testing.

19              MR. COUGHLIN:  No, I'm sorry,

20    (indiscernible) speak clearly.  What is the age-

21    appropriate text, T-E-X-T, for S███ J███?

22              MR. DONOHUE:  Text, well, I believe she's

23    operating at a pre-K to K level.

24              MR. COUGHLIN:  And who has told you this?

25              MR. DONOHUE:  Multiple assessments, her

1    teacher, the CSE, when they did their evaluations.

2    I believe it's on one of their reports, actually,

3    that the Committee on Special Education did when

4    they assessed S████ J███, (indiscernible) reports.

5                MR. COUGHLIN:  And what is a jellybean

6    switch?

7                MR. DONOHUE:  It's a switch which -- with

8    a kind of a -- a -- a big button in order to make

9    it easier for a child to activate it.  And --

10               MR. COUGHLIN:  (Interposing) How does

11   that --

12               MR. DONOHUE:  -- based upon the -- based

13   upon the activation, it would have a pre-programmed

14   purpose, either in perhaps generating -- it -- it

15   can then -- from that activation, it can then

16   trigger all different types of activities.

17               So sometimes, you can -- you can attach a

18   toy or a fan or a voice output mechanism to that

19   switch, all depending upon what activity or what

20   functionality you're working on at the time.

21               MR. COUGHLIN:  And how does S████ J███

22   activate a jellybean switch?

23               MR. DONOHUE:  So sometimes, she'll

24   activate it using her hand.  Sometimes, she'll

25   activate it using her head.

1          MR. COUGHLIN:  And when S███ J██ is

2     using the jellybean switch for communication, you

3     said that for responses, how many switches would

4     she be using?

5          MR. DONOHUE:  Well, you'd -- you'd use

6     one switch at a time.  But sometimes, you may --

7     you may use a -- a dual-button switch as opposed to

8     a single-button switch, but you're really only

9     going to use one -- one switch at a time.

10          MR. COUGHLIN:  Do you know what the

11     communication function classification system is?

12          MR. DONOHUE:  Say that again.

13          MR. COUGHLIN:  The communication function

14     classification system, do you know what that is?

15          MR. DONOHUE:  Not off the top of my head.

16          MR. COUGHLIN:  Do you know what the DAGG-

17     2 is, D-A-G-G-dash-2?

18          MR. DONOHUE:  I believe that's an

19     assessment.  I believe both of them are assessments

20     that are done, and I believe they may even be in

21     S███ J██ 's IEP.  If you want to, I can go --

22          MR. COUGHLIN:  (Interposing) Have you

23     ever conducted these assessment, sir?

24          MR. DONOHUE:  No, I -- assessments like

25     that are going to be conducted by experts in -- in

1            their particular area.

2                      MR. COUGHLIN:  And do you know what the

3            TEDI is, the T-E-D-I?

4                      MR. DONOHUE:  Yeah, that's a pediatric

5            assessment typically done for -- for physical

6            therapy to -- to show the range of motion and --

7            and the different types of physical activity the

8            student is able to do.  These -- these are all

9            assessments, I believe, that are in S    J    's

10           iBrain IEP.

11                      MR. COUGHLIN:  Have you ever done one of

12           these assessments, sir?

13                      MR. DONOHUE:  No, I'm not a licensed

14           physical therapist.

15                      MR. COUGHLIN:  Are you the person that

16           developed the scores for the assessments?

17                      MR. DONOHUE:  No, these -- these are --

18           these -- these assessments are -- are created by

19           professional organizations.  They're standardized.

20           They're published and updated regularly.

21                      MR. COUGHLIN:  And S    J    receives

22           feeding from a G-tube one time per day when she was

23           at iBrain for the 2019/2020 school year; is that

24           correct?

25                      MR. DONOHUE:  Yes.

1              MR. COUGHLIN:  And that usually takes

2      about 30 minutes to complete; is that right?

3              MR. DONOHUE:  No, it could be up to 45

4      minutes.  It depends.  But that's also the initial

5      feeding.  But then they have to wait a certain

6      amount of time to then do a water flush, and then

7      they have to closely monitor her.

8              As you heard Mr. Olthoff speak with --

9      with your -- your witness, S▮▮▮ J▮▮ can either

10     vomit and obviously, there's always a close

11     monitoring for potential aspiration for something

12     like that.

13             MR. COUGHLIN:  Okay.  Can you tell us

14     what the MAC classification is?

15             MR. DONOHUE:  Say that again?

16             MR. COUGHLIN:  MAC -- M-A-C --

17     classification.

18             MR. DONOHUE:  I believe that's a

19     communication type of assessment.

20             MR. COUGHLIN:  And all the scores and

21     assessments done on the iBrain IEP, they were done

22     by other people other than yourself; is that right?

23             MR. DONOHUE:  Yes.

24             MR. COUGHLIN:  Okay.  So for the

25     2019/2020 school year, did iBrain ever close

1      because of the pandemic?

2                MR. DONOHUE:  It -- in late March, we

3      shifted the spring break time from April to late

4      March so that the last week and a half to two weeks

5      of March, the school then physically shut down.

6                And then in early April, we then

7      started -- the students stayed at home while paras

8      and staff started going to home for those families

9      who felt comfortable doing so.  And then therapists

10     started going to the homes, as well, so that in-

11     person services would be provided while

12     simultaneously remote learning was going on.

13               And then the first week in May, the

14     facility physically reopened, and S███ J███

15     returned on May 4th.

16               MR. COUGHLIN:  And so going back to when

17     it was for the remote learning, how often would the

18     physical -- the related services providers come to

19     your home to --

20               MR. DONOHUE:  (Interposing) So the

21     paraprofessional came every day.  The one-to-one

22     nurse came every day.  And then I believe twice a

23     week, therapists came to the home, and then the

24     other -- the other times during the week, sessions

25     were done remotely.

672

```
1                    MR. COUGHLIN:  How were they done
2        remotely?
3                    MR. DONOHUE:   Including academics.
4                    MR. COUGHLIN:  How was it --
5                    MR. DONOHUE:   (Interposing) I'm sorry?
6                    MR. COUGHLIN:  How were the physical
7        therapy sessions done remotely?
8                    MR. DONOHUE:  Well, the physical
9        therapist working with the paraprofessional would
10       give instructions on stretching or assessments.
11       Obviously, there's limitations on -- you can only
12       do so much therapy, but certainly as you probably
13       well know as the attorney for the Department of
14       Education, it was teletherapy was actually
15       approved, and it had been previously approved
16       for -- for these type of services.
17                   MR. COUGHLIN:  So what was the -- what
18       was the paraprofessional doing with the -- with
19       your daughter during the physical therapy sessions?
20                   MR. DONOHUE:  Well, I wasn't physically
21       there.  But the physical therapist would -- would
22       zoom in and give instructions to the
23       paraprofessional on different types of tasks.
24                   We had -- we brought the stander home.
25       So -- so that -- that -- she'd be put in the
```

1      stander between the paraprofessional and the nurse,

2      and so she'd be able to have some of that time

3      done.

4           And that -- that certainly would be done

5      under the supervision of the physical therapist as

6      well.  So that would be kind of an example.

7           Or stretching.  Also, monitoring with her

8      AFOs and her braces, you know, so the physical

9      therapist would also do skin checks by having

10     the -- the monitor, you know, look and cover her --

11     S███  Jane's body.

12           HEARING OFFICER FARAGO:  So the para and

13     the nurse were both physically present, and the PT

14     was present via Zoom?  Is that what you're

15     describing?

16           MR. DONOHUE:  Yes, Your Honor. So the

17     nurse and the one-to-one paraprofessional would

18     physically be with S███  J███ , and the physical

19     therapist would be on a Zoom session.  Or OT or

20     vision, if they weren't physically here.

21           MR. COUGHLIN:  Were you still responsible

22     for the full cost of the tuition during the

23     closure?

24           MR. DONOHUE:  I'm sorry?

25           MR. COUGHLIN:  Were you still responsible

1    for covering the full cost of tuition during the
2    time of the closure?
3              MR. DONOHUE:   The school never closed.
4              MR. COUGHLIN:   Well, with respect to the
5    remote learning, were you still required to pay the
6    total amount of tuition --
7              MR. DONOHUE:   (Interposing) Yes.
8              MR. COUGHLIN:   Okay.  Besides the stander
9    that you said that you took home, was there any
10   other devices that you had available at your home
11   during the time of the remote learning?
12             MR. DONOHUE:   Yeah, we have -- I have
13   mats at home, and I have some benches at home, as
14   well, so those are some equipment that I already
15   had at home.
16             MR. COUGHLIN:   I heard you say mats, and
17   then you cut off.
18             MR. DONOHUE:   Mat and also bench.  So --
19   so they'll basically sit S▮▮▮ J▮▮ up on the bench
20   and work on her -- on her sitting and on an actual
21   bench.
22             MR. COUGHLIN:   Besides the bench and the
23   stander, any other devices that you had?
24             MR. DONOHUE:   Well, we had her
25   communication device, which travels with her

1        anywhere, as they mutually had the iPad that we

2        used for -- for the Zoom sessions.  And then there

3        may have been other materials that -- that they

4        carried over.  I don't know specifically which

5        materials, but I know that they had other types of

6        materials that -- that they'd previously be using

7        in the classroom that they then were using at the

8        home.

9                    MR. COUGHLIN:  And how were the vision

10       services provided while she was working remotely?

11                   MR. DONOHUE:  The same.  A combination of

12       in-person and -- and remote.  Live sessions.

13                   MR. COUGHLIN:  How often would the -- the

14       vision therapist come to your home?

15                   MR. DONOHUE:  I believe at least once a

16       week.

17                   MR. COUGHLIN:  And how many times --

18                   MR. DONOHUE:  And sometimes twice a week.

19                   MR. COUGHLIN:  And how many times would

20       your daughter receive vision therapy remotely?

21                   MR. DONOHUE:  Well, for the month of

22       April, if I had to take a guess, it was probably

23       about half of the sessions were in person and half

24       were done remotely, somewhere in that range, give

25       or take.

1           MR. COUGHLIN:  Are you responsible for

2      taking attendance of the students at the --

3           MR. DONOHUE:  (Interposing) No.

4           MR. COUGHLIN:  -- at iBrain?  Who does

5      that?  Who takes the --

6           MR. DONOHUE:  (Interposing) Well, the

7      teacher would take attendance of each student in

8      her class.

9           MR. COUGHLIN:  And who is responsible

10     for -- with respect to taking attendance and

11     documenting how often the physical therapy and

12     other related services are provided?

13          MR. DONOHUE:  Well, for S████ J████

14     specifically, it would be her -- her therapists.

15     And then once she returned physically fulltime in

16     person -- I believe it was March 4th, whatever that

17     first Monday in March -- in May, I'm sorry, that

18     first Monday in May, all the services were then

19     continued in person.

20          MR. COUGHLIN:  All right.  So now, let's

21     move on to the IEP meeting that occurred in June of

22     2019.  You appeared for that in person; is that

23     right?

24          MR. DONOHUE:  Yes.

25          MR. COUGHLIN:  And then there are a

1            number of iBrain employees that called on -- called

2            in via the telephone; is that right?

3                        MR. DONOHUE:  Correct.

4                        MR. COUGHLIN:  But then you left that

5            meeting; is that right?

6                        MR. DONOHUE:  That's correct.

7                        MR. COUGHLIN:  Then all of the other

8            employees left the meeting, as well; is that right?

9                        MR. DONOHUE:  Well, I -- I instructed

10           that the IEP meeting was not to continue without my

11           participation and presence.

12                       HEARING OFFICER FARAGO:  Which meeting

13           again?

14                       MR. DONOHUE:  June 19th, 2019.

15                       HEARING OFFICER FARAGO:  Okay.

16                       MR. COUGHLIN:  Has S███ J███ ever

17           attended a New York City public school?

18                       MR. DONOHUE:  No.

19                       MR. COUGHLIN:  Now with respect to the

20           IEP meeting in 2018/2019 --

21                       MR. DONOHUE:  (Interposing) You're

22           referring specifically -- I'm sorry, can you be

23           specific about the -- you're talking about the June

24           19th, 2019, IEP meeting?

25                       MR. COUGHLIN:  No.  So now let's back up

1           a little bit.  So with respect to the IEP meetings
2           for the 2018/2019 school year, the CSE sent you a
3           number of notices for that school year; is that
4           right?  For meetings.
5                       MR. OLTHOFF:  Your Honor, how is --
6           objection.  How is the '18/'19 school year relevant
7           here?
8                       HEARING OFFICER FARAGO:  Well, let's give
9           him a little leeway and then see where it's headed.
10                      MR. DONOHUE:  Well, are you referring to
11          any specific document in evidence?
12                      MR. COUGHLIN:  Sir, I've asked you a
13          question.  The IHO has directed you to answer the
14          question.  My question is --
15                      HEARING OFFICER FARAGO:  (Interposing)
16          No, I said give some leeway.  Say it again.
17                      MR. COUGHLIN:  With respect to the IEP
18          meetings for your daughter for the 2018/2019 school
19          year, you were sent a number of notices for IEP
20          meetings; is that right?
21                      MR. OLTHOFF:  Objection.  He's referring
22          to documents that are not in evidence.
23                      HEARING OFFICER FARAGO:  That's okay.  Go
24          ahead.
25                      MR. DONOHUE:  So there were --

1              HEARING OFFICER FARAGO:   (Interposing)
2        It's a yes or no question (indiscernible).
3              MR. DONOHUE:   (Indiscernible) Your Honor,
4        I just want to clarify.  There were several
5        notices, but that doesn't mean they were proper
6        notices.
7              HEARING OFFICER FARAGO:   Well, that
8        doesn't matter.
9              MR. DONOHUE:   Sure.  I just wanted to
10        clarify my answer.
11              HEARING OFFICER FARAGO:   One question at
12        a time.  Go ahead.  So the answer is yes.
13              MR. DONOHUE:   There were several notices
14        that were sent --
15              HEARING OFFICER FARAGO:   (Interposing)
16        Yeah, I know.  I heard you.  I heard you.  The
17        answer's yes.
18              MR. COUGHLIN:   Okay.  And you were also
19        asked for the 2018/2019 school year to provide
20        documents from you and also the school with respect
21        to the -- your daughter's progress or reports from
22        that school; is that right?
23              MR. DONOHUE:   Every year the IEP
24        meeting -- the answer is, yes, of course.
25              MR. COUGHLIN:   And the IEP meeting was

1        rescheduled about three times for the 2018/2019

2        school year; is that right?

3                    MR. DONOHUE:  No, that's not correct.

4                    MR. COUGHLIN:  How many times was it

5        rescheduled, sir?

6                    MR. DONOHUE:  I don't believe it was ever

7        rescheduled.  There were a couple of dates that

8        were proposed that weren't mutually agreeable, and

9        I believe there was another date where it wasn't a

10       proper IEP meeting.  I'm just going off of memory,

11       Your Honor, because obviously many --

12                   HEARING OFFICER FARAGO:  (Interposing)

13       Yeah, I know.  Now, I want to know where we're

14       headed.

15                   MR. COUGHLIN:  Okay.  So --

16                   HEARING OFFICER FARAGO:  (Interposing)

17       Where are we headed?  Why are we talking about

18       '18/'19?

19                   MR. COUGHLIN:  Because when we have a

20       situation such as this where the CSE has to come to

21       a choice between whether or not to complete a

22       timely IEP or wait for parental participation, the

23       CSE has to make a determination of what it needs to

24       do here.

25                   And the appeal from last year's decision

1        discusses this.  And the CSE has to determine

2        whether or not what's the best course of action,

3        what's the reasonable course of action.  When a

4        parent has repeatedly shown that they're not

5        willing to cooperate with the CSE or attend IEP

6        meetings, then the CSE has to make a choice.

7                     Mr. Donohue's course of action --

8                     HEARING OFFICER FARAGO:  (Interposing)

9        So --

10                    MR. COUGHLIN:  -- for the last two years

11       has shown that he does not want to cooperate with

12       the CSE.  So therefore --

13                    HEARING OFFICER FARAGO:  (Interposing)

14       Well, now you're making arguments rather than

15       asking questions.  Let -- if I'm not mistaken,

16       right, if we go into -- let me just check the

17       record.  Maybe I'm wrong.  But we have the

18       transcript from 175162 in evidence, right?

19                    MR. COUGHLIN:  Yes.

20                    HEARING OFFICER FARAGO:  We have

21       available a decision from that case and the

22       preceding case.  We have the SRO decisions as a

23       matter of record.

24                    You can make your arguments.  You have

25       the full factual basis on which to make your

1          argument.
2                    MR. COUGHLIN:  Okay, I'll move on.
3                    HEARING OFFICER FARAGO:  They are
4          arguments I have found persuasive in the past.  But
5          I don't know what they have to do with this
6          questioning.
7                    MR. COUGHLIN:  Okay, so I'll move on,
8          sir.
9                    HEARING OFFICER FARAGO:  Yeah.  Thanks.
10                   MR. COUGHLIN:  Let me just go through my
11         notes here.  I think I'm almost done.
12                   HEARING OFFICER FARAGO:  Okay.
13                   MR. COUGHLIN:  Now, sir, with respect to
14         the meeting for the -- in 2019, when would you
15         first receive an IEP notice, if you remember?
16                   MR. DONOHUE:  For which -- which date,
17         which meeting?  I mean --
18                   MR. COUGHLIN:  (Interposing) For the
19         2019/2020 school year.  Did you only receive one --
20                   MR. DONOHUE:  (Interposing) No, we
21         actually had an IEP meeting in, I believe, April of
22         2020.  Which -- which IEP meeting are you referring
23         to?
24                   MR. COUGHLIN:  So I'm referring to the
25         one that occurred in April -- I'm sorry, June of

1          2019.

2                    MR. DONOHUE:  Okay.

3                    MR. COUGHLIN:  Was the notice that you

4          received, was the first notice that you received

5          for the IEP meeting scheduled for the June 2019

6          date?

7                    MR. DONOHUE:  Well, I'm looking -- can I

8          look at the records in evidence?  Is that okay?

9                    HEARING OFFICER FARAGO:  I actually

10         thought we'd already ascertained that there was a

11         May -- that originally there was a May date that

12         didn't happen, and then -- isn't that in -- hasn't

13         that been testified to already?  And then --

14                   MR. DONOHUE:  Right, because I cleaned up

15         my --

16                   HEARING OFFICER FARAGO:  (Interposing)

17         June?

18                   MR. COUGHLIN:  Okay.  So why was the May

19         meetings canceled in 2019?  Or postponed?  I'm

20         sorry.

21                   MR. DONOHUE:  Well, I believe for two

22         reasons.  One is I specifically asked for the

23         meetings to be conducted later in the afternoon.

24         And the second thing is that the CSE had not

25         circulated the medical accommodation forms in a

1    timely manner in order for us to be able to

2    actually have medical forms filled out and then

3    submitted back in time.

4         So the CSE -- in order to have a proper

5    meeting, they -- they agreed to reschedule when all

6    the documentation could be available for the actual

7    meeting.

8         MR. COUGHLIN:  I'm just going to go

9    through my notes here.  Just give me one second.

10        Sir, did you draft the enrollment

11   contract for iBrain?  Or did you take any role in

12   it in drafting the contract?

13        MR. DONOHUE:  Yes, I had a -- it was

14   similar enrollment contract that was previously in

15   S▓▓▓ J▓▓'s previous school, yeah, in different

16   iterations.  I've had a role in the drafting of it.

17        MR. COUGHLIN:  Okay, the contract

18   discusses base tuition and supplemental tuition.

19   What is covered with the base tuition?  I mean, it

20   says -- if I read that, it says an individual

21   paraprofessional is covered, and the nurses -- the

22   cost of the nurse is covered.  So what else is

23   covered by that base tuition?

24        MR. DONOHUE:  Well, the core academic

25   program, which means the student with the teacher,

1      with the infrastructure of the program, as you also

2      noted, which includes a one-to-one

3      paraprofessional.

4                  And then the supplemental is the various

5      related services that each student individually is

6      developed per their needs.  That's why there's not

7      a -- I'm sorry.

8                  MR. COUGHLIN:  So some students in

9      your -- in the iBrain have individual nurse; is

10     that correct?

11                 MR. DONOHUE:  Yes.

12                 MR. COUGHLIN:  Now, is the individual

13     nurse covered in the supplemental or the base

14     tuition?

15                 MR. DONOHUE:  No, it's not covered in the

16     base because that would be -- that's -- the school

17     nurse is covered in the base of the program but not

18     one-to-one nursing.

19                 MR. COUGHLIN:  And how many school nurses

20     are there that are not the one-to-one?

21                 MR. DONOHUE:  There's one school nurse.

22                 MR. COUGHLIN:  And that's the -- and she

23     oversees the -- all students.

24                 MR. DONOHUE:  He.  It's a he.  Yes.  He

25     oversees --

1           MR. COUGHLIN:  (Interposing) Okay.  And

2      how much is the school nurse paid?

3           MR. OLTHOFF:  Objection.  Objection.  How

4      is that relevant?

5           HEARING OFFICER FARAGO:  Basis?

6           MR. OLTHOFF:  How is the salary of the

7      school nurse relevant to S███ Jane's program?

8           MR. COUGHLIN:  Just try to --

9           HEARING OFFICER FARAGO:  (Interposing)

10     It's okay.  I'll let it in.

11          MR. OLTHOFF:  Okay.

12          MR. DONOHUE:  I believe it's around 130,

13     140,000.

14          MR. COUGHLIN:  And how much are

15     paraprofessionals paid?

16          MR. DONOHUE:  Well, there's a range

17     from -- I'd say anywhere from low 30s to low 40s --

18     actually, to mid-40s, depending upon their

19     experience.

20          MR. COUGHLIN:  And how much are the

21     teachers paid?

22          MR. DONOHUE:  Teachers are paid in the

23     range of 60 to 80,000, once again, depending upon

24     their level of experience.

25          MR. COUGHLIN:  Now, the base tuition also

1            covers the academic program.  Can you tell me what

2            is included in the academic program?

3                     MR. DONOHUE:  Well, the academic program

4            is the infrastructure of the school.  So the base

5            covers the core academics.  In other words, the

6            base covers what every student receives.  So every

7            student has a teacher.  Every student has a one-to-

8            one paraprofessional.  The school nurse is --

9            covers for the entire school, and then obviously,

10           all other school-wide expenses -- rent, cable, Con-

11           Ed, all the different, various costs of running the

12           program would then be included into the cost of

13           the -- the base program.

14                    HEARING OFFICER FARAGO:  And there's -- I

15           assume there's some sort of head of school and --

16                    MR. DONOHUE:  Yeah, we have a program

17           director.  We have a deputy program director.  We

18           have a director of special ed.  We have a special

19           education manager.  We have a paraprofessional

20           manager.  We have a director or HR.  We have -- I

21           mean, various administrative roles.

22                    HEARING OFFICER FARAGO:  Are there other

23           supervisory related service staff who are not --

24           who are billed as part of the core tuition base?

25                    MR. DONOHUE:  Yes, Your Honor, there's a

1           program director who (indiscernible).

2                   HEARING OFFICER FARAGO:  (Indiscernible).

3                   MR. DONOHUE:  The answer's yes.

4                   HEARING OFFICER FARAGO:  I understand

5           when you talk about this -- there's special ed.

6           There's a -- all those folks.  Are there

7           specific -- is there like a head of TC or something

8           like that, some sort of supervisors?

9                   MR. DONOHUE:  Well, yes.  There is the

10          director -- the deputy program director is also the

11          director of related services.

12                  HEARING OFFICER FARAGO:  Right.

13                  MR. DONOHUE:  So she oversees all the

14          related services, and each department has a

15          director.  So there's other director -- a senior --

16          PT, OT, speech, vision, so on, so forth.

17                  HEARING OFFICER FARAGO:  Okay.  And are

18          those people also providing direct services to

19          kids?

20                  MR. DONOHUE:  The -- the -- the providers

21          are, not the -- not the related services director.

22                  HEARING OFFICER FARAGO:  But the person

23          who is the head of OT or the person who is the head

24          of speech --

25                  MR. DONOHUE:  (Interposing) Will also

1        have (indiscernible).

2                    HEARING OFFICER FARAGO:  (Indiscernible).

3                    MR. DONOHUE:  Yes, Your Honor.

4                    HEARING OFFICER FARAGO:  About how much

5        of their time is spent on supervision and how much

6        on caseload?

7                    MR. DONOHUE:  Probably about 50 percent

8        of their time is cases and 50 percent of the time

9        is supervision.

10                   HEARING OFFICER FARAGO:  Okay.  And do

11       you in your accounting mechanism allocate their

12       salaries separately so that some portion gets paid

13       out of the core tuition or -- it all come out of

14       the related services supplemental charges?

15                   MR. DONOHUE:  No, it's -- it's -- it's

16       not -- it's not actually calculated in that

17       particular way as far as the allocation goes.  But

18       certainly, if a -- if a -- if a therapist has, you

19       know, a certain amount of -- of cases, they

20       obviously would be partaking in those services and

21       that -- that would be considered part of the

22       supplemental --

23                   HEARING OFFICER FARAGO:  (Interposing)

24       Right.

25                   MR. DONOHUE:  -- tuition.

Exhibit 6: Page 117 of 159

1                    HEARING OFFICER FARAGO:   And are they

2          billed -- are they billed at the same rate as the

3          other providers?

4                    MR. DONOHUE:   Yes.

5                    HEARING OFFICER FARAGO:   The

6          supplemental?   Okay.

7                    MR. DONOHUE:   Yeah.

8                    HEARING OFFICER FARAGO:   Sorry, Mr.

9          Coughlin, I just want to get some detail.

10                    MR. COUGHLIN:   So then the supplemental

11         tuition costs covers related services,

12         transportation paraprofessionals, individual

13         nurses, and the assistive technology; is that

14         correct?

15                    MR. DONOHUE:   Yes.

16                    MR. COUGHLIN:   So does the related

17         service providers' salary come strictly from the

18         supplemental tuition, or does it also come from the

19         base tuition cost?

20                    MR. DONOHUE:   I'm not sure.   I don't

21         think that it's necessarily segregated out in any

22         particular manner.   I mean, budgets are created

23         based upon the needs of what the students are, and

24         then providers are hired based upon their ability

25         to service what those students' needs are.

| | |
|---|---|
| 1 | HEARING OFFICER FARAGO: Mr. Coughlin, |
| 2 | can you repeat for me the list you just read, |
| 3 | the -- it covers related service providers, |
| 4 | transportation para, one-to-one nurse, anything |
| 5 | else? |
| 6 | MR. COUGHLIN: The assistive technology. |
| 7 | HEARING OFFICER FARAGO: Right. Thank |
| 8 | you. I knew I dropped something. |
| 9 | MR. COUGHLIN: Now, directing your |
| 10 | attention to the transportation costs. Do you have |
| 11 | any role in the transportation costs or contracts? |
| 12 | MR. DONOHUE: No. |
| 13 | MR. COUGHLIN: And who provides the |
| 14 | transportation? |
| 15 | MR. DONOHUE: Sisters Travel and |
| 16 | Transportation. |
| 17 | MR. COUGHLIN: And who is in charge of |
| 18 | Sisters Travel and Transportation? |
| 19 | MR. DONOHUE: Sam Schwartz is the chief |
| 20 | of staff for Sisters Travel and Transportation. |
| 21 | MR. COUGHLIN: And who is the owner and |
| 22 | operator of that company? |
| 23 | MR. DONOHUE: And the relevance? |
| 24 | MR. COUGHLIN: Do you have any connection |
| 25 | with the owner/operation? |

Exhibit 6: Page 119 of 159

1                      MR. OLTHOFF:  Objection.

2                      HEARING OFFICER FARAGO:  Okay.  Well, we

3            have the transcript from the previous hearing

4            admitted into evidence.  Can we stipulate that

5            Sisters continues to be owned by your spouse, Mr.

6            Donohue?

7                      MR. DONOHUE:  Yes.  Yes, Your Honor.

8                      HEARING OFFICER FARAGO:  Thank you.

9                      MR. COUGHLIN:  Is there any

10           relationship -- has the relationship between iBrain

11           and the transportation company changed in any way

12           since last year?

13                     MR. DONOHUE:  No.

14                     HEARING OFFICER FARAGO:  So my

15           recollection, Mr. Donohue, is that you

16           subcontracted with a company last year called

17           Senior Care.  Is that who you subcontract to or

18           they -- is that who transports S█████ J███ in your

19           care or someone else?

20                     MR. DONOHUE:  Mostly Senior Care, but

21           then there's -- they do use other subcontractors,

22           as well.  But primarily, it's been Senior Care.

23                     HEARING OFFICER FARAGO:  Just asking

24           about S█████ J███.

25                     MR. DONOHUE:  Yeah.

1                    HEARING OFFICER FARAGO:  Does she have

2          the same driver every day and the same --

3                    MR. DONOHUE:  (Interposing) Yes.

4                    HEARING OFFICER FARAGO:  Does she go in a

5          vehicle with more than one -

6                    MR. DONOHUE:  (Interposing) Well,

7          actually -- no, there's usually just -- I'm

8          thinking for 2019/2020.  I believe most of the time

9          it's just her.  But sometimes, depending upon

10         various schedules, there may be another student in

11         the vehicle with her.

12                   HEARING OFFICER FARAGO:  Okay.  And what

13         kind of vehicle is it?

14                   MR. DONOHUE:  It would be a lift

15         ambulette bus.

16                   HEARING OFFICER FARAGO:  Okay.  So it

17         would accommodate more than one.

18                   MR. DONOHUE:  Oh, yes.  Yes.  It would,

19         right.

20                   HEARING OFFICER FARAGO:  Yeah.  Okay.

21         Unless you're -- iBrain was in the same location.

22         So it's traveling across town last year, right?

23                   MR. DONOHUE:  Correct.

24                   MR. COUGHLIN:  So has the address of

25         iBrain changed since last year?

694

1                    MR. DONOHUE:  No.

2                    MR. COUGHLIN:  So it's still at Columbia?

3                    MR. DONOHUE:  No, the school's been on

4          the East Side for years.

5                    MR. COUGHLIN:  Okay.

6                    HEARING OFFICER FARAGO:  Well, two years.

7          Right?  Yeah.

8                    MR. COUGHLIN:  I have no further

9          questions.

10                    HEARING OFFICER FARAGO:  Okay.  Mr.

11          Olthoff, redirect?

12                    MR. OLTHOFF:  Yes, Your Honor.

13                    So Mr. Donohue, you visited the DOE's

14          proposed placement for the 2019/2020 school year,

15          correct?

16                    MR. DONOHUE:  Yes.

17                    MR. COUGHLIN:  Objection.  It's already

18          in the affidavit.

19                    MR. OLTHOFF:  Okay, so based on -- go

20          ahead.

21                    HEARING OFFICER FARAGO:  Okay, some

22          leeway here.  We don't actually abide by the rules

23          of evidence.  They don't govern us.  So let's see

24          where it's heading before we narrow

25          (indiscernible).

Exhibit 6: Page 122 of 159

1              MR. OLTHOFF:  (Indiscernible).  That was

2        just foundational, Your Honor.

3              Mr. Donohue, based on the testimony of

4        Ms. LeFaivre that you heard today, is there

5        anything you remember from your visit that's

6        different from Ms. LeFaivre's testimony?

7              MR. DONOHUE:  Yeah, there was several

8        things.  First of all, the speech therapy is an

9        office.  It's not a separate location.  And it's

10       filled with basically desks.  A wheelchair, I don't

11       think, would be able to physically fit into that

12       office.

13             So when she said that -- that speech

14       therapy would be done in the -- that room on the

15       second floor, that's just flat out not true because

16       we actually met with the speech therapist we

17       visited.  And said, yeah, if they ever do speech

18       therapy in that room and said, no, all speech

19       therapy is done in the classroom.

20             The second thing that she said, which was

21       inaccurate, when I met with the school nurse, the

22       school nurse informed me when I was speaking with

23       her because on the IEP that was developed by the

24       DOE, they didn't include school nurse services on

25       the IEP.

1             And so the school nurse informed me that

2       that IEP would have to be modified to include

3       school nurse services in order for her to actually

4       provide the feeding for S█████ J██ and that Ms.

5       LeFaivre did correctly state that she would

6       actually have to stay in the nurse's office because

7       the nurse does not go to particular classrooms.

8             So that was -- those were two specific

9       things that -- that was -- that was -- the other

10      thing is I don't necessarily think Ms. LeFaivre was

11      completely forthright when she talked about the

12      time it would take to go from the first floor to

13      the third floor, especially with the elevator's in

14      the other side of the building.

15            When I visited, we waited for five

16      minutes just for the elevator, and it didn't even

17      arrive.  So we walked up the stairs.  We actually

18      finally took the elevator coming down and waiting a

19      few minutes.

20            So I mean, it would easily take five or

21      ten minutes just to go from the first floor

22      classroom to the third floor therapy room, which --

23      I can give you a description.  It was about a 25x25

24      square feet, and it was split, and OT and PT are in

25      the same room with mat.  So it's not a very large

1      space.

2                  The other thing, when I met with the

3      physical therapist there, the physical therapist

4      told us that if a student has 60 minutes or -- or

5      more than 30 minutes on their IEP that they would

6      typically go to modify so it would fit into their

7      class schedules.

8                  So those were just significant things.

9      And the other piece is that when I visited in July

10     of 2019, the age range that they had in the two

11     classrooms, the youngest student was 17 years of

12     age and older.  And the rest of the students were

13     17 and older.  So there was -- there was no younger

14     age group that S████ J██ would have been

15     appropriately set with.

16                 So those are just a few of the items that

17     she stated that, based upon my visit when I visited

18     at the time that was in align with her testimony.

19                 MR. OLTHOFF:  Okay.  And we now change

20     the paragraph number to paragraph 11, but you're

21     stating that when you met with one of the physical

22     therapists, you were told that if the therapy

23     sessions were longer than 30 minutes, the IEPs were

24     amended?  How does -- how did they explain that

25     worked to you?

698

1            MR. DONOHUE:  Yeah, they basically
2       reconvened an IEP and made the amendments and
3       changes to the IEP.
4            MR. OLTHOFF:  Did they change the time of
5       the session, then?
6            MR. DONOHUE:  Yeah, they would reduce
7       them so that it would fit into what their schedules
8       were.
9            MR. OLTHOFF:  Okay.  And in your
10      affidavit -- all right.  I think that's all, Your
11      Honor.
12           HEARING OFFICER FARAGO:  Okay.  Any re-
13      cross?
14           MR. COUGHLIN:  Yes.
15           So you went -- you visited the school in
16      July of 2019; is that correct?
17           MR. DONOHUE:  Yes.
18           MR. COUGHLIN:  And did the physical
19      therapy reduce your daughter's sessions on the
20      Department of Education's IEP?
21           MR. DONOHUE:  No, because I didn't bring
22      it there.
23           MR. COUGHLIN:  Thank you.  I have no
24      further questions.
25           HEARING OFFICER FARAGO:  Anything from

1    you, Mr. Olthoff?

2              MR. OLTHOFF:  Yes, Your Honor.  I

3    apologize.

4              Mr. Donohue, in your last paragraph, you

5    talked about the CSE reconvening on April of 2020.

6    What happened at this meeting?

7              MR. DONOHUE:  Well, it was --

8    everybody -- it was conducted over phone because it

9    was right in the middle of the COVID crisis.

10   Everybody participated by phone.

11             And the CSE reconvened.  I specifically

12   inquired whether it was a reconvene, and they said

13   yes, and that it would be operational within a

14   couple weeks after that meeting, which obviously

15   the documentation that the CSE has shows that the

16   implementation date was for May 2020.

17             So they specifically were developing an

18   IEP for the '19/'20 school year which would also

19   then carry over into the '20/'21 school year.

20             And also I -- I also inquired as to how

21   they could be making a recommendation for a

22   District 75 program in the middle of the COVID

23   crisis when the program that they were recommending

24   wasn't actually available, and I was told by the

25   school supervisor -- the school's psychologist, who

1           was the District rep, that that was their

2           instructions is to -- is to submit them as if -- as

3           if the COVID wasn't actually occurring.

4                    And in that IEP, they agreed that all of

5           S█████ J███'s therapies need to be at 60-minute

6           sessions.

7                    MR. OLTHOFF:  All right, thank you.

8                    Nothing further, Your Honor.

9                    HEARING OFFICER FARAGO:  Mr. Coughlin?

10                    MR. COUGHLIN:  No, thank you, sir.

11                    HEARING OFFICER FARAGO:  Okay.  Great.

12           Well, thank you, Mr. Donohue.

13                    MR. DONOHUE:  Thank you, Your Honor.

14                    HEARING OFFICER FARAGO:  Always a

15           pleasure, even virtually, to be back at the table.

16           That said, Mr. Coughlin, do you want to now address

17           this question of that IEP?  The spring 2020 IEP?

18                    MR. COUGHLIN:  So --

19                    HEARING OFFICER FARAGO:  (Interposing)

20           And the District's theory as to why it's

21           noncognizable?

22                    MR. COUGHLIN:  Yes.  So the challenged

23           IEP here is the IEP that was developed for the

24           start of the 2019/2020 school year.  Mr. Donohue

25           filed a due process complaint in July of 2019,

1        challenging that IEP.

2                    Any subsequent IEP cannot be used to

3        challenge the appropriateness of that July 2019

4        IEP.  The due process complaint here has not been

5        amended to add new facts with respect to this --

6        this April 2020 IEP, and therefore, it should not

7        be considered during this hearing to, one,

8        challenge the appropriateness of that first IEP.

9        And two, it shouldn't be considered because it's

10       not within the four corners of the due process

11       complaint.

12                   HEARING OFFICER FARAGO:  Okay.  Well, I

13       agree that as an issue, the -- the subsequent IEP

14       is not in the current complaint, though it is

15       complained of in a different complaint, I believe.

16       Has there been a '20/'21 case filed?  And it's

17       assigned to me, right?

18                   MR. COUGHLIN:  Yes.

19                   HEARING OFFICER FARAGO:  And it's still

20       potentially consolidatable.  So the family has

21       plainly done what they need to do in order to raise

22       issues about that IEP, whether they -- and I

23       haven't looked at the complaint.  So I can't tell

24       you to a certainty whether or not they've actually

25       challenged that IEP.

1           But they've done everything they need to
2      do in order to challenge it and -- or have it
3      reviewed.  And in addition to that, it's before me,
4      and I have the power to consolidate the two.  So I
5      don't think actually that we can characterize it as
6      unconnected, though I have not consolidated them as
7      yet.
8           That being said, though, the real
9      question is the existing complaint challenges the
10     District's proposed placement for 2019/'20.  So --
11     and then somewhere in the middle of 2019/'20, the
12     District comes up with a new IEP that is expects to
13     apply within 2019/'20 and start in that school
14     year.
15          I believe that as a purely factual
16     question, not an issue question, that raises some
17     pretty serious factual questions about why the CSE
18     would have done that and that's to say change the
19     child's placement midyear.
20          And how that relates to its own
21     understanding of the child's needs and whether
22     they've changed in the course of that year, which
23     would be relevant to any remedy I'd craft, if the
24     child's needs had changed.
25          Mr. Coughlin, what do you think?

1        MR. COUGHLIN:  Well, again, the needs may

2   have changed throughout the school year.  However,

3   ultimately, we're here to determine whether or not

4   the Department of Education provided a free and

5   appropriate public education for the 2019/2020 --

6   the start of the 2020 school year and whether or

7   not that recommendation was appropriate and the

8   placement was appropriate.

9        HEARING OFFICER FARAGO:  Okay.  So now

10   let's assume (indiscernible) --

11        MR. COUGHLIN:  (Indiscernible).

12        HEARING OFFICER FARAGO:  Right.  By the

13   way, I'm sorry to have to interrupt, but it

14   suddenly occurs to me that I didn't ask you whether

15   you had rested as Ms. LeFaivre.

16        THE COURT REPORTER:  Did you say you

17   wanted to go off the record?

18        HEARING OFFICER FARAGO:  Who me?  No.

19        THE COURT REPORTER:  Okay.  You're still

20   on.  Okay.

21        HEARING OFFICER FARAGO:  Yeah.  So did

22   you, in fact, rest after Ms. LeFaivre, or did I

23   inappropriately move on to the family's witness?

24        MR. COUGHLIN:  Yeah, the Department

25   rests.

1          HEARING OFFICER FARAGO:  What?  I didn't

2      hear you.

3              MR. COUGHLIN:  The Department rests.

4              HEARING OFFICER FARAGO:  Oh, the

5      Department rests.  Okay.  So having rested, let's

6      now assume that the Department has failed to meet

7      its burden and didn't provide an appropriate

8      placement for the 2019/'20 school year, insofar as

9      on its face, your witness' testimony stated that

10     the class that they proposed proceeded that whole

11     school year under mandate -- lower than the

12     mandated ratio.

13              I'm not 100 percent sure I'm going to

14     reach that conclusion, but I'm upwards of around 95

15     to 99 percent, 100 percent sure.  Well, I'm not 100

16     percent sure.  But I'm upwards of 95 percent sure

17     that absent going back through the record, as I

18     will do, and see whether there is anything in the

19     record that could lead me to change that

20     observation, my -- my hearing that from your

21     witness was pretty startling because I didn't quite

22     know why it was we were engaging in hearing about

23     the placement at all if the placement wasn't the

24     one on the IEP.

25              That having been said, let's turn then to

1      the next question that I asked you, which is about

2      crafting remedy.  Don't we need to explore this

3      April IEP?  Or are you willing to just -- I don't

4      know, willing to.  How am I supposed to think about

5      whether or not the student's needs have changed or

6      whether the District's understanding of the

7      student's needs have changed or what my remedy

8      should be?  Do we need to talk to somebody from

9      that review?

10             MR. COUGHLIN:  I think that -- that all

11     those issues will come up in the subsequent hearing

12     for the -- if there's a hearing for the '20/'21

13     CSE.  I don't believe that we need to get into that

14     at this point, given your comments just before I

15     start to speak.

16             HEARING OFFICER FARAGO:  Okay.  So where

17     I see us as being right now is that we -- have you

18     rested, Mr. Olthoff?

19             MR. OLTHOFF:  Yes, Your Honor.  We're

20     going to rest.

21             HEARING OFFICER FARAGO:  Okay.  So where

22     I see us as being is that the District has failed

23     to meet its burden.  Provisionally, I will again go

24     through the whole transcript and review and see if

25     there's anything from the long ago hearing dates

1          that I'm not recollecting.

2                    I will also review the record review, and

3          I will, of course, review the testimony today as

4          well.  And that having all been said, what remain

5          are the questions of whether or not iBrain has been

6          shown to be an appropriate placement by the family

7          for the 2019/2020 school year and whether --

8          whether the equities, if it is appropriate, whether

9          the equities favor funding in whole or in part for

10         that school year.

11                   Do the two of you want to provide written

12         closings or oral closings or what?

13                   MR. COUGHLIN:  I'm prepared to do oral.

14                   HEARING OFFICER FARAGO:  Wait, was that

15         you, Mr. Coughlin --

16                   MR. COUGHLIN:  (Interposing) Yeah, I am

17         prepared to do an oral argument, if you'd like.

18                   HEARING OFFICER FARAGO:  Um-hum.

19                   MR. OLTHOFF:  The Parent would very much

20         prefer to brief this, Your Honor.

21                   HEARING OFFICER FARAGO:  And why --

22                   MR. COUGHLIN:  (Interposing) Is that

23         necessary?

24                   HEARING OFFICER FARAGO:  And why would

25         you want to brief it?  Why?

1              MR. OLTHOFF:  There are -- this hearing

2       has gone on for many dates.  If we wish to -- just

3       to consolidate the issues and make the arguments,

4       Parent would prefer to do a written brief.

5              However, if Your Honor says an oral is

6       necessary, we would be willing to do that,

7       scheduling it a different date.

8              HEARING OFFICER FARAGO:  I think that's

9       what I'd like to do.

10              MR. OLTHOFF:  Okay.

11              HEARING OFFICER FARAGO:  Because that

12       will give me an opportunity to make sure that I

13       understand clearly the points that you're making

14       and -- on both sides -- and to ask questions, if I

15       need to, in order to clarify.

16              Is there a near term -- and it will also

17       give you an opportunity to present your closing --

18       prepare it and present it, taking into account

19       today's evidence as well with organization and

20       clarity that would be beneficial.

21              Is there a date in the near-ish term that

22       we could pick to do oral closings and say -- if we

23       could schedule no more than a half an hour for

24       each, I could do the 13th at 8 a.m.

25              MR. OLTHOFF:  The 13th at 8 a.m. looks --

1              MR. COUGHLIN:  I have a hearing at 10
2         a.m. on the 13th.  So it would have to be --
3              HEARING OFFICER FARAGO:  (Interposing) At
4         8.  I have to be out by 9.
5              MR. COUGHLIN:  Okay.
6              HEARING OFFICER FARAGO:  So you'd have an
7         hour before your -- would that work?  It would work
8         well for me.
9              MR. OLTHOFF:  Yes, it works for me.
10             MR. COUGHLIN:  I can do that.
11             HEARING OFFICER FARAGO:  Okay.  Let's do
12        that.
13             MR. DONOHUE:  Can we expedite the
14        transcript, Your Honor, obviously?  Sorry to jump
15        in.
16             HEARING OFFICER FARAGO:  Yes, please.
17             MR. OLTHOFF:  Yes.
18             HEARING OFFICER FARAGO:  Yes, let's get
19        the transcript expedited.  And we'll schedule for
20        the 8th at 8 a.m.
21             MR. OLTHOFF:  You said the 8th or the
22        13th, sir?
23             HEARING OFFICER FARAGO:  I'm sorry, the
24        13th.  I'm staring at the time.  The 13th at 8 a.m.
25        for closings.  Anything else we need to do today?

1                     MR. COUGHLIN:  No, thank you.

2                     HEARING OFFICER FARAGO:  Let's make sure

3           we have final versions of all the evidence

4           submitted in one large lump and also with -- I

5           think I have the District is fine.  What I have

6           from the District is fine, but from the family, if

7           you could just do a submission that has everything

8           with the coversheet and PDF, a coversheet in

9           Microsoft Word, and all of that.

10                    MR. COUGHLIN:  I think I need to send you

11          a Microsoft Word --

12                    HEARING OFFICER FARAGO:  (Interposing)

13          No, you don't.  You don't.  I mean, it would help.

14          I mean, to be honest about it, it would help to --

15                    MR. COUGHLIN:  (Interposing) I'll send

16          it.

17                    HEARING OFFICER FARAGO:  -- to have a

18          revised one.

19                    MR. COUGHLIN:  I'll send it right now.

20                    HEARING OFFICER FARAGO:  Okay.  Anything

21          else?

22                    MR. OLTHOFF:  I'll send it by the end of

23          the day.  Sorry.

24                    HEARING OFFICER FARAGO:  Great.  Go

25          ahead.  Somebody said something?

1           MR. OLTHOFF:  I said that I would send it
2      by the end of the day.
3           HEARING OFFICER FARAGO:  Great.  Okay.
4      Then thank you, all, for your participation in this
5      ongoing odyssey.  And -- yes?  Mr. Coughlin?
6           MR. COUGHLIN:  Do we need to address the
7      compliance date before I forget?
8           HEARING OFFICER FARAGO:  No, actually, I
9      think the compliance date -- I believe the
10     compliance date --
11          MR. OLTHOFF:  (Interposing) You said it
12     was the 16th.
13          HEARING OFFICER FARAGO:  -- is October
14     16th.  So we can do it then.  Just let's remember
15     to do it then.  Okay?  Great.
16          MR. DONOHUE:  Thank you, Your Honor.
17          HEARING OFFICER FARAGO:  Looking forward
18     to it.  Bye-bye, everyone.  Be well.
19          MR. OLTHOFF:  Thank you.
20          THE COURT REPORTER:  You're off the
21     record.
22          (Whereupon, at 11:53 a.m. the proceeding
23     was adjourned.)
24
25

1          C E R T I F I C A T I O N

2

3                  I, Wendy Sawyer, do hereby certify that I

4          typed the transcript in the Matter of S███ J██

5          Donohue taken on October 1, 2020 by Jacqueline

6          Mayfield at the offices of the Department of

7          Education, 131 Livingston Street, Brooklyn, NY

8          11201, and that to the best of my ability, this is

9          an accurate transcription of what was recorded at

10         that time and place.  I further certify that I am

11         not connected by blood, marriage, or employment

12         with any of the parties herein nor interested

13         directly or indirectly in the matter transcribed.

14

15

16

17         _____

18         WENDY SAWYER

19         October 4, 2020

20

21

22

23

24

25

**$**

**$100 (2)**
662:16; 664:3

**0**

**05 (1)**
596:16

**1**

**10th (1)**
580:19
**11th (1)**
580:20
**1213-plus (3)**
590:25; 601:19;
602:17
**13th (6)**
707:24; 707:25;
708:2; 708:22;
708:24; 708:24
**15-page (1)**
580:25
**16th (4)**
624:15; 658:15;
710:12; 710:14
**18/'19 (2)**
678:6; 680:18
**18th (1)**
579:4
**19/'20 (4)**
584:15; 592:3; 593:5;
699:18
**19th (4)**
646:15; 646:18;
677:14; 677:24
**1st (2)**
575:7; 577:23

**2**

**20/'21 (3)**
699:19; 701:16;
705:12
**2018/2019 (5)**
677:20; 678:2;
678:18; 679:19; 680:1
**2019/'20 (4)**
702:10; 702:11;
702:13; 704:8
**2019/2020 (21)**
583:6; 649:5; 649:17;
650:15; 651:5;
651:16; 652:6;
652:13; 653:4; 653:8;
653:17; 655:17;
666:8; 669:23;
670:25; 682:19;
693:8; 694:14;
700:24; 703:5; 706:7
**2020/2021 (1)**
583:1

**20th (4)**
646:13; 646:19;
646:25; 647:7
**22nd (1)**
583:13
**25th (1)**
581:1
**25x25 (1)**
696:23
**2D (1)**
582:21

**3**

**30s (1)**
686:17
**3x40 (1)**
618:23

**4**

**40-minute (1)**
617:5
**40s (1)**
686:17
**4th (3)**
580:2; 671:15; 676:16

**5**

**5th (1)**
579:25

**6**

**60-minute (3)**
652:17; 653:14; 700:5
**611's (1)**
638:25
**6th (1)**
579:25

**7**

**7th (1)**
583:14

**8**

**8th (3)**
580:5; 708:20; 708:21

**9**

**976F (1)**
582:21
**9s (1)**
645:15

**A**

**abide (1)**
694:22
**ability (2)**
600:11; 690:24
**able (17)**

581:5; 585:20;
585:23; 600:6;
600:15; 600:23;
605:4; 609:16;
609:25; 613:12;
630:2; 630:8; 630:9;
669:8; 673:2;
684:1; 695:11
**absent (1)**
704:17
**academic (7)**
598:15; 598:18;
599:6; 684:24; 687:1;
687:2; 687:3
**academics (2)**
672:3; 687:5
**accents (1)**
576:20
**accepted (1)**
659:23
**accommodate (6)**
609:22; 609:25;
611:12; 632:17;
647:1; 693:17
**accommodation (1)**
683:25
**According (1)**
582:19
**according (2)**
609:19; 626:16
**accordingly (1)**
582:8
**account (1)**
707:18
**accounting (1)**
689:11
**accuracy (2)**
583:16; 583:18
**accurate (3)**
583:23; 589:1; 603:2
**across (3)**
634:2; 651:12; 693:22
**acted (1)**
638:16
**action (6)**
585:5; 585:5; 621:15;
681:2; 681:3; 681:7
**activate (1)**
667:9; 667:22;
667:24; 667:25
**activation (2)**
667:13; 667:15
**activities (1)**
667:16
**activity (2)**
667:19; 669:7
**actual (4)**
646:14; 662:14;
674:20; 684:6
**actually (22)**
603:10; 618:17;
642:23; 646:18;
667:2; 672:14;
682:21; 683:9; 684:2;

686:18; 689:16;
693:7; 694:22;
695:16; 696:3;
696:6; 696:17;
699:24; 700:3;
701:24; 702:5;
710:8
**adapted (4)**
633:24; 637:17;
638:11; 639:3
**adaptive (1)**
591:19
**add (2)**
579:21; 701:5
**added (1)**
579:25
**adding (2)**
581:8; 581:9
**addition (5)**
581:12; 588:2;
635:10; 635:10; 702:3
**additional (5)**
601:16; 602:8;
649:20; 651:1; 658:21
**address (6)**
598:20; 604:4;
610:17; 693:24;
700:16; 710:6
**addressed (2)**
604:16; 610:10
**adjourned (1)**
710:23
**administer (1)**
626:24
**administered (1)**
632:3
**administrative (1)**
687:21
**admissible (1)**
585:8
**admission (1)**
659:20
**admit (5)**
577:20; 577:25;
578:5; 582:11; 584:20
**admitted (18)**
578:3; 578:6; 580:2;
580:9; 580:15;
580:23; 581:1; 581:3;
581:17; 582:15;
584:5; 585:11;
585:12; 589:8;
661:25; 662:10;
662:11; 692:4
**advanced (1)**
639:10
**affidavit (22)**
577:13; 577:23;
581:10; 581:13;
582:7; 582:12;
583:11; 585:12;
589:15; 589:22;
590:16; 592:15;
606:17; 614:16;

615:14; 615:24;
619:2; 622:20;
626:7; 626:13;
694:18; 698:10
**affirm (2)**
588:4; 644:23
**affirmation (1)**
578:1
**AFOs (1)**
673:8
**afternoon (1)**
683:23
**again (14)**
610:12; 618:11;
633:10; 636:2; 639:1;
653:24; 663:18;
668:12; 670:15;
677:13; 678:16;
686:23; 703:1; 705:23
**age (9)**
596:5; 596:6; 596:11;
596:12; 666:16;
666:20; 697:10;
697:12; 697:14
**age-appropriate (1)**
666:15
**Agency (1)**
575:16
**ago (1)**
705:25
**agree (3)**
659:12; 659:15;
701:13
**agreeable (1)**
680:8
**agreed (3)**
585:3; 684:5; 700:4
**agreement (3)**
643:16; 660:18;
661:11
**Ah (1)**
645:16
**ahead (7)**
576:2; 599:23; 662:8;
678:24; 679:12;
694:20; 709:25
**aids (1)**
591:20
**air-conditioning (2)**
590:8; 590:10
**align (1)**
697:18
**aligned (1)**
635:14
**aligning (1)**
635:11
**allegedly (1)**
585:3
**allocate (1)**
689:11
**allocation (1)**
689:17
**allow (1)**
613:16

almost (1)
682:11
alphabet (3)
576:17; 576:19;
576:24
alternate (1)
635:1
Always (2)
576:16; 700:14
always (2)
608:7; 670:10
ambulation (1)
614:24
ambulatory (6)
597:20; 599:13;
599:15; 599:16;
603:22; 652:20
ambulette (1)
693:15
amended (2)
697:24; 701:5
amendments (1)
698:2
among (1)
633:14
amount (3)
670:6; 674:6; 689:19
Andrew (2)
618:8; 618:9
annual (2)
642:21; 642:24
Annual (1)
640:5
answer's (2)
679:17; 688:3
answered (7)
586:6; 605:15; 610:4;
610:6; 610:19;
610:24; 621:13
anticipation (1)
659:5
AP (1)
589:22
apart (1)
583:21
apologize (3)
645:18; 646:16; 699:3
appeal (1)
680:25
appear (1)
663:1
appeared (1)
676:22
apply (1)
702:13
appreciate (2)
602:12; 612:10
appreciative (1)
612:4
approached (1)
636:17
appropriate (11)
583:6; 604:10;
621:15; 666:17;

666:21; 703:5;
703:7; 703:8; 704:7;
706:6; 706:8
appropriately (1)
697:15
appropriateness (2)
701:3; 701:8
approved (2)
672:15; 672:15
approximate (1)
658:6
Approximately (1)
590:14
approximately (4)
575:8; 590:21; 609:2;
617:11
approximation (1)
590:21
April (10)
583:13; 659:4; 671:3;
671:6; 675:22;
682:21; 682:25;
699:5; 701:6; 705:3
area (1)
669:1
argument (4)
583:10; 585:9; 682:1;
706:17
arguments (4)
681:14; 681:24;
682:4; 707:3
around (4)
577:2; 658:3; 686:12;
704:14
Around (1)
653:11
arrange (1)
613:15
arrive (1)
696:17
ascertained (1)
683:10
aside (1)
623:6
aspects (1)
649:2
aspiration (1)
670:11
assertion (1)
583:24
assessed (2)
640:12; 667:4
assessment (7)
635:1; 640:4; 640:10;
668:19; 668:23;
669:5; 670:19
assessments (10)
660:3; 666:25;
668:19; 668:24;
669:9; 669:12;
669:16; 669:18;
670:21; 672:10
assigned (7)
575:4; 598:12; 599:9;

601:15; 602:6;
603:21; 609:1;
625:16; 701:17
assignments (1)
641:25
assist (2)
616:24; 654:20
assistance (1)
591:14
Assistant (1)
577:24
assistant (1)
587:18
assistive (2)
690:13; 691:6
assume (3)
687:15; 703:10; 704:6
attach (1)
667:17
attend (3)
593:8; 617:14; 681:5
attendance (3)
676:2; 676:7; 676:10
attended (3)
592:21; 592:23;
677:17
attending (3)
627:16; 627:20; 649:6
attention (2)
642:3; 691:10
attest (1)
577:19
attorney (3)
575:16; 589:14;
672:13
attorneys (1)
575:22
auditory (2)
609:18; 634:12
August (1)
581:1
autism (2)
593:11; 593:21
availability (1)
602:7
available (10)
577:18; 585:17;
585:18; 586:11;
586:21; 640:14;
674:10; 681:21;
684:6; 699:24
aware (6)
597:10; 597:11;
618:15; 627:11;
627:14; 660:17

**B**

bachelor's (1)
650:25
back (23)
577:11; 578:7; 583:8;
605:10; 613:5; 615:5;
616:5; 616:24;
616:25; 617:4;

621:10; 625:24;
642:5; 646:15;
654:8; 657:7;
657:10; 658:19;
671:16; 677:25;
684:3; 700:15;
704:17
Back (1)
587:12
background (1)
630:6
bad (1)
665:7
balls (1)
607:12
bang (1)
605:9
base (12)
684:18; 684:19;
684:23; 685:13;
685:16; 685:17;
686:25; 687:4; 687:6;
687:13; 687:24;
690:19
based (17)
591:9; 602:7; 602:17;
615:21; 618:2;
622:21; 629:9; 639:4;
652:23; 662:17;
667:12; 667:12;
690:23; 690:24;
694:19; 695:3; 697:17
basic (1)
637:12
basically (3)
674:19; 695:10; 698:1
basis (3)
588:24; 655:1; 681:25
Basis (1)
686:5
beginning (3)
575:13; 616:19;
640:11
behalf (1)
589:4
behavior (1)
605:9
behavioral (4)
603:18; 605:12;
606:3; 640:20
belief (1)
652:22
believes (1)
584:6
bench (4)
674:18; 674:19;
674:21; 674:22
benches (1)
674:13
beneficial (1)
707:20
Besides (2)
674:8; 674:22
best (4)

588:24; 643:14;
647:18; 681:2
better (6)
641:21; 642:1; 643:6;
662:25
beyond (1)
596:7
bicycle (1)
608:16
big (4)
611:22; 613:22;
614:1; 667:8
bigger (1)
614:3
bilingual (1)
596:9
billed (3)
687:24; 690:2; 690:2
birthdates (1)
596:16
bit (1)
678:1
black (2)
630:5; 630:6
board (7)
629:20; 629:22;
634:2; 648:22;
651:12; 654:16;
656:13
boards (1)
601:3
body (1)
673:11
books (1)
636:16
both (6)
585:9; 624:10; 659:6;
668:19; 673:13;
707:14
braces (1)
673:8
Brain (1)
575:21
brain (2)
591:25; 592:6
break (1)
671:3
brief (3)
706:20; 706:25; 707:4
bright (1)
630:7
bring (3)
578:24; 664:20;
698:21
brings (1)
664:20
brought (1)
672:24
budgets (1)
690:22
build (1)
636:2
building (11)
589:25; 590:3; 590:5;

590:6; 590:8;
594:1; 606:14;
611:18; 628:6;
655:1; 696:14
**burden (2)**
704:7; 705:23
**bus (1)**
693:15
**button (1)**
667:8
**bye (1)**
644:16
**Bye-bye (2)**
644:15; 710:18

## C

**cable (1)**
687:10
**calculated (1)**
689:16
**call (2)**
577:12; 645:5
**called (4)**
655:5; 677:1; 677:1;
692:16
**calls (2)**
610:3; 610:14
**came (3)**
671:21; 671:22;
671:23
**Can (15)**
592:9; 603:15;
604:12; 607:5;
614:21; 619:25;
635:21; 654:7;
656:10; 657:22;
666:14; 670:13;
687:1; 692:4; 708:13
**can (37)**
581:6; 581:18; 584:2;
587:15; 590:20;
592:24; 593:2; 593:3;
601:18; 605:22;
611:23; 612:24;
622:17; 628:23;
628:23; 631:14;
631:18; 633:9;
635:23; 644:9; 656:4;
656:16; 667:15;
667:15; 667:17;
667:17; 668:21;
670:9; 672:11;
677:22; 681:24;
683:7; 691:2; 696:23;
702:5; 708:10; 710:14
**canceled (1)**
683:19
**capacity (1)**
655:22
**Care (3)**
692:17; 692:20;
692:22
**care (2)**
626:24; 692:19

**carried (1)**
675:4
**carry (1)**
699:19
**case (19)**
575:5; 578:25; 583:3;
585:2; 585:4; 589:5;
639:9; 647:23; 661:7;
663:2; 663:17;
664:15; 664:18;
664:19; 664:22;
665:8; 681:21;
681:22; 701:16
**caseload (1)**
689:6
**cases (3)**
665:4; 689:8; 689:19
**catch-and-throw (1)**
608:15
**Center (1)**
665:25
**central (1)**
590:8; 590:9
**certain (2)**
670:5; 689:19
**Certainly (2)**
577:9; 586:1
**certainly (6)**
585:8; 655:21;
660:16; 672:12;
673:4; 689:18
**certainty (1)**
701:24
**certification (1)**
650:9
**certified (2)**
650:7; 650:9
**chair (5)**
604:25; 605:6;
605:10; 616:25;
618:20
**chairman (5)**
648:22; 654:16;
656:12; 659:19; 661:3
**challenge (3)**
701:3; 701:8; 702:2
**challenged (2)**
700:22; 701:25
**challenges (4)**
606:4; 634:8; 641:12;
702:9
**challenging (1)**
701:1
**change (7)**
588:19; 642:22;
647:14; 697:19;
698:4; 702:18; 704:19
**changed (8)**
648:25; 692:11;
693:25; 702:22;
702:24; 703:2; 705:5;
705:7
**changes (1)**
698:3

**characterize (2)**
663:20; 702:5
**characterized (4)**
584:2; 595:20;
595:23; 596:25
**characters (2)**
637:13; 638:21
**charge (1)**
691:17
**charges (1)**
689:14
**check (2)**
581:22; 681:16
**checklist (1)**
640:13
**checks (1)**
673:9
**chief (1)**
691:19
**child (2)**
586:2; 667:9
**child's (4)**
626:17; 702:19;
702:21; 702:24
**children (3)**
664:22; 665:6; 665:16
**children's (1)**
665:4
**choice (4)**
630:3; 630:9; 680:21;
681:6
**circulated (1)**
683:25
**City (4)**
582:20; 587:1; 614:2;
677:17
**clarifications (2)**
657:7; 657:13
**clarify (4)**
621:20; 679:4;
679:10; 707:15
**clarity (2)**
621:20; 707:20
**class (48)**
590:25; 591:5;
592:21; 592:23;
593:9; 593:24;
593:25; 594:11;
594:12; 595:23;
596:2; 596:19;
596:19; 598:11;
598:16; 599:1; 599:5;
599:9; 600:2; 601:14;
601:16; 602:7;
602:14; 603:8;
603:23; 605:13;
624:3; 627:10;
628:20; 628:21;
629:6; 629:12;
629:16; 631:1;
631:11; 631:18;
632:7; 637:4; 638:7;
638:10; 641:16;
641:21; 642:2; 642:8;

650:1; 676:8;
697:7; 704:10
**classes (29)**
591:2; 592:18; 593:1;
593:6; 593:11;
593:16; 594:7; 594:9;
594:10; 594:14;
594:18; 595:6; 595:9;
595:10; 596:1; 596:4;
596:14; 597:7;
628:23; 629:14;
634:14; 636:10;
636:15; 636:17;
637:18; 639:10;
643:7; 649:10; 649:13
**classification (9)**
592:12; 593:13;
597:3; 628:25; 629:4;
668:11; 668:14;
670:14; 670:17
**classifications (1)**
629:3
**classified (5)**
591:24; 592:5; 597:7;
597:13; 597:14
**classifying (1)**
600:22
**classroom (32)**
591:14; 601:6;
601:12; 601:15;
602:6; 602:21;
604:16; 604:19;
609:1; 614:3; 614:6;
617:20; 617:21;
619:19; 620:6;
620:13; 620:20;
621:8; 631:1; 631:11;
631:15; 634:6; 634:7;
636:3; 640:25; 641:3;
649:19; 650:10;
655:2; 675:7; 695:19;
696:22
**classrooms (10)**
590:11; 607:8;
628:22; 633:6;
633:14; 634:8;
654:23; 654:25;
696:7; 697:11
**cleaned (1)**
683:14
**clear (1)**
644:2
**clearly (2)**
666:20; 707:13
**clerical (1)**
624:12
**clips (1)**
637:19
**close (3)**
585:23; 670:10;
670:25
**closed (4)**
612:24; 628:2; 628:6;
674:3
**closels (1)**

670:7
**closing (1)**
707:17
**closings (4)**
706:12; 706:12;
707:22; 708:25
**closure (2)**
673:23; 674:2
**cognitive (1)**
598:18
**cognitively (2)**
633:25; 639:10
**coincides (2)**
632:18; 632:20
**collected (3)**
618:1; 642:17; 643:5
**Columbia (1)**
694:2
**combination (1)**
675:11
**comfortable (1)**
671:9
**coming (1)**
696:18
**comments (4)**
657:6; 657:10;
657:15; 705:14
**committee (1)**
577:2
**Committee (1)**
667:3
**Common (1)**
635:12
**communicate (4)**
600:7; 600:16;
600:23; 601:2
**communication (12)**
591:13; 591:19;
591:20; 597:18;
601:2; 634:9; 657:19;
668:2; 668:11;
668:13; 670:19;
674:25
**company (3)**
691:22; 692:11;
692:16
**comparing (2)**
636:14; 638:18
**complained (1)**
701:15
**complaint (7)**
700:25; 701:4;
701:11; 701:14;
701:15; 701:23; 702:9
**complete (4)**
617:5; 641:25; 670:2;
680:21
**completed (2)**
657:8; 658:11
**completely (3)**
597:16; 600:25;
696:11
**compliance (3)**

comprehension (4)
634:9; 634:15;
636:13; 639:12
Con (1)
687:10
concerned (1)
608:9
conclusion (1)
704:14
concrete (1)
635:22
conducted (7)
626:1; 646:17; 647:6;
668:23; 668:25;
683:23; 699:8
Conductive (4)
665:10; 665:11;
665:24; 666:7
confirm (1)
607:1
conflicting (1)
611:24
connection (3)
665:2; 665:2; 691:24
consider (2)
599:3; 640:3
considered (5)
582:22; 583:4;
689:21; 701:7; 701:9
consistent (1)
634:2
consolidatable (1)
701:20
consolidate (2)
702:4; 707:3
consolidated (1)
702:6
constitute (2)
589:4; 647:23
constitutes (1)
585:4
constitution (1)
664:18
construe (1)
583:9
consult (3)
615:8; 615:12; 626:9
contained (1)
590:5
content (4)
584:22; 633:16;
633:23; 636:4
context (1)
656:17
contextualized (1)
605:20
continuation (1)
575:6
continue (1)
677:10
continued (2)
575:9; 676:19
continues (1)
692:5

contract (6)
660:8; 662:3; 684:11;
684:12; 684:14;
684:17
contracts (6)
660:24; 661:19;
661:25; 662:1; 662:9;
691:11
contrast (1)
630:5
contrasting (2)
636:14; 638:18
controversy (2)
583:25; 583:25
convened (2)
580:19; 580:20
conversation (4)
613:12; 615:21;
622:21; 622:23
cooperate (2)
681:5; 681:11
cooperation (1)
664:23
copy (2)
582:7; 588:14
core (4)
684:24; 687:5;
687:24; 689:13
Core (1)
635:12
corners (1)
701:10
correction (1)
646:22
correctly (1)
696:5
cost (5)
673:22; 674:1;
684:22; 687:12;
690:19
costs (4)
687:11; 690:11;
691:10; 691:11
Coughlin (19)
575:16; 582:16;
586:22; 588:9;
628:16; 643:21;
646:21; 648:1;
661:22; 662:24;
663:8; 663:12; 690:9;
691:1; 700:9; 700:16;
702:25; 706:15; 710:5
COUGHLIN (228)
575:15; 577:14;
578:6; 578:10;
578:14; 578:18;
578:23; 579:3; 579:7;
579:9; 579:16; 580:4;
580:8; 580:17;
582:19; 583:17;
586:23; 604:6; 604:8;
605:14; 605:21;
610:3; 610:12;
621:11; 628:17;

628:19; 629:1;
629:17; 629:19;
629:22; 630:12;
630:15; 630:20;
631:14; 631:17;
631:20; 631:23;
632:2; 632:5;
632:11; 632:13;
632:20; 633:1;
643:22; 646:24;
647:4; 648:2; 648:5;
648:23; 649:4;
649:9; 649:12;
649:15; 650:4;
650:6; 650:13;
650:21; 651:3;
651:8; 651:14;
651:18; 651:20;
652:1; 652:4; 652:8;
652:11; 652:16;
652:22; 653:2;
653:6; 653:11;
653:13; 653:16;
653:20; 653:24;
654:5; 654:15;
654:22; 655:4;
655:11; 655:13;
655:20; 656:12;
656:21; 657:1;
657:9; 657:12;
657:22; 658:1;
658:7; 658:11;
658:25; 659:8;
659:12; 659:15;
659:18; 659:24;
660:7; 660:10;
660:15; 660:20;
660:23; 661:3;
661:24; 662:5;
662:9; 663:3;
663:13; 663:18;
663:22; 664:2;
664:5; 664:9;
664:12; 664:23;
665:9; 666:6;
666:11; 666:14;
666:19; 666:24;
667:5; 667:10;
667:21; 668:1;
668:10; 668:13;
668:16; 668:22;
669:2; 669:11;
669:15; 669:21;
670:1; 670:13;
670:16; 670:20;
670:24; 671:16;
672:1; 672:4; 672:6;
672:17; 673:21;
673:25; 674:4;
674:8; 674:16;
674:22; 675:9;
675:13; 675:17;
675:19; 676:1;
676:4; 676:9;
676:20; 676:25;
COVID (3)

677:4;   677:7;
677:16;   677:19;
677:25;   678:12;
678:17;   679:18;
679:25;   680:4;
680:15;   680:19;
681:10;   681:19;
682:2;   682:7;
682:10;   682:13;
682:18;   682:24;
683:3;   683:18;
684:8;   684:17;
685:8;   685:12;
685:19;   685:22;
686:1;   686:8;
686:14;   686:20;
686:25;   690:10;
690:16;   691:6;
691:9;   691:13;
691:17;   691:21;
691:24;   692:9;
693:24;   694:2;
694:5;   694:8;
694:17;   698:14;
698:18;   698:23;
700:10;   700:18;
700:22;   701:18;
703:1;   703:11;
703:24;   704:3;
705:10;   706:13;
706:16;   706:22;
708:1;   708:5;
708:10;   709:1;
709:10;   709:15;
709:19;   710:6
countries (1)
576:21
couple (3)
628:15; 680:7; 699:14
course (14)
579:14; 584:11;
584:24; 591:1;
621:15; 642:13;
642:15; 655:16;
679:24; 681:2; 681:3;
681:7; 702:22; 706:3
COURT (7)
576:5; 576:10; 587:9;
587:12; 703:16;
703:19; 710:20
cover (2)
582:2; 673:10
covered (7)
684:19; 684:21;
684:22; 684:23;
685:13; 685:15;
685:17
covering (1)
674:1
covers (6)
687:1; 687:5; 687:6;
687:9; 690:11; 691:3
coversheet (2)
709:8; 709:8

699:9; 699:22;
700:3
COVID-19 (1)
575:10
craft (1)
702:23
crafting (1)
705:2
created (5)
584:14; 646:16;
659:1; 669:18; 690:22
creates (2)
655:5; 657:2
creating (1)
613:10
crises (2)
604:3; 604:15
crisis (9)
603:14; 603:16;
603:17; 603:21;
603:21; 604:15;
605:4; 699:9; 699:23
criteria (2)
639:22; 639:25
cross (1)
698:13
cross-examination (1)
589:9
CSE (24)
582:25; 584:13;
584:25; 585:5;
639:19; 639:23;
642:5; 655:15;
656:14; 667:1; 678:2;
680:20; 680:23;
681:1; 681:5; 681:6;
681:12; 683:24;
684:4; 699:5; 699:11;
699:15; 702:17;
705:13
CSE's (1)
664:24
curious (1)
664:5
current (1)
701:14
currently (1)
586:18
curriculum (5)
633:11; 633:16;
633:21; 634:1; 635:25
cut (1)
674:17

**D**

D-1 (1)
658:15
D-A-G-G-dash-2 (1)
668:17
dad (2)
585:21; 660:17
DAGG (1)
668:16
data (5)

617:25; 629:10;
640:20; 642:16;
643:4
**date (21)**
583:14; 584:11;
584:15; 585:2;
646:10; 646:14;
658:1; 658:2; 658:6;
658:6; 658:15; 680:9;
682:16; 683:6;
683:11; 699:16;
707:7; 707:21; 710:7;
710:9; 710:10
**dated (5)**
577:22; 579:4;
580:24; 580:25;
588:11
**dates (3)**
680:7; 705:25; 707:2
**daughter (4)**
655:11; 672:19;
675:20; 678:18
**daughter's (4)**
655:12; 663:2;
679:21; 698:19
**day (9)**
578:5; 644:8; 644:14;
669:22; 671:21;
671:22; 693:2;
709:23; 710:2
**days (1)**
587:1
**deal (1)**
577:3
**decision (4)**
578:25; 578:25;
680:25; 681:21
**decisions (1)**
681:22
**definitely (1)**
650:1
**degree (2)**
650:25; 651:1
**delicacy (1)**
602:13
**denominate (1)**
581:13
**denominated (1)**
582:7
**department (1)**
688:14
**Department (10)**
575:15; 578:2;
582:20; 672:13;
698:20; 703:4;
703:24; 704:3; 704:5;
704:6
**Department's (1)**
580:9
**depend (5)**
597:16; 598:1; 598:6;
608:5; 631:12
**depending (7)**
586:16; 639:1;

658:21; 667:19;
686:18; 686:23;
693:9
**depends (10)**
599:3; 607:16; 608:4;
608:7; 619:14; 624:4;
629:15; 631:6; 637:6;
670:4
**deposit (1)**
662:16
**deputy (2)**
687:17; 688:10
**describe (6)**
591:7; 591:8; 600:24;
603:15; 607:5; 614:21
**described (5)**
579:23; 581:11;
584:3; 610:22; 611:4
**describing (2)**
605:12; 673:15
**description (5)**
583:16; 583:18;
611:22; 612:15;
696:23
**description's (1)**
662:10
**descriptive (1)**
612:3
**designation (1)**
601:19
**designed (1)**
635:7
**desks (3)**
613:3; 624:11; 695:10
**detail (1)**
690:9
**determination (2)**
631:2; 680:23
**Determination (1)**
640:8
**determinations (1)**
659:22
**determine (6)**
583:4; 604:9; 621:15;
629:10; 681:1; 703:3
**develop (1)**
664:25
**developed (12)**
582:24; 583:2;
583:13; 584:3; 584:6;
609:12; 665:13;
665:18; 669:16;
685:6; 695:23; 700:23
**developing (3)**
666:3; 666:4; 699:17
**developmental (1)**
600:8; 665:21
**device (1)**
674:25
**devices (5)**
591:20; 601:2;
637:25; 674:10;
674:23
**dialectic (1)**

577:8
**differ (2)**
633:22; 639:7
**difference (1)**
597:12
**differences (1)**
633:13
**different (27)**
577:7; 591:2; 605:17;
605:19; 611:14;
613:13; 628:20;
633:5; 633:6; 634:3;
634:18; 636:15;
636:17; 636:18;
640:14; 642:8; 642:8;
643:6; 658:13;
667:16; 669:7;
672:23; 684:15;
687:11; 695:6;
701:15; 707:7
**differentiate (1)**
598:20
**differentiated (2)**
634:5; 634:21
**differently (1)**
633:6
**dimensions (1)**
612:21
**direct (4)**
589:4; 589:8; 647:23;
688:18
**directed (1)**
678:13
**directing (1)**
691:9
**director (2)**
649:24; 687:17;
687:17; 687:18;
687:20; 688:1;
688:10; 688:10;
688:11; 688:15;
688:15; 688:21
**disabilities (14)**
595:2; 595:3; 595:9;
595:9; 597:1; 597:3;
597:8; 597:13;
597:25; 597:25;
598:3; 598:7; 629:8;
629:14
**disability (5)**
593:13; 593:22;
595:25; 595:25;
628:24
**discuss (6)**
659:24; 660:7;
660:10; 660:13;
660:18; 661:2
**discussed (5)**
618:7; 628:19;
629:19; 630:12;
631:21
**discusses (4)**
660:20; 660:23;
681:1; 684:18

**discussing (2)**
604:8; 662:14
**discussions (1)**
657:15
**disorder (1)**
593:21
**disorders (1)**
593:12
**disputing (2)**
583:16; 583:17
**distances (1)**
605:4
**distinct (1)**
586:1
**distinguish (1)**
639:25
**District (10)**
577:12; 580:15;
585:15; 586:5;
699:22; 700:1;
702:12; 705:22;
709:5; 709:6
**District's (7)**
575:13; 580:3; 584:1;
586:17; 700:20;
702:10; 705:6
**disturbance (1)**
593:23
**divided (1)**
614:6
**divider (2)**
607:9; 607:9
**doctor (4)**
626:16; 626:17;
626:18; 627:6
**doctor's (3)**
626:16; 626:25; 627:3
**document (17)**
580:25; 583:2;
584:19; 584:20;
585:11; 588:9;
588:11; 588:14;
589:1; 645:3; 645:4;
645:10; 646:18;
647:5; 647:6; 647:20;
678:11
**documentation (2)**
684:6; 699:15
**documenting (1)**
676:11
**documents (3)**
585:15; 678:22;
679:20
**DOE (4)**
606:20; 609:12;
648:18; 695:24
**DOE's (2)**
646:11; 694:13
**done (29)**
588:20; 608:10;
615:5; 616:8; 626:21;
631:15; 631:18;
631:24; 632:5; 632:6;
652:17; 653:14;

668:20; 669:5;
669:11; 670:21;
670:21; 671:25;
672:1; 672:7; 673:3;
673:4; 675:24;
682:11; 695:14;
695:19; 701:21;
702:1; 702:18
**DONOHIUE (12)**
645:9; 646:6; 648:14;
652:9; 655:10;
658:10; 660:21;
661:5; 661:16; 662:2;
663:5; 663:9
**Donohue (22)**
575:5; 576:3; 582:12;
585:12; 585:20;
586:1; 589:5; 644:18;
644:19; 656:13;
661:9; 662:13; 663:1;
664:21; 665:4; 692:6;
692:15; 694:13;
695:3; 699:4; 700:12;
700:24
**DONOHUE (182)**
575:25; 576:3;
644:20; 645:1;
645:14; 645:17;
645:20; 646:8; 647:5;
647:15; 647:21;
647:24; 648:4; 648:7;
648:11; 648:18;
648:21; 649:3; 649:7;
649:11; 649:14;
649:18; 650:5; 650:8;
650:16; 650:24;
651:6; 651:10;
651:17; 651:19;
651:23; 652:3; 652:7;
652:14; 652:18;
652:24; 653:5; 653:9;
653:12; 653:15;
653:19; 653:22;
654:2; 654:10;
654:13; 654:17;
654:24; 655:12;
655:19; 655:21;
656:16; 656:24;
657:2; 657:11;
657:14; 657:24;
658:5; 658:12; 659:2;
659:11; 659:14;
659:17; 659:21;
660:1; 660:9; 660:12;
660:16; 660:25;
661:10; 665:11;
666:9; 666:13;
666:16; 666:22;
666:25; 667:7;
667:12; 667:23;
668:5; 668:12;
668:15; 668:18;
668:24; 669:4;
669:13; 669:17;
669:25; 670:3;

670:15; 670:18;
670:23; 671:2;
671:20; 672:3;
672:5; 672:8;
672:20; 673:16;
673:24; 674:3;
674:7; 674:12;
674:18; 674:24;
675:11; 675:15;
675:18; 675:21;
676:3; 676:6;
676:13; 676:24;
677:3; 677:6; 677:9;
677:14; 677:18;
677:21; 678:10;
678:25; 679:3;
679:9; 679:13;
679:23; 680:3;
680:6; 682:16;
682:20; 683:2;
683:7; 683:14;
683:21; 684:13;
684:24; 685:11;
685:15; 685:21;
685:24; 686:12;
686:16; 686:22;
687:3; 687:16;
687:25; 688:3;
688:9; 688:13;
688:20; 688:25;
689:3; 689:7;
689:15; 689:25;
690:4; 690:7;
690:15; 690:20;
691:12; 691:15;
691:19; 691:23;
692:7; 692:13;
692:20; 692:25;
693:3; 693:6;
693:14; 693:18;
693:23; 694:1;
694:3; 694:16;
695:7; 698:1; 698:6;
698:17; 698:21;
699:7; 700:13;
708:13; 710:16
Donohue's (4)
611:12; 647:1;
662:17; 681:7
door (2)
612:23; 612:24
double (1)
581:21
down (6)
609:5; 609:7; 633:4;
655:14; 671:5; 696:18
Down (1)
598:4
Dr (1)
665:14
draft (7)
657:3; 657:5; 658:16;
658:24; 659:1;
659:10; 684:10
drafted (3)

615:14; 619:1;
626:10
drafting (3)
619:5; 684:12; 684:16
drafts (1)
658:18
driver (1)
693:2
dropped (2)
619:24; 691:8
dual (1)
663:23
dual-button (1)
668:7
due (3)
700:25; 701:4; 701:10
duration (1)
654:1
during (15)
584:13; 584:15;
592:3; 631:18; 632:6;
632:9; 643:3; 655:16;
666:8; 671:24;
672:19; 673:22;
674:1; 674:11; 701:7
duties (1)
654:15

E

earlier (1)
605:15
early (2)
643:16; 671:6
easier (1)
667:9
easily (1)
696:20
East (1)
694:4
Ed (1)
687:11
ed (3)
592:17; 687:18; 688:5
education (11)
649:19; 649:20;
649:22; 649:22;
649:24; 649:25;
650:1; 650:2; 650:12;
687:19; 703:5
Education (9)
575:16; 582:20;
665:10; 665:11;
665:25; 666:7; 667:3;
672:14; 703:4
Education's (2)
578:2; 698:20
educational (3)
598:15; 598:25; 649:1
effect (2)
583:10; 586:3
effectuate (1)
577:13
efforts (1)
664:24

eight (2)
652:7; 652:10
Eight (2)
653:19; 654:10
either (11)
601:2; 608:12; 616:1;
616:18; 616:23;
621:21; 643:20;
650:25; 658:20;
667:14; 670:9
ELA (1)
636:10
elements (1)
635:6
elevator (7)
606:14; 609:6; 609:7;
620:24; 623:17;
696:16; 696:18
elevator's (1)
696:13
ELL (1)
596:7
else (8)
586:7; 586:7; 647:14;
684:22; 691:5;
692:19; 708:25;
709:21
email (4)
578:18; 578:20;
579:4; 586:23
emails (1)
662:13
emotional (1)
593:23
employed (7)
649:16; 650:3;
650:14; 651:4; 652:5;
653:3; 653:17
employees (2)
677:1; 677:8
encourage (1)
665:3
end (6)
579:14; 588:12;
616:19; 645:18;
709:22; 710:2
engaged (1)
644:2
engaging (3)
637:25; 639:16;
704:22
English (2)
596:8; 596:9
ENL (1)
596:9
enough (5)
612:6; 621:3; 622:4;
622:16; 624:24
enrollment (12)
642:10; 642:13;
643:3; 660:8; 660:17;
660:24; 661:11;
661:19; 662:1; 662:3;
684:10; 684:14

ensure (1)
613:19
entered (3)
578:14; 579:11;
648:24
entire (2)
665:18; 687:9
environment (3)
609:18; 629:11; 641:1
equipment (4)
591:21; 607:11;
608:12; 674:14
equities (2)
706:8; 706:9
error (1)
647:10
especially (1)
696:13
essential (1)
635:6
essentially (1)
640:13
Europe (2)
665:22; 666:5
evaluations (1)
667:1
even (6)
586:7; 610:6; 646:18;
668:20; 696:16;
700:15
everybody (1)
699:8
Everybody (1)
699:10
everybody's (1)
575:11
everyday (1)
649:1
everyone (3)
643:15; 644:14;
710:18
evidence (24)
578:3; 578:15; 580:9;
581:3; 582:15;
582:22; 589:8;
606:21; 646:12;
648:24; 655:6; 659:9;
661:25; 662:10;
662:11; 662:21;
678:11; 678:22;
681:18; 683:8; 692:4;
694:23; 707:19; 709:3
exact (5)
591:2; 592:8; 592:22;
624:24; 658:6
exactly (4)
605:18; 617:17;
658:18; 663:20
example (3)
635:22; 636:22; 673:6
examples (1)
610:21
Excuse (1)
576:5

exercise (1)
607:12
exercises (2)
607:16; 608:16
exhibit (1)
579:19
Exhibit (24)
577:21; 578:3; 578:4;
578:11; 578:16;
578:21; 580:1;
580:11; 581:3; 581:9;
581:10; 581:14;
582:7; 582:11;
582:14; 585:13;
588:10; 606:21;
645:5; 655:7; 655:7;
656:21; 658:1; 659:9
exhibited (1)
606:3
exhibits (4)
578:15; 579:10;
580:19; 580:20
Exhibits (2)
580:2; 580:3
existence (1)
582:23
existing (1)
702:9
expects (1)
702:12
expedite (1)
708:13
expedited (1)
708:19
expenses (1)
687:10
experience (3)
597:12; 686:19;
686:24
experts (1)
668:25
explain (2)
601:18; 697:24
explore (1)
705:2
extent (1)
605:17
extremely (1)
644:1
eye (1)
630:8
eye-gaze (3)
601:3; 629:19; 629:22

F

face (2)
584:24; 704:9
facility (1)
671:14
facing (2)
613:5; 613:5
fact (4)
577:18; 610:23;

662:15; 703:22
**facts (2)**
577:3; 701:5
**factual (3)**
681:25; 702:15;
702:17
**factually (1)**
583:23
**failed (2)**
704:6; 705:22
**fair (1)**
605:11
**fairly (1)**
606:4
**familiar (5)**
591:18; 591:24;
614:18; 622:16;
640:16
**families (2)**
664:21; 671:8
**family (4)**
584:5; 701:20; 706:6;
709:6
**Family (4)**
580:1; 581:12;
585:16; 585:16
**family's (1)**
703:23
**Family's (1)**
575:18
**fan (1)**
667:18
**far (2)**
608:8; 689:17
**FARAGO (268)**
575:2; 575:18;
575:23; 576:1; 576:8;
576:15; 576:18;
576:25; 577:5;
577:16; 578:4; 578:8;
578:12; 578:16;
578:19; 579:2; 579:5;
579:8; 579:13;
579:17; 580:6;
580:12; 580:18;
581:4; 581:19;
581:23; 582:1; 582:6;
582:10; 582:16;
583:7; 583:19;
584:16; 585:25;
586:13; 586:16;
586:25; 587:4; 587:6;
587:13; 587:19;
587:23; 588:1; 588:8;
588:17; 588:23;
589:3; 589:7; 594:17;
594:22; 594:25;
595:19; 595:22;
596:24; 597:5;
600:12; 600:17;
601:24; 602:3;
602:11; 602:18;
602:23; 602:25;
603:3; 603:6; 604:7;
604:12; 604:17;

604:21; 605:16;
606:6; 606:9;
606:12; 610:7;
610:20; 611:13;
611:17; 611:21;
612:9; 612:15;
612:18; 613:22;
614:1; 614:8;
619:23; 620:2;
620:10; 620:15;
621:18; 621:24;
628:14; 633:3;
633:9; 633:13;
633:18; 634:22;
635:3; 635:15;
635:18; 635:21;
636:1; 636:6;
636:19; 636:23;
637:1; 637:3; 637:8;
637:14; 637:20;
637:24; 638:2;
638:6; 638:13;
638:19; 638:23;
639:6; 639:14;
639:18; 639:21;
640:6; 640:15;
640:22; 641:6;
641:18; 642:4;
642:12; 642:18;
642:23; 643:2;
643:11; 643:18;
643:23; 644:1;
644:8; 644:12;
644:15; 644:17;
644:21; 645:2;
645:8; 645:12;
645:16; 645:19;
645:21; 645:24;
646:4; 646:7;
646:20; 647:2;
647:8; 647:13;
647:17; 647:22;
647:25; 648:9;
648:12; 648:16;
648:19; 654:6;
654:11; 654:14;
656:2; 656:6;
656:10; 656:20;
661:8; 661:12;
661:21; 662:7;
662:18; 662:22;
663:7; 663:11;
663:16; 663:19;
663:25; 664:4;
664:7; 664:11;
664:14; 665:1;
673:12; 677:12;
677:15; 678:8;
678:15; 678:23;
679:1; 679:7;
679:11; 679:15;
680:12; 680:16;
681:8; 681:13;
681:20; 682:3;
682:9; 682:12;

683:9;   683:16;
686:5;   686:9;
687:14;   687:22;
688:2;   688:4;
688:12;   688:17;
688:22;   689:2;
689:4;   689:10;
689:23;   690:1;
690:5;   690:8;
691:1;   691:7;
692:2;   692:8;
692:14;   692:23;
693:1;   693:4;
693:12;   693:16;
693:20;   694:6;
694:10;   694:21;
698:12;   698:25;
700:9;   700:11;
700:14;   700:19;
701:12;   701:19;
703:9;   703:12;
703:18;   703:21;
704:1;   704:4;
705:16;   705:21;
706:14;   706:18;
706:21;   706:24;
707:8;   707:11;
708:3;   708:6;
708:11;   708:16;
708:18;   708:23;
709:2;   709:12;
709:17;   709:20;
709:24;   710:3;
710:8;   710:13;
710:17
**Farago (1)**
575:3
**father (1)**
576:4
**favor (1)**
706:9
**February (2)**
580:19; 659:3
**fed (1)**
627:10
**feeding (12)**
626:20; 627:5;
627:24; 631:21;
631:24; 632:2;
632:16; 632:22;
632:25; 669:22;
670:5; 696:4
**feedings (2)**
627:13; 627:16
**feel (1)**
633:10
**feels (1)**
586:5
**feet (1)**
696:24
**felt (2)**
643:14; 671:9
**few (3)**
640:2; 696:19; 697:16
**figure (2)**

579:18; 621:16
**filed (2)**
700:25; 701:16
**filled (2)**
684:2; 695:10
**final (6)**
577:12; 579:19;
647:11; 657:7;
659:10; 709:3
**finalized (1)**
626:13
**finally (1)**
696:18
**find (2)**
580:24; 642:4
**fine (9)**
577:17; 591:15;
591:15; 591:16;
597:21; 631:8;
646:24; 709:5; 709:6
**finish (1)**
662:6
**First (2)**
595:16; 695:8
**first (23)**
580:13; 583:10;
583:15; 587:21;
588:2; 594:21;
595:15; 596:5; 615:9;
616:2; 618:9; 619:15;
628:15; 628:19;
644:21; 671:13;
676:17; 676:18;
682:15; 683:4;
696:12; 696:21; 701:8
**fit (3)**
695:11; 697:6; 698:7
**five (7)**
593:17; 602:9; 649:9;
651:7; 651:25;
696:15; 696:20
**fix (2)**
588:19; 647:10
**flat (1)**
695:15
**floor (13)**
594:7; 594:9; 594:12;
595:15; 595:16;
609:6; 623:20; 625:9;
695:15; 696:12;
696:13; 696:21;
696:22
**floors (3)**
594:3; 594:4; 595:15
**Florida (1)**
665:25
**flush (1)**
670:6
**FO (1)**
582:20
**focusing (2)**
636:11; 637:12
**folks (1)**
688:6

**follows (1)**
634:25
**forcefully (1)**
604:25
**forget (2)**
666:1; 710:7
**formative (1)**
640:9
**forms (2)**
683:25; 684:2
**forth (2)**
658:20; 688:16
**forthright (1)**
696:11
**forward (2)**
659:6; 710:17
**found (2)**
659:13; 682:4
**foundation (1)**
611:18
**foundational (1)**
695:2
**founder (5)**
648:22; 654:16;
656:13; 659:19; 661:4
**Four (1)**
607:21
**four (6)**
577:22; 601:11;
601:12; 601:16;
602:8; 701:10
**four-page (1)**
581:10
**four-page-long (1)**
588:10
**foxtrot (2)**
576:14; 576:14
**free (1)**
703:4
**frequently (1)**
660:3
**front (1)**
592:13
**frustrated (2)**
604:24; 605:7
**full (4)**
649:13; 673:22;
674:1; 681:25
**fulltime (3)**
625:1; 625:2; 676:15
**fully (1)**
600:15
**function (2)**
668:11; 668:13
**functionality (1)**
667:20
**functioning (5)**
597:22; 598:19;
599:7; 600:6; 600:23
**funding (1)**
706:9
**further (4)**
633:2; 694:8; 698:24;
700:8

**G**

**G-tube (4)**
626:20; 627:9;
627:13; 669:22
**gai (1)**
621:7
**gait (16)**
614:19; 614:22;
615:1; 615:4; 615:25;
616:16; 617:3; 617:8;
617:14; 619:11;
620:20; 620:25;
621:8; 621:10; 622:5;
622:16
**gather (4)**
584:6; 586:8; 610:20;
645:5
**gave (1)**
611:4
**gaze (1)**
630:8
**general (4)**
593:8; 593:18;
594:16; 650:24
**generating (1)**
667:14
**Generation (1)**
635:12
**germane (1)**
584:23
**gestures (1)**
600:7
**gets (1)**
689:12
**given (3)**
613:18; 618:3; 705:14
**glad (2)**
644:6; 644:7
**goal (9)**
607:17; 608:9;
615:25; 616:16;
618:3; 631:6; 631:8;
631:12; 631:13
**goals (3)**
637:6; 657:3; 659:16
**goes (3)**
633:6; 636:3; 689:17
**Goes (1)**
664:23
**good (3)**
575:20; 589:13; 644:8
**Good (8)**
575:2; 575:17; 588:1;
628:17; 628:18;
644:15; 648:2; 648:4
**govern (1)**
694:23
**grateful (1)**
644:3
**Great (6)**
587:19; 588:17;
700:11; 709:24;
710:3; 710:15

**great (2)**
612:19; 644:11
**gross (2)**
597:21; 630:1
**Group (1)**
575:22
**group (4)**
596:17; 596:18;
605:17; 697:14
**grouped (3)**
596:5; 596:6; 598:21
**grouping (1)**
596:10
**groups (3)**
596:12; 608:5; 613:14
**growing (1)**
665:23
**growth (2)**
654:20; 665:21
**guess (6)**
583:10; 608:3; 619:7;
619:14; 636:8; 675:22

**H**

**half (6)**
614:7; 653:10; 671:4;
675:23; 675:23;
707:23
**hall (2)**
609:5; 609:7
**hallway (1)**
608:15
**hand (3)**
588:4; 644:23; 667:24
**hands-on (1)**
634:10
**handwriting (1)**
631:9
**hang (2)**
580:6; 644:9
**happen (6)**
616:8; 627:10;
642:22; 643:9;
643:10; 683:12
**happened (1)**
699:6
**happens (1)**
643:9
**happy (1)**
576:16
**head (7)**
605:10; 667:25;
668:15; 687:15;
688:7; 688:23; 688:23
**headed (4)**
661:22; 678:9;
680:14; 680:17
**heading (1)**
694:24
**health (3)**
601:7; 601:8; 603:13
**hear (8)**
575:4; 585:9; 644:7;

656:3; 656:3;
656:4; 664:16;
704:2
**heard (5)**
670:8; 674:16;
679:16; 679:16; 695:4
**hearing (15)**
575:4; 575:9; 581:6;
585:10; 585:23;
611:6; 692:3; 701:7;
704:20; 704:22;
705:11; 705:12;
705:25; 707:1; 708:1
**Hearing (3)**
580:10; 580:15; 581:2
**HEARING (268)**
575:2; 575:18;
575:23; 576:1; 576:8;
576:15; 576:18;
576:25; 577:5;
577:16; 578:4; 578:8;
578:12; 578:16;
578:19; 579:2; 579:5;
579:8; 579:13;
579:17; 580:6;
580:12; 580:18;
581:4; 581:19;
581:23; 582:1; 582:6;
582:10; 582:16;
583:7; 583:19;
584:16; 585:25;
586:13; 586:16;
586:25; 587:4; 587:6;
587:13; 587:19;
587:23; 588:1; 588:8;
588:17; 588:23;
589:3; 589:7; 594:17;
594:22; 594:25;
595:19; 595:22;
596:24; 597:5;
600:12; 600:17;
601:24; 602:3;
602:11; 602:18;
602:23; 602:25;
603:3; 603:6; 604:7;
604:12; 604:17;
604:21; 605:16;
606:6; 606:9; 606:12;
610:7; 610:20;
611:13; 611:17;
611:21; 612:9;
612:15; 612:18;
613:22; 614:1; 614:8;
619:23; 620:2;
620:10; 620:15;
621:18; 621:24;
628:14; 633:3; 633:9;
633:13; 633:18;
634:22; 635:3;
635:15; 635:18;
635:21; 636:1; 636:6;
636:19; 636:23;
637:1; 637:3; 637:8;
637:14; 637:20;
637:24; 638:2; 638:6;

638:13; 638:19;
638:23; 639:6;
639:14; 639:18;
639:21; 640:6;
640:15; 640:22;
641:6; 641:18;
642:4; 642:12;
642:18; 642:23;
643:2; 643:11;
643:18; 643:23;
644:1; 644:8;
644:12; 644:15;
644:17; 644:21;
645:2; 645:8;
645:12; 645:16;
645:19; 645:21;
645:24; 646:4;
646:7; 646:20;
647:2; 647:8;
647:13; 647:17;
647:22; 647:25;
648:9; 648:12;
648:16; 648:19;
654:6; 654:11;
654:14; 656:2;
656:6; 656:10;
656:20; 661:8;
661:12; 661:21;
662:7; 662:18;
662:22; 663:7;
663:11; 663:16;
663:19; 663:25;
664:4; 664:7;
664:11; 664:14;
665:1; 673:12;
677:12; 677:15;
678:8; 678:15;
678:23; 679:1;
679:7; 679:11;
679:15; 680:12;
680:16; 681:8;
681:13; 681:20;
682:3; 682:9;
682:12; 683:9;
683:16; 686:5;
686:9; 687:14;
687:22; 688:2;
688:4; 688:12;
688:17; 688:22;
689:2; 689:4;
689:10; 689:23;
690:1; 690:5; 690:8;
691:1; 691:7;
692:2; 692:8;
692:14; 692:23;
693:1; 693:4;
693:12; 693:16;
693:20; 694:6;
694:10; 694:21;
698:12; 698:25;
700:9; 700:11;
700:14; 700:19;
701:12; 701:19;
703:9; 703:12;
703:18; 703:21;

704:1; 704:4;
705:16; 705:21;
706:14; 706:18;
706:21; 706:24;
707:8; 707:11;
708:3; 708:6;
708:11; 708:16;
708:18; 708:23;
709:2; 709:12;
709:17; 709:20;
709:24; 710:3;
710:8; 710:13;
710:17
**hearings (1)**
664:16
**help (7)**
617:6; 619:5; 619:10;
654:18; 665:20;
709:13; 709:14
**helpful (1)**
644:2
**HENRY (1)**
575:20
**Henry (2)**
575:21; 576:6
**Hi (1)**
587:17
**high (3)**
630:5; 651:1; 651:24
**higher (5)**
634:15; 634:15;
639:11; 639:13;
639:17
**hired (1)**
690:24
**hold (1)**
589:18
**home (12)**
671:7; 671:8; 671:19;
671:23; 672:24;
674:9; 674:10;
674:13; 674:13;
674:15; 675:8; 675:14
**homes (1)**
671:10
**honest (1)**
709:14
**honestly (1)**
622:2
**Honor (38)**
581:16; 584:10;
585:19; 589:12;
594:21; 611:8; 612:5;
622:8; 628:11; 645:7;
645:10; 646:3;
647:16; 647:21;
647:24; 654:10;
655:25; 656:18;
661:18; 663:10;
673:16; 678:5; 679:3;
680:11; 687:25;
689:3; 692:7; 694:12;
695:2; 698:14; 699:2;
700:8; 700:13;

707:5; 708:14;
710:16
hope (1)
585:25
Horan (2)
589:22; 590:13
hotel (3)
576:13; 618:10;
618:12
hour (3)
666:13; 707:23; 708:7
HR (1)
687:20
Huh (1)
613:25
Hungarian (1)
577:9
Hungry (1)
665:13
hypothetical (2)
618:3; 618:17

**I**

iBrain (44)
585:21; 648:6; 649:2;
649:6; 649:16;
650:14; 650:23;
651:4; 651:9; 651:15;
652:5; 653:17;
654:16; 655:5; 655:6;
655:9; 655:16;
655:22; 656:13;
656:15; 656:19;
656:22; 657:23;
658:8; 658:8; 659:8;
659:10; 659:13;
659:19; 659:20;
661:4; 662:1; 669:10;
669:23; 670:21;
670:25; 676:4; 677:1;
684:11; 685:9;
692:10; 693:21;
693:25; 706:5
identification (1)
650:25
identifying (1)
637:13
IEP (91)
582:21; 582:23;
583:2; 583:3; 583:3;
583:5; 583:13; 584:3;
584:14; 591:10;
597:4; 604:10;
606:20; 609:11;
609:12; 609:21;
615:24; 618:18;
619:8; 623:3; 624:13;
629:9; 631:3; 637:6;
642:6; 642:21;
643:13; 643:16;
646:10; 646:11;
646:14; 646:17;
647:6; 647:6; 655:8;
655:15; 656:19;

656:22; 656:23;
656:25; 657:3;
657:21; 657:23;
658:4; 659:8;
659:10; 659:13;
664:25; 668:21;
669:10; 670:21;
676:21; 677:10;
677:20; 677:24;
678:1; 678:17;
678:19; 679:23;
679:25; 680:10;
680:22; 681:5;
682:15; 682:21;
682:22; 683:5;
695:23; 695:25;
696:2; 697:5; 698:2;
698:3; 698:20;
699:18; 700:4;
700:17; 700:17;
700:23; 700:23;
701:1; 701:2; 701:4;
701:6; 701:8;
701:13; 701:22;
701:25; 702:12;
704:24; 705:3
IEPs (8)
592:13; 624:25;
655:6; 655:6; 655:8;
658:9; 658:19; 697:23
IHO (3)
579:10; 579:19;
678:13
II (1)
579:22
III (2)
580:11; 580:16
Im (2)
622:8; 623:6
imagine (1)
577:1
impairment (1)
598:4
impairments (2)
630:1; 665:17
Impartial (1)
581:2
impartial (2)
575:3; 664:16
implementation (5)
583:14; 584:11;
584:15; 585:2; 699:16
implemented (1)
584:7
in-house (1)
640:4
in-person (1)
675:12
inaccurate (1)
695:21
inadvertently (1)
646:10
inappropriately (1)
703:23

include (3)
576:19; 695:24; 696:2
included (2)
687:2; 687:12
includes (1)
685:2
Including (1)
672:3
including (3)
582:3; 584:21; 591:19
increments (1)
653:14
indicate (1)
630:2
indicated (3)
610:16; 627:3; 628:20
indicates (1)
582:25
indiscernible (20)
577:6; 616:4; 621:19;
625:11; 628:22;
641:7; 648:10;
648:17; 656:17;
661:10; 661:13;
663:6; 663:8; 666:20;
667:4; 679:2; 688:1;
689:1; 694:25; 703:10
Indiscernible (10)
581:24; 648:11;
648:20; 660:22;
663:20; 679:3; 688:2;
689:2; 695:1; 703:11
individual (8)
597:17; 613:14;
641:2; 642:2; 684:20;
685:9; 685:12; 690:12
individually (1)
685:5
individuals (1)
662:14
information (2)
634:4; 642:17
informed (2)
695:22; 696:1
infrastructure (2)
685:1; 687:4
initial (2)
643:2; 670:4
injury (2)
591:25; 592:6
Injury (1)
575:21
inquired (2)
699:12; 699:20
inquiry (1)
662:25
insofar (1)
704:8
instance (3)
598:5; 616:15; 629:6
instructed (1)
677:9
instruction (2)
598:21; 598:22

instructions (3)
672:10; 672:22; 700:2
intellectual (4)
593:22; 595:2; 595:8;
595:25
interest (1)
643:15
Interesting (1)
576:19
international (1)
576:23
Interposing (147)
576:1; 576:8; 576:25;
577:5; 578:8; 578:12;
578:19; 579:9;
579:16; 580:4;
580:12; 581:19;
581:23; 582:5;
583:19; 586:13;
588:21; 590:19;
592:16; 592:19;
592:25; 594:17;
594:20; 595:19;
596:24; 597:9; 598:9;
598:13; 599:11;
599:20; 601:24;
602:22; 603:20;
604:6; 606:1; 606:19;
606:23; 608:3;
609:14; 612:13;
612:17; 614:15;
616:3; 618:19;
619:23; 620:15;
621:18; 622:13;
625:8; 625:21;
629:18; 630:14;
630:22; 632:4;
632:12; 633:12;
633:18; 635:3;
635:15; 635:18;
635:24; 636:5;
636:19; 636:23;
636:25; 637:3; 637:8;
637:14; 637:20;
638:1; 638:4; 638:13;
638:19; 639:14;
639:20; 640:6;
640:15; 640:22;
641:18; 642:12;
642:18; 643:1;
643:11; 643:25;
644:12; 645:9;
645:21; 645:23;
645:24; 646:6; 647:2;
647:8; 647:15;
648:14; 648:19;
652:9; 654:6; 655:10;
655:20; 656:2;
658:10; 660:21;
661:5; 661:8; 661:16;
661:17; 662:2; 662:7;
662:18; 662:20;
663:5; 663:9; 663:16;
663:19; 663:25;
664:7; 667:10;

668:22; 671:20;
672:5; 674:7; 676:3;
676:6; 677:21;
678:15; 679:1;
679:15; 680:12;
680:16; 681:8;
681:13; 682:18;
682:20; 683:16;
686:1; 686:9;
688:25; 689:23;
693:3; 693:6;
700:19; 706:16;
706:22; 708:3;
709:12; 709:15;
710:11
interrupt (2)
654:7; 703:13
intervention (1)
666:3
into (51)
578:3; 578:14; 580:9;
581:3; 582:15;
582:22; 589:8;
612:22; 615:4;
616:25; 617:3;
619:11; 630:25;
631:10; 641:8;
646:12; 648:24;
659:6; 661:25;
662:10; 662:11;
664:22; 681:16;
687:12; 692:4;
695:11; 697:6; 698:7;
699:19; 705:13;
707:18
introduce (2)
575:12; 587:15
Inventory (1)
640:9
involve (1)
617:13
iPad (1)
675:1
irrelevant (1)
655:23
issue (3)
583:3; 701:13; 702:16
issues (3)
701:22; 705:11; 707:3
items (2)
647:20; 697:16
iterations (2)
658:14; 684:16
IV (2)
580:16; 580:22

**J**

James (1)
575:16
JAMES (1)
575:15
J██████ (37)
575:5; 589:5; 590:18;
591:10; 598:12;

599:9; 604:11;
606:24; 609:1;
609:15; 627:12;
627:15; 651:21;
653:1; 657:5;
658:23; 661:1;
661:20; 662:3;
662:4; 666:7;
666:15; 666:21;
667:4; 667:21;
668:1; 669:21;
670:9; 671:14;
673:18; 674:19;
676:13; 677:16;
692:18; 692:24;
696:4; 697:14
**Jane's (18)**
576:3; 585:20; 591:8;
600:2; 618:18; 619:8;
623:3; 650:10;
656:25; 660:17;
661:2; 661:7; 668:21;
669:9; 673:11;
684:15; 686:7; 700:5
**January (1)**
659:3
**jellybean (3)**
667:5; 667:22; 668:2
**job (1)**
621:14
**John (3)**
575:3; 575:21; 576:6
**JOHN (2)**
575:2; 575:20
**joined (1)**
587:14
**judgement (1)**
584:21
**Juliet (1)**
636:17
**July (4)**
697:9; 698:16;
700:25; 701:3
**jump (1)**
708:14
**June (10)**
579:4; 579:5; 646:15;
646:18; 676:21;
677:14; 677:23;
682:25; 683:5; 683:17
**jurisdiction (1)**
585:1

**K**

**kid (2)**
641:7; 641:8
**kids (2)**
611:23; 688:19
**kind (14)**
590:1; 605:9; 611:25;
612:2; 612:5; 619:24;
626:24; 633:10;
637:4; 643:19;
657:18; 667:8; 673:6;

693:13
**kinds (4)**
596:25; 604:18;
634:22; 641:6
**knew (1)**
691:8
**knowledge (3)**
588:25; 647:19;
652:24
**known (1)**
627:12
**knows (1)**
586:19

**L**

**L's (1)**
587:20
**L-E-F-A-I-V-R-E (1)**
587:24
**labeled (1)**
588:9; 588:10
**language (4)**
596:8; 596:9; 625:25;
653:21
**large (3)**
607:11; 696:25; 709:4
**larger (3)**
607:8; 612:22; 641:16
**last (23)**
576:6; 576:10;
587:24; 592:24;
594:12; 596:14;
599:5; 602:7; 618:9;
619:16; 619:25;
636:9; 636:16;
648:23; 648:25;
671:4; 680:25;
681:10; 692:12;
692:16; 693:22;
693:25; 699:4
**late (2)**
671:2; 671:3
**later (2)**
585:9; 683:23
**law (1)**
664:17
**lawyer (1)**
575:19
**lead (1)**
704:19
**leads (2)**
643:4; 643:5
**learner (1)**
596:8
**learners (2)**
633:24; 633:25
**learning (17)**
590:17; 590:23;
591:8; 595:3; 595:9;
595:25; 628:5; 628:8;
634:10; 634:17;
634:17; 635:8;
637:10; 671:12;
671:17; 674:5; 674:11

**least (5)**
650:4; 650:16;
650:19; 651:18;
675:15
**leave (6)**
616:2; 616:5; 616:23;
617:4; 619:12; 623:6
**lecturing (1)**
664:18
**leeway (3)**
678:9; 678:16; 694:22
**LEFAIVRE (220)**
587:17; 587:22;
587:25; 588:7;
588:16; 588:21;
589:2; 589:6; 589:16;
589:20; 589:24;
590:4; 590:9; 590:14;
590:19; 590:24;
591:9; 592:1; 592:7;
592:11; 592:16;
592:19; 592:22;
593:2; 593:5; 593:10;
593:17; 593:20;
594:2; 594:6; 594:11;
594:15; 595:1; 595:6;
595:11; 595:14;
595:21; 595:24;
596:4; 596:14;
596:22; 597:2; 597:9;
597:15; 598:10;
598:13; 598:17;
599:2; 599:11;
599:14; 599:18;
599:20; 599:22;
599:24; 600:4;
600:14; 600:19;
601:1; 601:8; 601:14;
601:20; 602:1; 602:4;
602:16; 602:22;
602:24; 603:2; 603:5;
603:9; 603:17;
603:24; 604:5;
604:20; 604:23;
605:24; 606:2; 606:8;
606:11; 606:15;
606:19; 606:23;
607:3; 607:7; 607:21;
607:24; 608:3;
608:24; 609:4;
609:10; 609:14;
609:20; 612:13;
612:17; 612:20;
613:25; 614:5; 614:9;
614:11; 614:15;
614:17; 614:20;
614:23; 615:2;
615:11; 615:15;
615:19; 616:3; 616:6;
616:9; 616:14;
617:10; 617:16;
618:8; 618:11;
618:13; 618:19;
618:22; 619:3; 619:6;
619:13; 620:1; 620:4;

620:13; 620:17;
620:22; 621:1;
621:22; 622:1;
622:13; 622:19;
623:4; 623:9;
623:12; 623:15;
623:19; 623:23;
624:1; 624:4;
624:10; 624:18;
624:22; 625:5;
625:8; 625:12;
625:15; 625:21;
626:2; 626:5; 626:8;
626:11; 626:14;
626:17; 626:22;
627:14; 627:19;
627:25; 628:4;
628:9; 628:18;
628:24; 629:2;
629:18; 629:21;
629:23; 630:14;
630:19; 630:22;
631:16; 631:19;
631:22; 631:25;
632:4; 632:6;
632:12; 632:14;
632:23; 633:8;
633:12; 633:15;
633:20; 634:24;
635:5; 635:17;
635:20; 635:24;
636:5; 636:8;
636:21; 636:25;
637:2; 637:5;
637:10; 637:16;
637:22; 638:1;
638:4; 638:9;
638:15; 638:21;
638:25; 639:8;
639:16; 639:20;
640:2; 640:8;
640:17; 640:24;
641:10; 641:20;
642:9; 642:15;
642:20; 643:1;
643:8; 643:13;
643:25; 644:6;
644:10; 644:14;
644:16
**Lefaivre (8)**
577:24; 586:21;
589:13; 605:23;
612:11; 622:11;
628:12; 643:24
**LeFaivre (6)**
587:18; 695:4; 696:5;
696:10; 703:15;
703:22
**LeFaivre's (1)**
695:6
**left (4)**
589:9; 602:19; 677:4;
677:8
**legal (1)**
584:2

**legally (1)**
584:4
**legitimate (1)**
583:25
**less (2)**
629:11; 641:1
**letter (1)**
577:7
**letters (2)**
576:20; 577:10
**letting (3)**
605:20; 621:21; 665:3
**level (5)**
597:21; 639:13;
639:17; 666:23;
686:24
**levels (5)**
599:7; 634:15;
634:16; 639:11;
640:18
**licensed (3)**
651:10; 651:12;
669:13
**lift (1)**
693:14
**light (1)**
641:14
**likelihood (1)**
660:2
**Lima (1)**
576:13
**limitations (1)**
672:11
**limited (3)**
600:6; 600:11; 609:18
**line (3)**
575:12; 588:12; 613:8
**link (1)**
663:17
**list (1)**
691:2
**listed (1)**
646:12
**literary (2)**
636:12; 636:13
**litigate (2)**
584:17; 584:18
**little (4)**
632:16; 665:17;
678:1; 678:9
**Live (1)**
675:12
**located (3)**
593:25; 594:3; 595:13
**location (9)**
606:25; 619:9;
619:20; 620:6; 624:6;
630:15; 630:18;
693:21; 695:9
**locations (1)**
608:19
**lockdown (1)**
575:10
**long (6)**

577:22; 582:12;
609:2; 666:6;
666:11; 705:25
**longer (3)**
586:9; 632:16; 697:23
**look (11)**
583:11; 583:12;
630:4; 634:18; 635:5;
640:17; 640:19;
641:4; 647:18;
673:10; 683:8
**looked (3)**
591:10; 646:15;
701:23
**looking (11)**
589:21; 592:14;
595:17; 606:16;
609:11; 614:12;
622:8; 626:6; 659:4;
659:6; 683:7
**Looking (1)**
710:17
**looks (4)**
588:15; 611:25;
634:2; 707:25
**lot (5)**
634:10; 641:13;
641:25; 662:14;
665:16
**lots (1)**
664:15
**low (4)**
651:24; 665:19;
686:17; 686:17
**lower (1)**
704:11
**lump (1)**
709:4
**lunch (6)**
632:7; 632:8; 632:8;
632:8; 632:18; 632:21

**M**

**M-A-C (1)**
670:16
**M-A-R-I-O-T-T (1)**
618:14
**MAC (2)**
670:14; 670:16
**making (4)**
631:4; 681:14;
699:21; 707:13
**MALE (1)**
645:23
**management (10)**
603:19; 609:13;
609:19; 609:21;
610:10; 610:17;
613:18; 629:16;
640:19; 641:22
**manager (2)**
687:19; 687:20
**mandate (4)**
602:15; 624:5; 624:5;

704:11
**mandated (1)**
704:12
**mandates (3)**
613:15; 630:23; 654:3
**manner (2)**
684:1; 690:22
**manually (1)**
630:11
**many (50)**
579:6; 590:12;
590:21; 591:11;
592:3; 592:4; 592:21;
593:1; 593:15;
594:13; 595:4; 595:5;
595:10; 599:12;
599:17; 600:3;
600:12; 601:6;
601:13; 607:19;
607:22; 607:25;
608:19; 610:13;
611:10; 611:10;
611:23; 613:19;
615:8; 623:21;
623:24; 624:16;
649:5; 649:15;
650:13; 651:3;
651:14; 652:4;
652:11; 653:2; 653:6;
653:16; 654:8; 668:3;
675:17; 675:19;
680:4; 680:11;
685:19; 707:2
**March (7)**
628:2; 659:4; 671:2;
671:4; 671:5; 676:16;
676:17
**Mariott (4)**
618:9; 618:12; 619:1;
623:2
**mark (1)**
577:8
**marked (2)**
578:3; 581:3; 582:14
**mass-market (1)**
662:13
**mat (2)**
607:11; 696:25
**Mat (1)**
674:18
**material (4)**
634:11; 634:20;
634:23; 635:25
**materials (4)**
634:3; 675:3; 675:5;
675:6
**math (2)**
602:12; 611:9
**Matilda (1)**
577:4
**mats (2)**
674:13; 674:16
**matter (5)**
575:4; 583:24;

648:25; 679:8;
681:23
**matters (1)**
663:15
**may (29)**
579:9; 584:4; 584:5;
608:7; 608:11;
608:13; 611:17;
630:1; 630:23;
632:15; 633:23;
634:8; 634:11;
634:16; 638:10;
638:12; 639:11;
639:12; 641:2;
642:21; 655:1;
658:17; 659:21;
668:6; 668:7; 668:20;
675:3; 693:10; 703:1
**May (14)**
583:14; 646:12;
646:19; 646:25;
647:7; 658:15;
671:13; 671:15;
676:17; 676:18;
683:11; 683:11;
683:18; 699:16
**maybe (5)**
586:8; 630:7; 632:16;
638:17; 642:7
**Maybe (3)**
645:22; 652:9; 681:17
**mean (24)**
580:10; 597:15;
599:2; 600:24;
601:19; 605:18;
605:25; 629:24;
633:15; 634:24;
637:5; 641:10;
642:10; 642:13;
657:14; 658:13;
679:5; 682:17;
684:19; 687:21;
690:22; 696:20;
709:13; 709:14
**means (2)**
602:20; 684:25
**measure (1)**
635:20
**mechanics (1)**
621:17
**mechanism (2)**
667:18; 689:11
**mechanisms (1)**
665:20
**medical (3)**
626:24; 683:25; 684:2
**meet (4)**
613:18; 659:21;
704:6; 705:23
**meeting (26)**
629:9; 646:10;
646:14; 646:17;
646:25; 656:19;
656:22; 676:21;
677:5; 677:8; 677:10;

677:12; 677:20;
677:24; 679:24;
679:25; 680:10;
682:14; 682:17;
682:21; 682:22;
683:5; 684:5; 684:7;
699:6; 699:14
**meetings (11)**
655:8; 655:15;
656:14; 659:5; 678:1;
678:4; 678:18;
678:20; 681:6;
683:19; 683:23
**member (1)**
625:16
**memory (1)**
680:10
**mentioned (1)**
629:3
**met (5)**
660:4; 695:16;
695:21; 697:2; 697:21
**Michelle (2)**
577:24; 587:17
**MICHELLE (1)**
587:17
**Michigan (1)**
666:2
**Microsoft (3)**
582:3; 709:9; 709:11
**mid-40s (1)**
686:18
**middle (4)**
639:1; 699:9; 699:22;
702:11
**midyear (1)**
702:19
**might (8)**
579:21; 586:17;
586:17; 629:11;
631:9; 636:24; 641:3;
641:17
**mind (1)**
611:21
**minor (1)**
658:20
**minutes (28)**
609:5; 609:8; 615:25;
616:16; 616:17;
616:18; 616:23;
617:5; 617:7; 618:4;
618:21; 619:18;
619:21; 620:7; 632:9;
651:22; 652:2;
652:21; 654:1; 654:4;
670:2; 670:4; 696:16;
696:19; 696:21;
697:4; 697:5; 697:23
**Miss (1)**
611:12
**mission (1)**
660:14
**mistaken (1)**
681:15

**modification (1)**
645:10
**modifications (1)**
658:20
**modified (2)**
608:16; 696:2
**modify (2)**
588:20; 697:6
**moment (2)**
577:20; 655:14
**Monday (2)**
676:17; 676:18
**monitor (3)**
605:1; 670:7; 673:10
**monitoring (2)**
670:11; 673:7
**month (1)**
675:21
**more (23)**
585:9; 608:22; 609:4;
610:23; 610:25;
611:25; 628:11;
634:8; 634:10;
634:12; 634:16;
634:20; 637:12;
638:11; 639:4;
639:10; 642:2; 650:2;
652:19; 693:5;
693:17; 697:5; 707:23
**morning (10)**
575:3; 575:17;
575:21; 585:10;
585:24; 589:13;
628:17; 628:18;
648:2; 648:4
**most (4)**
579:18; 593:13;
650:11; 693:8
**Mostly (1)**
692:20
**motion (2)**
578:22; 669:6
**motor (4)**
591:16; 597:21;
630:1; 631:8
**move (10)**
612:7; 622:10;
629:10; 629:12;
665:8; 665:9; 676:21;
682:2; 682:7; 703:23
**movies (1)**
637:19
**moving (1)**
624:15
**much (14)**
617:12; 617:17;
628:13; 633:22;
634:1; 641:2; 644:10;
672:12; 686:2;
686:14; 686:20;
689:4; 689:5; 706:19
**multidisciplinary (2)**
665:12; 665:19
**multiple (12)**

591:3; 597:3; 597:8;
597:13; 597:25;
598:2; 598:3;
610:10; 612:16;
613:4; 613:4; 629:7
**Multiple (1)**
666:25
**muted (1)**
655:24
**mutually (2)**
675:1; 680:8
**myself (1)**
660:19

**N**

**name (9)**
576:6; 576:11;
587:21; 587:24;
588:12; 618:6; 618:8;
618:9; 618:9
**name's (1)**
575:3
**named (1)**
665:14
**narrow (1)**
694:24
**NATO (3)**
576:16; 576:19;
576:20
**nature (4)**
598:7; 598:22; 601:4;
656:7
**Nature (1)**
604:7
**navigate (1)**
617:24
**navigating (1)**
608:14
**near (1)**
707:16
**near-ish (1)**
707:21
**necessarily (4)**
600:8; 652:25;
690:21; 696:10
**necessary (3)**
585:22; 706:23; 707:6
**need (19)**
584:19; 585:15;
610:10; 617:24;
623:17; 641:2;
641:24; 651:9; 661:1;
700:5; 701:21; 702:1;
705:2; 705:8; 705:13;
707:15; 708:25;
709:10; 710:6
**needed (3)**
597:20; 604:25;
650:22
**Needs (1)**
640:5
**needs (30)**
577:8; 580:23;
597:17; 598:15;

598:19; 598:25;
603:19; 604:9;
605:12; 609:13;
609:19; 609:21;
610:17; 611:12;
613:18; 617:25;
629:16; 640:20;
641:13; 641:22;
641:23; 680:23;
685:6; 690:23;
690:25; 702:21;
702:24; 703:1;
705:5; 705:7
**neurological (1)**
665:17
**neurologist (1)**
665:14
**New (7)**
582:20; 614:2; 635:1;
635:11; 650:7;
651:12; 677:17
**new (4)**
596:9; 646:8; 701:5;
702:12
**Next (1)**
635:11
**next (5)**
612:8; 614:13; 623:7;
659:6; 705:1
**nexus (1)**
586:2
**nine (4)**
599:24; 652:9;
653:19; 654:10
**noise (1)**
641:14
**nonambulatory (3)**
591:13; 597:20;
603:24
**noncognizable (1)**
700:21
**nondistracting (1)**
609:17
**nonverbal (5)**
591:12; 600:3;
600:11; 600:20;
600:25
**Nope (1)**
656:3
**note (3)**
584:24; 590:16;
615:24
**noted (2)**
618:16; 685:2
**notes (4)**
581:5; 655:14;
682:11; 684:9
**notice (4)**
584:13; 682:15;
683:3; 683:4
**notices (5)**
678:3; 678:19; 679:5;
679:6; 679:13
**November (8)**

578:7; 579:24;
579:25; 579:25;
580:1; 580:5;
580:13; 580:14
**number (10)**
575:6; 579:1; 591:2;
592:23; 624:24;
654:12; 677:1; 678:3;
678:19; 697:20
**numbered (4)**
582:8; 582:11;
588:13; 645:4
**numbering (1)**
646:1
**nurse (29)**
603:8; 603:12;
626:10; 626:12;
626:22; 626:22;
627:2; 627:16;
627:20; 627:21;
671:22; 673:1;
673:13; 673:17;
684:22; 685:9;
685:13; 685:17;
685:21; 686:2; 686:7;
687:8; 691:4; 695:21;
695:22; 695:24;
696:1; 696:3; 696:7
**nurse's (8)**
626:21; 627:7;
627:17; 627:23;
631:24; 632:21;
632:24; 696:6
**nurses (3)**
684:21; 685:19;
690:13
**nursing (2)**
627:7; 685:18

**O**

**object (1)**
661:18
**objected (1)**
655:25
**objection (3)**
582:17; 656:7; 678:6
**Objection (12)**
604:6; 605:14; 610:3;
610:12; 621:11;
655:18; 655:20;
678:21; 686:3; 686:3;
692:1; 694:17
**objections (1)**
589:17
**objectives (1)**
657:4
**obligated (1)**
662:16
**obligation (2)**
663:23; 664:2
**obligations (2)**
662:15; 663:24
**observation (1)**
704:20

**observed (1)**
626:2
**obviously (9)**
632:17; 634:17;
639:24; 670:10;
680:11; 687:9;
689:20; 699:14;
708:14
**Obviously (3)**
632:12; 640:25;
672:11
**occupational (14)**
606:17; 610:16;
613:9; 630:13;
630:16; 630:17;
630:24; 630:25;
631:3; 631:7; 651:3;
651:9; 651:11; 651:16
**occurred (2)**
676:21; 682:25
**occurring (1)**
700:3
**occurs (1)**
703:14
**October (3)**
575:7; 577:23; 710:13
**odyssey (1)**
710:5
**Off (1)**
587:9
**off (7)**
587:7; 646:11;
668:15; 674:17;
680:10; 703:17;
710:20
**OFF (1)**
587:10
**office (18)**
581:6; 624:6; 624:9;
624:11; 625:5;
625:22; 626:21;
627:7; 627:18;
627:21; 627:23;
630:16; 631:24;
632:22; 632:24;
695:9; 695:12; 696:6
**OFFICER (268)**
575:2; 575:18;
575:23; 576:1; 576:8;
576:15; 576:18;
576:25; 577:5;
577:16; 578:4; 578:8;
578:12; 578:16;
578:19; 579:2; 579:5;
579:8; 579:13;
579:17; 580:6;
580:12; 580:18;
581:4; 581:19;
581:23; 582:1; 582:6;
582:10; 582:16;
583:7; 583:19;
584:16; 585:25;
586:13; 586:16;
586:25; 587:4; 587:6;
587:13; 587:19;

587:23; 588:1;
588:8; 588:17;
588:23; 589:3;
589:7; 594:17;
594:22; 594:25;
595:19; 595:22;
596:24; 597:5;
600:12; 600:17;
601:24; 602:3;
602:11; 602:18;
602:23; 602:25;
603:3; 603:6; 604:7;
604:12; 604:17;
604:21; 605:16;
606:6; 606:9;
606:12; 610:7;
610:20; 611:13;
611:17; 611:21;
612:9; 612:15;
612:18; 613:22;
614:1; 614:8;
619:23; 620:2;
620:10; 620:15;
621:18; 621:24;
628:14; 633:3;
633:9; 633:13;
633:18; 634:22;
635:3; 635:15;
635:18; 635:21;
636:1; 636:6;
636:19; 636:23;
637:1; 637:3; 637:8;
637:14; 637:20;
637:24; 638:2;
638:6; 638:13;
638:19; 638:23;
639:6; 639:14;
639:18; 639:21;
640:6; 640:15;
640:22; 641:6;
641:18; 642:4;
642:12; 642:18;
642:23; 643:2;
643:11; 643:18;
643:23; 644:1;
644:8; 644:12;
644:15; 644:17;
644:21; 645:2;
645:8; 645:12;
645:16; 645:19;
645:21; 645:24;
646:4; 646:7;
646:20; 647:2;
647:8; 647:13;
647:17; 647:22;
647:25; 648:9;
648:12; 648:16;
648:19; 654:6;
654:11; 654:14;
656:2; 656:6;
656:10; 656:20;
661:8; 661:12;
661:21; 662:7;
662:18; 662:22;
663:7; 663:11;

663:16;   663:19;
663:25;   664:4;
664:7;   664:11;
664:14;   665:1;
673:12;   677:12;
677:15;   678:8;
678:15;   678:23;
679:1;   679:7;
679:11;   679:15;
680:12;   680:16;
681:8;   681:13;
681:20;   682:3;
682:9;   682:12;
683:9;   683:16;
686:5;   686:9;
687:14;   687:22;
688:2;   688:4;
688:12;   688:17;
688:22;   689:2;
689:4;   689:10;
689:23;   690:1;
690:5;   690:8;
691:1;   691:7;
692:2;   692:8;
692:14;   692:23;
693:1;   693:4;
693:12;   693:16;
693:20;   694:6;
694:10;   694:21;
698:12;   698:25;
700:9;   700:11;
700:14;   700:19;
701:12;   701:19;
703:9;   703:12;
703:18;   703:21;
704:1;   704:4;
705:16;   705:21;
706:14;   706:18;
706:21;   706:24;
707:8;   707:11;
708:3;   708:6;
708:11;   708:16;
708:18;   708:23;
709:2;   709:12;
709:17;   709:20;
709:24;   710:3;
710:8;   710:13;
710:17
officer (1)
575:4
Officer's (3)
580:10; 580:16; 581:2
official (1)
629:24
often (7)
643:9; 654:22;
654:24; 666:6;
671:17; 675:13;
676:11
old (1)
646:9
older (3)
596:19; 697:12;
697:13
OLTHOFF (195)

575:20; 576:12;
576:16; 576:22;
577:4; 581:16;
581:21; 581:25;
582:5; 582:9;
584:10; 585:19;
586:11; 586:15;
587:3; 587:5;
589:12; 589:17;
589:21; 589:25;
590:7; 590:12;
590:15; 590:20;
591:6; 591:23;
592:2; 592:9;
592:14; 592:17;
592:20; 592:25;
593:4; 593:7;
593:15; 593:18;
593:24; 594:5;
594:8; 594:13;
594:16; 594:20;
594:24; 595:4;
595:8; 595:12;
595:16; 596:1;
596:12; 596:20;
596:23; 597:6;
597:10; 598:9;
598:11; 598:14;
598:23; 599:8;
599:12; 599:17;
599:19; 599:21;
599:23; 600:1;
600:21; 601:5;
601:10; 601:18;
603:7; 603:15;
603:20; 604:1;
604:14; 604:22;
605:11; 605:22;
606:1; 606:13;
606:16; 606:20;
606:24; 607:5;
607:19; 607:22;
608:2; 608:21;
608:25; 609:9;
609:11; 609:15;
609:24; 610:5;
610:9; 611:8;
611:16; 611:20;
612:5; 613:21;
613:24; 614:10;
614:12; 614:16;
614:18; 614:21;
614:25; 615:7;
615:12; 615:17;
615:23; 616:4;
616:7; 616:11;
617:7; 617:11;
618:5; 618:10;
618:12; 618:15;
618:20; 618:24;
619:4; 619:7;
619:22; 620:9;
620:19; 620:25;
621:5; 621:16;
622:7; 622:14;

623:2;   623:5;
623:10;   623:14;
623:16;   623:21;
623:24;   624:2;
624:8;   624:14;
624:19;   625:3;
625:7;   625:10;
625:14;   625:19;
625:23;   626:4;
626:6;   626:9;
626:12;   626:15;
626:19;   627:11;
627:15;   627:22;
628:1;   628:7;
628:10;   645:7;
646:2;   647:12;
655:18;   655:24;
656:5;   656:8;
661:17;   662:4;
662:20;   678:5;
678:21;   686:3;
686:6;   686:11;
692:1;   694:12;
694:19;   695:1;
697:19;   698:4;
698:9;   699:2;
700:7;   705:19;
706:19;   707:1;
707:10;   707:25;
708:9;   708:17;
708:21;   709:22;
710:1;   710:11;
710:19
Olthoff (18)
575:21; 576:9;
581:15; 584:9;
586:10; 589:10;
589:11; 611:7;
643:21; 645:6;
646:21; 647:10;
661:15; 662:22;
670:8; 694:11; 699:1;
705:18
on-ones (1)
602:9
once (8)
611:24; 622:25;
642:16; 657:5;
658:13; 675:15;
676:15; 686:23
One (8)
583:20; 596:20;
601:25; 602:4;
624:18; 636:15;
679:11; 683:22
one (81)
577:7; 578:15; 579:3;
583:8; 583:20;
595:17; 596:2;
596:17; 596:17;
596:18; 596:18;
596:19; 597:25;
601:15; 602:1; 602:6;
602:8; 602:10; 603:1;
603:9; 603:13;

603:13; 603:22;
606:3; 607:7;
607:10; 608:22;
609:9; 610:23;
610:25; 610:25;
611:11; 611:14;
611:24; 612:1;
612:21; 612:25;
613:1; 613:4; 613:5;
615:16; 622:7;
622:8; 624:14;
634:14; 635:22;
636:10; 636:10;
636:22; 638:7;
642:7; 642:8; 643:7;
644:3; 645:10;
649:11; 650:8;
650:17; 654:7;
655:14; 658:17;
658:24; 658:24;
667:2; 668:6; 668:9;
668:9; 669:11;
669:22; 682:19;
682:25; 684:9;
685:21; 687:8;
693:5; 693:17;
697:21; 701:7;
704:24; 709:4;
709:18
one-to (1)
687:7
one-to-one (14)
601:6; 601:8; 603:8;
603:12; 603:13;
617:21; 641:24;
641:25; 671:21;
673:17; 685:2;
685:18; 685:20; 691:4
one-to-ones (1)
601:17
ones (1)
579:23
ongoing (2)
657:19; 710:5
only (13)
586:6; 590:5; 602:25;
616:17; 616:22;
624:20; 625:1;
662:16; 664:2; 664:3;
668:8; 672:11; 682:19
onto (2)
612:7; 623:7
open (3)
580:5; 581:18; 581:21
open-ended (1)
633:10
open-endedly (1)
612:3
operating (1)
666:23
operational (1)
699:13
operations (1)
649:1
operator (1)

691:22
opinions (1)
638:22
opportunity (3)
577:19; 707:12;
707:17
opposed (1)
668:7
opposite (1)
616:25
oral (5)
706:12; 706:13;
706:17; 707:5; 707:22
order (12)
584:18; 604:9; 627:9;
661:14; 665:20;
667:8; 684:1; 684:4;
696:3; 701:21; 702:2;
707:15
orders (3)
626:16; 626:25; 627:3
organization (1)
707:19
organizations (1)
669:19
originally (1)
683:11
Oscar (2)
576:12; 576:13
OT (8)
607:2; 607:3; 607:6;
611:10; 673:19;
688:16; 688:23;
696:24
others (1)
599:21
OTs (2)
607:19; 611:11
Out (1)
599:18
out (19)
579:18; 585:23;
599:17; 602:19;
605:6; 615:1; 615:4;
616:21; 617:6;
619:24; 621:17;
638:16; 662:13;
684:2; 689:13;
689:13; 690:21;
695:15; 708:4
output (1)
667:18
outside (3)
606:25; 663:15;
666:17
over (6)
577:6; 585:1; 591:1;
675:4; 699:8; 699:19
overall (1)
660:14
overflow (1)
650:17
oversees (3)
685:23; 685:25;

688:13
**own (3)**
650:1; 663:2; 702:20
**owned (1)**
692:5
**owner (1)**
691:21
**owner/operation (1)**
691:25

## P

**P79M (1)**
587:18
**page (1)**
609:12
**pages (7)**
577:22; 579:1; 579:4;
579:6; 579:7; 579:8;
582:12
**paginated (1)**
645:25
**Paginated (1)**
582:10
**paid (5)**
686:2; 686:15;
686:21; 686:22;
689:12
**pandemic (1)**
671:1
**para (17)**
601:15; 602:1; 602:4;
602:20; 603:13;
603:21; 603:21;
604:4; 604:15; 606:7;
617:21; 617:21;
638:3; 641:24;
657:17; 673:12; 691:4
**Paragraph (1)**
582:25
**paragraph (18)**
582:17; 583:12;
584:19; 584:21;
584:23; 590:16;
592:15; 606:16;
614:13; 623:8; 626:7;
645:15; 646:1; 646:8;
646:9; 697:20;
697:20; 699:4
**paragraphs (3)**
588:13; 588:18; 645:4
**paraprofessional (19)**
601:7; 601:9; 601:25;
602:6; 603:14;
603:16; 603:18;
605:5; 650:22;
671:21; 672:9;
672:18; 672:23;
673:1; 673:17;
684:21; 685:3; 687:8;
687:19
**paraprofessionals (10)**
601:13; 601:17;
601:21; 601:22;
602:10; 620:14;

650:13; 650:20;
686:15; 690:12
**paras (3)**
602:8; 602:21; 671:7
**parent (6)**
575:22; 584:11;
584:12; 586:3; 660:2;
681:4
**Parent (5)**
581:17; 585:19;
589:14; 706:19; 707:4
**Parent's (3)**
655:7; 656:21; 659:9
**parent's (1)**
575:23
**parental (1)**
680:22
**parents (9)**
658:9; 659:21;
659:25; 660:4; 660:8;
660:11; 660:24;
662:15; 662:15
**Parents (1)**
661:24
**part (7)**
590:1; 615:14;
657:17; 664:15;
687:24; 689:21; 706:9
**partaking (1)**
689:20
**participant (1)**
639:24
**participate (4)**
655:4; 655:7; 655:15;
659:19
**participated (3)**
656:14; 656:18;
699:10
**participating (2)**
575:11; 575:24
**participation (3)**
677:11; 680:22; 710:4
**particular (7)**
584:17; 597:17;
604:23; 669:1;
689:17; 690:22; 696:7
**past (1)**
682:4
**PATRICK (1)**
575:25
**Patrick (3)**
575:25; 582:12;
585:12
**pay (4)**
660:11; 662:16;
664:3; 674:5
**payment (1)**
662:14
**PDF (2)**
582:3; 709:8
**pediatric (2)**
665:14; 669:4
**pending (1)**
650:8

**people (4)**
577:1; 612:18;
670:22; 688:18
**per (6)**
608:23; 650:17;
651:22; 651:22;
669:22; 685:6
**percent (7)**
689:7; 689:8; 704:13;
704:15; 704:15;
704:16; 704:16
**perhaps (2)**
586:4; 667:14
**period (4)**
585:3; 608:23;
632:10; 632:19
**periodically (1)**
654:25
**periods (1)**
632:9
**permanent (1)**
624:23
**permission (1)**
646:21
**person (9)**
617:13; 669:15;
671:11; 675:23;
676:16; 676:19;
676:22; 688:22;
688:23
**personally (3)**
615:5; 616:9; 622:19
**persuasive (1)**
682:4
**Peter (1)**
580:1
**Peto (1)**
665:14
**phone (3)**
619:24; 699:8; 699:10
**phonetic (1)**
576:23
**physical (46)**
591:14; 591:20;
597:19; 614:13;
615:2; 615:9; 615:13;
615:16; 616:11;
617:9; 617:14;
617:16; 618:6; 619:9;
619:21; 620:7;
620:18; 621:2; 621:6;
621:13; 621:14;
622:3; 622:15;
622:22; 631:14;
652:4; 652:12;
652:15; 652:16;
654:8; 669:5; 669:7;
669:14; 671:18;
672:6; 672:8; 672:19;
672:21; 673:5; 673:8;
673:18; 676:11;
697:3; 697:3; 697:21;
698:18
**physically (10)**

585:14; 628:6;
671:5; 671:14;
672:20; 673:13;
673:18; 673:20;
676:15; 695:11
**pick (2)**
620:23; 707:22
**picture (1)**
630:10
**pictures (1)**
630:7
**piece (1)**
697:9
**place (1)**
625:4
**placed (4)**
620:19; 621:7; 621:9;
642:8
**placement (11)**
575:5; 604:10;
642:22; 694:14;
702:10; 702:19;
703:8; 704:8; 704:23;
704:23; 706:6
**plainly (1)**
701:21
**planning (1)**
659:5
**play (1)**
638:16
**please (10)**
576:11; 587:16;
589:18; 604:22;
607:1; 618:6; 621:24;
656:11; 662:5; 708:16
**pleasure (1)**
700:15
**pm (1)**
585:17
**point (5)**
580:15; 584:1; 630:2;
630:10; 705:14
**points (1)**
707:13
**portion (3)**
619:1; 626:10; 689:12
**position (1)**
648:5
**possible (6)**
598:8; 611:12; 612:8;
621:6; 621:12; 621:12
**post-World (1)**
665:13
**poster-board (1)**
630:6
**postponed (2)**
646:25; 683:19
**potential (1)**
670:11
**potentially (2)**
598:25; 701:20
**power (1)**
702:4
**pre-K (1)**

666:23
**pre-programmed (1)**
667:13
**preceding (1)**
681:22
**precision (2)**
583:22; 602:12
**prefer (2)**
706:20; 707:4
**prepare (1)**
707:18
**prepared (2)**
706:13; 706:17
**prereaders (1)**
639:3
**presence (1)**
677:11
**present (6)**
577:20; 613:20;
673:13; 673:14;
707:17; 707:18
**presented (6)**
633:17; 633:23;
634:4; 634:11;
634:21; 637:17
**presently (1)**
575:12
**pretty (3)**
634:1; 702:17; 704:21
**previous (5)**
578:5; 610:18;
658:24; 684:15; 692:3
**previously (3)**
672:15; 675:6; 684:14
**Primarily (1)**
608:10
**primarily (4)**
595:24; 596:11;
641:5; 692:22
**primary (4)**
592:12; 595:1; 597:3;
629:4
**principal (1)**
587:18
**Principal (1)**
577:24
**prior (1)**
658:16
**probably (8)**
586:7; 609:5; 637:11;
637:17; 642:1; 653:9;
672:12; 675:22
**Probably (1)**
689:7
**problem (1)**
579:14
**proceeded (1)**
704:10
**proceeding (1)**
710:22
**process (5)**
615:3; 659:20;
700:25; 701:4; 701:10
**professional (1)**

669:19
professor (1)
  664:17
profile (3)
  591:8; 593:8; 593:19
profiles (2)
  590:17; 590:23
program (35)
  585:21; 586:2; 586:9;
  596:15; 629:7;
  648:20; 649:2; 649:6;
  650:3; 654:9; 654:18;
  654:18; 654:21;
  659:24; 660:5;
  660:13; 660:14;
  662:10; 665:12;
  665:19; 684:25;
  685:1; 685:17; 686:7;
  687:1; 687:2; 687:3;
  687:12; 687:13;
  687:16; 687:17;
  688:1; 688:10;
  699:22; 699:23
programmer (1)
  625:16
progress (5)
  629:8; 629:15; 657:4;
  659:6; 679:21
prominent (1)
  593:13
proper (3)
  679:5; 680:10; 684:4
properly (2)
  581:6; 611:6
proposed (7)
  577:21; 585:5;
  657:20; 680:8;
  694:14; 702:10;
  704:10
provide (6)
  582:2; 660:11;
  679:19; 696:4; 704:7;
  706:11
provided (9)
  577:13; 658:9;
  658:12; 658:14;
  658:16; 671:11;
  675:10; 676:12; 703:4
provider (3)
  624:19; 624:20;
  624:22
providers (8)
  608:5; 624:16;
  671:18; 688:20;
  690:3; 690:17;
  690:24; 691:3
provides (1)
  691:13
providing (1)
  688:18
Provisionally (1)
  705:23
psychologist (1)
  699:25

PT (3)
  673:13; 688:16;
  696:24
public (2)
  677:17; 703:5
published (1)
  669:20
pullout (2)
  608:10; 624:13
purely (1)
  702:15
purpose (2)
  625:13; 667:14
purposes (3)
  577:17; 584:2; 606:10
push (2)
  630:25; 631:10
push-in (1)
  630:24
put (7)
  577:8; 577:22;
  616:23; 617:2;
  646:10; 646:12;
  672:25

Q

qualifications (2)
  650:22; 651:8
qualified (1)
  617:13
quick (1)
  622:7
quickly (1)
  625:24
quiet (1)
  609:17
quite (3)
  598:10; 644:4; 704:21

R

raise (5)
  588:3; 643:20;
  644:22; 662:25;
  701:21
raises (2)
  583:24; 702:16
randomly (1)
  636:7
range (15)
  596:6; 598:14;
  598:18; 598:25;
  599:4; 599:4; 605:12;
  605:25; 649:8;
  653:12; 669:6;
  675:24; 686:16;
  686:23; 697:10
ranged (1)
  651:23
ranging (1)
  596:16
rate (1)
  690:2
rather (1)

681:14
ratio (2)
  642:7; 704:12
ratios (2)
  633:7; 638:8
re (1)
  698:12
reach (1)
  704:14
read (3)
  636:16; 684:20; 691:2
readers (1)
  639:2
readily (1)
  657:15
reading (4)
  634:16; 638:10;
  639:11; 639:12
real (1)
  702:8
really (6)
  598:1; 598:6; 606:2;
  633:4; 644:4; 668:8
reason (2)
  575:10; 579:18
reasonable (1)
  681:3
reasons (1)
  683:22
recall (3)
  611:3; 636:12; 637:12
receive (18)
  611:10; 611:23;
  619:9; 626:20; 627:4;
  627:16; 630:17;
  651:15; 652:12;
  652:14; 653:7;
  653:21; 653:23;
  654:3; 666:7; 675:20;
  682:15; 682:19
received (7)
  606:25; 628:8;
  657:23; 657:25;
  658:4; 683:4; 683:4
receives (2)
  669:21; 687:6
receiving (3)
  607:2; 627:23; 632:22
recollecting (1)
  706:1
recollection (3)
  588:25; 647:19;
  692:15
recommend (2)
  641:15; 642:21
recommendation (4)
  643:17; 651:21;
  699:21; 703:7
recommendations (6)
  583:5; 631:5; 652:20;
  653:25; 657:3; 659:13
recommended (5)
  583:1; 651:15;
  652:12; 653:7; 653:21

recommending (2)
  640:1; 699:23
reconvene (4)
  584:12; 584:13;
  643:16; 699:12
reconvened (2)
  698:2; 699:11
reconvening (1)
  699:5
record (16)
  579:15; 580:22;
  581:7; 581:9; 587:7;
  587:9; 587:12;
  587:16; 591:7;
  681:17; 681:23;
  703:17; 704:17;
  704:19; 706:2; 710:21
RECORD (2)
  587:10; 587:11
records (1)
  683:8
recusal (1)
  578:21
redirect (2)
  628:15; 694:11
reduce (2)
  698:6; 698:19
refer (1)
  658:2
referring (5)
  677:22; 678:10;
  678:21; 682:22;
  682:24
refunded (1)
  662:17
regard (1)
  624:15
regarding (1)
  606:17
regular (1)
  655:1
regularly (3)
  611:1; 611:1; 669:20
relate (1)
  661:19
related (12)
  605:6; 671:18;
  676:12; 685:5;
  687:23; 688:11;
  688:14; 688:21;
  689:14; 690:11;
  690:16; 691:3
relates (1)
  702:20
relation (1)
  586:2
relationship (2)
  692:10; 692:10
relevance (2)
  661:6; 691:23
relevant (11)
  596:7; 648:8; 650:11;
  653:1; 656:8; 661:1;
  661:23; 678:6; 686:4;

686:7; 702:23
remain (2)
  620:6; 706:4
remedy (3)
  702:23; 705:2; 705:7
remember (9)
  657:9; 657:12;
  657:19; 658:6;
  658:18; 658:25;
  682:15; 695:5; 710:14
remote (7)
  628:5; 628:8; 671:12;
  671:17; 674:5;
  674:11; 675:12
remotely (6)
  671:25; 672:2; 672:7;
  675:10; 675:20;
  675:24
removed (1)
  621:8
rent (1)
  687:10
reopened (1)
  671:14
rep (1)
  700:1
repeat (6)
  604:12; 610:8; 612:6;
  619:25; 656:10; 691:2
repeatedly (1)
  681:4
report (1)
  584:25
REPORTER (7)
  576:5; 576:10; 587:9;
  587:12; 703:16;
  703:19; 710:20
reports (3)
  667:2; 667:4; 679:21
representations (1)
  662:17
representative (2)
  575:14; 575:19
represented (1)
  661:14
request (1)
  647:4
requested (1)
  584:12
require (1)
  617:18
required (1)
  674:5
requiring (2)
  591:12; 591:13
reschedule (1)
  684:5
rescheduled (3)
  680:1; 680:5; 680:7
reserving (1)
  584:21
resolved (1)
  589:18
resources (1)

665:18
respect (10)
583:4; 649:1; 674:4;
676:10; 677:19;
678:1; 678:17;
679:20; 682:13; 701:5
response (1)
602:13
responses (1)
668:3
responsible (4)
673:21; 673:25;
676:1; 676:9
rest (3)
697:12; 703:22;
705:20
rested (3)
703:15; 704:5; 705:18
restrictive (2)
629:11; 641:1
rests (3)
703:25; 704:3; 704:5
resurrect (1)
581:5
returned (2)
671:15; 676:15
review (19)
577:19; 579:15;
580:23; 584:25;
585:4; 591:7; 615:18;
615:19; 623:3;
626:13; 629:9;
639:19; 642:21;
642:25; 705:9;
705:24; 706:2; 706:2;
706:3
reviewed (3)
606:21; 657:6; 702:3
reviewing (1)
585:6
reviews (1)
659:3
revise (1)
642:6
revised (1)
709:18
Rifton (2)
615:25; 618:20
Right (29)
580:1; 586:14;
601:20; 602:3;
602:18; 614:8; 614:9;
620:10; 633:19;
635:4; 635:19; 637:5;
637:9; 638:20; 640:7;
640:16; 642:19;
647:3; 647:5; 647:9;
647:9; 648:12; 661:5;
683:14; 688:12;
689:24; 691:7; 694:7;
703:12
right (42)
578:17; 578:20;
579:21; 579:21;

580:6; 580:16;
582:8; 584:18;
587:24; 602:23;
606:13; 614:8;
618:5; 633:1;
644:16; 644:22;
645:6; 648:17;
649:10; 651:14;
660:22; 670:2;
670:22; 676:20;
676:23; 677:2;
677:5; 677:8; 678:4;
678:20; 679:22;
680:2; 681:16;
681:18; 693:19;
693:22; 698:10;
699:9; 700:7;
701:17; 705:17;
709:19
Rights (1)
575:21
rock (1)
604:25
role (9)
603:15; 648:25;
656:19; 656:22;
658:8; 663:23;
684:11; 684:16;
691:11
roles (2)
649:21; 687:21
Romeo (1)
636:16
room (46)
602:10; 607:2; 607:4;
607:6; 607:10;
607:14; 607:23;
608:22; 609:2;
609:16; 610:11;
610:11; 610:22;
611:11; 611:22;
612:16; 612:21;
613:1; 613:2; 613:23;
614:2; 618:1; 619:11;
620:21; 620:24;
621:9; 622:24;
623:11; 623:13;
623:13; 623:14;
623:14; 623:17;
623:25; 624:1; 624:3;
624:8; 625:5; 625:10;
625:11; 625:16;
626:1; 695:14;
695:18; 696:22;
696:25
rooms (1)
612:22
roughly (1)
654:9
rules (1)
694:22
running (1)
687:11
S

safe (1)
608:21
safety (1)
605:2
salaries (1)
689:12
salary (2)
686:6; 690:17
Sam (1)
691:19
same (15)
594:9; 594:12;
607:23; 610:1; 610:1;
610:11; 651:21;
653:25; 654:11;
675:11; 690:2; 693:2;
693:2; 693:21; 696:25
SANDI (3)
640:4; 640:12; 640:17
S█████ (55)
575:5; 576:3; 585:20;
589:5; 590:18; 591:8;
591:10; 598:12;
599:9; 600:2; 604:11;
606:24; 609:1;
609:15; 618:18;
619:8; 623:3; 627:12;
627:15; 650:10;
651:21; 653:1;
656:25; 657:4;
658:23; 660:16;
661:1; 661:2; 661:7;
661:20; 662:3; 662:4;
666:7; 666:15;
666:21; 667:4;
667:21; 668:1;
668:21; 669:9;
669:21; 670:9;
671:14; 673:11;
673:18; 674:19;
676:13; 677:16;
684:15; 686:7;
692:18; 692:24;
696:4; 697:14; 700:5
satisfies (1)
654:19
saw (1)
584:11
saying (3)
617:9; 619:10; 622:14
scan (1)
588:18
scenes (1)
638:16
schedule (4)
608:6; 613:16;
707:23; 708:19
scheduled (1)
683:5
schedules (2)
613:11; 693:10;
697:7; 698:7
scheduling (1)
707:7

School  (2)
589:22; 590:13
school (82)
583:1; 583:6; 584:14;
584:15; 590:1; 590:2;
590:2; 590:5; 592:3;
592:5; 592:20; 593:6;
607:20; 615:9;
616:12; 623:10;
624:17; 624:20;
626:10; 626:12;
627:20; 627:20;
628:2; 630:16;
631:24; 649:5;
649:17; 650:15;
651:1; 651:5; 651:16;
652:6; 652:13; 653:4;
653:8; 653:18;
655:17; 659:7;
659:10; 666:8;
669:23; 670:25;
671:5; 674:3; 677:17;
678:2; 678:3; 678:6;
678:18; 679:19;
679:20; 679:22;
680:2; 682:19;
684:15; 685:16;
685:19; 685:21;
686:2; 686:7; 687:4;
687:8; 687:9; 687:15;
694:14; 695:21;
695:22; 695:24;
696:1; 696:3; 698:15;
699:18; 699:19;
699:25; 700:24;
702:13; 703:2; 703:6;
704:8; 704:11; 706:7;
706:10
school's (2)
694:3; 699:25
school-wide (1)
687:10
Schwartz (1)
691:19
scope (2)
634:25; 635:7
scores (3)
640:18; 669:16;
670:20
scrolling (2)
596:21; 655:13
second (22)
579:3; 584:18;
585:16; 587:7;
595:17; 596:20;
596:21; 609:9;
612:22; 619:16;
622:8; 623:7; 623:20;
624:14; 625:8; 654:7;
662:23; 663:11;
683:24; 684:9;
695:15; 695:20
section (2)
607:10; 609:13
sections (3)

607:9; 612:23;
612:24
seeing (4)
576:22; 608:6;
613:13; 619:15
seem (1)
585:7
seemed (1)
605:19
seems (2)
583:24; 591:10
segregated (1)
690:21
select (1)
630:10
self (1)
590:4
self-injurious (1)
605:8
Semm (3)
586:8; 586:8; 587:1
Semm's (1)
585:22
send (5)
709:10; 709:15;
709:19; 709:22; 710:1
sending (1)
586:23
sends (1)
662:13
Senior (3)
692:17; 692:20;
692:22
senior (1)
688:15
sense (3)
611:4; 633:5; 636:2
sensory (1)
641:12
sent (4)
657:6; 678:2; 678:19;
679:14
sentence (1)
619:25
separate (11)
576:23; 577:10;
606:25; 619:9;
619:20; 620:6;
623:11; 624:6;
630:13; 630:17; 695:9
separated (1)
596:2
separately (2)
613:7; 689:12
September (1)
580:20
sequence (2)
634:25; 635:7
serious (1)
702:17
serve (2)
607:18; 613:17
served (3)
642:1; 643:6; 662:25

service (5)
  630:24; 687:23;
  690:17; 690:25; 691:3
services (21)
  605:6; 608:10;
  614:13; 624:13;
  624:25; 671:11;
  671:18; 672:16;
  675:10; 676:12;
  676:18; 685:5;
  688:11; 688:14;
  688:18; 688:21;
  689:14; 689:20;
  690:11; 695:24; 696:3
serving (1)
  613:17
session (14)
  616:17; 617:5; 618:4;
  618:22; 619:16;
  619:17; 619:21;
  620:8; 620:17; 626:1;
  626:3; 651:22;
  673:19; 698:5
sessions (19)
  606:18; 623:11;
  625:4; 651:22; 652:1;
  652:17; 652:17;
  653:14; 666:7;
  666:12; 671:24;
  672:7; 672:19; 675:2;
  675:12; 675:23;
  697:23; 698:19; 700:6
set (2)
  655:3; 697:15
several (3)
  679:4; 679:13; 695:7
Shall (1)
  586:21
share (1)
  661:13
sharing (1)
  590:2
sheet (1)
  582:2
shifted (1)
  671:3
short (1)
  605:4
shorter (1)
  632:17
show (1)
  669:6
shown (4)
  629:8; 681:4; 681:11;
  706:6
shows (1)
  699:15
shut (1)
  671:5
side (6)
  607:14; 613:1; 613:2;
  651:24; 651:24;
  696:14
Side (1)

694:4
sides (2)
  585:9; 707:14
signature (1)
  588:12
signed (2)
  577:14; 588:11
significant (2)
  641:12; 697:8
similar (5)
  590:17; 590:22;
  597:23; 598:10;
  684:14
simply (3)
  577:8; 589:9; 610:21
simultaneously (1)
  671:12
single-button (1)
  668:8
Sisters (4)
  691:15; 691:18;
  691:20; 692:5
sit (1)
  674:19
site (1)
  586:15
sitting (2)
  639:19; 674:20
situation (2)
  618:17; 680:20
six (8)
  590:25; 591:1; 591:1;
  591:4; 623:23; 624:1;
  650:4; 651:7
size (3)
  614:6; 629:16; 641:16
sizes (1)
  628:20
skills (2)
  591:16; 640:13
skin (1)
  673:9
slightly (1)
  605:19
small (1)
  607:12
smaller (2)
  614:4; 642:1
Somebody (1)
  709:25
somebody (4)
  586:6; 586:7; 586:18;
  705:8
someone (2)
  605:1; 692:19
Sometimes (1)
  667:24
sometimes (9)
  608:14; 608:18;
  658:20; 658:21;
  667:17; 667:23;
  668:6; 675:18; 693:9
Somewhere (1)
  653:12

somewhere (3)
  649:8; 675:24; 702:11
Sorry (3)
  690:8; 708:14; 709:23
sorry (24)
  580:10; 595:7;
  595:21; 596:21;
  599:15; 599:22;
  603:11; 618:25;
  619:24; 624:16;
  632:1; 632:13;
  655:24; 663:9;
  666:19; 672:5;
  673:24; 676:17;
  677:22; 682:25;
  683:20; 685:7;
  703:13; 708:23
sort (12)
  600:7; 604:24; 605:8;
  613:5; 630:6; 633:10;
  633:21; 636:2;
  637:16; 638:25;
  687:15; 688:8
sound (2)
  600:7; 600:16
sounds (2)
  600:23; 602:14
space (2)
  625:18; 697:1
speak (3)
  666:20; 670:8; 705:15
speaking (2)
  639:23; 695:22
speaks (1)
  660:15
special (13)
  592:17; 644:4;
  649:19; 649:20;
  649:22; 649:24;
  649:25; 650:1; 650:2;
  650:12; 687:18;
  687:18; 688:5
Special (1)
  667:3
specific (10)
  599:6; 604:2; 606:4;
  641:11; 655:3;
  657:20; 677:23;
  678:11; 688:7; 696:8
specifically (8)
  650:10; 661:20;
  675:4; 676:14;
  677:22; 683:22;
  699:11; 699:17
spectrum (2)
  593:11; 593:21
speculation (3)
  610:4; 610:13; 610:15
Speech (1)
  623:14
speech (18)
  600:9; 623:11;
  623:12; 623:21;
  625:24; 625:25;

631:17; 653:16;
  653:21; 654:3;
  654:12; 688:16;
  688:24; 695:8;
  695:13; 695:16;
  695:17; 695:18
speech-language (1)
  653:23
Spell (1)
  576:10
spelling (1)
  587:20
spend (1)
  664:17
spending (1)
  577:2
spent (1)
  689:5
split (3)
  607:8; 612:22; 696:24
spoke (3)
  615:15; 615:20;
  618:25
spoon (1)
  627:12
sporadically (1)
  665:23
spouse (1)
  692:5
spring (2)
  671:3; 700:17
square (1)
  696:24
SRO (1)
  681:22
staff (11)
  605:6; 617:20;
  619:19; 625:16;
  625:22; 642:3; 657:2;
  659:5; 671:8; 687:23;
  691:20
staffed (1)
  602:15
staffing (3)
  602:7; 633:7; 642:7
stairs (3)
  608:13; 608:14;
  696:17
standalone (1)
  590:1
standard (2)
  614:2; 614:6
standardized (2)
  666:18; 669:19
standards (3)
  635:12; 635:13;
  636:11
stander (4)
  672:24; 673:1; 674:8;
  674:23
stands (1)
  586:1
staring (1)
  708:24

start (13)
  615:10; 649:4;
  649:16; 650:14;
  651:4; 652:5; 653:3;
  659:3; 659:4; 700:24;
  702:13; 703:6; 705:15
started (3)
  671:7; 671:8; 671:10
starting (2)
  636:3; 659:3
startling (1)
  704:21
state (3)
  617:19; 650:10; 696:5
State (5)
  635:1; 635:2; 635:11;
  650:7; 651:13
state-certified (1)
  650:12
stated (4)
  627:2; 627:6; 697:17;
  704:9
statements (2)
  663:14; 664:6
States (2)
  665:24; 666:4
states (3)
  583:12; 609:21;
  624:13
stating (1)
  697:21
status (1)
  596:8
stay (5)
  616:1; 616:23;
  627:17; 627:21; 696:6
stayed (1)
  671:7
step (4)
  583:8; 583:8; 583:20;
  583:20
still (6)
  673:21; 673:25;
  674:5; 694:2; 701:19;
  703:19
stimuli (1)
  609:19
stipulate (1)
  692:4
stop (1)
  655:2
stretching (2)
  672:10; 673:7
strictly (1)
  690:17
student (71)
  597:13; 597:14;
  597:24; 603:10;
  603:13; 603:19;
  604:11; 604:24;
  606:3; 606:5; 606:6;
  608:8; 608:12;
  608:23; 610:23;
  610:25; 612:1; 615:1;

615:24; 616:15;
617:3; 617:3; 617:8;
617:14; 617:22;
617:23; 619:14;
619:15; 619:18;
621:3; 622:15;
622:24; 623:16;
624:5; 626:19;
627:1; 627:3; 627:6;
627:8; 627:9;
630:8; 631:8;
631:11; 631:13;
632:8; 640:21;
641:3; 641:10;
641:11; 641:13;
641:20; 641:23;
642:6; 643:4; 643:6;
643:15; 650:17;
656:9; 658:22;
660:3; 664:25;
669:8; 676:7;
684:25; 685:5;
687:6; 687:7; 687:7;
693:10; 697:4;
697:11
Student (1)
640:5
student's (8)
597:16; 607:17;
626:18; 632:7;
632:18; 637:6; 705:5;
705:7
Student's (1)
582:14
students (128)
590:13; 590:17;
590:21; 591:3; 591:3;
591:11; 591:17;
591:24; 592:3; 592:5;
592:21; 592:23;
593:8; 593:10;
593:11; 593:19;
593:21; 593:22;
595:2; 595:20;
595:23; 596:2; 596:5;
596:9; 596:15;
596:25; 597:7; 598:2;
598:15; 598:21;
599:12; 599:16;
600:1; 600:5; 600:15;
600:21; 600:25;
601:1; 601:6; 601:21;
602:2; 602:5; 603:7;
603:11; 603:12;
603:22; 604:9;
607:22; 607:25;
608:5; 608:6; 608:20;
610:1; 610:11;
610:13; 611:10;
612:25; 613:6;
613:13; 613:15;
613:17; 613:19;
614:24; 620:5; 624:3;
624:24; 625:2;
625:17; 625:22;

628:8; 628:21;
629:5; 629:7;
629:13; 629:25;
630:1; 630:16;
630:21; 630:21;
630:23; 632:15;
632:21; 632:24;
633:17; 633:20;
634:8; 634:15;
634:18; 634:21;
635:2; 635:8;
636:22; 638:10;
638:15; 639:2;
639:9; 640:12;
640:18; 640:25;
649:5; 650:18;
651:15; 651:17;
651:20; 652:8;
652:11; 652:14;
652:19; 652:25;
653:1; 653:7;
653:20; 653:22;
653:25; 654:2;
655:8; 655:16;
656:14; 659:23;
661:11; 665:21;
671:7; 676:2; 685:8;
685:23; 690:23;
690:25; 697:12
studying (1)
636:12
style (2)
597:19; 637:13
subcontract (1)
692:17
subcontracted (1)
692:16
subcontractors (1)
692:21
subject (1)
577:25
submission (2)
582:13; 709:7
submit (1)
700:2
submits (1)
646:22
submitted (4)
581:12; 582:22;
684:3; 709:4
subpoena (1)
665:4
subpoenaing (1)
663:1
subsequent (6)
577:25; 582:21;
584:3; 701:2; 701:13;
705:11
subsequently (1)
585:10
substance (1)
582:17
substantive (1)
584:22
suddenly (1)

703:14
suggest (1)
642:5
suited (1)
641:21
summative (1)
640:10
sup (1)
582:21
supervising (1)
620:11
supervision (4)
627:8; 673:5; 689:5;
689:9
supervisor (1)
699:25
supervisors (1)
688:8
supervisory (1)
687:23
supplemental (8)
684:18; 685:4;
685:13; 689:14;
689:22; 690:6;
690:10; 690:18
support (12)
597:19; 605:1; 605:5;
614:23; 616:20;
635:7; 637:22; 639:5;
640:24; 641:2;
641:25; 651:2
supporting (2)
615:4; 635:17
supports (6)
591:13; 591:19;
591:21; 603:18;
615:3; 634:12
suppose (3)
599:2; 602:17; 613:11
supposed (2)
654:19; 705:4
sure (15)
579:20; 592:11;
608:19; 617:17;
620:1; 648:7; 654:18;
660:25; 690:20;
704:13; 704:15;
704:16; 704:16;
707:12; 709:2
Sure (10)
607:7; 612:9; 612:17;
612:20; 614:15;
618:8; 633:15; 638:9;
643:8; 679:9
sustained (1)
610:18
swear (5)
577:15; 588:3; 588:4;
644:22; 644:23
switch (9)
667:6; 667:7; 667:19;
667:22; 668:2; 668:6;
668:7; 668:8; 668:9
switches (1)

668:3
syndrome (1)
598:4
system (2)
668:11; 668:14

T

T-E-D-I (1)
669:3
T-E-X-T (1)
666:21
table (4)
577:2; 577:11;
607:15; 700:15
tables (4)
607:15; 613:3; 613:4;
613:4
talk (2)
688:5; 705:8
talked (2)
696:11; 699:5
talking (5)
592:4; 610:13;
656:25; 677:23;
680:17
tango (1)
576:13
tasks (5)
634:17; 637:11;
638:17; 639:17;
672:23
taught (9)
590:17; 590:22;
590:24; 591:4;
591:11; 591:18;
591:23; 666:1; 666:2
TBI (2)
597:14; 598:1
TC (1)
688:7
teach (1)
599:5
teacher (17)
597:11; 598:19;
601:21; 602:10;
617:22; 620:13;
638:3; 649:19;
649:25; 650:2;
650:11; 650:12;
657:16; 667:1; 676:7;
684:25; 687:7
Teachers (1)
686:22
teachers (6)
649:16; 649:21;
649:22; 649:23;
650:3; 686:21
teaching (1)
597:12
team (3)
631:3; 642:21; 643:14
teasing (1)
583:21
tech (1)

665:19
technically (1)
663:24
technology (2)
690:13; 691:6
TEDI (1)
669:3
telephone (2)
575:11; 677:2
telephonically (1)
575:10
teletherapy (1)
672:14
tells (1)
604:18
ten (4)
600:17; 600:19;
600:19; 696:21
ten-day (1)
584:12
term (3)
629:24; 707:16;
707:21
terms (18)
591:15; 591:17;
595:14; 597:18;
597:19; 598:20;
605:24; 607:18;
628:24; 629:16;
633:15; 633:16;
635:24; 636:9; 637:7;
640:21; 641:22;
661:14
test (2)
635:6; 666:15
testified (1)
683:13
testify (1)
586:12
testifying (3)
648:15; 648:17;
648:18
testimony (11)
585:22; 588:5; 589:4;
589:9; 644:24;
647:23; 695:3; 695:6;
697:18; 704:9; 706:3
testing (1)
666:18
tests (2)
635:2; 666:17
text-based (1)
634:16
texted-based (1)
638:12
texts (3)
636:12; 636:13;
639:16
Thanks (4)
643:18; 646:4;
654:14; 682:9
that'll (1)
586:4
theory (1)

700:20
therapeutic (1)
  666:3
therapies (1)
  700:5
therapist (35)
  609:22; 609:25;
  610:17; 615:3; 616:1;
  616:11; 617:9;
  617:14; 617:17;
  618:6; 619:10;
  620:18; 620:22;
  621:2; 621:6; 621:13;
  622:4; 622:15;
  622:22; 630:25;
  631:3; 631:7; 651:9;
  651:11; 669:14;
  672:9; 672:21; 673:5;
  673:9; 673:19;
  675:14; 689:18;
  695:16; 697:3; 697:3
therapist's (1)
  621:14
therapists (19)
  613:9; 613:10; 615:9;
  615:13; 615:16;
  623:22; 623:24;
  651:4; 651:12; 652:5;
  653:3; 653:17; 654:8;
  654:12; 657:16;
  671:9; 671:23;
  676:14; 697:22
therapy (46)
  606:18; 606:25;
  609:2; 609:17; 610:1;
  610:11; 611:11;
  611:24; 614:13;
  619:9; 619:11;
  619:21; 620:8;
  620:21; 620:24;
  621:9; 623:11; 625:4;
  625:25; 630:13;
  630:17; 630:24;
  631:14; 631:18;
  651:16; 652:12;
  652:15; 652:17;
  653:7; 653:14;
  653:21; 653:23;
  654:3; 669:6; 672:7;
  672:12; 672:19;
  675:20; 676:11;
  695:8; 695:14;
  695:18; 695:19;
  696:22; 697:22;
  698:19
therefore (2)
  681:12; 701:6
thinking (3)
  636:9; 642:24; 693:8
third (4)
  590:15; 609:6;
  696:13; 696:22
though (5)
  602:14; 646:18;
  701:14; 702:6; 702:8

thought (1)
  683:10
three (20)
  579:6; 582:12; 594:3;
  596:6; 599:15;
  599:15; 599:17;
  601:12; 601:21;
  601:22; 602:1; 602:2;
  602:5; 603:12; 609:4;
  609:8; 630:7; 644:4;
  653:5; 680:1
three-page (3)
  581:13; 585:11; 645:3
throughout (5)
  594:4; 650:3; 665:22;
  666:5; 703:2
Thursday (1)
  575:7
thwarted (1)
  664:24
timeframe (1)
  585:5
timely (2)
  680:22; 684:1
times (6)
  627:17; 671:24;
  675:17; 675:19;
  680:1; 680:4
to-one (1)
  603:14
today (5)
  585:18; 648:3; 695:4;
  706:3; 708:25
Today (1)
  575:6
today's (1)
  707:19
together (1)
  613:10
told (4)
  666:24; 697:4;
  697:22; 699:24
tolerate (1)
  641:13
took (3)
  646:11; 674:9; 696:18
top (2)
  607:16; 668:15
total (5)
  590:13; 591:4; 602:9;
  645:4; 674:6
totally (2)
  577:9; 585:8
town (1)
  693:22
toy (1)
  667:18
train (1)
  617:23
trainer (18)
  614:19; 614:22;
  615:1; 615:5; 615:25;
  616:16; 617:4; 617:8;
  617:15; 617:24;

619:11; 620:20;
620:25; 621:7;
621:8; 621:10;
622:16; 622:25
trainers (1)
  622:5
training (3)
  617:12; 617:18; 651:1
trampoline (1)
  607:12
transcript (6)
  580:11; 681:18;
  692:3; 705:24;
  708:14; 708:19
transcripts (4)
  578:24; 579:11;
  581:18; 648:24
transfer (5)
  616:20; 616:25;
  617:3; 617:6; 622:24
transferred (1)
  621:9
transitioned (1)
  628:5
Transportation (3)
  691:16; 691:18;
  691:20
transportation (6)
  690:12; 691:4;
  691:10; 691:11;
  691:14; 692:11
transports (1)
  692:18
traumatic (2)
  591:25; 592:6
Travel (3)
  691:15; 691:18;
  691:20
travel (1)
  624:21
traveling (1)
  693:22
travels (1)
  674:25
treated (1)
  577:9
treatment (2)
  626:24; 627:4
trigger (1)
  667:16
true (2)
  664:1; 695:15
truth (6)
  588:5; 588:6; 588:6;
  644:24; 644:25;
  644:25
try (1)
  686:8
trying (9)
  577:2; 579:18;
  611:18; 621:16;
  621:19; 621:20;
  633:5; 636:2; 663:4
tube (1)

627:5
tuition (15)
  673:22; 674:1; 674:6;
  684:18; 684:18;
  684:19; 684:23;
  685:14; 686:25;
  687:24; 689:13;
  689:25; 690:11;
  690:18; 690:19
turn (2)
  644:17; 704:25
twice (3)
  666:9; 671:22; 675:18
two (32)
  579:4; 579:7; 587:20;
  595:11; 599:14;
  600:5; 600:5; 607:9;
  609:4; 609:8; 612:24;
  613:6; 630:7; 635:22;
  641:5; 642:24;
  645:14; 645:15;
  647:14; 647:20;
  651:24; 658:17;
  663:24; 671:4;
  681:10; 683:21;
  694:6; 696:8; 697:10;
  701:9; 702:4; 706:11
Two (4)
  579:8; 595:12;
  615:11; 615:12
two-page (1)
  578:18
type (3)
  604:15; 670:19;
  672:16
types (9)
  592:17; 604:2; 604:3;
  607:13; 608:12;
  667:16; 669:7;
  672:23; 675:5
typical (3)
  600:8; 628:21; 628:21
typically (12)
  593:20; 597:7;
  598:17; 625:1;
  631:23; 632:6;
  632:18; 639:9;
  639:17; 658:18;
  669:5; 697:6
Typically (6)
  593:10; 597:2; 615:2;
  631:25; 639:8; 666:13
typo (1)
  645:17
typos (1)
  588:19

**U**

ultimately (1)
  703:3
Um-hum (36)
  578:9; 592:16;
  592:19; 597:5; 597:9;
  598:13; 599:11;

600:21; 604:5;
606:19; 606:23;
609:10; 609:14;
614:11; 614:17;
616:3; 616:6;
622:13; 623:15;
626:8; 629:18;
629:21; 630:14;
631:22; 632:4;
633:8; 633:12;
635:16; 636:5;
636:20; 636:25;
637:21; 638:1;
639:15; 639:20;
706:18
unanswered (1)
  586:6
unconnected (1)
  702:6
undated (2)
  582:13; 585:12
under (5)
  585:4; 602:15; 627:7;
  673:5; 704:11
Understood (1)
  589:20
unfold (1)
  586:20
unfolds (1)
  586:20
United (2)
  665:24; 666:4
units (1)
  590:10
university (1)
  666:2
Unless (1)
  693:21
unsigned (1)
  645:3
unsupervised (3)
  619:14; 620:5; 620:11
up (17)
  579:11; 580:22;
  581:17; 609:6;
  609:16; 620:23;
  621:2; 621:6; 644:9;
  663:17; 670:3;
  674:19; 677:25;
  683:14; 696:17;
  702:12; 705:11
updated (3)
  582:2; 582:7; 669:20
updates (1)
  657:18
upload (1)
  581:6
upon (10)
  658:21; 667:12;
  667:13; 667:19;
  686:18; 686:23;
  690:23; 690:24;
  693:9; 697:17
upwards (2)

704:14; 704:16
**use (13)**
608:18; 622:4;
623:24; 624:1; 624:2;
639:22; 639:25;
640:3; 665:23; 668:5;
668:7; 668:9; 692:21
**used (10)**
608:22; 614:23;
624:12; 625:11;
625:12; 665:19;
665:22; 666:5; 675:2;
701:2
**user (2)**
603:25; 605:3
**users (1)**
599:25
**using (18)**
591:15; 591:18;
601:2; 601:3; 607:23;
608:11; 608:16;
610:11; 612:19;
617:23; 620:24;
625:17; 667:24;
667:25; 668:2; 668:4;
675:6; 675:7
**usually (4)**
630:5; 632:9; 670:1;
693:7
**Usually (1)**
644:2

**V**

**varied (1)**
594:3
**various (4)**
685:4; 687:11;
687:21; 693:10
**vary (3)**
593:12; 628:23;
628:23
**vehicle (3)**
693:5; 693:11; 693:13
**verbal (5)**
600:6; 600:11;
600:13; 600:15;
600:22
**version (4)**
638:11; 646:1;
647:11; 657:8
**versions (1)**
709:3
**versus (2)**
582:20; 597:14
**via (2)**
673:14; 677:2
**videos (2)**
634:12; 639:4
**view (2)**
584:1; 584:4
**virtual (1)**
628:8
**virtually (1)**
700:15

**vision (19)**
598:3; 613:8; 624:16;
624:16; 624:19;
624:20; 624:25;
625:4; 649:21; 653:7;
653:13; 654:17;
660:4; 660:13;
673:20; 675:9;
675:14; 675:20;
688:16
**visit (2)**
695:5; 697:17
**visited (6)**
694:13; 695:17;
696:15; 697:9;
697:17; 698:15
**visual (8)**
591:20; 609:18;
630:2; 630:9; 634:10;
636:2; 639:4; 653:2
**visualize (1)**
646:7
**visually (1)**
634:11
**visuals (3)**
601:3; 630:7; 637:18
**voice (1)**
667:18
**VOICE (1)**
645:23
**vomit (2)**
627:12; 670:10

**W**

**Wait (3)**
663:7; 663:8; 706:14
**wait (4)**
589:18; 662:23;
670:5; 680:22
**waited (1)**
696:15
**waiting (1)**
696:18
**walk (2)**
605:4; 654:25
**walked (1)**
696:17
**walks (1)**
605:7
**wall (3)**
607:9; 612:23; 613:5
**War (2)**
665:13; 665:15
**watched (1)**
637:19
**water (1)**
670:6
**way (10)**
581:5; 588:20; 613:6;
613:16; 633:22;
634:3; 634:4; 689:17;
692:11; 703:13
**ways (1)**
636:18

**week (8)**
651:22; 666:10;
671:4; 671:13;
671:23; 671:24;
675:16; 675:18
**weekly (1)**
657:18
**weeks (3)**
577:2; 671:4; 699:14
**weren't (3)**
613:19; 673:20; 680:8
**wh (1)**
637:12
**what'd (1)**
631:25
**What's (2)**
589:9; 656:6
**what's (5)**
610:21; 655:5; 655:5;
681:2; 681:3
**wheelchair (5)**
599:25; 603:25;
605:3; 615:4; 695:10
**wheelchairs (2)**
591:21; 611:23
**whenever (1)**
632:7
**Whereupon (4)**
578:2; 581:2; 582:14;
710:22
**who's (3)**
585:17; 586:18;
617:13
**whole (8)**
588:5; 611:14;
627:23; 639:23;
644:24; 704:10;
705:24; 706:9
**wide (5)**
598:25; 599:3; 599:3;
605:12; 605:24
**widely (2)**
665:22; 666:4
**willing (5)**
585:8; 681:5; 705:3;
705:4; 707:6
**window (1)**
590:10
**wish (2)**
662:25; 707:2
**wishes (1)**
581:13
**within (9)**
584:6; 584:7; 585:1;
585:3; 585:5; 596:6;
699:13; 701:10;
702:13
**without (6)**
577:7; 604:2; 611:24;
617:8; 626:25; 677:10
**witness (14)**
577:12; 577:15;
577:18; 585:17;
587:14; 589:11;

612:6; 621:12;
648:1; 648:17;
670:9; 703:23;
704:9; 704:21
**Word (3)**
582:3; 709:9; 709:11
**worded (1)**
602:13
**words (1)**
687:5
**work (14)**
586:4; 613:10;
617:19; 617:19;
621:4; 622:5; 622:17;
622:18; 624:12;
631:11; 643:3;
674:20; 708:7; 708:7
**worked (2)**
629:25; 697:25
**working (12)**
586:9; 607:17; 608:8;
608:14; 612:25;
613:7; 631:7; 631:8;
639:3; 667:20; 672:9;
675:10
**works (1)**
708:9
**World (1)**
665:15
**writing (3)**
638:17; 638:22;
639:17
**written (5)**
597:4; 622:20;
626:25; 706:11; 707:4
**wrong (4)**
583:9; 646:10; 665:8;
681:17
**wrote (5)**
615:18; 615:20;
615:21; 638:16;
657:10

**Y**

**year (64)**
583:1; 583:6; 584:4;
584:6; 584:7; 584:14;
584:15; 585:1; 592:3;
592:4; 592:24; 593:6;
594:12; 596:14;
599:6; 602:7; 636:9;
636:16; 640:10;
640:11; 642:14;
642:15; 643:3;
648:25; 649:5;
649:17; 650:15;
651:5; 651:16; 652:6;
652:13; 653:4; 653:8;
653:18; 655:17;
659:7; 659:10; 666:8;
669:23; 670:25;
678:2; 678:3; 678:6;
678:19; 679:19;
679:23; 680:2;

682:19; 692:12;
692:16; 693:22;
693:25; 694:14;
699:18; 699:19;
700:24; 702:14;
702:22; 703:2;
703:6; 704:8;
704:11; 706:7;
706:10
**year's (3)**
582:21; 648:23;
680:25
**years (9)**
590:25; 591:1; 591:3;
591:4; 596:6; 681:10;
694:4; 694:6; 697:11
**Yep (1)**
579:3
**yep (1)**
579:2
**York (7)**
582:20; 614:2; 635:1;
635:11; 650:7;
651:13; 677:17
**young (1)**
665:16
**younger (4)**
596:19; 633:24;
633:25; 697:13
**youngest (1)**
697:11

**Z**

**zone (1)**
587:2
**Zoom (3)**
673:14; 673:19; 675:2
**zoom (1)**
672:22

# EXHIBIT 7

1

```
 1                      DEPARTMENT OF EDUCATION
                              of the
 2                         CITY OF NEW YORK

 3
         ------------------------------X
 4
         In the Matter of:
 5
              S████ J████ DONOHUE            Case No. 196228
 6
         ------------------------------X
 7                                        EXPEDITED
                                          District # 2
 8                                        131 Livingston Street
                                          Brooklyn, NY 11201
 9
                                          Wednesday
10                                        July 14, 2021

11            The above-entitled matter came on for hearing at
         10:46 A.m.
12

13       BEFORE:          JOHN FARAGO,
                          Impartial Hearing Officer
14

15       A P P E A R A N C E S:

16       (All present by video or telephone)

17       For the Student:
            JOHN HENRY OLTHOFF, ESQ., Attorney
18          PATRICK DONOHUE, Parent
            TIFFANY SEMM, Director of Special Education, iBrain
19

20       For the Department of Education:
            KASHIF FORBES, ESQ., Attorney
21          MICHELLE LEFAIVRE, Assistant Principal
            SHAREE LEWIN, School Psychologist
22

23

24

25
```

Exhibit 7: Page 1 of 182

```
 1                          I N D E X
                            ---------
 2
                                                      VOIR
 3    WITNESSES:        DIRECT  CROSS REDIRECT  RECROSS DIRE

 4    Sharee Lewin                 18

 5    Michelle LeFaivre            60

 6    Tiffany Semm                 98       141

 7    Patrick Donohue             154

 8

 9                      E X H I B I T S

10    STUDENT          DESCRIPTION                 I.D.  IN EV.

11    A                Due process complaint,       10    10
                       7/6/20, 11 pages
12
      B                Order in 20-CV-7032,         10    10
13                     4/1/21, four pages

14    C                FOFD in case 185111,         10    10
                       5/22/21, 59 pages
15
      D                iBrain IEP, 2/19/21, 53      10    10
16                     pages

17    E                Enrollment contract,         10    10
                       6/19/20, seven pages
18
      F                Program description,         10    10
19                     2/22/21, 16 pages

20    G                Class schedule,              10    10
                       2020/2021, one page
21
      H                Quarterly progress           10    10
22                     report, 4/15/21, 13
                       pages
23
      I                Transportation              10    10
24                     contract, 3/2/21, five
                       pages
25
```

  
| | | | I.D. | IN EV. |
|---|---|---|---|---|
| J | | Ten-day letter, 6/26/20, five pages | 10 | 10 |
| K | | IEP, 6/19/19, 20 pages | 10 | 10 |
| L | | IEP, 4/22/20, 38 pages | 10 | 10 |
| M | | IEP, 2/24/21, 56 pages | 10 | 10 |
| N | | PWN, 7/7/20, 11 pages | 10 | 10 |
| O | | PWN, 6/27/21, six pages | 10 | 10 |
| P | | Letter, 4/14/20, one page | 10 | 10 |
| Q | | HIPPA release, 4/21/20, one page | 10 | 10 |
| R | | Medical accommodation form, 4/21/20, three pages | 10 | 10 |
| S | | Doctor report, 8/25/20, 15 pages | 10 | 10 |
| T | | Affidavit of T. Semm, Undated, four pages | 10 | 10 |
| U | | Affidavit of P. Donohue, Undated, three pages | 10 | 10 |
| DEPARTMENT OF EDUCATION | | DESCRIPTION | I.D. | IN EV. |
| 1 | | IEP, 4/22/20, 49 pages | 8 | 8 |
| 2 | | Prior notice package, 7/7/20, six pages | 8 | 8 |
| 3 | | Request for medical transportation, 4/21/20, nine pages | 8 | 8 |
| 4 | | Level I Vocational Assessment, 4/21/20, two pages | 8 | 8 |

4

| | | | | |
|---|---|---|---|---|
| 5 | Classroom observation, 4/1/20, one page | 8 | 8 | |
| 6 | Social history update, 3/11/20, three pages | 8 | 8 | |
| 7 | Psychoeducational evaluation, 3/12/19, three pages | 8 | 8 | |
| 8 | Prior notice package, 6/25/19, six pages | 8 | 8 | |
| 9 | AT evaluation, 4/29/19, four pages | 8 | 8 | |
| 10 | Recommended IEP, 4/10/20, 50 pages | 8 | 8 | |
| 11 | Suggested procurement order, 4/27/19, three pages | 8 | 8 | |
| 12 | Nursing referral, 4/15/20, one page | 8 | 8 | |
| 13 | Unsigned affidavit of M. LeFaivre, 7/9/21, two pages | 8 | 8 | |
| 14 | Unsigned affidavit of S. Lewin, 7/9/21, six pages | 8 | 8 | |

| IMPARTIAL HEARING OFFICER | DESCRIPTION | I.D. | IN EV. |
|---|---|---|---|
| None | | | |

5

```
 1              P R O C E E D I N G S
 2              THE COURT REPORTER:  It is 10:46, and we
 3         are on the record.
 4              HEARING OFFICER FARAGO:  Okay.  Good
 5         morning.  My name is John Farago, and I am the
 6         impartial hearing officer assigned to hear the
 7         matter of the placement of S███ J██ Donohue.
 8         This is case number 196228, and I believe it covers
 9         the 2020/'21 school year.
10              Today is Wednesday, the 14th of July
11         2021.  It's now approximately 10:45.  We're
12         conducting this hearing telephonically.  Who's
13         representing the District here today?
14              MR. KASHIF FORBES:  For the Department of
15         Education, Agency Attorney Kashif Forbes.
16              HEARING OFFICER FARAGO:  Okay.  Thank
17         you.  And who is representative the family?
18              MR. JOHN HENRY OLTHOFF:  Yes, good
19         morning.  This is John Henry Olthoff, Brain Injury
20         Rights Group, attorneys for the Parent.
21              HEARING OFFICER FARAGO:  Thank you.  And
22         we have the parent, as well, if you could you
23         introduce yourself?
24              MR. PATRICK DONOHUE:  Patrick Donohue
25         (indiscernible).
```

6

1          HEARING OFFICER FARAGO:  You're breaking

2     up, Mr. Donohue.  I don't know if it's your

3     connection or that's --

4          MR. DONOHUE:  (Interposing) Sorry.

5          HEARING OFFICER FARAGO:   --

6     (indiscernible) me.

7          MR. DONOHUE:  Sorry, it's Patrick

8     Donohue, S███ J███ Donohue's father.

9          HEARING OFFICER FARAGO:  Thank you.

10    Okay.  So this hearing, as we all know, is the most

11    recent in a series of hearings considering S███

12    J███'s program on a year-by-year basis.  As I said,

13    I think this one is about the just-finished

14    2020/'21 school year.

15          The parties have cross-disclosed evidence

16    as I understand it.  Does the family have any

17    objection to any of the documents that the District

18    disclosed?

19          MR. OLTHOFF:  No objections, Your Honor.

20          HEARING OFFICER FARAGO:  The District

21    disclosed 14 exhibits.

22          Exhibit 1 is an IEP dated 4/22/20, 49

23    pages in length.

24          Exhibit 2 is a prior notice package dated

25    7/7/20, six pages.

Exhibit 7: Page 6 of 182

1             Exhibit 3 is a request for medical
2      transportation dated 4/21/20, nine pages.
3             Exhibit 4 is a Level I Vocational
4      Assessment dated 4/21/20, two pages.
5             Exhibit 5 is a classroom observation
6      dated 4/1/20, one page.
7             Exhibit 6 is a social history update
8      dated 3/11/20, three pages.
9             Exhibit 7 is a psychoeducational
10     evaluation dated 3/12/19, three pages.
11            Exhibit 8 is a prior notice package dated
12     6/25/19, six pages.
13            Exhibit 9 is an assistive tech evaluation
14     dated 4/29/19, four pages.
15            Exhibit 10 is a recommended IEP dated
16     4/10/20, 50 pages.
17            Exhibit 11 is a suggested procurement
18     order dated 4/27/19, three pages.
19            Exhibit 12 is a nursing referral dated
20     4/15/20, one page.
21            Exhibit 13 is an unsigned affidavit of
22     Michelle LeFaivre, L-E, capital F as in Frank, A-I-
23     V as in Victor, R-E, dated 7/9/21, two pages.
24            And Exhibit 14 is an unsigned affidavit
25     of Sharee Lewin, S-H-A-R-E-E is the first name,

8

```
 1              Lewin is L-E-W-I-N, dated 7/9/21, six pages in
 2              length.  All of these now admitted into evidence,
 3              get them properly formatted, and I will submit them
 4              to the District to maintain an affirmative record
 5              for this trial -- for this child's hearing, I
 6              should say.
 7                   (Whereupon Department of Education's
 8              Exhibits 1 through 14 were marked and admitted into
 9              evidence.)
10                   HEARING OFFICER FARAGO:  And turning to
11              the Family's evidence, does the District have any
12              objections to any of the Family's proposed
13              exhibits?
14                   MR. FORBES:  No, we do not.
15                   HEARING OFFICER FARAGO:  Okay.  My
16              computer's trying to catch up with us.  I think
17              there are 21 of these.
18                   Exhibit A is a 7/6/20 due process
19              complaint, 11 pages.
20                   B as in boy is a 4/1/21 order in 20-CV-
21              7032, four pages.
22                   Exhibit C is a 5/22/21 FOFD in case
23              185111, 59 pages.
24                   Exhibit D as in dog is a 2/19/21 iBrain
25              IEP, 53 pages.
```

1                    Exhibit E is a 6/19/20 enrollment

2          contract, 7 pages.

3                    F as in Frank is a 2/22/21 program

4          description, 16 pages.

5                    Exhibit G is a 2020/'21 class schedule,

6          one page.

7                    Exhibit H is a 4/15/21 quarterly progress

8          report, 13 pages.

9                    Exhibit I is a 3/2/21 transportation

10         contract, five pages.

11                   Exhibit J is a 6/26/20 ten-day letter,

12         five pages.

13                   Exhibit K is a 6/19/19 IEP, 20 pages.

14                   Exhibit L is a 4/22/20 IEP, 38 pages.

15                   Exhibit M as in Mary is a 2/24/21 IEP, 56

16         pages.

17                   Exhibit N as in Nancy is a 7/7/20 PWN, 11

18         pages.

19                   Exhibit O is a 6/27/21 PWN, six pages.

20                   Exhibit P as in Peter is a 4/14/20

21         letter, one page.

22                   Exhibit Q is a 4/21/20 HIPAA release,

23         that's H-I-P like Peter, A-A, one page.

24                   Exhibit R is a 4/21/20 medical

25         accommodation form, three pages.

1       Exhibit S as in Sam is an 8/25/20 report

2       from Dr. Robert Bakey (phonetic), 15 pages.

3               Exhibit T as Tom is an undated affidavit

4       of Tiffany Semm, S like Sam, E, M like Mary, M like

5       Mary, four pages.

6               And Exhibit U is an undated affidavit of

7       Patrick Donohue, three pages.

8               All of these are now admitted into

9       evidence.

10              (Whereupon Student's Exhibits A through U

11      were marked and admitted into evidence.)

12              HEARING OFFICER FARAGO:  Okay.  And

13      again, give me a moment to render these

14      intelligible to the way the hearing office

15      maintains files, so they can be uploaded.  Okay.

16      Now, I'll get them back open before me, and we can

17      move forward.

18              Mr. Forbes, did you wish to make an

19      opening statement?

20              MR. FORBES:  Yes, I do, thank you.

21              HEARING OFFICER FARAGO:  Okay.

22              MR. FORBES:  May I proceed?  Sorry.

23              HEARING OFFICER FARAGO:  Sure, please.

24              MR. FORBES:  Okay.  It is the position of

25      the Department of Education that S███ J██ Donohue

1    was offered a free and appropriate public education

2    for the 2020 to 2021 school year.  The Department

3    contends that this case presents this tribunal with

4    two discrete issues of fact of law, including

5    whether it is clinically appropriate for the

6    student to attend a 12:1:3:1 program as opposed to

7    a 6:1:1 program, and whether or not the student

8    requires a fulltime one-to-one nurse throughout the

9    day.

10          The Department will contend that after

11    the testimony and the review of the evidence that

12    you will see that it has shown that this IEP that

13    was created for the student on April 22nd, 2020,

14    was reasonably calculated to enable this student to

15    make progress appropriate in the light of her

16    circumstances.

17          We will additionally argue that the

18    appropriateness of this IEP in question will

19    (indiscernible) determine as of the time it has

20    offered to the student and therefore neither the

21    statute nor (indiscernible) "Monday morning

22    quarterbacking" in evaluating the appropriateness

23    of the child's placement.

24          Therefore, we believe that the Court will

25    find as of the date of the IEP, the team was duly

12

1          constituted and had a legitimate clinical basis for

2          making its recommendations.

3                    You will hear from two witnesses on

4          behalf of the Department, one by the name of Sharee

5          Lewin, who is a school psychologist.

6                    Now, she was not a part of the IEP team

7          that created the program and its recommendation for

8          the 2020/2021 school year, but you will hear that

9          she did, in fact, review the IEP, as well as the

10         same evaluative materials that the team used in

11         creation of the program, as well as she would have

12         been able to access and review the recording of the

13         IEP meeting.

14                   Ms. Lewin will testify that based on her

15         clinical and professional opinion that the IEP was

16         appropriate and reasonably calculated to ensure

17         that the student did make and gain an educational

18         benefit for the upcoming school year.

19                   And Ms. Lewin will testify as to the

20         basis of the team's recommendation as it relates to

21         the 12:1:3:1 class size in the District 75 school,

22         as well as the one-to-one health paraprofessional

23         with two-and-a-half hours of nursing one-to-one

24         services provided to the student was appropriate to

25         support this student's needs.

1          You will also hear from the assistant

2    principal of the recommended school placement, PS

3    79, which is a District 75 specialized school that

4    the student was recommended to attend.  You will

5    hear that the school could have fully implemented

6    the recommended program and services for the

7    student for the 12-month school year, whether that

8    be in-person or remotely, whichever was decided by

9    the parent.

10          You will hear that there was, in fact, a

11   seat available for the student to attend PS 79, the

12   Horan School, for the 2020/2021 school year.

13          Accordingly, it is the Department's

14   contention that the IEP developed as a result of

15   the meeting was both structurally and

16   (indiscernible) sound and most importantly, was

17   reasonably calculated to enable the child to make

18   progress appropriate in light of the circumstances

19   at the time of the IEP took place.

20          The IEP was therefore appropriate

21   precisely because it took into consideration and

22   was developed with the best interests of the

23   student in mind.  Subsequently, the parents filed a

24   due process complaint requesting a hearing.

25          At the conclusion of this hearing, we are

1    confident that you will find that under the

2    (indiscernible) decision, the DOE provided a FAPE,

3    that the parent's school is not appropriate, and

4    that are equities are in favor of the Department.

5         The District reserves the right to call

6    additional witness and rebuttal witnesses.  Thank

7    you.

8         HEARING OFFICER FARAGO:  Thank you.  I

9    was going to ask you one question along the way in

10   that.  Oh, yeah, why is it that you don't have a

11   witness who actually participated in the review and

12   relying on somebody to tell us something that

13   essentially amounts to having reviewed the same

14   documents I can review?

15        MR. FORBES:  The IEP team witnesses were

16   unavailable during this course of time.

17        HEARING OFFICER FARAGO:  Okay.  I

18   don't -- I mean for whatever it's worth, and you've

19   submitted witnesses direct via affidavit, we've

20   admitted it and continue to do so for what it's

21   worth, the -- I don't have a need for your witness

22   to answer the question that I'm being asked to

23   answer, which is whether the evidence available to

24   me constitutes a finding or supports a finding that

25   the District's proposed placement, both in the form

1    of its program in the IEP and in the form of the

2    school proposed, was appropriate.

3              But obviously, the witness being a school

4    psychologist is an expert in that regard, and the

5    judgement is admissible and again (indiscernible)

6    evidence within which we look.  Is she available?

7              MR. FORBES:  Yes, she is.  I will ask her

8    to call in.  Thank you.

9              HEARING OFFICER FARAGO:  Great, thanks.

10             MR. OLTHOFF:  Your Honor?

11             HEARING OFFICER FARAGO:  Yes?

12             MR. OLTHOFF:  I just would like to have

13   Mr. Forbes confirm that both of these witnesses

14   were provided with both evidence packages.

15             HEARING OFFICER FARAGO:  Okay.  Mr.

16   Forbes?

17             MS. SHAREE LEWIN:  Hi, good morning.

18             HEARING OFFICER FARAGO:  Good morning.

19   This is John Farago, the hearing officer.  Give me

20   one moment.  We had a quick question.  Well,

21   actually, a question for you.  Do have a copy --

22   I'm assuming -- let's do this right in order.

23             First of all, can you state your name,

24   please, for the record, then, I'll have a question

25   for you.

16

1          MS. LEWIN:  Yes, my name is Sharee Lewin.
2          HEARING OFFICER FARAGO:  Okay.  Thank
3     you.  And do you have a copy of both sides'
4     evidence packages in this case?
5          MS. LEWIN:  I do.
6          HEARING OFFICER FARAGO:  Great.  Would
7     you be so good as to tell me your title or job
8     description, just a word for how we characterize
9     you in the transcript?
10         MS. LEWIN:  Yes, I am a school
11    psychologist with the Department of Education.
12         HEARING OFFICER FARAGO:  Thanks.  That
13    being said, would you raise your right hand?  And
14    do swear --
15         MS. LEWIN:  (Interposing) Yes.
16         HEARING OFFICER FARAGO:  -- or affirm
17    that the testimony you will give is the truth, the
18    whole truth, and nothing but the truth?
19         MS. LEWIN:  Yes, I do.
20         HEARING OFFICER FARAGO:  Thank you.  So
21    we have a document that is your affidavit.  Do you
22    have a copy of that?
23         MS. LEWIN:  Yes, I am just going to it
24    right now.
25         HEARING OFFICER FARAGO:  I'm going to do

1    the same thing, try and find my copy.  I have it
2    as -- oh, I guess before we do that, can I ask you
3    spell your name, actually.
4              MS. LEWIN:  Sharee, S-H-A-R-E-E --
5              HEARING OFFICER FARAGO:  (Interposing)
6    Um-hum.
7              MS. LEWIN:  -- last name is Lewin, L-E-W-
8    I-N.
9              HEARING OFFICER FARAGO:  Thank you.
10   Okay.  So we have your affidavit already admitted
11   into evidence as a six-page document, Exhibit 14.
12   It's at the very end of the District's evidence
13   package.  The last two pages are your CV.  Prior to
14   that, there's four pages of numbered paragraphs
15   with your typed named at the end, a total of ten
16   numbered paragraphs across those four pages.  Is
17   that consistent with what you're looking at?
18             MS. LEWIN:  Yes.
19             HEARING OFFICER FARAGO:  Great.  Could
20   you take a moment to look through it and just tell
21   me if there's anything in it that you feel should
22   be corrected or that you want to add to or clarify?
23             MS. LEWIN:  Give me a moment.
24             HEARING OFFICER FARAGO:  Sure.
25             MS. LEWIN:  Nope, it's -- it's accurate.

18

1        Um-hum.

2                    HEARING OFFICER FARAGO:  Great.  So we've

3        admitted that into evidence, as I say, as your

4        direct testimony.  Having reviewed it and having

5        been sworn, to the best of your knowledge and

6        belief, does this constitute the direct testimony

7        you wanted to provide to us about S███ J██

8        Donohue for the 2020/'21 school year?

9                    MS. LEWIN:  Yes, it is.

10                   HEARING OFFICER FARAGO:  Okay.  Then,

11       what remains is for Mr. Olthoff to be able to

12       cross-examine you about this.

13                   And accordingly, Mr. Olthoff, she's your

14       witness.

15                   MR. OLTHOFF:  Thank you, Your Honor.

16                   And good morning, Ms. Lewin.  Thank you

17       for joining us today.

18                   MS. LEWIN:  Good morning.

19                   MR. OLTHOFF:  So Ms. Lewin, I'm looking

20       at the affidavit submitted in lieu of direct

21       testimony, in paragraph 5 of the affidavit, you

22       list the documents that you reviewed.  When did you

23       review these documents?

24                   MS. LEWIN:  I reviewed them most recently

25       yesterday, but prior to this, last week.

1          MR. OLTHOFF:  Okay.  So did you review

2    any of these documents prior to the April 22nd IEP

3    meeting?

4          MS. LEWIN:  No.

5          MR. OLTHOFF:  And it also -- you also

6    note that you were able to listen to the meeting.

7    Did you listen to the meeting?

8          MS. LEWIN:  Yes.

9          MR. OLTHOFF:  And how long was the

10   meeting?

11         MS. LEWIN:  A little over four hours.

12         MR. OLTHOFF:  And you listened to the

13   entirety?

14         MS. LEWIN:  Yeah.

15         MR. OLTHOFF:  And one of the documents

16   listed is a letter from the student's doctor.  It

17   is in evidence as Parent's Exhibit P.  Are you

18   familiar with the contents of that letter from Dr.

19   Hoffman?

20         MS. LEWIN:  To refresh my memory, I would

21   have to open the document.  There were a number of

22   documents reviewed for S███ J██.

23         MR. OLTHOFF:  I would like --

24         HEARING OFFICER FARAGO:  (Interposing)

25   Feel free.

1              MR. OLTHOFF:  -- you to refer to Parent's

2       Exhibit P.

3              MS. LEWIN:  All right.  Give me a moment.

4       Can you assist me with locating a CCO, just so I

5       can, with efficiency, get to it quickly.

6              MR. OLTHOFF:  Yes, I'm scrolling down

7       now.  In the PDF form, it is page 307.

8              MS. LEWIN:  307, oh, I don't have it like

9       that.  Okay.  So let me just go to the -- I think

10      I'll just try to find it on my own.  Give me a

11      moment.  Okay.  So it's P.  I think it's -- the P

12      letter is about one page.  Give me a moment.  A, B,

13      C, D, E, F, G, H, I, J, M, N, O, P, here we are,

14      hold on.  Yes, I'm here.

15             MR. OLTHOFF:  Okay.  So at the bottom,

16      the student's physician is noting that S    J

17      requires a one-to-one fulltime nurse during the

18      day.  Do you see that?

19             MS. LEWIN:  Yes, I do.

20             MR. OLTHOFF:  Are you a medical doctor?

21             MS. LEWIN:  No.

22             MR. OLTHOFF:  But the CSE disagreed with

23      Dr. Hoffman's recommendations; is that correct?

24             MS. LEWIN:  Yes, they did not feel that a

25      nurse was required on a fulltime basis, though they

1          did identify that a nurse was needed when feeding

2          was required.

3                    MR. OLTHOFF:  And in the IEP that was

4          developed on April 22nd, it's noted that the CSE

5          recommended 2 hours and 15 minutes per day with the

6          nurse, is that correct?

7                    MS. LEWIN:  Yep, that's accurate.

8                    MR. OLTHOFF:  And where did the CSE

9          envision this would take place?

10                   MS. LEWIN:  A physical location?

11                   MR. OLTHOFF:  Yes.

12                   MS. LEWIN:  I don't know the answer to

13         that question.

14                   MR. OLTHOFF:  And did the CSE recommend

15         that S███  J███ attend a school that operated on an

16         extended school day?

17                   MS. LEWIN:  Not to my knowledge.  It was

18         for a traditional school day.

19                   MR. OLTHOFF:  And one of the other

20         documents that was recommended -- one of the

21         documents that you note that you reviewed is a

22         psychoeducational dated March 12th, 2019; is that

23         correct?

24                   MS. LEWIN:  Yes.

25                   MR. OLTHOFF:  That is in evidence as

1          Exhibit 7.  And so Ms. Lewin, what -- are you aware
2          that this evaluation was reviewed by an independent
3          neuropsychologist prior to the April -- well, that
4          this psychoeducational was reviewed by an
5          independent neuropsychologist?  Are you aware of
6          that?
7                    MS. LEWIN:  No, I'm not sure if I
8          understand the question; that it was reviewed?
9                    MR. OLTHOFF:  Yes.
10                   MS. LEWIN:  By someone else?
11                   MR. OLTHOFF:  Yes.
12                   MS. LEWIN:  I -- I mean I would assume
13         that it was reviewed by a number of people, but I
14         can't verify who reviewed the documents.
15                   MR. OLTHOFF:  So you're not aware, then,
16         that this independent neuropsychologist said that
17         the psychoeducational evaluation did not yield any
18         useful results in developing a program for the
19         student; is that correct?
20                   MS. LEWIN:  That specific conclusion, no,
21         I was not aware of that.  I do know that the
22         student was difficult to assess as far as acquiring
23         standardized scores to offer a full-scale IQ,
24         though there were different subtests that were
25         tested, and overall, like, an interview was done

23

1           with the parent, and they did try a number of
2           different assessments.
3                     But I'm not familiar with that specific
4           statement that the psychoeducational was inadequate
5           overall.  I mean that's what it sounds to me is
6           being said.
7                     MR. OLTHOFF:  And prior to this hearing,
8           you did review the iBrain recommended program; is
9           that correct?
10                    MS. LEWIN:  Yes.
11                    MR. OLTHOFF:  Okay.  And that is -- in
12          your affidavit, it's listed as DOE Exhibit 10, just
13          to be sure.  It's also in the evidence as Parent's
14          D.  Is music therapy a New York State-approved
15          therapy that can be added to a student's IEP?
16                    MS. LEWIN:  No, it cannot.
17                    MR. OLTHOFF:  It cannot be added; is your
18          testimony that it cannot be added to an IEP?
19                    MS. LEWIN:  During CSE 9 meetings, that's
20          specific recommendation to the best of my knowledge
21          cannot be added.  However, it is -- if it is
22          offered on the school level, once the parent does
23          accept the placement, that can be a discussion
24          to -- to decide whether or not the program is
25          available and therefore could be offered at that

1    time.

2         However, at a CSE meeting, we cannot

3    guarantee that the recommended program would

4    provide music therapy, though we do make

5    indications that a student may benefit from such

6    service or interventions that can be offered

7    differently throughout the school day but would not

8    specifically be identified as music therapy.

9         MR. OLTHOFF:  Okay.  Thank you.  I may --

10   under -- but you did say that the CSE can discuss

11   it or can make that recommendation, but can't add

12   it to the IEP; is that your testimony?

13        MS. LEWIN:  I would say that it would not

14   be appropriate to do so as we cannot guarantee

15   that.  However, if we do indicate that a student

16   does respond to music therapy, it should be

17   included in the IEP and -- as it relates to S█████

18   J███ Donohue, it was discussed that she does enjoy

19   music, and it was indicated in the IEP that she was

20   currently receiving it as her school.

21        MR. OLTHOFF:  Under what --

22        HEARING OFFICER FARAGO:  (Interposing)

23   Can I interrupt you, Mr. Olthoff?  Can I interrupt

24   you for a just a moment to ask the --

25        MR. OLTHOFF:  (Interposing) Yes.

1          HEARING OFFICER FARAGO:  -- witness a

2   question?  Thank you.

3          Just I understand what you just said,

4   that the history of this student suggests that she

5   benefits from music in her instruction.  But you've

6   been music therapy as a service.  Does it -- does

7   such a -- is there such a thing as music therapy,

8   and if so, what is it in New York State?

9          MS. LEWIN:  So depending on the student's

10  ability and functioning level, it could be as

11  rudimentary such as a student being in a space

12  where they're able to listen to music, to help with

13  any type of therapeutic.  Sometimes, it is used as

14  a form of therapy.  There's, like, art therapy --

15          HEARING OFFICER FARAGO:  (Interposing)

16  Yeah.

17          MS. LEWIN:  -- so there's different

18  manners in which --

19          HEARING OFFICER FARAGO:  (Interposing)

20  (Indiscernible).

21          MS. LEWIN:  -- they can receive it.

22          HEARING OFFICER FARAGO:  Yeah, I

23  understand that.  I actually went to --

24          MS. LEWIN:  (Interposing) Oh.

25          HEARING OFFICER FARAGO:  -- ed school.

1        There was a program in music therapy down the hall
2        from the program I was in.  So I knew people who
3        were studying to be music therapists.  I just don't
4        know whether there is such -- that it's a licensed
5        field in New York State, do you?
6                    MS. LEWIN:  No, to the best of my
7        knowledge, no, which is why in my practice, I do
8        not recommend it, but I do indicate if a student
9        may respond to it, so that the classroom is --
10                   HEARING OFFICER FARAGO:  (Interposing)
11       Okay.
12                   MS. LEWIN:  -- able to incorporate that
13       into their program.  It's not something that I
14       could specifically say --
15                   HEARING OFFICER FARAGO:  (Interposing)
16       (Indiscernible).
17                   MS. LEWIN:  -- music therapy is in School
18       A, and so --
19                   HEARING OFFICER FARAGO:  (Interposing)
20       Yeah.
21                   MS. LEWIN:  -- this is where the student
22       should go, so not at all, but I think it's more or
23       less about how you incorporate music into a
24       student's program rather than designating 60
25       minutes of service to that specifically.

1    HEARING OFFICER FARAGO:  Okay.  You've

2    answered my question to the best of your knowledge.

3    My knowledge is 40 years out of date, going back to

4    when I went to ed school.  So you're not aware

5    either, currently, of a State licensure for music

6    therapy.

7    MS. LEWIN:  Unfortunately, no, I -- I

8    cannot --

9    HEARING OFFICER FARAGO:  (Interposing)

10   Okay.  Okay.

11   MS. LEWIN:  -- answer that.

12   HEARING OFFICER FARAGO:  Great, that's

13   all I was asking.  Thanks.

14   Mr. Olthoff, she's back to you.

15   MR. OLTHOFF:  So Ms. Lewin, so would you

16   agree, then, that the CSE will make recommendations

17   based on what the DOE is able to provide?

18   MS. LEWIN:  Yes.

19   MR. OLTHOFF:  Now, did you review the

20   report from the music therapist that's incorporated

21   into the DOE IEP?

22   MS. LEWIN:  Hello?

23   MR. OLTHOFF:  Yes, hello?

24   MS. LEWIN:  Oh, okay, sorry, I thought

25   (indiscernible) hung up.

1                    MR. OLTHOFF:  So did you review the

2           report of the music therapist that --

3                    MS. LEWIN:  (Interposing) Oh,

4           (indiscernible), yes, um-hum.

5                    MR. OLTHOFF:  And do you agree that the

6           report indicates the student received a benefit

7           from music therapy?

8                    MR. FORBES:  If I may object.  You know,

9           the witness has stated that she has reviewed, so I

10          believe Mr. Olthoff can direct the witness and say,

11          you know, the music report says this rather than

12          question --

13                   HEARING OFFICER FARAGO:  (Interposing)

14          Agreed, agreed.

15                   MR. FORBES:  -- the witness' --

16                   HEARING OFFICER FARAGO:  (Interposing) Go

17          ahead, Mr. Olthoff.

18                   MR. OLTHOFF:  Then, I would different Ms.

19          Lewin to look at Parent's Exhibit D.

20                   MS. LEWIN:  Give me a moment to get

21          there.

22                   MR. FORBES:  I believe you meant E, Mr.

23          Olthoff, because your numbering is off.  I mean

24          your lettering is off on your exhibit package.

25          However, I would object to that, as well, because

1    that is not the basis -- that document is not the
2    basis of the IEP.  The basis of the IEP is in the
3    DOE's exhibit package as Exhibit 10.
4             MR. OLTHOFF:  We can look at DOE's
5    Exhibit 10.  We could also look at DOE's Exhibit 1.
6    If that is --
7             HEARING OFFICER FARAGO:  (Interposing) So
8    then, what are we looking at, Mr. Olthoff?
9             MR. OLTHOFF:  So then, Ms. Lewin, can I
10   direct you to the DOE's exhibit and the first
11   exhibit.
12             MS. LEWIN:  Okay.  So I'm not looking at
13   the music therapy report.  I'm going back to the
14   IEP?
15             MR. OLTHOFF:  Yes, the --
16             MS. LEWIN:  (Interposing) Okay.
17             MR. OLTHOFF:  -- DOE 1 --
18             MS. LEWIN:  (Interposing)  Yes.
19             MR. OLTHOFF:  -- and page 8, 1-8.
20             MS. LEWIN:  Okay.  Correct.  I'm there.
21             MR. OLTHOFF:  And you did note in your
22   testimony that music can be used as a form of
23   therapy, and you did note that it can help a
24   student -- I believe you did say that the
25   student -- that music could help a student regulate

1          their emotions; is that correct?

2                      MS. LEWIN:  I don't recall exactly what I

3          said, but music therapy has helped students in

4          various ways.  It's another form of therapy,

5          counseling.

6                      MR. OLTHOFF:  Okay.  And on page 8 of the

7          first exhibit --

8                      MS. LEWIN:  (Interposing) Um-hum.

9                      MR. OLTHOFF:  -- of the District, there

10         is the report of the music therapist.

11                     MS. LEWIN:  Um-hum.

12                     MR. OLTHOFF:  Do you need a minute to

13         review that?

14                     MS. LEWIN:  No, no, no, I've -- I've read

15         through this document.

16                     MR. OLTHOFF:  So then, would you agree

17         that the music therapist reports that S      J

18         can benefit and has benefitted from music therapy?

19                     MS. LEWIN:  I would have to say that I am

20         not comfortable drawing such a conclusion.  The

21         report did indicate that she responds to music,

22         that she shows some response as a soothing

23         stimulus.

24                      I think that there were a lot of

25         hypotheticals.  There was nothing specific that

1    stood out.  They did say that she enjoys to listen

2    to music, but there are not direct indications to

3    show that she does benefit from this type of

4    service.

5              I think the measurements that were used

6    is really hard to determine what the educational

7    benefit may be from the service.  I think in

8    general, it offers a break for individuals.  Music

9    therapy or music as itself, however, as it offering

10   S████ J████ an educational benefit, I don't see

11   anything in this report that really stands out to

12   suggest that.

13             I think there is even a part in the

14   narrative, I don't know if it was in the report or

15   the IEP, where it said that she would even cry

16   during sessions, so it's -- it's really hard to

17   ascertain if it was soothing, if it did help to

18   regulate, or if it did trigger her.

19             I don't think that there was clear data

20   to support that this benefitted her.  It's nice,

21   but I -- I don't really -- it's -- it's hard to

22   draw that conclusion.

23             MR. OLTHOFF:  Have you recommended music

24   therapy for any other students that have had

25   similar profiles to S████ J████?

1    MS. LEWIN:  No, it has been considered,
2    though, and discussed in other meetings that I've
3    had with iBrain, but it was never recommended.
4    MR. OLTHOFF:  And in your affidavit, you
5    note in paragraph 6 that the IEP team relied
6    heavily on the progress recommendations from
7    iBrain; is that correct?
8    MS. LEWIN:  Yes, they -- and they did.
9    They are the ones that work with the student
10   primarily, so that was information that was used.
11   MR. OLTHOFF:  And in addition to the IEP
12   recommended IEP, did the DOE conduct any additional
13   evaluations prior to the April 22nd IEP meeting?
14   MS. LEWIN:  It's really hard for me to
15   recall dates, but I do believe a social history
16   update was completed.  A classroom observation was
17   attempted, which included an overall summary of the
18   student's current classroom level.
19   I would have to go back to see, but I
20   know for sure that a social history was completed,
21   and I believe the psychoeducational was still
22   current at the time of the meeting, so that was
23   also used.
24   MR. OLTHOFF:  And did you review any
25   documentation that indicated that the student's

1                     needs had changed significantly?

2                          MS. LEWIN:  No.

3                          MR. OLTHOFF:  In paragraph 7 of your

4             affidavit, you note that the student remains at a

5             pre-K level.  Could you explain pre-K level with

6             regard to what?

7                          MS. LEWIN:  Emerging -- an emerging

8             learner.  I also just want to indicate that a

9             vocational assessment was completed, I just

10            remembered that for the student, so that was

11            another assessment done by the DOE.

12                         A pre-K level is an emerging learner, so

13            someone who is at a pre-K level may not be able to

14            identify all letters of the alphabet, numbers, to

15            formulate certain sentences, to be able to identify

16            certain pictures or sounds or phrases, so an

17            emerging learner is what a pre-K level is.

18                         MR. OLTHOFF:  And are you referring to

19            instructional/functional levels as they're listed

20            on the IEP?

21                         MS. LEWIN:  Yes.

22                         MR. OLTHOFF:  Are there -- to your

23            knowledge, are there measures of progress that may

24            not be captured in instructional/functional levels?

25                         MS. LEWIN:  So yeah, if I can refer to

34

1    the IEP, I do recall seeing very minimal progress

2    that was made by the student as it relates to her

3    overall physical abilities and adaptive daily

4    living skills.  If I may, can I refer to the DOE

5    document in the package where -- where that was

6    indicated?

7              HEARING OFFICER FARAGO:  Yes.

8              MR. OLTHOFF:  Yes.

9              MS. LEWIN:  Okay.  So DOE 1-2, iBrain

10   does indicate a student's progress in various areas

11   of development as far as -- so this is a

12   nonfunctional -- we're looking at the gross motor

13   functioning.

14             So if we were take a look at S    J    's

15   ability to lie down, in rolling at the time of the

16   IEP, when this was submitted, she acquired 16 out

17   of 51.  It did indicate that she actually

18   decreased, and it was a result of her spinal

19   surgery.  So prior to the IEP meeting, it was 24

20   out of 51.

21             As far as sitting, there was some slight

22   improvement.  We now had 12 out of 50, 9 out of 10.

23   If we were took at crawling, out of 42, she did go

24   to 1.  Standing was still -- there was no progress.

25   Walking, running, and jumping, there's no progress.



1          So throughout the IEP, iBrain did

2     indicate progress or lack of progress that was

3     made.  And my overall assessment was that, aside

4     from academic functional level in her related

5     service domains and gross motor, fine motor

6     development, sensory regulation, there was

7     either -- there was very minimal progress that was

8     made at the time.

9          Though there was not a significant

10    decrease, there was not an overall increase in --

11    any jump, of any progress in any of these areas.

12    And throughout the IEP, I believe that there were

13    different sections, but that's the first that comes

14    to mind.

15         So I'm not sure if you were specifically

16    referring to that, which was not academic

17    functional.  Did I answer what you were inquiring

18    about?

19         MR. OLTHOFF:  Okay.  But you did mention

20    that in the IEP it does reference that S███ J██

21    had spinal surgery, correct?

22         MS. LEWIN:  Yeah, that is correct.

23         MR. OLTHOFF:  And you did note that you

24    reviewed the social history update, which also

25    references the spinal surgery; is that correct?

1          MS. LEWIN:  Yes.

2          MR. OLTHOFF:  Now, while a student is

3     recovering from surgery, would you expect that

4     student to have made the kinds of -- any more

5     progress than is indicated on the IEP?

6          MS. LEWIN:  No, but that still does

7     regardless of what has occurred, that's still her

8     present levels of functioning, though we can take

9     into consideration the reason, the lack there of

10    progress, it still stands that there was a

11    regression, whether it be due to a physical

12    surgery, lack of instruction.

13          As a psychologist, I would want to

14    consider what the current level of functioning is.

15    So yes, she did have surgery, therefore, there has

16    been a delay in her ability to progress.

17          MR. OLTHOFF:  And in your opinion, having

18    surgery and then having some recovery time

19    necessitates a change in program and placement?

20          MS. LEWIN:  Well, if she continues to

21    receive the services and programs where she was

22    making progress -- well, specifically, what are you

23    referring to?  I'm sorry.

24          MR. OLTHOFF:  Well, the DOE IEP and it is

25    noted in your affidavit, the DOE IEP differs from

1          the iBrain recommended program in a number of ways.

2          So if a student has a surgery and then requires

3          time to recover, is that sufficient rationale for

4          changing the school's classroom -- the student's

5          classroom placement?

6                    MR. FORBES:  I'm going to object to this

7          line of questioning as mischaracterizing of the

8          witness' testimony.  The witness specified that the

9          difference was the class ratio as well as the

10         nursing recommendation.

11                   So there was no discussion of whether or

12         not the physical therapy had been changed or

13         anything of that nature.  So therefore the

14         question, which asks about the change in program

15         and placement as it relates to physical therapy, is

16         not correct because that is not what the witness'

17         affidavit states.

18                   MR. OLTHOFF:  Your Honor, I did not

19         mention physical therapy.  I am discussing the

20         program on a whole and the rationale for changing

21         the student's recommended placement from the --

22         from what iBrain has recommended for the student.

23                   I'm going to come back around to

24         questions of progress in other areas.  However, it

25         seems to me that in the affidavit, there is a note

1          stating as testimony that the student has made

2          trivial progress and thus required a change in

3          placement.

4                    HEARING OFFICER FARAGO:  Okay.  I'm going

5          to let it in.

6                    MS. LEWIN:  A change in placement?  Can

7          you please direct me to where I made that

8          statement?

9                    MR. OLTHOFF:  A change in placement

10         recommendation, in your affidavit, you state --

11                   MS. LEWIN:  (Interposing) Yeah.

12                   MR. OLTHOFF:  -- that because the student

13         made -- you are claiming that the student had made

14         only trivial progress --

15                   MS. LEWIN:  (Interposing) Correct.

16                   MR. OLTHOFF:  -- at iBrain and then,

17         therefore, are recommending that the student go to

18         a 12:1:4 rather than a 6:1:1.

19                   MS. LEWIN:  Okay.  So let me clarify.

20         I -- I -- I'm the Committee on Special Education

21         side, we don't -- we don't base our recommendations

22         solely on what -- a nonapproved school.  So for me,

23         I guess I was just misunderstanding.  It wouldn't

24         have been a change in placement because her

25         placement continues -- the recommended placement

1    continues to be a 12:1:3:1.

2              So I guess I just was confused because it
3    was -- I was under the impression that the -- that
4    you were saying that the DOE had previously
5    recommended a 6:1:1, and so we made a change in
6    placement of a 12:1:1.  So I -- I do not
7    acknowledge it being a change in placement because
8    a placement for iBrain was not the placement that
9    was recommended by us.

10             So there was never a change in placement.
11   If anything, we maintained the recommendation of a
12   12:1:3.  So it wouldn't be a change in placement
13   because we're not comparing our placement to
14   iBrain's placement.  That was iBrain's suggestion
15   based on their evidence.

16             However, we felt that a 12:1:1 -- 12:1:3
17   District 75 12-month program with the related
18   services would be beneficial for the student to
19   make progress as within that setting, she will
20   receive highly intensive support by the team and
21   the classroom structure.

22             We do not feel that a 6:1:1 setting that
23   we offer through the Department of Education would
24   be supportive enough for the student.  If S
25   J    did indicate that there was progress that was

1    made, we, then, therefore can come back to the
2    table and identify if our DOE 6:1:1 placement would
3    be appropriate.  However, that was not the
4    determination made at this meeting.
5                    MR. OLTHOFF:  So --
6                    MS. LEWIN:  (Interposing) That is least
7    restrictive.  A 6:1:1, as far as we are considered,
8    is least restrictive.
9                    MR. OLTHOFF:  Is less restrictive than
10   a --
11                   MS. LEWIN:  (Interposing) Less
12   restrictive.
13                   MR. OLTHOFF:  -- 12:1:4, correct?
14                   MS. LEWIN:  Sorry, yes, less restrictive.
15                   MR. OLTHOFF:  And so it's your testimony
16   that S████ J███ would not have been appropriately
17   placed in a less restrictive environment than a
18   12:1:4, correct?
19                   MS. LEWIN:  It's my that she would not be
20   appropriate for a 6:1:1 setting in a D75.
21                   MR. OLTHOFF:  So can I -- I just want to
22   refer you back to the DOE's IEP.  If you go to
23   page -- Exhibit 1, page 3.
24                   MS. LEWIN:  Give me one second.  DOE
25   Exhibit 3?

1              MR. OLTHOFF:  1, page 3, 1-3.

2              MS. LEWIN:  Oh, 1, page 3, okay.

3              MR. OLTHOFF:  So in the middle -- would

4         you agree that for students with the profound

5         disabilities who are alternately assessed, progress

6         is measured mainly by IEP goals?

7              MS. LEWIN:  I would say yeah, just about

8         every -- every student we identify goals who have

9         IEPs and do measure their progress from there.

10             MR. OLTHOFF:  So --

11             MR. FORBES:  (Interposing) I just heard a

12        beep.  Hold on, I just heard a beep.

13             MR. DONOHUE:  The parent is still here.

14        IHO, are you there?

15             MR. OLTHOFF:  Appears we may have lost

16        IHO Farago.  Are you back?

17             HEARING OFFICER FARAGO:  I just -- yeah,

18        I just dropped off.  The last words I heard were

19        IEP goals from Mr. Olthoff.

20             MR. OLTHOFF:  Yes.  So Ms. Lewin, in the

21        middle of -- so the question was for students with

22        profound disabilities such as S    J   , is it

23        true that progress is measured mainly by how well

24        they perform in their IEP goals?

25             MS. LEWIN:  And yes, I did answer that

42

1   for all students with IEPs, even with significant

2   needs as S███, we do measure their progress based

3   on their goals.  That is correct.

4           MR. OLTHOFF:  All right.  Thank you.  And

5   based on this IEP, are you aware that S███ J██

6   was at risk for aspiration?

7           MS. LEWIN:  Yes, which is why offered a

8   nurse for the student on her IEP.

9           MR. OLTHOFF:  And you're also aware that

10  S███ J███ has a seizure disorder?

11          MS. LEWIN:  I believe so.  I can't verify

12  the name of it.

13          MR. OLTHOFF:  I would like to direct Ms.

14  Lewin to Parent's Exhibit M like Mike.

15          MS. LEWIN:  M like Mike.  Just give me a

16  moment because I have to get out of DOE exhibits.

17  Okay.  A, B, C, D, E, F, G -- M, and okay, I'm

18  almost there.  M, so the bottom of the page, like,

19  M-010.  What's the name of the document that I'm

20  looking at?  I think that might be a little bit

21  more helpful.

22          MR. OLTHOFF:  Okay.  One second.  I'm

23  going to direct you to the page.  M as in Mike, and

24  it's page 46, so it would be M-046.

25          MS. LEWIN:  Okay.  And if you could just

Exhibit 7: Page 42 of 182

43

1    tell me the document, so that I'm even --

2              MR. OLTHOFF:  (Interposing) Yes, it is --

3              MS. LEWIN:  -- know what I'm looking for.

4              MR. OLTHOFF:  -- it is an IEP, and the

5    date on the IEP is February 24th, 2021.

6              MS. LEWIN:  Okay.  So we're looking at

7    the recommendation page for the IEP?

8              MR. OLTHOFF:  Yes.

9              MS. LEWIN:  Okay.

10             MR. OLTHOFF:  Ms. Lewin, are you aware

11   that the CSE 9 reconvened during the '20/'21 school

12   year for S███ J██?

13             MS. LEWIN:  Is this the document, the

14   reconvene document?

15             MR. OLTHOFF:  Yes.

16             MS. LEWIN:  So then, yes.  I didn't

17   realize that there was a -- okay.

18             MR. OLTHOFF:  And looking at the

19   document, do you notice that a one-to-one nurse,

20   full day, was added to S███ J██'s IEP?

21             MS. LEWIN:  As group service, that's what

22   was indicated here, yes.

23             MR. OLTHOFF:  It says --

24             MS. LEWIN:  (Interposing)

25   (Indiscernible).

1            MR. OLTHOFF:  -- school nurse,

2      individual, group is parent counseling therapy.

3            MS. LEWIN:  I'm sorry, I'm scrolling up

4      and down.  Yes, it says school nurse, individual,

5      daily, fulltime, one-to-one.

6            MR. OLTHOFF:  And this IEP also

7      recommends a one-to-one nurse during

8      transportation, which is down where the

9      transportation documents are.

10            MS. LEWIN:  Okay.

11            MR. OLTHOFF:  So given that your

12      testimony that you don't believe the student's

13      needs changed considerably during the time in

14      question, why is it, then, that the CSE reconvened

15      and added a one-to-one nurse to S███ J███'s IEP?

16            MS. LEWIN:  Unfortunately --

17            MR. FORBES:  (Interposing) I would object

18      to this line of questioning as Ms. Lewin's

19      testimony has been specific about a period of time

20      as it relates to documents received prior to the

21      IEP meeting.  Therefore, asking her about an IEP

22      that was conducted after the start of the school

23      year in a totally different year, is inappropriate

24      and unfair to the witness.

25            MR. OLTHOFF:  With an implementation date

1       in March of 2021, which is squarely in the middle
2       of the '20/'21 school year.
3                   HEARING OFFICER FARAGO:  I do think that
4       the focus of our inquiry is on the date that the
5       team met and things that -- the run up to that
6       date.  So I'm going to sustain the objection.
7                   MR. OLTHOFF:  But Your Honor, this is --
8                   HEARING OFFICER FARAGO:  (Interposing) I
9       also should say in terms of the scope of this
10      witness' knowledge and testimony.  I'm not
11      suggesting that you can't make those arguments in
12      your closing statement or through your evidence or
13      other witnesses.  I'm just talking about what makes
14      sense to ask this witness about.
15                  MR. OLTHOFF:  Yeah, sure, but it is noted
16      that parent, in their due process complaint,
17      requested a reconvene after disagreeing with the
18      program and placement.  The issue of the one-to-one
19      nurse is very much a contested in this hearing.
20                  HEARING OFFICER FARAGO:  I understand
21      that.  It's an argument that you can surely make
22      and (indiscernible).  In fact, Mr. Forbes framed it
23      in his opening.
24                  MR. OLTHOFF:  Yes.
25                  HEARING OFFICER FARAGO:  So if you want

1          to speak to the merits of that, that's -- with this

2          witness, that's fine or -- but the event of the CSE

3          and other meetings, it seems to me, are outside of

4          the scope of this witness' testimony.

5                    MR. OLTHOFF:  Okay.  Thank you.

6                    And Ms. Lewin, you previously testified

7          that you did not believe that a 6:1:1 placement in

8          a D75 would be appropriate for S███ J███ Donohue;

9          is that correct?

10                   MS. LEWIN:  That is correct.  If

11         anything, I would have considered a more

12         restrictive program than a 12:1:3, but absolutely

13         not a 6:1:1, so that's the --

14                   MR. OLTHOFF:  (Interposing) But you do

15         note in your affidavit that S███ J███ has --

16         you've characterized her management needs has

17         highly intensive, correct?

18                   MS. LEWIN:  (Indiscernible), absolutely.

19                   MR. OLTHOFF:  And are you aware that the

20         regulatory requirement for students whose needs are

21         characterized as highly intensive are -- must be

22         placed in a class with no more than six students?

23                   MS. LEWIN:  That is not what the

24         regulations specifically indicate.  It's more so

25         about the student-to-teacher ratio, and that number

1           is actually -- it cannot exceed 12 students for
2           highly intensive needs.
3                       MR. OLTHOFF:  That's your testimony, and
4           that's your understanding of the regulations.
5                       MS. LEWIN:  100 percent.
6                       MR. OLTHOFF:  And looking again at
7           Parent's Exhibit M, do you see that S███ J██ was
8           recommended for a 6:1:1 placement?
9                       MS. LEWIN:  I do see that, and I do
10          disagree with that recommendation.
11                      MR. OLTHOFF:  So it's your position that
12          a 6:1:1 is inappropriate for S███ J██?
13                      MS. LEWIN:  Yes, it is not supportive
14          enough for the student with --
15                      MR. FORBES:  (Interposing)
16          (Indiscernible).
17                      MS. LEWIN:  -- highly intensive needs.
18                      MR. FORBES:  Once again, I'm sorry, I'm
19          going to object once again.  As stated, this
20          witness is speaking about a certain IEP meeting,
21          and the evaluative materials there were available
22          prior to that meeting.
23                      Mr. Olthoff is asking about another IEP
24          meeting that occurred afterwards, and we do not
25          know what the evaluative material was provided for

1           this meeting because we know that there is, in

2           evidence, an IEP from iBrain for February 2021, and

3           the witness has already stated that the team for

4           the April '20 meeting relied on the recommended IEP

5           from iBrain that is from April 19th, 2020.

6                      So for this witness to be asked to make a

7           characterization as to the recommendations of a

8           future or not future, but another IEP program and

9           recommendation when she does not have knowledge of

10          the evaluative material that was used to create

11          that program and supports is unfair to this witness

12          and beyond her scope and understanding and

13          knowledge.

14                     HEARING OFFICER FARAGO:  Well, I

15          understand the nature of your objection.  On the

16          other hand, to the extent that the witness has a

17          view based on the response that she's made so far

18          and to the extent that that view from her vantage

19          point, given what she understood of the student's

20          needs, is to disagree with the subsequent IEP's

21          determination based on what it understood at that

22          time, she's not here to defend the subsequent IEP.

23                     She's only here to defend or reflect the

24          IEP being challenged here, and if Mr. Olthoff wants

25          to continue to ask questions that lead to answers

1          that cut against his argument, I think it's okay

2          for him to keep doing that, even though --

3                    MR. OLTHOFF:  (Interposing) Well, Your

4          Honor, may I --

5                    HEARING OFFICER FARAGO:  (Interposing)

6          Yeah.

7                    MR. OLTHOFF:  -- sorry.  Just Parent

8          notes that Parent is alleging that the DOE denied

9          S████ J███ a FAPE during the '20/'21 school year,

10         and so we're challenging both of these IEPs because

11         they are both intended to be implemented during the

12         '20/'21 school year.

13                   HEARING OFFICER FARAGO:  No, I understand

14         that, but one of them applies to a very limited

15         portion of the '20/'21 school year, and further,

16         the District's not defending it.

17                   Is that right --

18                   MR. OLTHOFF:  (Interposing) And --

19                   HEARING OFFICER FARAGO:  -- Mr. Forbes?

20                   MR. FORBES:  Well, it's the District's

21         position that the parent unilaterally placed the

22         student at the start of the '20/'21 school year, so

23         any subsequent IEP after the start of the school

24         year, we would be unable to implement because the

25         student is already attending a program.

1              HEARING OFFICER FARAGO:   That's not about
2       implementation, but even if it were, students come
3       and go in and out of the public schools all the
4       time, through the school year.   You have an IEP
5       with a contemplated start date within the '20/'21
6       school year.   I gather you're not defending that
7       IEP here, unless you want to do so.
8              But I think the District argued against
9       consolidating these cases, and -- or not
10      consolidating these cases, argued against
11      continuing bringing that IEP into this case.   Have
12      to have it one way or the other, Mr. Forbes.   Which
13      way did you want to have it?
14             MR. FORBES:   I'm not the one bringing
15      this IEP into this case, IHO --
16             HEARING OFFICER FARAGO:   (Interposing)
17      (Indiscernible).
18             MR. FORBES:   -- I'm actually trying to
19      prohibit it.
20             HEARING OFFICER FARAGO:   I recognize
21      that, but the IEP exists, and it covers the school
22      year that we're talking about.   And the District,
23      by virtue of putting that recommendation forward
24      with that start date, changed its recommendation
25      for whatever reason it did so on that date.

51

1                    So you either want to defend the new

2          recommendation in the context of a change or do --

3          I don't know.  You'll get to characterize it as you

4          continue to make your case, but I don't see any

5          reason why Mr. Olthoff can't ask questions about

6          it, and the witness can't answer them.

7                    MR. FORBES:  It's -- IHO, it's --

8                    HEARING OFFICER FARAGO:  (Interposing)

9          Yeah.

10                    MR. FORBES:  -- not about -- it's about

11          what this witness is specifically for.  And asking

12          her --

13                    HEARING OFFICER FARAGO:  (Interposing)

14          Well --

15                    MR. FORBES:  -- about -- if Mr. Forbes

16          asks her opinion of the 6:1:1 program based on the

17          evaluative materials that were in possession of the

18          IEP team from April 2020, that --

19                    HEARING OFFICER FARAGO:  (Interposing) I

20          thought that's what he asked.

21                    MR. FORBES:  No, he asked --

22                    HEARING OFFICER FARAGO:  (Interposing)

23          (Indiscernible).

24                    MR. FORBES:  -- no, he asked why was it

25          changed, and she cannot answer that because she did

1          not review --

2                    HEARING OFFICER FARAGO:   (Interposing)

3          No, I thought he asked whether she agreed with it,

4          the last question, the most recent question that

5          was asked that you objected to, I thought was,

6          whether she thought -- whether she agreed with that

7          recommendation, and she said based on the

8          information she had, she did not.

9                    Am I mischaracterizing your testimony?

10                   MS. LEWIN:   No, that -- that was my

11         statement.

12                   HEARING OFFICER FARAGO:   Yeah.

13                   MR. FORBES:   I misunderstood then, so I

14         would withdraw the objection.

15                   HEARING OFFICER FARAGO:   Okay.

16                   MR. OLTHOFF:   Your Honor, may I note that

17         it is -- without having to draw the witness to the

18         page, it is the same CSE team that developed both

19         IEPs that we're talking about.

20                   HEARING OFFICER FARAGO:   Even so, again,

21         it's not the IEP that the District's defending.

22         Unless (indiscernible) --

23                   MR. OLTHOFF:   (Interposing) Now --

24                   HEARING OFFICER FARAGO:   -- they do.

25                   MR. OLTHOFF:   Another, Parent notes in

1          response to another of Mr. Forbes's comments that

2          the claim that it would be impossible to defend the

3          February 2021 IEP because the parent had

4          unilaterally placed, however --

5                    HEARING OFFICER FARAGO:   (Interposing)

6          (Indiscernible).  I think I've already ruled on

7          that.

8                    MR. OLTHOFF:  Okay.  So okay, just one --

9          a little -- just one more, Ms. Lewin.  You did --

10         in your review of the DOE's IEP, you noted that the

11         student does -- it is noted, I'm sorry, not you, it

12         is noted in the IEP that the student does perform

13         best when she is not overstimulated, do you

14         remember seeing that?

15                   MS. LEWIN:  Yes.

16                   MR. OLTHOFF:  And in a 12:1:4 class,

17         potentially, how many adults and students could be

18         in that class?

19                   MS. LEWIN:  Just based on the ratio

20         alone, there could be at least four to five

21         standardized.  These classrooms are very large.

22                   MR. OLTHOFF:  So what if a student --

23         what if the students, all of the students, had one-

24         to-one paras?

25                   MS. LEWIN:  So then, you would add that

1    on to how many students are actually enrolled.  The

2    ratio of the classroom is up to 12 students.  That

3    does not necessarily mean that there is a total of

4    12 students at the time, so you would have to be

5    specific about what that classroom environment

6    looks like in that moment of enrollment.

7              MR. OLTHOFF:  So if you had a 12:1:4

8    classroom with students who are similar to S

9    J   , then, you would have -- if there were 12

10   students, you have a minimum of 17 adults; is that

11   correct?

12             MS. LEWIN:  I am not comfortable speaking

13   of hypotheticals about what a 12:1:3:1 would look

14   like.  I think that that question is more

15   appropriate for someone at a school-based level to

16   identify what the structure of what that ratio

17   would look like in the event that --

18             MR. OLTHOFF:  (Interposing) But --

19             MS. LEWIN:  -- every student has a one-

20   to-one because I'm not -- I can't -- I cannot

21   confirm or verify that every student in a 12:1:4

22   necessarily would have a one-to-one para or if that

23   would be (indiscernible) of the structure of that

24   class size.  So I'm not comfortable agreeing to the

25   proposal of 16 adults.  I -- I don't know.

1          MR. OLTHOFF:  But it is -- I mean the

2    CSE's job is to ensure that the student is placed

3    with students who have similar needs; is that

4    correct?

5          MS. LEWIN:  I cannot verify that all of

6    the students within the 12:1:4 will have all

7    similar needs, so I -- I cannot -- I -- I don't

8    know how I can say this.  It's more specifically

9    about what a student would benefit from and what

10   that classroom structure can offer.  Would every --

11         MR. OLTHOFF:  (Interposing) If --

12         MS. LEWIN:  -- student in a 12:1:4 have a

13   para, I do not know that.  Would they all need a

14   one-to-one nurse, I do not know that.

15         MR. OLTHOFF:  Okay.  But you have to

16   consider that possibility when you develop the

17   program for a student, correct?

18         MS. LEWIN:  I believe that it would

19   probably be unlikely.  So it's -- it's -- no, I

20   just focus on the student, individually, versus the

21   other students because the purpose of me developing

22   an IEP is support the student that needs the help.

23         So I don't necessarily consider what the

24   other students' needs may be.  It's more so about

25   if the program would be supportive enough and able

1       to offer the student an educational benefit.

2              But I do get asked this question a lot of

3       parents, who say, well, what are the other students

4       like in the classroom, does the student have this

5       problem, does the student have this problem, and I

6       do encourage those parents to really focus on what

7       their student needs and what the program can offer

8       versus the health or development or cognitive

9       ability of the other students.

10             MR. OLTHOFF:  All right.  Well, thank

11      you.

12             I don't have anything further for the

13      witness at this time, Your Honor.

14             HEARING OFFICER FARAGO:  Okay.  Mr.

15      Forbes, any redirect?

16             MR. FORBES:  None, thank you.

17             HEARING OFFICER FARAGO:  Okay.

18             Thank you so much, and you can hang up

19      now.

20             MS. LEWIN:  All right.  Thank you.  Have

21      a good day.

22             HEARING OFFICER FARAGO:  Thank you.

23             Just a note going forward, Mr. Olthoff,

24      my understanding of the law is that the

25      responsibility of the District is to group students

1          similarly, with similar needs together, but that's

2          not identical, identical needs.

3                    But more importantly, it's also my

4          understanding, for better or worse, that what the

5          District does is bifurcate the class-building

6          process from the IEP-building process and that the

7          courts have accepted that the City does that.

8                    As a result, the people building the IEP

9          really don't have any input into who the other

10         children in the class are except to the extent that

11         the IEP they develop should inform a process that

12         they don't have any further input into.

13                   Mr. Forbes, I don't think I'm misstating

14         your client's process, am I?

15                   MR. FORBES:  No, you're not.  Thank you.

16                   HEARING OFFICER FARAGO:  Okay.  Thanks.

17         Mr. Forbes, your next witness?

18                   MR. FORBES:  Yes, this is the school

19         witness, Assistant Principal Michelle LeFaivre.  I

20         would just be a moment to try and contact her --

21                   HEARING OFFICER FARAGO:  (Interposing)

22         Sure.

23                   MR. FORBES:  -- to dial in.

24                   MR. OLTHOFF:  Might I suggest that we go

25         off the record for five minutes, take a quick

58

1       bathroom break?

2                   HEARING OFFICER FARAGO:  I think that's

3       an excellent suggestion.  I'll stay around, I

4       think, but we can off the record, and those who

5       need it should take it, and we'll move forward as

6       soon as everyone's here.

7                   MR. OLTHOFF:  Okay.

8                   HEARING OFFICER FARAGO:  We're off the

9       record.

10                  THE COURT REPORTER:  It is 12:01; we're

11      off the record.

12                  (OFF THE RECORD)

13                  (ON THE RECORD)

14                  THE COURT REPORTER:  It is 12:04, and we

15      are back on the record.

16                  HEARING OFFICER FARAGO:  Okay.  I want to

17      welcome a new witness.  Would you state your name,

18      please, for the record.

19                  MS. MICHELLE LEFAIVRE:  Michelle

20      LeFaivre.

21                  HEARING OFFICER FARAGO:  Thank you.  And

22      your job description or title?

23                  MS. LEFAIVRE:  I am an assistant

24      principal.

25                  HEARING OFFICER FARAGO:  Thank you.

Exhibit 7: Page 58 of 182

1        Would you be so good as to raise your right hand,
2        and do you swear or affirm that the testimony you
3        will give is the truth, the whole truth, and
4        nothing but the truth?
5                    MS. LEFAIVRE:  Yes.
6                    HEARING OFFICER FARAGO:  Great.  We are
7        in possession a document that we've admitted into
8        evidence, and it is our Exhibit 13.  It's --
9                    MS. LEFAIVRE:  (Interposing) Okay.
10                   HEARING OFFICER FARAGO:  -- two pages in
11       length.  It has ten numbered paragraphs.  It has
12       your name typed at the end, and I don't believe I
13       can tell you anything more about it.  Oh, it's
14       dated July 9th.  Do you have a copy of a document
15       that looks like that?  Is that what you're looking
16       at as your affidavit?
17                   MS. LEFAIVRE:  I do, yes.
18                   HEARING OFFICER FARAGO:  Terrific.  Could
19       you take a moment to look over it, and just scan it
20       and tell me if there's anything in it that you want
21       to correct or --
22                   MS. LEFAIVRE:  (Interposing) Sure.
23                   HEARING OFFICER FARAGO:  -- sorry,
24       juggling (indiscernible) -- anything that you want
25       to correct, or add to, or clarify.

1          MS. LEFAIVRE:  Sure.  No, nothing to add

2     to or correct at this time.

3          HEARING OFFICER FARAGO:  Great.  Then,

4     having been sworn in, having reviewed it, does

5     this, to the best of your knowledge and belief,

6     constitute your direct testimony you wanted to

7     provide to us about S█████ J███ Donohue in  this

8     case about the 2020/'21 school year?

9          MS. LEFAIVRE:  Yes, it does.

10          HEARING OFFICER FARAGO:  Then what

11     remains is for Mr. Olthoff to have an opportunity

12     to ask you questions about it.  Mr. Olthoff, she's

13     your witness.

14          MR. OLTHOFF:  Thank you, Your Honor.

15          And thank you for joining us, Ms.

16     LeFaivre.  How are you today?

17          MS. LEFAIVRE:  Hi, I'm fine, thanks.  How

18     are you?

19          MR. OLTHOFF:  Good, good, and just as an

20     introduction, I'm going to ask some questions.  If

21     there is an objection, please wait until the

22     hearing officer resolves whether you can answer the

23     question.

24          MS. LEFAIVRE:  Understood.

25          MR. OLTHOFF:  And so I am looking at your

1    affidavit, and prior to the start of the '20/'21

2    school year, did you speak to the parent of S█████

3    J█ ?

4             MS. LEFAIVRE:  I do not recall.  I do not

5    have that information at this time.

6             MR. OLTHOFF:  And just one second.  One

7    second, I apologize, I'm looking at a couple of

8    different things.  Now, in your affidavit, you note

9    in  paragraph 8 that the student -- the Horan

10   School received a placement recommendation for

11   S█████ J█████ for the '20/'21 school year.  When did

12   the '20/'21 school year begin at the Horan School?

13            MS. LEFAIVRE:  We are a 12-month program,

14   so our school year begins July, so the 2020/'21

15   school year would have begun July of 2020.

16            MR. OLTHOFF:  Okay.  Does July 2nd ring a

17   bell as the date services started?

18            MS. LEFAIVRE:  Yeah, that does sound --

19   yes, I don't have the exact date in front of me,

20   but that does sound familiar.

21            MR. OLTHOFF:  Okay.  And in paragraph 9

22   of your affidavit, you note that the Horan School

23   could have implemented the services, either in

24   person or remotely, as of the first day of school;

25   is that correct?

1              MS. LEFAIVRE:  That is correct.

2              MR. OLTHOFF:  You're aware that this

3        student is recommended for a one-to-one

4        paraprofessional, correct?

5              MS. LEFAIVRE:  Yes.

6              MR. OLTHOFF:  Would Horan have sent a

7        paraprofessional to the student's home?

8              MS. LEFAIVRE:  No, if the family would

9        have opted for remote learning, the one-to-one

10       paraprofessional would have joined the student

11       online, on Google Classroom, which is our remote

12       platform.

13             MR. OLTHOFF:  So how would the one-to-one

14       para have been able to support the student

15       remotely?

16             MS. LEFAIVRE:  All of our -- for the

17       students that did opt for remote learning, all

18       services were provided remotely.  None of our staff

19       members were going to the home, so the -- the

20       paraprofessional would have joined on the classroom

21       with the student, would have provided supports as

22       recommended by the IEP, and as recommended by the

23       remote learning plan that would have been developed

24       had the student enrolled.

25             MR. OLTHOFF:  So for the summer of 2020,

1        there were no in-person services at Horan, is that

2        correct?

3                    MS. LEFAIVRE:  For the summer of 2020,

4        there were no in-person services, that is correct.

5        In-person services resumed in September of 2020.

6                    MR. OLTHOFF:  Did they resume fulltime

7        for all students?

8                    MS. LEFAIVRE:  No.  In September, we

9        resumed -- it was the parent and family's choice,

10       so parents and -- and families could opt either

11       for, at that time, blended in-person learning or

12       fully remote instruction.  So it would have been up

13       to the family.

14                   MR. OLTHOFF:  And did Horan ever return

15       to fully in-person services during the '20/'21

16       school year?

17                   MS. LEFAIVRE:  No.  We have -- we have

18       not.  We are still -- we still have both in-person

19       and remote students at this time.

20                   MR. OLTHOFF:  And if the parent shows to

21       be in person fulltime as of September, would they

22       have been able to choose that option?

23                   MS. LEFAIVRE:  As of September 2020, no.

24       We -- our in-person students were participating in

25       blended learning, so at that time, it was one week

1    in, one week out.  I don't have the exact date, but
2    sometime in early 2021, either January or February,
3    our in-person students did resume fulltime in-
4    person instruction.
5                    MR. OLTHOFF:  And you're aware that the
6    student is mandated to have 2 hours and 15 minutes
7    with the school nurse per day on her IEP, correct?
8                    MS. LEFAIVRE:  Yes.
9                    MR. OLTHOFF:  So during remote learning,
10   how, if at all, could that have been implemented?
11                   MS. LEFAIVRE:  During remote learning,
12   our school nurse would not been able to provide
13   services to the student.
14                   MR. OLTHOFF:  And if a parent attempted
15   to call Horan in July of 2020, after receiving the
16   school location letter, would they have been able
17   to speak to anyone?
18                   MS. LEFAIVRE:  In July 2020, there was no
19   one in the school building that would have
20   answered -- would have been able to answer a phone
21   call physically.
22                   MR. OLTHOFF:  And so would the parent
23   have been able to leave a message?
24                   MS. LEFAIVRE:  Yes, the parent would have
25   been able to leave a message at the school.

1              MR. OLTHOFF:  But Ms. LeFaivre, isn't it
2         true --
3              HEARING OFFICER FARAGO:  (Interposing)
4         Let me just ask -- a message that someone would
5         have listened to within a reasonable period of
6         time?
7              MS. LEFAIVRE:  Not until we returned to
8         the building in September.
9              MR. OLTHOFF:  Isn't it true, Ms.
10        LeFaivre, that Horan has had voicemail issues with
11        Verizon for over a year?
12             MS. LEFAIVRE:  That is true, yes.
13             MR. OLTHOFF:  So with these issues, did
14        Horan change the voicemail message or direct
15        parents to call a number where they could speak to
16        someone?
17             MS. LEFAIVRE:  No, we did not.
18             MR. OLTHOFF:  In the summer of 2020, was
19        the school open for parents to tour?
20             MS. LEFAIVRE:  It was not, no.
21             MR. OLTHOFF:  And you have been provided
22        with the District's exhibits, correct?
23             MS. LEFAIVRE:  Yes, I have.
24             MR. OLTHOFF:  Okay.  So I would like to
25        direct you to -- okay.  So I'd like to direct you

66

1              to the District's Exhibit 1, and it's page --

2              starting on page 38, so it's 1-38.  Let me know

3              when you're there.

4                      MS. LEFAIVRE:  Okay.  Just a minute.

5              Okay.  I am on 1-38.

6                      MR. OLTHOFF:  And so when Horan began

7              with remote learning in July of 2020, what time did

8              the school day start?

9                      MS. LEFAIVRE:  In July, our start is 8:10

10             a.m.

11                     MR. OLTHOFF:  8:10?

12                     MS. LEFAIVRE:  Yes.

13                     MR. OLTHOFF:  And what time did the

14             school day end?

15                     MS. LEFAIVRE:  2:40 p.m.

16                     MR. OLTHOFF:  Okay.  8:10 to 2:40.

17                     MS. LEFAIVRE:  Those are the summer hours

18             for July and August.

19                     MR. OLTHOFF:  And then, in September,

20             what time did the school day start?

21                     MS. LEFAIVRE:  Start at 8 a.m.

22                     MR. OLTHOFF:  Um-hum, and --

23                     MS. LEFAIVRE:  (Interposing) And --

24                     MR. OLTHOFF:  -- what time did the school

25             day end?

1              MS. LEFAIVRE:  -- ends at 2:50 p.m.

2              MR. OLTHOFF:  2:50.  So during the

3        summer, that's a five-and-a-half-hour school day,

4        correct?

5              MS. LEFAIVRE:  Correct.

6              MR. OLTHOFF:  And during the September,

7        it's 5 hours and 50 minutes, correct?

8              MS. LEFAIVRE:  Yes -- no, six hours.

9              MR. OLTHOFF:  Okay.  6 hours, 50 minutes?

10             MS. LEFAIVRE:  Um-hum.

11             MR. OLTHOFF:  Okay.  One second.  On page

12        38, you note that this student is recommended for

13        related services of 60 minutes; is that correct?

14             MS. LEFAIVRE:  Yes, for --

15             MR. OLTHOFF:  (Interposing) And --

16             MS. LEFAIVRE:  -- OT, physical therapy,

17        yes, and speech.

18             MR. OLTHOFF:  Yes, and on the next page,

19        it's speech and vision, as well --

20             MS. LEFAIVRE:  (Interposing) Yes.

21             MR. OLTHOFF:  -- correct?

22             MS. LEFAIVRE:  Um-hum.

23             MR. OLTHOFF:  Now, would Horan have been

24        able to implement the 60-minute sessions?

25             MS. LEFAIVRE:  Yes.

1              MR. OLTHOFF:  During -- okay.  Hold on

2       one second.  Okay.  So in addition to the 35

3       instructional periods per week?

4              MS. LEFAIVRE:  Yes.

5              MR. OLTHOFF:  How long -- how many

6       periods are in a day at Horan?

7              MS. LEFAIVRE:  We -- our current

8       schedules nine periods in the day.

9              MR. OLTHOFF:  And how long is each

10      period?

11             MS. LEFAIVRE:  Most of those periods are

12      45 minutes except for the last period, which is the

13      transition period and -- and dismissal is 30

14      minutes.  But the academic periods are 45 minutes.

15             MR. OLTHOFF:  Okay.  And one of those

16      periods per day is lunch?

17             MS. LEFAIVRE:  Yes.

18             MR. OLTHOFF:  And how long is lunch?

19             MS. LEFAIVRE:  Student lunch is 45

20      minutes, as well.

21             MR. OLTHOFF:  So it's eight instructional

22      periods per day?

23             MS. LEFAIVRE:  Yes.

24             MR. OLTHOFF:  And you note on page 1-38

25      the student is mandated to have 2 hours and 15

1          minutes with a school nurse each day; do you see
2          that?
3                    MS. LEFAIVRE:  I do, yes.
4                    MR. OLTHOFF:  Okay.  So when would this
5          take place?
6                    MS. LEFAIVRE:  It depends on when the
7          student needs the service, I guess.  I'm not quite
8          sure.  Assuming it's for lunchtime feeding, I
9          suppose, would take place at a set time that the
10         nurse would agree with the family and the doctor as
11         to when the student needs the service.
12                   MR. OLTHOFF:  So that 2 hours and 15
13         minutes with the school nurse, where would that
14         take place?
15                   MS. LEFAIVRE:  It does not indicate on
16         the IEP where the service will be provided, so I
17         can't say at this time.
18                   MR. OLTHOFF:  So given the student's
19         related service mandates, there are days when the
20         student would be receiving up to five hours of
21         related services; is that correct?
22                   MS. LEFAIVRE:  Yes, that is correct.
23                   MR. OLTHOFF:  So five hours of related
24         services and two-and-a-quarter hours with the
25         nurse, is it possible to provide that level of

1          service to the student given Horan's schedule?

2                    MS. LEFAIVRE:  It is possible.  It would

3          depend on how that schedule was set up for the

4          student.  I see that as far as the related

5          services, OT, PT, speech, vision, in terms of the

6          location being provided, it states either in the

7          special education classroom or provider's office.

8                    So based on the IEP, it seems as though

9          these could be push-in or pullout services, so I

10         suppose that would depend on how the providers and

11         the IEP team determined the services would be best

12         provided to the student.

13                   MR. OLTHOFF:  And did you review the rest

14         of the IEP --

15                   MS. LEFAIVRE:  (Interposing) Yes, I --

16                   MR. OLTHOFF:  -- when you received it?

17                   MS. LEFAIVRE:  Yes.

18                   MR. OLTHOFF:  And do you remember whether

19         the IEP recommends or how -- what percentage of

20         push in versus pullout that the IEP recommends?

21                   MS. LEFAIVRE:  I do not recall.

22                   MR. OLTHOFF:  Would -- and if the student

23         is pulled out of the classroom, is the student,

24         then, receiving the mandated instructional periods?

25                   MS. LEFAIVRE:  If the student is pulled

1    out of the classroom for related services, then,

2    no, they would not be receiving academic

3    instruction at the same time.

4              MR. OLTHOFF:  Okay.  And you did testify

5    that there was a seat in a 12:1:4 class in July of

6    2020, correct?

7              MS. LEFAIVRE:  Correct.

8              MR. OLTHOFF:  How many students were in

9    that class?

10             MS. LEFAIVRE:  At this time, I do not

11   have that information.  But there would have been

12   no more than 12 in any given classroom.  In July,

13   we had one 12:1:4 class, I believe.

14             MR. OLTHOFF:  And that one 12:1:4 class,

15   your testimony is you don't remember how many

16   students were assigned to that?

17             MS. LEFAIVRE:  Correct.

18             MR. OLTHOFF:  And do you know the age

19   ranges?

20             MS. LEFAIVRE:  I can look that

21   information up if it's needed.

22             MR. FORBES:  Please do not.

23             MS. LEFAIVRE:  Okay.

24             HEARING OFFICER FARAGO:  Did you say

25   something?

1                      MR. OLTHOFF:  I believe Mr. Forbes
2           said --
3                      HEARING OFFICER FARAGO:  (Interposing) I
4           did not -- yeah, the last I heard was I do not, and
5           then, I thought Mr. Forbes was --
6                      MR. FORBES:  (Interposing) Yeah, yes.
7           The witness --
8                      HEARING OFFICER FARAGO:  -- something
9           (indiscernible) dropped off the edge.  Go ahead.
10                     MR. FORBES:  The witness stated that she
11          could look it up, and I said, please do not.
12                     MS. LEFAIVRE:  Okay.
13                     HEARING OFFICER FARAGO:  Oh, okay.
14                     MR. OLTHOFF:  Ms. LeFaivre, in the
15          12:1:4, how are the students grouped?
16                     MS. LEFAIVRE:  Could you be more specific
17          in terms of what exactly?
18                     MR. OLTHOFF:  Well, going back to the
19          first question about the age range --
20                     MS. LEFAIVRE:  (Interposing) Yes.
21                     MR. OLTHOFF:  -- Parent doesn't have an
22          objection to the witness looking up that
23          information, so we could Your Honor to determine
24          whether she can answer that question.
25                     HEARING OFFICER FARAGO:  Tell me the

1      question again exactly.

2                    MR. OLTHOFF:   What was the age range of

3      students assigned to the 12:1:4 class?

4                    MR. FORBES:   I would object to allowing

5      the witness to use evidence outside of what is in

6      this hearing to answer a question.

7                    HEARING OFFICER FARAGO:   I think if she

8      has access to information that can answer that

9      question, which is an essential elements or speaks

10     to an essential element of the District's burden,

11     to, frankly, the District's interest, for her to be

12     able to do that.

13                    And how would you look it up?

14                    MS. LEFAIVRE:   The -- the class list of

15     last --

16                    HEARING OFFICER FARAGO:   (Interposing)

17     Yeah.

18                    MS. LEFAIVRE:   -- I would just have to go

19     back in my documents to last summer, to -- to look

20     up our class last from last year.

21                    HEARING OFFICER FARAGO:   And the specific

22     class that she would have been in.

23                    MS. LEFAIVRE:   I cannot say whether she

24     would have been in this specific class, since we

25     are an open enrollment school.   As students enroll,

1    it does change the makeup of the class list so

2    depending on how many students potentially would

3    have enrolled, it could have changed the --

4            HEARING OFFICER FARAGO:   (Interposing)

5    Okay.

6            MS. LEFAIVRE:   -- makeup of this class.

7            HEARING OFFICER FARAGO:   Okay.   But --

8            MR. FORBES:   (Interposing)

9    (Indiscernible).

10           HEARING OFFICER FARAGO:   -- as organized

11   when the class -- as organized as of July 1st, you

12   could look that up?

13           MS. LEFAIVRE:   Of -- July of 2020?

14           HEARING OFFICER FARAGO:   Yeah.

15           MS. LEFAIVRE:   Yes.

16           HEARING OFFICER FARAGO:   Could you

17   please?

18           MS. LEFAIVRE:   So you would -- so I

19   should look that up?

20           HEARING OFFICER FARAGO:   Yes, please.

21           MS. LEFAIVRE:   Okay.   I have pulled that

22   up.   There were eight students assigned to our

23   12:1:4 class, which was a fully remote class in

24   July of 2020.   So there would have been a seat

25   available.

1                    HEARING OFFICER FARAGO:  Okay.  But --
2              and what was the age range?
3                    MS. LEFAIVRE:  The age range of these
4              students was birth years 1999 to 2005.
5                    HEARING OFFICER FARAGO:  Okay.  Mr.
6              Olthoff?
7                    MR. OLTHOFF:  Okay.  So isn't it true
8              that the age range should be no more than three
9              years for students in the same class?
10                    MS. LEFAIVRE:  That is true, yes.
11                    MR. OLTHOFF:  Okay.  And so in the 12:1:4
12              class, how were the students grouped with regard to
13              functioning level?
14                    MS. LEFAIVRE:  I'm not sure I understand.
15              Do you mean how were they grouped within this one
16              class?
17                    MR. OLTHOFF:  Or how and why -- yes, or
18              how --
19                    MS. LEFAIVRE:  (Interposing) Why were
20              they placed in this class?
21                    MR. OLTHOFF:  Yes.
22                    MS. LEFAIVRE:  So these --
23                    MR. FORBES:  (Interposing) Objection.
24                    MS. LEFAIVRE:  Okay.
25                    MR. FORBES:  Objection.  It was a

1       recommended program from the CSE team and so I

2       don't think this witness has any objective

3       knowledge as to why the CSE team would have

4       recommended this class.

5               HEARING OFFICER FARAGO:  The CSE team

6       does recommend the class, Mr. Forbes.

7               MR. FORBES:  But she does not know why

8       the CSE team recommended this class for the

9       student.  She was not a part of the --

10              HEARING OFFICER FARAGO:  (Interposing)

11      You mean the 12:1:4 or -- but I don't think that --

12              MR. FORBES:  (Interposing) Correct.

13              HEARING OFFICER FARAGO:  -- was the

14      question that was asked.

15              Mr. Olthoff, would you repeat your

16      question?

17              MR. OLTHOFF:  Yes.  The question was what

18      was the functional level grouping in this 12:1:4

19      class.

20              HEARING OFFICER FARAGO:  Was that the

21      question?  I thought you had asked a follow-up to

22      that or one that -- as to how they were grouped or

23      something along those lines, how they were selected

24      to be in this class.  Did you ask that or did I --

25              MR. OLTHOFF:  (Interposing) Correct,

1         correct.  Okay.  So --
2                   HEARING OFFICER FARAGO:  (Interposing)
3         (Indiscernible).
4                   MR. OLTHOFF:  -- there is a group of
5         students in a 12:1:4 class.  So --
6                   HEARING OFFICER FARAGO:  (Interposing)
7         Right.
8                   MR. OLTHOFF:  -- the question is, what
9         was the functional level of that group or the range
10        in that group.
11                  HEARING OFFICER FARAGO:  Range, okay,
12        that's in the same (indiscernible) as the age.
13                  Do you want to answer that, please?
14                  MS. LEFAIVRE:  Yes, I actually -- I don't
15        have the -- the IEPs or any documentation in front
16        of me for these eight students, so I can't
17        accurately speak to their functioning level at this
18        time.
19                  MR. OLTHOFF:  Okay.  And so Ms. LeFaivre,
20        how many classroom paras were there in July of
21        2020?
22                  MS. LEFAIVRE:  For the -- for the 12:1:4
23        class, there would have --
24                  MR. OLTHOFF:  (Interposing) Um-hum.
25                  MS. LEFAIVRE:  -- been -- it's 12:1:2, 3

1          plus 1.  So there would have been four classroom

2          paraprofessionals and based on this list, two --

3          two of these students also had one-to-one

4          paraprofessionals, as well.

5                    MR. OLTHOFF:  And so there were full --

6          there was a full complement of four classroom

7          paras, is that correct?

8                    MS. LEFAIVRE:  Yes.

9                    MR. OLTHOFF:  And two had one-to-one

10         paras?

11                   MS. LEFAIVRE:  Yes.

12                   MR. OLTHOFF:  And did any have one-to-one

13         nurses?

14                   MS. LEFAIVRE:  I don't believe so, no.

15                   MR. OLTHOFF:  How many of these students

16         were ambulatory?

17                   MS. LEFAIVRE:  One, one of these students

18         was ambulatory, seven were wheelchair users.

19                   MR. OLTHOFF:  And how many were verbal?

20                   MS. LEFAIVRE:  Based on my knowledge of

21         these students, none of these students are verbal

22         communicators or traditional verbal communicators.

23                   MR. OLTHOFF:  And were there any students

24         who were classified as TBI?

25                   MS. LEFAIVRE:  I don't -- that, I

1           don't -- I don't have their classification

2           information in front of me, so I can't answer that

3           exactly.

4                       MR. OLTHOFF:  Did any of these students

5           receive related services in 60-minute sessions?

6                       MS. LEFAIVRE:  Again, I'm not sure as

7           I -- I don't have their documentation in front of

8           me.

9                       MR. OLTHOFF:  So does Horan provide

10          related service sessions at 60-minute sessions?

11                      MS. LEFAIVRE:  If the IEP recommends a

12          60-minute service session, then, yes, we do.

13                      MR. OLTHOFF:  And how common is this?

14                      MS. LEFAIVRE:  I would not say that it's

15          that common, but we have had students that have

16          those recommendations on their IEP.

17                      MR. OLTHOFF:  And does Horan -- would

18          Horan be able to provide the assistive technology

19          services as a related service for this student?

20                      MS. LEFAIVRE:  Can you be more specific

21          about that?  I'm sorry.  In terms of?

22                      MR. OLTHOFF:  With --

23                      MS. LEFAIVRE:  (Interposing) When you say

24          as a service?

25                      MR. OLTHOFF:  Yes, S███ J███ is mandated

1            to receive assistive technology as a related

2            service.

3                        MS. LEFAIVRE:  Yes --

4                        MR. OLTHOFF:  (Interposing) An hour a

5            day.

6                        MS. LEFAIVRE:  Yes, we would provide

7            that, yes.

8                        MR. OLTHOFF:  And who would be providing

9            those services?

10                       MS. LEFAIVRE:  I can't speak to that

11           directly.  Once the student would -- would enroll

12           in the -- in the school, then, that -- then, that

13           provider would be assigned.

14                       MR. OLTHOFF:  And do any of the other

15           students in that 12:1:4 receive assistive

16           technology as a related service?

17                       MS. LEFAIVRE:  I don't believe so, no.

18                       MR. OLTHOFF:  And do any of the students

19           receive vision education as a related service?

20                       MS. LEFAIVRE:  Yes.

21                       MR. OLTHOFF:  And are these provided in

22           60-minute sessions?

23                       MS. LEFAIVRE:  I'm not sure what the

24           service mandate is for those services that receive

25           vision services.

81

1              MR. OLTHOFF:  Now, is there a separate
2         location for occupational therapy?
3              MS. LEFAIVRE:  Yes, we do have an
4         occupational therapy room.
5              MR. OLTHOFF:  And where is it located in
6         the building?
7              MS. LEFAIVRE:  It's on the third floor,
8         room 324.
9              MR. OLTHOFF:  On the third floor.  And
10        what floor are the classrooms located?
11             MS. LEFAIVRE:  We have classrooms on all
12        three of our floors.
13             MR. OLTHOFF:  So where would the 12:1:4
14        class have been located?
15             MS. LEFAIVRE:  The current location is on
16        the first floor.
17             MR. OLTHOFF:  On the first floor.
18             MS. LEFAIVRE:  Yes.  Last July --
19             MR. OLTHOFF:  (Interposing) And --
20             MS. LEFAIVRE:  -- it was all remote.
21             MR. OLTHOFF:  Oh.
22             MS. LEFAIVRE:  But currently, our 12:1:4
23        class is located on the first floor.
24             MR. OLTHOFF:  And do you have a separate
25        location for physical therapy?

1           MS. LEFAIVRE: We do. It's --
2           MR. OLTHOFF: (Interposing) And where is
3       that located?
4           MS. LEFAIVRE: -- the same -- same room,
5       the occupational therapist and the physical
6       therapist share a room that has a divider.
7           MR. OLTHOFF: Okay. And how many
8       elevators are there in the building?
9           MS. LEFAIVRE: We have one elevator.
10          MR. OLTHOFF: And during this -- we are
11      still in the middle of this COVID pandemic. How
12      many people are allowed in the elevator at one
13      time?
14          MS. LEFAIVRE: I -- I'm not sure of the
15      capacity for the elevator. I believe that it's
16      four, from my recollection. We do have capacity
17      guidelines posted that were given to us by the DOE
18      for all of our rooms and spaces.
19          MR. OLTHOFF: So from the classroom to
20      the therapy room -- from the classroom on the first
21      floor to the therapy room on the third floor, about
22      how long did it take to do that, to get there?
23          MS. LEFAIVRE: In minutes?
24          MR. OLTHOFF: Yes.
25          MS. LEFAIVRE: I'm not sure. No more

1          than two to three minutes mostly likely.

2                    MR. OLTHOFF:   Including waiting for other

3          students and staff?

4                    MS. LEFAIVRE:   Yes, I -- I mean I suppose

5          it depends on how many other students are -- are

6          waiting.   I can't really speak to exactly how long

7          it would take at any given time.

8                    MR. OLTHOFF:   How far from the classroom

9          is the elevator?

10                   MS. LEFAIVRE:   The current location of

11         the classroom, it is across the hallway, across

12         the -- our school is sort of in a U shape, so the

13         elevator is on the other side of the U from the --

14         from the classroom, the current state of the

15         classroom.   I can't speak to where it would have

16         been last year, but the -- they would cross through

17         the middle corridor.

18                   MR. OLTHOFF:   And is there a separate

19         room for speech therapy?

20                   MS. LEFAIVRE:   Yes.   That is -- the

21         speech therapists' office is the second floor, room

22         210.

23                   MR. OLTHOFF:   And that was used -- was

24         that room used by speech therapists during the

25         '20/'21 school year?

1           MS. LEFAIVRE:  Yes.

2           MR. OLTHOFF:  And where are the vision

3     services provided?

4           MS. LEFAIVRE:  The vision providers use

5     also a room on the second floor.  It -- I believe

6     it's room 218.

7           MR. OLTHOFF:  So in those rooms, are

8     those rooms for the therapists to, like, as kind of

9     like a planning room or are those rooms where they

10    see students?

11          MS. LEFAIVRE:  Both.

12          MR. OLTHOFF:  So I'm not sure if I asked

13    this exactly directly before, but in the speech

14    room that you mentioned, are students seen in that

15    room for speech therapy?

16          MS. LEFAIVRE:  Not often, but they have

17    seen students in that room.  We have also had

18    situations where if students are receiving pullout

19    services and the speech providers need another

20    space to provide services, they'll request another

21    space, and we've -- we've used other spaces in the

22    building, as well, depending on the time of day and

23    the -- and the class schedules.

24          MR. OLTHOFF:  Isn't it true that the

25    speech room is just a room with desks and chairs

1          for the speech therapist?

2                 MS. LEFAIVRE:  Yes, the -- the speech

3          therapists do have desks and chairs.  They have

4          seen students in there, depending on who else is in

5          the room.  Like I said, not frequently, and in many

6          cases, if they need to pull someone out, they'll

7          request a separate location, and we have had --

8          identified other spaces for specific times for use.

9                 MR. OLTHOFF:  Okay.  Now, I did ask if

10         you spoke to the parent at any time prior to the

11         start of the '20/'21 school year.  I believe your

12         answer was you don't remember.

13                MS. LEFAIVRE:  That's correct.  I don't

14         recall.

15                MR. OLTHOFF:  Did you speak with the

16         parent at any time during the '20/'21 school year?

17                MS. LEFAIVRE:  I -- I believe so, yes.

18                MR. OLTHOFF:  Are you aware that the

19         parent attempted to call in July but was unable to

20         leave a message?

21                MS. LEFAIVRE:  I was not aware, no.

22                MR. OLTHOFF:  And are you aware that the

23         parent was finally able to leave two messages with

24         Ms. Jackson on June 21st and Ms. Perez on June

25         23rd?

86

1                    MS. LEFAIVRE:   I was not specifically
2          aware of that, no.
3                    MR. OLTHOFF:   And were you aware that the
4          parent was told that Ms. Maribelle would call him
5          back?
6                    MS. LEFAIVRE:   No.
7                    MR. OLTHOFF:   And are you aware that Ms.
8          Maribelle never called him back?
9                    MS. LEFAIVRE:   No, I was not aware.
10                   MR. OLTHOFF:   And do you -- but you did
11         say that you spoke to the parent, correct?
12                   MS. LEFAIVRE:   I -- I was under the
13         impression that someone did speak to the parent
14         this year, so I wasn't sure if it was prior to the
15         start of the 2020 school year.  But I do recall the
16         student -- the parents -- that someone spoke to the
17         parent.
18                   MR. OLTHOFF:   Do you remember calling the
19         parent on June 30th and scheduling a call for July
20         1st?
21                   MS. LEFAIVRE:   Yes.
22                   MR. OLTHOFF:   And do you remember
23         speaking to the parent the following day, on July
24         2nd?
25                   MS. LEFAIVRE:   I can grab my notes if --

1          yes, I believe so.

2                          MR. OLTHOFF:  And at Horan, how many

3          6:1:1 classes were there during the '20/'21 school

4          year?

5                          MS. LEFAIVRE:  How many 6:1:1 classes?

6          I'm sorry.

7                          MR. OLTHOFF:  Sorry, on July 1st, 2021.

8                          MS. LEFAIVRE:  Sorry, if you'll give me a

9          moment.  I would have to look that up again.  All

10         right.  On July 1st of 2020, there were nine 6:1:1

11         classes.

12                         MR. OLTHOFF:  There were how many?  I'm

13         sorry.

14                         MS. LAFAIVRE:  Nine.

15                         MR. OLTHOFF:  Nine.  At the beginning of

16         the -- during the 2020/2021 school year, there were

17         nine.

18                         MS. LAFAIVRE:  Yes.

19                         MR. OLTHOFF:  And in these 6:1:1 classes,

20         what was the classification of the students?

21                         MS. LAFAIVRE:  It varies.

22                         MR. OLTHOFF:  But was there a predominant

23         classification?

24                         MS. LAFAIVRE:  I -- I mean, the

25         predominant classification in our 6:1:1 classrooms

1        is -- is autism, but not all students are

2        classified with autism.

3                    MR. OLTHOFF:  Okay.  So in the classes

4        where the students would have been within S█████

5        J███ 's age range, are you -- do you know if there

6        was a predominant classification?

7                    MS. LAFAIVRE:  No, I do not.  I would

8        have to look through each class based on her age.

9                    MR. OLTHOFF:  Okay.  So I am going to

10       refer you to one of the Parent's exhibits.  Were

11       you provided with the Parent's exhibits?

12                   MS. LAFAIVRE:  I believe so.  Is it in

13       the same document that you had referenced?

14                   MR. OLTHOFF:  That would have been the

15       District's.

16                   MS. LAFAIVRE:  Okay.  Oh yes.  Yes, I

17       have been provided with that, yes.  I see the

18       second attachment.

19                   MR. OLTHOFF:  All right.  I would like

20       you to look at the Parent's Exhibit M.  M, as in

21       Mike.

22                   MS. LAFAIVRE:  Okay.

23                   MR. OLTHOFF:  Page M-46.

24                   MS. LAFAIVRE:  Sorry.  I'm trying to

25       locate it here.  What is the -- the title on the

1    page?  I'm sorry.

2                    MR. OLTHOFF:  On the top of M-46, it says

3    special education program, recommended special

4    education program and services.  If it is -- if you

5    are looking at the one PDF document, it is page 279

6    of the PDF.

7                    MS. LAFAIVRE:  Okay.  Page numbers --

8    279.  Okay.  I'm here, recommended special

9    education programs and services.  Sorry about that.

10                    MR. OLTHOFF:  No worries.  Are you -- you

11    see on this page that during the 2020/2021 school

12    year S█████ J██ was recommended for a one-to-one

13    nurse; is that correct?

14                    MS. LAFAIVRE:  Yes, one-to-one nurse.

15                    MR. OLTHOFF:  And did you discuss

16    anything about one-to-one nursing services with the

17    parent?

18                    MS. LAFAIVRE:  When I spoke with the

19    parent on July 1st?

20                    MR. OLTHOFF:  Yes, or July 2nd of 2021.

21                    MS. LAFAIVRE:  Yes, we did speak about --

22    about nursing.

23                    MR. OLTHOFF:  And did you tell the parent

24    how the nurse gets assigned?

25                    MS. LAFAIVRE:  No, I believe I told the

1          parent that I needed to -- he -- he asked to speak

2          to someone for more information about nursing, and

3          I told him I would get back to him with that

4          information for someone he could speak to.

5                     MR. OLTHOFF:  Okay.  Did you indicate to

6          the parent that a different office handles that

7          assignment?

8                     MS. LAFAIVRE:  Yes, the Office of Nursing

9          would assign someone.  That we as administrators

10         don't assign nurses.

11                    MR. OLTHOFF:  And did you call the parent

12         back with that information?

13                    MS. LAFAIVRE:  No, I'm still working on

14         gathering that information for the parent.

15                    MR. OLTHOFF:  Okay.  One second.  Just

16         one second.  I'm looking at my notes.

17                    MS. LAFAIVRE:  Sure.

18                    MR. OLTHOFF:  Okay, Your Honor, I don't

19         have any more for Ms. LeFaivre at this time.

20                    HEARING OFFICER FARAGO:  Okay.  Redirect,

21         Mr. Forbes?

22                    MR. FORBES:  None, thank you.

23                    HEARING OFFICER FARAGO:  Okay.  You can

24         hang up, Ms. LeFaivre.

25                    MS. LEFAIVRE:  Okay, thank you so much.

1                    HEARING OFFICER FARAGO:  You can hang up.

2                    MS. LEFAIVRE:  Okay, thank you.

3                    HEARING OFFICER FARAGO:  Thank you.  Mr.

4          Forbes, anything further?

5                    MR. FORBES:  Nothing further from the

6          Department.  The Department rests.  Thank you.

7                    HEARING OFFICER FARAGO:  Thank you so

8          much.

9                    Mr. Olthoff, an opening statement?

10                   MR. OLTHOFF:  Yes, Your Honor.  A brief

11         opening, and then we will get -- let me notify Ms.

12         Semm that she be on call, ready to call in.

13                   HEARING OFFICER FARAGO:  Okay.

14                   MR. OLTHOFF:  I'm going to send her a

15         quick text then.  All right, thank you.  I can

16         start.

17                   So this case is about S▆▆ J▆▆.  S▆▆

18         J▆▆ is a medically fragile, teenage girl, who as a

19         result of her traumatic brain injury has highly

20         intensive management needs, educational needs,

21         health management needs, all of which require a

22         high degree of support and intervention throughout

23         the school day.

24                        S▆▆  J▆▆ has intensive and unique

25         educational and medical needs resulting from her

1    TBI, traumatic brain injury.  Her diagnoses include

2    cerebral palsy, spastic quadriplegic cerebral

3    palsy, Lennox-Gastaut syndrome, seizure disorder,

4    cortical vision impairment, and is legally blind.

5                S███  J███ has attended the International

6    Institute for the Brain, also known as iBrain, at

7    public expenses since the '18/'19 school year.

8                In an unappealed FOFD concerning the

9    '19/'20 school year found that the DOE denied S███

10   J███ FAPE for that school year, that iBrain was

11   appropriate, and that the equities favored the

12   parents regarding a full tuition with services.

13               Parent's position in the instant hearing,

14   the DOE failed to offer or provide S███ J███ with

15   a FAPE for the '20/'21.  As an initial matter, DOE

16   should not even be defending the April 2020 IEP.

17   The New York regulations are clear.  The District

18   has to have an IEP in place at the beginning of

19   every school year.  There can be no delay in

20   implementing a student's IEP.

21               Although the IEP was developed on April

22   22nd, 2020, parent did not receive a notice or a

23   placement letter until July 7th, after the '20/'21

24   school year had started.

25               The case law is unequivocal.  The parent

1    has a legal right to receive information about a

2    District's offer of placement before the beginning

3    of the school year.  In this, DOE has failed its

4    most basic and fundamental obligation.

5           As noted, the prior written notice and

6    school location letter did not arrive until July

7    2nd, in clear violation of IDEA and New York

8    regulations.

9           In at least now ten cases involving

10   iBrain students, where DOE failed to issue a prior

11   written notice before the start of the 2020 school

12   year, including at least two before Your Honor, DOE

13   failed to defend its placement because DOE

14   acknowledged that the placement recommendation and

15   the IEP was per se invalid.

16          In at least three cases, where DOE

17   defended its IEP, despite the late PWN, hearing

18   officers found that this alone constituted denial

19   of FAPE for that school year.

20          In another case where the IHO did not

21   find that the late PWN was a denial of FAPE, the

22   SRO subsequently reversed on those grounds.

23          Regardless of this egregious procedural

24   error that is a per se denial of FAPE for S

25   J   , the April 22nd, 2020, IEP is also

1          substantively deficient and provides numerous other

2          ways upon which to find denial of FAPE.

3                    What the CSE did get right was its

4          adoption of nearly every jot and tittle of the

5          iBrain recommended IEP, and to that end, the

6          testimony of the DOE's CSE witness is actually in

7          support of the program that S█████ J████ received at

8          iBrain during the 2020/2021 school year.

9                    What the CSE got wrong was its failure to

10         adopt all of iBrain's related service

11         recommendations, most egregiously is the failure to

12         recommend the one-to-one nurse and the failure to

13         recommend music therapy, despite its own IEP noting

14         that the student received a benefit from music

15         therapy.

16                   The one-to-one nurse in the school and

17         during transportation are each independent bases

18         for finding that DOE denied S█████ J████ FAPE.  In

19         addition, the DOE's recommendation of a 12:1:4

20         class is inappropriate for S█████ J████.

21                   Despite S█████ J████'s need noted in the

22         IEP that the student requires an environment that

23         is not overly stimulating, the CSE then proceeded

24         to recommend a classroom placement that could have

25         up to 36 people in it, 37 people in it.

1              Despite noting in its own IEP and listing

2         the comprehensive report and evaluation of the

3         music therapist, noting that the music therapy is

4         providing a benefit in her self-regulation and in

5         her motivation and in her ability to soothe, DOE

6         failed to recommend the service.

7                   DOE additionally --

8                   HEARING OFFICER FARAGO:   (Interposing)

9         Did somebody just join us?

10                  MR. OLTHOFF:   Did we lose someone?

11                  MS. TIFFANY SEMM:   Hi, it's Tiffany.

12                  MR. OLTHOFF:   Oh, hi.

13                  HEARING OFFICER FARAGO:   Okay.   Let me

14        just ask you, Mr. Olthoff, is it already from your

15        vantage point that Ms. Semm hears the remainder of

16        your opening, or shall we curtail it and you pick

17        it up at the end?

18                  MR. OLTHOFF:   It's fine with me.   I only

19        have a little bit more to go.

20                  HEARING OFFICER FARAGO:   Mr. Forbes, do

21        you have a preference?

22                  MR. FORBES:   I would prefer that she dial

23        back in.

24                  HEARING OFFICER FARAGO:   Well, we can

25        also, I think -- I don't feel a compelling need to

1           hear the remainder of your opening before her

2           testimony, and she's here now. So if it's okay

3           with you, Mr. Olthoff, why don't we just interrupt

4           you. You make a mark somewhere, and you can pick

5           up --

6                     MR. OLTHOFF: Okay.

7                     HEARING OFFICER FARAGO:  -- anything you

8           want to tell me at the end after she's done.

9                     MR. OLTHOFF: Yes. That's fine.

10                     HEARING OFFICER FARAGO: Okay.

11                     MR. OLTHOFF: I will end there, and we

12           can proceed with Ms. Semm.

13                     HEARING OFFICER FARAGO: Okay. So Ms.

14           Semm, welcome. As you've heard, Mr. Olthoff is

15           here. Mr. Forbes, the District's attorney, is here

16           as well. Mr. Donohue is here, the parent. We have

17           a reporter. We have me. I'm John Farago. I'm the

18           hearing officer. Now we have you.

19                     MS. SEMM: How are you?

20                     HEARING OFFICER FARAGO: Welcome. How

21           are you?

22                     MS. SEMM: I'm okay.

23                     HEARING OFFICER FARAGO: Would you state

24           your name, please, for the record?

25                     MS. SEMM: Sure, my name is Tiffany Semm.

1              HEARING OFFICER FARAGO:  Can you spell

2         your last name, please?

3              MS. SEMM:  Sure.  It's S-E-M-M.

4              HEARING OFFICER FARAGO:  Great.  Would

5         you be so good -- oh, and would you tell us a job

6         description or title?

7              MS. SEMM:  Sure, I'm the director of

8         special education at iBrain.

9              HEARING OFFICER FARAGO:  Thank you.  And

10        would you be so good as to raise your right hand

11        and do you swear or affirm that the testimony you

12        will give is the truth, the whole truth, and

13        nothing but the truth?

14              MS. SEMM:  Yes, I do.

15              HEARING OFFICER FARAGO:  Thank you.  That

16        being said, do you have a copy of your affidavit

17        that you could take a look at?

18              MS. SEMM:  I do.

19              HEARING OFFICER FARAGO:  Great.  If you

20        would make that available to yourself, I -- my copy

21        is 4 pages long, and it has 14 numbered paragraphs.

22        It has your name typed at the end.  It has no date,

23        though it does mention the month of July.

24              Does that comport with the document

25        you're looking at?

1        MS. SEMM:  Yes, it does.

2        HEARING OFFICER FARAGO:  Okay.  Could you

3    take a look at it, then, let me know if there's

4    anything you want to correct or clarify or add to?

5        MS. SEMM:  I believe this is correct as

6    it's written.

7        HEARING OFFICER FARAGO:  Okay.  That

8    being the case and having been sworn in, to the

9    best of your knowledge and belief, does this

10   constate the testimony you want to provide about

11   S█████ J████ Donohue for the 2020/2021 school year?

12       MS. SEMM:  Yes, it does.

13       HEARING OFFICER FARAGO:  Great.  So we

14   have already admitted it into evidence as, I

15   believe, Exhibit T, as in Tom.  And that means that

16   all that's left is for Mr. Forbes to be able to

17   cross-examine you.

18       Mr. Forbes, she's your witness.

19       MR. FORBES:  Thank you.

20       Now, Ms. Semm, you testified that -- I

21   mean, you stated in your affidavit that you

22   participated in the April 22nd, 2020, IEP meeting,

23   correct?

24       MS. SEMM:  That's correct, yes.

25       MR. FORBES:  And you would be familiar

1           with the iBrain recommended program for this
2           student for the 2020/2021 school year that is in
3           evidence at DOE Number 10, correct?
4                      MS. SEMM:  Do you want me to pull that
5           specific document up?  I think there were actually
6           two -- I think there may have been actually two DOE
7           IEPs that were in effect for that school year.  So
8           can I --
9                      MR. FORBES:  (Interposing) Listen to my
10          question.  You were familiar with iBrain's
11          recommended individualized education plan for the
12          2020/2021 school year that is in evidence at DOE
13          Number 10, correct?
14                     MS. SEMM:  I -- I would need to look at
15          which one is --
16                     HEARING OFFICER FARAGO:  (Interposing) I
17          believe, Mr. Forbes, that she said she needed to
18          look at your evidence packet in order to make sure
19          that document is the document she thinks is that
20          IEP.
21                     MR. FORBES:  Not a problem.  And that's
22          Exhibit 10, Ms. Semm.  Let me know when you're and
23          have reviewed.
24                     MS. SEMM:  I'm sorry, what was the
25          exhibit number?

1              MR. FORBES:  Number 10.

2              MS. SEMM:  Okay.  So my DOE Exhibit 10 --

3      this is actually a little odd.  So for some reason,

4      my exhibit packet jumps from 9 to 11.  Is there a

5      way that I could be sent another exhibit packet for

6      the DOE?

7              MR. OLTHOFF:  Hold on.  I'm sorry.  I

8      think I -- yes, I will send it -- I will send it

9      right away.  Okay, I am forwarding it to Ms. Semm.

10             MS. SEMM:  Okay.  I'm just downloading

11     that now.  Okay.  Okay, I now have Exhibit 10.

12     Okay.  Yeah, the one from the meeting in April of

13     2020.  Yes, I am familiar with that recommendation

14     in this document.  Did I lose everyone?

15             HEARING OFFICER FARAGO:  No, the real

16     question is did you lose Mr. Forbes.  Mr. Forbes,

17     are we here?

18             MR. FORBES:  Sorry, sorry, sorry.

19             HEARING OFFICER FARAGO:  No problem.

20             MR. FORBES:  Hit the mute button.  I

21     apologize.

22             HEARING OFFICER FARAGO:  Not a problem.

23             MR. FORBES:  Thank you, Ms. Semm.  Could

24     you explain how your program developed this

25     document?

1           MS. SEMM:  Sure.  So the process really

2       began around January or February.  We start

3       reassessing the students to see what their progress

4       is and the goals that they were working on for the

5       '19/'20 school year.

6           And then we perform some standardized

7       assessments across different disciplines to have

8       that measure of their progress as well.  Then each

9       of the providers talks to the parent regarding

10      their priorities regarding the child's performance,

11      any specific skills that they want to address for

12      the upcoming year.

13          We then have an internal meeting, where

14      all of those goals that have already been discussed

15      with the parent are then discussed amongst the

16      staff so that we can make sure that we have an

17      interdisciplinary approach, and everyone knows

18      where, you know, what everyone else is focusing on,

19      the requires they're going to use.

20          From that point, people start entering in

21      all of that assessment data and the goal data into

22      one shared document, which eventually ends up

23      becoming the document that's before you at DOE

24      Exhibit 10.

25          That document is reviewed and edited by

1   department heads for each different department, and

2   then once that review is completed, I do the final

3   review, which I -- which I do for all the IEPs.

4           We send it to the parent, and the parent

5   reviews it.  We have -- and then we had S████

6   J███'s case another meeting with the parent and the

7   team at the parent's request, and then we will make

8   any changes or adjustments on the basis of that

9   meeting.

10          And then once we have a final version,

11  it's -- was sent to CSE 9.

12          MR. FORBES:  Okay, thank you.  Now, in

13  terms of your school's recommended program and

14  services, has it changed since the student started

15  your program in 2018?

16          MS. SEMM:  Yes, there have been changes.

17          MR. FORBES:  Okay, and what were those

18  changes?

19          MS. SEMM:  The most notable change, the

20  one that I can recall specifically is the music

21  therapy addition.  That was probably the biggest

22  change.

23          MR. FORBES:  Okay.  Other than music

24  therapy, what other changes occurred?

25          MS. SEMM:  I remember the nurse was added

1      right around that time, but I don't remember if

2      that was -- which exact school year that fell into.

3      Other than that, the recommendations, to my

4      recollection, have been pretty consistent.

5                Okay.  So it's your testimony that you

6      believe since 2018 only -- you believe music

7      therapy and you believe the one-to-one nurse was

8      added to her program and services?

9                MS. SEMM:  My testimony was that I know

10     music therapy was added since then, and I know that

11     nursing was added around 2018, but I don't remember

12     the specific time.

13               MR. FORBES:  Okay, no problem.  No

14     problem, thank you.  Okay.  Now, would you classify

15     the student as an early learner?

16               MS. SEMM:  I'm not familiar with what

17     that term means.

18               MR. FORBES:  Okay.  Academically, what

19     level is the student on?

20               MS. SEMM:  S███  J███  is working

21     basically at a pre-K to early kindergarten level in

22     both math and ELA.

23               MR. FORBES:  Since 2008 or in 2018 when

24     the student started, what were her academic levels

25     at that point?

1            MS. SEMM:  She was at a pre-K level at
2       that time.
3            MR. FORBES:  Okay.  Now, I see from the
4       class schedule that the student received
5       approximately an hour and a half of daily living
6       skills per day, correct?
7            MS. SEMM:  I would have to pull up the --
8       is there a specific exhibit that you're referring
9       to?
10           MR. FORBES:  Sure.  Not a problem.  It is
11      Exhibit G, as in goat.
12           MS. SEMM:  Okay.  Okay.  So we do have --
13      I guess on my reading, we have 8:30 to 9 for
14      activities of daily living.  And then 4 to 4:30.
15      So I think that would add to one hour by my math.
16           MR. FORBES:  Okay.  Yes, so five days,
17      one hour of ADL services per day, correct?
18           MS. SEMM:  I wouldn't classify them as
19      services, but yeah.
20           MR. FORBES:  Sorry.  Class, correct?
21           MS. SEMM:  Yeah, they're activities and
22      opportunities for S    J   to practice the self-
23      care and daily living skills that she's learning in
24      her therapies generalized into the school day.
25           MR. FORBES:  Now, do you track progress

1    or have any goals for these daily living skills?

2                    MS. SEMM:  Actually, yes.  So if we can

3    go back to Exhibit 10.

4                    MR. FORBES:  So your question is yes --

5                    MS. SEMM:  (Interposing) Yes.

6                    MR. FORBES:  -- there are goals or

7    progress.  Okay.  Could you turn to Parent's

8    Exhibit H, which would be the next one, and show

9    exactly where the goals or progress for these daily

10   living skills are portrayed?

11                   MS. SEMM:  Sure.  Give me just a moment.

12   Okay.  So if you turn to page -- it's a little hard

13   to read it, but I think it's H-5.  So the annual

14   goal reads in one year S███ J██ will improve

15   academic self-care skills.

16                   And so some of these benchmarks relate

17   directly to the activities that she does during

18   ADLs.  So specifically looking at Benchmark 3,

19   S███ J██ will engage in dressing, choosing

20   appropriate clothing items, this is something that

21   she does, for example, during the ADLs in the

22   afternoon.  She can -- often she will need a change

23   of clothes.  She will help to say, you know, if she

24   needs a jacket when she's leaving, choosing her

25   clothing items.

1             And Benchmark 4, S███ J███ will wipe her

2      face with a cloth with minimal tactile and verbal

3      cues.  Again, this is one of the ADL skills that

4      would fit into that time period.

5             MR. FORBES:  Okay.  Now, is the -- who is

6      teaching or with S███ J███ during these ADL

7      classes?

8             MS. SEMM:  So again, I wouldn't classify

9      them as therapy or classes.  The activities are

10     typically performed by the paraprofessional and

11     supervised by the teacher.

12            They work on them within the context of

13     the therapy sessions, and then they're generalized

14     into the school day at the time indicated on the

15     schedule, along with additional ADL skills.

16            MR. FORBES:  Okay.  So I see this -- you

17     pointed us to one where it's based on an

18     occupational therapy progress report, correct?

19            MS. SEMM:  Yes.

20            MR. FORBES:  So does the occupational

21     therapist cover these benchmarks in the ADLs time

22     frame?

23            MS. SEMM:  I believe I just answered that

24     question, but the ADLs are typically performed by

25     the paraprofessional.  Sometimes the therapist will

1    go in early in the morning.  For example, S█
2    J██, as we just looked at her schedule, has an OT
3    time slot at 9.
4              So sometimes they will get there a little
5    bit early, for example, to assist with that, and
6    they work on providing training to the paras during
7    the occupational therapy session so that the paras
8    can carry out these activities during the
9    designated ADL time.
10             MR. FORBES:  So during occupational
11   therapy sessions for S██  J██, the occupational
12   therapist also teaches the paraprofessional certain
13   instructions, and then the paraprofessional uses
14   those instructions during these ADLs courses?
15             MS. SEMM:  Yes.
16             MR. FORBES:  Okay.  And how -- and it's
17   one occupational therapist who is providing
18   occupational therapy to S██  J██ and instructing
19   her paraprofessional at the same time?
20             MS. SEMM:  Yes.  So as the occupational
21   therapist is carrying out the activities with S█
22   J██, she's providing daily demonstrations to the
23   paraprofessional on how to carry out these
24   activities.
25             And this way, the paraprofessional

1    becomes familiar with what to do and how to carry

2    out these activities so that they can be

3    generalized into the rest of her day, and S█████

4    J███ can have more opportunities to practice these

5    skills (indiscernible).

6                    MR. FORBES:  Understood.  Now,

7    considering it is -- now, withdrawn.

8                    This process is not only unique to

9    occupational therapy but also to speech and

10   language and physical therapy services, as well,

11   correct?

12                   MS. SEMM:  Yes, this process of the

13   therapist being able to demonstrate and teach

14   skills to the paraprofessional so it can be carried

15   over is a hallmark of our program across

16   disciplines.

17                   MR. FORBES:  Understood.  Now,

18   considering it's licensed individuals instructing

19   an unlicensed individual to provide these services

20   when the licensed individual is not present, why

21   has your school taken that approach?

22                   MS. SEMM:  Well, that's a good question.

23   So the generation of skills is a really key

24   factor -- an important area that students with

25   brain injury need to have addressed specifically.

1           Because of the nature of their executive

2      functioning skills being impaired, and in S█████

3      J███ 's case, being significantly impaired, they do

4      need additional help and support to practice skills

5      across a different -- a range of environments.

6           So they are at a really high risk for

7      becoming context-dependent.  You know, if they only

8      practice a skill, you know, with one person or only

9      at one time a day or only in one physical

10     environment, that environment itself becomes a

11     trigger or a precondition of them practicing the

12     skill.

13          So what we do is that, you know, our

14     students need support to practice that skill across

15     disciplines, across areas so that's the role of the

16     paraprofessional is to help them to generalize

17     those skills.

18          So just the same way that parents learned

19     skills and parent counseling and training that they

20     can apply to the home context, the

21     paraprofessionals -- they may not know all the

22     technicalities of, you know, why something is being

23     done a certain way, but they can certainly learn,

24     you know, how to help S█████ J███ to position, you

25     know, what's the best position for her to be in

1          while she's making -- while she's brushing her hair

2          or washing her face or --

3                    All of those things can easily be learned

4          the same way that they are taught to parents, and

5          it enables S███ J███ to have more practice in

6          generalizing and also more practice in the actual

7          skill so that she can develop the neural patterns

8          and understand, you know, motor planning needed to

9          execute them.

10                   MR. FORBES:  So in terms of providing

11         these progress reports, how much input does the

12         paraprofessional have?

13                   MS. SEMM:  They're not involved.  The

14         therapists use their clinical judgment to complete

15         the progress reports based on what they see in the

16         therapy sessions.

17                   MR. FORBES:  So even though the

18         paraprofessional is being instructed to provide

19         certain  services, one-on-one --

20                   MS. SEMM:  (Interposing) Again, they're

21         not services.

22                   MR. FORBES:  -- with this student --

23         well, what would you classify it as, so we can use

24         your --

25                   MS. SEMM:  (Interposing) They're --

1       they're -- they're -- they're teaching S    J
2       specific skills to complete daily living
3       activities.
4               MR. FORBES:  And so what would you call
5       the process of teaching her these activities?  A
6       class?  A program?  A service?  What would you like
7       me to refer --
8               MS. SEMM:  (Interposing) They're --
9       they're -- they're activities.  They're activities
10      of daily living.
11              MR. FORBES:  Okay.  So teaching
12      activities then.  All right.
13              HEARING OFFICER FARAGO:  But they are
14      instructional, based on what you just said.  She's
15      being taught them.  The activities themselves are
16      activities, but she's being -- they may be modeling
17      it or otherwise, but it is instructional, in a
18      sense, isn't it?
19              MS. SEMM:  Yes.  I just -- I just don't
20      believe that they're services because they're
21      not -- they're not a related service.  They're not
22      being provided by a clinician.
23              HEARING OFFICER FARAGO:  Right.  I
24      understand.  What you've described is that she --
25      that instruction is being provided by a

1          paraprofessional most of the time.

2                    MR. FORBES:  Adn so is it because you

3          believe that due to the fact that the

4          paraprofessional is the one providing these

5          learning activities that the paraprofessional

6          should not have an input as to the progress the

7          student is making?

8                    MS. SEMM:  No, that's not the reason.

9                    MR. FORBES:  Okay, so why is it that the

10         paraprofessional who does provide different and

11         several different activity instruction not have

12         input as it relates to these benchmarks that the

13         paraprofessional was taught to address?

14                   MS. SEMM:  So the reason is that the

15         language of the progress report and the goals is

16         very discipline-specific.  And the terms are used

17         in a way that's very specific to each discipline.

18                   So for example, when they talk in the

19         goals about what moderate physical assistance is or

20         what sustained pressure is, there's specific

21         meaning to those terms that the occupational

22         therapy department has an agreed way that that term

23         is being measured.

24                   They know how to measure -- they've been

25         taught in occupational therapy school or physical

1        therapy school how to -- how to judge and measure

2        muscle activation and how much of an activity, you

3        know, is being done by a child versus how much

4        support is being given by an adult.  And then

5        there's a ranking scale for what that percentage

6        translates to in terms of a mild -- you know,

7        minimal, moderate, maximum level of support.

8              So that's very specific training that

9        that is specific per discipline, and it's specific

10       to the training that they undertake as a part of

11       their licensure.

12             That is the wording that is used in a

13       very deliberate and specific way in the IEP goals,

14       and that is why that the clinicians are the ones

15       that make the judgment as to how the progress that

16       the child is making toward those specific goals

17       based on their clinical assessment of where S

18       J    is performing at that time.

19             So the additional support and -- and

20       practice that they're getting from the

21       paraprofessional is one thing, but in terms of

22       rating her actual progress towards the goals, that

23       requires the clinical judgment of the therapist.

24             MR. FORBES:  Understood.  Now, as it

25       relates to the progress you just stated, you also

1          mentioned that the student should be doing these

2          skills with multiple individuals, correct, in order

3          to generalize the skills?

4                    MS. SEMM:  Yes, that's correct.

5                    MR. FORBES:  So is it possible that the

6          student could make progress with the

7          paraprofessional that the licensed clinicians would

8          not necessarily see due to a different

9          relationship?

10                   MS. SEMM:  I -- I would find that --

11         first of all, I would find it an unreliable report

12         of progress from the paraprofessional if it wasn't

13         witnessed by a clinician for the reasons that I

14         stated previously.

15                   I think that there can be discrepancies

16         in children's performance from individual to

17         individual, but that's why we collect data over the

18         course of a quarter with -- from the judgment of

19         trained clinicians in order to develop a progress

20         report.

21                   MR. FORBES:  So therefore, no matter what

22         the paraprofessional reports, if it is not

23         witnessed or seen by a licensed clinician, then it

24         is of no relevance.

25                   MS. SEMM:  Well, it's not that it's not

1    relevant.  It's that it's not going to be the basis
2    for a progress report.
3                MR. FORBES:  Understood.  Thank you.
4    Now, in your affidavit, you stated that you
5    attended the April 22nd, 2020, meeting and agreed
6    with the recommendations for OT, PT, speech and
7    language, vision education services, but
8    specifically for the program, you disagreed with
9    the 12:1:3:1 class in a D-75 public school as well
10   as the lack of a one-to-one fulltime nurse,
11   correct?
12               MS. SEMM:  Yes, that's correct.
13               MR. FORBES:  Okay.  Now, at iBrain, does
14   the student receive related services pushed in or
15   pulled out?
16               MS. SEMM:  We follow a push-in and
17   pullout model.  So our target -- and we're pretty
18   close to it -- is about a half and half model.  So
19   sometimes it could be, you know, one whole session
20   that's pulled out and then another one that's fully
21   pushed in, or it could be half and half within a
22   session where, you know, maybe they join the class
23   to work on some activities in the classroom for the
24   first half of the session and then pullout of the
25   classroom to work on other activities outside for

116

1         the second half.  So it's pretty even split.

2                     MR. FORBES:  Okay, and including S███,

3         there are six total students in the class, correct?

4                     MS. SEMM:  Yes.  That's correct.

5                     MR. FORBES:  And does each student have a

6         one-to-one paraprofessional?

7                     MS. SEMM:  They do.

8                     MR. FORBES:  And does each student have a

9         one-to-one nurse?

10                     MS. SEMM:  No, of the six, three of them

11        do.

12                     MR. FORBES:  Okay.  So half of them have

13        one-to-one nurses.  Do the -- any of the other

14        students have any additional supports in class with

15        them?

16                     MS. SEMM:  No, they -- they -- that's

17        just the one-to-one para, and then for the three,

18        they have the one-to-one nurses, and that

19        constitutes their specialized one-to-one support.

20                     MR. FORBES:  Okay, not a problem.  Now,

21        these students also have similar or -- yes, similar

22        related service mandates as S███?

23                     MS. SEMM:  Yes, they do.

24                     MR. FORBES:  Okay, and they also follow

25        the same push-in/pullout system that you previously

1        spoke about, correct?

2                    MS. SEMM:  Yes, that's correct.

3                    MR. FORBES:  Okay.  So during the day,

4        there are, in fact, more than four adults in the

5        room with S███ at the same time, correct?

6                    MS. SEMM:  Yes, I would say that is

7        generally correct.

8                    MR. FORBES:  Okay.  And would you say

9        that at any given time during the day there are

10       more than ten adults in the room?

11                   MS. SEMM:  I would say most of the time

12       when I go not S███ J███'s classroom, which I do on

13       a daily basis, I've never seen it -- or maybe one

14       time seen it up to ten.  I think it's usually

15       within the four to six range most of the time when

16       I've been in their class.

17                   MR. FORBES:  Okay.  So for example, there

18       is one teacher and one assistant teacher, correct?

19                   MS. SEMM:  Yes.

20                   MR. FORBES:  Okay.  So that's two main

21       adults that are in the classroom, and you stated

22       that S███ -- well, S███ also has two adults

23       specifically supporting her, correct?

24                   MS. SEMM:  Yes.

25                   MR. FORBES:  So we're up to four adults

1      in the room specifically dealing with S███.  Now,

2      you mentioned that the other five students have

3      one-to-one paraprofessionals, correct?

4                  MS. SEMM:  Yes.

5                  MR. FORBES:  Okay.  And so now we are up

6      to nine students -- nine adults in the classroom at

7      any given time.  And you stated that the other --

8      there are three students with one-to-one nurses.

9      Was S███ J███ included in those three?

10                 MS. SEMM:  Yes, she is.

11                 MR. FORBES:  Okay, so that means there

12     are two other students with one-to-one nurses,

13     putting our total at 11 adults in the classroom

14     even before we get into the push-in of related

15     services for each student, correct?

16                 MS. SEMM:  In your hypothetical, that's

17     correct.

18                 MR. FORBES:  Well, is it a hypothetical

19     or is this actually what's happening?  Because it

20     is a 6:1:1 class, correct?

21                 MS. SEMM:  I'm sorry, can I answer both

22     parts of the question or just the part where you're

23     inaccurate or not?

24                 MR. FORBES:  Okay, can you please tell me

25     where I'm inaccurate?

1                     MS. SEMM:  So the teachers also conduct

2           one-to-one academic sessions, as is noted on S█████

3           J███ 's schedule.  So the teacher spends about three

4           hours of their day on one-to-one academics with the

5           student.  The teaching assistants also do one-to-

6           one academic support and push-in to one-to-one

7           sessions with other students.

8                     So it's not the case that they're always

9           present within the classroom.  So that's the first

10          thing.  So that's why a lot of times, you're -- the

11          characterization that all of them are there for

12          S█████  J███ is the inaccurate aspect.

13                    So there's some people in the classroom

14          the teacher might have, you know, be with another

15          student whose para and nurse are with them, and you

16          know, we have like -- I forget what they're

17          called -- like large -- like -- I forget what

18          they're called.  They're like folding wall kind of

19          things so that we can block out extraneous noise.

20                    So they might be in one corner of the

21          classroom working on that, and then two other

22          students might be, you know, with their

23          paraprofessionals working on a read-aloud with the

24          teaching assistant, for example.

25                    So it's not necessarily the case that

1    this is like a large setting of students that are

2    all crowded around S█████ J█████ while she's trying to

3    do some kind of activity.  That's where the

4    characterization becomes inaccurate.

5         MR. FORBES:  Okay.  So are there periods

6    of time where the teacher and the teacher's

7    assistant are not providing instruction to S█████

8    J█████ during the day?

9         MS. SEMM:  Well, there are times when

10   they are carrying out activities that are -- they

11   have a baseline of classroom activities that are

12   going on that are designed by the teacher while --

13   that are sometimes carried out by the paras or in a

14   push-in session with the therapist while the

15   teacher and sometimes the teaching assistant might

16   be doing push-in sessions or one-to-one academic

17   sessions with other students.

18        MR. FORBES:  Right.  So how often would

19   you say there are these periods where the teacher

20   is doing a one-to-one with another student and the

21   teacher's assistant is maybe doing another one-to-

22   one with another student and Sarah's there working

23   with the paraprofessional alone?

24        MS. SEMM:  Well, she wouldn't be alone.

25   She'd be with one of the related service providers.

1    So you can see from S███ J███ 's schedule -- I

2    forget what -- hold on, so I could reference it so

3    we can all be looking at the same thing.

4                I think the schedule was Exhibit G.  So

5    as we can see on Exhibit G, S███ J███ is -- would

6    be receiving push-in or pullout services with the

7    therapist for the vast majority of the day.  So

8    they wouldn't -- she wouldn't be alone or -- or

9    without services.  They would be following the

10   push-in/pullout model as I described previously.

11               MR. FORBES:  Okay.  And during that 30-

12   minute academic instruction block or during the

13   literacy read-aloud blocks, what about those

14   situations?

15               MS. SEMM:  So that's -- those are usually

16   led by either the teacher or the T.A., and then

17   they -- I would say it's very rare that they might

18   leave a book and an activity that they've designed,

19   and then, you know, one or two of the paras that

20   might be in the room with do that and then with

21   therapists to push into the activity.

22               So I have seen that a little bit.  More

23   often, either the teacher or the T.A. is there in

24   order to lead activities.

25               MR. FORBES:  Okay.  So during this time

1          when there's this academic instruction, all the

2          students are together, correct?

3                    MS. SEMM:  No.

4                    MR. FORBES:  No, the students are not

5          together during academic instruction.

6                    MS. SEMM:  That's correct.  So because of

7          the push-in and pullout model -- I know our

8          schedule can be a little bit confusing.  So I think

9          it'll help if I explain a little bit.  So this is

10         S█████ J██'s individual schedule.  So this sort of

11         supersedes an existing classroom schedule that you

12         can kind of see glimpse of when S█████ J██ doesn't

13         have assigned related service.

14                   So for example, at 10 o'clock, we have

15         the literacy and read-aloud time.  That takes place

16         at 10 o'clock regardless of whether S█████ J██ is

17         in therapy or not.

18                   So for exa2mple, that would be the

19         activity that the AT would be pushing into on

20         Tuesdays or Wednesdays.  Or the activity that the

21         teachers could push into AT with, for example.

22                   The same thing is true of math at 11:00.

23         So they would be doing a math activity on

24         Wednesday.  That would be a math activity that

25         vision, for example, could be pushing into for

1      Monday, Tuesday, or Thursday.

2            So the schedule in that sense is a little

3      bit -- is a little bit confusing.  I could see why

4      it's confusing for people that aren't looking at it

5      from the outside because, number one, you can't see

6      all of the activities.  But those -- it just

7      supersedes related service over what the classroom

8      would be doing.

9            So then, for example, if S    J    had

10     literacy and read-aloud with the class on Thursdays

11     at 10, other students might have that as a push-in

12     time.

13           So Sarah's therapist chose to push in for

14     a part of  a read-aloud of speech, maybe -- I know

15     there's kids in her class that are working on

16     answering "wh" questions with one to two-word

17     phrases, for example, they might push in for part

18     of the read-aloud to work on that goal and

19     generalize it into the group activity and then pull

20     them out to do oral motor -- work on oral motor

21     goals for the remainder of the session.

22           So some of the kids would be in the

23     classroom for the read-aloud.  Others, for example,

24     if they have PT and the PT didn't want to stay for

25     the read-aloud to do a push-in at that time, that

1    student wouldn't (indiscernible).

2                So it's sort of a flexible grouping

3    situation based on the student's schedule and then

4    when the speech therapist is doing a push-in.

5                MR. FORBES:  So is there any definitive

6    class period or time in the day where the student

7    is with the other students in her class for the

8    entire period?

9                MS. SEMM:  They do morning meeting as a

10   group usually around 9:30.  Yeah, typically, I

11   think in that class they do morning meeting at

12   9:30.  And that will be a time that the therapists

13   will push in.  And also --

14               MR. FORBES:  So there's still a therapist

15   that -- sorry -- there's still a therapist that

16   pushes in for Monday.  Now, is that therapist

17   specifically for the entire class or is it for

18   individuals?

19               MS. SEMM:  Well, for S■■■ J■■■, all of

20   her services are individual.  We -- the only group

21   service that we offer are speech groups in a group

22   of no more than two or three, and so that -- all of

23   the push-in sessions would be push into -- from a

24   one-on-one therapist.

25               So the therapist is working only with the

1    child that they're assigned to during that morning

2    meeting to address goals that they're targeting.

3                    MR. FORBES:  Okay.  So my real question

4    is -- hold on one second.  Sorry about that.

5                    Now, you stated that the morning meeting

6    is when the students are together.  However, there

7    are times when therapists will push into the

8    morning meeting as well, correct?

9                    MS. SEMM:  Yes, that's how they end up

10   all together.

11                   MR. FORBES:  Okay.  Are there any

12   instructional periods or classes that are provided

13   to the class in total, as in the six students,

14   including S███ J███, during the school day?

15                   MS. SEMM:  I would argue that morning

16   meeting is instructional because they go over --

17   they go over weather, they go over sequencing, they

18   go over identifying themselves, their name, saying

19   whether they're in school, for example.

20                   And so I would -- I would argue that that

21   is instructional time.  I -- I -- most of -- I --

22   that's really the designated time when all of the

23   class is together, and we do make sure that

24   therapists push in so that they are together as a

25   class.

1           Throughout the rest of the day, it varies

2       more in terms of who's going to be where.

3               MR. FORBES:  But when these individual

4       therapists push in during that morning meeting,

5       they're pushing in to provide individual students

6       with certain services, correct?

7               MS. SEMM:  I'm sorry, could you repeat

8       the question?  It cut out a little bit in the

9       middle.

10              MR. FORBES:  Not a problem.  You stated

11      that therapists push into the morning meeting, but

12      those therapists are pushing in to provide

13      individual students with services, correct?

14              MS. SEMM:  Yes.

15              MR. FORBES:  Okay.  So my question is is

16      there any instruction during a class period for the

17      full period where the entire class is actually

18      instructed together?

19              MS. SEMM:  So I think the confusion is

20      coming from -- so morning meeting is instructional.

21      All the push-in sessions are instructional because

22      the therapists are facilitating the children's

23      participation in classroom and academic activities.

24              So for example, the students have goals

25      regarding communication with peers and answering

1          questions using devices.  This is just a speech

2          example.

3                    So the teacher will be targeting teaching

4          the students, you know, the weather or teaching

5          them to follow a visual schedule, to identify what

6          are we doing first in the morning, what are doing

7          this afternoon, things like that.

8                    So the teacher is trying to teach those

9          specific objectives.  The speech therapist is

10         instructing the student on the use of the device to

11         answer the questions as per their speech goals.

12                   So that's the way in which the two are

13         kind of intertwined, but they're not losing the

14         instructional aspect of -- of it being a push-in

15         session.  They're being facilitated and

16         participating in those activities through the

17         therapies.

18                   So you know, other OT goals, we have

19         specific OT classroom goals that facilitate the

20         students' participation in classroom activities,

21         and those are targeted during push-in sessions.  If

22         that starts -- I think that hopefully will clarify

23         a little bit.

24                   MR. FORBES:  Okay.  You bring up an

25         interesting point.  Now previously, you stated that

1              in terms of the ADLs progress was incorporated into

2              the therapists' progress reports, correct?

3                        MS. SEMM:  Yes, whichever ADLs that

4              they're targeting with the goal because the

5              progress reports are reporting on goal progress.

6                        MR. FORBES:  Right.  But you stated that

7              the ADLs class is instructional, correct?

8                        MS. SEMM:  Again, what I stated was that

9              it wasn't a class so much as an activity, and it's

10             instructional, yes, because the children are

11             learning to generalize the skills that they are

12             practicing in therapy into other environments.

13                       MR. FORBES:  But you spoke about things

14             such as weather that the students are learning in

15             this activity, correct?

16                       MS. SEMM:  I'm not sure what activity

17             you're referring to.

18                       MR. FORBES:  The -- ma'am, the ALDS

19             (sic).  I'm referring to --

20                       MS. SEMM:  (Interposing) They're not

21             learning about --

22                       MR. FORBES:  -- as an activity --

23                       MS. SEMM:  (Interposing) They're not

24             learning about -- they're not learning about the

25             weather while they're getting changed and toileted.

1    So that's why I'm a little confused.

2                    They might be learning about the weather

3    in the morning meeting.  That's what --

4                    MR. FORBES:  (Interposing) Okay.  Yes, I

5    apologize.  Yes, the morning meeting.  They're

6    learning about the morning meeting, correct?

7    Weather in the morning meeting, correct?  Hello?

8                    MS. SEMM:  Yeah, my -- are you guys still

9    there?

10                    MR. FORBES:  Yes.  Hello, are you there?

11                    MS. SEMM:  Okay.  Yeah, I'm not sure what

12    happened.  All of a sudden, I couldn't hear it.

13                    MR. FORBES:  No problem.  What time does

14    your school -- what time does school start?

15                    MS. SEMM:  8:30.

16                    MR. FORBES:  Okay.  So the ADLs that's on

17    the schedule is not correct.  It is actually the

18    morning meeting.

19                    MS. SEMM:  Morning meeting is about 9:30

20    typically.  It varies a little bit by class.  S█████

21    J███'s class, it's usually around 9:30.

22                    MR. FORBES:  Well, can you take a look at

23    the schedule because I see 9:30 to be speech, OT,

24    for S█████ J███, so please let us know --

25                    MS. SEMM:  (Interposing) Yeah.

...

1           MR. FORBES:  -- so that's when the

2       morning meeting is?

3               MS. SEMM:  Yes.

4               MR. FORBES:  Okay.  And so you're saying

5       that her speech and OT is pushed into the morning

6       meeting for S█████ J██ during this time.

7               MS. SEMM:  Yes.

8               MR. FORBES:  And this is the meeting

9       where students learn about things such as the

10      weather, correct?

11              MS. SEMM:  That's correct.

12              MR. FORBES:  Okay.  Now, is there any

13      sort of measurement or progress concerning what is

14      being taught in this morning meeting?

15              MS. SEMM:  So yes.  We can take a look at

16      some goals that would apply to morning meeting

17      specifically.  If we take a look, I can -- I don't

18      know which example is better to use.

19              So -- I'll just -- because we were

20      already looking at the progress report, I'm just

21      going to use that.

22              So if you look at page 2 of the progress

23      report, which I guess is page H-2 in evidence,

24      so -- sorry.  I just -- somehow it zoomed right

25      past it on my computer.

1          Okay, so if we look actually at page --

2     it was H-1.  One of the goals here is increasing

3     her understanding of "wh" questions, answering who,

4     what, and where.

5          So during morning meeting, S▒▒▒ J▒▒ is

6     asked questions that are "wh" questions.  And so

7     based on her response to those questions, the

8     teacher can determine how close she is to meeting

9     this goal.  Right?  So that's one.

10         Secondly, if I go back to -- the third

11    academic goal, which is a social goal using switch

12    and auditory scanning, increasing social skills and

13    involvement with peers and adults.

14         So benchmark 1, participating in a group

15    game or activity with peers with minimal

16    assistance.  So morning meeting is a group

17    activity, but I (indiscernible) whole class is

18    together.

19         And so we will see the teacher, then,

20    every day at morning meeting, we'll be able to see

21    how well S▒▒▒ J▒▒ is doing with the specific

22    goal.  Is she able to use her switch, is she using

23    auditory scanning, what level of support is she

24    requiring to do that?

25         They have some specific goals around

1    participating in exchange with a classmate or a

2    familiar adult, including things like greetings.

3    So during morning meeting, the students will

4    practice greeting each other, and the teacher

5    will -- will be able to observe and take note of

6    how much support S███ J██ needed in order to

7    participate in this way.

8              Also making requests, greeting peers, and

9    like I said, participating in activities.  So those

10   are the -- those goals are the ones that the -- the

11   teacher would be able to reflect on the progress

12   report in terms of the morning meeting activity.

13             MR. FORBES:  Okay.  And so these academic

14   goals correspond with the morning meeting as well

15   as the one-to-one academic class?

16             MS. SEMM:  Yes.

17             MR. FORBES:  But in terms of the -- her

18   social interaction with her peers, that would only

19   occur mainly during the morning meeting.

20             MS. SEMM:  No, they have other small

21   group activities.  Well, with groups of maybe two

22   or three during the remainder of the day.  That's

23   just sort of the largest group.

24             So I would say that's the most

25   challenging one in terms of the generation of the

1       skill because there is the most going on at that

2       time.  Their morning meeting is a lot of fun, so I

3       know S█████ J███ really enjoys it and has been

4       really doing well using her switch to greet her

5       peers as they come in.

6                    MR. FORBES:  Not a problem.  Now, you

7       also stated that you disagreed with the lack of a

8       one-to-one fulltime nurse, correct?

9                    MS. SEMM:  That's correct.

10                   MR. FORBES:  Okay.  Now, the nurse is

11      recommended mainly because of feeding challenges

12      and the risk for aspiration, correct?

13                   MS. SEMM:  Yes, that's correct.

14                   MR. FORBES:  Okay.  And those occurred

15      generally around her feeding time, correct?  Those

16      concerns, sorry.

17                   MS. SEMM:  They can actually -- she is at

18      risk for aspiration.  From my understanding for at

19      least up to a couple of hours post eating, so that

20      is covering a pretty large majority of the school

21      day, given that she does eat before school, and

22      then she eats also at school.

23                   MR. FORBES:  And her feeding time is one

24      time at noon, correct?

25                   MS. SEMM:  I believe that's correct, yes.

1                    MR. FORBES:  Okay.  And how long does her
2          feeding usually take?
3                    MS. SEMM:  Honestly, I don't recall
4          specifically.  I think it's around about an hour to
5          an hour and a half.
6                    MR. FORBES:  Okay.
7                    MS. SEMM:  And then of course the seizure
8          monitoring, too, which is throughout the day.
9                    MR. FORBES:  Not a problem.  Now, the
10         one-to-one paraprofessional provides support in
11         areas of toileting, feeding, and ambulation as
12         well, correct?
13                   MS. SEMM:  Yes.
14                   MR. FORBES:  So the one-to-one
15         paraprofessional is also instructed by the nurse on
16         how to, for example, give anticonvulsive
17         medication.
18                   MS. SEMM:  No.
19                   MR. FORBES:  Okay.  What exactly does the
20         one-to-one paraprofessional do as it relates to
21         feeding?
22                   MS. SEMM:  So right now, S█████ J█████,
23         because of her feeding concerns, really can only be
24         feed by the nurse or by the speech therapist who
25         has more training.

1           The paraprofessional's involvement at

2      this point in time is centered on making sure that

3      S███ J███ is ready and properly positioned for

4      feeding activities, that she has -- you know, that

5      she's comfortable, that she's -- that her body

6      mechanics are -- are -- as really as best they can

7      be based on, you know, the input of the PT and the

8      OT for, you know, optimal positioning for feeding.

9           She can assist with repositioning, and --

10     so that -- that's pretty much where the one-to-one

11     para's role is around feeding specifically at this

12     time.

13           MR. FORBES:  Okay.  But the -- the

14     paraprofessional does closely monitor the health

15     management needs of the student, correct?

16           MS. SEMM:  Yes, that is part of their

17     responsibilities.

18           MR. FORBES:  Okay.  And to help make sure

19     that they are implemented, correct?

20           MS. SEMM:  Yes.

21           MR. FORBES:  Okay.  Not a problem.  As it

22     relates to seizures or -- yes, as it relates to

23     seizures, could you say how many episodes the

24     student would have had for the 2020/2021 school

25     year?

1        MS. SEMM:  I -- I don't have that

2   information available to me.

3        MR. FORBES:  Okay.  And do you have

4   information as it relates to the previous school

5   year?

6        MS. SEMM:  No, I don't have that

7   available to me right now.  The nurse keeps those

8   records.

9        MR. FORBES:  Understood.  Now, it was

10   stated that there are occasions during feeding

11   where there can be gagging as well as the student

12   may cry for an extended time after feeding,

13   correct?

14        MS. SEMM:  Yes.

15        MR. FORBES:  Okay.  Do you know how long

16   after feeding these concerns manifest?

17        MS. SEMM:  It varies by day.  I have seen

18   S███ J███ upset and dysregulated up -- I've

19   personally witnessed at least up to an hour, I

20   would say, after -- afterward, after feeding.

21        It -- I imagine that wasn't the longest

22   time.  It probably could go longer.  That's just --

23   and I happen to have just noticed myself.  That was

24   all that I've personally seen.

25        MR. FORBES:  Not a problem.  Now, I just

1    want to ask -- in terms of your 6:1:1 and the
2    direct instructional model that you spoke about, is
3    there a difference between the two?
4              MS. SEMM:  Well, direct instruction has a
5    few key components to it that make it a specific
6    kind of technique.  One-to-one instruction is just
7    designating that that time is -- you could use
8    direct instruction -- elements of a direct
9    instruction approach even with a group.  You could
10   pull some features out.
11             The one-to-one direct instruction time is
12   designated as the time that that student is being
13   worked on with only that student specifically on
14   their IEP goals using a direct instruction
15   approach.
16             MR. FORBES:  And so when exactly is that
17   provided to this student?
18             MS. SEMM:  I'm just going to consult the
19   schedule really quick.  I think that it was around
20   3 o'clock (indiscernible).
21             HEARING OFFICER FARAGO:  Mr. Forbes, I'm
22   a little at sea here.  We've being doing a lot of
23   latitude.  But let's recall that we're discussing
24   the second prong.  So we're limited to cross of an
25   existing affidavit.

1                    And the program that is at issue here,

2          the family's program, is one that has repeatedly

3          been deemed, including by me, to have been

4          appropriate for this student in the past.  Can

5          we --

6                    MR. FORBES:  (Interposing) I understand.

7                    HEARING OFFICER FARAGO:  -- focus in on

8          specifics that speak to potential challenges to the

9          propriety of the program under the Rowley and

10         Endrew (indiscernible)?

11                   MR. FORBES:  Yes, not a problem.

12                   HEARING OFFICER FARAGO:  Okay.

13                   MR. FORBES:  Ms. Semm, taking a look at

14         the recommended individualized education program

15         from your school in May -- sorry, in April of 2020,

16         in comparison with the iBrain IEP that is in

17         evidence at -- someone just leave?

18                   THE COURT REPORTER:  This is Pam the

19         court reporter.  Is everyone on the line or did we

20         lose someone?

21                   MR. FORBES:  I don't know.  I'm on the

22         line.  I don't know.

23                   HEARING OFFICER FARAGO:  I'm on -- Mr.

24         Forbes, I hear you.  I hear me.  Who else?

25                   MR. OLTHOFF:  John Olthoff is here.

1            Maybe we lost Ms. Semm.

2                     HEARING OFFICER FARAGO:  Ms. Semm?

3                     MR. DONOHUE:  Tiffany?

4                     HEARING OFFICER FARAGO:  Mr. Donohue.

5            Mr. Donohue?

6                     MR. DONOHUE:  I am still here, Your

7            Honor.

8                     HEARING OFFICER FARAGO:  Unfortunately,

9            it is the one almost impossible to replace person.

10                    MR. OLTHOFF:  She's back.

11                    HEARING OFFICER FARAGO:  Ms. Semm, are

12           you back?

13                    MS. SEMM:  Hi, it's -- yes, I'm back.

14                    HEARING OFFICER FARAGO:  Okay.  We were

15           all breathing a sigh of relief, and Mr. Forbes will

16           repeat his question.

17                    MR. FORBES:  Yes.  As it relates to

18           iBrain IEP that is in evidence at Parent's Exhibit

19           C, was that completed using updated evaluations as

20           of the time it was created?

21                    MS. SEMM:  So that is true.  We did

22           updated evaluations for the IEP.

23                    MR. FORBES:  And it would note the

24           present level of performance as well as updates to

25           progress that have been made since the creation of

140

1        the recommended IEP that is in evidence at DOE

2        Exhibit 10, correct?

3                    MS. SEMM:  I -- (indiscernible) which two

4        documents you're referring to.  Are you referring

5        to --

6                    MR. OLTHOFF:  (Interposing) Hold on.

7        This is the correct (indiscernible).

8                    MS. SEMM:  I'm sorry, I'm a little bit

9        lost.  So you're referring to Exhibit 10, which was

10       the document completed for the meeting in spring of

11       2020, April 22nd.

12                   MR. FORBES:  Correct.

13                   MS. SEMM:  What was the second document

14       that you're referring to?

15                   MR. FORBES:  The iBrain IEP that is in

16       evidence at Parent's C, which was dated February

17       19th, 2021.

18                   MS. SEMM:  Oh yes.  So February 2021 IEP

19       contains reports of progress on the goals that we

20       had discussed that previous April, has updated

21       evaluation results, and goals to reflect both of

22       those updates as well as the further input from

23       S█████ J███ 's family as discussed prior.

24                   MR. FORBES:  Thank you.  I have no

25       further questions of this witness.  Thank you.

1            HEARING OFFICER FARAGO:  Okay, thank you,

2       Mr. Forbes.  Redirect.

3            MR. OLTHOFF:  One second.  I've taken

4       myself off mute.  Thank you.

5            Good afternoon, Ms. Semm.  Am I off?

6       Yes.

7            MS. SEMM:  Yes.

8            MR. OLTHOFF:  Okay, so in your -- in your

9       affidavit, you note that S█████ J██ receives the

10      music therapy, and to your knowledge, is music

11      therapy an approved therapy that can be recommended

12      on an IEP?

13           MR. FORBES:  Objection.

14           MS. SEMM:  Yes.

15           MR. FORBES:  Objection.  Beyond the

16      scope.  I never asked about music therapy at all.

17      The Parent counselor has put in an affidavit.  He's

18      now using redirect to elicit additional testimony,

19      and so I would object on that basis.

20           HEARING OFFICER FARAGO:  Well, the

21      application of the rules of evidence is loose at

22      best.  However, in this instance, I think the

23      question is essentially a legal question

24      (indiscernible) not necessarily the right source to

25      address it.  So why don't you move on, Mr. Olthoff?

1          MR. OLTHOFF:  Well, I mean, I can ask Ms.

2      Semm the basis of her understanding.

3          HEARING OFFICER FARAGO:  You could, but

4      again, where -- I'm not sure where that would take

5      us, right?

6          MR. OLTHOFF:  Thank you.

7          HEARING OFFICER FARAGO:  You're more

8      expert at the answer to that question, I think,

9      than she is.

10         MR. OLTHOFF:  So Ms. Semm, you did note

11     in your testimony that iBrain does attempt to be

12     about 50/50 with push-in and pullout for -- for

13     related services; is that correct?

14         MS. SEMM:  Yes, that's correct.

15         MR. OLTHOFF:  So in your -- in your

16     opinion, if the student were -- if S█████ J████ were

17     to receive almost 100 percent of her related

18     services as push-in, would that be appropriate for

19     her?

20         MS. SEMM:  No, I would not think it would

21     be.

22         MR. OLTHOFF:  And can you explain why you

23     have that opinion?

24         MS. SEMM:  Yes.  That would be really

25     inappropriate for S█████ J████ because S█████ J████ has

1              a lot of challenges to her attention.   So she

2              needs to be able to practice skills in an isolated

3              environment first.

4                         And then with that (indiscernible) of

5              practice, she then is able to transfer the skills

6              into other environments, where her attention --

7              there's more things competing for her attention

8              such as, you know, other people in the room, other

9              noises.

10                        And so as she develops the skills, that's

11             when it should be integrated within -- into a group

12             setting.   If you're really doing 100 percent push-

13             in, she's not going to have that time to focus on

14             developing that skill in the first instance.

15                        And so I feel that her development of new

16             skills would suffer greatly because of that.

17                        MR. OLTHOFF:   I don't have any more for

18             Ms. Semm at this time.

19                        HEARING OFFICER FARAGO:  Anything

20             further, Mr. Forbes?

21                        MR. FORBES:  Nothing further.

22                        HEARING OFFICER FARAGO:  Okay, thank you.

23             Thank you very much, Ms. Semm.  And you have a

24             great remainder of your day.  You can hang up.

25                        MS. SEMM:  Great, thank you.  Have a nice

144

1           afternoon.

2                      HEARING OFFICER FARAGO:   Thank you.

3                      Mr. Olthoff, did you want to add anything

4           to your opening statement at this point in time

5           or --

6                      MR. OLTHOFF:   (Interposing) Thank you.

7                      HEARING OFFICER FARAGO:   -- did you want

8           to call your next witness or whatever?

9                      MR. OLTHOFF:   Yes, Your Honor.   I want to

10          just complete the opening very briefly.

11                     HEARING OFFICER FARAGO:   Sure.

12                     MR. OLTHOFF:   So in -- so in addition to

13          a deficient IEP, DOE failed to recommend a school

14          location where this IEP could be implemented for

15          the entire 2020/2021 school year.

16                     For most of the school year -- well, for

17          at least the beginning of the school year, they

18          could not implement the one-to-one para

19          appropriately and could not implement the one-to-

20          one or the access to the school nurse at all.

21                     Additionally, the CSE did reconvene

22          during the 2020/2021 school year and developed an

23          IEP purporting to correct some of the deficiencies

24          in the April 2020 IEP, including adding a one-to-

25          one nurse and recommending a 6:1:1 class size.

1          However, the issue here is there are two

2     IEPs meant to be implemented during the 2020/2021

3     school year.  They cannot both be right, but they

4     can both be wrong.

5          By a preponderance of the evidence,

6     Parent submits that DOE has failed to meet its

7     Prong I burden.

8          On the other hand, it is clear that

9     iBrain is appropriate for S███ J██ during the

10    2020/2021, as it has been deemed appropriate during

11    the 2019/2020 school year and during the 2018/2019

12    school year.

13         It is clear that iBrain is appropriate,

14    even to the DOE, who adopted nearly all of iBrain's

15    program recommendation for S███ J██ but then

16    purported somewhat disingenuously to be able to

17    provide that in a D-75 school.

18         It would be mathematically impossible to

19    provide the level of service in a D-75 school day,

20    and it would also be illegal under 8 NYC RR 175.5.

21         Regarding the equities -- I'm sorry.

22    The -- however, the -- iBrain's appropriateness,

23    which has been continuously demonstrated, is not

24    subject to those regulatory requirements regarding

25    a limited number of instructional hours.

1       Therefore, the program that is designed for S▊

2       J▊ can be designed and implemented without those

3       constraints and be designed and provided in a way

4       such that it meets her needs.

5                Regarding the equities, Parent submits

6       that equitable considerations weigh firmly in favor

7       of the Parent.  Parent has always made S▊   J▊

8       available for evaluations, assessments, and

9       observations.

10               Parent provided DOE with the proposed

11      educational program prior to the meeting, attended

12      and participated in the April 2020 IEP meeting and

13      in the February 2021 IEP meeting.

14               But however, DOE did not even have a

15      program to visit at the start of the 2020/2021

16      school year.  Parent has attempted to contact the

17      recommended location after receiving the late prior

18      written notice but still no response until a year

19      later.

20               Parent, therefore, had no choice but to

21      enroll S▊   J▊ at the only educational program

22      that has been found to meet her needs.  That is

23      iBrain.

24               S▊   J▊'s father will testify about

25      his attempts to contact Horan School after he

1    received a PWN, how he was unable to speak to

2    anyone.

3              To the extent that DOE raises any

4    argument about the number of instructional hours,

5    that argument has been disposed of numerous times

6    at the IHO and SRO level.  To the extent that DOE

7    raises any argument about the cost of

8    transportation in its closing, DOE has failed to

9    produce any evidence on what would be reasonable

10   costs for these services.

11             In essence, this is not a close call.

12   DOE has yet again failed to offer or provide FAPE

13   to S████ J███.  IBrain is clearly appropriate.

14   There is nothing at all in any consideration of

15   equities that would lead to anything but a full

16   reward of services.  Thank you.

17             HEARING OFFICER FARAGO:  And your next

18   witness?

19             MR. OLTHOFF:  Yes, Parent is calling the

20   parent.  Mr. Donohue, who is on the line, will

21   testify.

22             MR. DONOHUE:  Good afternoon, Your Honor.

23             HEARING OFFICER FARAGO:  Mr. Donohue, how

24   are you?

25             MR. DONOHUE:  Very well.

148

1           HEARING OFFICER FARAGO:   Good.   Could you

2       be so good as to raise your right hand?

3               MR. DONOHUE:   I can.

4           HEARING OFFICER FARAGO:   Do you swear or

5       affirm that the testimony you will give is the

6       truth, the whole truth, and nothing but the truth?

7               MR. DONOHUE:   I do.

8           HEARING OFFICER FARAGO:   Great.   I am

9       looking at what I believe we denominate as Exhibit

10      U.   It's a two-page affidavit, no date.   There is a

11      July notation at the end.   It has your typed name

12      at the bottom of it.   It has ten numbered

13      paragraphs.   Do you have a copy of this --

14              MR. DONOHUE:   (Interposing) I do.

15          HEARING OFFICER FARAGO:   -- and look like

16      what I just described?   Great.

17              MR. DONOHUE:   It -- it --

18          HEARING OFFICER FARAGO:   (Interposing)

19      It's what I just described?

20              MR. DONOHUE:   It is.   Although there is

21      one edit that needs to be made to it, Your Honor.

22          HEARING OFFICER FARAGO:   That's my next

23      question.   Look through it and tell me any -- any

24      corrections, modifications, clarifications.

25              MR. DONOHUE:   So -- so paragraph number

1       10, this was referring to the PWN that I just

2       received for the next school year, and I just asked

3       John to forward to you and Mr. Forbes -- it's

4       actually should be dated March 4th, not May 27th.

5               So the PWN I received was on March 4th.

6       And the Exhibit O that was admitted --

7               HEARING OFFICER FARAGO:   (Interposing)

8       March 4th of what year?

9               MR. DONOHUE:   Of 2021.

10              HEARING OFFICER FARAGO:   Okay.

11              MR. DONOHUE:   And Exhibit O should have

12      been the attachment that Mr. Olthoff just sent to

13      you and Mr. Forbes, which was the March 4th, 2021,

14      school location letter and PWN, not the May 27th

15      one.

16              HEARING OFFICER FARAGO:   I can make the

17      correction in the text, if everyone is in agreement

18      to do that.  Mr. Forbes, do you have any objection

19      to the modification?

20              MR. FORBES:   I do not.

21              MR. DONOHUE:   And I think we just have to

22      modify the Exhibit O, Your Honor, either --

23              HEARING OFFICER FARAGO:   I will do that

24      as well, in particular if Mr. Forbes takes a look

25      at it to see whether that's the document that is

1           familiar to the District.

2                   MR. DONOHUE:  And Mr. Olthoff can just

3           send the revised disclosure --

4                   HEARING OFFICER FARAGO:  (Interposing) I

5           can do that.

6                   MR. DONOHUE:  Okay.

7                   HEARING OFFICER FARAGO:  I can -- I

8           can -- I can put it in, as long as -- Mr. Olthoff,

9           you sent it around to us all?

10                  MR. OLTHOFF:  I did forward it to -- to

11          Your Honor and Mr. Forbes.

12                  HEARING OFFICER FARAGO:  All right.  I

13          haven't seen it yes.  Have you seen it, Mr. Forbes?

14                  MR. FORBES:  Yes, I have it.

15                  HEARING OFFICER FARAGO:  Okay.  Have you

16          had a chance to look at it, and does it look like a

17          document you're familiar with?  Or are you in

18          agreement with the request to modify?

19                  MR. FORBES:  I can agree, yes.

20                  HEARING OFFICER FARAGO:  Okay.  Then the

21          first thing I'm going to do is make the correction,

22          which I'm just doing now, and then let me get a

23          copy of this document from Mr. Olthoff, which for

24          whatever reason (indiscernible).

25                  MR. OLTHOFF:  I'll send it again.

151

1                    HEARING OFFICER FARAGO:  Yeah.

2                    MR. OLTHOFF:  I will forward it over

3            again.

4                    HEARING OFFICER FARAGO:  Now, we're

5            replacing Exhibit --

6                    MR. OLTHOFF:  (Interposing) O.

7                    HEARING OFFICER FARAGO:  I got -- I found

8            it, I think.  One moment (indiscernible).

9                    MR. DONOHUE:  Not a problem.  I apologize

10           for the error.

11                   HEARING OFFICER FARAGO:  (Speaking to

12           himself).  (Indiscernible) paginated a little

13           confusingly because I think there's 11 pages, but

14           there's only 6.  (Speaking to himself)

15                   Let's see if I was successful, and then

16           we'll be all set.  Send it around to you if it

17           appears to be working at my end.  There's O, all

18           six pages.  And here is -- there it is.

19                   I will now send you all a copy of the

20           complete evidence set --

21                   MR. DONOHUE:  (Interposing) Just Your

22           Honor --

23                   HEARING OFFICER FARAGO:  Yes.

24                   MR. DONOHUE:  On number 10, just for it

25           to be clear, the last sentence should say I was

1                unable to reach anyone at the school, leave a

2                message, or leave a voicemail until June 21st,

3                2021.  Just so it's completely accurate.

4                        HEARING OFFICER FARAGO:  I think you can

5                clarify that --

6                        MR. DONOHUE:  (Interposing) Okay.

7                        HEARING OFFICER FARAGO:  --

8                testimonially --

9                        MR. DONOHUE:  (Interposing) Okay.  Okay.

10                       HEARING OFFICER FARAGO:  And then simply

11               all of us understand that you mean that as after

12               time.

13                       MR. DONOHUE:  Right.  Okay.  I just want

14               it to be accurate, that's all.

15                       HEARING OFFICER FARAGO:  Right.  But

16               we'll -- okay.  Was that taken care of and with us

17               all understanding that as of -- that you received

18               the prior written notice on March 4th, and you were

19               not -- the statement in paragraph 10 should be read

20               as saying you were not at that time able to

21               communicate with the school, but you did

22               communicate with the school on June 21st.

23                       I'm going to take us off the record for a

24               minute, and I am coming back in a minute.

25                       THE COURT REPORTER:  It is 2:21, and we

1           are off the record.

2                          (OFF THE RECORD)

3                          (ON THE RECORD)

4                  THE COURT REPORTER:  It is 2:24, and we

5           are back on the record.

6                  HEARING OFFICER FARAGO:  Okay, thank you.

7           So we're back on the record.  While we were off the

8           record, Mr. Donohue confirmed to me that this is

9           his direct testimony, and he has no further changes

10          or correction.

11                 And Mr. Forbes confirmed to me that he

12          does wish to cross-examine Mr. Donohue.  The

13          reporter confirmed to all of us that we will get

14          summarily thrown off this connection at the four-

15          hour mark.

16                 So I'm thinking we should all hang up and

17          dial back in and start a whole new clock and then

18          have Mr. Forbes begin his questioning.  Does that

19          make sense to the reporter, in particular?  Will

20          that save us?

21                 THE COURT REPORTER:  Well, I just emailed

22          the powers that be to ask that question, and I have

23          not received an email back.  I am unsure, and I

24          don't want to give you the wrong information.

25                 HEARING OFFICER FARAGO:  Well, the worst

1    it can do is bump us off again.  But I know that if

2    we hang up now and dial back in, as long as you

3    don't close the case out, it should put us onto a

4    connection together.

5              THE COURT REPORTER:  Yep, she just --

6    okay.  All parties -- they just responded -- all

7    parties would have to hang up, including me, the

8    reporter, me, is the host.  When the hearing

9    officer calls back in, it should come back to me

10   again.  So yes, we can all hang up.

11             HEARING OFFICER FARAGO:  That's my

12   understanding.  Okay, let's hang up and dial in.

13   Bye-bye.

14             THE COURT REPORTER:  And I'm going to

15   take us off the record right now.

16             HEARING OFFICER FARAGO:  Okay.

17             MR. DONOHUE:  2:26, we're off the record.

18             (OFF THE RECORD)

19             (ON THE RECORD)

20             THE COURT REPORTER:  Back on the record

21   at 2:28.

22             HEARING OFFICER FARAGO:  Thank you.  Mr.

23   Forbes, he's your witness.

24             MR. FORBES:  Thank you.

25             Mr. Donohue, I just wanted to confirm

1          that you rejected the 12:1:3:1 in the D-75 school
2          recommendation at the April 22nd, 2020, IEP
3          meeting, correct?
4                    MR. DONOHUE:  Yes.
5                    MR. FORBES:  And --
6                    MR. DONOHUE:  (Interposing) I alerted the
7          CSE that I did not think it was appropriate,
8          correct.
9                    MR. FORBES:  Okay.  Not a problem.  And
10         this was the similar class ratio from the previous
11         IEP, correct?
12                   MR. DONOHUE:  Yes.
13                   MR. FORBES:  And you were previously
14         recommended the same school, P.S. 79, correct?
15                   MR. DONOHUE:  Correct.
16                   MR. FORBES:  Okay.  And so at the
17         meeting, you were -- you had knowledge that most
18         likely, the recommendation would be the P.S. 79
19         school again, correct?
20                   MR. DONOHUE:  No, they -- they tell us at
21         the CSE meetings that they have no idea where
22         you're going to be placed.
23                   MR. FORBES:  Not a problem.  Now, you
24         did -- sorry.  Transportation accommodation forms
25         were submitted (indiscernible), correct?

1                    MR. DONOHUE:  Correct.

2                    MR. FORBES:  And specialized

3          transportation services was recommended?

4                    MR. DONOHUE:  Correct.

5                    MR. FORBES:  Did you contact OPT, the

6          Office of Pupil Transportation, to arrange the

7          specialized transportation services for S███?

8                    MR. DONOHUE:  OPT never contacted me.

9                    MR. FORBES:  Okay.

10                   MR. DONOHUE:  If you okay at the school

11         location notice, there's no (indiscernible)

12         information.  I'm only supposed to contact the

13         school.

14                   MR. FORBES:  And as it relates to the IEP

15         meeting that was recently conducted this year, you

16         were in agreement with that program recommendation?

17                   MR. DONOHUE:  I was in agreement with the

18         classroom recommendation but not the D-75 program.

19                   MR. FORBES:  Okay.  So your only

20         objection to that recommendation is the D-75

21         program.

22                   MR. DONOHUE:  Plus also the lack of music

23         therapy services.

24                   MR. FORBES:  Okay, no problem.  I have no

25         further questions.  Thank you.

1                    HEARING OFFICER FARAGO:  Okay, thank you.

2          Any redirect?

3                    MR. OLTHOFF:  Just -- nothing -- nothing

4          for the Parent, Your Honor.

5                    HEARING OFFICER FARAGO:  Okay, thank you.

6          How do you want to address closings?  Do you want

7          to do them orally now, which would be my

8          preference?  Or you want to do something in

9          writing?

10                    MR. OLTHOFF:  Parent is prepared to do it

11          orally now.

12                    MR. FORBES:  The Department is not, and

13          we prefer writing.

14                    HEARING OFFICER FARAGO:  Okay.

15                    MR. OLTHOFF:  Or if Your Honor would like

16          to schedule a short date to do an oral closing,

17          that would be fine as well.

18                    HEARING OFFICER FARAGO:  No, as long as

19          the closings come in swiftly, I don't mind them

20          being in writing.

21                    MR. FORBES:  The Department would --

22                    MR. DONOHUE:  (Interposing) Expedited

23          transcript.

24                    HEARING OFFICER FARAGO:  I think --

25          Mr. -- what did you say, Mr. Forbes?  Let's get you

158

1       in the record here as well.

2                   MR. FORBES:  Yes, sorry, I was just

3       saying the Department would not object to

4       scheduling an oral closing date if that is

5       agreeable.

6                   HEARING OFFICER FARAGO:  Okay.  Okay.

7       Well, I would be happy to -- let's make certain

8       that this is requesting to be expedited on the

9       reporter's end, and I will also do it from the

10      impartial hearing office end.

11                  How would 8 o'clock on the 26th --

12      Monday, the 26th, look to you?  Or the 27th, either

13      of those.

14                  MR. OLTHOFF:  Either date is fine.

15                  HEARING OFFICER FARAGO:  (Indiscernible)

16      in my calendar and do the 27th.  Somebody else have

17      something to say?

18                  MR. FORBES:  Yes, if we're going to start

19      at 8, then the 27th is preferable.

20                  HEARING OFFICER FARAGO:  Okay, to me as

21      well, slightly.  It gives me some space after --

22      okay.  So I will set this down for the 27th for

23      closings.  I will request the expedited transcript.

24      So we should have that in a week or less.  It is a

25      long-ish transcript.

1               Our compliance date is in August, so that

2       should be ample to cover us all the way through to

3       the end.  And I believe that concludes all of our

4       work together today to a certain extent,

5       miraculously.

6               Anything further from either side?

7               MR. OLTHOFF:  Nothing from the Parent.

8               MR. FORBES:  Nothing from the Department.

9       Thank you.

10              HEARING OFFICER FARAGO:  Okay.  Before we

11      go off the record, give me one moment to make the

12      scheduling formal, and then we will conclude.  We

13      said the 27th at 8 o'clock; is that correct?

14              MR. DONOHUE:  Yes.

15              HEARING OFFICER FARAGO:  Okay.  All set.

16      It's out.  You should just be receiving it now, and

17      I thank you all for your forbearance and -- and

18      attention today to the work we've done.  Have a

19      pleasant remainder of the day.

20              THE COURT REPORTER:  Off the record at

21      2:37.

22              (Whereupon, at 2:37 p.m. the proceeding

23      was adjourned.)

24

25

1              C E R T I F I C A T I O N

2

3              I, Wendy Sawyer, do hereby certify that I

4       typed the transcript in the Matter of S███  J███

5       Donohue taken on July 14, 2021, by Sandra Rivera at

6       the offices of the Department of Education, 131

7       Livingston Street, Brooklyn, NY 11201, and that to

8       the best of my ability, this is an accurate

9       transcription of what was recorded at that time and

10      place.  I further certify that I am not connected

11      by blood, marriage, or employment with any of the

12      parties herein nor interested directly or

13      indirectly in the matter transcribed.

14

15

16

17                    _Wendy S._

18                    _____

19
                      WENDY SAWYER, CDLT-151
20
                      July 19, 2021
21

22

23

24

25