UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

United States of America and States of the United States,
ex rel. Patrick Donohue,

                                    Plaintiffs,


            -against-                                      **1:20–CV–5396 (GHW)**


RICHARD CARRANZA, in his official capacity, as
the former Chancellor of the New York City Department of
Education, *et al*.,


                                    Defendants.

-----------------------------------------------------------------------x




**PLAINTIFFS' OPPOSITION TO DEFENDANTS WAKE COUNTY PUBLIC SCHOOL
DISTRICT AND CATHY QUIROZ MOORE'S MOTION TO DISMISS UNDER
FEDERAL RULES OF CIVIL PROCEDURE 12(B)(2), (3), AND (6)**




                              Respectfully submitted
                              Brain Injury Rights Group
                              Attorneys for Plaintiffs

                              By:
                              Ashleigh C. Rousseau, Esq. [5801923]
                              Rory J. Bellantoni, Esq. [RB 2901]
                              300 East 95th Street, Suite 130
                              New York, NY 10128
                              (646) 850-5035
                              Ashleigh@pabilaw.org
                              Rory@pabilaw.org

## **TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………...……1

LEGAL STANDARD…………………………………………,…………....…………..6

Point I: This Court Has Personal Jurisdiction Over Defendants………………………..7

Point II: This Court Does Not Lack Personal Jurisdiction Over
The Wake County Board of Education Because It Was Incorrectly Named……...………9

Point III: The Claims Against Defendant Cathy Quiroz Moore Are
Claims Against the Wake County Board of Education…………………………….…12

Point IV: The Complaint Stated Valid Claims Upon Which
Relief Can Be Granted……………………………………………………….…………..12

Point V: Venue is Proper in This Court………………………………….……………19

CONCLUSION……………………………………………………………….……………20

## <u>TABLE OF AUTHORITIES</u>

### <u>*Cases*</u>

*Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp.2d 189 (S.D.N.Y. 2000) ...............................................22

*Arista Records, LLC. v. Doe*, 604 F.3d 110 (2d Cir. 2010).................................................................19

*Ashcroft v. Iqbal*, 556 US 662 (2009)..................................................................................9, 16

*Bell Atl. Corp. v. Twombly*, 550 US 544 (2007)....................................................................9, 16

*Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549 (S.D.N.Y. 2000) .......................................21

*Datskow v. Teledyne, Inc., Cont'l Prods. Div.*, 899 F.2d 1298 (2d Cir. 1990) .....................12, 13

*DiFolco v. MSNBC Cable LLC*, 622 F.3d 104 (2d Cir. 2010) ...........................................................9

*Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013).......................................9

*In re Manville Forest Prods.*, 896 F.2d 1384 (2d Cir. 1990) ...........................................................22

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)............10

*Int'l Shoe Co. v. Washington*, 326 US 310 (1945) ...........................................................................10

*Joseph F. o/b/ minor Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988 (2017) ....................17

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012).......................10

*N.Y. Marine & Gen. Ins. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010) ...........................21

*Neitzke* v. *Williams*, 490 US 319 (1989) .........................................................................................16

*Peterson v. Islamic Republic of Iran*, 2013 US Dist. LEXIS 40470  (SDNY Mar. 13, 2013)......10

*Robinson v. Sanctuary Music*, 383 Fed. Appx. 54 (2d Cir. 2010)............................................11, 13

*Scheuer* v. *Rhodes*, 416 US 232 (1974)............................................................................................16

*Shenzhen OKT Lighting Co. v. JLC-Tech LLC*, 2021 US Dist. LEXIS 185703 (SDNY Sept. 28, 2021)...................................................................................................................................9

*U.S. ex rel Bilotta v. Noartis Pharm. Corp.*, 50 F. Supp. 3d 497 (SDNY 2014)...........................18

*U.S. ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022 (EDNY 2013)..................................19

*U.S. ex rel. Polanski v. Pfizer, Inc.*, 2009 US Dist. LEXIS 43428 (E.D.N.Y. 2009) ...................18

*United States er rel. Ladas v. Exelis, Inc.*, 824 F.3d 16 (2d. 2016)..............................................18

*United States ex rel. Lee v. N. Adult Day Health Care Ctr.*, 205 F.Supp.3d 276 (2016).............18

*United States ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) ...............................................6

*United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861 (2d Cir. 1997)...................................................................................................................................9

*United States v. Bank of NY. Mellon*, 941 F.Supp.2d 438 (S.D.N.Y. 2013) .................................18

*United States v. Morton*, 467 US 822 (1984) ...................................................................................9

*United States v. Wells Fargo Bank, NA*, 972 F.Supp.2d 593 (S.D.N.Y. 2013)............................18

*Waldman v. Palestinian Liberation Organization*, 835 F.3d 317 (2d Cir. 2016)..........................10

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2d Cir. 1990) ......................................................19

### *Statutes*

§ 3729(a)(1)(A) ........................................................................................................14

20 U.S.C §1400, *et seq* ...........................................................................................3

28 U.S.C. §1404(a) .................................................................................................21

31 U.S.C. §3729(a)(1)(C) .......................................................................................17

31 USC §3729-3733, *et seq*. ...................................................................................5

42 U.S.C. §1396(b)(c) ..............................................................................................3

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004) ......16

NC 1501-11(f) ..........................................................................................................4

NCGS §§1-605 through 617, *et seq* .........................................................................5

Fed. Civ. P. Rule 60(a) ............................................................................................14

Section 1903(c) ..........................................................................................................3

Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 .....................14

## **INTRODUCTION**

Plaintiff Relator Donohue respectfully submits the foregoing in opposition to Defendants' WAKE COUNTY PUBLIC SCHOOL DISTRICT's ("Wake County") and CATHY QUIROZ MOORE's ("Moore") (collectively "Defendants") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6), for lack of personal jurisdiction, improper venue, and failure to state a claim upon which relief can be granted, respectively.

The claims within the Complaint are predicated on the submission of false Medicaid claims and the application for IDEA Part B funds. Each year, Defendants submitted an application for IDEA Part B funds, in which they assured the federal government that they were providing, and will continue to provide, a FAPE to those students with disabilities under the Individuals with Disabilities Act, 20 U.S.C. §1400, *et seq*. ("IDEA"). Under the IDEA, School Districts are entitled to submit claims to Medicaid for those students with disabilities who require a "medical" component to their education (i.e., nurses, behavioral paraprofessionals, Physical Therapy (PT), Occupational Therapy (OT), Vision Therapy (VT), Hearing Therapy (HT), Speech-Language Therapy (SLT), etc.) (hereinafter referred to as "related services," collectively).[1] These services may be billed on a "Fee-for-Service" basis, a School-Based Administrative Claiming (SBAC) quarterly basis, or a Cost-Reconciliation (or Cost-Settlement) basis. In order to be compensated, a claim must be submitted that the service was rendered in accordance with the subject student's IEP. 42 U.S.C. §1396(b)(c), Section 1903(c) (which allows Medicaid to pay for coverable Medicaid services for children that are included in an IEP or Individualized Family Service Plan (IFSP) under the IDEA.)[2] (emphasis added). If the cost of the service is not entirely funded through

---

[1] *See* https://www.macpac.gov/wp-content/uploads/2018/04/Medicaid-in-Schools.pdf
[2] Medicaid Billing Guidelines can be found here: https://www.cms.gov/research-statistics-data-and-systems/computer-data-and-systems/medicaidbudgetex

Medicaid, NC 1501-11(f) allows Defendants to utilize IDEA Part B funds to satisfy the remaining balance.[3]

Beginning in March 2020, Defendant Wake County closed the doors of its schools and transitioned to a remote online learning platform. During remote learning, Plaintiff Relator learned that Defendants herein were submitting Medicaid claims for services rendered remotely (contrary to the terms of the students' IEPs, as the district formulated no "remote" IEPs) or services that did not occur or otherwise conferred no meaningful benefit to the student, as required by Medicaid.

During the COVID-19 public health emergency, Medicaid revised its billing guidelines to help patients avoid travel and unnecessary exposure to further illness. Medicaid required its providers to use interactive audio and video telecommunications systems that permitted real-time communication between the provider and the patient at home.[4] However, Medicaid/Medicare did not allow for medical services such as OT, PT, and SLT, to be offered using this model.[5]

As discussed below, Plaintiff Relator made allegations in the Complaint related to A.C., an autistic student in the Wake County school system. In learning more about the services offered to A.C. during the COVID-19 pandemic (or lack thereof), Relator Donohue also reviewed A.C.'s IEP, which reflected that Defendants were required to provide A.C. both OT and ST during the 2020-2021 school year. (*See* Plaintiff's Complaint, Ex. 21, p. 12-13). To the Relator's knowledge, no "remote" IEP or alternative supplement to A.C.'s IEP was created that recommended remote related services or educational instruction.

In order to maintain compliance with the IDEA, Defendants were required to continue A.C.'s educational program, as indicated in his IEP. If Defendants were noncompliant with the

---

[3] https://www.dpi.nc.gov/media/8754/open, p. 42.
[4] https://www.dpi.nc.gov/media/8754/open,
[5] https://medicaid.ncdhhs.gov/media/7333/download

IDEA and failed to offer A.C. the services listed on his IEP, then Defendants' eligibility for IDEA funding would be questionable, as compliance was not maintained. Relator Donohue accepts the North Carolina Department of Public Instruction's (NC DPI) submission of their 2021 IDEA Part B Application as confirmation that compliance was maintained, as the application indicates that:

> A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled, in accordance with 20 USC 1412(a)(1); 34 C.F.R. §§300.101-300.108.[6]

As the NC DPI is the State Education Agency (SEA) responsible for the supervision and the overall implementation of the IDEA and related federal statutes, the application indicates that Defendants necessarily complied with the IDEA—otherwise, NC DPI would be obligated to report the noncompliance and the steps taken to correct same to the United States Department of Education (USDOE) in the Part B Application.[7] Thus, as A.C.'s Parent reported the failure to offer in-person services, the Relator filed the instant suit for those services offered inappropriately and/or unlawfully to A.C. and possibly other students similarly situated.

Relator Donohue initiated this action alleging, *inter alia*, that Defendants violated the federal False Claims Act, 31 U.S.C. §3729-3733, et seq. ("FCA"), as well as corresponding state false claim statutes, including NCGS §§1-605 through 617, et seq. In an action under the FCA, there are three (3) theories of liability:

> (1) a factually false theory, under which a claim for payment is made to the government seeking payment for services that were never actually provided or for which the description of the goods or services provided is incorrect; (2) an express false legal certification theory, where a claim for payment of federal funds falsely certifies compliance with a statute or regulation that must be complied with before payment can be made; and (3) an implied false legal certification theory, where, although the claim for payment does not certify compliance with a statute or regulation on its face, compliance is a prerequisite to payment under the express statutory or regulatory terms.

---

[6] https://www2.ed.gov/fund/data/award/idea/2021partb/nc-2021b-letter-enclosures.pdf (p. 5).

[7] In the alternative, the Relator makes claims under the FCA for IDEA Part B, as Relator contends that Defendants falsely assured NC DPI that compliance was maintained, when in fact it was not.

*United States ex rel. Mikes v. Straus*, 274 F.3d 687, 696-700 (2d Cir. 2001).

Plaintiff Relator alleged that Wake County and Moore committed acts violating the FCA and its related state statutes, as Defendants billed Medicaid for services rendered inappropriately and directly contrary to many, if not all, students' IEPs. (*See* Complaint ¶¶ 246-251). Specifically, Plaintiff Relator used the example of the IEP of A.C., a student with Autism in attendance at Wake County Public Schools, to illustrate one example of how Defendants defrauded Medicaid and the federal government by knowingly submitting claims for services that were not rendered in accordance with then-current IEPs. (*See* Complaint Exhibit 21).

A.C.'s Parent contacted the Relator concerning the Defendants' failure to provide adequate and consistent services throughout the school closures beginning in March 2020. A.C. is a fourteen-year-old young man diagnosed with Autism. (*Id.* at 3). His IEP notes that his "disability in the area of [Autism] impacts his ability to access his education in the general curriculum because he has lacked adaptive skills to work through normal academic frustrations, lacked the ability to know when and how to ask for help, and lacked the necessary stamina to work through difficult situations without an individual adult to support him specifically throughout his school day, and specialized direct instruction in math, reading, and writing." (*Id.* at 4). A.C. represents one of the many students with disabilities within Defendant's school districts that require a combination of services. In the example of A.C., he receives [OT] four times per reporting period and [SLT] four times per reporting period. (*Id.* at 10). A.C.'s IEP does not address Defendants submitting claims to Medicaid for those services rendered to A.C. at school. Given the constraints of the COVID-19 pandemic, Defendants attempted to offer services to those students with disabilities via telehealth or otherwise outside of a classroom.

Per the Center for Medicare & Medicaid Services (CMS) Guidelines:

> States are not required to submit a state plan amendment (SPA) to pay for services delivered via telehealth if payments for services furnished via telehealth are made in the same manner as when the service is furnished in a face-to-face setting. States may submit a coverage SPA to describe services delivered via telehealth. A state would need an approved state plan payment methodology (and thus, need to submit a SPA) to establish rates or payment methodologies for telehealth services that differ from those applicable for the same service furnished in a face-to-face setting.[8]

Plaintiff Relator also alleges that Wake County and Moore failed to adjust the rates at which Medicaid was billed for related services and billed for sessions in which the student was not in attendance. Again, following the example of A.C., his IEP highlights:

"A.C.'s IEP also notes that a Special Assistant is to accompany him to class to help him meet classroom expectations and prevent maladaptive behaviors. Exhibit 21." (Complaint ¶ 236). However, "in a remote setting, there was no Special Assistant to 'accompany [A.C.]' to class, as classes were remote. This is further substantiated by the Parents' concerns noted on page 1 of the IEP, which notes A.C. was indeed not given the face-to-face instruction as written in the IEP and required under the Medicaid billing requirements. *See*, Exhibit 21." (Complaint ¶ 237).

"Additionally, Defendants noted the following in A.C.'s IEP: 'In Remote Learning, [A.C.] is relying heavily on his parent for support. In the classroom, he sat up and worked daily. In remote learning, he has a sensory need to sit in a more relaxed seat and work like he is in a classroom. He has been unresponsive to any discussion of his behavior, and such discussions have been counterproductive. Nevertheless, [A.C.] has continued to improve his understanding of the material although does not show improvement in his independence building behaviors.' (Exhibit 21, p. 6)." (Complaint ¶ 238).

"Although his IEP thoroughly describes A.C.'s needs and, for instance, need for 'support from the SLP [Speech Language Pathologist] to monitor social skills interactions with peers and

---

[8] https://www.medicaid.gov/medicaid/benefits/downloads/medicaid-chip-telehealth-toolkit.pdf

adults in the in-person and virtual school environments,' Defendants changed A.C.'s service recommendations to '00' minutes of [SLT], [OT], and Adaptive Physical Education. Exhibit 21, p. 12-13." (Complaint ¶ 240). "However, A.C.'s IEP specifically notes his need for assistance in speech; for instance, on page 15 of A.C.'s IEP, it states:

> [A.C.] has struggled since transitioning to remote/virtual learning in March 2020. [A.C.] continues to require support from the SLP to monitor social skills interactions with peers and adults in the in-person and virtual school environments, especially when he is overwhelmed, anxious, or confused. Exhibit 21.

(Complaint ¶ 241). "Moreover, the IEP highlights that: 'Parents are concerned that due to pandemic, [A.C.] is not receiving face-to-face, in-person help from his Instructional Assistant. Working with his father is causing [A.C.] to over-rely on his father. Parents are concerned about seizures, regression, and that he has needed more one-to-one support than before the pandemic.' Exhibit 21, p. 1." (Complaint ¶ 242).

"Despite being made aware of A.C.'s educational and management needs, the District met in October 2020 and drafted an IEP that simply could not be implemented. For instance, one of A.C.'s social-emotional goals moving forward was '[A.C.] will strike up a quick conversation with at least 3 others each school day in at least 4/5 trials.' Exhibit 21, p. 11." (Complaint ¶ 243). "In remote learning from his home, this goal is unattainable. The preceding serves as yet another example of Defendants recommending and implementing an IEP that is a *per se* denial of FAPE, yet utilizing the same IEP to bill Medicaid and implement the utilize IDEA funds." (Complaint ¶ 244).

Plaintiff Relator alleges that Defendants Wake County and Moore submitted and/or authorized to be submitted fraudulent Medicaid claims that implicitly required services to be offered in accordance with the IEPs in order to be reimbursed appropriately. During the COVID-19 pandemic, Medicaid did not provide a waiver for this requirement.

## LEGAL STANDARD

To counter a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). Similarly, to survive a motion to dismiss for improper venue under Rule 12(b)(3), a plaintiff must make a *prima facie* showing that the venue is proper. A case will be dismissed under Rule 12(b)(3) only if the venue is "wrong" or "improper." *Shenzhen OKT Lighting Co. v. JLC-Tech LLC*, 2021 US Dist. LEXIS 185703 at *13 (SDNY Sept. 28, 2021).

In considering a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 US 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007). "While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations." *Id.* at 679.

## POINT I
### THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS

Personal jurisdiction is principally concerned with the relationship of a given defendant to the particular geographic area in which a case is brought. *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 864 (2d Cir. 1997). *See also United States v. Morton*, 467 U.S. 822, 828 (1984). Limitations on personal jurisdiction "protect the individual interest that is implicated when a nonresident defendant is haled into a distant and possible

inconvenient forum." *Id.*; *see also, Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-703 and n.10 (1982).

Pursuant to the due process clauses of the Fifth and Fourteenth Amendments, there are two parts to the due process test for personal jurisdiction: the minimum contacts inquiry and the reasonableness inquiry. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

> The minimum contacts inquiry requires that the court determine whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction and the reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice.

*Waldman v. Palestinian Liberation Organization*, 835 F.3d 317, 331 (2d Cir. 2016).

Even in the "absence of the systematic presence needed for 'doing business' jurisdiction, a plaintiff may properly assert specific jurisdiction based on its 'transacting business' in New York—*i.e.*, where a defendant, itself 'or through an agent . . . transacts any business within the state, so long as the plaintiff's "cause of action arise[s] from" that transact[ion].""" *Peterson v. Islamic Republic of Iran*, 2013 US Dist. LEXIS 40470 *69-70 (SDNY Mar. 13, 2013) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012)).

Contrary to Defendants' claims, Wake County does extensive business with New York State, as perhaps the most fundamental element of its funding is derived from direct relations and contact with New York City. Specifically, a substantial amount of Defendants' funding for capital improvement projects, if not all, began with Defendants' contact with rating companies based in New York City—Fitch Ratings and Standard Poor & Global—in order to issue bonds into the market.[9] As a direct result of the contacts with New York City, in November 2018, Defendants were able to obtain a $548 million construction bond, $349 million construction bond, and a $120

---

[9] https://s3.us-west-2.amazonaws.com/wakegov.com.if-us-west-2/prod/documents/2020-10/CAFR_Entire%20Document_web%20version.pdf (p. 4).

million parks, recreation, greenways and open space bond from Bank of America.[10] Simply stated, without the approval of Fitch Ratings and Standard & Poor Global in New York City, Defendants would not be able to implement their current seven-year capital improvement plan.[11]

In addition, Defendants' employees hold their 403(b) and 457 Plans with Voya Financial (formerly ING Life Insurance and Annuity Company), headquartered in New York City.[12] [13]

Though the interactions may seem *de minimis*, the approval from New York City served as the lynchpin that secure Defendants' funding. As reported by Defendants in their publicly reported financial reports, they have maintained a "AAA" rating from Moody's since 1973, "AAA" rating from Standard & Poor Global since 1983, and "AAA" rating from Fitch Ratings since 2000.[14] In order to maintain "AAA" rating, Defendants would need to contact each of the agencies (located in New York City) each fiscal year to receive an updated and accurate rating in order to maintain their bonds and shareholders. Defendants also utilize New York City to maintain, manage, and distribute their employees' 403(b) and 457 plans. Thus, Defendants' contacts with New York City are not only significant, but consistent in nature.

## POINT II

### THIS COURT DOES NOT LACK PERSONAL JURISDICTION OVER THE WAKE COUNTY BOARD OF EDUCATION BECAUSE IT WAS INCORRECTLY NAMED

Defendants argue that this Court lacks personal jurisdiction over the Wake County Board of Education because it was incorrectly named the Wake County Public School District. This argument fails.

---

[10] https://s3.us-west-2.amazonaws.com/wakegov.com.if-us-west-2/prod/documents/2020-10/CAFR_Entire%20Document_web%20version.pdf (p. 4).
[11] https://s3.us-west-2.amazonaws.com/wakegov.com.if-us-west-2/prod/documents/2020-10/CAFR_Entire%20Document_web%20version.pdf (p. 5).
[12] https://www.wcpss.net/Page/17004
[13] https://www.wcpss.net/Page/17007
[14] https://s3.us-west-2.amazonaws.com/wakegov.com.if-us-west-2/prod/documents/2020-10/CAFR_Entire%20Document_web%20version.pdf

Selecting the correct defendant but mislabeling it is not grounds for dismissal. In *Robinson v. Sanctuary Music*, 383 Fed. Appx. 54, 56 (2d Cir. 2010), the Second Circuit addressed a case filed in this Court in which the plaintiffs filed a lawsuit against "Sanctuary Music." An officer of Sanctuary Record Groups, Ltd. refused service, claiming there was no entity called "Sanctuary Music." *Id.* at 56. This Court subsequently entered a default judgment against the defendant. *Id.* Having been served under the Hague Convention, Sanctuary Records Group moved to vacate the default judgment, arguing that the correct entity had not been served. *Id.* at 57. The plaintiffs responded with a cross-motion, under Rule 60(a), "to amend the summons, complaint, and default judgment to substitute Appellants as the named defendants in place of Sanctuary Music, *nunc pro tunc*." *Id.* This Court denied the motion to vacate and granted the motion to substitute the correctly-named defendant. *Id.*

The Second Circuit held that a misnomer in a party's name "may be corrected when 'plaintiffs did not select the wrong defendant but committed the lesser sin of mislabeling the right defendant.'" *Id.* (quoting *Datskow v. Teledyne, Inc., Cont'l Prods. Div.*, 899 F.2d 1298, 1301 (2d Cir. 1990)). The court noted the important factors to be considered in determining whether substitution is permissible: "'[p]laintiffs identified the defendant in several ways,' the defendant's correct address appeared on the complaint, and the complaint listed a corporate entity with a name similar to the defendant's when the defendant's actual name was not readily discernable." *Id.* (quoting *Teledyne*, 899 F.2d at 1301). The Court held that the plaintiffs did not sue the wrong defendant but simply mislabeled the proper defendant. *Id.* Process was served on an officer of the correct entity at the entity's correct address, and the entity served held the rights to the recordings that were the subject of the lawsuit. *Id.* While there was no entity called "Sanctuary Music," there

were several entities that included the word "Sanctuary," and it was clear that Sanctuary Records Group was the entity the plaintiffs sought to sue. *Id.* at 58.

All of these factors weigh in favor of personal jurisdiction over the Wake County Board of Education. The summons was issued to the attention of Cathy Quiroz Moore, whom Defendants do not dispute is the Superintendent, nor do they deny that the correct entity was served. The summons was served at 5625 Dillard Drive, Cary, North Carolina 27518. That is the address listed on the Wake County Public School System website. On that website, located at www.wcpss.net, under the "About Us" tab, the first item listed is "School Board," and the second is "Superintendent." Thus, the School Board and the Superintendent are located at that address.

Additionally, the Defendants do not dispute that A.C. is a student within their jurisdiction. The top of A.C.'s IEP clearly reads "WAKE COUNTY SCHOOLS IEP DOCUMENT." (Complaint, Ex. 21, p. 1). Thus, Defendants' attempt to evade responsibility through improper naming is belied by their own failure to list the appropriate Local Educational Agency (LEA) on the IEPs issued to students and their parents. At its logical end, Defendants' argument is unavailing, as federal regulations and the IDEA contain comprehensive due process protections for those eligible under the IDEA and their Parents. Following this argument and assuming *arguendo* that the Parent, not the Relator, brought this action, it would be reasonable to conclude that Defendants would be named similarly. Thus, Defendants' underhanded practice of misnaming themselves on their own IEPs cannot be used as a mechanism and defense to avoid and insulate themselves from liability.

Finally, it is apparent from the allegations of the Complaint that Plaintiff Relator seeks to sue the entity responsible for applying for and obtaining federal IDEA funds and Medicaid funds, as well as the entity responsible for providing educational and related services to disabled students.

Defendants themselves state: "Under North Carolina law, the Wake County Board of Education is the body corporate and the entity responsible for defending suits against the local school administrative unit." Thus, they concede that this is the entity Plaintiff Relator intended to sue. For the reasons set forth in *Robinson* and *Teledyne*, Plaintiff Relator clearly sued, and served, the correct entity but simply mislabeled it. Accordingly, should this Court determine that Plaintiff Relator incorrectly named the Wake County Public School District, Plaintiff Relator reserves his right, under Rule 60(a), to amend the Summons and Complaint to substitute the name of the Wake County Board of Education for the Wake County Public School District.

## POINT III

### THE CLAIMS AGAINST DEFENDANT CATHY QUIROZ MOORE ARE CLAIMS AGAINST THE WAKE COUNTY BOARD OF EDUCATION

Defendants argue first that claims against Cathy Quiroz Moore in her official capacity are essentially claims against the School Board. Thus, even if the School Board was improperly named, per Defendants' own argument, the claims against Moore are effectively claims against the School Board. Yet, Defendants argue that **both** the claims against the School Board **and** the claims against Moore should be dismissed. This argument fails. As discussed above, Plaintiff Relator sued the correct entity but simply mislabeled it. In the alternative, Plaintiff Relator sued the correct entity by suing the Superintendent, Cathy Quiroz Moore. While it may be unnecessary for claims against both to proceed, there certainly are no grounds for claims against both Defendants to be dismissed.

## POINT IV

### THE COMPLAINT STATED VALID CLAIMS UPON WHICH RELIEF CAN BE GRANTED

Defendants contend that the Complaint fails to state facts to support its claims under § 3729(a)(1)(A), (B), and (G) and Section 411(k)(13) of the Medicare Catastrophic Coverage Act of

1988. First, Plaintiff Relator has pled facts sufficient to establish a *prima facie* case under the FCA

and § 411(k)(13).

The Complaint alleges that Defendants engaged in fraudulent conduct by extracting from

the State and Federal Governments hundreds of millions of dollars in payments when they:

   a. knowingly presented, or caused to be presented, false or fraudulent claims for
      payment or approval;

   b. knowingly made, used, or caused to be made or used, a false record or statement
      material to a false or fraudulent claim;

   c. knowingly made, used, or caused to be made or used, a false record or statement
      material to an obligation to pay or transmit money or property to the
      Government, or knowingly concealed or knowingly and improperly avoided or
      decreased an obligation to pay or transmit money or property to the
      Government; and

   d. conspired to commit the above acts, all in violation of 31 USC § 3729(a)(1)(A),
      (B), (C) & (G).

(Complaint at ¶ 232). The Complaint substantiates these claims by providing specific examples

involving a Wake County school system student, A.C. (Complaint at ¶¶ 234-247). The Complaint

further alleges:

   248.   As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage
   Act of 1988, billing for related services must mirror (at maximum) the services
   recommended in each student's IEP. However, Defendant WCPS, by and through
   Defendant CATHY QUIROZ MOORE in her official capacity as Superintendent
   of Schools, have billed for services that were recommended to be in person as
   opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate
   but runs afoul of the Medicaid billing restrictions and is unlawful.

   249.   Moreover, the IDEA regulations provide that in order to utilize IDEA funds
   to provide an appropriate education for students with disabilities, the LEA utilizing
   the IDEA funds must first provide a FAPE for the Student.

   250.   Defendant WCPS, by and through Defendant CATHY QUIROZ MOORE,
   in her official capacity as Superintendent, have failed to provide the students within
   their jurisdiction a FAPE by formulating IEPs with recommended related services
   to be offered to students with disabilities at physical site locations on the LEA
   campuses and subsequently failing to provide the recommended related services as
   written.

   251.   Thereafter, Defendant WCPS, by and through Defendant CATHY QUIROZ
   MOORE, in her official capacity as Superintendent, benefitted from their unlawful

acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEP as written.

252.   Alternatively, Defendants WCPS and Defendant CATHY QUIROZ MOORE, in her official capacity as Superintendent, remained complicit in the scheme to defraud.

These specific, fact-based allegations are more than sufficient to satisfy the pleading threshold set by the Supreme Court in *Iqbal* and *Twombly*.

Plaintiff Relator acknowledges his obligation to provide the "grounds" of his "entitle[ment] to relief" in the complaint requires more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007). A formulaic recitation of the elements of a cause of action will not do. *Id.* However, Plaintiff Relator need not set forth all facts relevant to his claims; factual allegations merely must be enough to raise a right to relief above the speculative level. *Id. See also,* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp 235-236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action").

Further, at the motion to dismiss stage, alleged facts are not to be weighed, nor subject to credibility determinations. *See Neitzke* v. *Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). Further, a Complaint need not even show a likelihood of success to survive a Rule 12(b)(6) motion. *See Scheuer* v. *Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). As set forth above, Plaintiff Relator has pled fact-based allegations in the Complaint that satisfy these pleading requirements.

Defendants also spend a significant amount of space discussing the general requirements of FAPEs and IEPs. They make confusing arguments that imply the Court's need to determine whether remote learning was appropriate for students with disabilities. While remote learning is

an *aspect* of Plaintiff Relator's claim, that aspect comes into play when determining if Defendants' reimbursement claims were appropriate under the Medicaid guidelines during remote learning.

Defendants recite the law appropriately; a Student's IEP is a comprehensive plan drafted through the collaboration of teachers, school officials, and parents and serves to lay out the special education and related services that are tailored to the unique needs of that specific student. *Joseph F. o/b/ minor Endrew F. v. Douglas Cty. Sch. Dist.*, 137 S. Ct. 988, 994 (2017). Defendants seemingly argue that because its district offered its students a FAPE during the time period in question, then *de facto,* each Medicaid reimbursement claim was proper. This is a bold assertion yet unavailing.

Plaintiff Relator's claims stem from ***Medicaid reimbursements*** for services provided in accordance with each Student's IEP. Thus, the inquiry could be resolved by examination of the reimbursement claims made, the provider logs (which would substantiate the service session provided), implemented remote service plans/IEPs, and the Medicaid billing guidelines for school-based services that were in place during the remote-learning period. Some states, like North Carolina, allow for LEAs to utilize IDEA Part B funding for those remaining balances concerning services offered to students in accordance with their IEPs. Thus, the Relator also included claims with regard to IDEA Part B funds. As long as the guidelines were adhered to, Defendants need not worry.

Defendants contend that Plaintiff Relator's claims under 31 U.S.C. §3729(a)(1)(C) are without merit and fail to satisfy Rule 9(b)'s standard. As set forth above, Defendants misunderstand Plaintiff Relator's claims—Defendants herein failed to adhere to the Medicaid guidelines during the "remote learning" period. Each reimbursement submitted is an implicit agreement that the party submitting for reimbursement has adhered to the Medicaid billing

requirements. Thus, Defendants seemingly fail to grasp that "the agreement" is representative of the submitted reimbursement claims, which Defendants submitted with the understanding that the Medicaid billing requirements applied to such submission.

Pleadings subject to Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent." *United States er rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 20 (2d. 2016). "Ultimately, whether a complaint satisfies Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties, and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *United States v. Wells Fargo Bank, NA*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Polanski v. Pfizer, Inc.*, 2009 US Dist. LEXIS 43428, *4 (E.D.N.Y. 2009). "Nevertheless, in cases where the alleged fraudulent scheme is extensive and involves numerous transactions that occurred over a period of time, courts in this Circuit have held that it is impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *United States ex rel. Lee v. N. Adult Day Health Care Ctr.*, 205 F.Supp.3d 276, 285 (2016) (citing *U.S. ex rel Bilotta v. Noartis Pharm. Corp.*, 50 F. Supp. 3d 497, 508 (S.D.N.Y. 2014)). When alleging a fraudulent scheme that is complex and far-reaching, a Relator need only allege "representative samples" of fraudulent conduct to satisfy Rule 9(b). *See United States v. Bank of N.Y. Mellon*, 941 F.Supp.2d 438, 481-482 (S.D.N.Y. 2013). Plaintiff Relator did so here.

The pleading standard under Rule 9(b) may be relaxed where "(1) the facts are peculiarly within the possession and control of the defendant; or (2) where the belief is based on factual

information that makes the inference of culpability plausible." *Arista Records, L.L.C. v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010); *see also U.S. ex rel. Mooney v. Americare, Inc.*, 2013 WL 1346022 at *3 (E.D.N.Y. 2013) ("The Second Circuit applies a relaxed pleading standard when a plaintiff is not in a position to know specific facts until after discovery and 'when the facts are peculiarly within the opposing party's knowledge") (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). Here, it is clear that "the facts are peculiarly within the possession and control of" Defendants, and Plaintiff Relator is "not in a position to know specific facts until after discovery."

Here, Plaintiff Relator sufficiently alleges that Defendants herein knowingly submitted fraudulent IDEA Part B applications and Medicaid reimbursement claims for related services that were not offered in accordance with students' IEPs, nor the Medicaid billing requirements during the "series of occurrences" as occurring during remote learning. Following the example of A.C., "A.C.'s IEP, drafted amid the pandemic on October 5, 2020, does not denote the setting in which A.C. is to receive his services (*i.e.* 'remote,' 'push-in,' 'pull out,' etc.), and only notes that he shall receive his services 'within the school environment.' A.C.'s IEP also notes that a Special Assistant is to accompany him to class to help him meet classroom expectations and prevent maladaptive behaviors. Exhibit 21." (Complaint ¶ 236). However, "in a remote setting, there was no Special Assistant to 'accompany [A.C.]' to class, as classes were remote. The Parents' concern further substantiates this noted on page 1 of the IEP, which notes A.C. was indeed not given the face-to-face instruction as written in the IEP and required under the Medicaid billing requirements. See, Exhibit 21." (Complaint ¶ 237).

"Additionally, Defendants noted the following in A.C.'s IEP: 'In Remote Learning, [A.C.] is relying heavily on his parent for support. In the classroom, he sat up and worked daily. In remote

learning, he has a sensory need to sit in a more relaxed seat and work like he is in a classroom. He has been unresponsive to any discussion of his behavior and such discussions have been counterproductive. Nevertheless, [A.C.] has continued to improve his understanding of the material although does not show improvement in his independence building behaviors.' (Exhibit 21, p. 6)." (Complaint ¶ 238).

"Although his IEP thoroughly describes A.C.'s needs and for instance, need for 'support from the SLP [Speech Language Pathologist] to monitor social skills interactions with peers and adults in the in-person and virtual school environments,' Defendants changed A.C.'s service recommendations to '00' minutes of [SLT], [OT], and Adaptive Physical Education. Exhibit 21, p. 12-13." (Complaint ¶ 240). "However, A.C.'s IEP specifically notes his need for assistance in speech; for instance, on page 15 of A.C.'s IEP, it states:

> [A.C.] has struggled since transitioning to remote/virtual learning in March 2020. [A.C.] continues to require support from the SLP to monitor social skills interactions with peers and adults in the in-person and virtual school environments, especially when he is overwhelmed, anxious, or confused. Exhibit 21.

(Complaint ¶ 241). "Moreover, the IEP highlights that: 'Parents are concerned that due to pandemic, [A.C.] is not receiving face-to-face, in-person help from his Instructional Assistant. Working with his father is causing [A.C.] to over-rely on his father. Parents are concerned about seizures, regression, and that he has needed more one-to-one support than before the pandemic.' Exhibit 21, p. 1." (Complaint ¶ 242).

"Despite being made aware of A.C.'s educational and management needs, the District met in October 2020 and drafted an IEP that simply could not be implemented. For instance, one of A.C.'s social-emotional goals moving forward was '[A.C.] will strike up a quick conversation with at least 3 others each school day in at least 4/5 trials.' Exhibit 21, p. 11." (Complaint ¶ 243). "In remote learning from his home, this goal is unattainable. This serves as yet another example of

Defendants recommending and implementing an IEP that is a per se denial of FAPE, yet utilizing the same IEP to bill Medicaid and implement the utilize IDEA funds." (Complaint ¶ 244).

As set forth above, Plaintiff Relator has more than satisfied the pleading requirements and has stated valid claims upon which relief can be granted.

**POINT V**

**VENUE IS PROPER IN THIS COURT**

A court is permitted to transfer a case to any other district where the venue is proper, "for the convenience of the parties and witnesses [and] in the interest of justice." *See* 28 U.S.C. §1404(a). Defendants argue that this case should be dismissed rather than transferred for improper venue. Plaintiff Relator contends that venue is proper in this Court, and this Court should not transfer this case to another court.

Whether the transfer promotes convenience is based on the following seven factors set forth by the Second Circuit: "(1) the plaintiffs' choice of forum; (2) the convenience of witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of parties; (5) the locus of operative facts; (6) the availability of process to compel the attendance of unwilling witnesses; and (7) the relative means of the parties." *N.Y. Marine & Gen. Ins. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010). However, "[t]here is no rigid formula for balancing these factors, and no single one of them is determinative." *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 561 (S.D.N.Y. 2000).

Here, Plaintiff Relator makes claims with regard to Medicaid claims and IDEA Part B funds made by Defendants in violation of the FCA and the corresponding State statute(s). There will likely be few witnesses, if any, to be called, and any claims submitted that do not align with provider logs or students' IEPs would be considered fraudulent. Thus, this case is based primarily on documentation, or lack thereof. Defendants should be able to produce records easily; if they

cannot do so, they could request the same from Medicaid and forward it to Plaintiff Relator. Defendants have not yet been called to physically appear before the Court. In light of the continuing uncertainty of COVID-19, it remains unclear if the Parties will have to physically appear.

Although Plaintiff Relator maintains that jurisdiction before this Court is appropriate, he acknowledges the concurrent federal jurisdiction of the Eastern District of North Carolina. However, the Eastern District of North Carolina is no more convenient for Plaintiff Relator than this Court is for Defendants. Ultimately, the decision whether to transfer the venue is at the court's discretion. *See In re Manville Forest Prods.*, 896 F.2d 1384, 1391 (2d Cir. 1990). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp.2d 189, 197 (S.D.N.Y. 2000).

As noted above, Defendants seek dismissal rather than transfer. Although transfer to a concurrent jurisdiction may be proper, the Supreme Court set forth that in exceptional circumstances, a district court could dismiss an action if "considerations of wise judicial administration" warranted it. *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Dismissal is not warranted here.

"Emphasizing the 'virtually unflagging obligation' of the district courts to exercise the jurisdiction given them, the Court enumerated three facts for a federal court to consider in assessing the appropriateness of dismissal where concurrent jurisdiction exists: (1) the inconvenience of federal forum; (2) the desirability of avoiding piecemeal litigation; and (3) the order in which jurisdiction was obtained by the concurrent forums." *W.J. Nolan & Co. v. Midway Fed. Credit Union*, 913 F. Supp. 806 (S.D.N.Y. 1996), citing *Colorado River*, 424 U.S. at 818. As stated above, the Eastern District of North Carolina is no more convenient for Plaintiff Relator than this Court

is for Defendants. It is highly desirable to avoid piecemeal litigation, and the order in which jurisdiction was obtained in the concurrent jurisdictions is not a factor in this case. Thus, venue is proper in this Court, and this Court should not dismiss the case, nor should it transfer the case to the Eastern District of North Carolina.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court deny the North Carolina Defendants' Motion to Dismiss and that Defendants remain in the pending litigation before this Court.

Respectfully submitted,

Brain Injury Rights Group
Attorneys for Plaintiffs

By: /s/ Ashleigh C. Rousseau
Ashleigh C. Rousseau, Esq. [5801923]
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
Ashleigh@pabilaw.org

cc:     Christopher J. Seusing, Esq.
        John A. Darminio, Esq.
        Wood, Smith, Henning & Berman, LLP
        Attorneys for Defendants
        5 Waller Avenue, Suite 200
        White Plains, NY 10601
        *Via ECF*