UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA and STATES of the UNITED STATES, ex rel. PATRICK DONOHUE,<br><br>Plaintiff-Relator,<br><br>- against -<br><br>RICHARD CARRANZA, in his official capacity as the former Chancellor of New York City Department of Education, et al.,<br><br>Defendants. | Case No. 1:20-CV-5396 (GHW) (SDA) |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS THE SECOND AMENDED COMPLAINT OF RELATOR PATRICK DONOHUE BY DEFENDANTS:**

**NEW YORK CITY DEPARTMENT OF EDUCATION AND RICHARD CARRANZA AND MEISHA PORTER, IN THEIR OFFICIAL CAPACITIES AS FORMER CHANCELLORS OF THE NEW YORK CITY DEPARTMENT OF EDUCATION;**

**BOARD OF EDUCATION OF THE CITY OF CHICAGO AND JOSE M. TORRES, PHD, IN HIS OFFICIAL CAPACITY AS FORMER SUPERINTENDENT OF THE BOARD OF EDUCATION OF THE CITY OF CHICAGO; AND**

**LOS ANGELES UNIFIED SCHOOL DISTRICT AND AUSTIN BEUTNER, IN HIS OFFICIAL CAPACITY AS FORMER SUPERINTENDENT OF THE LOS ANGELES UNIFIED SCHOOL DISTRICT**

HON. SYLVIA O. HINDS-RADIX
CORPORATION COUNSEL OF THE
CITY OF NEW YORK
By: Stephen Kitzinger
Assistant Corporation Counsel
100 Church Street
New York, New York 10009

*Attorneys for Defendants*
*New York City Department of Education, and Richard Carranza and Meisha Porter, in their official capacities as former Chancellors of the New York City Department of Education*

KATTEN MUCHIN ROSENMAN LLP
Joseph V. Willey
Alessandra Denis
50 Rockefeller Plaza
New York, New York 10020

*Attorneys for Defendants*
*New York City Department of Education and its former Chancellors in their official capacities, Richard Carranza and Meisha Porter; Board of Education of the City of Chicago and its former Superintendent in his official capacity, Jose M. Torres, PhD; and Los Angeles Unified School District and its former Superintendent in his official capacity, Austin Beutner*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

STATUTORY AND REGULATORY BACKGROUND................................................ 5

    I.     IDEA FUNDING FOR RELATED SERVICES ....................................... 5

          A.     General Background ........................................................... 5

          B.     Federal and State Agency Guidance Regarding Compliance with the IDEA During COVID-19 Pandemic ..................................... 6

    II.    MEDICAID FUNDING FOR RELATED SERVICES....................................... 10

          A.     General Background ........................................................... 10

          B.     Federal and State Agency Guidance Regarding Telehealth Services During COVID-19 Pandemic ................................. 11

THE SAC'S ALLEGATIONS OF FRAUD ................................................................ 13

STANDARD OF REVIEW ...................................................................................... 15

ARGUMENT ......................................................................................................... 16

    I.     THE SAC'S FIRST AND SECOND CAUSES OF ACTION MUST BE DISMISSED FOR FAILURE TO ALLEGE ANY FRAUDULENT CONDUCT ..................................................................................... 16

          A.     The SAC Fails To Allege That School Districts Submitted Any False Claims........................................................................ 17

          B.     The SAC Fails to Allege Any Violation of the Applicable Claiming Requirements .......................................................... 19

          C.     The SAC Fails to Adequately  Allege Materiality or Scienter ................ 23

          D.     The SAC Fails to Adequately Allege  A Worthless Services Claim ........ 27

    II.    THE SAC'S THIRD CAUSE OF ACTION MUST BE DISMISSED FOR FAILURE TO ADEQUATELY ALLEGE A REVERSE FALSE CLAIM......... 30

    III.   THE SAC'S FOURTH CAUSE OF ACTION MUST BE DISMISSED FOR FAILURE TO ADEQUATELY ALLEGE CONSPIRACY........................ 31

IV.    LAUSD MAY NOT BE SUED BY RELATOR UNDER THE FEDERAL
       FALSE CLAIMS ACT ...................................................................................... 31

V.     THE STATE AND CITY CAUSES OF ACTION MUST BE
       DISMISSED ...................................................................................................... 31

VI.    THE CLAIMS AGAINST CHICAGO BOE AND LAUSD MUST BE
       DISMISSED FOR IMPROPER VENUE ............................................................. 32

VII.   THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE ................... 35

CONCLUSION ..................................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................24

*Coyne v. Amgen, Inc.*,
  717 F. App'x 26 (2d Cir. Dec. 18, 2017).............................................16, 17, 24, 25

*J.T. v. de Blasio*,
  500 F. Supp.3d 137 (S.D.N.Y. 2020)..................................................................2, 23

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014)...............................................................................24

*Mikes v. Straus*,
  274 F.3d 687 (2d Cir. 2001), *abrogated on other grounds by Universal Health
  Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) ......................17, 27, 28, 29

*Stoner v. Santa Clara Cnty. Off. of Educ.*,
  502 F.3d 1116 (9th Cir. 2007) ............................................................................31

*Thomas v. Five Star Electric*,
  18-CV-3691, 2019 WL 13125152 (S.D.N.Y. Aug. 23, 2019)................................22

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
  764 F.3d 699 (7th Cir. 2014) ...........................................................................28, 32

*U.S. ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Response,
  Inc.*,
  865 F.3d 71 (2d Cir. 2017)........................................................................15, 17, 19

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*,
  785 F. Supp. 2d 303 (S.D.N.Y. 2011)..................................................................24

*U.S. ex rel. Doe v. Taconic Hills Cent. Sch. Dist.*,
  8 F. Supp. 3d 339 (S.D.N.Y. 2014), *aff'd sub nom. U.S. ex rel. Doe v. New
  York State Sch. Districts*, 597 F. App'x 16 (2d Cir. 2015)..........................33, 34, 35

*U.S. ex rel. Donohue v. Carranza*,
  20-CV-5396, 2022 WL 446042 (S.D.N.Y. Feb. 14, 2022)................................33, 34

*U.S. ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) ............................................................................24, 29, 30

*U.S. ex rel. Gelbman v. City of New York*,
    14-CV-771, 2018 WL 4761575 (S.D.N.Y. Sept. 30, 2018), *aff'd* 790 F. App'x
    244 (2d Cir. 2019)..................................................................................................15, 18

*U.S. ex rel. Grupp v. DHL Worldwide Ex., Inc.*,
    604 F. App'x 40 (2d Cir. Mar, 23, 2015)..........................................................15, 30

*U.S. ex rel. Hussain v. CDM Smith, Inc.*,
    14-CV-9107, 2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017) ..................................30

*U.S. ex rel. O'Toole v Cmty. Living Corp.*,
    17-CV-4007, 2020 WL 2512099 (S.D.N.Y. May 14, 2020) ............................23, 31

*U.S. ex rel. Roop v. Hypoguard USA, Inc.*,
    559 F.3d 818 (8th Cir. 2009) .................................................................................29

*U.S. ex rel. Sibley v. Delta Reg'l Med. Ctr.*,
    17-CV-53, 2019 WL 1305069 (N.D. Miss. Mar. 21, 2019) ...................................28

*U.S. ex rel. Stop Illinois Mktg. Fraud, LLC v. Addus Homecare Corp.*,
    13-CV-9059, 2018 WL 1411124 (N.D. Ill. Mar. 21, 2018) ...................................32

*U.S. ex rel. SW Challenger, LLC v. Evicore Healthcare MSI, LLC*,
    19-CV-2501, 2021 WL 3620427 (S.D.N.Y. 2021), *appeal filed* No. 22-530 ........29

*U.S. ex rel. Takemoto v. Nationwide Mut. Ins. Co.*,
    674 F. App'x 92 (2d Cir. 2017) ......................................................................15, 20

*U.S. ex rel. Tessler v. City of New York*,
    712 F. App'x 27 (2d Cir. Oct. 5, 2017)....................................................... *passim*

*U.S. ex rel. Yu v. Grifols USA, LLC*,
    17-CV-2226, 2021 WL 5827047 (Dec. 8, 2021) ...................................................27

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)................................................................................... *passim*

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000)................................................................................................31

*Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.*,
    07-CV-3314, 2008 WL 2566728 (S.D.N.Y. Jun. 26, 2008)....................................30

**State Cases**

*Wells v. One2One Learning Foundation*,
    141 P.3d 225 (Cal. 2006) .......................................................................................32

**Federal Statutes**

20 U.S.C. § 1400(d)(1)(A) .................................................................................................5

28 U.S.C. § 1391 ...........................................................................................................34

28 U.S.C. § 1406(a) .......................................................................................................34

31 U.S.C. § 3729(a)(1) ...................................................................................................16

31 U.S.C. § 3729(a)(1)(A) ...................................................................................2, 3, 16, 30

31 U.S.C. § 3729(a)(1)(B) ...................................................................................2, 3, 16, 30

31 U.S.C § 3729(a)(1)(C) ........................................................................................4, 31

31 U.S.C § 3729(a)(1)(G) ........................................................................................3, 30

31 U.S.C. § 3729(b)(1)(A) .............................................................................................24

31 U.S.C. § 3729(b)(4) ..................................................................................................24

31 U.S.C. § 3732(a) ......................................................................................................33

42 U.S.C. § 1396a(a)(25) ...............................................................................................10

42 U.S.C. § 1396a(b) ....................................................................................................10

42 U.S.C. § 1396b(c) ...............................................................................................10, 20

**State Statutes**

740 ILCS 174/5 ............................................................................................................32

Cal. Educ. Code § 56345 (a)(9)(A)-(C) .............................................................................9

N.Y.C. Admin. Code § 7-802(1) ......................................................................................32

N.Y.C. Admin. Code § 7-805(5) ......................................................................................32

N.Y. Social Services Law § 366-B ...................................................................................32

N.Y. State Fin. Law § 188(6) ..........................................................................................31

N.Y. State Fin. Law § 190(2) ..........................................................................................31

**Federal Regulations and Rules**

4 C.F.R. § 300.201 .....................................................................................................5, 23

4 C.F.R. § 300.700 ....................................................................................................5

34 C.F.R. § 300.200 ..............................................................................................5, 23

34 C.F.R. § 300.202(a) .............................................................................................5

42 C.F.R. pt. 435 .....................................................................................................11

42 C.F.R. § 430.0 ....................................................................................................11

42 C.F.R. § 431.10(b)(3) .........................................................................................11

34 C.F.R. § 300.705 ..................................................................................................5

Elimination of Reimbursement Under Medicaid for School Administration
    Expenditures and Costs Related to Transportation of School-Age Children, 72
    Fed. Reg. 73,635 (Dec. 28, 2007) (to be codified at 42 C.F.R. pts. 431, 433,
    440) .............................................................................................................11, 20

Fed. R. Civ. P. 9(b) ......................................................................................1, 2, 15, 16

Fed. R. Civ. P. 12(b)(2) ........................................................................................1, 32

Fed. R. Civ. P. 12(b)(3) ........................................................................................1, 32

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 2, 15, 16, 20

Fed. R. Civ. P. 20(a)(2) .............................................................................................33

Fed. R. Civ. P. 20(a)(2)(A) .......................................................................................34

**Federal and State Agency Guidance**

CA. DEP'T HEALTH CARE SERVS., PPL. NO. 20-014R: LOCAL EDUCATIONAL
    AGENCY MEDI-CAL BILLING OPTION PROGRAM (LEA BOP) TELEHEALTH
    POLICY RELATED TO THE CORONAVIRUS DISEASE 2019 (COVID-19) (Sept. 15,
    2020) ...........................................................................................................13

CA. DEP'T EDUC., SPECIAL EDUCATION GUIDANCE FOR COVID-19 (Apr. 9, 2020) .....................8

CTR. MEDICARE & MEDICAID SERVS., STATE MEDICAID & CHIP TELEHEALTH
    TOOLKIT: POLICY CONSIDERATIONS FOR STATES EXPANDING USE OF
    TELEHEALTH, COVID-19 VERSION 3 ..............................................................11

ILL. BD. EDUC., FREQUENTLY ASKED QUESTIONS FOR SPECIAL EDUCATION
    DURING REMOTE LEARNING (Apr. 20, 2020) .................................................8, 9

ILL. DEP'T HEALTHCARE FAMILY SERVS., FAQs FOR ILLINOIS MEDICAID VIRTUAL
    HEALTHCARE EXPANSION/TELEHEALTH EMERGENCY RULES (May 19, 2020) ...................12

ILL. BD. EDUC., FALL 2020 LEARNING RECOMMENDATIONS (July 23, 2020) ...............................10

N.Y. DEP'T HEALTH, MEDICAID IN EDUCATION ALERT, ISSUE # 20-02 (Apr. 2, 2020) ...................................................................................................................................12

N.Y. DEP'T HEALTH, MEDICAID IN EDUCATION ALERT, ISSUE # 20-02: ADDENDUM (June 5, 2020).................................................................................................................21

N.Y. EDUC. DEP'T, PROVISION OF SERVICES TO STUDENTS WITH DISABILITIES DURING STATEWIDE SCHOOL CLOSURES DUE TO NOVEL CORONAVIRUS (COVID-19) OUTBREAK IN NEW YORK STATE – ADDITIONAL QUESTIONS AND ANSWERS 5 (Apr. 27, 2020)..........................................................................................8, 26

OFF. SPECIAL EDUC., N.Y. DEP'T EDUC., SUPPLEMENT #3 - PROVISION OF SERVICES TO STUDENTS WITH DISABILITIES DURING STATEWIDE SCHOOL CLOSURES DUE TO NOVEL CORONAVIRUS (CO VID-19) OUTBREAK IN NEW YORK STATE, QUESTIONS AND ANSWERS (June 20, 2020).......................................................10

OFF. SPECIAL EDUC. PROGRAMS, U.S. DEP'T EDUC., OSEP QA 20-01: IDEA PART B SERVICE PROVISION (Sept. 28, 2020) ....................................................................7

U.S. DEP'T EDUC., QUESTIONS AND ANSWERS ON PROVIDING SERVICES TO CHILDREN WITH DISABILITIES DURING THE CORONAVIRUS DISEASE 2019 OUTBREAK (Mar. 2020) ..............................................................................................6, 7

Defendants New York City Department of Education along with Richard Carranza and Meisha Porter in their official capacities as its former Chancellors (collectively, "NYC DOE"), Board of Education of the City of Chicago (identified as Chicago Public School District in the Second Amended Complaint (the "SAC") (ECF No.19)) along with Jose M. Torres, PhD, in his official capacity as its former Superintendent (collectively, "Chicago BOE"), and the Los Angeles Unified School District along with Austin Beutner, in his official capacity as its former Superintendent (collectively, "LAUSD") (together, the "School Districts"), submit this memorandum of law in support of their motion to dismiss the SAC of Relator Patrick Donohue ("Relator") in this *qui tam* action because the SAC fails to (i) state a claim on which relief can be granted, as required by Federal Rule of Civil Procedure 12(b)(6); or (ii) plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Chicago BOE and LAUSD further move for dismissal of the SAC based on lack of personal jurisdiction and improper venue pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(3).

## PRELIMINARY STATEMENT

In this case, school districts that furnished school supportive health services (or "related services") to students with disabilities via telehealth while schools were fully or partially closed to combat the spread of COVID-19 are wrongly accused of violating the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") and similar State False Claims Acts by billing Medicaid at the "full rates" for, and applying for IDEA grants that cover, such telehealth services. Such claiming was fraudulent, Relator contends, because such students' "individualized education plans" ("IEPs")—which are required under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400, *et seq.* (the "IDEA")—required that such services be provided in person. That this was not fraud is overwhelmingly clear given the guidance issued by the federal and state agencies that administer the IDEA and Medicaid programs, which *expressly authorized* the provision of,

and claiming for, such telehealth services without requiring IEPs to be amended to reflect such change in modality.

Relator is well aware of such guidance. In a case filed by Relator's law firm, *J.T. v. de Blasio*, 500 F. Supp.3d 137, 150-152 (S.D.N.Y. 2020), the District Court issued a decision more than *nine months* before Relator filed the SAC that found that the United States Department of Education ("USDOE") (i) authorized school districts to provide related services remotely during school closures, (ii) did not require IEPs to be updated to reflect such change in modality, and (iii) instructed school districts to, if necessary, conduct assessments and provide any needed compensatory services upon resuming normal operations. In the SAC itself, Relator misrepresents guidance issued by the New York State Medicaid agency. (*See* SAC ¶ 53 at 21.)[1] Such guidance clearly provides that telephonic/telehealth services would be covered by Medicaid at the same rates as if the services were furnished in person, and that IEPs would not need to be amended to reflect telehealth services. As a self-described expert regarding Medicaid billing (*see id*. ¶¶ 184, 211 at 59), Relator must be aware that the California and Illinois Medicaid agencies similarly modified their billing requirements to allow for the reimbursement of related services furnished via telehealth without a change in the reimbursement rate and without requiring the IEPs to be amended accordingly. Yet, Relator nonetheless filed the SAC, which should be dismissed under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for the reasons discussed below.

First, the SAC fails to adequately allege violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B). Relator does not identify any claims, let alone any *false* claims, actually submitted under the IDEA or to Medicaid – a critical element for FCA claims – and fails to allege any facts that could form

---

[1] The SAC includes several sets of duplicate paragraph numbers; citations to the SAC herein that reference a duplicate paragraph number are followed by the corresponding page number.

the basis of a strong inference that any *false* claims were in fact submitted. (*See* Argument, Section I.A, *infra*).

Relying upon conclusory allegations, the SAC alleges that the School Districts violated the IDEA and Medicaid billing requirements by providing certain related services to students with disabilities without amending their IEPs to reflect that such services would be provided remotely, and then failed to disclose such violations when submitting claims to the government for such services. In light of the guidance described above, it is clear that the alleged misconduct alleged in the SAC was, in fact, lawful. (*See* Argument, Section I.B, *infra*). Further, the SAC does not, and, in light of such guidance, cannot, allege any facts meeting the FCA's materiality and scienter requirements. (*See* Argument, Section I.C, *infra*).

The SAC's conclusory and unsupported claim that the School Districts caused the government to pay for nothing because the remote related services the School Districts "may have provided was so subpar as to be completely worthless" (SAC ¶ 276 (emphasis added)) also fails, as (i) there are no allegations regarding the *actual* services provided; (ii) the SAC fails to allege any facts to support a reasonable inference that the School Districts billed for any remote related service *knowing* that such service provided *no medical value* to the student; and (iii) the SAC contains no facts to support that the modality in which the related services at issue were furnished (*i.e.*, in-person or via telehealth) was *material* to the applicable government agency's decision to distribute IDEA funding or reimburse Medicaid claims for such services. (*See* Argument, Section I.D, *infra*).

The SAC's "reverse False Claims Act" cause of action (31 U.S.C § 3729(a)(1)(G)) should be dismissed because it is simply duplicative of the allegations of false claiming under §§ 3729(a)(1)(A) and (B). (*See* Argument, Section II, *infra*).

The SAC's alleged FCA conspiracy cause of action (31 U.S.C § 3729(a)(1)(C)) also should be dismissed because the SAC fails to allege any facts identifying an agreement among the School Districts to violate the FCA. (*See* Argument, Section III, *infra*).

The SAC's FCA claims should be dismissed in their entirety as against LAUSD for the additional reason that as California school districts are considered to be "arms of the state," LAUSD is not subject to *qui tam* liability under the FCA. (*See* Argument, Section IV, *infra*).

The causes of action under the respective State and City False Claims Acts should also be dismissed on the grounds that (i) the SAC's deficiencies under the federal FCA also apply under the State and City False Claims Acts, which are modeled after the FCA; (ii) NYC DOE and LAUSD are not subject to *qui tam* suits under those State/City laws; and (iii) Relator apparently did not provide notice of this action to the applicable States as required thereunder. (*See* Argument, Section V, *infra*).

Finally, because the SAC does not establish personal jurisdiction over Chicago BOE or LAUSD in this District, joinder of Chicago BOE and LAUSD in this case, and Relator's choice of venue in this District, are improper. We respectfully submit that the Court should decline, in the interest of justice, to transfer this case to the proper venues, as (i) dismissal of the SAC is warranted as to NYC DOE, and the SAC's allegations against Chicago BOE and LAUSD are almost identical to those against NYC DOE; (ii) the authorities authorizing the provision of related services via telehealth are substantively identical for each School District; and (iii) with respect to LAUSD, on the additional ground that it is not subject to *qui tam* liability under the FCA. (*See* Argument, Section VI, *infra*).

## STATUTORY AND REGULATORY BACKGROUND

### I.     IDEA FUNDING FOR RELATED SERVICES

#### A.   General Background

States and local education agencies ("LEAs"), such as the School Districts, are mandated by the IDEA "to ensure that all children with disabilities have available to them a free and appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The USDOE distributes IDEA block grants to States to assist them in providing a FAPE; States distribute block subgrants to LEAs to fund the costs of providing special education and related services to students with disabilities that exceed the average annual per-student expenditure and are not reimbursed by another payer. *See* 34 C.F.R. §§ 300.202(a), 300.700, 300.705. The respective maximum amount of such grants and sub-grants is equal to a prescribed base amount, adjusted to reflect the population of children of a certain age, and those in poverty, in the State, or enrolled or living in the LEA's jurisdiction, as applicable. *See id*. §§ 300.703, 300.700, 300.705.

States and LEAs must provide assurances that they have in effect policies and procedures that meet a number of conditions, including the development and implementation of an IEP, which is a written plan that details the education programs and related services to "be provided to enable the child [t]o advance appropriately toward attaining the annual goals" for academic achievement and functional performance. *Id*. § 300.320(a)(4)(i); *see also id*. §§ 300.100, 300.101(a), 300.200, 300.201. IEPs are developed, and updated on at least an annual basis, by the student's IEP team, which includes the students' parent(s) or guardian(s). *See id*. §§ 300.321, 300.323(c), 300.324(b)(1)(i). The IEP must identify the "anticipated frequency, location, and duration of"

related services—such as speech, physical and occupational therapy—to be provided. *Id*. § 300.320(a)(7); *see also id*. §§ 300.34(a), 300.320(a)(4).

> **B. Federal and State Agency Guidance Regarding**
> **Compliance with the IDEA During COVID-19 Pandemic**

When schools began closing to help combat the spread of COVID-19, the USDOE, acknowledging that the IDEA does not "address a situation in which . . . schools are closed for an extended period of time . . . because of exceptional circumstances, such as an outbreak of a particular disease[,]" issued guidance regarding how to comply with the IDEA during the COVID-19 pandemic. U.S. DEP'T EDUC., QUESTIONS AND ANSWERS ON PROVIDING SERVICES TO CHILDREN WITH DISABILITIES DURING THE CORONAVIRUS DISEASE 2019 OUTBREAK 2 (Mar. 2020) ("USDOE MARCH 2020 COVID-19 Q&AS").[2] Addressing concerns raised by schools that the provision of remote services would violate the IDEA, USDOE assured schools that:

> This is simply not true. . . .
>
> **To be clear: ensuring compliance with the [IDEA] . . . should not prevent any school from offering educational programs through distance instruction.**
>
> School districts must provide a [FAPE] consistent with the need to protect the health and safety of students with disabilities and those individuals providing education, specialized instruction, and related services to these students. In this unique and ever-changing environment, [the USDOE] recognize(s) that these exceptional circumstances may affect how all educational and related services and supports are provided, and the Department will offer flexibility where possible. However, school districts must remember that the provision of FAPE may include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically.
>
> . . .
>
> It is important to emphasize that federal disability law allows for flexibility in determining how to meet the individual needs of students with disabilities. The determination of how FAPE is to be provided may need to be different in this time of unprecedented national emergency. . . . Where, due to the global pandemic and resulting closures of schools, there has been an inevitable delay in providing services

---

[2] *See* Declaration of Joseph V. Willey ("Willey Decl."), Ex. A.

– or even making decisions about how to provide services – IEP teams . . . must make an individualized determination whether and to what extent compensatory services may be needed when schools resume normal operations.

OFF. SPECIAL EDUC. REHAB. SERVS., U.S. DEP'T EDUC., SUPPLEMENTAL FACT SHEET: ADDRESSING

THE RISK OF COVID-19 IN PRESCHOOL, ELEMENTARY AND SECONDARY SCHOOLS WHILE SERVING

CHILDREN WITH DISABILITIES 1-2 (March 21, 2020) (emphasis in original).[3] USDOE also advised

that "IEP teams may, but are not required to, include distance learning plans in a child's IEP that

could be triggered and implemented during a selective closure due to a COVID-19 outbreak."

USDOE MARCH 2020 COVID-19 Q&As at 5.

USDOE continued to authorize the provision of remote instruction for the 2020-2021

school year, as deemed necessary by the relevant State or local officials:

Decisions about the 2020-2021 school year, including how and when educational and other services are provided, are being made by State and local officials, with continued academic growth and the safety of the local school community being paramount significance. As public agencies and officials grapple with challenging decisions, administrators, educators, and parents may need to consider multiple options for delivering instruction, including special education and related services to children with disabilities. Those options could include remote/distance instruction, in-person attendance, or a combination of both remote/distance instruction and in-person attendance (hybrid model).

OFF. SPECIAL EDUC. PROGRAMS, U.S. DEP'T EDUC., OSEP QA 20-01: IDEA PART B

SERVICE PROVISION 1-2 (Sept. 28, 2020).[4]

The applicable state agencies responsible for administering the IDEA on the state level—

the New York State Education Department ("NYSED"), the Illinois State Board of Education

("ISBE") and the California Department of Education ("CDE")—issued guidance, consistent with

USDOE guidance, that authorized the provision of FAPE "consistent with the need to protect the

---

[3] *See* Willey Decl., Ex. B.

[4] *See* Willey Decl., Ex. C.

health and safety of students with disabilities and those individuals providing special education and related services to students . . . through distance instruction provided virtually, online, or telephonically." N.Y. Educ. Dep't, Provision of Services to Students with Disabilities During Statewide School Closures Due to Novel Coronavirus (COVID-19) Outbreak in New York State & Topic Questions and Answers 3 (Mar. 27, 2020) ("NYSED Mar. 27, 2020 Guidance"); *see also* Ill. Bd. Educ., Frequently Asked Questions for Special Education During Remote Learning 2 (Apr. 20, 2020) ("ISBE Apr. 20, 2020 Guidance"); Ca. Dep't Educ., Special Education Guidance for COVID-19, FAQ no. 1 (Apr. 9, 2020) ("CDE Apr. 9, 2020 Guidance").[5]

Acknowledging that school districts "may not be able to provide all services in the same manner they are typically provided," and that there may be delays in providing, and determining how to provide, services, NYSED, ISBE and CDE noted that flexibility would be offered where possible and that, *when normal operations were resumed*, IEP teams would determine "whether and to what extent compensatory services may be needed." ISBE Apr. 20, 2020 Guidance at 2-3; *see also* NYSED Mar. 27, 2020 Guidance at 1-3, 6-7; N.Y. Educ. Dep't, Supplement #1 - Provision of Services to Students with Disabilities During Statewide School Closures Due to Novel Coronavirus (COVID-19) Outbreak in New York State – Additional Questions and Answers 5 (Apr. 27, 2020) ("NYSED Apr. 27, 2020 Guidance")[6]; CDE Apr. 9, 2020 Guidance at FAQ no. 1. NYSED, ISBE and CDE did not require the School Districts to reconvene an IEP meeting to amend IEPs to reflect the provision of remote services:

> Guidance provided by [the USDOE] . . . indicated that if online or virtual learning is part of a school closure recommendation, the school district would not be

---

[5] *See* Willey Decl., Exs. D-F, respectively.

[6] *See* Willey Decl., Ex. G.

required to amend students' IEPs as online or virtual learning would be considered an alternate mode of instructional delivery.

NYSED MAR. 27, 2020 GUIDANCE at 5.

ED guidance expressly recommends that schools and school districts consider practices such as teletherapy and tele-intervention. . . . Districts should consult their board, administrators, and counsel on whether an IEP amendment may be required for the provision of teletherapy or tele-intervention.

ISBE APR. 20, 2020 GUIDANCE at 4.

Under this unique circumstance, in the CDE's view it is not necessary for an LEA to convene an IEP team meeting, or propose an IEP amendment without a team meeting, for every student, solely for the purpose of discussing the need to provide services away from school, because that change must necessarily occur due to the COVID-19 pandemic.

CDE APR. 9, 2020 GUIDANCE at FAQ no. 1.[7]

As schools began partially reopening in the 2020-2021 school year, NYSED, ISBE and CDE recognized that the effects of, and the efforts to combat, the COVID-19 pandemic would continue to affect how instruction and services could be provided to students, consistent with the need to protect the health and safety of such students, staff and families:

[T]he offer of FAPE may be made by providing . . . programs and/or services either in-person or remotely (or a combination of both). The decision as to whether a student receives in-person versus remote services is solely based on the extent to which in-person services may be offered by the student's provider in accordance with the DOH health and safety requirements.

. . .

[S]chool districts must ensure that, to the greatest extent possible, each student with a disability is provided the special education and related services identified in the student's IEP recognizing that during the COVID-19 outbreak, providers may not be able to deliver all services in the mode or manner they are typically provided. The school district would not be required to amend students' IEPs.

---

[7] In June 2020, the California Education Code was amended to require IEP teams to include in the *next regularly scheduled* revision of a student's IEP "[a] description of the means by which the [IEP] will be provided" if in-school or in-person instruction or services cannot be provided for more than 10 school days due to an emergency. Cal. Educ. Code § 56345 (a)(9)(A)-(C).

OFF. SPECIAL EDUC., N.Y. DEP'T EDUC., SUPPLEMENT #3 - PROVISION OF SERVICES TO STUDENTS WITH DISABILITIES DURING STATEWIDE SCHOOL CLOSURES DUE TO NOVEL CORONAVIRUS (COVID-19) OUTBREAK IN NEW YORK STATE, QUESTIONS AND ANSWERS 2-4 (June 20, 2020); *see also* ILL. BD. EDUC., FALL 2020 LEARNING RECOMMENDATIONS 5, 45 (July 23, 2020) ("While . . . in-person learning is the goal, it may not be safe or feasible to fully resume in-person learning in every school community. . . . As such, the purpose of this document is to provide recommendations to educators for implementing in-person, blended, and/or remote learning during the 2020-21 school year."); CA. DEP'T EDUC., DISTANCE LEARNING FREQUENTLY ASKED QUESTIONS ABOUT DISTANCE LEARNING FOR THE 2020-21 SCHOOL YEAR PURSUANT TO EDUCATION CODE 43500-43511, FAQ nos. 4, 6 (Aug. 21, 2020) ("The intent is that LEAs offer in-person instruction to the greatest extent possible. However, LEAs can, and in some instances must, offer distance learning and/or hybrid models of learning under certain circumstances during the 2020–21 school year.").[8]

## II.    MEDICAID FUNDING FOR RELATED SERVICES

### A.    <u>General Background</u>

The Medicaid Act, 42 U.S.C. §§ 1396, *et seq.*, provides federal funding to states that make medical care available to eligible indigent and low-income persons and have a state plan—which sets forth how a state administers Medicaid—approved by the Centers for Medicare and Medicaid Services ("CMS"). *See* 42 U.S.C. § 1396a(b). While the Medicaid statute generally prohibits Medicaid payments for services for which another payer is liable (*see* 42 U.S.C. § 1396a(a)(25)), the Medicare Catastrophic Coverage Act of 1988 included a provision, codified at 42 U.S.C. § 1396b(c)), specifying that Medicaid payments for covered services would not be prohibited on the ground that funding for such services is available under the IDEA, *i.e.*, "because such services are

---

[8] *See* Willey Decl., Exs. H-J, respectively.

included" in an IEP. For such related services to be billable under Medicaid, the student must be

Medicaid-eligible (as determined by the State) and the related service must be within "a Medicaid

covered category under the approved State Medicaid plan, and [] meet all other Federal and State

Medicaid regulations." Elimination of Reimbursement Under Medicaid for School Administration

Expenditures and Costs Related to Transportation of School-Age Children, 72 Fed. Reg. 73,635,

73,636 (Dec. 28, 2007) (to be codified at 42 C.F.R. pts. 431, 433, 440); *see also* 42 C.F.R. §§

430.0, 431.10(b)(3); 42 C.F.R. pt. 435.

**B.   Federal and State Agency Guidance Regarding
Telehealth Services During COVID-19 Pandemic**

In response to the COVID-19 pandemic, CMS issued a variety of new rules, guidance and

waivers to ensure that "Medicaid agencies have the necessary tools to prepare for and respond to

this emergency on behalf of the nation's 71 million Medicaid and CHIP beneficiaries, including

children." CTR. MEDICARE & MEDICAID SERVS., STATE MEDICAID & CHIP TELEHEALTH TOOLKIT:

POLICY CONSIDERATIONS FOR STATES EXPANDING USE OF TELEHEALTH, COVID-19 VERSION 3.[9]

As part of this effort, CMS expressly permitted state Medicaid agencies to reimburse providers for

telehealth services in the same manner and at the same rates as when such services were provided

in person without requiring an amendment to the state plan. *Id.* at 19.

Each of the applicable state agencies responsible for administering the Medicaid program

on the state level—the New York State Department of Health ("NYS DOH"), the Illinois

Department of Healthcare and Family Services ("IL HFS"), and the California Department of

Health Care Services ("CA DHCS")—authorized the School Districts to bill Medicaid for related

---

[9] *See* Willey Decl., Ex. K.

services furnished remotely, did not require IEPs to reflect this change in modality, and reimbursed

such services at the same rate applicable to such services when furnished in person:

> NYS DOH advised that:

> During the period of the emergency the existing approved set of Medicaid-reimbursable SSHSP services will be reimbursed under current rates when delivered through the following means:

> •    Two-way audio/video communication;

> •    Video, including technology commonly available on smart phones and other devices; and/or

> •    Telephonic communication (To the extent the service can reasonably be delivered over the phone).

> . . . Payment for services delivered via telephonically/telehealth during this emergency will be the same as if the services were delivered face-to-face.

> **Please note that temporary changes to service delivery due to school closures do not require changes to the IEP. . . . This does not preclude the need for the service itself to be in the IEP.**

N.Y. Dep't Health, Medicaid In Education Alert, Issue # 20-02 (Apr. 2, 2020) (emphasis in

original).[10]

> IL HFS advised LEAs and other providers that:

> HFS will reimburse medically necessary and clinically appropriate telehealth and virtual care services with dates of service on or after March 9, 2020 until the public health emergency no longer exists. The rules also require providers to be paid the same rate for telehealth services as services delivered by traditional in-person methods. Finally, the emergency rules expand the modes of communication that can be used for telehealth services to include audio-only telephone communication.

Ill. Dep't Healthcare Family Servs., FAQs for Illinois Medicaid Virtual Healthcare

Expansion/Telehealth Emergency Rules 1 (May 19, 2020).[11] Further, IL HFS did not require

---

[10] *See* Willey Decl., Ex. L.

[11] *See* Willey Decl., Ex. M.

IEPs to be amended, requiring only that providers "maintain adequate documentation of the telehealth services provided." *Id.* at 2.

CA DHCS directed LEA providers "to provide covered direct medical services to Medi-Cal enrolled students via telehealth whenever possible" and confirmed that, during the COVID-19 national emergency, such telehealth services would be reimbursed "at the same rate as for face-to-face services." CA. DEP'T HEALTH CARE SERVS., PPL. NO. 20-014R: LOCAL EDUCATIONAL AGENCY MEDI-CAL BILLING OPTION PROGRAM (LEA BOP) TELEHEALTH POLICY RELATED TO THE CORONAVIRUS DISEASE 2019 (COVID-19), at 2 (Sept. 15, 2020).[12] CA DHCS further advised LEA providers that they were not required to amend students' IEPs to "identify that the services will be provided via telehealth." *Id.* at 3.

## THE SAC'S ALLEGATIONS OF FRAUD

The SAC generally alleges that, in school years 2019-2020 (beginning in March 2020) and 2020-2021, the School Districts violated both the IDEA and Medicaid billing requirements by furnishing related services via telehealth and/or telephone while schools were fully or partially closed as a result of the COVID-19 pandemic even though such students' IEPs recommended that such services be furnished in-person or furnishing fewer services than set forth on such IEPs, thereby denying such students a FAPE, and subsequently violated the FCA by failing to disclose such violations when claiming reimbursement under the IDEA and the Medicaid program. (*See, e.g.*, SAC ¶¶ 1, 62 at 23, 66 at 24.) The SAC also alleges that the School Districts violated the FCA by failing to "change the rate at which related services were billed when offered by alternative means (i.e., telehealth, phone, etc. [*sic*]), and [] billed at the same rate as in-person services at the

---

[12] *See* Willey Decl., Ex. N.

full rate, while conferring no meaningful benefit to students with disabilities." (SAC ¶ 68 at 24; *see also* SAC ¶¶ 2, 19.)

For each School District, the SAC bases its allegations of fraud on one or two examples of IEPs developed for students attending a school within such School District—J.R.'s IEP was developed by NYC DOE (SAC ¶¶ 81-88 at 27-29; SAC, Exs. 3, 4); B.W.'s IEP was developed by Chicago BOE (SAC ¶¶ 178-183; SAC, Ex. 15); and C.A.'s and M.R.'s IEP were developed by LAUSD (SAC ¶¶ 203-210 at 57-59; SAC, Exs. 18, 19). While the specific details vary, the allegations concerning the IEPs for such students—which are attached as Exhibits to the Complaint—contend that such IEPs demonstrate that (i) the School Districts unilaterally decided to provide remote services instead of in-person as recommended in the IEPs then in effect and did not reconvene an IEP meeting to update such IEP; (ii) the School Districts fraudulently developed IEPs during the pandemic to recommend in-person services when the School District knew that such services would be furnished remotely, which knowledge was demonstrated in the IEPs themselves in some cases; and/or (iii) certain of the recommended services were essentially of no value to the student when provided remotely.

Additionally, Relator alleges that, during an IEP meeting for his daughter, S.J.D., NYC DOE's representative stated that NYC DOE had been instructed to recommend in-person services in the IEPs even though schools were physically closed. (*See* SAC §§ 77-78 at 26.) Relator also alleges that the testimony given by an assistant principal of Horan School, an NYC DOE school, during a hearing regarding S.J.D.'s placement for the 2019-2020 school year demonstrates that, even in person, Horan School could not have provided certain of the recommended services in the manner mandated in S.J.D's IEP, and that services at Horan School were provided remotely instead of in person during school closures. (*See* SAC ¶¶ 77-78 at 26, 89-95; SAC, Exs. 6, 7.) However,

S.J.D. did not attend Horan School or any other NYC DOE school; instead, in school year 2019-2020, S.J.D. attended iBrain, of which Relator is founder and chairman of the Board. (*See* SAC, Ex. 6 at 76, 97, 105.)

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a "complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *U.S. ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. Oct. 5, 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have facial plausibility when the plaintiff pleads "sufficient 'factual content' to allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *U.S. ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 F. App'x 92, 94 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). The complaint "must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *U.S. ex rel. Grupp v. DHL Worldwide Ex., Inc.*, 604 F. App'x 40, 42 (2d Cir. Mar, 23, 2015) (quoting *Iqbal*, 556 U.S. at 678). "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *U.S. ex rel. Gelbman v. City of New York*, 14-CV-771, 2018 WL 4761575, at *3 (S.D.N.Y. Sept. 30, 2018), *aff'd* 790 F. App'x 244 (2d Cir. 2019) (alteration in original) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)). And, critically, "bald assertions and conclusions of law will not suffice to avoid dismissal, . . . nor will factual allegations that are wholly conclusory." *Takemoto*, 674 F. App'x at 94 (citations and quotation marks omitted).

Additionally, *qui tam* complaints filed under the FCA, "because they are claims of fraud, are subject to Rule 9(b)," which states, "in alleging fraud … a party must state with particularity the circumstances constituting the fraud." *U.S. ex rel. Chorches for Bankruptcy Estate of Fabula*

*v. Am. Med. Response, Inc.* ("*Chorches*"), 865 F.3d 71, 81 (2d Cir. 2017) (alteration in original) (citation omitted). This ordinarily requires a relator to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citation and quotation marks omitted). To comply with Rule 9(b), "the complaint must be supported by more than 'conclusory statements' or 'hypotheses,' and it must set forth 'particularized allegations of fact.'" *Tessler*, 712 F. App'x at 29 (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26-27 (2d Cir. 2016)). And while Rule 9(b) permits scienter to be averred generally, this Circuit has "repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *Id.* (citation omitted); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016) (observing that the FCA's scienter requirement is "rigorous").

## ARGUMENT

### I.  THE SAC'S FIRST AND SECOND CAUSES OF ACTION MUST BE DISMISSED FOR FAILURE TO ALLEGE ANY FRAUDULENT CONDUCT

Applying the foregoing standards for Rules 12(b)(6) and 9(b), the SAC must be dismissed. The SAC's first and second causes of action allege that the School Districts: (1) knowingly presented, or caused to be presented, false claims for payment to the federal government (*see* 31 U.S.C. § 3729(a)(1)(A)), and (2) knowingly made or used, or caused to be made or used, false records or statements material to such false claims (*see* 31 U.S.C. § 3729(a)(1)(B)). (*See* SAC ¶¶ 267-276.) To state a claim under either subsection of 31 U.S.C. § 3729(a)(1), Relator must show that the School Districts "(1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. Dec. 18, 2017) (citation and quotation marks omitted).

A claim is false or fraudulent if it is an "improper claim [ ] *aimed* at extracting money the government otherwise would not have paid." *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001) (emphasis added), *abrogated on other grounds by Escobar*, 579 U.S. at 190-192. "Specifically, to be material the government must have made the payment 'as a result of the defendant's alleged misconduct.'" *Coyne*, 717 F. App'x at 29 (quoting *United States ex rel. Ge v. Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 124 (1st Cir. 2013)). The SAC does not allege sufficient fact allegations to show, as it must, that any claims purportedly submitted by the School Districts were actually false or that, but for the School Districts' alleged fraudulent conduct, the Government would not have paid such claims.

### A.   The SAC Fails To Allege That School Districts Submitted Any False Claims

It is fundamental that, to be liable under the FCA, defendants "'must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent.'" *Chorches*, 865 F.3d at 83 (quoting *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26, 31 (1st Cir. 2016). To show that a false claim was submitted to the government for money, the SAC must, at the very least, "provide details of actual bills or invoices submitted to the government" or must "make plausible allegations . . . that lead to a strong inference that specific claims were indeed submitted and that information about the details of the claims submitted are peculiarly within the opposing party's knowledge." *Id.* at 93. In *Chorches*, the relator alleged sufficient facts to demonstrate that the defendant's "billing procedures . . . made it virtually impossible" for relator to provide details of actual false claims submitted by the defendant. *Id.* at 82. However, the Second Circuit further found:

> [the] allegations detail specific and plausible facts from which we may easily infer
> . . . that [the defendant] systematically falsified its records, noting in particular that
> the complaint named the supervisory personnel who directed the falsification of the
> reports; identified more than ten specific instances in which Fabula was ordered to

fabricate documents; and explained in detail both the scheme itself and the method by which [the defendant] executed the scheme.

*U.S. ex. rel Gelbman*, 790 F. App'x at 249 (quoting *Chorches*, 865 F.3d at 77, 83-84) (quotation marks omitted).

Like in *Chorches*, the Relator fails to identify a single claim for IDEA funds or Medicaid reimbursement—let alone a false claim—knowingly submitted by the School Districts. The SAC instead relies instead on conclusory, unsupported allegations. With respect to Medicaid, the SAC alleges that Relator "has first-hand knowledge that claims were submitted on behalf of Special Education students by the Defendants for related services that were not offered in-person" (SAC ¶ 62 at 23; *see also* SAC ¶¶ 66 at 24, 88, 183, 183, 212 at 55) and that the parents of certain of the identified students were "not privy to the billing practices and requirements for Medicaid billing" (SAC ¶¶ 184, 211 at 59). The SAC also appears to suggest that Ms. LeFaivre, the assistant principal of a NYC DOE school, provided testimony concerning "inconsistent Medicaid billing practices on behalf of NYC DOE at full rates, as if IEPs were being fully implemented, despite a lack of resources and reduced services" (SAC ¶ 89), but the transcripts of such testimony (SAC, Exs. 6, 7) reveal that Ms. LaFaivre made no mention of Medicaid claiming. With respect to the IDEA, the SAC alleges that "Defendants herein submitted additional applications for IDEA funding to the federal government with false assurances that Defendants were offering FAPE to students with disabilities for school years 2019-2020, 2020-2021, and 2021-2022." (SAC ¶ 75 at 26 (citing SAC, Ex. 1).) Exhibit 1, however, contains letters from USDOE to the applicable state education agencies responding to such *state agencies'* application for IDEA funds; it does not contain any applications for IDEA funding by the School Districts.

Unlike in *Chorches*, however, the Relator fails to allege any facts—such as who submitted such false claims, when they were submitted, or that anyone involved in the submission of false

claims had knowledge that claims were false and submitted them anyway—that could lead to a strong inference that the School Districts submitted any such false claims (knowingly or not) or that the submission of IDEA or Medicaid claims by the School Districts is "peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 93; *Tessler*, 712 F. App'x at 30 (affirming dismissal of complaint where "Relator fail[ed] to plausibly allege that the [defendant] submitted false or fraudulent claims for payment" and "allege[d] only 'hypotheses' and conclusory allegations").

### B. The SAC Fails to Allege Any Violation of the Applicable Claiming Requirements

Relator's main claims against the School Districts are based on a theory of legal falsity and, specifically, implied false certification. (SAC ¶¶ 269-274.) This theory is premised on the notion that "when a defendant submits [or causes to be submitted] a claim, it impliedly certifies compliance with all conditions of payment." *Escobar*, 579 U.S. at 180. The *sine qua non* of a plausible implied certification claim is a defendant's noncompliance with a legal or contractual requirement. *Escobar*, 579 U.S. at 181; *Tessler*, 712 F. App'x at 30 (affirming dismissal where the alleged misconduct did not constitute a violation of the "applicable law and guidelines"). The SAC has not shown any such noncompliance. In fact, the relevant federal and state agencies authorized the very conduct that the SAC alleges was unlawful.

*Medicaid.* – Misunderstanding what laws are applicable to school districts in their role as Medicaid providers, Relator alleges that a FAPE (an IDEA requirement) must "be provided in order to submit claims for Medicaid reimbursement for related services." (SAC ¶ 94 at 30.) The IDEA does not govern reimbursement of services under Medicaid. CMS has made clear that Medicaid will reimburse only those related services identified in IEPs that "are in a Medicaid covered category under the approved State Medicaid plan . . . and that meet all other Federal and

State *Medicaid* regulations." Elimination of Reimbursement Under Medicaid, 72 Fed. Reg. at 73,636 (emphasis added).

Relator also self-servingly mischaracterizes the Medicare Catastrophic Coverage Act of 1988 to prohibit billing for services that fail to "mirror (at maximum) the services recommended in each student's IEP." (SAC ¶ 106.) In actuality, this Act, which added a provision to the Medicaid statute, 42 U.S.C. § 1396b(c), does no more than carve out an exception to Medicaid's "payer of last resort" requirement by prohibiting the Medicaid program from denying claims for Medicaid-covered services otherwise reimbursable under the IDEA "*because* such services are included" in the student's IEP. (*See supra*, at 10-11 (citing, *inter alia*, 42 U.S.C. § 1396b(c).)

Relator also alleges that the School Districts violated Medicaid billing requirements, but does not identify such billing requirements. (*See e.g.*, SAC ¶¶ 1, 19.) Doing so would have made clear the frivolousness of the SAC's allegations of fraud. *See Takemoto*, 674 F. App'x at 95 ("[Relator's] 'allegations supply nothing but low-octane fuel for speculation' about the requirement reimbursement obligation element of his claims, which cannot defeat Rule 12(b)(6) dismissal even under the basic pleading requirements of Rule 8(a)." (quoting *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 115 (2d Cir. 2013))). The alleged misconduct at the core of Relator's Medicaid-related claims involves the School Districts: (i) furnishing "related services for students with disabilities via telehealth and/or via phone" (SAC ¶ 1) contrary to "each Student's last-agreed-upon IEP, which required in-person services" (SAC ¶ 66 at 24); (ii) failing to reconvene "an IEP meeting with the Students' parent(s) to recommend remote related services" (SAC ¶ 105); and (iii) billing Medicaid for such remote services "at their regular, full rates" (SAC ¶ 2). Specifying the relevant federal and State Medicaid billing requirements in effect during the COVID-19 pandemic would have shown that, in fact:

- CMS permitted States to reimburse Medicaid providers for telehealth services in the same manner and at the same rates as when such services were provided in person;

- NYS DOH modified its billing requirements to provide that related services delivered via telephone or telehealth would be reimbursable, "[p]ayment for services delivered via telephonically/telehealth during this emergency will be the same as if the services were delivered face-to-face" and "temporary changes to service delivery due to school closures do not require changes to the IEP . . . for [] Medicaid purposes";

- IL HFS modified its billing requirements to permit reimbursement for telehealth/telephonic services at "the same rate for telehealth services as services delivered . . . in-person," without requiring IEPs to reflect such change in modality; and

- CA DHCS *directed* LEAs "to provide covered direct medical services . . . via telehealth whenever possible" and modified its billing requirements to permit reimbursement for such remote services "at the same rate as for face-to-face services," without requiring the IEP to "identify that the services will be provided via telehealth."

(*See supra*, at 11-13.)

Relator was clearly aware of such Medicaid billing requirements when drafting the SAC, as the addendum to NYS DOH's Medicaid in Alert # 20-02 is cited in the SAC (SAC ¶ 53). *See* N.Y. DEP'T HEALTH, MEDICAID IN EDUCATION ALERT, ISSUE # 20-02: ADDENDUM (June 5, 2020).[13] While Relator quotes snippets of this addendum out of context to create the misimpression that related services *were not* billable when furnished remotely, in reality, this addendum states that "telephonic/telehealth services will be covered by Medicaid" (*id*. at Q&A A1); payment for telephonic/telehealth services "will be the same as if the services were delivered face-to-face" (*id*.

---

[13] *See* Willey Decl., Ex. O.

at Q&A B1); and "IEPs do not need to be amended to indicate telehealth delivery" (*id*. at Q&A C1). Furthermore, in a hearing on October 1, 2020 regarding his daughter's placement, when asked about the remote therapy sessions furnished in April 2020 to students at his daughter's school, Relator responded, "Obviously, there's limitations on – you can only do so much therapy, but certainly as you probably well know as the attorney for the Department of Education, <u>it was teletherapy was actually approved, and it had been previously approved for – for these type of services</u>." SAC, Ex. 6 at 100 (emphasis added). The court thus need not accept any contradictory allegations in the complaint as true. *See Thomas v. Five Star Electric*, 18-CV-3691, 2019 WL 13125152, at *6 (S.D.N.Y. Aug. 23, 2019) ("In that regard, if 'a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.'") (quoting *Poindexter v. EMI Record Group Inc.*, 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012)).

    ***IDEA.* –** For the IDEA-related claims, the core of Relator's implied false certification theory is that the School Districts violated the IDEA because they failed to offer or provide a FAPE when they "conducted related services . . . via telehealth and/or via phone, contrary to . . . IDEA/Title I billing requirements" where students' IEPs allegedly recommended in-person services or furnished fewer services than required by the IEP.[14] (SAC ¶¶ 1; *see id*. ¶¶ 2, 72-75 at 25-26.) First, while the provision of FAPE is integral to the IDEA, eligibility for a subgrant is dependent upon an LEA submitting "a plan that provides assurances" to the State that, in relevant

---

[14] These allegations are contrary to information in the IEPs for Chicago BOE and LAUSD and thus need not be accepted as true. *See Thomas*, 2019 WL 13125152, at *6. The IEP developed by Chicago BOE recommends remote services when necessary based on "public health conditions and how the district/school is operating." (SAC, Ex. 15 at 31-33.) The IEPs developed by LAUSD recommend that students receive remote services in accordance with their distance or at-home learning plan during school closures. (*See* SAC, Ex. 18 at 30; Ex. 19 at 21-23.)

part, they have "in effect policies, procedures, and programs" to provide FAPE (34 C.F.R. §§ 300.200, 300.201; *see also id*. at § 300.101); an alleged failure to provide FAPE to certain students during the midst of a pandemic is substantially different than alleging facts from which a reasonable inference could be made that the School Districts did not have "in effect policies, procedures, and programs" to provide FAPE. *See U.S. ex rel. O'Toole v Cmty. Living Corp.*, 17-CV-4007, 2020 WL 2512099, at *11 (S.D.N.Y. May 14, 2020) ("[T]here is no indication in the SAC that the United States . . . would have considered the violations so fundamental that they would have refused reimbursement."). Such allegations also fail to plausibly allege that the School Districts failed to offer or provide FAPE given that the USDOE and relevant State agencies assured schools that "the provision of FAPE may include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically" and did not require IEPs to be updated to reflect the provision of such services remotely. *See supra*, at 6-10.[15]

### C.   The SAC Fails to Adequately Allege Materiality or Scienter

Recognizing that "billing parties are often subject to thousands of complex statutory and regulatory provisions," the Supreme Court has mandated courts to strictly enforce the FCA's rigorous materiality and scienter requirements to ensure that the FCA does not become "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 192-194. To be actionable under the FCA, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision."

---

[15] Relator clearly was aware of this guidance as, prior to the SAC's filing, Chief Judge McMahon issued an opinion in a case filed by Relator's law firm that extensively detailed the relevant USDOE and NYSED guidance. *See J.T.*, 500 F. Supp.3d at 150-152 (discussed *supra*, at 2).

*Id*. at 192; *see also Coyne*, 717 F. App'x at 29. The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). It is not sufficient to allege "that the Government would have *the option* to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194 (emphasis added). Instead, a plaintiff must "plead sufficient facts to plausibly allege" that the Government *would have declined* to pay if it knew of the defendant's noncompliance. *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 109 (2d Cir. 2021).

Further, because the FCA is, at its core, an anti-fraud statute, Relator must allege facts to support an inference that the School Districts committed the type of "knowing 'wrongdoing' that the FCA is intended to remedy." *U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 317 (S.D.N.Y. 2011). Under the FCA, "knowingly" means the defendant "(i) has actual knowledge of the information; (ii) acted in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Allegations that a defendant's actions were "knowing and/or intentional" or resulted from "reckless disregard" or "deliberate ignorance," without more, are legal conclusions that the Court is not permitted to credit. *Tessler*, 712 F. App'x at 30; *Twombly*, 550 U.S. at 555. And although a plaintiff is permitted to plead knowledge "generally," "generally is not the equivalent of conclusory." *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (citation and quotation marks omitted) ("Generally is merely 'a relative term' that allows knowledge to be pleaded with less particularity than is required for the pleading of fraud."). The Federal Rules "do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Id*. (quoting *Iqbal*, 556 U.S. at 686). Instead, a complaint must allege sufficient *facts* to plausibly allege that the defendant "knew or had reason to know" or a reasonable person would have known that, but

for the misrepresentation made by the defendant, the Government would not have made payment. *Escobar*, 579 U.S. at 193; *see also id*. at 196.

With respect to materiality and scienter, the SAC does little more that reiterate the relevant provisions of the FCA—*i.e.*, that the School Districts engaged in fraudulent conduct when they "knowingly presented . . . false or fraudulent claims" or "knowingly made . . . a false record or statement material to a false or fraudulent claim" (SAC ¶¶ 103, 176, 221 at 56-57); the court is not "required to credit those legal conclusions." *Tessler*, 712 F. App'x at 30. There simply are no facts alleged from which the court may draw the reasonable inference that the: (i) relevant governmental agencies would not have made payment had they known that the School Districts provided remote instead of in-person services or provided fewer services than identified on the IEP, without amending IEPs; or (ii) School Districts submitted claims without disclosing any of the alleged violations, *knowing* that the Government would not have made payment if it knew of such violations. *See Coyne*, 717 F. App'x at 29 ([T]he complaint must present concrete allegations from which the court may draw the reasonable inference that the [defendant's] misrepresentations . . . caused the Government to make the reimbursement decision."). Relator fails to even clearly identify the statutory, regulatory or billing requirements that the School Districts allegedly knowingly violated, let alone ones expressly designated by the Government as a condition of payment. *See Escobar*, 579 U.S. at 194 (holding that, while not dispositive, the Government's designation of "a provision as a condition of payment" is relevant when evaluating materiality).

The SAC appears to suggest that the School Districts' fraudulent intent could be discerned by the fact that they developed IEPs "for special education students, knowing they could not implement these IEPs as written." (SAC ¶ 72 at 25; *see also* SAC ¶¶ 77-78 at 26-27 (alleging that NYC DOE "was instructed to proceed as if schools were not closed and to continue recommending

in-person services" on IEPs); ¶ 209 at 58-59 ("[LAUSD] drafted an IEP that [it] <u>had no intention</u> <u>of implementing following the meeting</u> in order to continue utilizing IDEA funds and making submissions for reimbursement to Medicaid."). First, as discussed above (*see supra*, at n. 14), the IEPs developed by Chicago BOE and LAUSD did recommend that remote services be provided during school closures. With respect to NYC DOE, NYSED did in fact instruct schools that "[a]n IEP must be developed to ensure the provision of FAPE and should not be written to accommodate a temporary situation. Therefore, Committees should be developing an IEP for a student . . . based on what the student will need once the school reopens." NYSED APR. 27, 2020 GUIDANCE, at 5-6. It is therefore implausible to infer "a strong inference of fraudulent intent" from these allegations. *Tessler*, 712 F. App'x at 30 (affirming dismissal of complaint where "the SAC does not plausibly allege that anyone at the City knew, or was reckless in not knowing, that the City was causing false claims to be presented to the federal government").

Further, it is inconceivable that the USDOE, CMS and the relevant State agencies were unaware that, beginning in March 2020, the School Districts (the largest in the country), and schools nationwide were fully or partially closing to combat the spread of COVID-19, switching to distance learning and remote related services, and experiencing understaffing and interruptions and delays in services. The guidance (summarized *supra*, at 6-10, 11-13), which represents a small subset of COVID-related guidance issued by agencies since March 2020, not only belies this notion, but demonstrates that the agencies took affirmative actions to address such issues by: (i) assuring schools that the provision of remote services would not violate the IDEA; (ii) modifying Medicaid billing requirements to authorize payments for remote related services; (iii) offering flexibility in determining how FAPE could be furnished; and (iv) assuring schools that issues in providing services during the unprecedented and extraordinary circumstances caused

by the pandemic could be resolved once schools resumed normal operation via the provision of compensatory services, as necessary. *See U.S. ex rel. Yu v. Grifols USA, LLC*, 17-CV-2226, 2021 WL 5827047, at *9 (Dec. 8, 2021) (holding that relator failed to allege materiality where government had knowledge of the alleged misconduct, but "continued to make payments and reimbursements").

Moreover, it is clear from Exhibit 1 to the SAC that the federal Government would *not* have reduced IDEA grant awards even if it had been determined that the School Districts had failed to offer or provide FAPE to the students identified in the SAC. In its application for Federal fiscal years 2020 and 2021 IDEA grants, Texas failed to provide an assurance that it had policies and procedures in place to ensure that a FAPE "is available to all children residing in the State between the ages of 3 and 21, inclusive." (SAC, Ex. 1 at 312, 329.) Despite this failure, there is no indication that USDOE reduced Texas' IDEA grant award. (*Compare id*. at 254, 317 (demonstrating no difference in USDOE's notification to New York and Texas of such state's "Total Grant Award")). "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195.

### D.   The SAC Fails to Adequately Allege A Worthless Services Claim

Relator similarly fails to allege sufficient facts to support a worthless services claim. Liability arises under a worthless services claim when the defendant seeks payment for services but "the *performance* of the service is so deficient that for all practical purposes it is the equivalent of no *performance* at all." *Mikes*, 274 F.3d at 703 (emphasis added). The SAC makes allegations only about the *offer* of services to the students identified in the complaint. There are no facts concerning the actual performance of such services, let alone any that would allow a court to

reasonably infer that such services, as furnished, were worthless. For example, the SAC alleges
"NYC DOE's recommendation" for remote speech services by telephone—as opposed to
teletherapy, which was recommended for occupational and physical therapy—was "wholly
inappropriate for J.R.—a non-verbal Autistic young man" and "was of no benefit whatsoever to
J.R." (SAC ¶¶ 86-88.) But, there are no allegations regarding the actual service that was furnished;
in fact, as such Special Education Remote Learning Plan (*see* SAC, Ex. 4) *recommends* a "phone
consultation," not a therapy session, it may be possible that, instead of speech therapy sessions
with J.R., the therapist had phone consultations with J.R.'s parents, guardians or teachers. *See e.g.*,
*U.S. ex rel. Sibley v. Delta Reg'l Med. Ctr.*, 17-CV-53, 2019 WL 1305069, at *15 (N.D. Miss.
Mar. 21, 2019) ("[Relator] alleges no fact surrounding the services [defendant] provide[d] to the
patients that would allow one to infer they were worthless . . . Her worthless services claim fails.").

      Further, Relator must, but does not, allege any facts that such remote related services
provided "no medical value." *Mikes*, 274 F.3d at 702 ("[A] worthless services claim asserts that
the knowing request of federal reimbursement for a procedure with no medical value violates the
Act irrespective of any certification."). Instead, Relator appears to allege that the related services,
when provided remotely, were of *reduced* medical value, which is consistent with his comment
during a hearing regarding his daughter's placement that the physical therapy services furnished
in April 2020 on a remote basis to students of iBrain—of which Relator is a founder and chairman
of the board—had its "limitations" and that "you can only do so much therapy" on a remote basis.
(*See* SAC, Ex. 6 at 100.) In fact, the allegations concerning the provision of "worthless services"
complain that School Districts billed for such services at the full rate, instead of a *reduced* rate.
(*See e.g.*, SAC, ¶ 68 at 24-25). "It is not enough to offer evidence that the defendant provided
services that are worth some amount less than the services paid for." *U.S. ex rel. Absher v.*

*Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) ("Services that are 'worth less' are not 'worthless.'"); *see also U.S. ex rel. SW Challenger, LLC v. Evicore Healthcare MSI, LLC*, 19-CV-2501, 2021 WL 3620427, at *9 (S.D.N.Y. 2021), *appeal filed* No. 22-530 ("[T]he Court finds that falsity has not been alleged because the services [defendant] provided were not so "worthless" that they were 'the equivalent of no performance at all.'") (citation omitted)).

Finally, the SAC alleges neither the requisite scienter nor materiality. *See Mikes*, 274 F.3d at 703 (affirming summary judgment because "plaintiff makes no showing that defendants knowingly—as the Act defines that term—submitted a claim for reimbursement of worthless services"); *Foreman*, 19 F.4th at 105-106 (holding that *Escobar* imposes a materiality requirement on both legally false and factually false claims). Relator fails to allege any facts to support a reasonable inference that the School Districts billed for any remote-related service *knowing* that such service provided *no medical value* to the student. Nor does the SAC contain any facts suggesting that the applicable government agencies would not have paid the claim had they known that the School Districts provided the related services at issue via teletherapy or by telephone. *See U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824-825 (8th Cir. 2009) ("Nor did [the complaint] allege with particularity how any product defect . . . was material to—that is, 'capable of influencing'—the government's decisions to pay countless unidentified Medicare reimbursement claims."). Here, the applicable state Medicaid agencies clearly determined that, generally, such remote services were of medical value as they authorized the billing for related services furnished via teletherapy or by telephone and established rates for such remote services equal to those applicable to such services when furnished in person. (*See supra*, at 11-13.) By advising schools that a FAPE could be provided via distance learning and remote services, the relevant educational agencies similarly determined that such services were of value to students

with disabilities. (*See id*.) That Relator might not agree with the determinations made by these agencies does not render claims submitted by the School Districts false. *See Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.*, 07-CV-3314, 2008 WL 2566728, at *4 (S.D.N.Y. Jun. 26, 2008) ("Seeking payment for services rendered to [a federal government agency] is not unlawful simply because the plaintiffs themselves disagree with [such agency's] investigative findings.")

Because Relator has "failed to allege a claim for fraud—let alone fraud executed with the requisite scienter to be actionable under the FCA," dismissal of the SAC's first and second causes of action is warranted under Rules 9(b) and 12(b)(6). *Grupp*, 604 Fed. Appx. at 43.

## II. THE SAC'S THIRD CAUSE OF ACTION MUST BE DISMISSED FOR FAILURE TO ADEQUATELY ALLEGE A REVERSE FALSE CLAIM

The SAC's reverse false claim theory likewise must be dismissed for failure to state a claim. A defendant is liable for making a "reverse false claim" if it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Under this theory of FCA liability, the SAC must allege (i) an existing financial obligation that the School Districts owed to the government; and (ii) a specific false record or statement that the School Districts made to avoid such a purported obligation. *See U.S. ex rel. Hussain v. CDM Smith, Inc.*, 2017 WL 4326523, at *9 (S.D.N.Y. Sept. 27, 2017). Relator has not shown either. So-called "reverse False Claims Act" violations under 31 U.S.C § 3729(a)(1)(G) that are simply duplicative of the allegations of false claiming under §§ 3729(a)(1)(A) and (B) cannot survive a motion to dismiss. S*ee Foreman*, 19 F.4th at 120.

III.   **THE SAC'S FOURTH CAUSE OF ACTION MUST BE DISMISSED FOR FAILURE TO ADEQUATELY ALLEGE CONSPIRACY**

The SAC recites the elements of its fourth cause of action (SAC ¶¶ 294-298), but makes no allegation of any kind linking the School Districts to an alleged conspiracy. To state a claim under 31 U.S.C. § 3729(a)(1)(C), Relator must at least allege that the School Districts had "an unlawful agreement . . . to violate the FCA." *O'Toole*, 2020 WL 2512099 at *11, n. 7, (quoting *U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 268 (S.D.N.Y. 2014)). There are no allegations in the SAC of such an agreement. Instead, the School Districts allegedly conspired with themselves: "<u>By reason of Defendants' conspiracy within their respective school districts</u>, the State and federal governments of the United States have been damaged in a substantial amount to be determined at trial." (SAC ¶ 298 (emphasis added).) The SAC thus falls woefully short of stating a claim for conspiracy under the FCA.

IV.   **LAUSD MAY NOT BE SUED BY RELATOR UNDER THE FEDERAL FALSE CLAIMS ACT**

The Supreme Court has held that States and state agencies are statutorily not subject to FCA suits brought by relators because "States are not 'persons' for purposes of *qui tam* liability under § 3729." *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 783 (2000). Having determined that California school districts "are arms of the state," the Ninth Circuit has held that, in accordance with *Stevens*, California school districts, like LAUSD, are not "'persons' subject to qui tam liability under the FCA." *Stoner v. Santa Clara Cnty. Off. of Educ.*, 502 F.3d 1116, 1123 (9th Cir. 2007). Therefore, dismissal of the federal False Claims Act causes of action as against LAUSD is additionally warranted because it is not subject to this *qui tam* suit.

V.   **THE STATE AND CITY CAUSES OF ACTION MUST BE DISMISSED**

The SAC's fifth, sixth, thirteenth and seventeenth causes of action against the School Districts, which concern violations of the School Districts' respective State False Claims Act and,

with respect to NYC DOE, the New York City False Claims Act, should be dismissed in their entirety. First, NYC DOE is not subject to *qui tam* suit under the NYS or NYC False Claims Act. *See* N.Y. State Fin. Law §§ 188(6) and 190(2) (exempting local governments, which is defined to include school districts, from *qui tam* actions); N.Y.C. Admin. Code §§ 7-802(1) and 7-805(5) (exempting agencies of the city of New York from *qui tam* suit). Similarly, LAUSD is not a "person" subject to *qui tam* suit under the California False Claims Act. *See Wells v. One2One Learning Foundation*, 141 P.3d 225, 242 (Cal. 2006). Such causes of action also should be dismissed for (i) the reasons set forth above in Section I of the Argument, as such State False Claims Acts closely mirror the federal False Claims Act (*see, e.g.*, *Absher*, 764 F.3d at 704 n.5); and (ii) failure to serve the applicable State with "[a] copy of the complaint and written disclosure of substantially all material evidence and information the [relator] possesses." 740 ILCS 174/5; *see e.g.*, *U.S. ex rel. Stop Illinois Mktg. Fraud, LLC v. Addus Homecare Corp.*, 13-CV-9059, 2018 WL 1411124, at *7 (N.D. Ill. Mar. 21, 2018) ("The notice and opportunity that Relator afforded the federal government does not absolve Relator of its duties to the State of Illinois.")

Additionally, the seventh through tenth causes of action against NYC DOE under N.Y. Social Services Law § 366-B and various New York Penal Code sections should be dismissed because there is no private right of action under such Law and Code sections.

## VI.   THE CLAIMS AGAINST CHICAGO BOE AND LAUSD MUST BE DISMISSED FOR IMPROPER VENUE

The claims against defendants Chicago BOE and LAUSD should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) because this Court lacks personal jurisdiction over these defendants, and because the Southern District of New York is not a proper

venue.[16] On a motion to dismiss for improper venue under Rule 12(b)(3), the burden of proof lies with plaintiff to show that venue is proper. Relator cannot meet that burden here.

The SAC alleges that venue is proper as to Chicago BOE and LAUSD because 31 U.S.C. § 3732(a) provides that an FCA case may be brought in any judicial district where "any one defendant can be found." (SAC ¶ 71 at 15-16.) Relator alleges, therefore, that because NYC DOE operates in this District, all other defendants can be sued in this District as well. However, this Court found the FCA's venue provision does not, by itself, allow for defendants accused of similar but unrelated conduct throughout the country to be sued in the same district. *See Loudoun Decision* at *3-4. The Court's reasoning, which is supported by well-settled Second Circuit case law, was that § 3732(a) does not permit the joinder of multiple defendants involved in distinct and independent actions in a district where one of the defendants can be found. *See Loudoun Decision* at *2; *U.S. ex rel. Doe v. Taconic Hills Cent. Sch. Dist.* ("*Taconic Hills*"), 8 F. Supp. 3d 339, 344-45 (S.D.N.Y. 2014), *aff'd sub nom. U.S. ex rel. Doe v. New York State Sch. Districts*, 597 F. App'x 16 (2d Cir. 2015). That is because § 3732(a) is constrained by Fed. R. Civ. P. 20, which governs permissive joinder.

Under Fed. R. Civ. P. 20(a)(2), persons may be joined in one action as defendants if: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

---

[16] This Court lacks personal jurisdiction over Chicago BOE and LAUSD as the SAC contains *no* factual allegations—let alone any sufficient factual allegations—to establish personal jurisdiction over any defendant situated outside of the Southern District of New York. However, as this Court has determined with respect to the motion to dismiss filed by Loudoun County Public School District and Scott A. Ziegler (the "Loudoun Defendants"), this Court need not reach the question of personal jurisdiction as "prudential considerations favor evaluating the issue of venue first" in this case because "it is clear that venue does not exist in this Court." *U.S. ex rel. Donohue v. Carranza*, 20-CV-5396, 2022 WL 446042, at *2 (S.D.N.Y. Feb. 14, 2022) (Dkt. No. 86) (the "*Loudoun Decision*").

(B) any question of law or fact common to all defendants will arise in the action." The SAC does not contain any factual allegations that either Chicago BOE or LAUSD could be held jointly or severally liable for any purportedly false claim made by any other defendant. Nor does the SAC assert a right to relief against Chicago BOE or LAUSD and NYC DOE "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(2)(A). Rather, the claims against Chicago BOE and LAUSD each arise out of discrete transactions, which are wholly independent from the separate and unrelated transactions upon which the claims against NYC DOE are based. (*Compare* SAC ¶¶ 80-110 at 27-34 (NYC DOE) with ¶¶ 175-190 (Chicago BOE) and ¶¶ 203-218 at 57-60 (LAUSD).) Allegations that "the defendants merely committed the same type of violation in the same way is, by itself, insufficient to justify joinder; the Second Circuit has held that the fact that a large number of people use the same method to violate the law does not authorize them to be joined as defendants in a single lawsuit." *Loudoun Decision* at *4 (quoting *J.T.*, 500 F. Supp. at 175).

Therefore, like the Loudoun Defendants, Chicago BOE and LAUSD were improperly joined as defendants with NYC DOE in this action. Misjoinder of Chicago BOE and LAUSD necessitates that the claims against them be severed. *Loudoun Decision* at *5; *see Taconic Hills*, 8 F. Supp. 3d at 344-45; 28 U.S.C. § 1391. Once such claims are severed, Relator cannot establish that venue is proper for Chicago BOE or LAUSD. *Loudoun Decision* at *5. Because the events giving rise to the claims against Chicago BOE and LAUSD occurred outside of the Southern District of New York, venue is inappropriate in this district. *See id*. at *5.

Where, as here, a case is filed in the wrong district, a court "shall dismiss, or if it be in the interest of justice, transfer such a case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision of whether to dismiss or transfer lies within the broad

discretion of the district court. *See Loudoun Decision* at *5. When determining whether to transfer a case pursuant to Section 1406(a), a court may take into account "the ultimate goal of the expeditious and orderly adjudication of cases and controversies on their merits." *Id.* (quoting *Meserole St. Recycling, Inc. v. CSX Transp., Inc.*, 06-CV-4652, 2007 WL 2891424, at *4 (E.D.N.Y. Sept. 28, 2007) (internal quotation marks omitted)); *see also Taconic Hills*, 8 F. Supp. 3d at 344-45. Here, it is in the interest of justice to decline to transfer the claims against Chicago BOE and LAUSD and instead dismiss such claims in their entirety because (i) dismissal of the SAC is warranted as to NYC DOE, and the SAC's allegations against Chicago BOE and LAUSD are almost identical to those against NYC DOE (*see* Argument, Sections I-III, V, *supra*); (ii) the federal and state authorities discussed herein authorizing the remote provision of related services are identical in substance as to each School District (*see supra,* at 6-10, 11-13); and (iii) with respect to LAUSD, on the additional ground that it is not subject to *qui tam* liability under the FCA (*see* Argument, Section IV, *supra*). *See Taconic Hills*, 8 F. Supp. 3d at 344-45 (declining to transfer in similar circumstances).

## VII.   THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE

The SAC—which is the third complaint filed by the Relator in this matter—should be dismissed with prejudice. It is clear that Relator lacks knowledge of actionable conduct by School Districts, or it would have been alleged by now. Since a further amendment of the SAC would be futile, it should be dismissed with prejudice. *See, e.g.*, *Tessler*, 712 F. App'x at 31 (affirming denial of leave to amend where "there is no indication that a third amended complaint would address the aforementioned issues").

## <u>CONCLUSION</u>

For the reasons set forth herein, the School Districts respectfully request dismissal of the SAC with prejudice, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 30, 2022

                                   KATTEN MUCHIN ROSENMAN LLP

                                   By: /s/ Joseph V. Willey _____

HON. SYLVIA O. HINDS-RADIX              Joseph V. Willey
CORPORATION COUNSEL OF THE              Alessandra Denis
CITY OF NEW YORK
By: Stephen Kitzinger                   50 Rockefeller Plaza
Assistant Corporation Counsel           New York, New York 10020
100 Church Street                       (212) 940-8800 (phone)
New York, New York 10009                (212) 940-8776 (fax)
(212) 356-2087 (phone)                  joseph.willey@katten.com
SKitzing@law.nyc.gov                    alessandra.denis@katten.com

*Attorneys for Defendants*              *Attorneys for Defendants*
*New York City Department of Education,*   *New York City Department of Education and its*
*and Richard Carranza and Meisha Porter,*  *former Chancellors in their official capacities,*
*in their official capacities as former*   *Richard Carranza and Meisha Porter; Board of*
*Chancellors of the New York City*         *Education of the City of Chicago and its former*
*Department Education*                     *Superintendent in his official capacity, Jose M.*
                                           *Torres, PhD; and Los Angeles Unified School*
                                           *District and its former Superintendent in his official*
                                           *capacity, Austin Beutner*