UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

United States of America and States of the United States,
ex rel. Patrick Donohue,

       Plaintiffs,


   -against-           **1:20–CV–5396 (GHW)**


RICHARD CARRANZA, in his official capacity, as
the former Chancellor of the New York City Department of
Education, *et al*.,

       Defendants.

------------------------------------------------------------------------x




## PLAINTIFF-RELATOR'S OPPOSITION
## TO NEW YORK CITY DEFENDANTS' MOTION TO DISMISS




Respectfully submitted
Brain Injury Rights Group
Attorneys for Plaintiffs

By:
Ashleigh C. Rousseau, Esq. [5801923]
Rory J. Bellantoni, Esq. [RB 2901]
300 East 95th Street, Suite 130
New York, NY 10128
(646) 850-5035
Ashleigh@pabilaw.org
Rory@pabilaw.org

# <u>TABLE OF CONTENTS</u>

I.   THE SAC RAISES VALID CLAIMS FOR FRAUD IN THE FIRST AND SECOND
CAUSES OF ACTION...........................................................................................................1

    A.   The SAC Alleges that Schools Submitted False Claims............................................... 1
    B.   The SAC Adequately Alleges Violations of the Applicable Claiming Requirements............... 11
    C.   The SAC Adequately Alleges Materiality and Scienter........................................................ 14
    D.   The SAC has Stated a Valid Claim for Worthless Services................................................. 20

***CONCLUSION*** ................................................................................................................. ***23***

## TABLE OF AUTHORITIES

**CASES**

*American Hospital Association v. Becerra*, 142 S. Ct. 1896 (2022) .................................................. 18
*Devaney v. Chester*, 813 F.2d 566 (2d Cir. 1987) ......................................................................... 17
*Kopec v. Coughlin*, 922 F.2d 152 (2d Cir. 1991) .......................................................................... 17
*Krys v. Pigott*, 749 F.3d 117 (2d Cir. 2014) ................................................................................. 17
*M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2nd Cir., 2012) .................................... 3, 15
*Maniolos v. United States*, 741 F. Supp. 2d 555 (S.D.N.Y. 2010) .............................................. 17
*Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) .............................................................................. 20
*Neitzke* v. *Williams*, 490 US 319 (1989) ....................................................................................... 11
*Scheuer* v. *Rhodes*, 416 US 232 (1974) ......................................................................................... 11
*U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85 (2d Cir. 2021) ..................................................... 14
*U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F.Supp.3d 242 (S.D.N.Y. 2014) ...................... 1
*United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F.Supp.3d 497 (S.D.N.Y. 2014)....... 1
*United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71 (2d Cir. 2017).............. 2
*United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 U.S. Dist. LEXIS 159538 (S.D.N.Y. Sep. 27, 2017) ........... 1
*United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010), rev'd on other grounds, 563 U.S. 401 (2011) ............................................................................................... 10
*United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 2021 U.S. Dist. LEXIS 153871 (S.D. N.Y. Aug. 13, 2021) ....................................................................................... 20
*United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593 (S.D.N.Y. 2013) .......................... 1
*Universal Health Servs. v. United States*, 579 U.S. 176 (2016) ................................................. 14
*Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016) ................ 21
*Vassilatos v. Ceram Tech Int'l, Ltd.*, 92 Civ. 4574, 1993 U.S. Dist. LEXIS 6620, 1993 WL 177780 (S.D.N.Y. May 19, 1993) ............................................................................................... 17

**STATUTES**

20 U.S.C. §1400 et seq. ................................................................................................................... 4
31 U.S.C. § 3729-3733 .................................................................................................................... 2
42 C.F.R. §413.24(a) ....................................................................................................................... 3
42 C.F.R. §413.24(c) .................................................................................................................... 3, 4
42 C.F.R. §413.60 (c) ...................................................................................................................... 2
42 C.F.R. §413.60(a) ....................................................................................................................... 2
42 C.F.R. §413.64 (f) ....................................................................................................................... 2
42 C.F.R. §413.64(a) ....................................................................................................................... 2
42 U.S.C. §1396b(c) ........................................................................................................................ 4
P.L. 100-360 ................................................................................................................................... 11
Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 ................................. 9, 11

Plaintiff Relator hereby responds to the Motion to Dismiss filed by the New York City Department of Education, Richard Carranza, and Meisha Porter ("NYC") (ECF No. 165) and the Memorandum in Support (ECF No. 169).[1]

## I. THE SAC RAISES VALID CLAIMS FOR FRAUD IN THE FIRST AND SECOND CAUSES OF ACTION

### A. The SAC Alleges that Schools Submitted False Claims

NYC argues that the SAC does not allege fraudulent conduct. (ECF No. 169 at 16ff). This argument fails. This Court has held: "Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint." *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, 50 F.Supp.3d 497, 508 (S.D.N.Y. 2014). This Court continued:

> Ultimately, whether a complaint satisfies Rule 9(b) 'depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'

*Id.* (quoting *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F.Supp.3d 242, 258 (S.D.N.Y. 2014) (quoting *United States v. Wells Fargo Bank, N.A.*, 972 F.Supp.2d 593, 616 (S.D.N.Y. 2013)). This Court concluded that "[t]his is a fact-specific inquiry." *Id.* (internal citation and quotation marks omitted).

More specifically, "the Second Circuit held that 'Rule 9(b) does not require that every qui tam complaint provide details of actual bills or invoices submitted to the government.'" *United States ex rel. Hussain v. CDM Smith, Inc.*, 2017 U.S. Dist. LEXIS 159538 at *11 (S.D.N.Y. Sep. 27, 2017) (quoting *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 93 (2d

---

[1] Counsel filed the instant motion and memorandum on behalf of its clients, NYC, the Board of Education of the City of Chicago and Jose M. Torres, PhD ("Chicago"), and the Los Angeles Unified School District and Austin Beutner ("LA"). Plaintiff Relator has responded separately to the motion as to Chicago, and has agreed to voluntarily dismiss LA. Accordingly, this memorandum addresses only the arguments raised by NYC. Further, Plaintiff Relator has agreed to voluntarily dismiss the New York state law claims, and does not address those herein.

Cir. 2017)). "Instead, Rule 9(b) is satisfied by 'making plausible allegations creating a strong inference that [1] specific false claims were submitted to the government and [2] that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge.'" *Id.* (quoting *Chorches*, 865 F.3d at 86). Thus, NYC's claim that "Relator fails to identify a single claim for IDEA funds or Medicaid reimbursement," even if true, does not entitle them to dismissal of the claims.

In the SAC, Plaintiff Relator alleges the following:

1.  This is an action brought to recover taxpayer dollars spent as a result of Defendants' fraudulent conduct. Specifically, above-named Defendants conducted related services for students with disabilities via telehealth and/or via phone, contrary to the Medicaid and IDEA/Title I billing requirements, and submitted for reimbursement of same by misrepresenting that such services were in compliance with the relevant State and federal laws.

2.  Due to the profound nature of their disabilities, known to both the Defendants and related providers, these students were unable to meaningfully participate in these remote "sessions," yet Defendants fraudulently billed for these "sessions" through Medicaid at their regular, full rates. Defendants herein also utilized IDEA funding for non-related services, despite failing to offer a free appropriate public education in accordance with the law.

3.  As a result, Defendants obtained the benefit of virtually unfettered Medicaid reimbursements for these related service sessions, and as a result, Defendants have violated the federal False Claims Act, 31 U.S.C. § 3729-3733, ("FCA") as well as the corresponding state false claim statutes.

60. The Relator has first-hand knowledge that the named District(s) and entities received interim payments based on fixed estimates of their actual costs in accordance with 42 C.F.R. §413.60(a), (c); §413.64(a), (f).

61. At the end of each fiscal year, Relator knows that providers submitted cost reports of their actual expenditures in accordance with C.F.R. §413.60(b), §413.64(f) and that a final adjustment is made to settle the difference between the interim payments and a provider's actual purported costs. C.F.R. §413.64(f)(2).

62. Further described herein, Relator has first-hand knowledge that claims were submitted on behalf of Special Education students by the Defendants for

related services that were not offered in-person as defined by relevant case law, including related service sessions that were not offered to at all to students with disabilities, as described in their respective IEPs.

63.     In accordance with 42 C.F.R. §413.24(a), the named Defendants(s) must be able to provide adequate cost data supported by financial and statistical records, which must be capable of verification by independent and qualified auditors, and must provide the cost information in accurate and sufficient detail to support the payments made for services furnished to the purported students. *See* 42 C.F.R. §413.24(c), §413.20(d).

64.     Further, Defendants are to maintain adequate documentation for auditing purposes. In order to perform a comprehensive audit, the Relator alleges that the claim details must be obtained from the provider's records. 42 C.F.R. §413.24(c).

65.     The Relator has knowledge that the above-named Defendants do not possess adequate or detailed records to substantiate the Medicaid claims made on behalf of students with disabilities for the 2019-2020 and 2020-2021 school years.

66.     The Relator also has first-hand knowledge that Defendants herein knowingly submitted false claims for related services purportedly offered to Special Education students via telehealth, phone, and otherwise, when Defendants were acutely aware that such services were contrary to those set forth in each Student's last-agreed-upon IEP, which required in-person services. Relator also has knowledge that some of these sessions were not offered to students with disabilities, despite Defendants' assertions that students within their jurisdictions were being educated in accordance with the law. *See*, M.H. v. New York City Dep't of Educ., 685 F.3d 217, 224 (2nd Cir., 2012) ("The IEP, the results of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and *describes the specially designed instruction and services that will enable the child to meet those objectives*.") (emphasis added).

67.     Upon information and belief, Defendants obtained a consent from some parents on behalf of students with disabilities in order to obtain reimbursement for said services or alternatively, submitted said claims without consent.

68.     Further, Relator alleges that Defendants did not change the rate at which related services were billed when offered by alternative means (i.e. telehealth, phone, etc.), and were billed at the same rate as in-person

services at the full rate, while conferring no meaningful benefit to students with disabilities, as required by law.

69.   As set forth above, Defendants must produce provider detailed statements in accordance with 42 C.F.R. §413.24(c).

70.   Each of the named Defendants is eligible to receive reimbursement by the federal government for a portion of the cost of providing health-related and related services to Medicaid eligible children pursuant to the IDEA, 20 U.S.C. §1400 et seq., 42 U.S.C. §1396b(c).

71.   The IDEA (20 U.S.C. §1400) sets forth the regulations of the United States Department of Education, which were promulgated pursuant to authority granted by the statute (34 C.F.R. Part 300), guarantees students with disabilities a free and appropriate public education ("FAPE"). The term FAPE refers to special education and related services that are designed to meet a child's unique needs and that will prepare the child for further education, employment, and independent living.

72.   Defendants fraudulently created Individualized Education Plans (IEPs) for special education students, knowing they could not implement these IEPs as written, thus knowingly denying students a FAPE.

73.   Defendants then fraudulently claimed they were providing special education and related services as outlined and described in the students' IEPs and billed and/or were reimbursed or otherwise by the federal government and the States, including the District of Columbia, for services that were not performed, and for services performed at an over-billed rate or for services (medical, educational, related, and otherwise) that were established fraudulently.

74.   As a result of Defendants' multi-faceted campaign of fraud against the government, Defendants have collected hundreds of millions of dollars, if not billions of dollars, to which they were never entitled, causing direct injury to students with disabilities that had an IEP in place for the 2019-2020 and 2020-2021 school years, in addition to the general taxpayers funding such grants and reimbursements.

75.   Additionally, while simultaneously depriving students with disabilities of a free appropriate public education ("FAPE"), Defendants herein submitted additional applications for IDEA funding to the federal government with false assurances that Defendants were offering FAPE to students with disabilities for school years 2019-2020, 2020-2021, and 2021-2022. **Exhibit 1.**

77.     As the parent of a special education student, the Relator has first-hand knowledge that the NYC DOE Committee on Special Education ("CSE") fraudulently created an IEP for his daughter (S.J.D.) that Defendants knew could not be implemented during the COVID-19 situation. Said IEP included in-person services, including 1:1 nursing and a 1:1 paraprofessional, which were not offered by the NYC DOE as a result of the COVID-19 closures. There was no subsequent IEP meeting to amend his daughter's IEP to include remote services.

78.     During the recorded IEP meeting, Relator questioned the NYC District Representative why in-person services were being recommended when the doors to the schools themselves remained closed. The District Representative informed Relator that the District was instructed to proceed as if schools were not closed and to continue recommending in-person services. Defendants proceeded to finalize said IEP and fraudulently present it as a FAPE. Although this meeting was not transcribed, the Relator is willing and able to produce an audio recording substantiating same upon request.

80.     There are over 100 students Relator has first-hand knowledge of to whom NYC DOE failed to provide the services outlined in their IEP since March 2020 (including live synchronous services), yet, Defendants herein fraudulently projected that these students were continuing to be properly serviced in accordance with each respective Students' IEP. Adding insult to injury, the NYC DOE and CSE fraudulently created IEPs including in-person services, for the 2019-2020 and 2020-2021 school years for these students they knew they could not implement during the COVID-19 situation.

81.     For illustration, Relator presents the IEP of J.R., with an implementation date of February 26, 2020 (pre-COVID). J.R. is a 15-year-old young man diagnosed with Autism. It is important to note that J.R. is also non-verbal. A copy of J.R.'s IEP implemented before the COVID-19 closures is annexed hereto as **Exhibit 3.**

82.     However, in a letter dated April 22, 2020, the NYC DOE informed J.R.'s parents that "[n]ow that your child's school has moved towards a new Remote Learning Model, this Special Education Remote Learning Plan sets out the special education supports that are being provided during the COVID-19 school closure." *See,* **Exhibit 4**, *Special Education Remote Learning Plan for J.R.* (April 22, 2020).

83.     Perhaps even more surprising, in a hearing on J.R.'s case before the Impartial Hearing Officer, NYC DOE took the position that they offered J.R. a FAPE, and that "[w]hether or not the student and their family *chose* to participate in remote services . . . what program was available for the

student to access the curriculum, and what, if anything, did the family do with that" would be the grounds to make a determination of whether a FAPE was denied. **Exhibit 5**, p. 20, lines 4-12.

84.   This position is contradictory at best—in light of the Executive Orders set forth by the local and state authorities, J.R.'s parents did not "choose" remote services, nor did the parents "choose" for the NYC DOE schools to remain closed following the expiry of said Executive Orders. As J.R.'s 2020 and 2021 IEP highlights, "Home instruction would be too restrictive for [J.R.]'s social and academic progress at this time." **Exhibit 3**, p. 28 ("*Other Options Considered*"). Additionally, it would seem that NYC DOE takes the position that any regression in skills and learning is a fault and burden shouldered by parents, which is not only inaccurate, but such a contention undermines the entire spirit of the IDEA.

85.   The letter dated April 22, 2020 (**Exhibit 4**) not only serves as evidence of the District's unilateral transfer of the Student's educational placement to remote learning, but also indicates that an IEP meeting should have been reconvened to appropriately determine J.R.'s remote services.

86.   Instead, taking into consideration J.R.'s specific conditions and management needs, NYC DOE recommended J.R. for individual remote Speech Services for twenty minutes, once a week, *by telephone. See,* **Exhibit 4.**

87.   It is incredibly important to note that J.R.'s other related services, Occupational Therapy and Physical Therapy, were recommended to be performed via tele-therapy.

88.   Relator alleges that not only is the NYC DOE's recommendation wholly inappropriate for J.R.—a non-verbal, Autistic young man— but that NYC DOE subsequently *billed* Medicaid for J.R.'s speech services, despite rendering a service that does not meet the requirements for Medicaid and/or IDEA reimbursement, and a service that was of no benefit whatsoever to J.R.

89.   Similarly, Relator presents redacted hearing transcripts from closed administrative hearings he served as a witness for his daughter, S.J.D., which further substantiates inconsistent Medicaid billing practices on behalf of the NYC DOE for billing Medicaid at full rates, as if IEPs were being fully implemented, despite a lack of resources and reduced services, as testified by an assistant principal from S.J.D.'s recommended D75 school. A copy of the redacted hearing transcripts from S.J.D.'s administrative hearings regarding the 2019-2020 and 2020-2021 school years are annexed hereto as **Exhibits 6** and **7**.

90.     In the hearing held for S.J.D. on October 1, 2020 as referenced above, the NYC DOE's witness, an assistant principal at the P79M Horan School in New York City testified about the school's operation and services during the 2019-2020 school year. In this hearing, the vice principal concedes that Horan School had fallen short of fulfilling the Student's IEP mandates.

91.     For instance, the assistant principal admitted that though a special education classroom recommendation in their school is for a 12:1:(3+1) classroom ratio, requiring 4 paraprofessionals in the classroom, the school was understaffed during the year and had only one paraprofessional available. *See* **Exhibit 6**, p. 30, 132.

92.     More astonishingly, this assistant principal admitted that though S.J.D.'s IEP mandates physical therapy in 60-minute sessions, the physical therapist at the school would only provide 40 minutes of therapy and <u>leaves the student for 20 minutes</u>, without the physical therapist. **Exhibit 6,** p. 44-45, 47 (emphasis added).

93.     In another closed administrative hearing for S.J.D. on July 14, 2021 with regard to the 2020-2021 school year (IHO Case: 196228), Relator witnessed the Horan School's assistant principal testify that during the 2020-2021 extended school year, students who have mandated nursing services on their IEPs could not receive those services because the school's nurse "[d]uring remote learning, our school nurse would not have been able provide services to the student." *See* **Exhibit 7,** p. 64.

94.     Without offering the nursing services within the IEP that Defendant drafted, S.J.D. was, by definition, denied a FAPE. Thus, any Medicaid billing for other related services in the IEP is unlawful, as a FAPE must be provided in order to submit claims for Medicaid reimbursement for related services.

95.     Moreover, though S.J.D. has mandated therapy and related service sessions of 60-minutes, and although the NYC DOE claimed that S.J.D.'s IEP mandates could be implemented at their proposed school(s), the assistant principal's testimony revealed that the NYC schools could not, in fact, implement the IEP because the school mandates 8 periods for 45 minutes per day, and does not offer an extended school day, indicating that all of S.J.D.'s related service mandates from her IEP could not realistically be implemented in a NYC DOE school, as NYC DOE schools do not offer extended school days. **Exhibit 7**, p. 66 - 70, generally.

96.     The above only serve as some of the many examples of NYC DOE's fraudulent behavior regarding Medicaid and IDEA billing. Without offering the Student a FAPE, by definition, the LEA cannot bill Medicaid for services or receive IDEA/Title I funds that would not offer the Student a meaningful education under the IDEA.

97.    Relator alleges that NYC DOE billed Medicaid for the full amount of services as listed on Students' IEPs, without actually delivering those services as mandated, as evidenced by the testimony of the assistant principal of the Horan School, a NYC DOE school.

98.    In addition to these claims and alleged misconduct, the Relator also alleges that Defendants CARRANZA, Defendant PORTER, and the NYC DOE further misappropriated these unlawfully obtained federal funds through Medicaid and/or the IDEA and transferred $43,967,285 into a high-interest yield savings CD Rollover account, approved on September 24, 2020, in the midst of the pandemic. A copy of the NYC DOE 2020 December Financial Status Report substantiating same is annexed hereto as **Exhibit 8,** p. 5.

99.    In said report, the DOE reported that it "rolled over" approximately $43,967,285 to a CD Rollover account and has earned, or continues to earn, interest on said federal funds. **Exhibit 8**, p. 5.

100.    This not only evidences Defendants' gross misconduct, but also serves to show that Defendants deliberately withheld these federal funds (in the midst of a worldwide pandemic) intended for students with disabilities, or alternatively, the public at large and taxpayers, and further intended to benefit from their malfeasance in the form of accruing interest on said federal funds.

101.    Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor and Defendant PORTER, in official capacity as the current Chancellor, have the responsibility of overseeing the LEAs and providers that are mandated to offer the related services tailored to the needs of students with disabilities.

102.    Based on his observations and interactions, Relator has direct first-hand knowledge that not only have numerous students been recommended to receive their related services remotely this year, despite the drafting and implementation of an IEP that requires "push in/pull out" services in "classrooms" or "separate provider locations", but that these students will continue to receive their services remotely, despite the tremendous reopening efforts, due to insufficient staffing. *See* **Exhibit 6, 7,** *see also* **Exhibit 9**, *infra*.

103.    Relator alleges that by and through the efforts of Defendants CARRANZA and PORTER, and NYC DOE extracted from the State and Federal Governments hundreds of millions of dollars in payments when they:

a.    knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

b.      knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

c.      knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

d.      conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

105.    Relator alleges that in order to properly bill Medicaid for related services offered remotely, the Local Education Agency (LEA) should have reconvened an IEP meeting with the Students' parent(s) to recommend remote related services. Relator has first-hand knowledge that the LEA (NYC DOE) did *not* reconvene for IEP meetings to recommend remote services for students with disabilities in light of school closures, which constitutes a procedural violation of the IDEA.

106.    As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP. However, Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her official capacity as current Chancellor, have billed for services that were recommended to be *in person* as opposed to remote. Thus, any billing for "remote sessions" is not only inappropriate, but runs afoul of the Medicaid billing and IDEA restrictions and is unlawful.

107.    Moreover, the IDEA regulations provide that in order to utilize IDEA funds to provide an appropriate education for students with disabilities, the LEA utilizing the IDEA funds must first provide a Free Appropriate Public Education (FAPE) for the Student.

108.    Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, have failed to provide the students with disabilities within its jurisdiction a FAPE by directly or indirectly assisting in formulating IEPs with recommended related services to be offered to students with disabilities at physical site locations on the LEA campus and subsequently failing to provide the recommended related services as written.

109.    Defendants NYC DOE, by and through Defendant CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor, benefitted from these unlawful acts by collecting Medicaid reimbursement payments for services that were not offered in accordance with the IEPs as written, and IDEA funds when a FAPE has been denied to numerous New York City students with disabilities.

110.    Alternatively, Defendants CARRANZA, in his official capacity as former Chancellor, and Defendant PORTER, in her capacity as current Chancellor remained complicit in the scheme to defraud.

Taken together, these averments make "plausible allegations creating a strong inference that [1] specific false claims were submitted to the government and [2] that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge.'"

The SAC alleges that NYC submitted claims for related services that were not offered in person or were not offered to disabled students at all. Similarly, in *Hussain*, the relator alleged that the "'contractor bill[ed] for something it did not provide.'" 2017 U.S. Dist. LEXIS 159538 at *14 (quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114 (2d Cir. 2010), rev'd on other grounds, 563 U.S. 401 (2011)). This Court concluded that the plaintiff had stated a cause of action under the FCA. *Id.* The same is true here.

NYC argues: "The SAC also appears to suggest that Ms. LeFaivre, the assistant principal of a NYC DOE school, provided testimony concerning 'inconsistent Medicaid billing practices on behalf of NYC DOE at full rates, as if IEPs were being fully implemented, despite a lack of resources and reduced services' (SAC ¶ 89), but the transcripts of such testimony (SAC, Exs. 6, 7) reveal that Ms. LaFaivre made no mention of Medicaid claiming." (ECF No. 169 at 18). NYC misinterprets the allegation. Paragraph 89, as substantiated by the attached Exhibits, alleges that

IEPs were not being fully implemented. This "plausible allegation" creates a "strong inference" that specific false claims were submitted.

Notably, at the motion to dismiss stage, alleged facts are not to be weighed, nor subject to credibility determinations. *See Neitzke* v. *Williams*, 490 US 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). Further, a Complaint need not even show a likelihood of success to survive a Rule 12(b)(6) motion. *See Scheuer* v. *Rhodes*, 416 US 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). As set forth above, Plaintiff Relator has pled fact-based allegations in the Complaint that satisfy these pleading requirements.

### B.  The SAC Adequately Alleges Violations of the Applicable Claiming Requirements

NYC argues that the SAC has not shown any noncompliance with billing requirements. (ECF No. 169 at 19-23). They center their argument on the guidance provided by various federal and state agencies, which NYC claims authorized all reimbursable services to be provided remotely. However, this "guidance" does not authorize NYC, or any other school system, to depart from statutory requirements.

As alleged in the SAC, Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 - P.L. 100-360 provides that one of the conditions that must be met for Medicaid to reimburse for IDEA-related services is that "[t]he services *must* be listed in the child's individualized education program (IEP)." (SAC at ¶ 81) (emphasis in original). The SAC also alleges: "As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP." (*Id.* at ¶ 106).

NYC's response is that all remote services were authorized by "guidance" from federal and state agencies. (ECF No. 169 at 20-22). NYC cannot hide behind this "guidance." The SAC alleges violations of the billing requirements of the Medicare statute and the IDEA, both federal statutes. NYC provides no authority for its inference that federal executive branch agencies, not to mention state agencies, have authority to abrogate, alter, or modify the provisions of a federal statute. In fact, the Supreme Court recently has severely limited the *Chevron* deference previously accorded to government agencies in interpreting statutes. In *American Hospital Association v. Becerra*, 142 S.Ct. 1896 (2022) the Supreme Court addressed HHS reimbursement of hospital costs for certain prescription drugs, as directed by the Medicare Act. Under the Act, HHS has two options for setting reimbursement rates: it may conduct a survey of hospital acquisition costs, in which case it may vary the rate of reimbursement "by hospital group" (Option 1); or, it must "obtain price data from drug manufacturers," in which case it "must set reimbursement rates based on 'the average price for the drug' as 'calculated and adjusted by the Secretary as necessary for purposes of' this statutory provision" (Option 2). *Id.* at 1903. Under Option 2, HHS may not vary the rate based on hospital group. *Id.*

In the case at bar, HHS varied the rates of reimbursement by hospital group without conducting the survey required by the statute. HHS argued that it was entitled to do so since, even when it does not conduct a survey, it is authorized to adjust the rate, under Option 2. *Id.* at 1904. The Supreme Court disagreed:

> HHS's interpretation not only would render irrelevant the survey prerequisite for varying reimbursement rates by hospital group, but also would render largely irrelevant the provision of the statute that precisely details the requirements for surveys of hospitals' acquisition costs. See §1395l(t)(14)(D). We must hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text.

*Id.* at 1905. Thus, even HHS was not authorized to alter the terms of the statute governing its own reimbursement of hospital prescription drug costs.

In the instant case, the IDEA is clear that disabled students must be provided a FAPE. As alleged in the SAC, "a FAPE must be provided in order to submit claims for Medicaid reimbursement for related services" (¶ 94), and "one of the conditions that must be met for Medicaid to reimburse for IDEA-related services is that "[t]he services *must* be listed in the child's individualized education program (IEP)." (¶ 81). The SAC also alleges: "As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP." (*Id.* at ¶ 106). Contrary to NYC's argument, neither the USDOE, the CMS, nor any state agency may vary these statutory requirements, as the Supreme Court set forth in *AHA*. Thus, any agency "guidance" that is contrary to codified statutory requirements is false guidance.

NYC argues that the SAC fails to allege a violation of the IDEA because "an alleged failure to provide FAPE to certain students during the midst of a pandemic is substantially different than alleging facts from which a reasonable inference could be made that the School Districts did not have 'in effect policies, procedures, and programs' to provide FAPE." (ECF No. 169 at 31). This argument is nonsensical. They essentially argue that it is not a violation to fail to provide a FAPE; it is only a violation to fail to have "in effect policies, procedures, and programs." Further, contrary to NYC's argument, the failure to provide a FAPE clearly provides a reasonable inference that NYC did not have "in effect policies, procedures, and programs" to provide a FAPE during the school closures.

### C.  The SAC Adequately Alleges Materiality and Scienter

**<u>Materiality</u>**

Materiality is defined in the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "[M]ateriality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs. v. United States*, 579 U.S. 176, 193 (2016) (internal citation and quotation marks omitted).

NYC cites *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 109 (2d Cir. 2021), for the proposition that "a plaintiff must 'plead sufficient facts to plausibly allege' that the Government *would have declined* to pay if it knew of the defendant's noncompliance." (ECF 169 at 32) (emphasis in NYC's Memo). However, *Foreman* does not set forth this "would have declined to pay" standard. Rather, a plaintiff must "plead sufficient facts to plausibly allege materiality." *Foreman*, 19 F.4th at 109.

As alleged in the SAC, Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988 - P.L. 100-360 provides that one of the conditions that must be met for Medicaid to reimburse for IDEA-related services is that "<u>[t]he services *must* be listed in the child's individualized education program (IEP)</u>." (SAC at ¶ 81). The SAC also alleges: "As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP." (*Id.* at ¶ 106). Thus, providing a service not listed in the student's IEP, as set forth clearly in the statute, disqualifies that service from Medicaid reimbursement. Plaintiff Relator alleges in the SAC that NYC did just that – provided services that were not listed in students' IEPs, and then applied for, and received, reimbursement for those services. (*See* SAC at ¶¶ 1-3, 62, 66, 68, 72-74, 77-78, 80, 84-97, 102-

110). Further, the SAC alleges that NYC billed Medicaid for services that were not provided at all. (*See* SAC at ¶¶ 62, 66, 73, 93, 95, 97, 109).

*Foreman* held that "relevant factors in evaluating materiality include: (1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment . . . ." 19 F.4th at 110. As alleged in the SAC, one of the requirements for Medicaid reimbursement is that the services must be listed in the IEP. Thus, based on this factor, the SAC alleges material misrepresentations by NYC. Further, as set forth above, the SAC alleges that NYC billed Medicaid for services that were not provided at all. It cannot be doubted that such a misrepresentation is material. Indeed, in *Hussain*, the relator alleged that the "'contractor bill[ed] for something it did not provide.'" 2017 U.S. Dist. LEXIS 159538 at *14 (quoting *Kirk*, 601 F.3d at 114). This Court concluded that the plaintiff had stated a cause of action under the FCA. *Id.*

### Scienter

NYC's argument that the SAC fails to allege scienter also must fail. Plaintiff Relator has satisfied the requirements of Rule 9(b) with respect to his allegations of knowledge. Rule 9(b) provides: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This presumably is because of the inherent difficulty in alleging concrete facts related to a person's mental state. In the SAC, Plaintiff Relator alleges:

> 66.    The Relator also has first-hand knowledge that Defendants herein knowingly submitted false claims for related services purportedly offered to Special Education students via telehealth, phone, and otherwise, when Defendants were acutely aware that such services were contrary to those set forth in each Student's last-agreed-upon IEP, which required in-person services. Relator also has knowledge that some of these sessions were not offered to students with disabilities, despite Defendants' assertions that students within their jurisdictions were being educated in accordance with the law. *See*, M.H. v. New York City Dep't of Educ., 685 F.3d 217, 224 (2nd Cir., 2012) ("The IEP, the results of collaborations between parents, educators, and representatives of the school district, 'sets out the child's

present educational performance, establishes annual and short-term objectives for improvements in that performance, and *describes the specially designed instruction and services that will enable the child to meet those objectives*.") (emphasis added).

72.   Defendants fraudulently created Individualized Education Plans (IEPs) for special education students, knowing they could not implement these IEPs as written, thus knowingly denying students a FAPE.

103.   Relator alleges that by and through the efforts of Defendants CARRANZA and PORTER, and NYC DOE extracted from the State and Federal Governments hundreds of millions of dollars in payments when they:

   a.   knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval;

   b.   knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim;

   c.   knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government; and

   d.   conspired to commit the above acts, all in violation of 31 U.S.C. § 3729(a)(1)(A),(B),(C) & (G).

270.   The Defendants submitted "false claims" when its representatives submitted fraudulent representations that:

   A)   the IEPs they created were knowingly not in compliance with IDEA and they could not implement these IEPs, thereby denying the students a FAPE; and

   B)   when their service providers knowingly misrepresented that they were providing related services in accordance with IDEA and Medicaid regulations.

271.   These claims were legally false, since the provider knew it was in violation of federal regulations at the time of submission. Upon information and belief, the federal and state government disbursed the money for said fraudulent claims because the Defendants certified that they had complied with the relevant federal regulations.

NYC cites *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) for the proposition that, while knowledge may be pleaded generally, "generally is not the equivalent of conclusor[il]y." (ECF No. 169 at 24). *Krys* goes on to hold that a plaintiff must "'plead the events which they claim give rise to an inference of knowledge.'" 749 F.3d at 129 (quoting *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987)). As set forth above, the SAC alleges the "events that give rise to an inference of knowledge." NYC knew that services that were contrary to a student's last-agreed-upon IEP would not be eligible for Medicaid reimbursement. Similarly, NYC knew that creating IEPs that they knew they could not implement, thereby denying the students a FAPE, would disqualify them from Medicaid reimbursement for services provided contrary to those IEPs. Finally, NYC knew that it could not be reimbursed for services it did not provide at all. The attendant "events," alleged in the SAC, create an inference of knowledge that NYC's Medicaid claims were fraudulent.

NYC relies heavily on the "guidance" provided by the USDOE and various state agencies, including the NYSED. (ECF 169 at 26-27). This reliance is misplaced for multiple reasons. First, the guidance NYC cites is outside the four corners of the SAC. "A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading. Thus, in deciding such a motion to dismiss, 'the Court must limit its analysis to the four corners of the complaint.'" *Maniolos v. United States*, 741 F. Supp. 2d 555, 560 (S.D.N.Y. 2010) (quoting *Vassilatos v. Ceram Tech Int'l, Ltd.*, 92 Civ. 4574, 1993 U.S. Dist. LEXIS 6620, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin*, 922 F.2d 152, 154-55 (2d Cir. 1991))). NYC requests the Court look beyond the confines of the SAC and consider guidance provided by various agencies. This Court may not do so. Even if this Court took the guidance into account, it has no bearing on whether Plaintiff Relator stated a cause of action; it merely serves as a defense against Plaintiff Relator's claims and is subject to interpretation.

Second, it is common sense that certain services cannot be provided remotely. While the USDOE and other agencies may have provided guidance that educational services may be provided remotely, obviously this does not include services that cannot physically be provided remotely. For example, many services provided pursuant to IEPs, such as physical therapy, require actual physical contact between the therapist and the student. As set forth above, J.R.'s 2020 and 2021 IEP highlights, "Home instruction would be too restrictive for [J.R.]'s social and academic progress at this time." **Exhibit 3**, p. 28 ("*Other Options Considered*"). (SAC at ¶ 84). Yet, despite this, "NYC recommended J.R. for individual remote Speech Services for twenty minutes, once a week, *by telephone. See*, **Exhibit 4**." (*Id.* at ¶ ¶ 86) (emphasis in original). J.R.'s other related services, Occupational Therapy and Physical Therapy, were recommended to be performed via tele-therapy. (*Id.* at ¶ 87). NYC cannot hide behind general guidance given by the USDOE in remotely providing services that either cannot be provided remotely or are of no value when provided remotely. IEPs must be considered individually and with the specific needs of the child in mind, and cannot be lumped together under a general standard that was drafted primarily for non-disabled students, and obviously did not consider the individual needs of individual disabled students.

Third, the SAC alleges violations of the billing requirements of the Medicare statute and the IDEA, both federal statutes. NYC provides no authority for its inference that executive branch agencies, not to mention state agencies, have the authority to abrogate, alter, or modify the provisions of a federal statute. In fact, the Supreme Court recently has severely limited the *Chevron* deference previously accorded to government agencies in interpreting statutes. In *American Hospital Association v. Becerra*, 142 S. Ct. 1896 (2022) the Supreme Court addressed HHS reimbursement of hospital costs for certain prescription drugs, as directed by the Medicare Act.

Under the Act, HHS has two options for setting reimbursement rates: it may conduct a survey of hospital acquisition costs, in which case it may vary the rate of reimbursement "by hospital group" (Option 1); or, it must "obtain price data from drug manufacturers," in which case it "must set reimbursement rates based on 'the average price for the drug' as 'calculated and adjusted by the Secretary as necessary for purposes of' this statutory provision" (Option 2). *Id.* at 1903. Under Option 2, HHS may not vary the rate based on hospital group. *Id.*

In the case at bar, HHS varied the rates of reimbursement by hospital group without conducting the survey required by the statute. HHS argued that it was entitled to do so since, even when it does not conduct a survey, it is authorized to adjust the rate, under Option 2. *Id.* at 1904. The Supreme Court disagreed:

> HHS's interpretation not only would render irrelevant the survey prerequisite for varying reimbursement rates by hospital group, but also would render largely irrelevant the provision of the statute that precisely details the requirements for surveys of hospitals' acquisition costs. See §1395l(t)(14)(D). We must hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text.

*Id.* at 1905. Thus, even HHS was not authorized to alter the terms of the statute governing its own reimbursement of hospital prescription drug costs.

In the instant case, the IDEA is clear that students must be provided a FAPE. For disabled students, a FAPE must comport with the student's IEP. As alleged in the SAC, "a FAPE must be provided in order to submit claims for Medicaid reimbursement for related services" (¶ 94), and "one of the conditions that must be met for Medicaid to reimburse for IDEA-related services is that "[t]he services *must* be listed in the child's individualized education program (IEP)." (¶ 81). The SAC also alleges: "As set forth in Section 411(k)(13) of the Medicare Catastrophic Coverage Act of 1988, billing for related services must mirror (at maximum) the services recommended in each student's IEP." (*Id.* at ¶ 106). Contrary to NYC's argument, neither the USDOE, the CMS,

nor any state agency may vary these statutory requirements, as the Supreme Court set forth in *AHA*. Thus, any agency "guidance" that is contrary to codified statutory requirements is false guidance.

NYC gives the example of Texas "fail[ing] to provide an assurance that it had policies and procedures in place to ensure" a FAPE to all students. (ECF 169 at 27). NYC then states that "there is no indication that USDOE reduced Texas' IDEA grant award." (*Id.*). First, there is no indication that USDOE *did not* reduce Texas' award. At the motion to dismiss stage, this possibility certainly cannot serve as the basis to find that Plaintiff Relator has failed to plead a cause of action.

Second, even if it were known that the USDOE did not reduce Texas' award, this would not be sufficient grounds to dismiss Plaintiff Relator's claims. *Foreman* listed "relevant factors in evaluating materiality": "(1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was minor or insubstantial." 19 F.4th at 110 (internal citation and quotation marks omitted). The Court held that "[n]o one factor is dispositive, and our inquiry is holistic." *Id.* (internal citation and quotation marks omitted). Thus, one example of one school district failing to comply with the statutory requirements, and possibly receiving a full reward anyway, cannot be the basis for dismissing the SAC for failure to state a claim.

### D.  The SAC has Stated a Valid Claim for Worthless Services

Worthless services claims "assert 'the knowing request of federal reimbursement for a procedure with no medical value.'" *United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, 2021 U.S. Dist. LEXIS 153871 *26 (S.D. N.Y. Aug. 13, 2021) (quoting *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), abrogated by *Universal Health Servs., Inc. v.*

*United States*, 579 U.S. 176, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016). "Services are considered 'worthless' when 'the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all.'" *Id.* (quoting *Mikes*, 274 F.3d at 703).

NYC argues that Plaintiff Relator alleges only the offer of services, but not the performance. (ECF 169 at 27-28). Not so. The SAC alleges that Defendants "conducted related services for students with disabilities via telehealth and/or via phone," (¶ 1), and "[d]ue to the profound nature of their disabilities, known to both the Defendants and related providers, these students were unable to meaningfully participate in these remote 'sessions,' yet Defendants fraudulently billed for these 'sessions' through Medicaid at their regular, full rates." (¶ 2). The SAC alleges further that NYC "billed Medicaid for J.R.'s speech services, despite *rendering a service* that does not meet the requirements for Medicaid and/or IDEA reimbursement, and a service that was of no benefit whatsoever to J.R." (¶ 88 (emphasis added, additional emphasis in original omitted)). The SAC alleges further that a NYC "assistant principal admitted that though S.J.D.'s IEP mandates physical therapy in 60-minute sessions, the physical therapist at the school would only provide 40 minutes of therapy and underline leaves the student for 20 minutes, without the physical therapist. **Exhibit 6,** p. 44-45, 47 (emphasis added)." (*Id.* at ¶ 92).

NYC argues that the SAC does not allege that services were worthless, but simply of reduced value. (ECF 169 at 28-29). Again, this is not so. The SAC alleges that Defendants billed for services that provided "no meaningful benefit to students with disabilities." (SAC at ¶ 68). Further, the SAC alleges that NYC "billed Medicaid for J.R.'s speech services, despite rendering a service that does not meet the requirements for Medicaid and/or IDEA reimbursement, and a service that was of *no benefit whatsoever* to J.R." (¶ 88 (emphasis added, additional emphasis in original omitted)).

NYC argues a lack of scienter and materiality. Again, as set forth above, the SAC alleges that Defendants "conducted related services for students with disabilities via telehealth and/or via phone," (¶ 1), and "[d]ue to the profound nature of their disabilities, *known to both the Defendants and related providers*, these students were unable to meaningfully participate in these remote 'sessions,' yet Defendants fraudulently billed for these 'sessions' through Medicaid at their regular, full rates." (¶ 2) (emphasis added). The SAC further alleges that "J.R.'s 2020 and 2021 IEP highlights, 'Home instruction would be too restrictive for [J.R.]'s social and academic progress at this time.' **Exhibit 3**, p. 28 ("*Other Options Considered*")." (¶ 84). The SAC alleges that NYC "fraudulently created IEPs including in-person services, for the 2019-2020 and 2020-2021 school years for these students they knew they could not implement during the COVID-19 situation." (¶ 80). The SAC alleges that NYC "knowingly submitted false claims for related services purportedly offered to Special Education students via telehealth, phone, and otherwise, when Defendants were acutely aware that such services were contrary to those set forth in each Student's last-agreed-upon IEP, which required in-person services." (¶ 66). The SAC further alleges that "Defendants fraudulently created Individualized Education Plans (IEPs) for special education students, knowing they could not implement these IEPs as written, thus knowingly denying students a FAPE." (¶ 72). The SAC alleges: "the IEPs [Defendants] created were knowingly not in compliance with IDEA and they could not implement these IEPs, thereby denying the students a FAPE." (¶ 270).

For their materiality argument, NYC again relies upon the "guidance" of state Medicaid agencies. They argue that since, with one broad stroke, these agencies determined that remote services constituted a FAPE for all students in all circumstances everywhere at any time, including disabled students, Plaintiff Relator cannot allege that services that cannot be performed remotely

are not worthless. (ECF 169 at 29-30). For the reasons set forth more fully above, this argument fails.

<u>**CONCLUSION**</u>

Based on the foregoing, all of the arguments NYC raises in its Memorandum in Support of its Motion to Dismiss fail, and Plaintiff-Relator respectfully requests that this Court deny the Motion in its entirety.


Dated:       August 12, 2022
             New York, New York

                                          Respectfully submitted,

                                          __/s/_____
                                          Rory J. Bellantoni, Esq. (RB 2901)
                                          Ashleigh C. Rousseau, Esq. (5801923)
                                          Brain Injury Rights Group, Ltd.
                                          *Attorneys for Plaintiff-Relator*
                                          300 E. 95th Street, #130
                                          New York, New York 10128
                                          rory@pabilaw.org
                                          ashleigh@pabilaw.org